**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| THE STATE OF TEXAS,<br><br>    *Plaintiff,*<br><br>    v.<br><br>MIGUEL CARDONA, in his official<br>capacity as Secretary of Education, et al.,<br><br>    *Defendants.* | No. 4:23-cv-604-O |

**DEFENDANT DEPARTMENT OF EDUCATION'S CERTIFICATION OF THE
CONTENTS OF THE ADMINISTRATIVE RECORD**

I, Francisco Lopez, pursuant to the provisions of 20 U.S.C. § 3472 and the authority

delegated to me from the General Counsel of the U.S. Department of Education, do hereby declare

as follows:

1.      I am the Acting Assistant General Counsel for the Division of Educational

Equity in the Office of the General Counsel, United States Department of Education

("Department"). I have served in this capacity since May 2023. Prior to this, I served as the

Deputy Assistant General Counsel for the Division of Educational Equity in the Office of the

General Counsel at the Department since January 2012. In my capacity as Acting Assistant

General Counsel, I provide, and supervise the provision of, legal advice and services to the

Department on civil rights, special education and vocational rehabilitative services, and other

equity issues.

2.      To the best of my knowledge, the documents listed in the attached Index

constitute a true and accurate copy of the agency record pertaining to the Notice of Interpretation,

86 Fed. Reg. 32,637 (June 22, 2021). The Index does not include statutes, regulations, and case

1

law cited in the Notice of Interpretation.

3.      To the best of my knowledge, the materials directly cited in the Dear Educator Letter on the 49th Anniversary of Title IX (June 23, 2021), and Joint Fact Sheet, Confronting Anti-LGBTQI+ Harassment in Schools (June 23, 2021), attached, comprise the agency record pertaining to those documents.[1] All of those record materials are publicly available, and so are not attached here separately. However, should the Court request that Defendants separately file these publicly available materials, they will do so.

4.      The statements made in this declaration are based upon my personal knowledge and the information provided to me in the course of my official duties.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Dated:  9/13/2023

FRANCISCO LOPEZ
Acting Assistant General Counsel
Division of Educational Equity
Office of the General Counsel
United States Department of Education

---

[1]     In providing this Certification, Defendants do not concede that the challenged documents constitute final agency action or legislative rules, or waive any arguments that they may raise on these grounds, or any others.

2

# Exhibit A
# Notice of Interpretation
# Index and Record

*Texas v. Cardona*, No. 4:23-cv-604 (N.D. Tex.)
**Administrative Record for Notice of Interpretation**
**Index**

| BATES RANGE | DESCRIPTION |
|---|---|
| **Notice of Interpretation and Documents cited in it (excluding cited case law and statutes)** ||
| 000001 – 000004 | U.S. Dep't of Educ., Office for Civil Rights, Notice of Interpretation: Enforcement of Title IX with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County* (June 22, 2021) |
| 000005 – 000007 | Memorandum from Principal Deputy Assistant Attorney General for Civil Rights Pamela S. Karlan to Federal Agency Civil Rights Directors and General Counsels regarding Application of *Bostock v. Clayton County* to Title IX of the Education Amendments of 1972 (Mar. 26, 2021) |
| 000008 – 000041 | U.S. Dep't of Educ., Office for Civil Rights, Case Processing Manual (Aug. 26, 2020) |
| **Other documents considered or relied upon, directly or indirectly** ||
| 000042 – 000059 | U.S. Dep't of Educ., Office for Civil Rights, Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 FR 12034, 12039 (Mar. 13, 1997) (revised in 2001) |
| 000060 – 000107 | U.S. Dep't of Educ., Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties at 3, noticed at 66 FR 5512 (Jan. 19, 2001) (rescinded Aug. 14, 2020) |
| 000108 – 000117 | U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter: Harassment and Bullying (Oct. 26, 2010) |
| 000118 – 000135 | OCR Case No. 09-12-1020, Arcadia Unified Sch. Dist. (July 24, 2013) (resolution letter and agreement) |
| 000136 – 000188 | U.S. Dep't of Educ., Office for Civil Rights, Q&A on Title IX and Sexual Violence (Apr. 29, 2014) (rescinded in 2017) |
| 000189 – 000224 | U.S. Dep't of Educ., Office for Civil Rights, Q&A on Title IX and Single-sex Elementary and Secondary Classes and Extracurricular Activities (Dec. 1, 2014) |
| 000225 – 000233 | U.S. Dep't of Justice and U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter on Title IX and Transgender Students (May 13, 2016) (rescinded in 2017) |
| 000234 – 000236 | U.S. Dep't of Justice and U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter on Transgender Students (Feb. 22, 2017) |
| 000237 – 000238 | U.S. Dep't of Educ., Office for Civil Rights, Letter from Assistant Secretary Kenneth L. Marcus to Representative Mark E. Green (Mar. 9, 2020) |
| 000239 – 000242 | U.S. Dep't of Educ., Final Rule: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 FR 30176-30179 (May 19, 2020) |
| 000243 – 000245 | OCR Case No. 04-20-1409, Shelby Cnty. Sch. Dist. (Aug. 31, 2020) (letter |

| | of notification) |
|---|---|
| 000246 – 000294 | OCR Case No. 01-19-4025, Conn. Interscholastic Athletic Conf. et al. (Aug. 31, 2020) (revised letter of impending enforcement action) |
| 000295 – 000307 | Memorandum from Principal Deputy General Counsel delegated the authority and duties of the General Counsel, Reed D. Rubinstein to Kimberly M. Richey, Acting Assistant Secretary of the Office for Civil Rights (January 8, 2021) (archived and marked not for reliance 2021) |
| 000308 – 000310 | Executive Order on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, E.O. 13988, 86 FR 7023 (Jan. 25, 2021) |
| 000311 – 000312 | Executive Order on Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity, E.O. 14021, 86 FR 13803 (Mar. 11, 2021) |

requirements, Security measures, Waterways.

For the reasons discussed in the preamble, the Coast Guard amends 33 CFR part 165 as follows:

## PART 165—REGULATED NAVIGATION AREAS AND LIMITED ACCESS AREAS

■ 1. The authority citation for part 165 continues to read as follows:

**Authority:** 46 U.S.C. 70034, 70051; 33 CFR 1.05–1, 6.04–1, 6.04–6, and 160.5; Department of Homeland Security Delegation No. 0170.1.

■ 2. Add § 165.T11–057 to read as follows:

### § 165.T11–057  Safety Zone; Southwest Shelter Island Channel Entrance Closure, San Diego, CA.

(a) *Location.* The following area is a safety zone: The Northeast Shelter Island Channel Entrance and all navigable waters of San Diego Bay encompassed by by a three hundred yard circle centered on the coordinate 32°43′13.7″ N, longitude 117°13′7.8″ W.

(b) *Definitions.* As used in this section, *designated representative* means a Coast Guard Patrol Commander, including a Coast Guard coxswain, petty officer, or other officer operating a Coast Guard vessel and a Federal, State, and local officer designated by or assisting the Captain of the Port Sector San Diego (COTP) in the enforcement of the safety zone.

(c) *Regulations.* (1) Under the general safety zone regulations in subpart C of this part, you may not enter the safety zone described in paragraph (a) of this section unless authorized by the COTP or the COTP's designated representative.

(2) To seek permission to enter, contact the COTP or the COTP's representative by VHF Channel 16. Those in the safety zone must comply with all lawful orders or directions given to them by the COTP or the COTP's designated representative.

(d) *Enforcement period.* This section will be enforced from 8:30 a.m. until 10:30 a.m. on June 22, 2021.

Dated: June 16, 2021.

**T.J. Barelli,**

*Captain, U.S. Coast Guard, Captain of the Port Sector San Diego.*

[FR Doc. 2021–13136 Filed 6–21–21; 8:45 am]

**BILLING CODE 9110–04–P**

## DEPARTMENT OF EDUCATION

### 34 CFR Chapter I

### Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County

**AGENCY:** Office for Civil Rights, Department of Education.

**ACTION:** Interpretation.

**SUMMARY:** The U.S. Department of Education (Department) issues this interpretation to clarify the Department's enforcement authority over discrimination based on sexual orientation and discrimination based on gender identity under Title IX of the Education Amendments of 1972 in light of the Supreme Court's decision in *Bostock* v. *Clayton County.* This interpretation will guide the Department in processing complaints and conducting investigations, but it does not itself determine the outcome in any particular case or set of facts.

**DATES:** This interpretation is effective June 22, 2021.

**FOR FURTHER INFORMATION CONTACT:** Alejandro Reyes, Director, Program Legal Group, Office for Civil Rights. Telephone: (202) 245–7272. Email: *Alejandro.Reyes@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll-free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

*Background:* Title IX of the Education Amendments of 1972, 20 U.S.C. 1681–1688, prohibits discrimination on the basis of sex in any education program or activity offered by a recipient of Federal financial assistance. The Department's Office for Civil Rights (OCR) is responsible for the Department's enforcement of Title IX.

OCR has long recognized that Title IX protects all students, including students who are lesbian, gay, bisexual, and transgender, from harassment and other forms of sex discrimination. OCR also has long recognized that Title IX prohibits harassment and other forms of discrimination against all students for not conforming to stereotypical notions of masculinity and femininity. But OCR at times has stated that Title IX's prohibition on sex discrimination does not encompass discrimination based on sexual orientation and gender identity. To ensure clarity, the Department issues this Interpretation addressing Title IX's coverage of discrimination based on sexual orientation and gender identity

in light of the Supreme Court decision discussed below.

In 2020, the Supreme Court in *Bostock* v. *Clayton County,* 140 S. Ct. 1731, 590 U.S. ___ (2020), concluded that discrimination based on sexual orientation and discrimination based on gender identity inherently involve treating individuals differently because of their sex. It reached this conclusion in the context of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.,* which prohibits sex discrimination in employment. As noted below, courts rely on interpretations of Title VII to inform interpretations of Title IX.

The Department issues this Interpretation to make clear that the Department interprets Title IX's prohibition on sex discrimination to encompass discrimination based on sexual orientation and gender identity and to provide the reasons for this interpretation, as set out below.

*Interpretation:*

Title IX Prohibits Discrimination Based on Sexual Orientation and Gender Identity.

Consistent with the Supreme Court's ruling and analysis in *Bostock,* the Department interprets Title IX's prohibition on discrimination ''on the basis of sex'' to encompass discrimination on the basis of sexual orientation and gender identity. As was the case for the Court's Title VII analysis in *Bostock,* this interpretation flows from the statute's ''plain terms.'' *See Bostock,* 140 S. Ct. at 1743, 1748–50. Addressing discrimination based on sexual orientation and gender identity thus fits squarely within OCR's responsibility to enforce Title IX's prohibition on sex discrimination.

### I. The Supreme Court's Ruling in Bostock

The Supreme Court in *Bostock* held that sex discrimination, as prohibited by Title VII, encompasses discrimination based on sexual orientation and gender identity. The Court explained that to discriminate on the basis of sexual orientation or gender identity ''requires an employer to intentionally treat individual employees differently because of their sex.'' 140 S. Ct. at 1742.[1] As the Court also explained,

---

[1] The Court recognized that the parties in *Bostock* each presented a definition of ''sex'' dating back to Title VII's enactment, with the employers' definition referring to ''reproductive biology'' and the employees' definition ''capturing more than anatomy[.]'' 140 S. Ct. at 1739. The Court did not adopt a definition, instead ''assum[ing]'' the definition of sex provided by the employers that the employees had accepted ''for argument's sake.'' *Id.* As the Court made clear, it did not need to adopt
Continued

when an employer discriminates against a person for being gay or transgender, the employer necessarily discriminates against that person for "traits or actions it would not have questioned in members of a different sex." *Id.* at 1737.

The Court provided numerous examples to illustrate why "it is impossible to discriminate against a person" because of their sexual orientation or gender identity "without discriminating against that individual based on sex." *Id.* at 1741. In one example, when addressing discrimination based on sexual orientation, the Court stated:

> Consider, for example, an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge.

*Id.*

In another example, the Court showed why singling out a transgender employee for different treatment from a non-transgender (*i.e.,* cisgender) employee is discrimination based on sex:

> [T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

*Id.* at 1741–42.

## II. Bostock's Application to Title IX

For the reasons set out below, the Department has determined that the interpretation of sex discrimination set out by the Supreme Court in *Bostock*— that discrimination "because of . . . sex" encompasses discrimination based on sexual orientation and gender identity—properly guides the

Department's interpretation of discrimination "on the basis of sex" under Title IX and leads to the conclusion that Title IX prohibits discrimination based on sexual orientation and gender identity.

*a. There is textual similarity between Title VII and Title IX.*

Like Title VII, Title IX prohibits discrimination based on sex.

Title IX provides, with certain exceptions: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. 1681(a).

Title VII provides, with certain exceptions: "It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[ ] . . .; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex[ ] . . . ." 42 U.S.C. 2000e–2(a). (Title VII also prohibits discrimination based on race, color, religion, and national origin).

Both statutes prohibit sex discrimination, with Title IX using the phrase "on the basis of sex" and Title VII using the phrase "because of" sex. The Supreme Court has used these two phrases interchangeably. In *Bostock*, for example, the Court described Title VII in this way: "[I]n Title VII, Congress outlawed discrimination in the workplace *on the basis of* race, color, religion, sex, or national origin." 140 S. Ct. at 1737 (emphasis added); *id.* at 1742 ("[I]ntentional discrimination *based on sex* violates Title IX . . . ." (emphasis added); *see also Jackson* v. *Birmingham Bd. of Educ.,* 544 U.S. 167, 174 (2005) ("[W]hen a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' '*on the basis of* sex,' in violation of Title IX." (second emphasis added)); *Meritor Sav. Bank* v. *Vinson,* 477 U.S. 57, 64 (1986) ("[W]hen a supervisor sexually harasses a subordinate *because of* the subordinate's sex, that supervisor 'discriminate[s]' *on the basis of sex.*" (emphasis added)).

In addition, both statutes specifically protect *individuals* against

discrimination. In *Bostock,* 140 S. Ct. at 1740–41, the Court observed that Title VII "tells us three times—including immediately after the words 'discriminate against'—that our focus should be on individuals." The Court made a similar observation about Title IX, which uses the term *person,* in *Cannon* v. *University of Chicago,* 441 U.S. 677, 704 (1979), stating that "Congress wanted to avoid the use of federal resources to support discriminatory practices [and] to provide *individual* citizens effective protection against those practices." *Id.* (emphasis added).

Further, the text of both statutes contains no exception for sex discrimination that is associated with an individual's sexual orientation or gender identity. As the Court stated in *Bostock,* "when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule." 140 S. Ct. at 1747. The Court has made a similar point regarding Title IX: "[I]f we are to give Title IX the scope that its origins dictate, we must accord it a sweep as broad as its language." *N. Haven Bd. of Ed.* v. *Bell,* 456 U.S. 512, 521 (1982) (citations and internal alterations omitted). It also bears noting that, in interpreting the scope of Title IX's prohibition on sex discrimination the Supreme Court and lower Federal courts have often relied on the Supreme Court's interpretations of Title VII. *See, e.g., Franklin* v. *Gwinnett Cnty. Pub. Sch.,* 503 U.S. 60, 75 (1992); *Jennings* v. *Univ. of N.C.,* 482 F.3d 686, 695 (4th Cir. 2007); *Frazier* v. *Fairhaven Sch. Comm.,* 276 F.3d 52, 66 (1st Cir. 2002); *Gossett* v. *Oklahoma ex rel. Bd. of Regents for Langston Univ.,* 245 F.3d 1172, 1176 (10th Cir. 2001).

Moreover, the Court in *Bostock* found that "no ambiguity exists about how Title VII's terms apply to the facts before [it]"—*i.e.,* allegations of discrimination in employment against several individuals based on sexual orientation or gender identity. 140 S. Ct. at 1749. After reviewing the text of Title IX and Federal courts' interpretation of Title IX, the Department has concluded that the same clarity exists for Title IX. That is, Title IX prohibits recipients of Federal financial assistance from discriminating based on sexual orientation and gender identity in their education programs and activities. The Department also has concluded for the reasons described in this document that, to the extent other interpretations may exist, this is the best interpretation of the statute.

In short, the Department finds no persuasive or well-founded basis for declining to apply *Bostock's* reasoning—discrimination "because of

---

either definition to conclude that discrimination "because of . . . sex" encompasses discrimination based on sexual orientation and gender identity. *Id.* ("[N]othing in our approach to these cases turns on the outcome of the parties' debate . . . ."). Similar to the Court's interpretation of Title VII, the Department's interpretation of the scope of discrimination "on the basis of sex" under Title IX does not require the Department to take a position on the definition of sex, nor do we do so here.

. . . sex'' under Title VII encompasses discrimination based on sexual orientation and gender identity—to Title IX's parallel prohibition on sex discrimination in federally funded education programs and activities.

*b. Additional case law recognizes that the reasoning of* Bostock *applies to Title IX and that differential treatment of students based on gender identity or sexual orientation may cause harm.*

Numerous Federal courts have relied on *Bostock* to recognize that Title IX's prohibition on sex discrimination encompasses discrimination based on sexual orientation and gender identity. *See, e.g., Grimm* v. *Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *reh'g en banc denied,* 976 F.3d 399 (4th Cir. 2020), *petition for cert filed,* No. 20–1163 (Feb. 24, 2021); *Adams* v. *Sch. Bd. of St. Johns Cnty.,* 968 F.3d 1286, 1305 (11th Cir. 2020), *petition for reh'g en banc pending,* No. 18–13592 (Aug. 28, 2020); *Koenke* v. *Saint Joseph's Univ.,* No. CV 19–4731, 2021 WL 75778, at *2 (E.D. Pa. Jan. 8, 2021); *Doe* v. *Univ. of Scranton,* No. 3:19–CV–01486, 2020 WL 5993766, at *11 n.61 (M.D. Pa. Oct. 9, 2020).

The Department also concludes that the interpretation set forth in this document is most consistent with the purpose of Title IX, which is to ensure equal opportunity and to protect individuals from the harms of sex discrimination. As numerous courts have recognized, a school's policy or actions that treat gay, lesbian, or transgender students differently from other students may cause harm. *See, e.g., Grimm,* 972 F.3d at 617–18 (describing injuries to a transgender boy's physical and emotional health as a result of denial of equal treatment); *Adams,* 968 F.3d at 1306–07 (describing ''emotional damage, stigmatization and shame'' experienced by a transgender boy as a result of being subjected to differential treatment); *Whitaker ex rel. Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034, 1044–46, 1049–50 (7th Cir. 2017) (describing physical and emotional harm to a transgender boy who was denied equal treatment); *Dodds* v. *U.S. Dep't of Educ.,* 845 F.3d 217, 221–22 (6th Cir. 2016) (describing ''substantial and immediate adverse effects on the daily life and well-being of an eleven-year-old'' transgender girl from denial of equal treatment); *Doe,* 2020 WL 5993766, at **1–3 (describing harassment and physical targeting of a gay college student that interfered with the student's educational opportunity); *Harrington ex rel. Harrington* v. *City of Attleboro,* No. 15–CV–12769–DJC, 2018

WL 475000, at **6–7 (D. Mass. Jan. 17, 2018) (describing '' 'wide-spread peer harassment' and physical assault [of a lesbian high school student] because of stereotyping animus focused on [the student's] sex, appearance, and perceived or actual sexual orientation'').

*c. The U.S. Department of Justice's Civil Rights Division has concluded that* Bostock's *analysis applies to Title IX.*

The U.S. Department of Justice's Civil Rights Division issued a Memorandum from Principal Deputy Assistant Attorney General for Civil Rights Pamela S. Karlan to Federal Agency Civil Rights Directors and General Counsels regarding Application of *Bostock* v. *Clayton County* to Title IX of the Education Amendments of 1972 (Mar. 26, 2021), *https://www.justice.gov/ crt/page/file/1383026/download.*

The memorandum stated that, after careful consideration, including a review of case law, ''the Division has determined that the best reading of Title IX's prohibition on discrimination 'on the basis of sex' is that it includes discrimination on the basis of gender identity and sexual orientation.'' Indeed, ''the Division ultimately found nothing persuasive in the statutory text, legislative history, or caselaw to justify a departure from *Bostock's* textual analysis and the Supreme Court's longstanding directive to interpret Title IX's text broadly.''

### III. Implementing This Interpretation

Consistent with the analysis above, OCR will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department. As with all other Title IX complaints that OCR receives, any complaint alleging discrimination based on sexual orientation or gender identity also must meet jurisdictional requirements as defined in Title IX and the Department's Title IX regulations, other applicable legal requirements, as well as the standards set forth in OCR's Case Processing Manual, *www.ed.gov/ ocr/docs/ocrcpm.pdf.*[2]

Where a complaint meets applicable requirements and standards as just described, OCR will open an investigation of allegations that an individual has been discriminated against because of their sexual orientation or gender identity in education programs or activities. This includes allegations of individuals being

harassed, disciplined in a discriminatory manner, excluded from, denied equal access to, or subjected to sex stereotyping in academic or extracurricular opportunities and other education programs or activities, denied the benefits of such programs or activities, or otherwise treated differently because of their sexual orientation or gender identity. OCR carefully reviews allegations from anyone who files a complaint, including students who identify as male, female or nonbinary; transgender or cisgender; intersex; lesbian, gay, bisexual, queer, heterosexual, or in other ways.

While this interpretation will guide the Department in processing complaints and conducting investigations, it does not determine the outcome in any particular case or set of facts. Where OCR's investigation reveals that one or more individuals has been discriminated against because of their sexual orientation or gender identity, the resolution of such a complaint will address the specific compliance concerns or violations identified in the course of the investigation.

This interpretation supersedes and replaces any prior inconsistent statements made by the Department regarding the scope of Title IX's jurisdiction over discrimination based on sexual orientation and gender identity. This interpretation does not reinstate any previously rescinded guidance documents.

*Accessible Format:* On request to the contact person listed under **FOR FURTHER INFORMATION CONTACT**, individuals with disabilities can obtain this document in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register.** You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register,** in text or Portable Document Format (PDF). To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit

---

[2] Educational institutions that are controlled by a religious organization are exempt from Title IX to the extent that compliance would not be consistent with the organization's religious tenets. *See* 20 U.S.C. 1681(a)(3).

your search to documents published by the Department.

**Suzanne B. Goldberg,**

*Acting Assistant Secretary for Civil Rights.*

[FR Doc. 2021–13058 Filed 6–21–21; 8:45 am]

**BILLING CODE 4000–01–P**

---

## DEPARTMENT OF COMMERCE

### Patent and Trademark Office

### 37 CFR Part 11

**[Docket No.: PTO–C–2013–0042]**

**RIN 0651–AC91**

### Changes to Representation of Others Before the United States Patent and Trademark Office; Correction

**AGENCY:** United States Patent and Trademark Office, Commerce.

**ACTION:** Final rule; correction.

**SUMMARY:** The United States Patent and Trademark Office (USPTO or Office) is correcting an earlier final rule, "Changes to the Representation of Others Before the United States Patent and Trademark Office," that appeared in the **Federal Register** on May 26, 2021 and which takes effect on June 25, 2021. This document corrects a minor error. No other changes are being made to the underlying final rule.

**DATES:** This rule is effective June 25, 2021.

**FOR FURTHER INFORMATION CONTACT:** William R. Covey, Deputy General Counsel for Enrollment and Discipline and Director of the Office of Enrollment and Discipline, at 571–272–4097.

**SUPPLEMENTARY INFORMATION:** This document corrects an error pertaining to revisions to definitions made in the final rule. Specifically, the Office intended to change the listed definition of "Roster" to "Roster or register." The Code of Federal Regulations editors informed the Office that the original **Federal Register** instruction to "revise" the definition was incorrect. Rather, the correct instruction should be to "remove and add" the intended definition. This document corrects that instruction.

In FR Doc. 2021–10528, appearing on page 28442 in the **Federal Register** of Wednesday, May 26, 2021, the following correction is made:

### § 11.1 [Corrected]

■ On page 28452, in the first column, in part 11, correct amendatory instruction 4 to read as follows:

■ 4. Amend § 11.1 by:

■ a. Revising the definitions of "Conviction or convicted" and "Practitioner;"

■ b. Removing the entry for "Roster" and adding, in alphabetical order, an entry for "Roster or register;" and

■ c. Revising the definitions for "Serious crime" and "State."

The revisions and addition read as follows:

**Andrew Hirshfeld,**

*Commissioner for Patents, Performing the Functions and Duties of the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

[FR Doc. 2021–13145 Filed 6–21–21; 8:45 am]

**BILLING CODE 3510–16–P**

---

## LIBRARY OF CONGRESS

### Copyright Office

### 37 CFR Parts 201, 202, 203, 210, and 370

**[Docket No. 2021–3]**

### Technical Amendments Regarding the Copyright Office's Organizational Structure

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Final rule.

**SUMMARY:** This final rule makes technical changes to the U.S. Copyright Office's regulations pertaining to its organizational structure in light of the agency's recent reorganization. It reflects recent structural changes, updates certain of the Office's division names, and adds a new section for the Copyright Claims Board established by the Copyright Alternative in Small-Claims Enforcement Act of 2020.

**DATES:** Effective July 22, 2021.

**FOR FURTHER INFORMATION CONTACT:** Regan A. Smith, General Counsel and Associate Register of Copyrights, by email at *regans@copyright.gov,* Kevin R. Amer, Deputy General Counsel, by email at *kamer@copyright.gov,* or Joanna R. Blatchly, Attorney-Advisor, by email at *jblatchly@copyright.gov* or by telephone at (202) 707–8350.

**SUPPLEMENTARY INFORMATION:** The Copyright Office is publishing this final rule pursuant to its May 2021 reorganization. This effort is intended to accomplish two goals: (1) Rename divisions and realign certain reporting structures to improve the Office's effectiveness and efficiency; and (2) reflect the agency structure for the new copyright small-claims tribunal established by the Copyright Alternative

in Small-Claims Enforcement ("CASE") Act of 2020.[1] The Register has determined that these changes will optimize business processes and aid in the administration of her functions and duties as Director of the Copyright Office.[2]

*Operational reorganization.* The reorganization reduces the number of direct reports to the Register of Copyrights and is expected to create administrative and cost efficiencies by consolidating operational organizations currently headed by senior-level positions. The reorganization brings the Office of the Chief Financial Officer (renamed the Financial Management Division) and the Copyright Modernization Office (renamed the Product Management Division) under the supervision of the Chief of Operations (renamed the Assistant Register and Director of Operations ("ARDO")). Realigning these divisions under the ARDO consolidates operational support elements under one senior manager, in line with operational structures across the Library of Congress. This consolidation is expected to facilitate Office coordination with centralized Library services, and with similar functional elements of other service units. It is also expected to allow the Office to increase the effectiveness of communications across areas of operational responsibility, in alignment with strategic objectives.

The reorganization renames certain organizational elements and senior positions for purposes of greater clarity and consistency. The Office of Public Records and Repositories is renamed the Office of Copyright Records. As noted above, the Office of the Chief of Operations is renamed the Office of the Director of Operations. The following subordinate offices are also renamed: The Copyright Acquisitions Division ("CAD") is renamed Acquisitions and Deposits ("A&D"); the Administrative Services Office ("ASO") is renamed the Administrative Services Division ("ASD"); and the Receipt Analysis and Control Division ("RAC") is renamed the Materials Control and Analysis Division ("MCA"). The Copyright Modernization Office ("CMO") is renamed the Product Management Division ("PMD").

Further, the Office of the Chief Financial Officer ("CFO") is renamed the Financial Management Division ("FMD") and work units under this division are also renamed, including by

---

[1] Public Law 116–260, sec. 212, 134 Stat. 1182, 2176 (2020).

[2] *See* 17 U.S.C. 701(a).



**U.S. Department of Justice**

Civil Rights Division

---

*Principal Deputy Assistant Attorney General*
*950 Pennsylvania Ave, NW - RFK*
*Washington, DC 20530*

**MEMORANDUM**                                        March 26, 2021

**TO:**          Federal Agency Civil Rights Directors and General Counsels

**FROM:**        Principal Deputy Assistant Attorney General Pamela S. Karlan          *PSK*
                 Civil Rights Division

**SUBJECT:**     Application of *Bostock v. Clayton County* to Title IX of the Education
                 Amendments of 1972

---

Several federal agencies have recently contacted the Civil Rights Division with questions regarding the application of the Supreme Court's reasoning in *Bostock v. Clayton County*, 140 S. Ct. 1731, 590 U.S. ___ (2020), to Title IX of the Education Amendments of 1972, as amended (20 U.S.C. § 1681 *et seq.*) (Title IX), particularly in light of Executive Order 13988, *Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation*, 86 Fed. Reg. 7023 (Jan. 25, 2021). The Department of Justice is charged with coordination of the implementation and enforcement of Title IX by Executive agencies. Exec. Order No. 12250, § 1-2, 45 Fed. Reg. 72,995 (Nov. 4, 1980). Under the Executive Order 12250 authority delegated to the Civil Rights Division, 28 C.F.R. § 0.51(a) (1981) and 28 C.F.R. § 42.412(a) (1981), I write to share the Division's view as to whether *Bostock* applies to Title IX.

Executive Order 13988 sets out the Administration's policy that "[a]ll persons should receive equal treatment under the law, no matter their gender identity or sexual orientation." Citing the Supreme Court's holding in *Bostock* that the prohibition on discrimination "because of . . . sex" under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII), covers discrimination on the basis of gender identity and sexual orientation, the Executive Order explains that *Bostock*'s reasoning applies with equal force to other laws that prohibit sex discrimination "so long as the laws do not contain sufficient indications to the contrary." The Executive Order directs agencies to review other laws that prohibit sex discrimination, including Title IX, to determine whether they prohibit discrimination on the basis of gender identity and sexual orientation. We conclude that Title IX does.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Because their statutory prohibitions against sex discrimination are similar, the Supreme Court and other federal courts consistently look to interpretations of Title VII to inform Title IX. *See, e.g.*, *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007); *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001). Thus, *Bostock*'s discussion of the text of Title VII informs the Division's analysis of the text of Title IX.

First, like Title VII, Title IX applies to sex discrimination against individuals.  The *Bostock* Court focused on this feature of Title VII in reaching its holding.  *Bostock*, 140 S. Ct. at 1740–41 ("[The statute] tells us three times—including immediately after the words "discriminate against"—that our focus should be on individuals").  Similarly, Title IX focuses on individuals when it uses the term "person."  *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979) (stating that, in enacting Title IX, Congress "wanted to provide *individual citizens* effective protection against those [discriminatory] practices" (emphasis added)).

Second, Title IX's "on the basis of sex" language is sufficiently similar to "because of" sex under Title VII as to be considered interchangeable.  In *Bostock* itself, the Supreme Court described Title VII's language that way: "[I]n Title VII, Congress outlawed discrimination in the workplace *on the basis of* race, color, religion, sex, or national origin."  *Bostock*, 140 S. Ct. at 1737 (emphasis added); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) ("[W]hen a supervisor sexually harasses a subordinate *because of* the subordinate's sex, that supervisor 'discriminate[s]' *on the basis of* sex." (emphasis added)).  The *Bostock* Court concluded that Title VII's prohibition of discrimination "because of" sex includes discrimination because of sexual orientation and transgender status, finding that when an employer discriminates against employees for being gay or transgender, "the employer must intentionally discriminate against individual men and women in part because of sex."  *Bostock*, 140 S. Ct. at 1740–43.  The same reasoning supports the interpretation that Title IX's prohibition of discrimination "on the basis of" sex would prohibit recipients from discriminating against an individual based on that person's sexual orientation or transgender status.  This interpretation of Title IX is consistent with the Supreme Court's longstanding directive that "if we are to give Title IX the scope that its origins dictate, we must accord it a sweep as broad as its language." *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 521 (1982) (citations and internal alterations omitted).

In the months following the *Bostock* decision, two appellate courts have reached the same conclusion, citing *Bostock* to support their holdings that Title IX protects transgender students from discrimination on the basis of gender identity.  *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020), *petition for cert. filed*, No. 20-1163 (Feb. 24, 2021); *Adams v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1305 (11th Cir. 2020), *petition for reh'g en banc pending*, No. 18-13592 (Aug. 28, 2020).  Other circuits reached this conclusion before *Bostock*.  *See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049–50 (7th Cir. 2017) (transgender boy was likely to succeed on his claim that school district violated Title IX by excluding him from the boys' restroom); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221–22 (6th Cir. 2016) (per curiam) (school district that sought to exclude transgender girl from girls' restroom was not likely to succeed on the claim because Title IX prohibits discrimination based on sex stereotyping and gender nonconformity).

After considering the text of Title IX, Supreme Court caselaw, and developing jurisprudence in this area, the Division has determined that the best reading of Title IX's prohibition on discrimination "on the basis of sex" is that it includes discrimination on the basis of gender identity and sexual orientation.  Before reaching this conclusion, the Division considered whether Title IX "contain[s] sufficient indications" that would merit a contrary conclusion.  The Division carefully considered, among other things, the dissenting opinions in

000006

*Gloucester* and *Adams*, and the concerns raised in the dissents in *Bostock*. Like the majority opinions in those cases, however, the Division ultimately found nothing persuasive in the statutory text, legislative history, or caselaw to justify a departure from *Bostock*'s textual analysis and the Supreme Court's longstanding directive to interpret Title IX's text broadly. Whether allegations of sex discrimination, including allegations of sexual orientation or gender identity discrimination, constitute a violation of Title IX in any given case will necessarily turn on the specific facts, and therefore this statement does not prescribe any particular outcome with regard to enforcement.

I hope this memorandum provides a starting point for your agencies to ensure the consistent and robust enforcement of Title IX, in furtherance of the commitment that every person should be treated with respect and dignity. The Civil Rights Division is available to answer any questions your agencies have as you implement Title IX's protections against sexual orientation and gender identity discrimination.

000007

Historical Only. Not current.

## U.S. Department of Education

## Office for Civil Rights



# CASE PROCESSING MANUAL (CPM)

**EFFECTIVE DATE: AUGUST 26, 2020**

<span style="color:red">Historical Only. Not current.</span>

Case Processing Manual                                                                                    Page 2

## INTRODUCTION

The mission of the Office for Civil Rights (OCR) is to ensure equal access to education and to promote educational excellence throughout the nation through vigorous enforcement of civil rights. The Case Processing Manual (CPM) provides OCR staff and stakeholders with information regarding how OCR promptly and effectively investigates and resolves complaints, compliance reviews, and directed investigations, to ensure compliance with the civil rights laws and regulations enforced by OCR.

Historical Only. Not current.

# Table of Contents

INTRODUCTION ............................................................................................................................................. 2

## ARTICLE I:     EVALUATION .............................................................................. 5
SECTION 101    PRIVACY ACT AND FREEDOM OF INFORMATION ACT ................................................................ 5
SECTION 102    DETERMINE WHETHER THE INFORMATION PROVIDED IS SUBJECT TO FURTHER PROCESSING ......... 5
SECTION 103    ASSIGN A CASE NUMBER AND ESTABLISH A FILE ........................................................................ 8
SECTION 104    ACKNOWLEDGE THE COMPLAINT ............................................................................................. 8
SECTION 105    OBTAIN A CONSENT FORM ...................................................................................................... 8
SECTION 106    DETERMINE WHETHER THE ALLEGATIONS ARE TIMELY ............................................................. 9
SECTION 107    DETERMINE WHETHER A WAIVER SHOULD BE GRANTED ........................................................... 9
SECTION 108    DISMISSAL OF ALLEGATIONS ................................................................................................. 10
SECTION 109    FIRST AMENDMENT PRINCIPLES ............................................................................................ 12
SECTION 110    EXPEDITED RESOLUTION WITH OCR'S RAPID RESOLUTION PROCESS ........................................ 12
SECTION 111    OPENING THE COMPLAINT ALLEGATION(S) FOR INVESTIGATION ............................................. 13

## ARTICLE II:     FACILITATED RESOLUTION BETWEEN THE PARTIES PROCESS ......... 14
SECTION 201    ROLES ................................................................................................................................. 14
(a)     OCR's Role .............................................................................................................................. 14
(b)     Role of the Participants ............................................................................................................ 14
SECTION 202    INITIATION AND TERMINATION OF THE FRBP PROCESS ........................................................... 14
SECTION 203    CONFIDENTIALITY OF THE FRBP PROCESS .............................................................................. 14
SECTION 204    SUCCESSFUL CONCLUSION OF THE FRBP PROCESS .................................................................. 15
SECTION 205    BREACH OF FRBP AGREEMENTS ............................................................................................ 15
SECTION 206    INVESTIGATIVE DETERMINATION WHEN FRBP IS NOT ACHIEVED .............................................. 15

## ARTICLE III: CASE PLANNING, INVESTIGATION AND RESOLUTION .................................... 15
SECTION 301    CASE PLANNING ................................................................................................................... 15
SECTION 302    RESOLUTION AGREEMENT REACHED DURING AN INVESTIGATION ............................................ 16
(a)     Statement of the Case .............................................................................................................. 16
(b)     Timeframes and Procedures for Negotiations ............................................................................ 17
(c)     Resolution Letters .................................................................................................................... 17
SECTION 303    INVESTIGATIVE DETERMINATIONS ........................................................................................ 18
(a)     Insufficient Evidence Determination ......................................................................................... 18
(b)     Non-Compliance Determination ................................................................................................ 18
(c)     Mixed Determination ............................................................................................................... 18
(d)     Statement of the Case .............................................................................................................. 19
(e)     Letter of Finding(s) .................................................................................................................. 19
(f)     Timeframes and Procedures for Negotiations ............................................................................ 19
(g)     Negotiations Impasse ............................................................................................................... 19
(h)     Negotiations On-Going at the End of the 90-day Period .............................................................. 20
SECTION 304    CONTENTS OF RESOLUTION AGREEMENTS ............................................................................. 20
SECTION 305    LETTER OF IMPENDING ENFORCEMENT ACTION ..................................................................... 21
SECTION 306    REFERRALS FROM THE DEPARTMENT OF JUSTICE (DOJ) AND THE EQUAL EMPLOYMENT OPPORTUNITY
    COMMISSION (EEOC) ............................................................................................................. 22
SECTION 307    APPEALS ............................................................................................................................. 22

## ARTICLE IV:     COMPLIANCE REVIEWS AND DIRECTED INVESTIGATIONS ..................... 23
SECTION 401    COMPLIANCE REVIEWS ........................................................................................................ 23
SECTION 402    DIRECTED INVESTIGATIONS .................................................................................................. 23

## ARTICLE V:     MONITORING RESOLUTION AGREEMENTS ......................................... 23
SECTION 501    RESPOND TO MONITORING REPORTS AND VERIFY RECIPIENT'S IMPLEMENTATION ...................... 23
SECTION 502    IMPLEMENTATION PROBLEMS .............................................................................................. 24
SECTION 503    MODIFICATIONS OF AGREEMENTS ........................................................................................ 24
(a)     Changed Circumstances Affecting Agreements .......................................................................... 24
(b)     New Compliance Issues ............................................................................................................ 24
(c)     Approval of Modifications ........................................................................................................ 24
SECTION 504    CONCLUSION OF MONITORING .............................................................................................. 24

## ARTICLE VI: INITIATION OF ENFORCEMENT ACTION ............................................... 24
SECTION 601    INITIATE ADMINISTRATIVE PROCEEDINGS WHERE APPROPRIATE .............................................. 25
SECTION 602    REFER TO DOJ WHERE APPROPRIATE .................................................................................... 25
SECTION 603    ENFORCEMENT FOR DENIAL OF ACCESS FOR OCR .................................................................. 25
SECTION 604    ENFORCEMENT FOR FAILURE TO COMPLY WITH OCR AGREEMENT ........................................... 25

## ARTICLE VII: APPENDICES ............................................................................ 26
SECTION 701    SPECIAL INTAKE PROCEDURES .............................................................................................. 26
(a)     Age Discrimination Complaints ................................................................................................ 26
(b)     Title VI Complaints against Proprietary Schools ........................................................................ 27
(c)     Title VI and Title IX Employment Complaints (see 29 C.F.R. §§ 1691.1 – 1691.13 and 28 C.F.R. §§ 42.601 – 42.613) ............. 27
(d)     Title II ADA Complaints (Other than Employment) (see 28 C.F.R. § 35.171(a)(2)(i)) ......................... 28

<div style="text-align: center; color: red;">

# Historical Only. Not current.

</div>

Case Processing Manual                                                                                      Page 4

| | | |
|---|---|---|
| (e) | Title II ADA Complaints (Other than Employment) (see 28 C.F.R. § 35.171(a)(2)(i)) | 28 |
| SECTION 702 | DATA COLLECTION AND INFORMATION GATHERING | 29 |
| (a) | Generally | 29 |
| (b) | OCR's Authority to Obtain Information | 30 |
| (c) | Requests for Records | 30 |
| (d) | Interviews | 31 |
| SECTION 703 | FREEDOM OF INFORMATION ACT AND PRIVACY ACT | 32 |
| SECTION 704 | RECIPIENTS OPERATING UNDER FEDERAL COURT ORDER | 33 |
| (a) | United States a Party | 33 |

**Historical Only. Not current.**

# ARTICLE I:   EVALUATION

Upon receipt of information, OCR will determine whether the information provided to OCR is subject to further processing pursuant to applicable statutes and regulations and OCR's CPM. As appropriate, OCR will provide complainants[1] with assistance regarding the nature of their rights and of the OCR investigation process. Also, as appropriate, OCR will provide assistance to complainants who are individuals with disabilities,[2] individuals of limited English proficiency, and individuals whose communication skills are otherwise limited. All written information provided to OCR should include the sender's contact information.[3] Written information may be filed online, as well as by mail, electronic mail, or fax.

## SECTION 101    PRIVACY ACT AND FREEDOM OF INFORMATION ACT

To investigate a complaint, OCR may collect and analyze personal information. The Privacy Act of 1974, as amended 5 U.S.C. § 552a (Privacy Act) and the Department's Privacy Act regulations at 34 C.F.R. Part 5b, Section 444 of the General Education Provisions Act (commonly referred to as the Family Educational Rights and Privacy Act (FERPA)), 20 U.S.C. § 1232g and FERPA's implementing regulations at 34 C.F.R. Part 99, and the Freedom of Information Act (FOIA), 5 U.S.C. § 552 and FOIA's implementing regulations at 34 C.F.R. Part 5, may apply to the personal information collected by OCR and, where applicable, govern its disclosure. OCR does not reveal the name or other personal information about an individual unless: (1) such information is necessary for the completion of an investigation or in enforcement activities against an institution that violates the laws and regulations enforced by OCR; (2) such information is required to be disclosed by law; or (3) such information is permitted to be disclosed under the Privacy Act and FERPA, as applicable. Disclosure will only be made as consistent with the Privacy Act, FERPA, and FOIA.

Subject to the restrictions imposed by the Privacy Act, OCR may release certain information about a complaint to the press or general public, including the name of the school or institution; the date a complaint was filed; the type of discrimination included in a complaint; the date a complaint was resolved, dismissed or closed; the basic reasons for OCR's decision; or other related information. Under these circumstances, any information OCR releases to the press or general public will not include the complainant's name, the name of the person on whose behalf the complaint was filed, or personal information about the complainant or the person on whose behalf the complaint was filed, except as noted in the paragraph above. See CPM Section 703.

## SECTION 102    DETERMINE WHETHER THE INFORMATION PROVIDED IS SUBJECT TO FURTHER PROCESSING

OCR will determine whether the information provided to OCR is subject to further processing pursuant to OCR's CPM, as follows:

(a)  Not all information that OCR receives is sufficient to constitute a complaint subject to further processing pursuant to OCR's CPM. The following are generally not subject to further processing, but this determination will be made on an individualized basis, as appropriate:

  i.   Anonymous correspondence with OCR;
  ii.  Courtesy copies of correspondence or documentation filed with or otherwise submitted to another person or entity;

  iii. Inquiries that solely seek advice or information from OCR; or

---

[1] This manual uses the term "complainant" throughout. The term "complainant" refers to (a) the person who files a complaint; or (b) the person or group injured by the alleged discriminations on whose behalf a complainant files a complaint.
[2] See 34 C.F.R. Part 105.
[3] Contact information should include, for example, mailing address, phone number, or an electronic mail address.

    iv.  Allegations that are communicated to OCR only orally and not in writing.

(b) OCR must have jurisdiction over the subject matter of the allegations. An allegation over which OCR lacks subject matter jurisdiction is not subject to further processing and will be dismissed pursuant to CPM Section 108.

For OCR to establish subject matter jurisdiction, the written information must allege, or OCR must be able to infer from the facts given, an allegation of: (1) discrimination based on race, color, national origin, sex, disability, or age, (2) discrimination in violation of the Boy Scouts of America Equal Access Act of 2001, or (3) retaliation for the purpose of interfering with any right or privilege secured by the civil rights laws and regulations enforced by OCR, or as a result of making a complaint, testifying, or participating in any manner in an OCR proceeding. *See* 34 C.F.R. §§ 100.7(e), 104.61, 106.71, 108.9, 110.34; and 28 C.F.R. § 35.134.

OCR has jurisdiction pursuant to the following statutory and regulatory authorities:

- **Title VI of the Civil Rights Act of 1964**, 42 U.S.C. §§ 2000d et seq., 34 C.F.R. Part 100.

  Under Title VI, OCR has jurisdiction to investigate complaints involving individuals who allege discrimination in a recipient's education program or activity, including applicants, students, and parents, as well as certain employment complaints, based on race, color, or national origin.[4] With respect to employment, OCR has jurisdiction if: (1) the alleged discrimination could adversely affect program beneficiaries on the basis of race, color, or national origin, or (2) a primary objective of the federal financial assistance is to provide employment. See CPM subsection 701(b) for processing Title VI complaints with respect to proprietary vocational schools. For employment complaints, OCR follows procedures consistent with the employment coordinating regulations at 28 C.F.R. Part 42 and 29 C.F.R. Part 1691. See CPM subsection 701(c).

- **Title IX of the Education Amendments of 1972**, as amended, 20 U.S.C. §§ 1681 et seq., 34 C.F.R. Part 106.

  Under Title IX, OCR has jurisdiction to investigate complaints involving individuals who allege discrimination in a recipient's education program or activity, including applicants, students, and parents, as well as employment complaints, based on sex. For employment complaints, OCR follows procedures consistent with the employment coordinating regulations at 28 C.F.R. Part 42 and 29 C.F.R. Part 1691. See CPM subsection 701(c).

- **Section 504 of the Rehabilitation Act of 1973**, as amended, 29 U.S.C. § 794, 34 C.F.R. Part 104.

  Under Section 504, OCR has jurisdiction to investigate complaints involving individuals who allege discrimination in a recipient's education program or activity, including applicants, students, and parents, as well as employment complaints based on disability. For employment

---

[4] This manual uses the term "recipient" throughout. With respect to Title VI, Title IX, Section 504 and the Age Discrimination Act, a recipient is an entity that receives federal financial assistance from the Department. With respect to the Boy Scouts of America Equal Access Act, a recipient is a public elementary or secondary school or local or State educational agency that receives funds made available through the Department. With respect to Title II, the term is intended to include public entities whether or not they receive federal financial assistance. Specifically, the Department of Justice has identified the Department of Education as the designated agency to carry out Title II compliance activities regarding public elementary and secondary education systems and institutions, public institutions of higher education and vocational education (other than schools of medicine, dentistry and nursing, and other health-related schools) and public libraries.

Historical Only. Not current.

complaints, OCR follows procedures consistent with the employment coordination regulations at 28 C.F.R. Part 37 and 29 C.F.R. Part 1640. See CPM subsection 701(e).

- **Age Discrimination Act of 1975**, 42 U.S.C. §§ 6101 et seq., 34 C.F.R. Part 110.

  Under the Age Discrimination Act, OCR has jurisdiction to investigate complaints involving individuals who allege discrimination in a recipient's program or activity, including applicants, students, and parents. For instructions regarding referral of complaints to the Federal Mediation and Conciliation Service (FMCS) before investigation, see CPM subsection 701(a). OCR does not have jurisdiction over employment under the Age Discrimination Act. See CPM subsection 701(a).

- **Title II of the Americans with Disabilities Act of 1990**, 42 U.S.C. §§ 12131 et seq., 28 C.F.R. Part 35.

  Under Title II, OCR has jurisdiction to investigate complaints involving individuals alleging discrimination in a recipient's education program or activity, including applicants, students, and parents, as well as employment complaints based on disability. For employment complaints, OCR follows procedures consistent with the employment coordination regulations at 28 C.F.R. Part 37 and 29 C.F.R. Part 1640, which address coordinating disability employment complaints with the Department of Justice (DOJ) and the Equal Employment Opportunity Commission (EEOC). See CPM subsection 701(e).

- **Boy Scouts of America Equal Access Act of 2001**, 20 U.S.C. § 7905, 34 C.F.R. Part 108. Under the Boy Scouts Act, OCR has jurisdiction to investigate complaints involving the denial of equal access or a fair opportunity to meet to, or discrimination against, any group officially affiliated with the Boy Scouts of America or officially affiliated with any other youth group listed in Title 36 of the United States Code.

(c) OCR must have personal jurisdiction over the entity alleged to have discriminated. An allegation about an entity over which OCR lacks personal jurisdiction will not be processed further but will be dismissed pursuant to Section 108.

Under Title VI, Title IX, Section 504, and the Age Discrimination Act, OCR has personal jurisdiction over institutions that receive federal financial assistance from the Department and institutions for which OCR has been delegated authority from other federal agencies. Under Title II, OCR has personal jurisdiction over public elementary and secondary education systems and institutions, public institutions of higher education and vocational education (other than schools of medicine, dentistry and nursing, and other health-related schools), and public libraries – regardless of whether these institutions receive federal financial assistance. Under the Boy Scouts Act, OCR has personal jurisdiction over public elementary schools, public secondary schools, local educational agencies and State educational agencies that receive funds made available through the Department.

Where appropriate, OCR will refer the written information to the appropriate agency. See CPM Section 701.

(d) Generally, statistical data alone are not sufficient to warrant opening an investigation but, as part of an individualized determination with regard to the complaint at issue, can serve to support the opening of an investigation when presented in conjunction with other facts and circumstances.

When OCR determines that the written information provided to the Department is not subject to further processing pursuant to CPM Section 102, OCR will notify the sender in writing of its determination.

Historical Only. Not current.

### SECTION 103    ASSIGN A CASE NUMBER AND ESTABLISH A FILE

Once OCR determines pursuant to CPM Section 102 that written information it has received is appropriate for further processing, the information is referred to as a complaint, and OCR will assign a case number to the complaint and establish a file. The case opening date for each complaint is the date on which OCR assigns a case number. The following guidelines will be applied in determining how many case numbers should be assigned:

- When OCR receives written information at or around the same time by the same complainant that raises identical allegations against the same recipient, OCR will assign one case number to the complaints.

- When OCR receives written information alleging discrimination against multiple recipients and OCR has determined, pursuant to CPM Section 102, that the written information is appropriate for further processing, OCR will assign a separate case number to each recipient named. If, during the course of the investigation, OCR determines that other recipients are involved in the alleged acts of discrimination, OCR will assign a separate case number for each such recipient.

- Written information from more than one person against the same recipient that contains different or distinct allegations will be assigned separate case numbers.

- Written information from one or more than one person that raises the same or a similar allegation based on the same operative facts against the same recipient may be assigned one case number when OCR makes this determination prior to the docketing.

- New allegations filed by the same person against the same recipient after OCR has begun to investigate the original complaint are reviewed on a case-by-case basis to determine whether to consolidate the allegations with the existing investigation and dismiss the subsequent complaint under CPM Section 108, or to proceed with a separate investigation of the new allegations.

### SECTION 104    ACKNOWLEDGE THE COMPLAINT

OCR will promptly acknowledge, in writing, the receipt of the complaint. OCR will also inform the complainant that the complaint will be evaluated to determine whether OCR will proceed to investigate the allegations and that further communications about complaint processing will be forthcoming. A Consent Form, a Complaint Form, and *OCR Complaint Processing Procedures* are available online at: https://www2.ed.gov/about/offices/list/ocr/docs/howto.html.

### SECTION 105    OBTAIN A CONSENT FORM

When it is necessary to disclose the identity of the complainant to the recipient and witnesses in order to resolve the complaint, OCR will require written consent before proceeding. The complainant will be informed that the complaint will be dismissed if written consent is necessary in order to resolve the complaint and is not received within 20 calendar days of the date that OCR requests the Consent Form from the complainant. The signed Consent Form may be submitted to OCR by mail, fax, electronic mail or in person. If OCR does not receive a signed written Consent Form, and it is necessary in order to resolve the complaint, the complaint will be dismissed and the complainant so informed in writing.

A complainant filing on behalf of or pertaining to another person is responsible for securing any necessary written consent from that individual, including when a parent files for a student over the age of 18 or one who

Case Processing Manual                                                                              Page 9

becomes 18 while the complaint is under investigation or in monitoring. Where the person is a minor (under the age of 18) or a legally incompetent adult, the Consent Form must be signed by that person's parent or legal guardian. Parental or legal guardian consent may not be required for persons under the age of 18 if they are emancipated under state law or in the context of Section 504, whose IDEA rights have transferred under 20 USC § 1415(m), and are therefore considered to have obtained majority. Proof of transfer for IDEA rights, emancipation, incompetence, and/or legal guardianship must be provided if requested by OCR.

**SECTION 106    DETERMINE WHETHER THE ALLEGATIONS ARE TIMELY**

OCR will take action only with respect to those allegations (except allegations of age discrimination and allegations relating to breach of Facilitated Resolution Between the Parties agreements) that have been filed within 180 calendar days of the date of the alleged discrimination, unless the complainant is granted a waiver under CPM Section 107. With respect to allegations of age discrimination, OCR will take action with respect to those complaint allegations that have been filed within 180 calendar days of the date the complainant first had knowledge of the alleged discrimination. OCR may extend this time limit for age discrimination complaints for good cause shown. See CPM subsection 701(a). With respect to the timeliness requirements for allegations relating to the breach of Facilitated Resolution Between the Parties agreements, see CPM Section 205.

The filing date of a complaint, for the purpose of determining timeliness, is the following:

- The filing date of complaints submitted online or by electronic mail or fax is the date the complaint was received by OCR. The filing date of complaints submitted by mail is the date the complaint is postmarked.
- For Title II complaints referred from DOJ, the filing date is the date the complaint was received by DOJ.

Timely allegations may include those where OCR determines that the complainant has alleged a continuing violation and/or a pattern or practice of discrimination.

**SECTION 107    DETERMINE WHETHER A WAIVER SHOULD BE GRANTED**

If a complaint allegation[5] is not filed in a timely manner (see CPM Section 106), where appropriate, OCR will notify the complainant of the opportunity to request a waiver.[6] OCR may grant a waiver of the 180 calendar day filing requirement for reasons such as:

(a) The complainant could not reasonably be expected to have known the act was discriminatory within the 180 calendar day period and the complaint allegation was filed within 60 calendar days after the complainant could have become aware of the alleged discrimination (note that a lack of previous awareness of OCR or the civil rights laws and regulations enforced by OCR is not a basis for a waiver).

(b) The complainant was unable to file a complaint because of incapacitating illness or other incapacitating circumstances during the 180 calendar day period that rendered the complainant physically or mentally incapable of filing a complaint or obtaining assistance so that a complaint could be filed on their behalf, the complainant provides to OCR documentation demonstrating such

---

[5] Although the manual refers to "complaints" and "complaint allegations," OCR makes a determination as to each allegation in a complaint. For example, in a single complaint, OCR may decide that it is appropriate to investigate one or more allegations while dismissing another allegation or other allegations. The complainant will be informed of OCR's decision with respect to each allegation.

[6] OCR's complaint form notifies the complainant of the opportunity to request a waiver of OCR's timeliness requirement.

lack of capacity, and the complaint allegation was filed within 60 calendar days after the incapacitation ended.

(c)  The complainant filed a complaint alleging the same or similar allegation based on the same operative facts within the 180 calendar day period with another federal, state or local civil rights enforcement agency, or federal or state court, and filed a complaint with OCR within 60 calendar days after the other agency completed its processing of the complaint or, in the case of a court, after there had been no decision on the merits or settlement of the complaint allegations. Dismissal with prejudice is considered a decision on the merits.

(d)  The complainant filed, within the 180 calendar day period, an internal grievance with the recipient, or a due process hearing, alleging the same discriminatory conduct that is the subject of the OCR complaint, and the complaint is filed no later than 60 calendar days after the internal grievance is concluded.

(e)  Unique circumstances generated by OCR's actions adversely affected the complainant.

## SECTION 108    DISMISSAL OF ALLEGATIONS

Allegations can be dismissed during the evaluation stage of case processing or after the allegations have been opened for investigation.

As appropriate, in the evaluation stage, OCR will assist the complainant in understanding the information that OCR requires in order to proceed to the investigation of the complainant's allegations. This will include explaining OCR's investigation process and the rights of the complainant under the statutes and regulations enforced by OCR. OCR may also specifically identify the information necessary for OCR to proceed to investigation. OCR staff will provide assistance to complainants who are individuals with disabilities,[7] individuals of limited English proficiency, or persons whose communication skills are otherwise limited.

As a threshold issue and throughout the processing of the complaint, OCR addresses First Amendment and other Constitutional considerations. See CPM Section 109.

When an allegation is dismissed during the evaluation stage, OCR will issue a letter to the complainant explaining the reason for the decision.[8] When a complaint allegation is dismissed after the complaint allegation has been opened for investigation, OCR will issue a letter to the complainant and the recipient explaining the reason for the decision. Complainants may elect to refile complaints that were dismissed pursuant to CPM Sections 108(a), (b), (c), (e), (q), (r), or (s) if they have addressed the deficiencies stated by OCR in the dismissal; such refiled complaints will not be dismissed pursuant to CPM Section 108(m).

Where OCR has approved issuance of a final determination under CPM Section 303 with regard to any allegations, OCR will not dismiss the allegations, but will proceed in accordance with CPM Section 303.

OCR will dismiss an allegation, or, if appropriate, the complaint[7] in its entirety, when:

(a)  The allegation, on its face or as clarified, fails to state a violation of one of the laws or regulations OCR enforces.

---

[7] See 34 C.F.R. Part 105.
[8] In circumstances where the complaint contains an allegation of age discrimination and therefore has been referred to the Federal Mediation and Conciliation Service, OCR will also notify the recipient of the dismissal.

Historical Only. Not current.

(b)  The allegation, on its face or as clarified, lacks sufficient factual detail (e.g., who, what, where, when, how), or is so speculative, conclusory[9] or incoherent that OCR cannot infer that discrimination or retaliation may have occurred or may be occurring.

Before dismissing an allegation under CPM subsection 108(b), OCR will contact the complainant either by telephone or in writing (by letter or via electronic mail) to: (i) explain the information necessary for OCR to open an investigation of the allegation; (ii) request that the information be received within 14 calendar days of the date of the telephone contact, letter, or electronic mail; and (iii) advise the complainant that the allegation will be dismissed if the information is not received by that date. OCR will dismiss the allegation if the requested information is not received within 14 calendar days of the date of the telephonic or written request, unless the complainant has requested additional time to provide the information.

(c)  Based on all of the facts/information provided by the complainant or publicly available information, OCR cannot reasonably conclude that the recipient has violated a law OCR enforces.

(d)  The allegation is not timely filed with OCR pursuant to CPM Section 106 and a waiver was not requested or was requested but not granted pursuant to CPM Section 107.

(e)  OCR determines that a signed Consent Form is required to proceed with an investigation, and the Consent Form has not been provided.

(f)  OCR determines that it lacks jurisdiction over the subject matter of the allegation.

(g)  OCR determines that it lacks personal jurisdiction over the entity alleged to have discriminated. When appropriate, OCR will refer the complaint to the appropriate agency. See CPM Section 701.

(h)  OCR transfers or refers the complaint to another agency for investigation. See CPM Section 701.

(i)  The same or a similar allegation based on the same operative facts has been filed either by the complainant or someone other than the complainant against the same recipient with another federal, state, or local civil rights enforcement agency[9] or through a recipient's internal grievance procedures, including due process proceedings, and

   1.  OCR anticipates that all allegations will be investigated and that there will be a comparable resolution process pursuant to legal standards that are acceptable to OCR. OCR will advise the complainant that she or he may re-file with OCR within 60 calendar days of the completion of the other entity's action. Generally, OCR will not conduct its own investigation. Instead, OCR reviews the results of the other entity's determination and decides whether the other entity provided a comparable resolution process pursuant to legal standards that are acceptable to OCR;

      or

   2.  OCR determines that all allegations were investigated and there was a comparable resolution process pursuant to legal standards that are acceptable to OCR.

(j)  The same or a similar allegation based on the same operative facts has been filed either by the complainant or someone other than the complainant against the same recipient with a state or federal court. OCR will advise the complainant that she or he may re-file the complaint with OCR within 60 calendar days following the termination of the court proceeding if there has been no decision on the

---

[9] This provision applies where the complaint allegation (including any additional information provided by the complainant) does not provide sufficient information to raise the allegation above the level of speculation. The complaint must provide more than bare conclusions of alleged violations of the laws and regulations enforced by OCR.

Historical Only. Not current.

merits or settlement of the complaint allegations. A dismissal with prejudice is considered a decision on the merits.

(k)  OCR obtains credible information indicating that the allegations raised by the complainant are currently resolved.

(l)  A class action with the same or a similar allegation with the same operative facts has been filed against the same recipient with a state or federal court. OCR will advise the complainant that she or he may re-file with OCR within 60 calendar days following the termination of the court proceeding if there has been no decision on the merits or settlement of the state or federal complaint. A dismissal with prejudice is considered a decision on the merits.

(m) The complaint filed by the complainant or someone other than the complainant against the same recipient raises the same or similar allegations based on the same operative facts that were previously dismissed or closed by OCR.

(n)  OCR has recently investigated or is currently investigating the same or similar allegations based on the same operative facts involving the same recipient in a compliance review, directed investigation or OCR complaint.

(o)  The complainant withdraws the allegation or complaint.

(p)  The death of the complainant makes it impossible to investigate the allegations fully.

(q)  OCR determines that its ability to complete its evaluation of the complaint or an investigation is substantially impaired by the complainant's refusal to provide information that is reasonably accessible to the complainant and is necessary for the investigation of the complaint. OCR will include documentation in the case file of its efforts to contact the complainant to request the necessary information and of the complainant's refusal to provide information.

(r)  OCR determines that its ability to complete its evaluation of the complaint or an investigation is substantially impaired by its inability to contact the complainant in order to obtain information that is necessary for investigation of the complaint. OCR will include documentation in the case file of its unsuccessful efforts to contact the complainant to request the necessary information.

(s)  OCR determines that the complaint is moot or unripe.

## SECTION 109     FIRST AMENDMENT PRINCIPLES

Although OCR does not have jurisdiction to enforce the First Amendment to the U.S. Constitution, as a threshold issue and throughout the processing of the complaint, OCR interprets its statutes and regulations consistent with the requirements of the First Amendment, and all actions taken by OCR must comport with First Amendment principles. OCR will not interpret any statute or regulation to require impinging upon rights protected under the First Amendment or to require recipients to encroach upon the exercise of such rights.

## SECTION 110     RAPID RESOLUTION PROCESS

The Rapid Resolution Process (RRP) is an expedited case processing approach that can be used to resolve cases in any of OCR's statutory areas either during the evaluation stage or after issuance of the letter of notification informing the complainant that OCR is opening an investigation. The outcomes in all RRP cases must meet OCR's standards for legal sufficiency and be consistent with applicable statutory and regulatory

Historical Only. Not current.

authority. Any resolution agreement reached through RRP must be aligned with the allegations in the complaint deemed appropriate for resolution pursuant to RRP. See CPM Article III.

Once OCR has determined that the complaint is appropriate for RRP, OCR will promptly attempt to resolve the complaint and obtain information necessary to make a compliance determination. OCR will contact the recipient to determine if the recipient is interested in immediately resolving or has taken action to resolve the complaint allegations. Where such interest is expressed, RRP may be used to resolve complaints under the following circumstances:

(a)  Where a recipient has already taken action that will resolve the complaint allegations, the complaint may be resolved without an agreement where compliance is verified and does not require monitoring by OCR. Under this circumstance, OCR will issue a dismissal letter pursuant to CPM subsection 108(k).

(b)  Where a recipient has indicated that it is willing to take action in the future to resolve the complaint allegations, or the recipient has already taken action that requires monitoring, upon the recipient's request and OCR's agreement, the complaint may be resolved pursuant to CPM Section 302. Per CPM Section 302(b), the recipient will sign a resolution agreement, the implementation of which OCR will monitor. See CPM Section 304. Under this circumstance, OCR will issue a resolution letter pursuant to CPM subsection 302(c).

(c)  Where OCR obtains sufficient information from the recipient to make a compliance determination pursuant to CPM Section 303, OCR will issue a letter of finding pursuant to CPM subsection 303(a) or OCR will issue a letter of finding and obtain a resolution agreement pursuant to CPM subsection 303(b), the implementation of which OCR will monitor.

For cases in RRP, OCR must ensure expeditious completion in accordance with the applicable statutes, regulations, and case processing procedures

## SECTION 111     OPENING THE COMPLAINT ALLEGATIONS FOR INVESTIGATION

When OCR opens a complaint for investigation, it will issue letters of notification to the complainant and the recipient that contain the following information:

- OCR's jurisdiction, with applicable statutory and regulatory citations;
- The allegations to be investigated;[10]
- A statement that OCR is a neutral fact-finder and citing the CPM;
- Information about OCR's Facilitated Resolution Between the Parties process, if appropriate;
- A statement that the complainant may have a right to file a private suit in federal court whether or not OCR finds a violation; and
- Contact information for the OCR staff person who will serve as the complainant's and the recipient's primary contact during the investigation and resolution of the complaint.

A copy of "*OCR Case Processing Procedures*" will be included with the letter to the recipient. A copy of the complaint will be provided to the recipient.

---

[10] Complainants sometimes raise multiple or overlapping allegations that result in OCR investigating one or more issues. Use of the term "allegations" should be read to encompass the term "issues," as appropriate.

# ARTICLE II:  FACILITATED RESOLUTION BETWEEN THE PARTIES

## SECTION 201    ROLES

The Facilitated Resolution Between the Parties (FRBP) process facilitates the resolution of complaints by providing an opportunity for the parties involved to voluntarily resolve the complaint allegations. When OCR determines, on an individualized basis with regard to the complaint at issue, that a complaint is appropriate for FRBP, it shall contact the parties to offer this resolution option.

**(a)  OCR's Role**

- To serve as an impartial, confidential facilitator between the parties;
- To inform the parties of FRBP procedures;
- To establish a constructive tone, and encourage the parties to work expeditiously and in good faith toward a mutually acceptable resolution;
- To review the allegations with the parties and assist both parties in understanding the pertinent legal standards and possible remedies;
- To facilitate a discussion between the parties regarding possible actions that the parties may consider in working toward a resolution; and
- To offer assistance, as appropriate, with regard to reducing any resolution to writing. When an agreement is reached, the parties will be informed that OCR will issue a closure letter reflecting the resolution of the complaint by agreement of the parties.

**(b)  Role of the Participants**

- Participate in the discussions in good faith;
- Consider offers or suggestions with an open mind and work constructively toward a mutually acceptable resolution; and
- Implement any agreement in good faith.

OCR does not sign, approve, endorse, or monitor any agreement reached between the parties.

## SECTION 202    INITIATION AND TERMINATION OF THE FRBP PROCESS

If OCR determines that FRBP is appropriate and the complainant and the recipient are willing to proceed with this resolution option, OCR will designate staff to facilitate an agreement between the recipient and complainant. Staff assigned to conduct FRBP of a complaint shall not be staff assigned to the investigation of that complaint.

An Agreement to Participate in FRBP must be reviewed and signed, verbally agreed to, or agreed to by electronic mail by the complainant and recipient. In circumstances where verbal agreement is obtained, the FRBP facilitator shall send a confirmatory letter or electronic mail to the parties.

If a case has been opened for investigation, OCR has the discretion to suspend its investigation for up to 30 calendar days to facilitate an agreement between the parties. If an agreement is not reached, OCR will resume its investigation.

## SECTION 203    CONFIDENTIALITY OF THE FRBP PROCESS

A Confidentiality Agreement must be reviewed and signed, verbally agreed to, or agreed to by electronic mail by the FRBP facilitator and the parties to the FRBP (the complainant or complainant's representative and the

Historical Only. Not current.

Case Processing Manual

Page 15

recipient or recipient's representative). In circumstances where verbal agreement is obtained, the FRBP facilitator shall send a confirmatory letter or electronic mail to the parties.

In order to maintain the integrity of the FRBP process apart from OCR's investigation, any notes taken during FRBP by the facilitator and/or any records or other documents offered by either party to the facilitator during FRBP will be kept in a separate file and will not be shared with the staff members assigned to investigate the complaint.

**SECTION 204    SUCCESSFUL CONCLUSION OF THE FRBP PROCESS**

At the conclusion of a successful FRBP, OCR will obtain a copy of either: (1) a statement signed by the complainant that the allegations have been resolved; or (2) a copy of the agreement that was signed by the parties. After a successful FRBP, OCR will send the parties closure letters that specify the allegations that have been resolved, and that other outstanding allegations, if any, will be resolved through the investigation and resolution process. See CPM Article III. A copy of the signed statement from the complainant or the agreement between the parties will be attached to the closure letter.

**SECTION 205    BREACH OF FRBP AGREEMENTS**

OCR will not monitor or enforce the agreement, but will inform the parties that if a breach occurs, the complainant has the right to file a new complaint; such new complaint is not subject to dismissal pursuant to CPM section 108(m). If a new complaint is filed, OCR will not address the alleged breach of the agreement. To be considered timely, the new complaint must be filed either within 180 calendar days of the date of the original allegations of discrimination, or within 60 calendar days of the date that the complainant obtains notice that a breach occurred, whichever date is later.

**SECTION 206    INVESTIGATIVE DETERMINATION WHEN FRBP IS NOT ACHIEVED**

OCR will ensure that there will be adequate time for completion of the investigation if FRBP is unsuccessful. Where FRBP is unsuccessful, an investigation will proceed in accordance with applicable law and OCR's case processing procedures.

## ARTICLE III:   CASE PLANNING, INVESTIGATION AND RESOLUTION

OCR will ensure that the actions it takes in investigations are legally sufficient, supported by evidence, and dispositive of the allegations. OCR can resolve allegations at any point during the course of the investigation, if appropriate. OCR resolution agreements will be drafted to ensure compliance with the civil rights laws and regulations enforced by OCR.

When, during the course of the investigation of a complaint, OCR identifies compliance concerns and/or violations involving issues that were not raised in the complaint, OCR will address any compliance concerns and/or identified violations in the resolution letter or letter of findings and the resolution agreement, or, depending on the nature of the compliance concerns, provide technical assistance or consider the compliance concerns for a possible compliance review or directed investigation. See CPM Sections 401 and 402.

**SECTION 301    CASE PLANNING**

Case planning will begin as early as possible, will be thorough, and will be conducted throughout the processing of every case to ensure high quality decisions, prompt investigations and the efficient use of OCR resources. Planning decisions will reflect sound legal standards and will be adjusted as necessary to take into

Historical Only. Not current.

Case Processing Manual                                                                        Page 16

account information obtained during case processing. See CPM Section 702. The scope of OCR's investigation and resolution activities is governed by applicable statutes and regulations.

OCR regional office management and investigative staff are accountable for effective planning and will participate in critical planning decisions commensurate with the nature and complexity of the case to ensure consistent high-quality casework.

The following essential elements of case planning will be addressed in every OCR file (unless inapplicable):

- The allegations;
- OCR's jurisdiction over the subject matter and entity;
- The legal standards, regulatory authority and elements of proof;
- Ensuring that OCR's actions comport with First Amendment principles;
- The scope of the investigation;
- Investigative methods (i.e., what data and/or information are necessary to resolve the case and the means and methods OCR will employ to obtain the relevant data and/or information); and
- The resolution strategy.

The case file will contain documentation that supports the decisions made. Planning documentation should be organized so that it can be readily located in the case file. Case planning should be documented in the Case Planning Document.

These planning activities will ensure accountability for high quality and consistency with OCR standards, and will address:

- Required actions to investigate compliance;
- Dates for completion of specific actions;
- Description of evidence required; and
- All settlement activities.

## SECTION 302      RESOLUTION AGREEMENT REACHED DURING AN INVESTIGATION

Allegations under investigation may be resolved at any time when, prior to the point when OCR issues a draft letter of findings under CPM Section 303(b), the recipient expresses an interest in resolving the allegations **and** OCR determines that it is appropriate to resolve them because OCR's investigation has identified concerns that can be addressed through a resolution agreement. The provisions of the resolution agreement must be tied to the allegations, and the evidence obtained during the investigation and will be consistent with applicable regulations.

OCR will inform the recipient that this resolution process is voluntary before proceeding to resolution pursuant to this section. When OCR determines that it is appropriate to resolve the allegations pursuant to CPM Section 302, OCR will notify the complainant of the recipient's interest in resolution.

### (a) Statement of the Case

For cases with allegations proposed for resolution under CPM Section 302, OCR will prepare a Statement of the Case. The Statement of the Case sets forth:

- A statement of OCR's jurisdictional authority, including recipient status and the statutory basis for the investigation;
- An explanation of the pertinent legal standards;
- The allegations investigated;

Historical Only. Not current.

- Relevant background information; and
- A summary of the investigation and the evidence, and the identified concerns that support the need for the provisions of the agreement.

The Statement of the Case must address all of the allegations proposed for resolution under CPM Section 302.

**(b) Timeframes and Procedures for Negotiations**

From the date that the proposed resolution agreement is shared with the recipient, OCR and the recipient will have a period of up to 30 calendar days within which to reach final agreement.

During the negotiations period (which may be less than 30 calendar days, at the discretion of OCR), OCR may suspend its investigation of the case. Where a final agreement is not reached by the 30th calendar day, OCR will resume its investigation thereafter. However, negotiations may continue while the investigation resumes. This 30 calendar day period for suspension of the investigation in order to conduct negotiations cannot be restarted.

**(c) Resolution Letters**

The resolution letter will address all allegations in the case resolved pursuant to CPM Section 302. The letter must include, at a minimum:

- A statement of OCR's jurisdictional authority, including recipient status and the statutory basis for the investigation;
- A statement of the allegations investigated and a summary of the evidence obtained to date;
- A statement that, when fully implemented, the resolution agreement will address all of the allegations investigated and that OCR will monitor the implementation of the agreement (see CPM Section 304 and CPM Article V); and
- The following statement: "The complainant may have a right to file a private suit in federal court whether or not OCR finds a violation." For service complaints under the Age Discrimination Act, the complainants may file in federal court only after they have exhausted administrative remedies. See CPM subsection 701(a).

OCR will issue a draft resolution letter and a proposed resolution agreement to the recipient. The recipient shall have five calendar days from the date of the issuance of the draft resolution letter to inform OCR of any factual errors contained therein.

If, after due consideration of the recipient's concerns, OCR determines that the draft resolution letter contains factual errors, it will correct the errors, make any other revisions it deems appropriate, and promptly issue a revised final resolution letter. In addition, where appropriate, OCR will modify the proposed resolution agreement to reflect any corrections.

If the recipient does not inform OCR of factual errors within five calendar days from the date of the issuance of the draft resolution letter, OCR will issue a final resolution letter in due course.

Once the recipient signs the resolution agreement, OCR will monitor its implementation until the recipient has fulfilled the terms and obligations of the resolution agreement. Upon completion of the terms and obligations under the agreement, OCR will close the case. See CPM Article V.

Historical Only. Not current.

Case Processing Manual                                                    Page 18

## SECTION 303     INVESTIGATIVE DETERMINATIONS

At the conclusion of an investigation, OCR will determine, using a preponderance of the evidence standard, whether:

- There is insufficient evidence to support a conclusion of noncompliance, or
- The evidence supports a conclusion of noncompliance.

**(a) Insufficient Evidence Determination**

When OCR determines that the preponderance of the evidence does not support a conclusion that the recipient failed to comply with applicable statutes and regulations, OCR will issue a letter of findings to the parties explaining the reasons for its decision. See CPM subsection 303(e).

**(b) Non-Compliance Determination**

When OCR determines that the preponderance of the evidence supports a conclusion that the recipient failed to comply with applicable statutes and regulations, OCR will issue a draft letter of findings and a proposed resolution agreement to the recipient. See CPM subsection 303(e) and Section 304.

The recipient shall have five calendar days from the date of the issuance of the draft letter of findings to inform OCR of any factual errors contained therein.

If, after due consideration of the recipient's concerns, OCR determines that the draft letter of findings contains factual errors, it will correct the errors, make any other revisions it deems appropriate, and promptly issue a revised final letter of findings. In addition, where appropriate, OCR will modify the proposed resolution agreement to reflect any corrections.

If the recipient does not inform OCR of factual errors within five calendar days from the date of the issuance of the draft letter of findings, OCR will issue a final letter of findings in due course.

When OCR determines that it will resolve the allegations pursuant to CPM subsection 303(b) and initiates negotiation of the resolution agreement with the recipient, OCR will notify the complainant that OCR has initiated negotiation of the resolution agreement pursuant to this subsection.

**(c) Mixed Determination**

A "mixed determination" is appropriate for complaints with multiple allegations, where the allegations will be resolved in different ways (e.g., the investigation has found a violation with regard to some allegations and insufficient evidence with regard to other allegations; the investigation has found a violation with regard to some allegations and there are other allegations that are appropriate to resolve prior to the conclusion of the investigation pursuant to CPM Section 302; or OCR has found insufficient evidence with regard to some allegations and determined that other allegations are appropriate to resolve prior to the conclusion of the investigation pursuant to CPM Section 302). In a "mixed determination" case, where OCR is making a determination pursuant to subsection 303(b), OCR will negotiate a resolution agreement and issue a letter of findings. See CPM subsections 303(e) and 304. In a "mixed determination" case where OCR is not making a determination pursuant to 303(b), but is resolving allegations pursuant to Section 302, OCR will issue a resolution letter pursuant to Section 302(c).

**(d) Statement of the Case**

OCR will prepare a Statement of the Case for investigative determinations under CPM Section 303. The Statement of the Case sets forth:

- The allegations raised in the complaint;
- A statement of OCR's jurisdictional authority, including recipient status and the statutory basis for the investigation;
- An explanation of the pertinent legal standards;
- Relevant background information;
- A statement of each allegation investigated and the findings of fact for each, including analysis of the evidence on which the findings are based; and
- Conclusions for each allegation that reference the relevant facts, the applicable regulations, and the appropriate legal standards.

**(e) Letter of Findings**

For insufficient evidence determinations, OCR will issue a letter of findings that explains the reasons for OCR's decision to both the recipient and the complainant.[11] For non-compliance and mixed determinations that include a non-compliance determination, OCR will issue a letter of findings explaining the reasons for its decision to the recipient after engaging in the process set forth in Section 303(b).

Letters of findings will address all allegations opened for investigation. The letter includes, as appropriate:

- A statement of the allegations opened for investigation;
- A statement of OCR's jurisdictional authority, including recipient status and the statutory basis for the investigation;
- A statement of the findings of fact for each allegation investigated, supported by any necessary explanation and/or analysis of the evidence on which the findings are based;
- Conclusions for each allegation that reference the relevant facts, the applicable regulations and the appropriate legal standards; and
- A statement that: "The complainant may have a right to file a private suit in federal court whether or not OCR finds a violation." For service complaints under the Age Discrimination Act, the complainant may file in federal court only after they have exhausted administrative remedies. See CPM subsection 701(a).

**(f) Timeframes and Procedures for Negotiations**

From the date that the proposed resolution agreement is shared with the recipient, OCR and the recipient will have a period of up to 90 calendar days within which to reach final agreement.

**(g) Negotiation Impasse**

OCR may end the 90-calendar day negotiations period if no agreement has been reached by the 90th day. OCR may end the negotiations period at any time prior to the expiration of the 90 calendar day period when it is clear that agreement will not be reached (e.g., the recipient has refused to discuss any resolution; the recipient has indicated a refusal to agree to a key resolution term; the recipient has not responded to a proposed resolution agreement and at least 30 calendar days have passed). At such

---

[11] For recipients operating under federal court order, see CPM Section 704.

time, OCR shall issue an Impasse Letter that informs the recipient that OCR will issue a Letter of Impending Enforcement Action in 10 calendar days if a resolution agreement is not reached within that 10-day period. The letter will include a description of OCR's unsuccessful attempts to resolve the complaint. If the recipient does not enter into a resolution agreement within 10 calendar days of the date of the issuance of the Impasse Letter, OCR must follow the procedures in CPM Section 305 for the issuance of a Letter of Impending Enforcement Action regarding its non-compliance determinations.

In the case of a mixed determination, when the negotiations included allegations that were appropriate to resolve prior to the conclusion of the investigation pursuant to CPM Section 302 and allegations for which OCR made determinations of non-compliance, OCR shall issue an Impasse Letter of Impending Enforcement Action. If the recipient does not enter into a resolution agreement within 10 calendar days of the date of the issuance of the Impasse Letter, OCR must follow the procedures in CPM Section 305 for the issuance of a Letter of Impending Enforcement Action regarding its non-compliance determinations.

**(h)   Negotiations Progressing at the End of the 90 Calendar Day Period**

If OCR and the recipient negotiate for 90 calendar days and fail to reach final agreement by the 90th day, but negotiations are progressing, OCR shall inform the recipient that OCR will issue a Letter of Impending Enforcement Action in 30 calendar days if a resolution is not reached within that 30-day period. Negotiations will be considered progressing if the recipient has agreed in principle to the terms and obligations of the agreement, but needs a short period of time within which, for example, to obtain approval of the agreement (e.g., by a board of education or president of a college) and/or the appropriate signature on the agreement; or where the recipient has agreed to most of the terms and obligations of the agreement but requests a short period of additional time to negotiate other terms and obligations. If the recipient does not enter into a resolution agreement within 30 calendar days, OCR will issue a Letter of Impending Enforcement Action regarding its non-compliance determinations pursuant to CPM Section 305.

In the case of a mixed determination, when the negotiations included allegations that were appropriate to resolve prior to the conclusion of the investigation pursuant to CPM Section 302, and allegations for which OCR made determinations of non-compliance, OCR shall inform the recipient that OCR will issue a Letter of Impending Enforcement Action in 30 calendar days if a resolution is not reached within that 30-day period. If the recipient does not enter into a resolution agreement within 30 calendar days, OCR will issue a Letter of Impending Enforcement Action regarding non-compliance determinations pursuant to CPM Section 305.

## SECTION 304    CONTENTS OF RESOLUTION AGREEMENTS

The complaint will be considered resolved and the recipient deemed compliant when the recipient, after negotiating with OCR and reaching agreement on its terms and obligations, enters into and fulfills them.

Resolution Agreements:

- Must be signed by a person with authority to bind the recipient; and
- Must include, in the agreement itself or through an exchange of letters or other written communications:
  - Specific acts or steps the recipient will take to resolve compliance concerns and/or violations;
  - Dates for implementing each act or step;
  - Dates for the submission of reports and documentation;

Historical Only. Not current.

Case Processing Manual                                                       Page 21

- o  Where appropriate, language requiring submission of documents and/or other information or actions for OCR's review and approval, and timeframes for their submission;
- o  Timeframes requiring the recipient to implement what OCR has approved, and language requiring documentation verifying implementation; and
- o  The following statements of principle:
  - • The recipient understands that by signing the resolution agreement, it agrees to provide data and other information in a timely manner in accordance with the reporting requirements of the resolution agreement. Further, the recipient understands that during the monitoring of the resolution agreement, if necessary, OCR may visit the recipient, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the recipient has fulfilled the terms and obligations of the resolution agreement;
  - • Upon the recipient's satisfaction of the terms and obligations of the resolution agreement, OCR will close the case; and
  - • The recipient understands and acknowledges that OCR may initiate proceedings to enforce the specific terms and obligations of the resolution agreement and/or the applicable statutes and regulations. Before initiating such proceedings, OCR will give the recipient written notice of the alleged breach and 60 calendar days to cure the alleged breach.

## SECTION 305    LETTER OF IMPENDING ENFORCEMENT ACTION

When, following the expiration of the 10 calendar day period referenced in CPM subsection 303(g) or the 30 calendar day period referenced in CPM subsection 303(h), the recipient does not enter into a resolution agreement to resolve the identified areas of non-compliance, OCR will prepare a Letter of Impending Enforcement Action, which will include the following:

- • A statement of the allegations opened for investigation;
- • A statement of OCR's jurisdictional authority, including recipient status and the statutory basis for the investigation;
- • A statement of the findings of fact for each allegation investigated supported by any necessary explanation or analysis of the evidence on which the findings are based;
- • Conclusions for each allegation that reference the relevant facts, the applicable regulations, and the appropriate legal standards;
- • Notice that the Letter of Impending Enforcement Action is not intended and should not be construed to cover any other issue regarding the recipient's compliance;
- • Notice of the time limit on OCR's resolution process and the consequence of failure to reach agreement;
- • A description of OCR's unsuccessful attempts to resolve the case;
- • When a decision is made to defer final approval of any applications by the recipient for additional federal financial assistance or, with respect to the Boy Scouts Act, additional funds made available through the Department over what the recipient is presently receiving, the letter also will provide notice of such possible deferral. A separate deferral letter will be prepared; and
- • Title II letters will include the following language: "The complainant may have a right to file a private suit pursuant to Section 203 of the Americans with Disabilities Act, whether or not OCR finds a violation of Title II."

To resolve the case after issuance of the Letter of Impending Enforcement Action, any resolution agreement that the recipient proposes must be approved by OCR.

Historical Only. Not current.

Case Processing Manual                                                                        Page 22

**SECTION 306    REFERRALS FROM THE DEPARTMENT OF JUSTICE AND THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

When a Title II complaint is referred to OCR by DOJ, OCR will send a copy of the letter resolving the case to DOJ, if requested by DOJ. When a Title II/504 employment discrimination complaint has been dual-filed with the Equal Employment Opportunity Commission (EEOC) and OCR, or when a complaint has been referred to OCR by EEOC, OCR will notify EEOC once the complaint has been resolved. See 28 C.F.R. Part 37 and 29 C.F.R. Part 1640.

**SECTION 307    APPEALS**

OCR affords an opportunity to complainants to appeal determinations based on CPM Section 303(a) and dismissals based on CPM subsection 108(a), (b), (c), (d), (i), or (j). Information about the appeal process is provided to complainants in *OCR Complaint Processing Procedures*, which is enclosed with OCR's letter acknowledging receipt of the complaint. Information is also published at http://www.ed.gov/about/offices/list/ocr/complaints-how.html.

OCR will provide notice of the right to appeal in letters setting forth determinations based on CPM Section 303(a) and dismissals based on CPM subsection 108(a), (b), (c), (d), (i), or (j).

An appeal can be filed electronically, by mail, or fax. The complainant must submit a completed online appeal form or written statement of no more than 10 pages (double-spaced, if typed). If submitted by mail, send to the Office for Civil Rights, U.S. Department of Education, 400 Maryland Avenue SW, Washington, D.C. 20202. If submitted via electronic mail, send to OCR@ed.gov. If submitted via fax, send to 202-453-6012. The filing date of an appeal is the date the appeal is postmarked, submitted electronically, or submitted via fax.

In the appeal, the complainant must explain why she or he believes the factual information was incomplete or incorrect, the legal analysis was incorrect or the appropriate legal standard was not applied, and how the correction of any errors would change the outcome of the case. Failure to provide this information may result in denial of the appeal.

OCR reviews appeals to determine whether there is a clear error of fact and/or an error in the legal conclusion that changes the outcome of the determination.

All information to support the appeal must be submitted in writing at the time the complainant files the appeal. The complainant may not submit new evidence for consideration on appeal. Instead, if a complainant has new evidence, the complainant should file a new complaint. (Note that complaints must be filed within 180 calendar days of the last act of alleged discrimination or retaliation in order to be considered timely filed with OCR. A waiver of this 180-day timeframe may be requested. See CPM Section 307.)

An appeal must be submitted within 60 calendar days of the date indicated on the letter of finding or the dismissal. A waiver of this 60-day timeframe may be granted where:

(a)  The complainant was unable to submit the appeal within the 60-day timeframe because of incapacitating illness or other incapacitating circumstances during the 60-day timeframe, and the appeal was submitted within 30 calendar days after the period of incapacitation ended; or

(b)  Unique circumstances generated by OCR's actions have adversely affected the complainant's ability to submit a timely appeal.

Historical Only. Not current.

Case Processing Manual                                                            Page 23

A request for a waiver may be submitted with the appeal, if the appeal is submitted beyond the 60 calendar day timeline. A request for a waiver can also be filed prior to the expiration of this 60-day timeframe, by electronic mail, fax, or mail. The waiver will be considered by the office reviewing and responding to the appeal.

For appeals of determinations under Section 303(a), OCR will forward a copy of the complainant's online appeal form or written statement to the recipient. The recipient has the option to submit to OCR a response to the complainant's appeal. Any response to the complainant's appeal must be submitted to OCR within 14 calendar days of the date that OCR forwarded a copy of the complainant's appeal to the recipient.

OCR will issue a written decision on the appeal to the complainant for appeals of determinations under Section 108 and to both parties for appeals of determinations under Section 303(a).

# ARTICLE IV:  COMPLIANCE REVIEWS AND DIRECTED INVESTIGATIONS

The investigation and resolution options and procedures identified in the CPM will be utilized for compliance reviews and directed investigations, as appropriate. See CPM Articles III, V, and VI. The initiation date for the compliance review or directed investigation is the date of the letter notifying the recipient of the compliance review or directed investigation.

## SECTION 401    COMPLIANCE REVIEWS

In addition to the regulations implementing Title VI that govern OCR's investigations, the regulations require OCR to, "from time to time," initiate "periodic compliance reviews" to assess the practices of recipients to determine whether they comply with the Title VI regulations. See 34 C.F.R. § 100.7(a). This regulatory provision is incorporated by reference in the regulations implementing other statutes enforced by OCR. See Title IX (34 C.F.R. § 106.71), Section 504 (34 C.F.R. § 104.61), the Boy Scouts Act (34 C.F.R. § 108.9); the Age Discrimination Act, (34 C.F.R. § 110.30; and Title II (28 C.F.R. § 35.172).

The compliance review regulations afford OCR broad discretion to determine the substantive issues for investigation and the number and frequency of the investigations.

## SECTION 402    DIRECTED INVESTIGATIONS

In appropriate circumstances, OCR may conduct a directed investigation when information indicates a possible failure to comply with the laws and regulations enforced by OCR; the matter warrants attention; and the compliance concern is not otherwise being addressed through OCR's complaint, compliance review, or technical assistance activities. See Title VI, 34 C.F.R. § 100.7(c). This regulatory provision is incorporated by reference in the regulations implementing the other statutes enforced by OCR. See Title IX (34 C.F.R. § 106.71), Section 504 (34 C.F.R. § 104.61), the Boy Scouts Act (34 C.F.R. § 108.9); the Age Discrimination Act (34 C.F.R. § 110.30), and Title II (28 C.F.R. § 35.172).

# ARTICLE V:  MONITORING RESOLUTION AGREEMENTS

## SECTION 501    RESPONDING TO MONITORING REPORTS AND VERIFYING RECIPIENT'S IMPLEMENTATION

OCR will promptly acknowledge its receipt of interim and final monitoring reports. OCR will evaluate each report and issue an appropriate response (i.e., where OCR determines actions taken are sufficient or insufficient under the agreement). OCR must obtain sufficient information to determine whether the recipient complied with the terms and obligations of the resolution agreement. Depending on the nature of the agreement, verification of remedial actions may be accomplished by, for example, the review of reports,

Historical Only. Not current.

documentation and other information submitted by recipients and knowledgeable persons; interviews of the recipients and knowledgeable persons; or site visits.

## SECTION 502    IMPLEMENTATION PROBLEMS

OCR will promptly provide written notice to the recipient of any deficiencies with respect to implementation of the terms and obligations of the agreement and will request appropriate action to address such deficiencies. When OCR has determined that a recipient has failed to comply with the agreement or any of the terms and obligations thereof for reasons that do not justify the modification of the agreement pursuant to CPM subsection 503(a), OCR will take prompt action to enforce the agreement pursuant to CPM Section 305 and CPM Article VI.

## SECTION 503    MODIFICATION OF AGREEMENTS

**(a) Changed Circumstances Affecting Agreements**

OCR may agree to modify (including with respect to deadlines for submitting a report or completing a required action) or terminate a resolution agreement when it learns that circumstances have arisen that substantially change, fully resolve, or render moot some or all of the compliance concerns that were addressed by the resolution agreement. OCR may also modify the agreement in response to changes in controlling case law, statutes, and regulations.

**(b) New Compliance Issues**

OCR may address new compliance issues identified for the first time during monitoring by providing technical assistance or considering the issues for a possible compliance review or directed investigation. See CPM Sections 401 and 402.

**(c) Approval of Modifications**

OCR must approve modifications to the agreement (e.g., requests to change the substance of any provision in the agreement, or requests for extension of time to submit a report or to complete a required action). Approved modifications must be set forth in writing and appended to the original agreement. Requests for modification must be documented in the case file. OCR will send the complainant written notification of approved modifications to the substance of the original agreement, where appropriate.

## SECTION 504    CONCLUSION OF MONITORING

OCR will conclude the monitoring of a resolution agreement when it determines that the recipient has fully and effectively implemented the terms and obligations of the resolution agreement, including any subsequent approved modifications to the agreement. OCR will promptly send written notification to the recipient, and the complainant where appropriate, of its determination that the terms and obligations of the resolution agreement have been implemented and that OCR is closing the case.

# ARTICLE VI:   INITIATION OF ENFORCEMENT ACTION

When post-Letter of Impending Enforcement Action negotiations do not result in a resolution agreement, OCR will initiate enforcement action. OCR will either: (1) initiate administrative proceedings to suspend, terminate, or refuse to grant or continue financial assistance from, or, with respect to the Boy Scouts Act, funds made available through, the Department to the recipient; or (2) refer the case to DOJ for judicial proceedings to enforce any rights of the United States under any law of the United States.

Historical Only. Not current.

## SECTION 601    INITIATE ADMINISTRATIVE PROCEEDINGS, WHERE APPROPRIATE

When post-Letter of Impending Enforcement Action negotiations do not result in a resolution agreement and OCR decides, within its discretion, to initiate administrative proceedings, it will request that an administrative proceeding be initiated. In collaboration with other Department personnel as appropriate, OCR will establish a team to prosecute the case. If OCR decides to defer new funds, a Notice of Opportunity for Hearing will be issued within 30 calendar days of the notice of the deferral action. See Section 305.

## SECTION 602    REFER TO DOJ, WHERE APPROPRIATE

When post-Letter of Impending Enforcement Action negotiations do not result in a resolution agreement and OCR decides, within its discretion, to refer the matter to DOJ, it will issue a letter to the recipient stating that the case will be referred to DOJ within 10 calendar days of the date of the letter.

## SECTION 603    ENFORCEMENT FOR DENIAL OF ACCESS

A recipient denies access to OCR when it:

- Refuses to permit OCR access during the recipient's normal business hours to information maintained by the recipient that is necessary to determine the compliance status of the allegations under investigation or, during monitoring, the recipient's compliance with a resolution agreement. Generally, this includes access to books, records, and accounts, including electronic storage media; retrieval systems and photocopies; and other sources of information, including witnesses and the recipient's facilities;
- Refuses to permit OCR access to its employees during the recipient's regular business hours;
- Fails to provide information by virtue of the refusal of one of its employees to do so or to provide access to information maintained exclusively by an employee in his/her official capacity; or
- Refuses to complete applicable Office of Management and Budget-approved compliance and survey forms relevant to an investigation.

Where the recipient has refused to provide OCR with access orally, either in person, over the telephone or through use of other media, OCR must attempt to ascertain the basis for the recipient's refusal and explain OCR's authority to obtain the evidence. Where attempts to persuade the recipient to provide access have failed, OCR must send a letter to the recipient that sets forth in detail the evidence (e.g., documents, data, other information, or witnesses) to which the recipient denied OCR access and specifies the efforts that OCR has made to obtain the evidence. If the recipient does not voluntarily provide OCR with access to the requested evidence within 30 calendar days of OCR's issuance of the letter to recipient, OCR will issue a Letter of Impending Enforcement Action. If the recipient continues to deny OCR access to the requested evidence, OCR will issue a letter to the recipient stating OCR's intention to take enforcement action.

## SECTION 604    ENFORCEMENT FOR FAILURE TO COMPLY WITH OCR AGREEMENT

Where the recipient has failed to comply with the terms and obligations of a resolution agreement, OCR will issue a Letter of Impending Enforcement Action pursuant to CPM Section 305. If the recipient does not come into compliance after issuance of the Letter of Impending Enforcement Action, OCR will initiate enforcement action pursuant to either CPM Section 601 or CPM Section 602.

Historical Only. Not current.

# ARTICLE VII:   APPENDICES

## SECTION 701    SPECIAL INTAKE PROCEDURES

### (a) Age Discrimination Complaints

An age discrimination complaint is timely when it is filed within 180 calendar days of the date the complainant first had knowledge of the alleged discrimination. For good cause shown, OCR may extend this time limit.

For service complaints under the Age Discrimination Act, the complainant may file a civil action under the Age Discrimination Act in federal court but only after she or he has exhausted administrative remedies. Administrative remedies are exhausted when either of the following has occurred: (1) 180 calendar days have elapsed since the filing of a complaint with OCR and OCR has made no finding, or (2) OCR issues a finding in favor of the recipient. If OCR fails to make a finding within 180 calendar days or issues a finding in favor of the recipient, OCR will promptly notify the complainant of this fact and of her or his right to bring a civil action for injunctive relief. OCR's notice must also contain the following information: (1) that a civil action can be brought only in a United States district court for the district in which the recipient is located or transacts business; (2) that a complainant prevailing in a civil action has the right to be awarded the costs of the action, including reasonable attorney's fees, but that these costs must be demanded in the complaint filed with the court; (3) that before commencing the action, the complainant shall give 30 calendar days' notice by registered mail to the Secretary, the Secretary of Health and Human Services, the Attorney General of the United States, and the recipient; (4) that the notice shall state the alleged violation of the Age Discrimination Act, the relief requested, the court in which the action will be brought, and whether or not attorney's fees are demanded in the event the complainant prevails; and (5) that the complainant may not bring an action if the same alleged violation of the Age Discrimination Act by the same recipient is the subject of a pending action in any court of the United States.

1. Employment Complaints

   OCR does not have jurisdiction over employment complaints under the Age Discrimination Act. Employment complaints filed by persons 40 and older are referred to the appropriate EEOC office, and the OCR complaint is dismissed. Employment complaints filed by persons under 40 are not within the jurisdiction of EEOC and may be closed with notice to the complainant that there is no jurisdiction under the Age Discrimination Act. If the complaint alleges age discrimination in employment that is within EEOC's jurisdiction and also contains allegations of discrimination in services within the jurisdiction of OCR, the complaint is split into two separate cases. Each is given its own case number, the age employment complaint is referred to EEOC with the OCR age employment case being dismissed, and OCR proceeds with the complaint based on allegations of discrimination in services.

2. Service Complaints

   All complete and timely complaints (see 34 C.F.R. §§ 110.31 and 110.32) containing an allegation of age discrimination in services are promptly referred to the following address or the appropriate regional office by electronic mail or mail:

   > Federal Mediation and Conciliation Service
   > Attention: Alternative Dispute Resolution Department
   > 250 E. Street SW
   > Washington, D.C. 20427

Historical Only. Not current.

Where OCR receives a complaint containing both allegations of age discrimination in services and allegations under Title VI, Title IX, Title II, Section 504, and/or the Boy Scouts Act, and OCR determines that the non-age allegation is independent and separable from the age allegation, OCR will refer only the age portion of the complaint to FMCS. OCR will proceed to investigate the additional allegations over which OCR has jurisdiction. OCR will not wait for mediation of the age portion of the complaint to conclude before beginning investigation of the non-age portion of the complaint.

Copies of the complaint and letters to the complainant and recipient and a completed FMCS "Request for ADA Mediation Assistance" must be included.

If FMCS does not resolve the complaint within 60 calendar days from the date of filing with OCR, OCR will resume processing the age aspects of the complaint. The date that the complaint or any portion of a complaint is sent to FMCS shall be entered in CMS. The date that the complaint is referred back from FMCS shall also be entered in CMS. FMCS's processing time will, therefore, not be included in OCR's case processing time.

**(b)  Title VI Complaints against Proprietary Schools**

Authority to process Title VI complaints against proprietary vocational schools (privately owned, profit-making enterprises that teach a trade or skill) has, with certain exceptions, been delegated to the U.S. Department of Veterans Affairs. Such complaints must be forwarded to:

> U.S. Department of Veterans Affairs
> Office of Resolution Management
> 810 Vermont Avenue, N.W.
> Washington, D.C. 20420

OCR must refer to the U.S. Department of Health and Human Services Title VI complaints filed against a proprietary school operated by a hospital. The complaint is then dismissed. The complainant must be notified of the referral.

The following exceptions apply.

- OCR remains responsible for enforcement of Title VI where a proprietary vocational school is operated by a college or university. See 38 C.F.R. § 18a.1(a).
- OCR remains responsible for enforcement of Title VI where a proprietary vocational school offers non-degree courses for which credit is given and which, on transfer, would be accepted toward a baccalaureate or higher degree by a degree-granting institution. See 38 C.F.R. § 18a.1(b).

**(c)  Title VI and Title IX Employment Complaints (see 29 C.F.R. §§ 1691.1 – 1691.13 and 28 C.F.R. §§ 42.601 – 42.613)**

Race, color, national origin, and sex discrimination in employment complaints will be processed in accordance with the government-wide regulations. OCR will:

1. Within 10 calendar days of receipt, notify the complainant and the recipient that OCR has received the complaint, including the date, place and circumstances of the alleged unlawful employment practice.

2.  Within 30 calendar days of receipt:

   i.  Determine whether OCR has jurisdiction over the complaint under Title VI and/or Title IX.
   ii.  Determine whether EEOC may have jurisdiction over the complaint.
   iii.  Transfer to EEOC all complaints over which OCR does not have jurisdiction but over which EEOC may have jurisdiction and notify the complainant and the recipient of the transfer, the reason for the transfer, the location of the EEOC office to which the complaint was transferred and that the date the agency received the complaint will be deemed the date it was received by EEOC.
   iv.  Refer to EEOC certain complaints over which both OCR and EEOC appear to have jurisdiction ("joint complaints"), consistent with the following guidance:

       Absent special circumstances, OCR will refer a joint complaint that solely alleges employment discrimination against an individual.

       Absent special circumstances, OCR will not refer a joint complaint alleging a pattern or practice of employment discrimination.

       Absent special circumstances, OCR will not refer a joint complaint that alleges discrimination in employment and includes allegations regarding other practices of a recipient. If, because of special circumstances, the employment allegations of such a complaint are referred to EEOC, OCR will assign a new case number to the allegations that are retained.

       OCR will notify the complainant and recipient of the action taken on the joint complaint. In the case of a referral to EEOC, the notice will include the location of the EEOC office to which the complaint was referred, the civil rights provisions involved, the authority of EEOC under this regulation and that the date the agency received the complaint will be deemed the date it was received by EEOC.

       For those joint complaints retained for OCR investigation, OCR will contact EEOC to ensure that, in the event EEOC has also received the complaint, EEOC defers its investigation.

**(d)  Title II ADA Complaints (Other than Employment) (see 28 C.F.R. § 35.171(a)(2)(i))**
OCR has jurisdiction to investigate Title II complaints against public elementary and secondary education systems and institutions, public institutions of higher education and vocational education (other than schools of medicine, dentistry, nursing, and other health-related schools), and public libraries. When OCR receives an ADA-only complaint over which it does not have jurisdiction, it will be referred to DOJ and then dismissed. The complainant will be notified of the referral.

**(e)  Section 504 and Title II Disability Employment Complaints (see 28 C.F.R. Part 37 and 29 C.F.R. Part 1640)**

   **1.  Referral or Deferral**

       i.  Disability employment complaints shall be referred to the DOJ Civil Rights Division if OCR has no jurisdiction under either Title II of the ADA or Section 504 of the Rehabilitation Act of 1973, and EEOC does not have jurisdiction under Title I (*i.e.*, the recipient has fewer than 15 employees). If EEOC has jurisdiction under Title I

(i.e., the recipient has 15 or more employees), the complaint shall be referred to EEOC.

ii.   OCR shall defer individual complaints unless the complainant elects to have OCR process the charge. OCR must notify the complainant in writing that he or she may choose whether to have OCR or EEOC process the complaint and that if the complainant would like OCR to process the complaint, OCR must receive such written request within 20 calendar days of the date of the letter. See 28 C.F.R. § 37.8(a)(1). If special circumstances make deferral inappropriate, OCR and the appropriate agency may jointly determine to reallocate investigation responsibilities. See 28 C.F.R. § 37.8(e).

2.   **Retention**

i.   When OCR has jurisdiction over a disability employment complaint under Section 504, OCR shall retain the complaint if:

- EEOC does not have jurisdiction under Title I (i.e., if fewer than 15 employees);
- EEOC has jurisdiction, but the complainant elects to have OCR process the complaint;
- The complaint alleges discrimination in both employment and other practices or services covered by Section 504; or
- The complaint alleges a pattern or practice of employment discrimination. See 28 C.F.R. § 37.6(d)(1).

ii.   When OCR has jurisdiction under Title II of the ADA but not under Section 504, OCR shall retain jurisdiction over a complaint when it determines that EEOC does not have jurisdiction under Title I. See 28 C.F.R. §§ 37.6(d)(2) and (3).

## SECTION 702    DATA COLLECTION AND INFORMATION GATHERING

### (a) Generally

OCR's data collection and information gathering activities will vary from case to case depending on applicable legal standards, investigative strategies, and the extent to which relevant data/information are in the control of the recipient or others. Some general investigative principles and practices include:

- Obtain independent written documentation to corroborate oral statements;
- Label all evidence, documents, electronic media, and written records of contact with information identifying the case being investigated and the circumstances under which the evidence was obtained (e.g., where and when an interview was conducted, and who provided a given document);
- Document efforts to obtain access to recipient data and witnesses;
- Undertake a robust outreach to the recipient community to increase access to relevant information in the conduct of an investigation (*e.g.,* by publicizing OCR's presence and availability in onsite investigations for individual interviews and focus groups as well as OCR's availability for discussion with interested individuals before and subsequent to the onsite), as appropriate; and
- Collect data resulting from any methods that OCR or recipients use to track and evaluate compliance with their legal responsibilities (*e.g.,* data from OCR's Civil Rights Data Collection, recipient public websites, climate surveys, and other self-assessment tools).

Historical Only. Not current.

**(b) OCR's Authority to Obtain Information**

OCR has the right of access during a recipient's regular business hours to the recipient's facilities and to information maintained by the recipient that is necessary to determine compliance status on those issues under investigation. See 34 C.F.R. § 100.6(c), 34 C.F.R. § 99.31(a)(3)(iii) and 34 C.F.R. § 110.22. Generally, this includes access to such of the recipient's books, records, accounts, including electronic storage media, microfilming, retrieval systems and photocopies maintained by the recipient, and other sources of information, including witnesses, and its facilities, as may be relevant, in OCR's judgment, to ascertain compliance.

**(c) Requests for Records**

**1. Data Requests**

A data request seeks information from the recipient relevant to the investigation. It can be used to initiate information collection or to request further information, as necessary.

**2. Timeframes for Recipient's Response**

The recipient will be given an appropriate amount of time to submit the information required, which shall be determined on the basis of the nature and extent of OCR's data request. This timeframe is established in OCR's discretion, considering factors such as the feasibility of complying with the request in the determined time period.

**3. Data Provided by Recipient**

A recipient must submit information as necessary for OCR's compliance activities. However, other federal regulations and policies may restrict OCR's information requests:

  i.   For example, in the context of an ongoing complaint, compliance review, or directed investigation, OCR may require recipients to record information in such form and containing such information as OCR may determine is necessary to assess compliance, without obtaining prior approval for its use by the Office of Management and Budget.[12]  See 34 C.F.R. § 100.6(b).
  ii.  OCR must consider federal policies concerning paperwork burdens when requesting that a recipient do more than provide OCR access to normally maintained information.  Requests that a recipient generate, aggregate, or compile information to meet an OCR need must be reasonable and may not be unduly burdensome.. Recipients that maintain data in an electronic format must provide the data in that format to OCR in a file type that can be accessed by OCR. Recipients that do not maintain data in an electronic format are encouraged to provide the requested information in an electronic format that can be accessed by OCR.

If a recipient invites OCR to come onsite and collect the requested information, including the interview of witnesses and provides OCR with sufficient access to files, records, logs, and appropriate indexes for OCR to obtain the needed information, then the recipient shall be deemed to have provided OCR with the requisite access necessary to satisfy this provision.

---

[12] The Paperwork Reduction Act only applies to collections directed at ten or more respondents, with one important exception.  Any information requirement in a "rule of general applicability" is presumed to affect or potentially affect at least ten respondents.

Historical Only. Not current.

### 4. Confidentiality

OCR has the right of access to a recipient's records, even if those records identify individuals by name. To protect the confidential nature of the records, OCR may, for example, permit the recipient to replace names with a code, and to retain a key to the code. However, OCR should inform the recipient that if at any time, such a procedure impedes the timely investigation of the case, OCR shall have access to the unmodified records. See 20 U.S.C. §§ 1232g(b)(1)(C)(i)(II) and (b)(3) and 34 C.F.R. §§ 99.31(a)(3)(iii) and 99.35 regarding the applicable provisions of the Family Educational Rights and Privacy Act.

## (d) Interviews

### 1. Introduction

Interviews are an integral part of investigations. The objective of interviews is to gain an understanding of the records and data relevant to the issues in the case; to obtain information from and assess the credibility of witnesses; and to evaluate recipient defenses. OCR may conduct individual interviews and focus groups, as appropriate, as part of its investigations. OCR will make efforts to work with recipients to conduct interviews in a manner that minimizes disruptions to the recipient's educational environment.

### 2. Notice

Prior to initiating an interview, OCR will inform the witness of the following.

   i. The general purpose of the interview, including OCR's role, what law or laws may be pertinent to the investigation, and where appropriate, a brief explanation of what is under investigation.
   ii. The approximate maximum amount of time that the interview may take.
   iii. The potential uses of the information to be obtained from the witness and the Freedom of Information Act. A witness who wants a more thorough explanation should be given a copy of the "OCR Notice of Witness Rights." This Notice is available at: (https://www2.ed.gov/about/offices/list/ocr/docs/witness-notice-mw.pdf).
   iv. The witness's right to personal representation during the interview by a person of his or her choice.
   v. When the witness is an employee of a recipient, his or her right to refuse to have anyone else present during the interview and his or her right to refuse to reveal the content of an interview.
   vi. The regulatory provisions concerning prohibition of intimidating or retaliatory acts by a recipient.
   vii. In most cases, the recipient's counsel will be allowed to be present during upper level management interviews.

### 3. Privacy

The privacy interests of witnesses will be considered in selecting the conditions and means employed by OCR to conduct witness interviews. An interpreter may be used when safeguards are taken to ensure the competence of the interpreter and to protect the witness's privacy.

Historical Only. Not current.

**4.  Interviews with Minors (Persons under 18) or Legally Incompetent Individuals**

OCR shall obtain written consent from a parent or guardian prior to conducting an interview of any person under 18 years of age or otherwise adjudicated legally incompetent, for example, mentally impaired. Parental or legal guardian consent may not be required for persons under 18 if they are emancipated under state law or in the context of Section 504, whose IDEA rights have transferred under 20 U.S.C. § 1415(m),  and are therefore considered to have obtained majority. For persons under 18 who state they are emancipated or whose IDEA rights have transferred, OCR should obtain proof of emancipation or proof of transfer of IDEA rights.

Parental or legal guardian consent may not be necessary where the questions asked are of a general nature, not related to any specific events in which the minor was involved, and there are no records kept to identify the student. Where a recipient refuses to allow minor students to be interviewed without consent where the questions asked are of a general nature, not related to any specific events in which the minor was involved, and there are no records kept to identify the student, written consent must be obtained.

Where parents or guardians refuse to provide consent for an interview, and OCR determines that the child's information is critical, OCR may attempt to secure parental or guardian consent by inviting the parent or guardian to be present during the interview. Where consent is denied, OCR will not interview the child.

**5.  Records of Interviews**

A written record of interviews (i.e., in-person, telephonic, or through use of other electronic media) must be kept. Interviewers will notify interviewees when recording is used and recording will be done only with the consent of the interviewee. When interviewers record interviews, the recording becomes part of the case record along with the written record. Regardless of the technique used during the interview, a written record of the interview must be created.

The record of the interview to be placed in the case file must contain the following information.

    i.  The case identification (name and case number).
    ii.  The name and identification of the interviewee, interviewer, and any other person present (include an explanation for the presence of any other persons).
    iii.  The date, time, and location of interview (including whether the interview was conducted in person or through use of media (e.g., telephone, videoconferencing).
    iv.  A record of whether the interviewee was informed of required notifications.
    v.  A written record reflecting the questions and responses obtained during the interview (this need not be a verbatim transcript but must accurately reflect the responses of the witness).

**SECTION 703    FREEDOM OF INFORMATION ACT AND PRIVACY ACT**

The information OCR collects is analyzed by authorized personnel within the agency and is used only for authorized civil rights compliance and enforcement activities. In order to resolve a complaint OCR may need to reveal certain information to persons outside the agency to verify facts or gather additional information. Such information could include the name, the age or physical condition of a complainant. The Privacy Act of 1974 (Privacy Act), 5 U.S.C. § 552a, governs the maintenance of records contained in a system of records, and the Freedom of Information Act (FOIA), 5 U.S.C. § 552, establishes a public right of access (with certain exemptions) to OCR's records.

Historical Only. Not current.

The Privacy Act regulates the collection, maintenance, use, and dissemination of certain personal information in records contained in a federal agency's system of records. OCR's investigation files have been exempted from certain provisions of the Privacy Act, including, but not limited to, provisions that provide individuals with notification of, access to, and correction or amendment of records maintained on them. See 34 C.F.R. § 5b.11(c)(2)(ii). The Department has published in the Federal Register a Privacy Act system of records notice entitled "Complaint Files and Log" (18-08-01). Third parties may not gain access to records about individuals within a system of records without the prior written consent of the subject individual except as required by FOIA or pursuant to other statutory exceptions contained in the Privacy Act. See 5 U.S.C. § 552a(b).

The FOIA gives the public a right of access to records of federal agencies. The FOIA is implemented by Department regulations. See 34 C.F.R. Part 5.

Although each FOIA request will be reviewed on a case-by-case basis, generally, OCR is not required to release documents, or portions thereof, during the case resolution and investigation process or enforcement proceedings if the release could reasonably be expected to interfere with OCR's law enforcement activities. See 5 U.S.C. § 552(b)(7)(A). Also, a federal agency is not required to release inter- or intra-agency records, or portions thereof, if they are pre-decisional, deliberative documents, or if the records would otherwise be subject to certain privileges in litigation. See 5 U.S.C. § 552(b)(5). Further, a federal agency may not release documents, or portions thereof, that constitute commercial or financial information, obtained from a submitter, that is privileged or confidential. See 5 U.S.C. § 552(b)(4). Finally, a federal agency may not release documents, or portions thereof, if their release would or could result in an unwarranted invasion of privacy of an individual. See 5 U.S.C. §§ 552(b)(6) and (7)(C). Disclosure will only be made as consistent with the Privacy Act and FERPA. OCR will only reveal the name or identifying information about an individual if such disclosure is consistent with the Privacy Act and FERPA.

In addition, OCR can release certain information about the complaint to the press or general public, including the name of the school or institution; the date the complaint was filed; the type of discrimination included in the complaint; the date the complaint was resolved, dismissed or closed; the basic reasons for OCR's decision; and other related information. Any information OCR releases to the press or general public will not include the complainant's name or the name of the person on whose behalf the complaint was filed, except as noted in the paragraph above.

## SECTION 704     RECIPIENTS OPERATING UNDER FEDERAL COURT ORDER

### (a) When the United States is a Party to the Court Order

When OCR receives a complaint alleging discrimination by a recipient against which the DOJ represents the United States as a party in pending litigation, the following procedures will apply:

1. **OCR notification to DOJ**: OCR will forward the complaint to DOJ by electronic mail immediately and ask whether DOJ wants OCR to refer the complaint to DOJ. This will occur before any OCR evaluation of the complaint begins and even if it is clear on the face of the complaint that OCR would not open it for investigation.

2. **DOJ response**: DOJ will have seven calendar days after the date of OCR's electronic mail notification to determine whether: (1) DOJ wants OCR to refer the complaint to DOJ; or (2) DOJ does not want OCR to refer the complaint to DOJ. There are no additional options. For example, a complaint cannot be conditionally referred or conditionally declined, nor may DOJ request referral of only a portion of a complaint.

<p style="text-align:center; color:red;">Historical Only. Not current.</p>

Case Processing Manual                                                      Page 34

3.  **No referral to DOJ**: When DOJ indicates that it does not want OCR to refer the complaint, or DOJ does not respond within seven calendar days of the date of OCR's electronic mail notification, OCR, in its sole authority, will immediately process the complaint.

4.  **Referral to DOJ**: When DOJ indicates that it wants OCR to refer the complaint, then:

    i.   OCR will refer the entire complaint to DOJ;
    ii.  OCR will dismiss the complaint and notify the complainant that the complaint has been referred to DOJ; and
    iii. Once the complaint is referred to DOJ, DOJ will be responsible for investigating and resolving the entire complaint. OCR will forward all communications it receives from the complainant relating to the complaint to DOJ and DOJ will be responsible for addressing all such communications. OCR will not accept any type of return or re-referral of the complaint from DOJ.

**(b) When the United States is Not a Party to the Court Order**
As part of evaluation of the complaint, OCR will consult with parties about the current status of the court order.

**12034**    Federal Register / Vol. 62, No. 49 / Thursday, March 13, 1997 / Notices

## DEPARTMENT OF EDUCATION

### Office for Civil Rights; Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties

**ACTION:** Final policy guidance.

**SUMMARY:** The Assistant Secretary for Civil Rights issues a final document entitled "Sexual Harassment Guidance" (Guidance). Sexual harassment of students is prohibited by Title IX of the Education Amendments of 1972 under the circumstances described in the Guidance. The Guidance provides educational institutions with information regarding the standards that are used by the Office for Civil Rights (OCR), and that institutions should use, to investigate and resolve allegations of sexual harassment of students engaged in by school employees, other students (peers), or third parties.

**FOR FURTHER INFORMATION CONTACT:** Howard I. Kallem. U.S. Department of Education, 600 Independence Avenue, S.W., Room 5412 Switzer Building, Washington, D.C. 20202–1174. Telephone (202) 205–9641. Internet address: Howard _ Kallem@ed.gov For additional copies of this Guidance, individuals may call OCR's Customer Service Team at (202) 205–5413 or toll-free at 1–800–421–3481. Individuals who use a telecommunications device for the deaf (TDD) may call the Department's toll-free number, 1–800–421–3481, in conjunction with the phone company's TDD relay capabilities. This Guidance will also be available at OCR's site on the Internet at URL http://www.ed.gov/offices/OCR/ocrpubs.html.

**SUPPLEMENTARY INFORMATION:**

### Purpose of the Guidance

Title IX of the Education Amendments of 1972 (Title IX) prohibits discrimination on the basis of sex in education programs and activities receiving Federal financial assistance. Sexual harassment of students can be a form of discrimination prohibited by Title IX. The Office for Civil Rights has long recognized that sexual harassment of students engaged in by school employees, other students, or third parties is covered by Title IX. OCR's policy and practice is consistent with the Congress' goal in enacting Title IX—the elimination of sex-based discrimination in federally assisted education programs. It is also consistent with United States Supreme Court precedent and well-established legal principles that have developed under Title IX, as well as under the related

anti-discrimination provisions of Title VI and Title VII of the Civil Rights Act of 1964.

The elimination of sexual harassment of students in federally assisted educational programs is a high priority for OCR. Through its enforcement of Title IX, OCR has learned that a significant number of students, both male and female, have experienced sexual harassment, that sexual harassment can interfere with a student's academic performance and emotional and physical well-being, and that preventing and remedying sexual harassment in schools is essential to ensure nondiscriminatory, safe environments in which students can learn.

The Guidance applies to students at every level of education. It provides information intended to enable school employees and officials to identify sexual harassment and to take steps to prevent its occurrence. In addition, the Guidance is intended to inform educational institutions about the standards that should be followed when investigating and resolving claims of sexual harassment of students. The Guidance is important because school personnel who understand their obligations under Title IX are in the best position to prevent harassment and to lessen the harm to students if, despite their best efforts, harassment occurs. The Guidance discusses factors to be considered in applying the standards and examples that are designed to illustrate how the standards may apply to particular situations. Overall, the Guidance illustrates that in addressing allegations of sexual harassment, the judgment and common sense of teachers and school administrators are important elements of a response that meets the requirements of Title IX.

In addition, it is clear from the Guidance that not all behavior with sexual connotations constitutes sexual harassment under Federal law. In order to give rise to a complaint under Title IX, sexual harassment must be sufficiently severe, persistent, or pervasive that it adversely affects a student's education or creates a hostile or abusive educational environment. For a one-time incident to rise to the level of harassment, it must be severe.

As illustrated in the Guidance, school personnel should consider the age and maturity of students when responding to allegations of sexual harassment. The Guidance explains that age is relevant in determining whether sexual harassment occurred in the first instance, as well as in determining the appropriate response by the school. For example, age is relevant in determining whether a

student welcomed the conduct and in determining whether the conduct was severe, persistent, or pervasive. Age is a factor to be considered by school personnel when determining what type of education or training to provide to students in order to prevent sexual harassment from occurring.

Notably, during the time that the Guidance was available for public comment, several incidents involving young students occurred in public schools and were widely reported in the press. In one incident a school reportedly punished a six-year-old boy, under its sexual harassment policy, for kissing a female classmate on the cheek. These incidents provide a good example of how the Guidance can assist schools in formulating appropriate responses to conduct of this type. The factors in the Guidance confirm that a kiss on the cheek by a first grader does not constitute sexual harassment.

Consistent with the Guidance's reliance on school employees and officials to use their judgment and common sense, the Guidance offers school personnel flexibility in how to respond to sexual harassment. Commenters who read the Guidance as always requiring schools to punish alleged harassment under an explicit sexual harassment policy rather than by use of a general disciplinary or behavior code, even if the latter may provide more age-appropriate ways to handle those incidents, are incorrect. First, if inappropriate conduct does not rise to the level of harassment prohibited by Title IX, school employees or officials may rely entirely on their own judgment regarding how best to handle the situation.

Even if a school determines that a student's conduct is sexual harassment, the Guidance explicitly states that Title IX permits the use of a general student disciplinary procedure. The critical issue under Title IX is whether responsive action that a school could reasonably be expected to take is effective in ending the sexual harassment and in preventing its recurrence. If treating sexual harassment merely as inappropriate behavior is not effective in ending the harassment or in preventing it from escalating, schools must take additional steps to ensure that students know that the conduct is prohibited sex discrimination.

### Process in Developing the Guidance

Because of the importance of eliminating sexual harassment in schools, and based on the requests of schools, teachers, parents, and other interested parties, OCR determined that it should provide to schools a

comprehensive discussion of the legal standards and related issues involved in resolving sexual harassment incidents. While this document reflects longstanding OCR policy and practice in this area, it also reflects extensive consultation with interested parties. Even before making documents available for formal comment, OCR held a series of meetings with groups representing students, teachers, school administrators, and researchers. In these discussions, OCR gained valuable information regarding the realities of sexual harassment in schools, as well as information regarding promising practices for identifying and preventing harassment. These insights and learning are reflected in the Guidance.

**Issuance of the Guidance for Comment and the Format of the Final Guidance**

On August 16, 1996, the Assistant Secretary for Civil Rights published a notice in the **Federal Register** (61 FR 42728) regarding the availability of a document entitled: ''Sexual Harassment Guidance: Peer Sexual Harassment'' (Peer Guidance) and inviting comments on the document. Subsequently, on October 4, 1996, the Assistant Secretary published in the **Federal Register** (61 FR 52172) a request for comments on a document entitled: ''Sexual Harassment Guidance: Harassment of Students by School Employees'' (Employee Guidance). Both notices stated that the guidance documents reflected longstanding OCR policy and practice and invited comments and recommendations regarding their clarity and completeness.

The most significant change in the format of the final document is that it combines the two separate guidance documents into one document that addresses sexual harassment of students by peers, school employees, or third parties. Commenters frequently stated that a combined document would be clearer and easier to use. OCR agrees. Thus, the term ''Guidance'' when used in this preamble refers to the combined document that incorporates both the Peer Guidance and the Employee Guidance.

**Analysis of Comments and Changes**

In response to the Assistant Secretary's invitations to comment, OCR received approximately 70 comments on the Peer Guidance and approximately 10 comments on the Employee Guidance. Many commenters stated that the guidance documents provided comprehensive, clear, and useful information to schools. For instance, one commenter stated that the Peer Guidance was ''a godsend * * * in one

convenient place [it provides] the clear implications of the statutes, regulations, and case law.'' Another commenter stated that the Guidance ''will assist universities * * * in maintaining a harassment-free educational environment.''

Commenters also provided many specific suggestions and examples regarding how the final Guidance could be more complete and clearer. Many of these suggested changes have been incorporated into the Guidance.

The preamble discusses recurring and significant recommendations regarding the clarity and completeness of the document. While the invitations to comment on the Peer Guidance and Employee Guidance did not request substantive comments regarding OCR's longstanding policy and practice in the area of sexual harassment, some commenters did provide these comments. In instances in which OCR could provide additional useful information to readers related to these comments, it has done so in the preamble. Comments are grouped by subject and are discussed in the following sections.

*The Need for Additional Guidance*

*Comments:* Many commenters agreed that a document combining the Peer Guidance and the Employee Guidance would provide more clarity to schools. Commenters disagreed, however, regarding whether, and what type of, additional information is needed to enhance schools' understanding of their legal obligations under Title IX. Some commenters asked for more detailed analysis regarding the applicable legal standards, including hard and fast rules for determining what is harassment and how a school should respond. Other commenters, by contrast, found OCR's guidance documents, including the extensive legal citations, to be too detailed and ''legalistic.'' They expressed a need for a document that is simpler and more accessible to teachers, parents, school administrators, and others who need to know how to recognize, report, or respond to sexual harassment.

*Discussion:* As the Guidance makes clear, it is impossible to provide hard and fast rules applicable to all instances of sexual harassment. Instead, the Guidance provides factors to help schools make appropriate judgments.

In response to concerns for more analysis of the legal standards, OCR has provided additional examples in the Guidance to illustrate how the Title IX legal standards may apply in particular cases. It is important to remember that examples are just that; they do not cover

all the types of situations that may arise. Moreover, they may not illustrate the only way to respond to sexual harassment of students because there is often no one right way to respond.

OCR also believes that there is a legitimate concern that school administrators, teachers, students, and parents need an accessible document to assist them in recognizing and appropriately responding to sexual harassment. Accordingly, OCR has developed, in addition to the final Guidance, a pamphlet for conveying basic information regarding parties' rights and responsibilities under Title IX. The pamphlet includes information from the Guidance that would be most useful to these groups as they confront issues of sexual harassment. Concurrent with the issuance of this Guidance, the pamphlet will be issued with copies available from all OCR offices and an electronic posting on OCR's web site. For a copy of the pamphlet, individuals may call OCR's Customer Service Team at (202) 205–5413 or toll-free 1–800–421–3481. Copies will also be available from all OCR enforcement offices, and the pamphlet will be posted on OCR's site on the Internet at URL http://www.ed.gov/offices/OCR/ocrpubs.html.

*Additional Guidance on the First Amendment*

*Comments:* Many commenters asked OCR to provide additional guidance regarding the interplay of academic freedom and free speech rights with Title IX's prohibition of sexual harassment. Several of these commenters wanted OCR to announce hard and fast rules in this area, although commenters disagreed on what those rules should be. For instance, one commenter requested that OCR tell schools that the First Amendment does not prevent schools from punishing speech that has no legitimate pedagogical purpose. Another commenter, by contrast, wanted OCR to state that classroom speech simply can never be the basis for a sexual harassment complaint. Other commenters requested that OCR include specific examples regarding the application of free speech rights.

*Discussion:* As the documents published for comment indicated, the resolution of cases involving potential First Amendment issues is highly fact- and context-dependent. Thus, hard and fast rules are not appropriate.

However, in order to respond to concerns that schools need assistance in making these determinations, OCR has provided additional examples in the Guidance regarding the application of

the First Amendment principles discussed there.

### Application of Guidance to Harassment by Third Parties

*Comments:* Several commenters stated that it was unclear whether the Guidance applies if a student alleges harassment by a third party, i.e., by someone who is not an employee or student at the school.

*Discussion:* The Guidance clarifies that the principles in the Guidance apply to situations in which, for example, a student alleges that harassment by a visiting professional speaker or members of a visiting athletic team created a sexually hostile environment. The Peer Guidance did, in fact, discuss the standards applicable to the latter situation in which students from another school harassed the school's students.

The applicable standards have not changed, but the final Guidance clarifies that the same standards also apply if adults who are not employees or agents of the school engage in harassment of students.

### Application of Guidance to Harassment Based on Sexual Orientation

*Comments:* Several commenters indicated that, in light of OCR's stated policy that Title IX's prohibition against sexual harassment applies regardless of the sex of the harassed student or of the sex of the alleged harasser, the Guidance was confusing regarding the statement that Title IX does not apply to discrimination on the basis of sexual orientation.

*Discussion:* The Guidance has been clarified to indicate that if harassment is based on conduct of a sexual nature, it may be sexual harassment prohibited by Title IX even if the harasser and the harassed are the same sex or the victim of harassment is gay or lesbian. If, for example, harassing conduct of a sexual nature is directed at gay or lesbian students, it may create a sexually hostile environment and may constitute a violation of Title IX in the same way that it may for heterosexual students. The Guidance provides examples to illustrate the difference between this type of conduct, which may be prohibited by Title IX, and conduct constituting discrimination on the basis of sexual orientation, which is not prohibited by Title IX. The Guidance also indicates that some State or local laws or other Federal authority may prohibit discrimination on the basis of sexual orientation.

### The Effect on the Guidance of Conflicting Federal Court Decisions

*Comments:* Several commenters requested clarification of the standards to be applied to sexual harassment cases in States subject to the jurisdiction of the United States Court of Appeals for the Fifth Circuit, specifically in light of the Fifth Circuit's decision in *Rowinsky* v. *Bryan Independent School District*, 80 F.3d 1006 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 165 (1996).

*Discussion:* One beneficial result of the Guidance will be to provide courts with ready access to the standards used by the agency that has been given the authority by law to interpret and enforce Title IX. Courts generally benefit from and defer to the expertise of an agency with that authority.

Nevertheless, OCR recognizes that recent Fifth Circuit decisions add to schools' confusion regarding Title IX legal standards. In *Rowinsky*, the Fifth Circuit held that a school is not liable under Title IX even if it is on notice of peer sexual harassment and it ignores or fails to remedy it, unless it responds differently based on the sex of the alleged victim. Consistent with the vigorous dissent in *Rowinsky*, as well as with other Federal decisions contrary to the *Rowinsky* holding, OCR continues to believe that the *Rowinsky* decision was wrongly decided. In OCR's view, the holding in *Rowinsky* was based on a mistaken belief that the legal principle underpinning this aspect of the Guidance makes a school responsible for the actions of a harassing student, rather than for the school's own discrimination in failing to respond once it knows that the harassment is happening.

In two very recent decisions involving sexual harassment of students by school employees, the Fifth Circuit again applied Title IX law in a manner inconsistent with OCR's longstanding policy and practice. First, in *Canutillo Indep. School Dist.* v. *Leija*, 101 F.3d 393, 398–400 (5th Cir. 1996), the court held, again over a strong dissent and contrary to OCR policy, that a school district was not liable for the sexual molestation of a second grade student by one of her teachers because the student and her mother only reported the harassment to her homeroom teacher. The court determined that notice to the teacher was not notice to the school—notwithstanding that a school handbook instructed students and parents to report complaints to the child's primary or homeroom teacher.

Finally, in *Rosa H.* v. *San Elizario Indep. School Dist.*, 1997 U.S. App. LEXIS 2780 (Feb. 17, 1997), the Fifth Circuit reversed a jury finding that a school district was liable under Title IX for a hostile environment created by the school's male karate instructor, who repeatedly initiated sexual intercourse with a fifteen-year-old female karate student, often during the school day. The court held that, while ''there was no question that the student was subject to discrimination based on sex,'' a school is liable only in situations in which an employee who has been invested by the school board with supervisory power over the offending employee actually knew of the abuse, had the power to end the abuse, and failed to do so.

Several of the decisions discuss according ''appreciable deference'' to OCR's interpretation of Title IX in appropriate circumstances and contain other indications that Title IX law is evolving in the Fifth Circuit. When OCR investigates complaints involving schools in States in the Fifth Circuit (Texas, Louisiana, and Mississippi), it will in each case determine and follow the current applicable law, even if it is inconsistent with OCR policy. OCR will also participate where appropriate, and in conjunction with the Department of Justice, to shape the evolution of Title IX law in a manner consistent with the Guidance.

Inconsistent decisions do not prohibit schools in States in the Fifth Circuit from following the Guidance. Since the Guidance assists school in ensuring that students can learn in a safe and nondiscriminatory educational environment, it is the better practice for these schools to follow the Guidance. Indeed, in light of the evolving case law in the Fifth Circuit, following the Guidance may also be the safest way to ensure compliance with the requirements of Title IX. School personnel in States in the Fifth Circuit should also consider whether State, local, or other Federal authority affects their obligations in these areas.

### Notice

*Comments:* Several commenters recommended that additional guidance be provided regarding the types of employees through which a school can receive notice of sexual harassment. Commenters disagreed, however, on who should be able to receive notice. For instance, some commenters stated that OCR should find that a school has received notice only if ''managerial'' employees, ''designated'' employees, or employees with the authority to correct the harassment receive notice of the harassment. Another commenter suggested, by contrast, that any school employee should be considered a

responsible employee for purposes of notice.

*Discussion:* The Guidance states that a school has actual notice of sexual harassment if an agent or responsible employee of the school receives notice. An exhaustive list of employees would be inappropriate, however, because whether an employee is an agent or responsible school employee, or whether it would be reasonable for a student to believe the employee is an agent or responsible employee, even if the employee is not, will vary depending on factors such as the authority actually given to the employee and the age of the student. Thus, the Guidance gives examples of the types of employees that can receive notice of harassment. In this regard, it is important for schools to recognize that the Guidance does not necessarily require that any employee who receives notice of the harassment also be responsible for taking appropriate steps to end the harassment or prevent its recurrence. An employee may be required only to report the harassment to other school officials who have the responsibility to take appropriate action.

OCR does not agree with those commenters who recommend that a school can receive notice only through managerial or designated employees. For example, young students may not understand those designations and may reasonably believe that an adult, such as a teacher or the school nurse, is a person they can and should tell about incidents of sexual harassment regardless of that person's formal status in the school administration.

*Comments:* Several commenters stated that constructive notice, or the "should have known" standard, puts schools in the untenable position of constantly monitoring students and employees to seek out potential harassers.

*Discussion:* Constructive notice is relevant only if a school's liability depends on notice and conduct has occurred that is sufficient to trigger the school's obligation to respond. As the examples in the Guidance indicate, constructive notice is applicable only if a school ignores or fails to recognize overt or obvious problems of sexual harassment. Constructive notice does not require a school to predict aberrant behavior.

*Remedying the Effects of Harassment on Students*

*Comments:* Several commenters expressed concern regarding the Guidance's statement that schools may be required to pay for professional counseling and other services necessary to remedy the effects of harassment on students. Some comments indicated confusion over the circumstances under which the responsibility for those costs would exist and concern over the financial responsibility that would be created. Others stated that schools should not be liable for these costs if they have taken appropriate responsive action to eliminate the harassing environment, or if the harassers are non-employees.

*Discussion:* The final Guidance provides additional clarification regarding when a school may be required to remedy the effects on those who have been subject to harassment. For instance, if a teacher engages in *quid pro quo* harassment against a student, a school is liable under Title IX for the conduct and its effects. Thus, appropriate corrective action could include providing counseling services to the harassed student or paying other costs necessary to remedy the effects of the teacher's harassment. On the other hand, if a school's liability depends on its failure to take appropriate action after it receives notice of the harassment, e.g., in cases of peer harassment, the extent of a school's liability for remedying the effects of harassment will depend on the speed and efficacy of the school's response once it receives notice. For instance, if a school responds immediately and appropriately to eliminate harassment of which it has notice and to prevent its recurrence, it will not be responsible for remedying the effects of harassment, if any, on the individual. By contrast, if a school ignores complaints by a student that he or she is persistently being sexually harassed by another student in his or her class, the school will be required to remedy those effects of the harassment that it could have prevented if it had responded appropriately to the student's complaints, including, if appropriate, the provision of counseling services.

*Confidentiality*

*Comments:* Many commenters recommended additional clarification regarding how schools should respond if a harassed student requests that his or her name not be disclosed. Some commenters believe that, particularly in the elementary and secondary school arena, remedying harassment must be the school's first priority, even if that action results in a breach of a request for confidentiality. These commenters were concerned that, by honoring requests for confidentiality, schools would not be able to take effective action to remedy harassment. Other commenters believe that if requests for confidentiality are not honored, students may be discouraged from reporting harassment. These commenters, therefore, argue that declining to honor these requests would be less effective in preventing harassment than taking whatever steps are possible to remedy harassment, while maintaining a victim's confidentiality. Finally, some commenters were concerned that withholding the name of the victim of harassment would interfere with the due process rights of the accused.

*Discussion:* The Guidance strikes a balance regarding the issue of confidentiality: encouraging students to report harassment, even if students wish to maintain confidentiality, but not placing schools in an untenable position regarding their obligations to remedy and prevent further harassment, or making it impossible for an accused to adequately defend himself or herself. The Guidance encourages schools to honor a student's request that his or her name be withheld, if this can be done consistently with the school's obligation to remedy the harassment and take steps to prevent further harassment. (The Guidance also notes that schools should consider whether the Family Educational Rights and Privacy Act (FERPA) would prohibit a school from disclosing information from a student's education record without the consent of the student alleging harassment.) In addition, OCR has provided clarification by describing factors schools should consider in making these determinations. These factors include the nature of the harassment, the age of the students involved, and the number of incidents and students involved. These factors also may be relevant in balancing a victim's need for confidentiality against the rights of an accused harasser.

The Guidance also has been clarified to acknowledge that, because of the sensitive nature of incidents of harassment, it is important to limit or prevent public disclosure of the names of both the student who alleges harassment and the name of the alleged harasser. The Guidance informs schools that, in all cases, they should make every effort to prevent public disclosure of the names of all parties involved, except to the extent necessary to carry out a thorough investigation.

*FERPA*

*Comments:* Several commenters stated that the Department should change its position that FERPA could prevent a school from informing a complainant of the sanction or discipline imposed on a student found guilty of harassment. Some commenters

argued that information regarding the outcome of a sexual harassment complaint is not an education record covered by FERPA. Other commenters argued alternatively that any information regarding the outcome of the proceedings is "related to" the complainant and, therefore, the information can be disclosed to him or her consistent with FERPA. In addition, some commenters asked for clarification that FERPA does not limit the due process rights of a teacher who is accused of harassment to be informed of the name of the student who has alleged harassment.

*Discussion:* As these comments indicate, the interplay of FERPA and Title IX raises complex and difficult issues. Regarding requests for clarification on the interplay of FERPA and the rights of an accused employee, the Guidance clarifies that the Department does not interpret FERPA to override any federally protected due process rights of a school employee accused of harassment.

Regarding whether FERPA prohibits the disclosure of any disciplinary action taken against a student found guilty of harassment, it is the Department's current position that FERPA prohibits a school from releasing information to a complainant if that information is contained in the other student's education record unless— (1) the information directly relates to the complainant (for example, an order requiring the student harasser not to have contact with the complainant); or (2) the harassment involves a crime of violence or a sex offense in a postsecondary institution. However, in light of the comments received on this issue, the Department has determined that its position regarding the application of FERPA to records and information related to sexual harassment needs further consideration. Accordingly, the section on "Notice of Outcome and FERPA" has been removed from the Guidance. Additional guidance on FERPA will be forthcoming.

*Does Title IX Require Schools to Have a Sexual Harassment Policy*

*Comments:* Several commenters requested additional clarity regarding whether Title IX requires schools to have a policy explicitly prohibiting sexual harassment or to have grievance procedures specifically intended to handle sexual harassment complaints, or both.

*Discussion:* Title IX requires a recipient of Federal funds to notify students and parents of elementary and secondary students of its policy against

discrimination based on sex and have in place a prompt and equitable procedure for resolving sex discrimination complaints. Sexual harassment can be a form of sexual discrimination. The Guidance clearly states that, while a recipient's policy and procedure must meet all procedural requirements of Title IX and apply to sexual harassment, a school does not have to have a policy and procedure specifically addressing sexual harassment, as long as its non-discrimination policy and procedures for handling discrimination complaints are effective in eliminating all types of sex discrimination. OCR has found that policies and procedures specifically designed to address sexual harassment, if age appropriate, are a very effective means of making students and employees aware of what constitutes sexual harassment, that that conduct is prohibited sex discrimination, and that it will not be tolerated by the school. That awareness, in turn, can be a key element in preventing sexual harassment.

Dated: March 10, 1997.

**Norma V. Cantú,**
*Assistant Secretary for Civil Rights.*

**Sexual Harassment Guidance: Harassment of Students[1] by School Employees, Other Students, or Third Parties**

**Summary of Contents**

Introduction
Applicability of Title IX
Liability of a School for Sexual Harassment
Welcomeness
Severe, Persistent, or Pervasive
Notice
Recipient's Response
Prompt and Equitable Grievance Procedures
First Amendment

**Introduction**

Under Title IX of the Education Amendments of 1972 (Title IX) and its implementing regulations, no individual may be discriminated against on the basis of sex in any education program or activity receiving Federal financial assistance.[2] Sexual harassment of students is a form of prohibited sex discrimination[3] under the circumstances described in the Guidance. The following types of conduct constitute sexual harassment:

*Quid Pro Quo Harassment*

A school employee[4] explicitly or implicitly conditions a student's participation in an education program or activity or bases an educational decision on the student's submission to unwelcome sexual advances, requests for sexual favors, or other verbal, nonverbal, or physical conduct of a

sexual nature.[5] *Quid pro quo* harassment is equally unlawful whether the student resists and suffers the threatened harm or submits and thus avoids the threatened harm.

*Hostile Environment Sexual Harassment*

Sexually harassing conduct (which can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature)[6] by an employee, by another student, or by a third party that is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from an education program or activity, or to create a hostile or abusive educational environment.[7]

Schools are required by the Title IX regulations to have grievance procedures through which students can complain of alleged sex discrimination, including sexual harassment.[8] As outlined in this guidance, grievance procedures also provide schools with an excellent mechanism to be used in their efforts to prevent sexual harassment before it occurs.

Finally, if the alleged harassment involves issues of speech or expression, a school's obligations may be affected by the application of First Amendment principles.

These and other issues are discussed in more detail in the following paragraphs.

**Applicability of Title IX**

Title IX applies to all public and private educational institutions that receive Federal funds, including elementary and secondary schools, school districts, proprietary schools, colleges, and universities. The Guidance uses the term "schools" to refer to all those institutions. The "education program or activity" of a school includes all of the school's operations.[9] This means that Title IX protects students in connection with all of the academic, educational, extra-curricular, athletic, and other programs of the school, whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere.

It is important to recognize that Title IX's prohibition of sexual harassment does not extend to legitimate nonsexual touching or other nonsexual conduct. For example, a high school athletic coach hugging a student who made a goal or a kindergarten teacher's consoling hug for a child with a skinned knee will not be considered sexual harassment.[10] Similarly, one student's demonstration of a sports maneuver or

technique requiring contact with another student will not be considered sexual harassment. However, in some circumstances, nonsexual conduct may take on sexual connotations and may rise to the level of sexual harassment. For example, a teacher's repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment.

Title IX protects any ''person'' from sex discrimination; accordingly both male and female students are protected from sexual harassment engaged in by a school's employees, other students, or third parties.[11] Moreover, Title IX prohibits sexual harassment regardless of the sex of the harasser, i.e., even if the harasser and the person being harassed are members of the same sex.[12] An example would be a campaign of sexually explicit graffiti directed at a particular girl by other girls.[13]

Although Title IX does not prohibit discrimination on the basis of sexual orientation,[14] sexual harassment directed at gay or lesbian students may constitute sexual harassment prohibited by Title IX. For example, if students heckle another student with comments based on the student's sexual orientation (e.g., ''gay students are not welcome at this table in the cafeteria''), but their actions or language do not involve sexual conduct, their actions would not be sexual harassment covered by Title IX. On the other hand, harassing conduct of a sexual nature directed toward gay or lesbian students (e.g., if a male student or a group of male students target a lesbian student for physical sexual advances) may create a sexually hostile environment and, therefore, may be prohibited by Title IX. It should be noted that some State and local laws may prohibit discrimination on the basis of sexual orientation. Also, under certain circumstances, courts may permit redress for harassment on the basis of sexual orientation under other Federal legal authority.[15]

It is also important to recognize that gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex, but not involving conduct of a sexual nature, may be a form of sex discrimination that violates Title IX if it is sufficiently severe, persistent, or pervasive and directed at individuals because of their sex.[16] For example, the repeated sabotaging of female graduate students' laboratory experiments by male students in the class could be the basis of a violation of Title IX. Although a comprehensive discussion of gender-based harassment

is beyond the scope of this Guidance, in assessing all related circumstances to determine whether a hostile environment exists, incidents of gender-based harassment combined with incidents of sexual harassment could create a hostile environment, even if neither the gender-based harassment alone nor the sexual harassment alone would be sufficient to do so.[17]

## Liability of a School for Sexual Harassment

### Liability of a School for Sexual Harassment by its Employees

A school's liability for sexual harassment by its employees is determined by application of agency principles,[18] i.e., by principles governing the delegation of authority to or authorization of another person to act on one's behalf.

Accordingly, a school will always be liable for even one instance of *quid pro quo* harassment by a school employee in a position of authority, such as a teacher or administrator, whether or not it knew, should have known, or approved of the harassment at issue.[19] Under agency principles, if a teacher or other employee uses the authority he or she is given (e.g., to assign grades) to force a student to submit to sexual demands, the employee ''stands in the shoes'' of the school and the school will be responsible for the use of its authority by the employee or agent.[20]

A school will also be liable for hostile environment sexual harassment by its employees,[21] i.e., for harassment that is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program or to create a hostile or abusive educational environment if the employee— (1) acted with apparent authority (i.e., because of the school's conduct, the employee reasonably appears to be acting on behalf of the school, whether or not the employee acted with authority);[22] or (2) was aided in carrying out the sexual harassment of students by his or her position of authority with the institution.[23] For example, a school will be liable if a teacher abuses his or her delegated authority over a student to create a hostile environment, such as if the teacher implicitly threatens to fail a student unless the student responds to his or her sexual advances, even though the teacher fails to carry out the threat.[24]

As this example illustrates, in many cases the line between *quid pro quo* and hostile environment discrimination will be blurred, and the employee's conduct may constitute both types of harassment. However, what is important

is that the school is liable for that conduct under application of agency principles, regardless of whether it is labeled as *quid pro quo* or hostile environment harassment.

Whether other employees, such as a janitor or cafeteria worker, are in positions of authority in relation to students—or whether it would be reasonable for the student to believe the employees are, even if the employees are not (i.e., apparent authority)—will depend on factors such as the authority actually given to the employee [25] (e.g., in some elementary schools, a cafeteria worker may have authority to impose discipline) and the age of the student. For example, in some cases the younger a student is, the more likely it is that he or she will consider any adult employee to be in a position of authority.

Even in situations not involving (i) *quid pro quo* harassment, (ii) creation of a hostile environment through an employee's apparent authority, or (iii) creation of a hostile environment in which the employee is aided in carrying out the sexual harassment by his or her position of authority, a school will be liable for sexual harassment of its students by its employees under the same standards applicable to peer and third party hostile environment sexual harassment, as discussed in the next section. That is, if the school fails to take immediate and appropriate steps to remedy known harassment, then the school will be liable under Title IX.[26] It is important to emphasize that under this standard of liability the school can avoid violating Title IX if it takes immediate and appropriate action upon notice of the harassment.

### Liability of a School for Peer or Third Party Harassment [27]

In contrast to the variety of situations in which a school may be liable for sexual harassment by its employees, a school will be liable under Title IX if its students sexually harass other students if (i) a hostile environment exists in the school's programs or activities, (ii) the school knows or should have known of the harassment, and (iii) the school fails to take immediate and appropriate corrective action.[28] (Each of these factors is discussed in detail in subsequent sections of the Guidance.) Under these circumstances, a school's failure to respond to the existence of a hostile environment within its own programs or activities permits an atmosphere of sexual discrimination to permeate the educational program and results in discrimination prohibited by Title IX. Conversely, if, upon notice of hostile environment harassment, a school takes immediate and appropriate

steps to remedy the hostile environment, the school has avoided violating Title IX. Thus, Title IX does not make a school responsible for the actions of harassing students, but rather for its own discrimination in failing to remedy it once the school has notice.

Sexually harassing conduct of third parties, who are not themselves employees or students at the school (e.g., a visiting speaker or members of a visiting athletic club) can also cause a sexually hostile environment in school programs or activities. For the same reason that a school will be liable under Title IX for a hostile environment caused by its students, a school will be liable if third parties sexually harass its students if (i) a hostile environment exists in the school's programs or activities, (ii) the school knows or should have known of the harassment, and (iii) the school fails to take immediate and appropriate corrective action.[29] However, the type of appropriate steps the school should take will differ depending on the level of control the school has over the third party harasser.[30] This issue is discussed in "Recipient's Response."

*Effect of Grievance Procedures on Liability*

Schools are required by the Title IX regulations to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination.[31] (These issues are discussed in the section on "Prompt and Equitable Grievance Procedures.") These procedures provide a school with a mechanism for discovering sexual harassment as early as possible and for effectively correcting problems, as required by Title IX. By having a strong policy against sex discrimination and accessible, effective, and fairly applied grievance procedures, a school is telling its students that it does not tolerate sexual harassment and that students can report it without fear of adverse consequences.

Accordingly, in the absence of effective policies and grievance procedures, if the alleged harassment was sufficiently severe, persistent, or pervasive to create a hostile environment, a school will be in violation of Title IX because of the existence of a hostile environment, even if the school was not aware of the harassment and thus failed to remedy it.[32] This is because, without a policy and procedure, a student does not know either of the school's interest in preventing this form of discrimination

or how to report harassment so that it can be remedied. Moreover, under the agency principles previously discussed, a school's failure to implement effective policies and procedures against discrimination may create apparent authority for school employees to harass students.[33]

*OCR Case Resolution*

If OCR is asked to investigate or otherwise resolve incidents of sexual harassment of students, including incidents caused by employees, other students, or third parties, OCR will consider whether—(1) the school has a policy prohibiting sex discrimination under Title IX and effective Title IX grievance procedures;[34] (2) the school appropriately investigated or otherwise responded to allegations of sexual harassment; and (3) the school has taken immediate and appropriate corrective action responsive to *quid pro quo* or hostile environment harassment. (Issues related to appropriate investigative and corrective actions are discussed in detail in the section on "Recipient's Response.") If the school has taken each of these steps, OCR will consider the case against the school resolved and take no further action other than monitoring compliance with any agreement between the school and OCR. This is true in cases in which the school was in violation of Title IX, as well as those in which there has been no violation of Title IX.[35]

**Welcomeness**

In order to be actionable as harassment, sexual conduct must be unwelcome. Conduct is unwelcome if the student did not request or invite it and "regarded the conduct as undesirable or offensive."[36] Acquiescence in the conduct or the failure to complain does not always mean that the conduct was welcome.[37] For example, a student may decide not to resist sexual advances of another student or may not file a complaint out of fear. In addition, a student may not object to a pattern of sexually demeaning comments directed at him or her by a group of students out of a concern that objections might cause the harassers to make more comments. The fact that a student may have accepted the conduct does not mean that he or she welcomed it.[38] Also, the fact that a student willingly participated in conduct on one occasion does not prevent him or her from indicating that the same conduct has become unwelcome on a subsequent occasion. On the other hand, if a student actively participates in sexual banter and discussions and gives no indication that

he or she objects, then the evidence generally will not support a conclusion that the conduct was unwelcome.[39]

If younger children are involved, it may be necessary to determine the degree to which they are able to recognize that certain sexual conduct is conduct to which they can or should reasonably object and the degree to which they can articulate an objection. Accordingly, OCR will consider the age of the student, the nature of the conduct involved, and other relevant factors in determining whether a student had the capacity to welcome sexual conduct.

Schools should be particularly concerned about the issue of welcomeness if the harasser is in a position of authority. For instance, because students may be encouraged to believe that a teacher has absolute authority over the operation of his or her classroom, a student may not object to a teacher's sexually harassing comments during class; however, this does not necessarily mean that the conduct was welcome. Instead, the student may believe that any objections would be ineffective in stopping the harassment or may fear that by making objections he or she will be singled out for harassing comments or other retaliation.

In addition, OCR must consider particular issues of welcomeness if the alleged harassment relates to alleged "consensual" sexual relationships between a school's adult employees and its students. If elementary students are involved, welcomeness will not be an issue: OCR will never view sexual conduct between an adult school employee and an elementary school student as consensual. In cases involving secondary students, there will be a strong presumption that sexual conduct between an adult school employee and a student is not consensual. In cases involving older secondary students, subject to the presumption,[40] OCR will consider a number of factors in determining whether a school employee's sexual advances or other sexual conduct could be considered welcome.[41] In addition, OCR will consider these factors in all cases involving postsecondary students in making those determinations.[42] The factors include:

• The nature of the conduct and the relationship of the school employee to the student, including the degree of influence (which could, at least in part, be affected by the student's age), authority, or control the employee has over the student.

• Whether the student was legally or practically unable to consent to the sexual conduct in question. For

example, a student's age could affect his or her ability to do so. Similarly, certain types of disabilities could affect a student's ability to do so.

If there is a dispute about whether harassment occurred or whether it was welcome—in a case in which it is appropriate to consider whether the conduct could be welcome— determinations should be made based on the totality of the circumstances. The following types of information may be helpful in resolving the dispute:

• Statements by any witnesses to the alleged incident.

• Evidence about the relative credibility of the allegedly harassed student and the alleged harasser. For example, the level of detail and consistency of each person's account should be compared in an attempt to determine who is telling the truth. Another way to assess credibility is to see if corroborative evidence is lacking where it should logically exist. However, the absence of witnesses may indicate only the unwillingness of others to step forward, perhaps due to fear of the harasser or a desire not to get involved.

• Evidence that the alleged harasser has been found to have harassed others may support the credibility of the student claiming the harassment; conversely, the student's claim will be weakened if he or she has been found to have made false allegations against other individuals.

• Evidence of the allegedly harassed student's reaction or behavior after the alleged harassment. For example, were there witnesses who saw the student immediately after the alleged incident who say that the student appeared to be upset? However, it is important to note that some students may respond to harassment in ways that do not manifest themselves right away, but may surface several days or weeks after the harassment. For example, a student may initially show no signs of having been harassed, but several weeks after the harassment, there may be significant changes in the student's behavior, including difficulty concentrating on academic work, symptoms of depression, and a desire to avoid certain individuals and places at school.

• Evidence about whether the student claiming harassment filed a complaint or took other action to protest the conduct soon after the alleged incident occurred. However, failure to immediately complain may merely reflect a fear of retaliation or a fear that the complainant may not be believed rather than that the alleged harassment did not occur.

• Other contemporaneous evidence. For example, did the student claiming harassment write about the conduct, and his or her reaction to it, soon after it occurred (e.g., in a diary or letter)? Did the student tell others (friends, parents) about the conduct (and his or her reaction to it) soon after it occurred?

**Severe, Persistent, or Pervasive**

Hostile environment sexual harassment of a student or students by other students, employees, or third parties is created if conduct of a sexual nature is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program or to create a hostile or abusive educational environment. Thus, conduct that is sufficiently severe, but not persistent or pervasive, can result in hostile environment sexual harassment.

In deciding whether conduct is sufficiently severe, persistent, or pervasive, the conduct should be considered from both a subjective [43] and objective [44] perspective. In making this determination, all relevant circumstances should be considered [45]:

• *The degree to which the conduct affected one or more students' education.* For a hostile environment to exist, the conduct must have limited the ability of a student to participate in or benefit from his or her education or altered the conditions of the student's educational environment. [46]

•• Many hostile environment cases involve tangible or obvious injuries. [47] For example, a student's grades may go down or the student may be forced to withdraw from school because of the harassing behavior. [48] A student may also suffer physical injuries and mental or emotional distress. [49]

•• However, a hostile environment may exist even if there is no tangible injury to the student. [50] For example, a student may have been able to keep up his or her grades and continue to attend school even though it was more difficult for him or her to do so because of the harassing behavior. [51] A student may be able to remain on a sports team, despite feeling humiliated or angered by harassment that creates a hostile environment. [52] Harassing conduct in these examples alters the student's educational environment on the basis of sex.

•• A hostile environment can occur even if the harassment is not targeted specifically at the individual complainant. [53] For example, if a student or group of students regularly directs sexual comments toward a particular student, a hostile environment may be created not only for the targeted student,

but also for others who witness the conduct. Similarly, if a middle school teacher directs sexual comments toward a particular student, a hostile environment may be created for the targeted student and for the students who witness the conduct.

• *The type, frequency, and duration of the conduct.* In most cases, a hostile environment will exist if there is a pattern or practice of harassment or if the harassment is sustained and nontrivial. [54] For instance, if a young woman is taunted by one or more young men about her breasts or genital area or both, OCR may find that a hostile environment has been created, particularly if the conduct has gone on for some time, takes place throughout the school, or if the taunts are made by a number of students. The more severe the conduct, the less the need to show a repetitive series of incidents; this is particularly true if the harassment is physical. For instance, if the conduct is more severe, e.g., attempts to grab a female student's breasts, genital area, or buttocks, it need not be as persistent or pervasive in order to create a hostile environment. Indeed, a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment. [55] On the other hand, conduct that is not severe, persistent, or pervasive will not create a hostile environment; e.g., a comment by one student to another student that she has a nice figure. Indeed, depending on the circumstances, this may not even be conduct of a sexual nature. [56] Similarly, because students date one another, a request for a date or a gift of flowers, even if unwelcome, would not create a hostile environment. However, there may be circumstances in which repeated, unwelcome requests for dates or similar conduct could create a hostile environment. For example, a person may request dates in an intimidating or threatening manner.

• *The identity of and relationship between the alleged harasser and the subject or subjects of the harassment.* A factor to be considered, especially in cases involving allegations of sexual harassment of a student by a school employee, is the identity of and relationship between the alleged harasser and the subject or subjects of the harassment. For example, due to the power that a professor or teacher has over a student, sexually based conduct by that person toward a student is more likely to create a hostile environment than similar conduct by another student. [57]

• *The number of individuals involved.* Sexual harassment may be committed by an individual or a group.

In some cases, verbal comments or other conduct from one person might not be sufficient to create a hostile environment, but could be if done by a group. Similarly, while harassment can be directed toward an individual or a group,[58] the effect of the conduct toward a group may vary, depending on the type of conduct and the context. For certain types of conduct, there may be "safety in numbers." For example, following an individual student and making sexual taunts to him or her may be very intimidating to that student but, in certain circumstances, less so to a group of students. On the other hand, persistent unwelcome sexual conduct still may create a hostile environment if directed toward a group.

• *The age and sex of the alleged harasser and the subject or subjects of the harassment.* For example, in the case of younger students, sexually harassing conduct is more likely to be intimidating if coming from an older student.[59]

• *The size of the school, location of the incidents, and context in which they occurred.* Depending on the circumstances of a particular case, fewer incidents may have a greater effect at a small college than at a large university campus. Harassing conduct occurring on a school bus may be more intimidating than similar conduct on a school playground because the restricted area makes it impossible for the students to avoid their harassers.[60] Harassing conduct in a personal or secluded area such as a dormitory room or residence hall can also have a greater effect (e.g., be seen as more threatening) than would similar conduct in a more public area. On the other hand, harassing conduct in a public place may be more humiliating. Each incident must be judged individually.

• *Other incidents at the school.* A series of instances at the school, not involving the same students, could—taken together—create a hostile environment, even if each by itself would not be sufficient.[61]

• *Incidents of gender-based, but non-sexual, harassment.* Acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex, but not involving sexual activity or language, can be combined with incidents of sexual harassment to determine if the incidents of sexual harassment are sufficiently severe, persistent, or pervasive to create a sexually hostile environment.[62]

**Notice**

A school will be in violation of Title IX if the school "has notice" of a sexually hostile environment and fails to take immediate and appropriate corrective action.[63] A school has notice if it actually "knew, or in the exercise of reasonable care, should have known" about the harassment.[64] In addition, as long as an agent or responsible employee of the school received notice,[65] the school has notice.

A school can receive notice in many different ways. A student may have filed a grievance or complained to a teacher about fellow students sexually harassing him or her. A student, parent, or other individual may have contacted other appropriate personnel, such as a principal, campus security, bus driver, teacher, an affirmative action officer, or staff in the office of student affairs. An agent or responsible employee of the school may have witnessed the harassment. The school may receive notice in an indirect manner, from sources such as a member of the school staff, a member of the educational or local community, or the media. The school also may have received notice from flyers about the incident or incidents posted around the school.[66]

Constructive notice exists if the school "should have" known about the harassment—if the school would have found out about the harassment through a "reasonably diligent inquiry."[67] For example, if a school knows of some incidents of harassment, there may be situations in which it will be charged with notice of others—if the known incidents should have triggered an investigation that would have led to a discovery of the additional incidents. In other cases, the pervasiveness of the harassment may be enough to conclude that the school should have known of the hostile environment—if the harassment is widespread, openly practiced, or well-known to students and staff (such as sexual harassment occurring in hallways, graffiti in public areas, or harassment occurring during recess under a teacher's supervision).[68]

In addition, if a school otherwise has actual or constructive notice of a hostile environment and fails to take immediate and appropriate corrective action, a school has violated Title IX even if the student fails to use the school's existing grievance procedures.

**Recipient's Response**

Once a school has notice of possible sexual harassment of students—whether carried out by employees, other students, or third parties—it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again. These steps are the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action.[69] As described in the next section, in appropriate circumstances the school will also be responsible for taking steps to remedy the effects of the harassment on the individual student or students who were harassed. What constitutes a reasonable response to information about possible sexual harassment will differ depending upon the circumstances.

*Response to Student or Parent Reports of Harassment; Response to Direct Observation by a Responsible Employee or Agent of Harassment*

If a student or the parent of an elementary or secondary student provides information or complains about sexual harassment of the student, the school should initially discuss what actions the student or parent is seeking in response to the harassment. The school should explain the avenues for informal and formal action, including a description of the grievance procedure that is available for sexual harassment complaints and an explanation of how the procedure works. If a responsible school employee or agent has directly observed sexual harassment of a student, the school should contact the student who was harassed (or the parent, depending upon the age of the student),[70] explain that the school is responsible for taking steps to correct the harassment, and provide the same information described in the previous sentence.

Regardless of whether the student who was harassed, or his or her parent, decides to file a formal complaint or otherwise request action on the student's behalf (including in cases involving direct observation by a responsible school employee or agent), the school must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation. The specific steps in an investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors. However, in all cases the inquiry must be prompt, thorough, and impartial. (Requests by the student who was harassed for confidentiality or for no action to be taken, responding to notice of harassment from other sources, and the components of a prompt and equitable grievance procedure are discussed in subsequent sections of the Guidance.)

It may be appropriate for a school to take interim measures during the investigation of a complaint. For instance, if a student alleges that he or she has been sexually assaulted by another student, the school may decide to immediately place the students in separate classes or in different housing arrangements on a campus, pending the results of the school's investigation. Similarly, if the alleged harasser is a teacher, allowing the student to transfer to a different class may be appropriate. In cases involving potential criminal conduct, school personnel should determine whether appropriate law enforcement authorities should be notified. In all cases, schools should make every effort to prevent public disclosure of the names of all parties involved, except to the extent necessary to carry out an investigation.

If a school determines that sexual harassment has occurred, it should take reasonable, timely, age-appropriate, and effective corrective action, including steps tailored to the specific situation. [71] Appropriate steps should be taken to end the harassment. For example, school personnel may need to counsel, warn, or take disciplinary action against the harasser, based on the severity of the harassment or any record of prior incidents or both. [72] A series of escalating consequences may be necessary if the initial steps are ineffective in stopping the harassment. [73] In some cases, it may be appropriate to further separate the harassed student and the harasser, e.g., by changing housing arrangements [74] or directing the harasser to have no further contact with the harassed student. Responsive measures of this type should be designed to minimize, as much as possible, the burden on the student who was harassed. If the alleged harasser is not a student or employee of the recipient, OCR will consider the level of control the school has over the harasser in determining what response would be appropriate [75].

Steps also should be taken to eliminate any hostile environment that has been created. For example, if a female student has been subjected to harassment by a group of other students in a class, the school may need to deliver special training or other interventions for that class to repair the educational environment. If the school offers the student the option of withdrawing from a class in which a hostile environment occurred, the school should assist the student in making program or schedule changes and ensure that none of the changes adversely affect the student's academic record. Other measures may include, if

appropriate, directing a harasser to apologize to the harassed student. If a hostile environment has affected an entire school or campus, an effective response may need to include dissemination of information, the issuance of new policy statements, or other steps that are designed to clearly communicate the message that the school does not tolerate harassment and will be responsive to any student who reports that conduct.

In some situations, a school may be required to provide other services to the student who was harassed if necessary to address the effects of the harassment on that student. [76] For example, if an instructor gives a student a low grade because the student failed to respond to his sexual advances, this constitutes *quid pro quo* harassment for which the school is liable under Title IX regardless of whether it knew of the harassment. Thus, the school may be required to make arrangements for an independent reassessment of the student's work, if feasible, and change the grade accordingly; make arrangements for the student to take the course again with a different instructor; provide tutoring; make tuition adjustments; offer reimbursement for professional counseling; or take other measures that are appropriate to the circumstances. As another example, if a school delays responding or responds inappropriately to information about harassment, such as a case in which the school ignores complaints by a student that he or she is being sexually harassed by a classmate, the school will be required to remedy the effects of the harassment that could have been prevented had the school responded promptly and appropriately.

Finally, a school should take steps to prevent any further harassment [77] and to prevent any retaliation against the student who made the complaint (or was the subject of the harassment), against a person who filed a complaint on behalf of a student, or against those who provided information as witnesses. [78] At a minimum, this includes making sure that the harassed students and their parents know how to report any subsequent problems and making follow-up inquiries to see if there have been any new incidents or any retaliation. To prevent recurrences, counseling for the harasser may be appropriate to ensure that he or she understands what constitutes harassment and the effects it can have. In addition, depending on how widespread the harassment was and whether there have been any prior incidents, the school may need to provide training for the larger school

community to ensure that students, parents, and teachers can recognize harassment if it recurs and know how to respond. [79]

*Requests by the Harassed Student for Confidentiality*

The scope of a reasonable response also may depend upon whether a student, or parent of a minor student, reporting harassment asks that the student's name not be disclosed to the harasser or that nothing be done about the alleged harassment. In all cases a school should discuss confidentiality standards and concerns with the complainant initially. The school should inform the student that the request may limit the school's ability to respond. The school also should tell the student that Title IX prohibits retaliation and that, if he or she is afraid of reprisals from the alleged harasser, the school will take steps to try to prevent retaliation and will take strong responsive actions if retaliation occurs. If the student continues to ask that his or her name not be revealed, the school should take all reasonable steps to investigate and respond to the complaint consistent with that request as long as doing so does not preclude the school from responding effectively to the harassment and preventing harassment of other students. Thus, for example, a reasonable response would not require disciplinary action against an alleged harasser if a student, who was the only student harassed, insists that his or her name not be revealed, and the alleged harasser could not respond to the charges of sexual harassment without that information.

At the same time, a school should evaluate the confidentiality request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students. The factors a school may consider in this regard include the seriousness of the alleged harassment, the age of the student harassed, whether there have been other complaints or reports of harassment against the alleged harasser, and the rights of the accused individual to receive information about the accuser and the allegations if a formal proceeding with sanctions may result. [80]

Although a student's request to have his or her name withheld may limit the school's ability to respond fully to an individual complaint of harassment, other means may be available to address the harassment. There are steps a recipient can take to limit the effects of the alleged harassment and prevent its recurrence without initiating formal action against the alleged harasser or revealing the identity of the

**12044**    **Federal Register** / Vol. 62, No. 49 / Thursday, March 13, 1997 / Notices

complainant. Examples include conducting sexual harassment training for the school site or academic department where the problem occurred, taking a student survey concerning any problems with harassment, or implementing other systemic measures at the site or department where the alleged harassment has occurred.

In addition, by investigating the complaint to the extent possible—including by reporting it to the Title IX coordinator or other responsible school employee designated pursuant to Title IX—the school may learn about or be able to confirm a pattern of harassment based on claims by different students that they were harassed by the same individual. In some situations there may be prior reports by former students who now might be willing to come forward and be identified, thus providing a basis for further corrective action. In instances affecting a number of students (for example, a report from a student that an instructor has repeatedly made sexually explicit remarks about his or her personal life in front of an entire class), an individual can be put on notice of allegations of harassing behavior and counseled appropriately without revealing, even indirectly, the identity of the student who notified the school. Those steps can be very effective in preventing further harassment.

*Response to Other Types of Notice*

The previous two sections deal with situations in which a student or parent of a student who was harassed reports or complains of harassment or in which a responsible school employee or agent directly observes sexual harassment of a student. If a school learns of harassment through other means, for example if information about harassment is received from a third party (such as from a witness to an incident or an anonymous letter or telephone call), different factors will affect the school's response. These factors include the source and nature of the information; the seriousness of the alleged incident; the specificity of the information; the objectivity and credibility of the source of the report; whether any individuals can be identified who were subjected to the alleged harassment; and whether those individuals want to pursue the matter. If, based on these factors, it is reasonable for the school to investigate and it can confirm the allegations, the considerations described in the previous sections concerning interim measures and appropriate responsive action will apply.

For example, if a parent visiting a school observes a student repeatedly harassing a group of female students and reports this to school officials, school personnel can speak with the female students to confirm whether that conduct has occurred and whether they view it as unwelcome. If the school determines that the conduct created a hostile environment, it can take reasonable, age-appropriate steps to address the situation. If, on the other hand, the students in this example were to ask that their names not be disclosed or indicate that they do not want to pursue the matter, the considerations described in the previous section related to requests for confidentiality will shape the school's response.

In a contrasting example, a student newspaper at a large university may print an anonymous letter claiming that a professor is sexually harassing students in class on a daily basis, but the letter provides no clue as to the identity of the professor or the department in which the conduct is allegedly taking place. Due to the anonymous source and lack of specificity of the information, a school would not reasonably be able to investigate and confirm these allegations. However, in response to the anonymous letter, the school could submit a letter or article to the newspaper reiterating its policy against sexual harassment, encouraging persons who believe that they have been sexually harassed to come forward, and explaining how its grievance procedures work.

*Prevention*

A policy specifically prohibiting sexual harassment and separate grievance procedures for violations of that policy can help ensure that all students and employees understand the nature of sexual harassment and that the school will not tolerate it. Indeed, they might even bring conduct of a sexual nature to the school's attention so that the school can address it *before* it becomes sufficiently severe, persistent, or pervasive to create a hostile environment. Further, training for administrators, teachers, and staff and age-appropriate classroom information for students can help to ensure that they understand what types of conduct can cause sexual harassment and that they know how to respond.

**Prompt and Equitable Grievance Procedures**

Schools are required by Title IX to adopt and publish a policy against sex discrimination and grievance procedures providing for prompt and equitable resolution of complaints of discrimination on the basis of sex. [81]

Accordingly, regardless of whether harassment occurred, a school violates this requirement of Title IX if it does not have those procedures and policy in place. [82]

A school's sex discrimination grievance procedures must apply to complaints of sex discrimination in the school's education programs and activities filed by students against school employees, other students, or third parties. [83] Title IX does not require a school to adopt a policy specifically prohibiting sexual harassment or to provide separate grievance procedures for sexual harassment complaints. However, its nondiscrimination policy and grievance procedures for handling discrimination complaints must provide effective means for preventing and responding to sexual harassment. Thus, if, because of the lack of a policy or procedure specifically addressing sexual harassment, students are unaware of what kind of conduct constitutes sexual harassment or that that conduct is prohibited sex discrimination, a school's general policy and procedures relating to sex discrimination complaints will not be considered effective. [84]

OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the procedures provide for—

(1) Notice to students, parents of elementary and secondary students, and employees of the procedure, including where complaints may be filed;

(2) Application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties;

(3) Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;

(4) Designated and reasonably prompt timeframes for the major stages of the complaint process;

(5) Notice to the parties of the outcome of the complaint; [85] and

(6) An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate. [86]

Many schools also provide an opportunity to appeal the findings or remedy or both. In addition, because retaliation is prohibited by Title IX, schools may want to include a provision in their procedures prohibiting retaliation against any individual who files a complaint or participates in a harassment inquiry.

**Federal Register** / Vol. 62, No. 49 / Thursday, March 13, 1997 / Notices     12045

Procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience. In addition, whether complaint resolutions are timely will vary depending on the complexity of the investigation and the severity and extent of the harassment. During the investigation it is a good practice for schools to inform students who have alleged harassment about the status of the investigation on a periodic basis.

A grievance procedure applicable to sexual harassment complaints cannot be prompt and equitable unless students know it exists, how it works, and how to file a complaint. Thus, the procedures should be written in language appropriate to the age of the school's students, easily understood, and widely disseminated. Distributing the procedures to administrators, or including them in the school's administrative or policy manual, may not by itself be an effective way of providing notice, as these publications are usually not widely circulated to and understood by all members of the school community. Many schools ensure adequate notice to students by having copies of the procedures available at various locations throughout the school or campus; publishing the procedures as a separate document; including a summary of the procedures in major publications issued by the school, such as handbooks and catalogs for students, parents of elementary and secondary students, faculty, and staff; and identifying individuals who can explain how the procedures work.

A school must designate at least one employee to coordinate its efforts to comply with and carry out its Title IX responsibilities.[87] The school must notify all of its students and employees of the name, office address, and telephone number of the employee or employees designated.[88] Because it is possible that an employee designated to handle Title IX complaints may him or herself engage in harassment, a school may want to designate more than one employee to be responsible for handling complaints in order to ensure that students have an effective means of reporting harassment.[89] While a school may choose to have a number of employees responsible for Title IX matters, it is also advisable to give one official responsibility for overall coordination and oversight of all sexual harassment complaints to ensure consistent practices and standards in handling complaints. Coordination of recordkeeping (for instance, in a

confidential log maintained by the Title IX coordinator) will also ensure that the school can and will resolve recurring problems and identify students or employees who have multiple complaints filed against them.[90] Finally, the school must make sure that all designated employees have adequate training as to what conduct constitutes sexual harassment and are able to explain how the grievance procedure operates.[91]

Grievance procedures may include informal mechanisms for resolving sexual harassment complaints to be used if the parties agree to do so.[92] OCR has frequently advised schools, however, that it is not appropriate for a student who is complaining of harassment to be required to work out the problem directly with the individual alleged to be harassing him or her, and certainly not without appropriate involvement by the school (e.g., participation by a counselor, trained mediator, or, if appropriate, a teacher or administrator). In addition, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process. In some cases, such as alleged sexual assaults, mediation will not be appropriate even on a voluntary basis. Title IX also permits the use of a student disciplinary procedure not designed specifically for Title IX grievances to resolve sex discrimination complaints, as long as the procedure meets the requirement of affording a complainant a ''prompt and equitable'' resolution of the complaint.

In some instances, a complainant may allege harassing conduct that constitutes both sex discrimination and possible criminal conduct. Police investigations or reports may be useful in terms of fact-gathering. However, because legal standards for criminal conduct are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly.[93] Similarly, schools are cautioned about using the results of insurance company investigations of sexual harassment allegations. The purpose of an insurance investigation is to assess liability under the insurance policy, and the applicable standards may well be different from those under Title IX. In addition, a school is not relieved of its responsibility to respond to a sexual harassment complaint filed under its grievance procedure by the fact that a complaint has been filed with OCR.[94]

Finally, a public school's employees may have certain due process rights under the United States Constitution.

The Constitution also guarantees due process to students in public and State-supported schools who are accused of certain types of infractions. The rights established under Title IX must be interpreted consistently with any federally guaranteed rights involved in a complaint proceeding. In both public and private schools, additional or separate rights may be created for employees or students by State law, institutional regulations and policies, such as faculty or student handbooks, and collective bargaining agreements. Schools should be aware of these rights and their legal responsibilities to those accused of harassment. Indeed, procedures that ensure the Title IX rights of the complainant while at the same time according due process to both parties involved will lead to sound and supportable decisions. Schools should ensure that steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant.

**First Amendment**

In cases of alleged harassment, the protections of the First Amendment must be considered if issues of speech or expression are involved.[95] Free speech rights apply in the classroom (e.g., classroom lectures and discussions)[96] and in all other education programs and activities of public schools (e.g., public meetings and speakers on campus; campus debates, school plays and other cultural events[97]; and student newspapers, journals and other publications[98]). In addition, First Amendment rights apply to the speech of students and teachers.[99]

Title IX is intended to protect students from sex discrimination, not to regulate the content of speech. OCR recognizes that the offensiveness of particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a sexually hostile environment under Title IX.[100] In order to establish a violation of Title IX, the harassment must be sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program or to create a hostile or abusive educational environment.[101]

Moreover, in regulating the conduct of its students and its faculty to prevent or redress discrimination prohibited by Title IX (e.g., in responding to harassment that is sufficiently severe, persistent, or pervasive as to create a hostile environment), a school must formulate, interpret, and apply its rules so as to protect academic freedom and free speech rights. For instance, while the First Amendment may prohibit a

school from restricting the right of students to express opinions about one sex that may be considered derogatory, the school can take steps to denounce those opinions and ensure that competing views are heard. The age of the students involved and the location or forum may affect how the school can respond consistent with the First Amendment.[102] As an example of the application of free speech rights to allegations of sexual harassment, consider the following:

**Example 1:** In a college level creative writing class, a professor's required reading list includes excerpts from literary classics that contain descriptions of explicit sexual conduct, including scenes that depict women in submissive and demeaning roles. The professor also assigns students to write their own materials, which are read in class. Some of the student essays contain sexually derogatory themes about women. Several female students complain to the Dean of Students that the materials and related classroom discussion have created a sexually hostile environment for women in the class. What must the school do in response?

*Answer:* Academic discourse in this example is protected by the First Amendment even if it is offensive to individuals. Thus, Title IX would not require the school to discipline the professor or to censor the reading list or related class discussion.

**Example 2:** A group of male students repeatedly targets a female student for harassment during the bus ride home from school, including making explicit sexual comments about her body, passing around drawings that depict her engaging in sexual conduct, and, on several occasions, attempting to follow her home off the bus. The female student and her parents complain to the principal that the male students' conduct has created a hostile environment for girls on the bus and that they fear for their daughter's safety. What must the school do in response?

*Answer:* Threatening and intimidating actions targeted at a particular student or group of students, even though they contain elements of speech, are not protected by the First Amendment. The school must take reasonable and appropriate actions against the students, including disciplinary action if necessary, to remedy the hostile environment and prevent future harassment.

**Footnotes**

1. This Guidance does not address sexual harassment of employees, although that conduct may be prohibited by Title IX. If

employees bring sexual harassment claims under Title IX, case law applicable to sexual harassment in the workplace under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e–2(a), and Equal Employment Opportunity Commission (EEOC) guidelines will apply. *See* 28 CFR 42.604 (Procedures for Complaints of Employment Discrimination Filed Against Recipients of Federal Financial Assistance).

2. 20 U.S.C. 1681 *et seq.*, as amended; 34 CFR 106.1, 106.31(a)(b). In analyzing sexual harassment claims, the Department also applies, as appropriate to the educational context, many of the legal principles applicable to sexual harassment in the workplace developed under Title VII. *See Franklin* v. *Gwinnett County Public Schools,* 503 U.S. 60, 75 (1992) (applying Title VII principles in determining that a student was entitled to protection from sexual harassment by a teacher in school under Title IX); *Kinman* v. *Omaha Public School Dist.,* 94 F.3d 463, 469 (8th Cir. 1996) (applying Title VII principles in determining that a student was entitled to protection from hostile environment sexual harassment by a teacher in school under Title IX); *Doe* v. *Claiborne County,* 1996 WL 734583, *19 (6th Cir. December 26, 1996) (holding in a case involving allegations of hostile environment sexual harassment of a student by a teacher that Title VII agency principles apply to sexual harassment cases brought under Title IX); *Murray* v. *New York University College of Dentistry,* 57 F.3d 243, 249 (2nd Cir. 1995) (while finding notice lacking, court applied Title VII principles in assuming a Title IX cause of action for sexual harassment of a medical student by a patient visiting the school clinic); *Doe* v. *Petaluma City School Dist.,* 830 F.Supp. 1560, 1571–72 (N.D. Cal. 1993) (applying Title VII principles in determining that if school had notice of peer sexual harassment and failed to take appropriate corrective action, student would be liable under Title IX), *rev'd in part on other grounds,* 54 F.3d 1447 (9th Cir. 1995); *Kadiki* v. *Virginia Commonwealth University,* 892 F.Supp. 746, 749 (E.D. Va. 1995) (in Title IX case involving allegations of both *quid pro quo* and hostile environment sexual harassment, court indicated that Title VII standards should be applied).

In addition, many of the principles applicable to racial harassment under Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.*, and Title VII also apply to sexual harassment under Title IX. Indeed, Title IX was modeled on Title VI, *Cannon* v. *University of Chicago,* 441 U.S. 677, 694 (1979). For information on racial harassment, see the Department's Notice of Investigative Guidance for Racial Harassment, 59 FR 11448 (1994).

3. Consistent with Supreme Court decisions, *see Franklin,* 503 U.S. at 75 (expressly ruling that the sexual harassment of a student by a teacher violates Title IX), the Department has interpreted Title IX as prohibiting sexual harassment for over a decade. *Kinman,* 94 F.3d at 469 (Title IX prohibits hostile environment sexual harassment of student by teacher). Moreover, it has been OCR's longstanding practice to apply Title IX to peer harassment. *See also*

*Bosley* v. *Kearney R–1 School Dist.,* 904 F.Supp. 1006, 1023 (W.D. Mo. 1995); *Doe* v. *Petaluma City School Dist., Plaintiff's Motion for Reconsideration Granted,* 1996 WL 432298 (N.D. Cal. July 22, 1996) (reaffirming Title IX liability for peer harassment if the school knows of the hostile environment but fails to take remedial action); *Burrow* v. *Postville Community School District,* 929 F.Supp. 1193, 1205 (N.D. Iowa 1996) (student may bring Title IX cause of action against a school for its knowing failure to take appropriate remedial action in response to the hostile environment created by students at the school); *Oona R.–S.* v. *Santa Rosa City Schools,* 890 F.Supp. 1452 (N.D. Cal. 1995); *Davis* v. *Monroe County Bd. of Education,* 74 F.3d 1186, 1193 (11th Cir. 1996) (as Title VII is violated if a sexually hostile working environment is created by co-workers and tolerated by the employer, Title IX is violated if a sexually hostile educational environment is created by a fellow student or students and the supervising authorities knowingly failed to act to eliminate the harassment), *vacated, reh'g granted,* 91 F.3d 1418 (11th Cir. 1996); *cf. Murray,* 57 F.3d at 249 (while court finds no notice to school, assumes a Title IX cause of action for sexual harassment of a medical student by a patient visiting school clinic). *But see* note 27. Of course, OCR has interpreted Title IX as prohibiting *quid pro quo* harassment of students for many years. *See Alexander* v. *Yale University,* 459 F.Supp. 1, 4 (D.Conn. 1977), *aff'd,* 631 F.2d 178 (2nd Cir. 1980).

4. The term "employee" refers to employees and agents of a school. This includes persons with whom the school contracts to provide services for the school. *See Brown* v. *Hot, Sexy, and Safer Productions, Inc.,* 68 F.3d 525 (1st Cir. 1995) (Title IX sexual harassment claim brought for school's role in permitting classroom consultant hired by it to create allegedly hostile environment).

In addition, while the standards applicable to peer sexual harassment are generally applicable to claims of student-on-student harassment, schools will be liable for the sexual harassment of one student by another student under the standards applicable to employee-on-student harassment if a student engages in sexual harassment as an agent or employee of a school. For instance, a school would be liable under the standards applicable to *quid pro quo* harassment if a student teaching assistant, who has been given the authority to assign grades, requires a student in his or her class to submit to sexual advances in order to obtain a certain grade in the class.

5. *Alexander,* 459 F.Supp. at 4 (a claim that academic advancement was conditioned upon submission to sexual demands constitutes a claim of sex discrimination in education); *Kadiki,* 892 F.Supp. at 752 (reexamination in a course conditioned on college student's agreeing to be spanked should she not attain a certain grade may constitute *quid pro quo* harassment); *see also Karibian* v. *Columbia University,* 14 F.3d 773, 777–79 (2nd Cir. 1994) (Title VII case).

6. *See e.g., Franklin,* 503 U.S. at 63 (conduct of a sexual nature found to support a sexual harassment claim under Title IX

**Federal Register** / Vol. 62, No. 49 / Thursday, March 13, 1997 / Notices **12047**

included kissing, sexual intercourse); *Meritor Savings Bank FSB* v. *Vinson,* 477 U.S. 57, 60–61 (1986) (demands for sexual favors, sexual advances, fondling, indecent exposure, sexual intercourse, rape sufficient to raise hostile environment claim under Title VII); *Harris* v. *Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367 (1993) (sexually derogatory comments and innuendo may support a sexual harassment claim under Title VII); *Ellison* v. *Brady,* 924 F.2d 872, 873–74, 880 (9th Cir. 1991) (allegations sufficient to state a sexual harassment claim under Title VII included repeated requests for dates, letters making explicit references to sex and describing the harasser's feelings for plaintiff); *Lipsett* v. *University of Puerto Rico,* 864 F.2d 881, 903–4 (1st Cir. 1988) (sexually derogatory comments, posting of sexually explicit drawing of plaintiff, sexual advances may support sexual harassment claim); *Kadiki,* 892 F.Supp. at 751 (professor's spanking of a university student may constitute sexual conduct under Title IX); *Doe* v. *Petaluma,* 830 F.Supp. at 1564–65 (sexually derogatory taunts and innuendo can be the basis of a harassment claim); *Denver School Dist.* #1, OCR Case No. 08–92–1007 (same as to allegations of vulgar language and obscenities, pictures of nude women on office walls and desks, unwelcome touching, sexually offensive jokes, bribery to perform sexual acts, indecent exposure); *Nashoba Regional High School,* OCR Case No. 01–92–1377 (same as to year-long campaign of derogatory, sexually explicit graffiti and remarks directed at one student.)

7. *Davis,* 74 F.3d at 1194, *vacated, reh'g granted; Doe* v. *Petaluma,* 830 F.Supp. at 1571–73; *Moire* v. *Temple University School of Medicine,* 613 F.Supp. 1360, 1366 (E.D. Pa. 1985), *aff'd mem.,* 800 F.2d 1136 (3d Cir. 1986); *see also Vinson,* 477 U.S. at 67; *Lipsett,* 864 F.2d at 901; Racial Harassment Guidance, 59 FR 11449–50. *But see* note 27.

8. 34 CFR 106.8(b).

9. 20 U.S.C. 1687 (codification of Title IX portion of the Civil Rights Restoration Act of 1987).

10. *See also Shoreline School Dist.,* OCR Case No. 10–92–1002 (a teacher's patting student on arm, shoulder, and back, and restraining the student when he was out of control, not conduct of a sexual nature); *Dartmouth Public Schools,* OCR Case No. 01–90–1058 (same as to contact between high school coach and student); *San Francisco State University,* OCR Case No. 09–94–2038 (same as to faculty advisor placing her arm around graduate student's shoulder in posing for a picture); *Analy Union High School Dist.,* OCR Case No. 09–92–1249 (same as to drama instructor who put his arms around both male and female students who confided in him.)

11. *Cf. John Does 1* v. *Covington County School Bd.,* 884 F.Supp. 462, 464–65 (M.D. Ala. 1995) (male students alleging that teacher sexually harassed and abused them stated cause of action under Title IX).

12. Title IX and the regulations implementing it prohibit discrimination ''on the basis of sex;'' they do not restrict sexual harassment to those circumstances in which the harasser only harasses members of the opposite sex in incidents involving either *quid pro quo* or hostile environment sexual harassment. *See* 34 CFR 106.31. In order for hostile environment harassment to be actionable under Title IX, it must create a hostile or abusive environment. This can occur when a student or employee harasses a member of the same sex. *See Kinman,* 94 F.3d at 468 (female student's alleging sexual harassment by female teacher sufficient to raise a claim under Title IX); *Doe* v. *Petaluma,* 830 F.Supp. at 1564–65, 1575 (female junior high school student alleging sexual harassment by other students, including both boys and girls, sufficient to raise claim under Title IX); *John Does 1,* 884 F.Supp. at 465 (same as to male students' allegations of sexual harassment and abuse by male teacher.) It can also occur in certain situations if the harassment is directed at students of both sexes. *Chiapuzo* v. *BLT Operating Co.,* 826 F.Supp. 1334 (D. Wyo. 1993) (court found that such harassment could violate Title VII).

In many circumstances, harassing conduct will be on the basis of sex because the student would not have been subjected to it at all had he or she been a member of the opposite sex; e.g., if a female student is repeatedly propositioned by a male student or employee (or, for that matter, if a male student is repeatedly propositioned by a male student or employee). In other circumstances, harassing conduct will be on the basis of sex if the student would not have been affected by it in the same way or to the same extent had he or she been a member of the opposite sex; e.g., pornography and sexually explicit jokes in a mostly male shop class are likely to affect the few girls in the class more than it will most of the boys.

In yet other circumstances, the conduct will be on the basis of sex in that the student's sex was a factor in or affected the nature of the harasser's conduct or both. Thus, in *Chiapuzo,* a supervisor made demeaning remarks to both partners of a married couple working for him, e.g., as to sexual acts he wanted to engage in with the wife and how he would be a better lover than the husband. In both cases, according to the court, the remarks were gender-driven in that they were made with an intent to demean each member of the couple because of his or her respective sex. *See also Steiner* v. *Showboat Operating Co.,* 25 F.3d 1459, 1463–64 (9th Cir. 1994), *cert. denied,* 115 S.Ct. 733 (1995) (Title VII case).

13. *Nashoba Regional High School,* OCR Case No. 01–92–1397. In *Conejo Valley School Dist.,* OCR Case No. 09–93–1305, female students allegedly taunted another female student about engaging in sexual activity; OCR found that the alleged comments were sexually explicit and, if true, would be sufficiently severe, persistent, and pervasive to create a hostile environment.

14. *Williamson* v. *A.G. Edwards & Sons, Inc.,* 876 F.2d 69 (8th Cir. 1989, *cert. denied* 493 U.S. 1089 (1990) (Title VII case); *DeSantis* v. *Pacific Tel. & Tel. Co., Inc.,* 608 F.2d 327 (9th Cir. 1979) (same); *Blum* v. *Gulf Oil Corp.,* 597 F.2d 936 (5th Cir. 1979) (same).

15. *See Nabozny* v. *Podlesny,* 92 F.3d 446 (7th Cir. 1996) (holding that a gay student could maintain claims alleging discrimination based on both gender and sexual orientation under the Equal Protection Clause of the United States Constitution in case in which school district officials allegedly failed to protect the student to the same extent that other students were protected from harassment and harm by other students due to the student's gender and sexual orientation).

16. *See Vinson,* 477 U.S. at 65–66; *Harris,* 114 S.Ct. at 370–371; *see also Hicks* v. *Gates Rubber Co.,* 833 F.2d 1406, 1416 (10th Cir. 1987) (Title VII case); *McKinney* v. *Dole,* 765 F.2d 1129, 1138 (D.C. Cir. 1985) (Title VII case; physical, but non-sexual, assault could be sex-based harassment if shown to be unequal treatment that would not have taken place but for the employee's sex); *Cline* v. *General Electric Capital Auto Lease, Inc.,* 757 F.Supp. 923 (N.D. Ill. 1991) (Title VII case).

17. *See Harris,* 114 S.Ct. at 370–371; *Andrews* v. *City of Philadelphia,* 895 F.2d 1469, 1485–86 (3rd Cir. 1990) (Title VII case; court directed trial court to consider sexual conduct as well as theft of female employees' files and work, destruction of property, and anonymous phone calls in determining if there had been sex discrimination); *see also Hall* v. *Gus Construction Co.,* 842 F.2d 1010, 1014 (8th Cir. 1988) (Title VII case); *Hicks,* 833 F.2d at 1415; *Eden Prairie Schools, Dist.* #272, OCR Case No. 05–92–1174 (the boys made lewd comments about male anatomy *and* tormented the girls by pretending to stab them with rubber knives; while the stabbing was not sexual conduct, it was directed at them because of their sex, i.e., because they were girls.

18. The Supreme Court has ruled that agency principles apply in determining an employer's liability under Title VII for the harassment of its employees by supervisors. *See Vinson,* 477 U.S. at 72. These principles would govern in Title IX cases involving employees who are harassed by their supervisors. *See* 28 CFR 42.604 (regulations providing for handling employment discrimination complaints by Federal agencies; requiring agencies to apply Title VII law if applicable). These same principles should govern the liability of educational institutions under Title IX for the harassment of students by teachers and other school employees in positions of authority. *See Franklin,* 503 U.S. at 75.

19. The Supreme Court in *Vinson* did not alter the standard developed in the lower Federal courts whereby an institution is absolutely liable for *quid pro quo* sexual harassment whether or not it knew, should have known, or approved of the harassment at issue. 477 U.S. at 70–71; *see also Lipsett,* 864 F.2d at 901; EEOC Notice N–915–050, March 1990, Policy Guidance on Current Issues of Sexual Harassment, at p. 21. This standard applies in the school context as well. *Kadiki,* 892 F.Supp. at 752 (for the purposes of *quid pro quo* harassment of a student, professor is in similar position as workplace supervisor).

20. *Kadiki,* 892 F.Supp. at 754–755; *cf. Martin* v. *Cavalier Hotel Corp.,* 48 F.3d 1343, 1351 n.3 (4th Cir. 1995) (Title VII case); *Karibian,* 14 F.3d at 777–78; *Henson* v. *City of Dundee,* 682 F.2d 897, 910 (11th Cir. 1982) (Title VII case).

**12048**   Federal Register / Vol. 62, No. 49 / Thursday, March 13, 1997 / Notices

21. *See* note 4.

22. Restatement (Second) Agency §219(2)(d); *Martin*, 48 F.3d at 1352 (finding an employer liable under Title VII for sexual harassment of an employee in case in which the Manager used his apparent authority to commit the harassment; the Manager was delegated full authority to hire, fire, promote, and discipline employees and used the authority to accomplish the harassment; and company policy required employees to report harassment to the Manager with no other grievance process made available to them).

23. *See* Restatement (Second) of Agency §219(2)(d); EEOC Policy Guidance on Current Issues of Sexual Harassment at p. 28; *Karibian*, 14 F.3d at 780; *Hirschfeld* v. *New Mexico Corrections Dept.*, 916 F.2d 572, 579 (10th Cir. 1990) (Title VII case); *Martin*, 48 F.3d at 1352. *But see Rosa H* v. *San Elizario Ind. School Dist.*, 1997 U.S. App. LEXIS 2780 (5th Cir. Feb. 17, 1997). In *San Elizario* the Fifth Circuit reversed a jury finding that a school district was liable under Title IX for a hostile environment created by the school's male karate instructor, who repeatedly initiated sexual intercourse with a fifteen-year-old female karate student. The court held, contrary to OCR policy, that a school could not be found liable under Title IX pursuant to agency principles.

However, language in this and previous decisions indicates that Title IX law is evolving in the Fifth Circuit. When OCR investigates complaints involving schools in the Fifth Circuit (Texas, Louisiana, and Mississippi), it will in each case determine and follow the current applicable law. In light of the evolving case law in the Fifth Circuit, adhering to the standards in the Guidance may be the best way for schools in these States to ensure compliance with the requirements of Title IX. School personnel should also consider whether State, local, or other Federal authority affects their obligations in these areas.

24. *Karibian*, 14 F.3d at 780 (employer would be liable for hostile environment harassment in case in which allegations were that a supervisor coerced employee into a sexual relationship by, among other things, telling her she "'owed him' for all he was doing for her as her supervisor"); *Sparks* v. *Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1558–60 (11th Cir. 1987) (Title VII case holding employer liable for sexually hostile environment created by supervisor who repeatedly reminded the harassed employee that he could fire her if she did not comply with his sexual advances).

25. *Cf. Karibian*, 14 F.3d at 780.

26. *Id.*

27. The overwhelming majority of courts that have considered the issue of sexually hostile environments caused by peers have indicated that schools may be liable under Title IX for their knowing failure to take appropriate actions to remedy the hostile environment. *See* note 7 and peer hostile environment cases cited in note 3. However, one Federal Circuit Court of Appeals decision, *Rowinsky* v. *Bryan Independent School Dist.*, 80 F.3d 1006 (5th Cir. 1996), *cert. denied*, 117 S.Ct. 165 (1996), has held to the contrary. In that case, over a strong dissent, the court rejected the authority of

other Federal courts and OCR's longstanding construction of Title IX and held that a school district is not liable under Title IX for peer harassment unless "the school district itself directly discriminated based on sex," i.e., the school responded differently to sexual harassment or similar claims of girls versus boys. For cases specifically rejecting the *Rowinsky* interpretation, *see e.g., Doe* v. *Petaluma, Plaintiff's Motion for Reconsideration Granted,* 1996 WL 432298 *6 (N.D. Cal. 1996); *Burrow* v. *Postville Community School Dist.*, 929 F.Supp. at 1193.

OCR believes that the *Rowinsky* decision misinterprets Title IX. As explained in this Guidance, Title IX does not make a school responsible for the actions of the harassing student, but rather for its own discrimination in failing to take immediate and appropriate steps to remedy the hostile environment once a school official knows about it. If a student is sexually harassed by a fellow student, and a school official knows about it, but does not stop it, the school is permitting an atmosphere of sexual discrimination to permeate the educational program. The school is liable for its own action, or lack of action, in response to this discrimination. Notably, Title VII cases that hold that employers are responsible for remedying hostile environment harassment of one worker by a co-worker apply this same standard. *See, e.g., Ellison* v. *Brady*, 924 F.2d at 881–82; *Hall* v. *Gus Construction Co.*, 842 F.2d 1010 (8th Cir. 1988); *Hunter* v. Allis-Chalmers Corp., 797 F.2d 1417 (7th Cir. 1986); *Snell* v. *Suffolk*, 782 F.2d 1094 (2nd Cir. 1986); *Robinson* v. *Jacksonville Shipyards*, 760 F.Supp. 1486 (M.D. Fla. 1991).

Language in subsequent decisions indicates that Title IX law is evolving in the Fifth Circuit. When OCR investigates complaints involving schools in States in the Fifth Circuit (Texas, Louisiana, and Mississippi), it will in each case determine and follow the current applicable law. However, the existence of Fifth Circuit decisions that are inconsistent with OCR policy does not prohibit schools in these States from following the Guidance. In order to ensure students a safe and nondiscriminatory educational environment, the better practice is for these schools to follow the Guidance. Thus, schools should take prompt corrective action to address peer harassment of which they knew or should have known. Indeed, following the Guidance may be the safest way for schools in these States to ensure compliance with the requirements of Title IX.

28. *See* Restatement (Second) of Agency §219(2)(b).

29. As with peer harassment by its own students, a school's liability for the harassment of its students by third parties is based on its obligation to provide an environment free of discrimination. *Murray*, 57 F.3d at 250 (student participating in university dental clinic providing services to the public alleged harassment by a patient; while the court ruled in defendant's favor because of lack of notice, it considered such a claim actionable under Title IX); Racial Harassment Investigative Guidance, 59 FR

11450 (referring to harassment by neighborhood teenagers, guest speaker, and parents). *See, e.g.*, 29 CFR 1604.11(e); *Sparks* v. *Regional Medical Ctr.*, 792 F.Supp. 735, 738 n.1 (N.D. Ala. 1992) (Title VII case); *Powell* v. Las Vegas Hilton Corp., 841 F.Supp. 1024, 1027–28 (D. Nev. 1992) (Title VII case); *Magnuson* v. *Peak Technical Servs., Inc.*, 808 F.Supp. 500, 512–13 (E.D. Va. 1992) (Title VII case); *EEOC* v. *Sage Realty Corp.*, 507 F.Supp. 599, 611 (S.D.N.Y. 1981) (Title VII case); *cf. Dornhecker* v. *Malibu Grand Prix Corp.*, 828 F.2d 307 (5th Cir. 1987) (assuming Title VII required employer to respond appropriately to sexual harassment of an employee by a contractor, but finding employer's response sufficient). *See also* Restatement (Second) of Agency §219(2)(b).

30. For example, if athletes from a visiting team harass the home school's students, the home school may not be able to discipline the athletes. However, it could encourage the other school to take appropriate action to prevent further incidents; if necessary, the home school may choose not to invite the other school back. *Cf. Danna* v. *New York Telephone Co.*, 752 F.Supp. 594, 611 (S.D.N.Y. 1990) (telephone company in violation of Title VII for not taking sufficient action to protect its own employee from sexually explicit graffiti at the airport where she was assigned to work, e.g., contacting airport management to see what remedial measures could be taken).

31. 34 CFR 106.8(b) and 106.9.

32. *See* Racial Harassment Investigative Guidance, 59 FR 11450; *Murray*, 57 F.3d at 249 (an employer is liable for the harassment of co-workers if the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it".

33. EEOC Policy Guidance at p. 25 ("* * * in the absence of a strong, widely disseminated, and consistently enforced employer policy against sexual harassment, and an effective complaint procedure, employees could reasonably believe that a harassing supervisor's actions will be ignored, tolerated, or even condoned by upper management.")

34. 34 CFR 106.8(b).

35. If OCR finds a violation of Title IX, it will seek to obtain an agreement with the school to voluntarily correct the violation. The agreement will set out the specific steps the school will take and provide for monitoring by OCR to ensure that the school complies with the agreement. Schools should note that the Supreme Court has held that monetary damages are available as a remedy in private lawsuits brought to redress violations of Title IX. *Franklin*, 503 U.S. at 76. Of course, a school's immediate and appropriate remedial actions are relevant in determining the nature and extent of the damages suffered by a plaintiff.

36. *Henson*, 682 F.2d at 903 (Title VII case).

37. [T]he fact that sex-related conduct was "voluntary," in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII * * *. The correct inquiry is whether [the

000056

subject of the harassment] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary. *Vinson,* 477 U.S. at 68.

38. *Lipsett,* 864 F.2d at 898 (while, in some instances, a person may have responsibility for telling the harasser directly that the conduct is unwelcome, in other cases a "consistent failure to respond to suggestive comments or gestures may be sufficient * * *."); *Danna,* 752 F.Supp. at 612 (despite female employee's own foul language and participation in graffiti writing, her complaints to management indicated that the harassment was not welcome); *see also Carr* v. *Allison Gas Turbine Div., GMC,* 32 F.3d 1007, 1011 (7th Cir. 1994) (Title VII case; cursing and dirty jokes by female employee did not show that she welcomed the sexual harassment, given her frequent complaints about it: "Even if * * * [the employee's] testimony that she talked and acted as she did [only] in an effort to be one of the boys' is * * * discounted, her words and conduct cannot be compared to those of the men and used to justify their conduct * * *. The asymmetry of positions must be considered. She was one woman; they were many men. Her use of [vulgar] terms * * * could not be deeply threatening.").

39. *Reed* v. *Shepard,* 939 F.2d 484, 486–87, 491–92 (7th Cir. 1991) (no harassment found under Title VII in case in which female employee not only tolerated, but also participated in and instigated the suggestive joking activities about which she was now complaining); *Weinsheimer* v. *Rockwell Int'l Corp.,* 794 F.Supp. 1559, 1563–64 (M.D. Fla. 1990) (same, in case in which general shop banter was full of vulgarity and sexual innuendo by men and women alike, and plaintiff contributed her share to this atmosphere). However, even if a student participates in the sexual banter, OCR may in certain circumstances find that the conduct was nevertheless unwelcome if, for example, a teacher took an active role in the sexual banter and a student reasonably perceived that the teacher expected him or her to participate.

40. The school bears the burden of rebutting the presumption.

41. Of course, nothing in Title IX would prohibit a school from implementing policies prohibiting sexual conduct or sexual relationships between students and adult employees.

42. *See* note 41.

43. In *Harris,* the Supreme Court explained the requirement for considering the "subjective perspective" when determining the existence of a hostile environment. The Court stated: "* * * if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." 114 S.Ct. at 370.

44. The Supreme Court used a "reasonable person" standard in *Harris,* 114 S.Ct. at 370–71 to determine whether sexual conduct constituted harassment. This standard has been applied under Title VII to take into account the sex of the subject of the harassment, *see, e.g., Ellison,* 924 F.2d at

878–79 (applying a "reasonable women" standard to sexual harassment), and has been adapted to sexual harassment in education, *Davis,* 74 F.3d at 1126 (relying on *Harris* to adopt an objective, reasonable person standard), *vacated, reh'g granted; Patricia H.* v. *Berkeley Unified School Dist.,* 830 F. Supp. 1288, 1296 (N.D. Cal. 1993) (adopting a "reasonable victim" standard and referring to OCR's use of it); Racial Harassment Guidance, 59 FR 11452 (the standard must take into account the characteristics and circumstances of victims on a case-by-case basis, particularly the victim's race and age).

45. *Harris,* 114 S.Ct. at 371; *See* Racial Harassment Guidance, 59 FR 11449 and 11452; *Brock* v. *United States,* 64 F.3d 1421, 1423 (9th Cir. 1995) (Title VII case); *Simon* v. *Morehouse Sch. of Medicine,* 908 F.Supp. 959, 969–970 (N.D. Ga. 1995) (Title VII case); *Al-Dabbagh* v. *Greenpeace, Inc.,* 873 F.Supp. 1105, 1111–12 (N.D. Ill. 1994) (Title VII case); *Watts* v. *N.Y.C. Police Dept.,* 724 F.Supp. 99, 104 (S.D.N.Y. 1989) (Title VII case).

46. *Davis,* 74 F.3d at 1126 (no Title IX violation unless the conduct has "actually altered the conditions of [the student's] learning environment"), *vacated, reh'g granted; Lipsett,* 864 F.2d at 898 (" altered" the educational environment); *Patricia H.,* 830 F. Supp. at 1297 (sexual harassment could be found where conduct interfered with student's ability to learn); *see also Andrews,* 895 F.2d at 1482 (Title VII case).

47. *Harris,* 114 S.Ct. at 371.

48. *See e.g., Doe* v *Petaluma,* 830 F. Supp at 1566 (student so upset about harassment by other students that she was forced to transfer several times, including finally to a private school); *Modesto City Schools,* OCR Case No. 09–93–1391 (evidence showed that one girl's grades dropped while the harassment was occurring); *Weaverville Elementary School,* OCR Case No. 09–91–1116 (students left school due to the harassment). *Compare with College of Alameda,* OCR Case No. 09–90–2104 (student not in instructor's class and *no* evidence of any effect on student's educational benefits or services, so no hostile environment).

49. *Doe* v. *Petaluma,* 830 F. Supp. at 1566.

50. *See Harris,* 114 S.Ct. at 371, in which the Court held that tangible harm is not required. In determining whether harm is sufficient, several factors are to be considered, including frequency, severity, whether the conduct was threatening or humiliating versus a mere offensive utterance, and whether it unreasonably interfered with work performance. No single factor is required; similarly, psychological harm, while relevant, is not required.

51. *See Modesto City Schools,* OCR Case No. 09–93–1391 (evidence showed that several girls were afraid to go to school because of the harassment).

52. *Summerfield Schools,* OCR Case No. 15–92–1029.

53. *See Waltman* v. *Int'l Paper Co.,* 875 F.2d 468, 477 (5th Cir. 1989) (Title VII case); *see also Hall,* 842 F.2d at 1015 (evidence of sexual harassment directed at others is relevant to show hostile environment under Title VII); Racial Harassment Investigative Guidance, 59 FR 11453.

54. *See, e.g., Andrews,* 895 F.2d at 1484 ("Harassment is pervasive when 'incidents of

harassment occur either in concert or with regularity'."); *Moylan* v. *Maries County,* 792 F.2d 746, 749 (8th Cir. 1986) (Title VII case); *Downes* v. *Federal Aviation Administration,* 775 F.2d 288, 293 (D.C. Cir. 1985) (same); *cf. Scott* v. *Sears, Roebuck and Co.,* 798 F.2d 210, 214 (7th Cir. 1986) (Title VII case; conduct was not pervasive or debilitating).

55. The U.S. Equal Employment Opportunity Commission (EEOC) has stated: "The Commission will presume that the unwelcome, intentional touching of [an employee's] intimate body areas is sufficiently offensive to alter the conditions of her working environment and constitute a violation of Title VII. More so than in the case of verbal advances or remarks, a single unwelcome physical advance can seriously poison the victim's working environment." EEOC Policy Guidance on Current Issues of Sexual Harassment, p. 17. *See also Barrett* v. *Omaha National Bank,* 584 F. Supp. 22, 30 (D. Neb. 1983), *aff'd,* 726 F.2d 424 (8th Cir. 1984) (hostile environment created under Title VII by isolated events, i.e., occurring while traveling to and during a two-day conference, including the co-worker's talking to plaintiff about sexual activities and touching her in offensive manner while they were inside a vehicle from which she could not escape).

56. *See also Ursuline College,* OCR Case No. 05–91–2068 (A single incident of comments on a male student's muscles arguably not sexual; however, assuming they were, not severe enough to create a hostile environment).

57. *Patricia H.,* 830 F.Supp. at 1297 ("grave disparity in age and power" between teacher and student contributed to the creation of a hostile environment); *Summerfield Schools,* OCR Case No. 15–92–1929 ("impact of the * * * remarks was heightened by the fact that the coach is an adult in a position of authority"); *cf. Doe* v. *Taylor I.S.D.,* 15 F.3d 443 (5th Cir. 1994), *cert. denied,* 115 S.Ct. 70 (1994) (Sec. 1983 case; in finding that a sexual relationship between a high school teacher and a student was unlawful, court considered the influence that the teacher had over the student by virtue of his position of authority).

58. *See, e.g., McKinney,* 765 F.2d at 1138–40; *Robinson,* 760 F. Supp. at 1522.

59. *Cf. Patricia H.,* 830 F. Supp. at 1297.

60. *See also Barrett,* 584 F. Supp. at 24 (harassment occurring in a car from which the plaintiff could not escape was deemed particularly severe).

61. *See also Hall,* 842 F.2d at 1015 (incidents of sexual harassment directed at other employees); *Hicks,* 833 F.2d at 1415–16 (same). *Cf. Midwest City-Del City Public Schools,* OCR Case No. 06–92–1012 (finding of racially hostile environment based in part on several racial incidents at school shortly before incidents in complaint, a number of which involved the same student involved in the complaint).

62. *See* note 17. In addition, incidents of racial or national origin harassment directed at a particular individual may also be aggregated with incidents of sexual or gender harassment directed at that individual in determining the existence of a hostile environment. *Hicks,* 833 F.2d at 1416;

*Jefferies* v. *Harris Community Action Ass'n,* 615 F.2d 1025, 1032 (5th Cir. 1980) (Title VII case).

63. In addition, even if there is no notice, schools may be liable for sexual harassment. *See* previous discussions of liability in situations involving *quid pro quo* harassment and hostile environment sexual harassment by employees in situations in which the employee acted with apparent authority or was aided in carrying out the harassment of students by his or her position of authority with the school.

64. *See Ellison* v. *Brady,* 924 F.2d 872, 881 (9th Cir. 1991), quoting *EEOC* v. *Hacienda Hotel,* 881 F.2d 1504, 1515–1516 (9th Cir. 1989) (Title VII cases); *Swentek* v. *USAir,* 830 F.2d 552, 558 (4th Cir. 1987), quoting *Katz* v. *Dole,* 709 F.2d at 255 (Title VII cases).

*But see Rosa H.* v. *San Elizario Indep. School Dist.,* 1997 U.S. App. LEXIS 2780 (5th Cir. Feb. 17, 1997) and note 23. In *San Elizario,* the Fifth Circuit held, among other things, that liability for hostile environment harassment cannot attach if the school has only constructive notice of the harassment. *See* note 23.

65. Whether an employee is an agent or responsible school employee, or whether it would be reasonable for a student to believe the employee is, even if the employee is not, will vary depending on factors such as the authority actually given to the employee and the age of the student.

With respect to the notice provisions applicable to schools under Title IX, one Federal Circuit Court of Appeals decision, *Canutillo Indep. School Dist.* v. *Leija,* 101 F.3d 393, 398–400 (5th Cir. 1996), held, contrary to OCR policy, that a school district was not liable in a case in which one of its teachers sexually molested a second grade student, because the student and her mother only reported the harassment to her homeroom teacher. Notwithstanding that a school handbook instructed students and parents to report complaints to the child's primary or homeroom teacher, the court held that notice must be given to "someone with authority to take remedial action." *See also Rosa H.* v. *San Elizario Indep. School Dist.,* 1997 U.S. App. LEXIS 2780 (5th Cir. Feb. 17, 1997), and notes 23 and 64. In *San Elizario,* the Fifth Circuit held, among other things, that although the fifteen-year-old student, whose karate instructor had repeatedly initiated sexual intercourse, "was subject to discrimination on the basis of sex," a school district is only liable if an employee who has been invested by the school board with supervisory power over the offending employee actually knew of the abuse, had the power to end the abuse, and failed to do so.

Based on these and other decisions, Title IX law is evolving in the Fifth Circuit. When OCR investigates complaints involving schools in States in the Fifth Circuit (Texas, Louisiana, and Mississippi), it will in each case determine and follow the current applicable law. However, the existence of Fifth Circuit decisions that are inconsistent with OCR policy does not prohibit schools in these States from following the Guidance. In order to ensure students a safe and nondiscriminatory educational environment, it is the better practice for these schools to follow the Guidance. For example, the better practice is for schools to ensure that teachers and other personnel recognize and report sexual harassment of students to the appropriate school staff so that schools can take prompt corrective action and ensure a safe educational environment. In addition, the Guidance makes clear that providing students with several avenues to report sexual harassment is a very helpful means for addressing and preventing sexually harassing conduct in the first place. Schools in States in the Fifth Circuit should also consider whether State, local or other Federal laws may affect their responsibilities in this regard.

66. Racial Harassment Guidance, 59 FR 11450 (discussing how a school may receive notice).

67. *See Yates* v. *Avco Corp.,* 819 F.2d 630, 634–36 (6th Cir. 1987) (Title VII case); *Katz* v. *Dole,* 709 F.2d 251, 256 (4th Cir. 1983) (same); *See also* Racial Harassment Investigative Guidance, 59 FR 11450.

68. *Cf. Katz,* 709 F.2d at 256 (the employer "should have been aware of the * * * problem both because of its pervasive character and because of Katz' specific complaints * * *"); *Smolsky* v. *Consolidated Rail Corp.,* 780 F. Supp. 283, 293 (E.D. Pa. 1991), *reconsideration denied,* 785 F. Supp. 71 (E.D. Pa. 1992) ("where the harassment is apparent to all others in the work place, supervisors and coworkers, this may be sufficient to put the employer on notice of the sexual harassment" under Title VII); *Jensen* v. *Eveleth Taconite Co.,* 824 F. Supp. 847, 887 (D. Minn. 1993) (Title VII case; "[s]exual harassment * * * was so pervasive that an inference of knowledge arises * * *. The acts of sexual harassment detailed herein were too common and continuous to have escaped Eveleth Mines had its management been reasonably alert"); *Cummings* v. *Walsh Construction Co.,* 561 F. Supp. 872, 878 (S.D. Ga. 1983) ("* * * allegations not only of the [employee] registering her complaints with her foreman * * * but also that sexual harassment was so widespread that defendant had overlooked notice of it" under Title VII); *but see Murray,* 57 F.3d at 250–51 (that other students knew of the conduct was not enough to charge the school with notice, particularly in case in which these students may not have been aware that the conduct was offensive or abusive).

69. Schools have an obligation to ensure that the educational environment is free of discrimination and cannot fulfill this obligation without determining if sexual harassment complaints have merit.

70. In some situations, for example, if a playground supervisor observes a young student repeatedly engaging in conduct toward other students that is clearly unacceptable under the school's policies, it may be appropriate for the school to intervene without contacting the other students. It may still be necessary for the school to talk with the students (and parents of elementary and secondary students) afterwards, e.g., to determine the extent of the harassment and how it affected them.

71. *Cf. Bundy* v. *Jackson,* 641 F.2d 934, 947 (D.C. Cir. 1981) (employers should take corrective and preventive measures under Title VII); *accord, Jones* v. *Flagship Int'l,* 793 F.2d 714, 719–720 (5th Cir. 1986) (employer should take prompt remedial action under Title VII). Racial Harassment Investigative Guidance, 59 FR 11450.

72. *Waltman* v. *Int'l Paper Co.,* 875 F.2d at 479 (appropriateness of employer's remedial action under Title VII will depend on the severity and persistence of the harassment and the effectiveness of any initial remedial steps); *Dornhecker* v. *Malibu Grand Prix Corp.,* 828 F.2d 307, 309–10 (5th Cir. 1987) (Title VII case; employer arranged for victim to no longer work with alleged harasser).

73. *Intlekofer* v. *Turnage,* 973 F.2d 773 (9th Cir. 1992) (Title VII case) (holding that the employer's response was insufficient and that more severe disciplinary action was necessary in situations in which counseling, separating the parties, and warnings of possible discipline were ineffective in ending the harassing behavior).

74. Offering assistance in changing living arrangements is one of the actions required of colleges and universities by the Campus Security Act in cases of rape and sexual assault. *See* 20 U.S.C. 1092(f).

75. *See* note 30.

76. University of California at Santa Cruz, OCR Case No. 09–93–2141 (extensive individual and group counseling); *Eden Prairie Schools, Dist.* #272, OCR Case No. 05–92–1174 (counseling).

77. Even if the harassment stops without the school's involvement, the school may still need to take steps to prevent or deter any future harassment—to inform the school community that harassment will not be tolerated. *Fuller* v. *City of Oakland,* 47 F.3d 1522, 1528–29 (9th Cir. 1995).

78. 34 CFR 106.8(b) and 106.71, incorporating by reference 34 CFR 100.7(e). Title IX prohibits intimidation, threats, coercion, or discrimination against any individual for the purpose of interfering with any right or privilege secured by Title IX.

79. *Tacoma School Dist. No. 10,* OCR Case No. 10–94–1079 (due to the large number of students harassed by an employee, the extended period of time over which the harassment occurred, and the failure of several of the students to report the harassment, school committed as part of corrective action plan to providing training for students); *Los Medanos College,* OCR Case No. 09–84–2092 (as part of corrective action plan, school committed to providing sexual harassment seminar for campus employees); *Sacramento City Unified School Dist.,* OCR Case No. 09–83–1063 (same as to workshops for management and administrative personnel, in-service training for non-management personnel).

80. In addition, if information about the incident is contained in an "education record" of the student alleging the harassment, as defined in the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, the school should consider whether FERPA would prohibit the school from disclosing information without the student's consent. *Id.* In evaluating whether FERPA would limit disclosure, the Department does not interpret

FERPA to override any federally protected due process rights of a school employee accused of harassment.

81. 34 CFR 106.8(b). This requirement has been part of the Title IX regulations since their inception in 1975. Thus, schools have been required to have these procedures in place since that time. At the elementary and secondary level, this responsibility generally lies with the school district. At the postsecondary level, there may be a procedure for a particular campus or college, or for an entire university system.

82. *Fenton Community High School Dist.* # 100, OCR Case 05–92–1104.

83. While a school is required to have a grievance procedure under which complaints of sex discrimination (including sexual harassment) can be filed, the same procedure may also be used to address other forms of discrimination.

84. *See Vinson,* 477 U.S. at 72–73.

85. It is the Department's current position under the Family Educational Rights and Privacy Act (FERPA) that a school cannot release information to a complainant regarding disciplinary action imposed on a student found guilty of harassment if that information is contained in a student's education record unless—(1) the information directly relates to the complainant (e.g., an order requiring the student harasser not to have contact with the complainant); or (2) the harassment involves a crime of violence or a sex offense in a postsecondary institution. *See* note 80. If the alleged harasser is a teacher, administrator, or other non-student employee, FERPA would not limit the school's ability to inform the complainant of any disciplinary action taken.

86. The section in the Guidance on "Recipient's Response" provides examples of reasonable and appropriate corrective action.

87. 34 CFR 106.8(a).

88. *Id.*

89. *See Vinson,* 477 U.S. at 72–73.

90. *University of California, Santa Cruz,* OCR Case No. 09–93–2141; *Sonoma State University,* OCR Case No. 09–93–2131. This is true for formal as well as informal complaints. *See University of Maine at Machias,* OCR Case No. 01–94–6001 (school's new procedures not found in violation of Title IX in part because they require written records for informal as well as formal resolutions). These records need not be kept in a student's or employee's individual file, but instead may be kept in a central confidential location.

91. For example, in *Cape Cod Community College,* OCR Case No. 01–

93–2047, the College was found to have violated Title IX in part because the person identified by the school as the Title IX coordinator was unfamiliar with Title IX, had no training, and did not even realize he was the coordinator.

92. Indeed, in *University of Maine at Machias,* OCR Case No. 01–94–6001, OCR found the school's procedures to be inadequate because only formal complaints were investigated. While a school isn't required to have an established procedure for resolving informal complaints, they nevertheless must be addressed in some way. However, if there are indications that the same individual may be harassing others, then it may not be appropriate to resolve an informal complaint without taking steps to address the entire situation.

93. *Academy School Dist. No. 20,* OCR Case No. 08–93–1023 (school's response determined to be insufficient in case in which it stopped its investigation after complaint filed with police); *Mills Public School Dist.,* OCR Case No. 01–93–1123 (not sufficient for school to wait until end of police investigation).

94. *Cf. EEOC* v. *Board of Governors of State Colleges and Universities,* 957 F.2d 424 (7th Cir.) (Title VII case), *cert. denied,* 113 S.Ct. 299 (1992); *Johnson* v. *Palma,* 931 F.2d 203 (2nd Cir. 1991) (same).

95. The First Amendment applies to entities and individuals that are State actors. The receipt of Federal funds by private schools does not directly subject those schools to the U.S. Constitution. *See Rendell-Baker* v. *Kohn,* 457 U.S. 830, 840 (1982). However, all actions taken by OCR must comport with First Amendment principles, even in cases involving private schools that are not directly subject to the First Amendment.

96. *See, e.g., George Mason University,* OCR Case No. 03–94–2086 (law professor's use of a racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment); *Portland School Dist. 1J,* OCR Case No. 10–94–1117 (reading teacher's choice to substitute a less offensive term for a racial slur when reading an historical novel aloud in class constituted an academic decision on presentation of curriculum, not racial harassment).

97. *See Iota Xi Chapter of Sigma Chi Fraternity* v. *George Mason University,* 993 F.2d 386 (4th Cir. 1993) (fraternity skit in which white male student dressed as an offensive caricature of a black female constituted student expression).

98. *See Florida Agricultural and Mechanical University,* OCR Case No. 04–92–2054 (no discrimination in case in which campus newspaper, which welcomed individual opinions of all sorts, printed individual article expressing one student's viewpoint on white students on campus).

99. *Tinker* v. *Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 506 (1969) (neither students nor teachers shed their constitutional rights to freedom of expression at the schoolhouse gates); *Cf. Cohen* v. *San Bernardino Valley College,* (college professor could not be punished for his longstanding teaching methods, which included discussion of controversial subjects such as obscenity and consensual sex with children, under an unconstitutionally vague sexual harassment policy); *George Mason University,* OCR Case No. 03–94–2086 (law professor's use of a racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment).

100. *See, e.g., University of Illinois,* OCR Case No. 05–94–2104 (fact that university's use of Native American symbols was offensive to some Native American students and employees was not dispositive, in and of itself, in assessing a racially hostile environment claim under Title VI).

101. *See Vinson,* 477 U.S. at 67 (the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not affect the conditions of employment to a sufficient degree to violate Title VII), quoting *Henson,* 682 F.2d at 904; *cf. R.A.V.* v. *City of St. Paul,* 505 U.S. 377, 389 (1992) (citing with approval EEOC's sexual harassment guidelines).

102. *Compare Bethel School Dist. No. 403* v. *Fraser,* 478 U.S. 675, 685 (1986) (Court upheld discipline of high school student for making lewd speech to student assembly, noting that "[t]he undoubted freedom to advocate unpopular and controversial issues in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior."), *with Iota XI* 993 F.2d 386 (holding that, notwithstanding a university's mission to create a culturally diverse learning environment and its substantial interest in maintaining a campus free of discrimination, it could not punish students who engaged in an offensive skit with racist and sexist overtones).

[FR Doc. 97–6373 Filed 3–12–97; 8:45 am]

**BILLING CODE 4000–01–P**

<span style="color:red">Archived Information</span>

# REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES

## TITLE IX



**January 2001**

**U.S. Department of Education
Office for Civil Rights**

# PREAMBLE

## Summary

The Assistant Secretary for Civil Rights, U.S. Department of Education (Department), issues a new document (revised guidance) that replaces the 1997 document entitled "Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties," issued by the Office for Civil Rights (OCR) on March 13, 1997 (1997 guidance). We revised the guidance in limited respects in light of subsequent Supreme Court cases relating to sexual harassment in schools.

The revised guidance reaffirms the compliance standards that OCR applies in investigations and administrative enforcement of Title IX of the Education Amendments of 1972 (Title IX) regarding sexual harassment.  The revised guidance re-grounds these standards in the Title IX regulations, distinguishing them from the standards applicable to private litigation for money damages and clarifying their regulatory basis as distinct from Title VII of the Civil Rights Act of 1964 (Title VII) agency law.  In most other respects the revised guidance is identical to the 1997 guidance.  Thus, we intend the revised guidance to serve the same purpose as the 1997 guidance.  It continues to provide the principles that a school[1] should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance.

## Purpose and Scope of the Revised Guidance

In March 1997, we published in the <u>Federal Register</u> "Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties."  62 FR 12034.  We issued the guidance pursuant to our authority under Title IX, and our Title IX implementing regulations, to eliminate discrimination based on sex in education programs and activities receiving Federal financial assistance.  It was grounded in longstanding legal authority establishing that sexual harassment of students can be a form of sex discrimination covered by Title IX.  The guidance was the product of extensive consultation with interested parties, including students, teachers, school administrators, and researchers.  We also made the document available for public comment.

Since the issuance of the 1997 guidance, the Supreme Court (Court) has issued several important decisions in sexual harassment cases, including two decisions specifically addressing sexual harassment of students under Title IX:  <u>Gebser v. Lago Vista Independent School District</u> (<u>Gebser</u>), 524 U.S. 274 (1998), and <u>Davis v. Monroe County Board of Education</u> (<u>Davis</u>), 526 U.S. 629 (1999). The Court held in <u>Gebser</u> that a school can be liable for monetary damages if a teacher sexually harasses a student, an

---

[1] As in the 1997 guidance, the revised guidance uses the term "school" to refer to all schools, colleges, universities, and other educational institutions that receive Federal funds from the Department.

official who has authority to address the harassment has actual knowledge of the harassment, and that official is deliberately indifferent in responding to the harassment. In Davis, the Court announced that a school also may be liable for monetary damages if one student sexually harasses another student in the school's program and the conditions of Gebser are met.

The Court was explicit in Gebser and Davis that the liability standards established in those cases are limited to private actions for monetary damages. See, e.g., Gebser, 524 U.S. 283, and Davis, 526 U.S. at 639. The Court acknowledged, by contrast, the power of Federal agencies, such as the Department, to "promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate," even in circumstances that would not give rise to a claim for money damages. See, Gebser, 524 U.S. at 292.

In an August 1998 letter to school superintendents and a January 1999 letter to college and university presidents, the Secretary of Education informed school officials that the Gebser decision did not change a school's obligations to take reasonable steps under Title IX and the regulations to prevent and eliminate sexual harassment as a condition of its receipt of Federal funding. The Department also determined that, although in most important respects the substance of the 1997 guidance was reaffirmed in Gebser and Davis, certain areas of the 1997 guidance could be strengthened by further clarification and explanation of the Title IX regulatory basis for the guidance.

On November 2, 2000, we published in the Federal Register a notice requesting comments on the proposed revised guidance (62 FR 66092). A detailed explanation of the Gebser and Davis decisions, and an explanation of the proposed changes in the guidance, can be found in the preamble to the proposed revised guidance. In those decisions and a third opinion, Oncale v. Sundowner Offshore Services, Inc. (Oncale), 523 U.S. 75 (1998) (a sexual harassment case decided under Title VII), the Supreme Court confirmed several fundamental principles we articulated in the 1997 guidance. In these areas, no changes in the guidance were necessary. A notice regarding the availability of this final document appeared in the Federal Register on January 19, 2001.

## Enduring Principles from the 1997 Guidance

It continues to be the case that a significant number of students, both male and female, have experienced sexual harassment, which can interfere with a student's academic performance and emotional and physical well-being. Preventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn. As with the 1997 guidance, the revised guidance applies to students at every level of education. School personnel who understand their obligations under Title IX, e.g., understand that sexual harassment can be sex discrimination in violation of Title IX, are in the best position to prevent harassment and to lessen the harm to students if, despite their best efforts, harassment occurs.

One of the fundamental aims of both the 1997 guidance and the revised guidance has been to emphasize that, in addressing allegations of sexual harassment, the good judgment and common sense of teachers and school administrators are important elements of a response that meets the requirements of Title IX.

ii

A critical issue under Title IX is whether the school recognized that sexual harassment has occurred and took prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects. If harassment has occurred, doing nothing is always the wrong response. However, depending on the circumstances, there may be more than one right way to respond. The important thing is for school employees or officials to pay attention to the school environment and not to hesitate to respond to sexual harassment in the same reasonable, commonsense manner as they would to other types of serious misconduct.

It is also important that schools not overreact to behavior that does not rise to the level of sexual harassment. As the Department stated in the 1997 guidance, a kiss on the cheek by a first grader does not constitute sexual harassment. School personnel should consider the age and maturity of students in responding to allegations of sexual harassment.

Finally, we reiterate the importance of having well- publicized and effective grievance procedures in place to handle complaints of sex discrimination, including sexual harassment complaints. Nondiscrimination policies and procedures are required by the Title IX regulations. In fact, the Supreme Court in Gebser specifically affirmed the Department's authority to enforce this requirement administratively in order to carry out Title IX's nondiscrimination mandate. 524 U.S. at 292. Strong policies and effective grievance procedures are essential to let students and employees know that sexual harassment will not be tolerated and to ensure that they know how to report it.

## Analysis of Comments Received Concerning the Proposed Revised Guidance and the Resulting Changes

In response to the Assistant Secretary's invitation to comment, OCR received approximately 11 comments representing approximately 15 organizations and individuals. Commenters provided specific suggestions regarding how the revised guidance could be clarified. Many of these suggested changes have been incorporated. Significant and recurring issues are grouped by subject and discussed in the following sections:

### Distinction Between Administrative Enforcement and Private Litigation for Monetary Damages

In Gebser and Davis, the Supreme Court addressed for the first time the appropriate standards for determining when a school district is liable under Title IX for money damages in a private lawsuit brought by or on behalf of a student who has been sexually harassed. As explained in the preamble to the proposed revised guidance, the Court was explicit in Gebser and Davis that the liability standards established in these cases are limited to private actions for monetary damages. See, e.g., Gebser, 524 U.S. at 283, and Davis, 526 U.S. at 639. The Gebser Court recognized and contrasted lawsuits for money damages with the incremental nature of administrative enforcement of Title IX. In Gebser, the Court was concerned with the possibility of a money damages award against a school for harassment about which it had not known. In contrast, the process of administrative enforcement requires enforcement agencies such as OCR to make schools

iii

aware of potential Title IX violations and to seek voluntary corrective action before pursuing fund termination or other enforcement mechanisms.

Commenters uniformly agreed with OCR that the Court limited the liability standards established in Gebser and Davis to private actions for monetary damages. See, e.g., Gebser, 524 U.S. 283, and Davis, 526 U.S. at 639. Commenters also agreed that the administrative enforcement standards reflected in the 1997 guidance remain valid in OCR enforcement actions.[2] Finally, commenters agreed that the proposed revisions provided important clarification to schools regarding the standards that OCR will use and that schools should use to determine compliance with Title IX as a condition of the receipt of Federal financial assistance in light of Gebser and Davis.

**Harassment by Teachers and Other School Personnel**

Most commenters agreed with OCR's interpretation of its regulations regarding a school's responsibility for harassment of students by teachers and other school employees. These commenters agreed that Title IX's prohibitions against discrimination are not limited to official policies and practices governing school programs and activities. A school also engages in sex-based discrimination if its employees, in the context of carrying out their day-to-day job responsibilities for providing aid, benefits, or services to students (such as teaching, counseling, supervising, and advising students) deny or limit a student's ability to participate in or benefit from the schools program on the basis of sex. Under the Title IX regulations, the school is responsible for discrimination in these cases, whether or not it knew or should have known about it, because the discrimination occurred as part of the school's undertaking to provide nondiscriminatory aid, benefits, and services to students. The revised guidance distinguishes these cases from employee harassment that, although taking place in a school's program, occurs outside of the context of the employee's provision of aid, benefits, and services to students. In these latter cases, the school's responsibilities are not triggered until the school knew or should have known about the harassment.

One commenter expressed concern that it was inappropriate ever to find a school out of compliance for harassment about which it knew nothing. We reiterate that, although a school may in some cases be responsible for harassment caused by an employee that occurred before other responsible employees of the school knew or should have known about it, OCR always provides the school with actual notice and the opportunity to take appropriate corrective action before issuing a finding of violation. This is consistent with the Court's underlying concern in Gebser and Davis.

Most commenters acknowledged that OCR has provided useful factors to determine whether harassing conduct took place "in the context of providing aid, benefits, or services." However, some commenters stated that additional clarity and examples regarding the issue were needed. Commenters also suggested clarifying

---

[2] It is the position of the United States that the standards set out in OCR's guidance for finding a violation and seeking voluntary corrective action also would apply to private actions for injunctive and other equitable relief. See brief of the United States as Amicus Curiae in Davis v. Monroe County.

references to quid pro quo and hostile environment harassment as these two concepts, though useful, do not determine the issue of whether the school itself is considered responsible for the harassment. We agree with these concerns and have made significant revisions to the sections "Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program" and "Harassment by Teachers and Other Employees" to clarify the guidance in these respects.

### Gender-based Harassment, Including Harassment Predicated on Sex-stereotyping

Several commenters requested that we expand the discussion and include examples of gender-based harassment predicated on sex stereotyping. Some commenters also argued that gender-based harassment should be considered sexual harassment, and that we have "artificially" restricted the guidance only to harassment in the form of conduct of a sexual nature, thus, implying that gender-based harassment is of less concern and should be evaluated differently.

We have not further expanded this section because, while we are also concerned with the important issue of gender-based harassment, we believe that harassment of a sexual nature raises unique and sufficiently important issues that distinguish it from other types of gender-based harassment and warrants its own guidance.

Nevertheless, we have clarified this section of the guidance in several ways. The guidance clarifies that gender-based harassment, including that predicated on sex-stereotyping, is covered by Title IX if it is sufficiently serious to deny or limit a student's ability to participate in or benefit from the program. Thus, it can be discrimination on the basis of sex to harass a student on the basis of the victim's failure to conform to stereotyped notions of masculinity and femininity. Although this type of harassment is not covered by the guidance, if it is sufficiently serious, gender-based harassment is a school's responsibility, and the same standards generally will apply. We have also added an endnote regarding Supreme Court precedent for the proposition that sex stereotyping can constitute sex discrimination.

Several commenters also suggested that we state that sexual and non-sexual (but gender-based) harassment should not be evaluated separately in determining whether a hostile environment exists. We note that both the proposed revised guidance and the final revised guidance indicate in several places that incidents of sexual harassment and non-sexual, gender-based harassment can be combined to determine whether a hostile environment has been created. We also note that sufficiently serious harassment of a sexual nature remains covered by Title IX, as explained in the guidance, even though the hostile environment may also include taunts based on sexual orientation.

### Definition of Harassment

One commenter urged OCR to provide distinct definitions of sexual harassment to be used in administrative enforcement as distinguished from criteria used to maintain private actions for monetary damages. We disagree. First, as discussed in the preamble to the proposed revised guidance, the definition of hostile environment sexual harassment used by the Court in Davis is consistent with the definition found in the proposed guidance. Although the terms used by the Court in Davis are in some ways different from

the words used to define hostile environment harassment in the 1997 guidance (see, e.g., 62 FR 12041, "conduct of a sexual nature is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program, or to create a hostile or abusive educational environment"), the definitions are consistent. Both the Court's and the Department's definitions are contextual descriptions intended to capture the same concept -– that under Title IX, the conduct must be sufficiently serious that it adversely affects a student's ability to participate in or benefit from the school's program. In determining whether harassment is actionable, both <u>Davis</u> and the Department tell schools to look at the "constellation of surrounding circumstances, expectations, and relationships" (526 U.S. at 651 (citing <u>Oncale</u>)), and the <u>Davis</u> Court cited approvingly to the underlying core factors described in the 1997 guidance for evaluating the context of the harassment. Second, schools benefit from consistency and simplicity in understanding what is sexual harassment for which the school must take responsive action. A multiplicity of definitions would not serve this purpose.

Several commenters suggested that we develop a unique Title IX definition of harassment that does not rely on Title VII and that takes into account the special relationship of schools to students. Other commenters, by contrast, commended OCR for recognizing that <u>Gebser</u> and <u>Davis</u> did not alter the definition of hostile environment sexual harassment found in OCR's 1997 guidance, which derives from Title VII caselaw, and asked us to strengthen the point. While <u>Gebser</u> and <u>Davis</u> made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the <u>Davis</u> Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX. We also believe that the factors described in both the 1997 guidance and the revised guidance to determine whether sexual harassment has occurred provide the necessary flexibility for taking into consideration the age and maturity of the students involved and the nature of the school environment.

**Effective Response**

One commenter suggested that the change in the guidance from "appropriate response" to "effective response" implies a change in OCR policy that requires omniscience of schools. We disagree. Effectiveness has always been the measure of an adequate response under Title IX. This does not mean a school must overreact out of fear of being judged inadequate. Effectiveness is measured based on a reasonableness standard. Schools do not have to know beforehand that their response will be effective. However, if their initial steps are ineffective in stopping the harassment, reasonableness may require a series of escalating steps.

## The Relationship Between FERPA and Title IX

In the development of both the 1997 guidance and the current revisions to the guidance, commenters raised concerns about the interrelation of the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, and Title IX. The concerns relate to two issues: (1) the harassed student's right to information about the outcome of a sexual harassment complaint against another student, including information about sanctions imposed on a student found guilty of harassment; and (2) the due process rights of

000066

individuals, including teachers, accused of sexual harassment by a student, to obtain information about the identity of the complainant and the nature of the allegations.

FERPA generally forbids disclosure of information from a student's "education record" without the consent of the student (or the student's parent). Thus, FERPA may be relevant when the person found to have engaged in harassment is another student, because written information about the complaint, investigation, and outcome is part of the harassing student's education record. Title IX is also relevant because it is an important part of taking effective responsive action for the school to inform the harassed student of the results of its investigation and whether it counseled, disciplined, or otherwise sanctioned the harasser. This information can assure the harassed student that the school has taken the student's complaint seriously and has taken steps to eliminate the hostile environment and prevent the harassment from recurring.

The Department currently interprets FERPA as not conflicting with the Title IX requirement that the school notify the harassed student of the outcome of its investigation, i.e., whether or not harassment was found to have occurred, because this information directly relates to the victim. It has been the Department's position that there is a potential conflict between FERPA and Title IX regarding disclosure of sanctions, and that FERPA generally prevents a school from disclosing to a student who complained of harassment information about the sanction or discipline imposed upon a student who was found to have engaged in that harassment.[3]

There is, however, an additional statutory provision that may apply to this situation. In 1994, as part of the Improving America's Schools Act, Congress amended the General Education Provisions Act (GEPA) -– of which FERPA is a part -– to state that nothing in GEPA "shall be construed to affect the applicability of … title IX of the Education Amendments of 1972…."[4] The Department interprets this provision to mean that FERPA continues to apply in the context of Title IX enforcement, but if there is a direct conflict between requirements of FERPA and requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. The Department is in the process of developing a consistent approach and specific factors for implementing this provision. OCR and the Department's Family Policy Compliance Office (FPCO) intend to issue joint guidance, discussing specific areas of potential conflict between FERPA and Title IX.

_____

[3] Exceptions include the case of a sanction that directly relates to the person who was harassed (e.g., an order that the harasser stay away from the harassed student), or sanctions related to offenses for which there is a statutory exception, such as crimes of violence or certain sex offenses in postsecondary institutions.

[4] 20 U.S.C. 1221(d). A similar amendment was originally passed in 1974 but applied only to Title VI of the Civil Rights Act of 1964 (prohibiting race discrimination by recipients). The 1994 amendments also extended 20 U.S.C. 1221(d) to Section 504 of the Rehabilitation Act of 1973 (prohibiting disability-based discrimination by recipients) and to the Age Discrimination Act.

000067

FERPA is also relevant when a student accuses a teacher or other employee of sexual harassment, because written information about the allegations is contained in the student's education record.  The potential conflict arises because, while FERPA protects the privacy of the student accuser, the accused individual may need the name of the accuser and information regarding the nature of the allegations in order to defend against the charges.  The 1997 guidance made clear that neither FERPA nor Title IX override any federally protected due process rights of a school employee accused of sexual harassment.

Several commenters urged the Department to expand and strengthen this discussion.  They argue that in many instances a school's failure to provide information about the name of the student accuser and the nature of the allegations seriously undermines the fairness of the investigative and adjudicative process.  They also urge the Department to include a discussion of the need for confidentiality as to the identity of the individual accused of harassment because of the significant harm that can be caused by false accusations.  We have made several changes to the guidance, including an additional discussion regarding the confidentiality of a person accused of harassment and a new heading entitled "Due Process Rights of the Accused," to address these concerns.

000068

# REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS[1] BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES

## Outline of Contents

I. Introduction

II. Sexual Harassment

III. Applicability of Title IX

IV. Title IX Regulatory Compliance Responsibilities

V. Determining a School's Responsibilities

    A.  Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program

        1. Factors Used to Evaluate Hostile Environment Sexual Harassment

        2. Welcomeness

    B. Nature of a School's Responsibility to Address Sexual Harassment

        1. Harassment by Teachers and Other Employees

        2. Harassment by Other Students or Third Parties

    C. Notice of Employee, Peer, or Third Party Harassment

    D. The Role of Grievance Procedures

VI. OCR Case Resolution

VII. Recipient's Response

    A. Response to Student or Parent Reports of Harassment; Response to Direct Observation of Harassment by a Responsible Employee

    B. Confidentiality

    C. Response to Other Types of Notice

VIII. Prevention

IX. Prompt and Equitable Grievance Procedures

X. Due Process Rights of the Accused

XI. First Amendment

## I. Introduction

Title IX of the Education Amendments of 1972 (Title IX) and the Department of Education's (Department) implementing regulations prohibit discrimination on the basis of sex in federally assisted education programs and activities.[2]  The Supreme Court, Congress, and Federal executive departments and agencies, including the Department, have recognized that sexual harassment of students can constitute discrimination prohibited by Title IX.[3]  This guidance focuses on a school's[4] fundamental compliance responsibilities under Title IX and the Title IX regulations to address sexual harassment of students as a condition of continued receipt of Federal funding.  It describes the regulatory basis for a school's compliance responsibilities under Title IX, outlines the circumstances under which sexual harassment may constitute discrimination prohibited by the statute and regulations, and provides information about actions that schools should take to prevent sexual harassment or to address it effectively if it does occur.[5]

## II. Sexual Harassment

Sexual harassment is unwelcome conduct of a sexual nature.  Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.[6]  Sexual harassment of a student can deny or limit, on the basis of sex, the student's ability to participate in or to receive benefits, services, or opportunities in the school's program.  Sexual harassment of students is, therefore, a form of sex discrimination prohibited by Title IX under the circumstances described in this guidance.

It is important to recognize that Title IX's prohibition against sexual harassment does not extend to legitimate nonsexual touching or other nonsexual conduct.  For example, a high school athletic coach hugging a student who made a goal or a kindergarten teacher's consoling hug for a child with a skinned knee will not be considered sexual harassment.[7]  Similarly, one student's demonstration of a sports maneuver or technique requiring contact with another student will not be considered sexual harassment.  However, in some circumstances, nonsexual conduct may take on sexual connotations and rise to the level of sexual harassment.  For example, a teacher's repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment.

## III. Applicability of Title IX

Title IX applies to all public and private educational institutions that receive Federal funds, i.e., recipients, including, but not limited to, elementary and secondary schools, school districts, proprietary schools, colleges, and universities.  The guidance uses the terms "recipients" and "schools" interchangeably to refer to all of those institutions.  The "education program or activity" of a school includes all of the school's operations.[8]  This means that Title IX protects students in connection with all of the academic, educational, extra-curricular, athletic, and other programs of the school,

2

whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere.

A student may be sexually harassed by a school employee,[9] another student, or a non-employee third party (e.g., a visiting speaker or visiting athletes). Title IX protects any "person" from sex discrimination. Accordingly, both male and female students are protected from sexual harassment[10] engaged in by a school's employees, other students, or third parties. Moreover, Title IX prohibits sexual harassment regardless of the sex of the harasser, i.e., even if the harasser and the person being harassed are members of the same sex.[11] An example would be a campaign of sexually explicit graffiti directed at a particular girl by other girls.[12]

Although Title IX does not prohibit discrimination on the basis of sexual orientation,[13] sexual harassment directed at gay or lesbian students that is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's program constitutes sexual harassment prohibited by Title IX under the circumstances described in this guidance.[14] For example, if a male student or a group of male students target a gay student for physical sexual advances, serious enough to deny or limit the victim's ability to participate in or benefit from the school's program, the school would need to respond promptly and effectively, as described in this guidance, just as it would if the victim were heterosexual. On the other hand, if students heckle another student with comments based on the student's sexual orientation (e.g., "gay students are not welcome at this table in the cafeteria"), but their actions do not involve conduct of a sexual nature, their actions would not be sexual harassment covered by Title IX.[15]

Though beyond the scope of this guidance, gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping,[16] but not involving conduct of a sexual nature, is also a form of sex discrimination to which a school must respond, if it rises to a level that denies or limits a student's ability to participate in or benefit from the educational program.[17] For example, the repeated sabotaging of female graduate students' laboratory experiments by male students in the class could be the basis of a violation of Title IX. A school must respond to such harassment in accordance with the standards and procedures described in this guidance.[18] In assessing all related circumstances to determine whether a hostile environment exists, incidents of gender-based harassment combined with incidents of sexual harassment could create a hostile environment, even if neither the gender-based harassment alone nor the sexual harassment alone would be sufficient to do so.[19]

## IV. Title IX Regulatory Compliance Responsibilities

As a condition of receiving funds from the Department, a school is required to comply with Title IX and the Department's Title IX regulations, which spell out prohibitions against sex discrimination. The law is clear that sexual harassment may constitute sex discrimination under Title IX.[20]

Recipients specifically agree, as a condition for receiving Federal financial assistance from the Department, to comply with Title IX and the Department's Title IX regulations. The regulatory provision requiring this agreement, known as an assurance of

000071

compliance, specifies that recipients must agree that education programs or activities operated by the recipient will be operated in compliance with the Title IX regulations, including taking any action necessary to remedy its discrimination or the effects of its discrimination in its programs.[21]

The regulations set out the basic Title IX responsibilities a recipient undertakes when it accepts Federal financial assistance, including the following specific obligations.[22]  A recipient agrees that, in providing any aid, benefit, or service to students, it will not, on the basis of sex—

- Treat one student differently from another in determining whether the student satisfies any requirement or condition for the provision of any aid, benefit, or service;[23]

- Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;[24]

- Deny any student any such aid, benefit, or service;[25]

- Subject students to separate or different rules of behavior, sanctions, or other treatment;[26]

- Aid or perpetuate discrimination against a student by providing significant assistance to any agency, organization, or person that discriminates on the basis of sex in providing any aid, benefit, or service to students;[27] and

- Otherwise limit any student in the enjoyment of any right, privilege, advantage, or opportunity.[28]

For the purposes of brevity and clarity, this guidance generally summarizes this comprehensive list by referring to a school's obligation to ensure that a student is not denied or limited in the ability to participate in or benefit from the school's program on the basis of sex.

The regulations also specify that, if a recipient discriminates on the basis of sex, the school must take remedial action to overcome the effects of the discrimination.[29]

In addition, the regulations establish procedural requirements that are important for the prevention or correction of sex discrimination, including sexual harassment. These requirements include issuance of a policy against sex discrimination[30] and adoption and publication of grievance procedures providing for prompt and equitable resolution of complaints of sex discrimination.[31]  The regulations also require that recipients designate at least one employee to coordinate compliance with the regulations, including coordination of investigations of complaints alleging noncompliance.[32]

To comply with these regulatory requirements, schools need to recognize and respond to sexual harassment of students by teachers and other employees, by other students, and by third parties.  This guidance explains how the requirements of the Title IX regulations apply to situations involving sexual harassment of a student and outlines measures that schools should take to ensure compliance.

4

## V. Determining a School's Responsibilities

In assessing sexually harassing conduct, it is important for schools to recognize that two distinct issues are considered. The first issue is whether, considering the types of harassment discussed in the following section, the conduct denies or limits a student's ability to participate in or benefit from the program based on sex. If it does, the second issue is the nature of the school's responsibility to address that conduct. As discussed in a following section, this issue depends in part on the identity of the harasser and the context in which the harassment occurred.

### A. Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program

This guidance moves away from specific labels for types of sexual harassment.[33] In each case, the issue is whether the harassment rises to a level that it denies or limits a student's ability to participate in or benefit from the school's program based on sex. However, an understanding of the different types of sexual harassment can help schools determine whether or not harassment has occurred that triggers a school's responsibilities under, or violates, Title IX or its regulations.

The type of harassment traditionally referred to as <u>quid pro quo</u> harassment occurs if a teacher or other employee conditions an educational decision or benefit on the student's submission to unwelcome sexual conduct.[34] Whether the student resists and suffers the threatened harm or submits and avoids the threatened harm, the student has been treated differently, or the student's ability to participate in or benefit from the school's program has been denied or limited, on the basis of sex in violation of the Title IX regulations.[35]

By contrast, sexual harassment can occur that does not explicitly or implicitly condition a decision or benefit on submission to sexual conduct. Harassment of this type is generally referred to as hostile environment harassment.[36] This type of harassing conduct requires a further assessment of whether or not the conduct is sufficiently serious to deny or limit a student's ability to participate in or benefit from the school's program based on sex.[37]

Teachers and other employees can engage in either type of harassment. Students and third parties are not generally given responsibility over other students and, thus, generally can only engage in hostile environment harassment.

### 1. Factors Used to Evaluate Hostile Environment Sexual Harassment

As outlined in the following paragraphs, OCR considers a variety of related factors to determine if a hostile environment has been created, i.e., if sexually harassing conduct by an employee, another student, or a third party is sufficiently serious that it denies or limits a student's ability to participate in or benefit from the school's program based on sex. OCR considers the conduct from both a subjective[38] and objective[39] perspective. In evaluating the severity and pervasiveness of the conduct, OCR considers all relevant circumstances, i.e., "the constellation of surrounding circumstances, expectations, and relationships."[40] Schools should also use these factors to evaluate conduct in order to draw commonsense distinctions between conduct that constitutes

5

sexual harassment and conduct that does not rise to that level.  Relevant factors include the following:

- The degree to which the conduct affected one or more students' education.  OCR assesses the effect of the harassment on the student to determine whether it has denied or limited the student's ability to participate in or benefit from the school's program.  For example, a student's grades may go down or the student may be forced to withdraw from school because of the harassing behavior.[41]  A student may also suffer physical injuries or mental or emotional distress.[42]  In another situation, a student may have been able to keep up his or her grades and continue to attend school even though it was very difficult for him or her to do so because of the teacher's repeated sexual advances.  Similarly, a student may be able to remain on a sports team, despite experiencing great difficulty performing at practices and games from the humiliation and anger caused by repeated sexual advances and intimidation by several team members that create a hostile environment.  Harassing conduct in these examples would alter a reasonable student's educational environment and adversely affect the student's ability to participate in or benefit from the school's program on the basis of sex.

  A hostile environment can occur even if the harassment is not targeted specifically at the individual complainant.[43]  For example, if a student, group of students, or a teacher regularly directs sexual comments toward a particular student, a hostile environment may be created not only for the targeted student, but also for others who witness the conduct.

- The type, frequency, and duration of the conduct.  In most cases, a hostile environment will exist if there is a pattern or practice of harassment, or if the harassment is sustained and nontrivial.[44]  For instance, if a young woman is taunted by one or more young men about her breasts or genital area or both, OCR may find that a hostile environment has been created, particularly if the conduct has gone on for some time, or takes place throughout the school, or if the taunts are made by a number of students.  The more severe the conduct, the less the need to show a repetitive series of incidents; this is particularly true if the harassment is physical.  For instance, if the conduct is more severe, e.g., attempts to grab a female student's breasts or attempts to grab any student's genital area or buttocks, it need not be as persistent to create a hostile environment.  Indeed, a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment.[45]  On the other hand, conduct that is not severe will not create a hostile environment, e.g., a comment by one student to another student that she has a nice figure.  Indeed, depending on the circumstances, this may not even be conduct of a sexual nature.[46]  Similarly, because students date one another, a request for a date or a gift of flowers, even if unwelcome, would not create a hostile environment.  However, there may be circumstances in which repeated, unwelcome requests for dates or similar conduct could create a hostile environment.  For example, a person, who has been refused previously, may request dates in an intimidating or threatening manner.

- The identity of and relationship between the alleged harasser and the subject or subjects of the harassment.  A factor to be considered, especially in cases involving allegations of sexual harassment of a student by a school employee, is the identity of

and relationship between the alleged harasser and the subject or subjects of the harassment. For example, due to the power a professor or teacher has over a student, sexually based conduct by that person toward a student is more likely to create a hostile environment than similar conduct by another student.[47]

- The number of individuals involved. Sexual harassment may be committed by an individual or a group. In some cases, verbal comments or other conduct from one person might not be sufficient to create a hostile environment, but could be if done by a group. Similarly, while harassment can be directed toward an individual or a group,[48] the effect of the conduct toward a group may vary, depending on the type of conduct and the context. For certain types of conduct, there may be "safety in numbers." For example, following an individual student and making sexual taunts to him or her may be very intimidating to that student, but, in certain circumstances, less so to a group of students. On the other hand, persistent unwelcome sexual conduct still may create a hostile environment if directed toward a group.

- The age and sex of the alleged harasser and the subject or subjects of the harassment. For example, in the case of younger students, sexually harassing conduct is more likely to be intimidating if coming from an older student.[49]

- The size of the school, location of the incidents, and context in which they occurred. Depending on the circumstances of a particular case, fewer incidents may have a greater effect at a small college than at a large university campus. Harassing conduct occurring on a school bus may be more intimidating than similar conduct on a school playground because the restricted area makes it impossible for students to avoid their harassers.[50] Harassing conduct in a personal or secluded area, such as a dormitory room or residence hall, can have a greater effect (e.g., be seen as more threatening) than would similar conduct in a more public area. On the other hand, harassing conduct in a public place may be more humiliating. Each incident must be judged individually.

- Other incidents at the school. A series of incidents at the school, not involving the same students, could — taken together — create a hostile environment, even if each by itself would not be sufficient.[51]

- Incidents of gender-based, but nonsexual harassment. Acts of verbal, nonverbal or physical aggression, intimidation or hostility based on sex, but not involving sexual activity or language, can be combined with incidents of sexual harassment to determine if the incidents of sexual harassment are sufficiently serious to create a sexually hostile environment.[52]

It is the totality of the circumstances in which the behavior occurs that is critical in determining whether a hostile environment exists. Consequently, in using the factors discussed previously to evaluate incidents of alleged harassment, it is always important to use common sense and reasonable judgement in determining whether a sexually hostile environment has been created.

### 2. Welcomeness

The section entitled "Sexual Harassment" explains that in order for conduct of a sexual nature to be sexual harassment, it must be unwelcome. Conduct is unwelcome if

000075

the student did not request or invite it and "regarded the conduct as undesirable or offensive."[53]  Acquiescence in the conduct or the failure to complain does not always mean that the conduct was welcome.[54]  For example, a student may decide not to resist sexual advances of another student or may not file a complaint out of fear.  In addition, a student may not object to a pattern of demeaning comments directed at him or her by a group of students out of a concern that objections might cause the harassers to make more comments.  The fact that a student may have accepted the conduct does not mean that he or she welcomed it.[55]  Also, the fact that a student willingly participated in conduct on one occasion does not prevent him or her from indicating that the same conduct has become unwelcome on a subsequent occasion.  On the other hand, if a student actively participates in sexual banter and discussions and gives no indication that he or she objects, then the evidence generally will not support a conclusion that the conduct was unwelcome.[56]

If younger children are involved, it may be necessary to determine the degree to which they are able to recognize that certain sexual conduct is conduct to which they can or should reasonably object and the degree to which they can articulate an objection.  Accordingly, OCR will consider the age of the student, the nature of the conduct involved, and other relevant factors in determining whether a student had the capacity to welcome sexual conduct.

Schools should be particularly concerned about the issue of welcomeness if the harasser is in a position of authority.  For instance, because students may be encouraged to believe that a teacher has absolute authority over the operation of his or her classroom, a student may not object to a teacher's sexually harassing comments during class; however, this does not necessarily mean that the conduct was welcome.  Instead, the student may believe that any objections would be ineffective in stopping the harassment or may fear that by making objections he or she will be singled out for harassing comments or other retaliation.

In addition, OCR must consider particular issues of welcomeness if the alleged harassment relates to alleged "consensual" sexual relationships between a school's adult employees and its students.  If elementary students are involved, welcomeness will not be an issue:  OCR will never view sexual conduct between an adult school employee and an elementary school student as consensual.  In cases involving secondary students, there will be a strong presumption that sexual conduct between an adult school employee and a student is not consensual.  In cases involving older secondary students, subject to the presumption,[57] OCR will consider a number of factors in determining whether a school employee's sexual advances or other sexual conduct could be considered welcome.[58]  In addition, OCR will consider these factors in all cases involving postsecondary students in making those determinations.[59]  The factors include the following:

- The nature of the conduct and the relationship of the school employee to the student, including the degree of influence (which could, at least in part, be affected by the student's age), authority, or control the employee has over the student.

- Whether the student was legally or practically unable to consent to the sexual conduct in question.  For example, a student's age could affect his or her ability to do so.  Similarly, certain types of disabilities could affect a student's ability to do so.

8

If there is a dispute about whether harassment occurred or whether it was welcome — in a case in which it is appropriate to consider whether the conduct would be welcome — determinations should be made based on the totality of the circumstances. The following types of information may be helpful in resolving the dispute:

- Statements by any witnesses to the alleged incident.

- Evidence about the relative credibility of the allegedly harassed student and the alleged harasser. For example, the level of detail and consistency of each person's account should be compared in an attempt to determine who is telling the truth. Another way to assess credibility is to see if corroborative evidence is lacking where it should logically exist. However, the absence of witnesses may indicate only the unwillingness of others to step forward, perhaps due to fear of the harasser or a desire not to get involved.

- Evidence that the alleged harasser has been found to have harassed others may support the credibility of the student claiming the harassment; conversely, the student's claim will be weakened if he or she has been found to have made false allegations against other individuals.

- Evidence of the allegedly harassed student's reaction or behavior after the alleged harassment. For example, were there witnesses who saw the student immediately after the alleged incident who say that the student appeared to be upset? However, it is important to note that some students may respond to harassment in ways that do not manifest themselves right away, but may surface several days or weeks after the harassment. For example, a student may initially show no signs of having been harassed, but several weeks after the harassment, there may be significant changes in the student's behavior, including difficulty concentrating on academic work, symptoms of depression, and a desire to avoid certain individuals and places at school.

- Evidence about whether the student claiming harassment filed a complaint or took other action to protest the conduct soon after the alleged incident occurred. However, failure to immediately complain may merely reflect a fear of retaliation or a fear that the complainant may not be believed rather than that the alleged harassment did not occur.

- Other contemporaneous evidence. For example, did the student claiming harassment write about the conduct and his or her reaction to it soon after it occurred (e.g., in a diary or letter)? Did the student tell others (friends, parents) about the conduct (and his or her reaction to it) soon after it occurred?

### B. Nature of the School's Responsibility to Address Sexual Harassment

A school has a responsibility to respond promptly and effectively to sexual harassment. In the case of harassment by teachers or other employees, the nature of this responsibility depends in part on whether the harassment occurred in the context of the employee's provision of aid, benefits, or services to students.

000077

### 1. Harassment by Teachers and Other Employees

Sexual harassment of a student by a teacher or other school employee can be discrimination in violation of Title IX.[60] Schools are responsible for taking prompt and effective action to stop the harassment and prevent its recurrence. A school also may be responsible for remedying the effects of the harassment on the student who was harassed. The extent of a recipient's responsibilities if an employee sexually harasses a student is determined by whether or not the harassment occurred in the context of the employee's provision of aid, benefits, or services to students.

A recipient is responsible under the Title IX regulations for the nondiscriminatory provision of aid, benefits, and services to students. Recipients generally provide aid, benefits, and services to students through the responsibilities they give to employees. If an employee who is acting (or who reasonably appears to be acting) in the context of carrying out these responsibilities over students engages in sexual harassment – generally this means harassment that is carried out during an employee's performance of his or her responsibilities in relation to students, including teaching, counseling, supervising, advising, and transporting students – and the harassment denies or limits a student's ability to participate in or benefit from a school program on the basis of sex,[61] the recipient is responsible for the discriminatory conduct.[62] The recipient is, therefore, also responsible for remedying any effects of the harassment on the victim, as well as for ending the harassment and preventing its recurrence. This is true whether or not the recipient has "notice" of the harassment. (As explained in the section on "Notice of Employee, Peer, or Third Party Harassment," for purposes of this guidance, a school has notice of harassment if a responsible school employee actually knew or, in the exercise of reasonable care, should have known about the harassment.) Of course, under OCR's administrative enforcement, recipients always receive actual notice and the opportunity to take appropriate corrective action before any finding of violation or possible loss of federal funds.

Whether or not sexual harassment of a student occurred within the context of an employee's responsibilities for providing aid, benefits, or services is determined on a case-by-case basis, taking into account a variety of factors. If an employee conditions the provision of an aid, benefit, or service that the employee is responsible for providing on a student's submission to sexual conduct, i.e., conduct traditionally referred to as quid pro quo harassment, the harassment is clearly taking place in the context of the employee's responsibilities to provide aid, benefits, or services. In other situations, i.e., when an employee has created a hostile environment, OCR will consider the following factors in determining whether or not the harassment has taken place in this context, including:

- The type and degree of responsibility given to the employee, including both formal and informal authority, to provide aids, benefits, or services to students, to direct and control student conduct, or to discipline students generally;

- the degree of influence the employee has over the particular student involved, including in the circumstances in which the harassment took place;

- where and when the harassment occurred;

- the age and educational level of the student involved; and

10

000078

- as applicable, whether, in light of the student's age and educational level and the way the school is run, it would be reasonable for the student to believe that the employee was in a position of responsibility over the student, even if the employee was not.

These factors are applicable to all recipient educational institutions, including elementary and secondary schools, colleges, and universities. Elementary and secondary schools, however, are typically run in a way that gives teachers, school officials, and other school employees a substantial degree of supervision, control, and disciplinary authority over the conduct of students.[63] Therefore, in cases involving allegations of harassment of elementary and secondary school-age students by a teacher or school administrator during any school activity,[64] consideration of these factors will generally lead to a conclusion that the harassment occurred in the context of the employee's provision of aid, benefits, or services.

For example, a teacher sexually harasses an eighth-grade student in a school hallway. Even if the student is not in any of the teacher's classes and even if the teacher is not designated as a hall monitor, given the age and educational level of the student and the status and degree of influence of teachers in elementary and secondary schools, it would be reasonable for the student to believe that the teacher had at least informal disciplinary authority over students in the hallways. Thus, OCR would consider this an example of conduct that is occurring in the context of the employee's responsibilities to provide aid, benefits, or services.

Other examples of sexual harassment of a student occurring in the context of an employee's responsibilities for providing aid, benefits, or services include, but are not limited to -- a faculty member at a university's medical school conditions an intern's evaluation on submission to his sexual advances and then gives her a poor evaluation for rejecting the advances; a high school drama instructor does not give a student a part in a play because she has not responded to sexual overtures from the instructor; a faculty member withdraws approval of research funds for her assistant because he has rebuffed her advances; a journalism professor who supervises a college newspaper continually and inappropriately touches a student editor in a sexual manner, causing the student to resign from the newspaper staff; and a teacher repeatedly asks a ninth grade student to stay after class and attempts to engage her in discussions about sex and her personal experiences while they are alone in the classroom, causing the student to stop coming to class. In each of these cases, the school is responsible for the discriminatory conduct, including taking prompt and effective action to end the harassment, prevent it from recurring, and remedy the effects of the harassment on the victim.

Sometimes harassment of a student by an employee in the school's program does not take place in the context of the employee's provision of aid, benefits, or services, but nevertheless is sufficiently serious to create a hostile educational environment. An example of this conduct might occur if a faculty member in the history department at a university, over the course of several weeks, repeatedly touches and makes sexually suggestive remarks to a graduate engineering student while waiting at a stop for the university shuttle bus, riding on the bus, and upon exiting the bus. As a result, the student stops using the campus shuttle and walks the very long distances between her classes. In this case, the school is not directly responsible for the harassing conduct because it did not occur in the context of the employee's responsibilities for the provision

11

of aid, benefits, or services to students.  However, the conduct is sufficiently serious to deny or limit the student in her ability to participate in or benefit from the recipient's program.  Thus, the school has a duty, upon notice of the harassment,[65] to take prompt and effective action to stop the harassment and prevent its recurrence.

If the school takes these steps, it has avoided violating Title IX.  If the school fails to take the necessary steps, however, its failure to act has allowed the student to continue to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program.  The school, therefore, has engaged in its own discrimination.  It then becomes responsible, not just for stopping the conduct and preventing it from happening again, but for remedying the effects of the harassment on the student that could reasonably have been prevented if the school had responded promptly and effectively.  (For related issues, see the sections on "OCR Case Resolution" and "Recipient's Response.")

## 2. Harassment by Other Students or Third Parties

If a student sexually harasses another student and the harassing conduct is sufficiently serious to deny or limit the student's ability to participate in or benefit from the program, and if the school knows or reasonably should know[66] about the harassment, the school is responsible for taking immediate effective action to eliminate the hostile environment and prevent its recurrence.[67]  As long as the school, upon notice of the harassment, responds by taking prompt and effective action to end the harassment and prevent its recurrence, the school has carried out its responsibility under the Title IX regulations.  On the other hand, if, upon notice, the school fails to take prompt, effective action, the school's own inaction has permitted the student to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program on the basis of sex.[68]  In this case, the school is responsible for taking effective corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had it responded promptly and effectively.

Similarly, sexually harassing conduct by third parties, who are not themselves employees or students at the school (e.g., a visiting speaker or members of a visiting athletic team), may also be of a sufficiently serious nature to deny or limit a student's ability to participate in or benefit from the education program.  As previously outlined in connection with peer harassment, if the school knows or should know[69] of the harassment, the school is responsible for taking prompt and effective action to eliminate the hostile environment and prevent its recurrence.

The type of appropriate steps that the school should take will differ depending on the level of control that the school has over the third party harasser.[70]  For example, if athletes from a visiting team harass the home school's students, the home school may not be able to discipline the athletes.  However, it could encourage the other school to take appropriate action to prevent further incidents; if necessary, the home school may choose not to invite the other school back.  (This issue is discussed more fully in the section on "Recipient's Response.")

If, upon notice, the school fails to take prompt and effective corrective action, its own failure has permitted the student to be subjected to a hostile environment that limits

000080

the student's ability to participate in or benefit from the education program.[71]  In this case, the school is responsible for taking corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had the school responded promptly and effectively.

### C. Notice of Employee, Peer, or Third Party Harassment

As described in the section on "Harassment by Teachers and Other Employees," schools may be responsible for certain types of employee harassment that occurred before the school otherwise had notice of the harassment.  On the other hand, as described in that section and the section on "Harassment by Other Students or Third Parties," in situations involving certain other types of employee harassment, or harassment by peers or third parties, a school will be in violation of the Title IX regulations if the school "has notice" of a sexually hostile environment and fails to take immediate and effective corrective action.[72]

A school has notice if a responsible employee "knew, or in the exercise of reasonable care should have known," about the harassment.[73]  A responsible employee would include any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility.[74]  Accordingly, schools need to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate school officials.  Training for employees should include practical information about how to identify harassment and, as applicable, the person to whom it should be reported.

A school can receive notice of harassment in many different ways.  A student may have filed a grievance with the Title IX coordinator[75] or complained to a teacher or other responsible employee about fellow students harassing him or her.  A student, parent, or other individual may have contacted other appropriate personnel, such as a principal, campus security, bus driver, teacher, affirmative action officer, or staff in the office of student affairs.  A teacher or other responsible employee of the school may have witnessed the harassment.  The school may receive notice about harassment in an indirect manner, from sources such as a member of the school staff, a member of the educational or local community, or the media.  The school also may have learned about the harassment from flyers about the incident distributed at the school or posted around the school.  For the purposes of compliance with the Title IX regulations, a school has a duty to respond to harassment about which it reasonably should have known, i.e., if it would have learned of the harassment if it had exercised reasonable care or made a "reasonably diligent inquiry."[76]

For example, in some situations if the school knows of incidents of harassment, the exercise of reasonable care should trigger an investigation that would lead to a discovery of additional incidents.[77]  In other cases, the pervasiveness of the harassment may be enough to conclude that the school should have known of the hostile environment — if the harassment is widespread, openly practiced, or well-known to students and staff

000081

(such as sexual harassment occurring in the hallways, graffiti in public areas, or harassment occurring during recess under a teacher's supervision.)[78]

If a school otherwise knows or reasonably should know of a hostile environment and fails to take prompt and effective corrective action, a school has violated Title IX even if the student has failed to use the school's existing grievance procedures or otherwise inform the school of the harassment.

### D. The Role of Grievance Procedures

Schools are required by the Title IX regulations to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination.[79] (These issues are discussed in the section on "Prompt and Equitable Grievance Procedures.") These procedures provide a school with a mechanism for discovering sexual harassment as early as possible and for effectively correcting problems, as required by the Title IX regulations. By having a strong policy against sex discrimination and accessible, effective, and fairly applied grievance procedures, a school is telling its students that it does not tolerate sexual harassment and that students can report it without fear of adverse consequences.

Without a disseminated policy and procedure, a student does not know either of the school's policy against and obligation to address this form of discrimination, or how to report harassment so that it can be remedied. If the alleged harassment is sufficiently serious to create a hostile environment and it is the school's failure to comply with the procedural requirements of the Title IX regulations that hampers early notification and intervention and permits sexual harassment to deny or limit a student's ability to participate in or benefit from the school's program on the basis of sex,[80] the school will be responsible under the Title IX regulations, once informed of the harassment, to take corrective action, including stopping the harassment, preventing its recurrence, and remedying the effects of the harassment on the victim that could reasonably have been prevented if the school's failure to comply with the procedural requirements had not hampered early notification.

## VI. OCR Case Resolution

If OCR is asked to investigate or otherwise resolve incidents of sexual harassment of students, including incidents caused by employees, other students, or third parties, OCR will consider whether — (1) the school has a disseminated policy prohibiting sex discrimination under Title IX[81] and effective grievance procedures;[82] (2) the school appropriately investigated or otherwise responded to allegations of sexual harassment;[83] and (3) the school has taken immediate and effective corrective action responsive to the harassment, including effective actions to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects.[84] (Issues related to appropriate investigative and corrective actions are discussed in detail in the section on "Recipient's Response.")

If the school has taken, or agrees to take, each of these steps, OCR will consider the case against the school resolved and will take no further action, other than monitoring compliance with an agreement, if any, between the school and OCR. This is true in cases

in which the school was in violation of the Title IX regulations (e.g., a teacher sexually harassed a student in the context of providing aid, benefits, or services to students), as well as those in which there has been no violation of the regulations (e.g., in a peer sexual harassment situation in which the school took immediate, reasonable steps to end the harassment and prevent its recurrence). This is because, even if OCR identifies a violation, Title IX requires OCR to attempt to secure voluntary compliance.[85]  Thus, because a school will have the opportunity to take reasonable corrective action before OCR issues a formal finding of violation, a school does not risk losing its Federal funding solely because discrimination occurred.

# VII. Recipient's Response

Once a school has notice of possible sexual harassment of students — whether carried out by employees, other students, or third parties — it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps

reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again. These steps are the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action.[86]  As described in the next section, in appropriate circumstances the school will also be responsible for taking steps to remedy the effects of the harassment on the individual student or students who were harassed. What constitutes a reasonable response to information about possible sexual harassment will differ depending upon the circumstances.

### A. Response to Student or Parent Reports of Harassment; Response to Direct Observation of Harassment by a Responsible Employee

If a student or the parent of an elementary or secondary student provides information or complains about sexual harassment of the student, the school should initially discuss what actions the student or parent is seeking in response to the harassment. The school should explain the avenues for informal and formal action, including a description of the grievance procedure that is available for sexual harassment complaints and an explanation of how the procedure works. If a responsible school employee has directly observed sexual harassment of a student, the school should contact the student who was harassed (or the parent, depending upon the age of the student),[87] explain that the school is responsible for taking steps to correct the harassment, and provide the same information described in the previous sentence.

Regardless of whether the student who was harassed, or his or her parent, decides to file a formal complaint or otherwise request action on the student's behalf (including in cases involving direct observation by a responsible employee), the school must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation. The specific steps in an investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors. However, in all cases the inquiry must be prompt, thorough, and impartial. (Requests by the student who

000083

was harassed for confidentiality or for no action to be taken, responding to notice of harassment from other sources, and the components of a prompt and equitable grievance procedure are discussed in subsequent sections of this guidance.)

It may be appropriate for a school to take interim measures during the investigation of a complaint. For instance, if a student alleges that he or she has been sexually assaulted by another student, the school may decide to place the students immediately in separate classes or in different housing arrangements on a campus, pending the results of the school's investigation. Similarly, if the alleged harasser is a teacher, allowing the student to transfer to a different class may be appropriate. In cases involving potential criminal conduct, school personnel should determine whether appropriate law enforcement authorities should be notified. In all cases, schools should make every effort to prevent disclosure of the names of all parties involved -– the complainant, the witnesses, and the accused -- except to the extent necessary to carry out an investigation.

If a school determines that sexual harassment has occurred, it should take reasonable, timely, age-appropriate, and effective corrective action, including steps tailored to the specific situation.[88] Appropriate steps should be taken to end the harassment. For example, school personnel may need to counsel, warn, or take disciplinary action against the harasser, based on the severity of the harassment or any record of prior incidents or both.[89] A series of escalating consequences may be necessary if the initial steps are ineffective in stopping the harassment.[90] In some cases, it may be appropriate to further separate the harassed student and the harasser, e.g., by changing housing arrangements[91] or directing the harasser to have no further contact with the harassed student. Responsive measures of this type should be designed to minimize, as much as possible, the burden on the student who was harassed. If the alleged harasser is not a student or employee of the recipient, OCR will consider the level of control the school has over the harasser in determining what response would be appropriate.[92]

Steps should also be taken to eliminate any hostile environment that has been created. For example, if a female student has been subjected to harassment by a group of other students in a class, the school may need to deliver special training or other interventions for that class to repair the educational environment. If the school offers the student the option of withdrawing from a class in which a hostile environment occurred, the school should assist the student in making program or schedule changes and ensure that none of the changes adversely affect the student's academic record. Other measures may include, if appropriate, directing a harasser to apologize to the harassed student. If a hostile environment has affected an entire school or campus, an effective response may need to include dissemination of information, the issuance of new policy statements, or other steps that are designed to clearly communicate the message that the school does not tolerate harassment and will be responsive to any student who reports that conduct.

In some situations, a school may be required to provide other services to the student who was harassed if necessary to address the effects of the harassment on that student.[93] For example, if an instructor gives a student a low grade because the student failed to respond to his sexual advances, the school may be required to make arrangements for an independent reassessment of the student's work, if feasible, and change the grade accordingly; make arrangements for the student to take the course again

16

with a different instructor; provide tutoring; make tuition adjustments; offer reimbursement for professional counseling; or take other measures that are appropriate to the circumstances. As another example, if a school delays responding or responds inappropriately to information about harassment, such as a case in which the school ignores complaints by a student that he or she is being sexually harassed by a classmate, the school will be required to remedy the effects of the harassment that could have been prevented had the school responded promptly and effectively.

Finally, a school should take steps to prevent any further harassment[94] and to prevent any retaliation against the student who made the complaint (or was the subject of the harassment), against the person who filed a complaint on behalf of a student, or against those who provided information as witnesses.[95] At a minimum, this includes making sure that the harassed students and their parents know how to report any subsequent problems and making follow-up inquiries to see if there have been any new incidents or any retaliation. To prevent recurrences, counseling for the harasser may be appropriate to ensure that he or she understands what constitutes harassment and the effects it can have. In addition, depending on how widespread the harassment was and whether there have been any prior incidents, the school may need to provide training for the larger school community to ensure that students, parents, and teachers can recognize harassment if it recurs and know how to respond.[96]

### B. Confidentiality

The scope of a reasonable response also may depend upon whether a student, or parent of a minor student, reporting harassment asks that the student's name not be disclosed to the harasser or that nothing be done about the alleged harassment. In all cases, a school should discuss confidentiality standards and concerns with the complainant initially. The school should inform the student that a confidentiality request may limit the school's ability to respond. The school also should tell the student that Title IX prohibits retaliation and that, if he or she is afraid of reprisals from the alleged harasser, the school will take steps to prevent retaliation and will take strong responsive actions if retaliation occurs. If the student continues to ask that his or her name not be revealed, the school should take all reasonable steps to investigate and respond to the complaint consistent with the student's request as long as doing so does not prevent the school from responding effectively to the harassment and preventing harassment of other students.

OCR enforces Title IX consistent with the federally protected due process rights of public school students and employees. Thus, for example, if a student, who was the only student harassed, insists that his or her name not be revealed, and the alleged harasser could not respond to the charges of sexual harassment without that information, in evaluating the school's response, OCR would not expect disciplinary action against an alleged harasser.

At the same time, a school should evaluate the confidentiality request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students. The factors that a school may consider in this regard include the seriousness of the alleged harassment, the age of the student harassed, whether there have been other complaints or reports of harassment against the alleged harasser, and the rights of the

000085

accused individual to receive information about the accuser and the allegations if a formal proceeding with sanctions may result.[97]

Similarly, a school should be aware of the confidentiality concerns of an accused employee or student. Publicized accusations of sexual harassment, if ultimately found to be false, may nevertheless irreparably damage the reputation of the accused. The accused individual's need for confidentiality must, of course, also be evaluated based on the factors discussed in the preceding paragraph in the context of the school's responsibility to ensure a safe environment for students.

Although a student's request to have his or her name withheld may limit the school's ability to respond fully to an individual complaint of harassment, other means may be available to address the harassment. There are steps a recipient can take to limit the effects of the alleged harassment and prevent its recurrence without initiating formal action against the alleged harasser or revealing the identity of the complainant. Examples include conducting sexual harassment training for the school site or academic department where the problem occurred, taking a student survey concerning any problems with harassment, or implementing other systemic measures at the site or department where the alleged harassment has occurred.

In addition, by investigating the complaint to the extent possible — including by reporting it to the Title IX coordinator or other responsible school employee designated pursuant to Title IX — the school may learn about or be able to confirm a pattern of harassment based on claims by different students that they were harassed by the same individual. In some situations there may be prior reports by former students who now might be willing to come forward and be identified, thus providing a basis for further corrective action. In instances affecting a number of students (for example, a report from a student that an instructor has repeatedly made sexually explicit remarks about his or her personal life in front of an entire class), an individual can be put on notice of allegations of harassing behavior and counseled appropriately without revealing, even indirectly, the identity of the student who notified the school. Those steps can be very effective in preventing further harassment.

### C. Response to Other Types of Notice

The previous two sections deal with situations in which a student or parent of a student who was harassed reports or complains of harassment or in which a responsible school employee directly observes sexual harassment of a student. If a school learns of harassment through other means, for example, if information about harassment is received from a third party (such as from a witness to an incident or an anonymous letter or telephone call), different factors will affect the school's response. These factors include the source and nature of the information; the seriousness of the alleged incident; the specificity of the information; the objectivity and credibility of the source of the report; whether any individuals can be identified who were subjected to the alleged harassment; and whether those individuals want to pursue the matter. If, based on these factors, it is reasonable for the school to investigate and it can confirm the allegations, the considerations described in the previous sections concerning interim measures and appropriate responsive action will apply.

000086

For example, if a parent visiting a school observes a student repeatedly harassing a group of female students and reports this to school officials, school personnel can speak with the female students to confirm whether that conduct has occurred and whether they view it as unwelcome.  If the school determines that the conduct created a hostile environment, it can take reasonable, age-appropriate steps to address the situation.  If on the other hand, the students in this example were to ask that their names not be disclosed or indicate that they do not want to pursue the matter, the considerations described in the previous section related to requests for confidentiality will shape the school's response.

In a contrasting example, a student newspaper at a large university may print an anonymous letter claiming that a professor is sexually harassing students in class on a daily basis, but the letter provides no clue as to the identity of the professor or the department in which the conduct is allegedly taking place.  Due to the anonymous source and lack of specificity of the information, a school would not reasonably be able to investigate and confirm these allegations.  However, in response to the anonymous letter, the school could submit a letter or article to the newspaper reiterating its policy against sexual harassment, encouraging persons who believe that they have been sexually harassed to come forward, and explaining how its grievance procedures work.

## VIII. Prevention

A policy specifically prohibiting sexual harassment and separate grievance procedures for violations of that policy can help ensure that all students and employees understand the nature of sexual harassment and that the school will not tolerate it.  Indeed, they might even bring conduct of a sexual nature to the school's attention so that the school can address it before it becomes sufficiently serious as to create a hostile environment.  Further, training for administrators, teachers, and staff and age-appropriate classroom information for students can help to ensure that they understand what types of conduct can cause sexual harassment and that they know how to respond.

## IX. Prompt and Equitable Grievance Procedures

Schools are required by the Title IX regulations to adopt and publish a policy against sex discrimination and grievance procedures providing for prompt and equitable resolution of complaints of discrimination on the basis of sex.[98]  Accordingly, regardless of whether harassment occurred, a school violates this requirement of the Title IX regulations if it does not have those procedures and policy in place.[99]

A school's sex discrimination grievance procedures must apply to complaints of sex discrimination in the school's education programs and activities filed by students against school employees, other students, or third parties.[100]  Title IX does not require a school to adopt a policy specifically prohibiting sexual harassment or to provide separate grievance procedures for sexual harassment complaints.  However, its nondiscrimination policy and grievance procedures for handling discrimination complaints must provide effective means for preventing and responding to sexual harassment.  Thus, if, because of the lack of a policy or procedure specifically addressing sexual harassment, students are unaware of what kind of conduct constitutes sexual harassment or that such conduct is

000087

prohibited sex discrimination, a school's general policy and procedures relating to sex discrimination complaints will not be considered effective.[101]

OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the procedures provide for —

- Notice to students, parents of elementary and secondary students, and employees of the procedure, including where complaints may be filed;

- Application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties;

- Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;

- Designated and reasonably prompt timeframes for the major stages of the complaint process;

- Notice to the parties of the outcome of the complaint;[102] and

- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.[103]

Many schools also provide an opportunity to appeal the findings or remedy, or both. In addition, because retaliation is prohibited by Title IX, schools may want to include a provision in their procedures prohibiting retaliation against any individual who files a complaint or participates in a harassment inquiry.

Procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience. In addition, whether complaint resolutions are timely will vary depending on the complexity of the investigation and the severity and extent of the harassment. During the investigation it is a good practice for schools to inform students who have alleged harassment about the status of the investigation on a periodic basis.

A grievance procedure applicable to sexual harassment complaints cannot be prompt or equitable unless students know it exists, how it works, and how to file a complaint. Thus, the procedures should be written in language appropriate to the age of the school's students, easily understood, and widely disseminated. Distributing the procedures to administrators, or including them in the school's administrative or policy manual, may not by itself be an effective way of providing notice, as these publications are usually not widely circulated to and understood by all members of the school community. Many schools ensure adequate notice to students by having copies of the procedures available at various locations throughout the school or campus; publishing the procedures as a separate document; including a summary of the procedures in major publications issued by the school, such as handbooks and catalogs for students, parents of elementary and secondary students, faculty, and staff; and identifying individuals who can explain how the procedures work.

A school must designate at least one employee to coordinate its efforts to comply with and carry out its Title IX responsibilities.[104]   The school must notify all of its students and employees of the name, office address, and telephone number of the employee or employees designated.[105]   Because it is possible that an employee designated to handle Title IX complaints may himself or herself engage in harassment, a school may want to designate more than one employee to be responsible for handling complaints in order to ensure that students have an effective means of reporting harassment.[106]   While a school may choose to have a number of employees responsible for Title IX matters, it is also advisable to give one official responsibility for overall coordination and oversight of all sexual harassment complaints to ensure consistent practices and standards in handling complaints.   Coordination of recordkeeping (for instance, in a confidential log maintained by the Title IX coordinator) will also ensure that the school can and will resolve recurring problems and identify students or employees who have multiple complaints filed against them.[107]   Finally, the school must make sure that all designated employees have adequate training as to what conduct constitutes sexual harassment and are able to explain how the grievance procedure operates.[108]

Grievance procedures may include informal mechanisms for resolving sexual harassment complaints to be used if the parties agree to do so.[109]   OCR has frequently advised schools, however, that it is not appropriate for a student who is complaining of harassment to be required to work out the problem directly with the individual alleged to be harassing him or her, and certainly not without appropriate involvement by the school (e.g., participation by a counselor, trained mediator, or, if appropriate, a teacher or administrator).   In addition, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process.   In some cases, such as alleged sexual assaults, mediation will not be appropriate even on a voluntary basis.   Title IX also permits the use of a student disciplinary procedure not designed specifically for Title IX grievances to resolve sex discrimination complaints, as long as the procedure meets the requirement of affording a complainant a "prompt and equitable" resolution of the complaint.

In some instances, a complainant may allege harassing conduct that constitutes both sex discrimination and possible criminal conduct.   Police investigations or reports may be useful in terms of fact gathering.   However, because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly and effectively.[110]   Similarly, schools are cautioned about using the results of insurance company investigations of sexual harassment allegations.   The purpose of an insurance investigation is to assess liability under the insurance policy, and the applicable standards may well be different from those under Title IX.   In addition, a school is not relieved of its responsibility to respond to a sexual harassment complaint filed under its grievance procedure by the fact that a complaint has been filed with OCR.[111]

000089

## X. Due Process Rights of the Accused

A public school's employees have certain due process rights under the United States Constitution. The Constitution also guarantees due process to students in public and State-supported schools who are accused of certain types of infractions. The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding. Furthermore, the Family Educational Rights and Privacy Act (FERPA) does not override federally protected due process rights of persons accused of sexual harassment. Procedures that ensure the Title IX rights of the complainant, while at the same time according due process to both parties involved, will lead to sound and supportable decisions. Of course, schools should ensure that steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant. In both public and private schools, additional or separate rights may be created for employees or students by State law, institutional regulations and policies, such as faculty or student handbooks, and collective bargaining agreements. Schools should be aware of these rights and their legal responsibilities to individuals accused of harassment.

## XI. First Amendment

In cases of alleged harassment, the protections of the First Amendment must be considered if issues of speech or expression are involved.[112] Free speech rights apply in the classroom (e.g., classroom lectures and discussions)[113] and in all other education programs and activities of public schools (e.g., public meetings and speakers on campus; campus debates, school plays and other cultural events[114]; and student newspapers, journals, and other publications[115]). In addition, First Amendment rights apply to the speech of students and teachers.[116]

Title IX is intended to protect students from sex discrimination, not to regulate the content of speech. OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a sexually hostile environment under Title IX.[117] In order to establish a violation of Title IX, the harassment must be sufficiently serious to deny or limit a student's ability to participate in or benefit from the education program.[118]

Moreover, in regulating the conduct of its students and its faculty to prevent or redress discrimination prohibited by Title IX (e.g., in responding to harassment that is sufficiently serious as to create a hostile environment), a school must formulate, interpret, and apply its rules so as to protect academic freedom and free speech rights. For instance, while the First Amendment may prohibit a school from restricting the right of students to express opinions about one sex that may be considered derogatory, the school can take steps to denounce those opinions and ensure that competing views are heard. The age of the students involved and the location or forum may affect how the school can respond consistently with the First Amendment.[119] As an example of the application of free speech rights to allegations of sexual harassment, consider the following:

Example 1: In a college level creative writing class, a professor's required reading list includes excerpts from literary classics that contain descriptions of explicit

sexual conduct, including scenes that depict women in submissive and demeaning roles. The professor also assigns students to write their own materials, which are read in class. Some of the student essays contain sexually derogatory themes about women. Several female students complain to the Dean of Students that the materials and related classroom discussion have created a sexually hostile environment for women in the class. What must the school do in response?

Answer: Academic discourse in this example is protected by the First Amendment even if it is offensive to individuals. Thus, Title IX would not require the school to discipline the professor or to censor the reading list or related class discussion.

Example 2: A group of male students repeatedly targets a female student for harassment during the bus ride home from school, including making explicit sexual comments about her body, passing around drawings that depict her engaging in sexual conduct, and, on several occasions, attempting to follow her home off the bus. The female student and her parents complain to the principal that the male students' conduct has created a hostile environment for girls on the bus and that they fear for their daughter's safety. What must a school do in response?

Answer: Threatening and intimidating actions targeted at a particular student or group of students, even though they contain elements of speech, are not protected by the First Amendment. The school must take prompt and effective actions, including disciplinary action if necessary, to stop the harassment and prevent future harassment.

_____

# Endnotes

[1] This guidance does not address sexual harassment of employees, although that conduct may be prohibited by Title IX.  20 U.S.C. 1681 et seq.; 34 CFR part 106, subpart E.  If employees file Title IX sexual harassment complaints with OCR, the complaints will be processed pursuant to the Procedures for Complaints of Employment Discrimination Filed Against Recipients of Federal Financial Assistance.  28 CFR 42.604.  Employees are also protected from discrimination on the basis of sex, including sexual harassment, by Title VII of the Civil Rights Act of 1964.  For information about Title VII and sexual harassment, see the Equal Employment Opportunity Commission's (EEOC's) Guidelines on Sexual Harassment, 29 CFR 1604.11, for information about filing a Title VII charge with the EEOC, see 29 CFR 1601.7–1607.13, or see the EEOC's website at www.eeoc.gov.

[2] 20 U.S.C. 1681; 34 CFR part 106.

[3] See, e.g., Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 649-50 (1999); Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 281 (1998); Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 75 (1992); S. REP. NO. 100-64, 100th Cong., 1st Sess. 14 (1987); Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties (1997 guidance), 62 FR 12034 (1997).

[4] As described in the section on "Applicability," this guidance applies to all levels of education.

[5] For practical information about steps that schools can take to prevent and remedy all types of harassment, including sexual harassment, see "Protecting Students from Harassment and Hate Crime, A Guide for Schools," which we issued jointly with the National Association of Attorneys General.  This Guide is available at our web site at: www.ed.gov/pubs/Harassment.

[6] See, e.g., Davis, 526 U.S. at 653 (alleged conduct of a sexual nature that would support a sexual harassment claim included verbal harassment and "numerous acts of objectively offensive touching;" Franklin, 503 U.S. at 63 (conduct of a sexual nature found to support a sexual harassment claim under Title IX included kissing, sexual intercourse); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 60-61 (1986) (demands for sexual favors, sexual advances, fondling, indecent exposure, sexual intercourse, rape, sufficient to raise hostile environment claim under Title VII); Ellison v. Brady, 924 F.2d 872, 873-74, 880 (9th Cir. 1991) (allegations sufficient to state sexual harassment claim under Title VII included repeated requests for dates, letters making explicit references to sex and describing the harasser's feelings for plaintiff); Lipsett v. University of Puerto Rico, 864 F.2d 881, 904-5 (1st Cir. 1988) (sexually derogatory comments, posting of sexually explicit drawing of plaintiff, sexual advances may support sexual harassment claim); Kadiki v. Virginia Commonwealth University, 892 F.Supp. 746, 751 (E.D. Va. 1995)

24

(professor's spanking of university student may constitute sexual conduct under Title IX); Doe v. Petaluma, 830 F.Supp. 1560, 1564-65 (N.D. Cal. 1996) (sexually derogatory taunts and innuendo can be the basis of a harassment claim); Denver School Dist. #2, OCR Case No. 08-92-1007 (same to allegations of vulgar language and obscenities, pictures of nude women on office walls and desks, unwelcome touching, sexually offensive jokes, bribery to perform sexual acts, indecent exposure); Nashoba Regional High School, OCR Case No. 01-92-1377 (same as to year-long campaign of derogatory, sexually explicit graffiti and remarks directed at one student.

[7] See also Shoreline School Dist., OCR Case No. 10-92-1002 (a teacher's patting a student on the arm, shoulder, and back, and restraining the student when he was out of control, not conduct of a sexual nature); Dartmouth Public Schools, OCR Case No. 01-90-1058 (same as to contact between high school coach and students); San Francisco State University, OCR Case No. 09-94-2038 (same as to faculty advisor placing her arm around a graduate student's shoulder in posing for a picture); Analy Union High School Dist., OCR Case No. 09-92-1249 (same as to drama instructor who put his arms around both male and female students who confided in him).

[8] 20 U.S.C. 1687 (codification of the amendment to Title IX regarding scope of jurisdiction, enacted by the Civil Rights Restoration Act of 1987). See 65 FR 68049 (November 13, 2000) (Department's amendment of the Title IX regulations to incorporate the statutory definition of "program or activity").

[9] If a school contracts with persons or organizations to provide benefits, services, or opportunities to students as part of the school's program, and those persons or employees of those organizations sexually harass students, OCR will consider the harassing individual in the same manner that it considers the school's employees, as described in this guidance. (See section on "Harassment by Teachers and Other Employees.") See Brown v. Hot, Sexy, and Safer Products, Inc., 68 F.3d 525, 529 (1st Cir. 1995) (Title IX sexual harassment claim brought for school's role in permitting contract consultant hired by it to create allegedly hostile environment).

In addition, if a student engages in sexual harassment as an employee of the school, OCR will consider the harassment under the standards described for employees. (See section on "Harassment by Teachers and Other Employees.") For example, OCR would consider it harassment by an employee if a student teaching assistant who is responsible for assigning grades in a course, i.e., for providing aid, benefits, or services to students under the recipient's program, required a student in his or her class to submit to sexual advances in order to obtain a certain grade in the class.

[10] Cf. John Does 1 v. Covington County Sch. Bd., 884 F.Supp. 462, 464-65 (M.D. Ala. 1995) (male students alleging that a teacher sexually harassed and abused them stated cause of action under Title IX).

[11] Title IX and the regulations implementing it prohibit discrimination "on the basis of sex;" they do not restrict protection from sexual harassment to those circumstances in

000093

which the harasser only harasses members of the opposite sex.  See 34 CFR 106.31.  In
Oncale v. Sundowner Offshore Services, Inc. the Supreme Court held unanimously that
sex discrimination consisting of same-sex sexual harassment can violate Title VII's
prohibition against discrimination because of sex.  523 U.S. 75, 82 (1998).  The Supreme
Court's holding in Oncale is consistent with OCR policy, originally stated in its 1997
guidance, that Title IX prohibits sexual harassment regardless of whether the harasser and
the person being harassed are members of the same sex.  62 FR 12039.  See also Kinman
v. Omaha Public School Dist., 94 F.3d 463, 468 (8th Cir. 1996), rev'd on other grounds,
171 F.3d 607 (1999) (female student's allegation of sexual harassment by female teacher
sufficient to raise a claim under Title IX);  Doe v. Petaluma, 830 F.Supp. 1560, 1564-65,
1575 (N.D. Cal. 1996) (female junior high student alleging sexual harassment by other
students, including both boys and girls, sufficient to raise a claim under Title IX); John
Does 1, 884 F.Supp. at 465 (same as to male students' allegations of sexual harassment
and abuse by a male teacher.)  It can also occur in certain situations if the harassment is
directed at students of both sexes.  Chiapuzo v. BLT Operating Corp., 826 F.Supp. 1334,
1337 (D.Wyo. 1993) (court found that if males and females were subject to harassment,
but harassment was based on sex, it could violate Title VII); but see Holman v. Indiana,
211 F.3d 399, 405 (7th Cir. 2000) (if male and female both subjected to requests for sex,
court found it could not violate Title VII).

In many circumstances, harassing conduct will be on the basis of sex because the student
would not have been subjected to it at all had he or she been a member of the opposite
sex; e.g., if a female student is repeatedly propositioned by a male student or employee
(or, for that matter, if a male student is repeatedly propositioned by a male student or
employee.)  In other circumstances, harassing conduct will be on the basis of sex if the
student would not have been affected by it in the same way or to the same extent had he
or she been a member of the opposite sex; e.g, pornography and sexually explicit jokes
in a mostly male shop class are likely to affect the few girls in the class more than it will
most of the boys.

In yet other circumstances, the conduct will be on the basis of sex in that the student's sex
was a factor in or affected the nature of the harasser's conduct or both.  Thus, in
Chiapuzo, a supervisor made demeaning remarks to both partners of a married couple
working for him, e.g., as to sexual acts he wanted to engage in with the wife and how he
would be a better lover than the husband.  In both cases, according to the court, the
remarks were based on sex in that they were made with an intent to demean each member
of the couple because of his or her respective sex.  826 F.Supp. at 1337.  See also Steiner
v. Showboat Operating Co., 25 F.3d 1459, 1463-64 (9th Cir. 1994), cert. denied, 115 S.Ct.
733 (1995); but see Holman, 211 F.3d at 405 (finding that if male and female both
subjected to requests for sex, Title VII could not be violated).

[12] Nashoba Regional High School, OCR Case No. 01-92-1397.  In Conejo Valley School
Dist., OCR Case No. 09-93-1305, female students allegedly taunted another female
student about engaging in sexual activity; OCR found that the alleged comments were
sexually explicit and, if true, would be sufficiently severe, persistent, and pervasive to
create a hostile environment.

26

[13] See Williamson v. A.G. Edwards & Sons, Inc., 876 F2d 69, 70 (8th Cir. 1989, cert. denied 493 U.S. 1089 (1990); DeSantis v. Pacific Tel. & Tel. Co., Inc., 608 F.2d 327, 329-30 (9th Cir. 1979)(same); Blum v. Gulf Oil Corp., 597 F.2d 936, 938 (5th Cir. 1979)(same).

[14] It should be noted that some State and local laws may prohibit discrimination on the basis of sexual orientation.  Also, under certain circumstances, courts may permit redress for harassment on the basis of sexual orientation under other Federal legal authority.  See Nabozny v. Podlesny, 92 F.3d 446, 460 (7th Cir. 1996) (holding that a gay student could maintain claims alleging discrimination based on both gender and sexual orientation under the Equal Protection Clause of the United States Constitution in a case in which a school district failed to protect the student to the same extent that other students were protected from harassment and harm by other students due to the student's gender and sexual orientation).

[15] However, sufficiently serious sexual harassment is covered by Title IX even if the hostile environment also includes taunts based on sexual orientation.

[16] See also, Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) (plurality opinion) (where an accounting firm denied partnership to a female candidate, the Supreme Court found Title VII prohibits an employer from evaluating employees by assuming or insisting that they match the stereotype associated with their sex).

[17] See generally Gebser; Davis; See also Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-66 (1986); Harris v. Forklift Systems Inc., 510 U.S. 14, 22 (1993); see also Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987) (concluding that harassment based on sex may be discrimination whether or not it is sexual in nature); McKinney v. Dole, 765 F.2d 1129, 1138 (D.C. Cir. 1985) (physical, but nonsexual, assault could be sex-based harassment if shown to be unequal treatment that would not have taken place but for the employee's sex); Cline v. General Electric Capital Auto Lease, Inc., 757 F.Supp. 923, 932-33 (N.D. Ill. 1991).

[18] See, e.g., sections on "Harassment by Teachers and Other Employees," "Harassment by Other Students or Third Parties," "Notice of Employee, Peer, or Third Party Harassment," "Factors Used to Evaluate a Hostile Environment," "Recipient's Response," and "Prompt and Equitable Grievance Procedures."

[19]  See Lipsett, 864 F.2d at 903-905 (general antagonism toward women, including stated goal of eliminating women from surgical program, statements that women shouldn't be in the program, and assignment of menial tasks, combined with overt sexual harassment); Harris, 510 U.S. at 23; Andrews v. City of Philadelphia, 895 F.2d 1469, 1485-86 (3rd Cir. 1990) (court directed trial court to consider sexual conduct as well as theft of female employees' files and work, destruction of property, and anonymous phone calls in determining if there had been sex discrimination); see also Hall v. Gus Construction Co., 842 F.2d 1010, 1014 (8th Cir. 1988) (affirming that harassment due to the employee's sex

000095

may be actionable even if the harassment is not sexual in nature); Hicks, 833 F.2d at 1415; Eden Prairie Schools, Dist. #272, OCR Case No. 05-92-1174 (the boys made lewd comments about male anatomy and tormented the girls by pretending to stab them with rubber knives; while the stabbing was not sexual conduct, it was directed at them because of their sex, i.e., because they were girls).

[20] Davis, 526 U.S. at 650 ("Having previously determined that 'sexual harassment' is 'discrimination' in the school context under Title IX, we are constrained to conclude that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute."); Franklin, 503 U.S. at 75 ("Unquestionably, Title IX placed on the [school] the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]" on the basis of sex.' … We believe the same rule should apply when a teacher sexually harasses and abuses a student." (citation omitted)).

OCR's longstanding interpretation of its regulations is that sexual harassment may constitute a violation. 34 CFR 106.31; See Sexual Harassment Guidance, 62 FR 12034 (1997). When Congress enacted the Civil Rights Restoration Act of 1987 to amend Title IX to restore institution-wide coverage over federally assisted education programs and activities, the legislative history indicated not only that Congress was aware that OCR interpreted its Title IX regulations to prohibit sexual harassment, but also that one of the reasons for passing the Restoration Act was to enable OCR to investigate and resolve cases involving allegations of sexual harassment. S. REP. NO. 64, 100th Cong., 1st Sess. at 12 (1987). The examples of discrimination that Congress intended to be remedied by its statutory change included sexual harassment of students by professors, id. at 14, and these examples demonstrate congressional recognition that discrimination in violation of Title IX can be carried out by school employees who are providing aid, benefits, or services to students. Congress also intended that if discrimination occurred, recipients needed to implement effective remedies. S. REP. NO. 64 at 5.

[21] 34 CFR 106.4.

[22] These are the basic regulatory requirements. 34 CFR 106.31(a)(b). Depending upon the facts, sexual harassment may also be prohibited by more specific regulatory prohibitions. For example, if a college financial aid director told a student that she would not get the student financial assistance for which she qualified unless she slept with him, that also would be covered by the regulatory provision prohibiting discrimination on the basis of sex in financial assistance, 34 CFR 106.37(a).

[23] 34 CFR 106.31(b)(1).

[24] 34 CFR 106.31(b)(2).

[25] 34 CFR 106.31(b)(3).

000096

[26] 34 CFR 106.31(b)(4).

[27] 34 CFR 106.31(b)(6).

[28] 34 CFR 106.31(b)(7).

[29] 34 CFR 106.3(a).

[30] 34 CFR 106.9.

[31] 34 CFR 106.8(b).

[32] 34 CFR 106.8(a).

[33] The 1997 guidance referred to quid pro quo harassment and hostile environment harassment.  62 FR 12038–40.

[34] See Alexander v. Yale University, 459 F.Supp. 1, 4 (D.Conn. 1977), aff'd, 631 F.2d 178 (2nd Cir. 1980)(stating that a claim "that academic advancement was conditioned upon submission to sexual demands constitutes [a claim of] sex discrimination in education..."); Crandell v. New York College, Osteopathic Medicine, 87 F.Supp.2d 304, 318 (S.D.N.Y. 2000) (finding that allegations that a supervisory physician demanded that a student physician spend time with him and have lunch with him or receive a poor evaluation, in light of the totality of his alleged sexual comments and other inappropriate behavior, constituted a claim of quid pro quo harassment); Kadiki, 892 F.Supp. at 752 (reexamination in a course conditioned on college student's agreeing to be spanked should she not attain a certain grade may constitute quid pro quo harassment).

[35] 34 CFR 106.31(b).

[36] Davis, 526 U.S. at 651 (confirming, by citing approvingly both to Title VII cases (Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57,67 (1986) (finding that hostile environment claims are cognizable under Title VII), and Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82 (1998)) and OCR's 1997 guidance, 62 FR at 12041-42, that determinations under Title IX as to what conduct constitutes hostile environment sexual harassment may continue to rely on Title VII caselaw).

[37] 34 CFR 106.31(b).  See Davis, 526 U.S. at 650 (concluding that allegations of student-on-student sexual harassment that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits" supports a claim for money damages in an implied right of action).

[38] In Harris, the Supreme Court explained the requirement for considering the "subjective perspective" when determining the existence of a hostile environment.  The Court stated–– "... if the victim does not subjectively perceive the environment to be abusive, the

000097

conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." 510 U.S. at 21-22.

[39] See Davis, 526 U.S. at 650 (conduct must be "objectively offensive" to trigger liability for money damages); Elgamil v. Syracuse University, 2000 U.S. Dist. LEXIS 12598 at 17 (N.D.N.Y. 2000) (citing Harris); Booher v. Board of Regents, 1998 U.S. Dist. LEXIS 11404 at 25 (E.D. Ky. 1998) (same).  See Oncale, 523 U.S. at 81, in which the Court "emphasized … that the objective severity of harassment should be judged from the perspective of a reasonable person in the [victim's] position, considering 'all the circumstances,'" and citing Harris, 510 U.S. at 20, in which the Court indicated that a "reasonable person" standard should be used to determine whether sexual conduct constituted harassment.  This standard has been applied under Title VII to take into account the sex of the subject of the harassment, see, e.g., Ellison, 924 F.2d at 878-79 (applying a "reasonable woman" standard to sexual harassment), and has been adapted to sexual harassment in education under Title IX, Patricia H. v. Berkeley Unified School Dist., 830 F.Supp. 1288, 1296 (N.D. Cal. 1993) (adopting a "reasonable victim" standard and referring to OCR's use of it).

[40] See Davis, 526 U.S. at 651, citing both Oncale, 523 U.S. at 82, and OCR's 1997 guidance (62 FR 12041-12042).

[41] See, e.g., Davis, 526 U.S. at 634 (as a result of the harassment, student's grades dropped and she wrote a suicide note); Doe v. Petaluma, 830 F. Supp. at 1566 (student so upset about harassment by other students that she was forced to transfer several times, including finally to a private school); Modesto City Schools, OCR Case No. 09-93-1391 (evidence showed that one girl's grades dropped while the harassment was occurring); Weaverville Elementary School, OCR Case No. 09-91-1116 (students left school due to the harassment).  Compare with College of Alameda, OCR Case No. 09-90-2104 (student not in instructor's class and no evidence of any effect on student's educational benefits or service, so no hostile environment).

[42] Doe v. Petaluma, 830 F.Supp. at 1566.

[43] See Waltman v. Int'l Paper Co., 875 F.2d 468, 477 (5th Cir. 1989) (holding that although not specifically directed at the plaintiff, sexually explicit graffiti on the walls was "relevant to her claim"); Monteiro v. Tempe Union High School, 158 F.3d 1022, 1033-34 (9th Cir. 1998) (Title VI racial harassment case, citing Waltman; see also Hall, 842 F. 2d at 1015 (evidence of sexual harassment directed at others is relevant to show hostile environment under Title VII).

[44] See, e.g., Elgmil 2000 U.S. Dist. LEXIS at 19 ("in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive"); Andrews, 895 F.2d at 1484 ("Harassment is pervasive when 'incidents of harassment occur either in concert or with regularity'"); Moylan v. Maries County, 792 F.2d 746, 749 (8th Cir. 1986).

000098

[45] 34 CFR 106.31(b).  See <u>Vance v. Spencer County Public School District</u>, 231 F.3d 253 (6th Cir. 2000); <u>Doe v. School Admin. Dist. No. 19</u>, 66 F.Supp.2d 57, 62 (D. Me. 1999).  See also statement of the U.S. Equal Employment Opportunity Commission (EEOC):  "The Commission will presume that the unwelcome, intentional touching of [an employee's] intimate body areas is sufficiently offensive to alter the conditions of her working environment and constitute a violation of Title VII.  More so than in the case of verbal advances or remarks, a single unwelcome physical advance can seriously poison the victim's working environment."  EEOC Policy Guidance on Current Issues of Sexual Harassment, 17.  <u>Barrett v. Omaha National Bank</u>, 584 F. Supp. 22, 30 (D. Neb. 1983), <u>aff'd</u>, 726 F. 2d 424 (8th Cir. 1984) (finding that hostile environment was created under Title VII by isolated events, i.e., occurring while traveling to and during a two-day conference, including the co-worker's talking to plaintiff about sexual activities and touching her in an offensive manner while they were inside a vehicle from which she could not escape).

[46] See also <u>Ursuline College</u>, OCR Case No. 05-91-2068 (a single incident of comments on a male student's muscles arguably not sexual; however, assuming they were, not severe enough to create a hostile environment).

[47] <u>Davis</u>, 526 U.S. at 653 ("The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity.  Peer harassment, in particular, is less likely to satisfy these requirements than is teacher student harassment."); <u>Patricia H.</u>, 830 F. Supp. at 1297 (stating that the "grave disparity in age and power" between teacher and student contributed to the creation of a hostile environment); <u>Summerfield Schools</u>, OCR Case No. 15-92-1929 ("impact of the ... remarks was heightened by the fact that the coach is an adult in a position of authority"); <u>cf. Doe v. Taylor I.S.D.</u>, 15 F.3d 443, 460 (5th Cir. 1994) (Sec. 1983 case; taking into consideration the influence that the teacher had over the student by virtue of his position of authority to find that a sexual relationship between a high school teacher and a student was unlawful).

[48] See, e.g., <u>McKinney</u>, 765 F.2d at 1138-49; <u>Robinson v. Jacksonville Shipyards</u>, 760 F. Supp. 1486, 1522 (M.D. Fla. 1991).

[49] <u>Cf. Patricia H.</u>, 830 F. Supp. at 1297.

[50] See, e.g., <u>Barrett</u>, 584 F. Supp. at 30 (finding harassment occurring in a car from which the victim could not escape particularly severe).

[51] See <u>Hall</u>, 842 F. 2d at 1015 (stating that "evidence of sexual harassment directed at employees other than the plaintiff is relevant to show a hostile environment") (citing <u>Hicks</u>, 833 F. 2d, 1415-16).  <u>Cf. Midwest City-Del City Public Schools</u>, OCR Case No. 06-92-1012 (finding of racially hostile environment based in part on several racial incidents at school shortly before incidents in complaint, a number of which involved the same student involved in the complaint).

000099

[52] In addition, incidents of racial or national origin harassment directed at a particular individual may also be aggregated with incidents of sexual or gender harassment directed at that individual in determining the existence of a hostile environment.  Hicks, 833 F.2d at 1416; Jefferies v. Harris County Community Action Ass'n, 615 F.2d 1025, 1032 (5th Cir. 1980).

[53] Does v. Covington Sch. Bd. of Educ., 930 F.Supp. 554, 569 (M.D. Ala. 1996); Henson v. City of Dundee, 682 F.2d 897, 903 (11th Cir. 1982).

[54] See Meritor Savings Bank, 477 U.S. at 68. "[T]he fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII....  The correct inquiry is whether [the subject of the harassment] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary."

[55] Lipsett, 864 F.2d at 898 (while, in some instances, a person may have the responsibility for telling the harasser "directly" that the conduct is unwelcome, in other cases a "consistent failure to respond to suggestive comments or gestures may be sufficient...."); Danna v. New York Tel. Co., 752 F.Supp. 594, 612 (despite a female employee's own foul language and participation in graffiti writing, her complaints to management indicated that the harassment was not welcome); see also Carr v. Allison Gas Turbine Div. GMC., 32 F.3d 1007, 1011 (7th Cir. 1994) (finding that cursing and dirty jokes by a female employee did not show that she welcomed the sexual harassment, given her frequent complaints about it:  "Even if ... [the employee's] testimony that she talked and acted as she did [only] in an effort to be one of the boys is ... discounted, her words and conduct cannot be compared to those of the men and used to justify their conduct....  The asymmetry of positions must be considered.  She was one woman; they were many men. Her use of [vulgar] terms ... could not be deeply threatening....").

[56] See Reed v. Shepard, 939 F.2d 484, 486-87, 491-92 (7th Cir. 1991) (no harassment found under Title VII in a case in which a female employee not only tolerated, but also instigated the suggestive joking activities about which she was now complaining); Weinsheimer v. Rockwell Int'l Corp., 754 F.Supp. 1559, 1563-64 (M.D. Fla. 1990) (same, in case in which general shop banter was full of vulgarity and sexual innuendo by men and women alike, and plaintiff contributed her share to this atmosphere.)  However, even if a student participates in the sexual banter, OCR may in certain circumstances find that the conduct was nevertheless unwelcome if, for example, a teacher took an active role in the sexual banter and a student reasonably perceived that the teacher expected him or her to participate.

[57] The school bears the burden of rebutting the presumption.

[58] Of course, nothing in Title IX would prohibit a school from implementing policies prohibiting sexual conduct or sexual relationships between students and adult employees.

[59] See note 58.

[60] Gebser, 524 U.S. at 281 ("Franklin ... establishes that a school district can be held liable in damages [in an implied action under Title IX] in cases involving a teacher's sexual harassment of a student...."; 34 CFR 106.31; See 1997 Sexual Harassment Guidance, 62 FR 12034.

[61] See Davis, 526 U.S. at 653 (stating that harassment of a student by a teacher is more likely than harassment by a fellow student to constitute the type of effective denial of equal access to educational benefits that can breach the requirements of Title IX).

[62] 34 CFR 106.31(b). Cf. Gebser, 524 U.S. at 283-84 (Court recognized in an implied right of action for money damages for teacher sexual harassment of a student that the question of whether a violation of Title IX occurred is a separate question from the scope of appropriate remedies for a violation).

[63] Davis, 526 U.S. at 646.

[64] See section on "Applicability of Title IX" for scope of coverage.

[65] See section on "Notice of Employee, Peer, or Third Party Harassment."

[66] See section on "Notice of Employee, Peer, or Third Party Harassment."

[67] 34 CFR 106.31(b).

[68] 34 CFR 106.31(b).

[69] See section on "Notice of Employee, Peer, or Third Party Harassment."

[70] Cf. Davis, 526 U.S. at 646.

[71] 34 CFR 106.31(b).

[72] 34 CFR 106.31(b).

[73] Consistent with its obligation under Title IX to protect students, cf. Gebser, 524 U.S. at 287, OCR interprets its regulations to ensure that recipients take reasonable action to address, rather than neglect, reasonably obvious discrimination. Cf. Gebser, 524 U.S. at 287-88; Davis, 526 U.S. at 650 (actual notice standard for obtaining money damages in private lawsuit).

[74] Whether an employee is a responsible employee or whether it would be reasonable for a student to believe the employee is, even if the employee is not, will vary depending on

000101

factors such as the age and education level of the student, the type of position held by the employee, and school practices and procedures, both formal and informal.

The Supreme Court held that a school will only be liable for money damages in a private lawsuit where there is actual notice to a school official with the authority to address the alleged discrimination and take corrective action.  Gebser, 524 U.S. at 290, and Davis, 526 U.S. at 642.  The concept of a "responsible employee" under our guidance is broader. That is, even if a responsible employee does not have the authority to address the discrimination and take corrective action, he or she does have the obligation to report it to appropriate school officials.

[75] The Title IX regulations require that recipients designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under the regulations, including complaint investigations.  34 CFR 106.8(a).

[76] 34 CFR 106.31.  See Yates v. Avco Corp., 819 F.2d 630, 636 (6th Cir. 1987); Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983).

[77] For example, a substantiated report indicating that a high school coach has engaged in inappropriate physical conduct of a sexual nature in several instances with different students may suggest a pattern of conduct that should trigger an inquiry as to whether other students have been sexually harassed by that coach.  See also Doe v. School Administrative Dist. No. 19, 66 F.Supp.2d 57, 63-64 and n.6 (D.Me. 1999) (in a private lawsuit for money damages under Title IX in which a high school principal had notice that a teacher may be engaging in a sexual relationship with one underage student and did not investigate, and then the same teacher allegedly engaged in sexual intercourse with another student, who did not report the incident, the court indicated that the school's knowledge of the first relationship may be sufficient to serve as actual notice of the second incident).

[78] Cf. Katz, 709 F.2d at 256 (finding that the employer "should have been aware of the problem both because of its pervasive character and because of [the employee's] specific complaints ..."); Smolsky v. Consolidated Rail Corp., 780 F.Supp. 283, 293 (E.D. Pa. 1991), reconsideration denied, 785 F.Supp. 71 (E.D. Pa. 1992) "where the harassment is apparent to all others in the work place, supervisors and coworkers, this may be sufficient to put the employer on notice of the sexual harassment" under Title VII); Jensen v. Eveleth Taconite Co., 824 F.Supp. 847, 887 (D.Minn. 1993); "[s]exual harassment ... was so pervasive that an inference of knowledge arises ....  The acts of sexual harassment detailed herein were too common and continuous to have escaped Eveleth Mines had its management been reasonably alert."); Cummings v. Walsh Construction Co., 561 F.Supp. 872, 878 (S.D. Ga. 1983) ("... allegations not only of the [employee] registering her complaints with her foreman ... but also that sexual harassment was so widespread that defendant had constructive notice of it" under Title VII); but see Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 250-51 (2nd Cir. 1995) (concluding that other students' knowledge of the conduct was not enough to charge the school with notice, particularly because these students may not have been aware that the conduct was offensive or abusive).

34

[79] 34 CFR 106.9 and 106.8(b).

[80] 34 CFR 106.8(b) and 106.31(b).

[81] 34 CFR 106.9.

[82] 34 CFR 106.8(b).

[83] 34 CFR 106.31.

[84] 34 CFR 106.31 and 106.3.  Gebser, 524 U.S. at 288 ("In the event of a violation, [under OCR's administrative enforcement scheme] a funding recipient may be required to take 'such remedial action as [is] deem[ed] necessary to overcome the effects of [the] discrimination.'  §106.3.").

[85] 20 U.S.C. 1682.  In the event that OCR determines that voluntary compliance cannot be secured, OCR may take steps that may result in termination of Federal funding through administrative enforcement, or, alternatively, OCR may refer the case to the Department of Justice for judicial enforcement.

[86] Schools have an obligation to ensure that the educational environment is free of discrimination and cannot fulfill this obligation without determining if sexual harassment complaints have merit.

[87] In some situations, for example, if a playground supervisor observes a young student repeatedly engaging in conduct toward other students that is clearly unacceptable under the school's policies, it may be appropriate for the school to intervene without contacting the other students.  It still may be necessary for the school to talk with the students (and parents of elementary and secondary students) afterwards, e.g., to determine the extent of the harassment and how it affected them.

[88] Gebser, 524 U.S. at 288; Bundy v. Jackson, 641 F.2d 934, 947 (D.C. Cir. 1981) (employers should take corrective and preventive measures under Title VII); accord, Jones v. Flagship Int'l, 793 F.2d 714, 719-720 (5th Cir. 1986) (employer should take prompt remedial action under Title VII).

[89] See Doe ex rel. Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380 (5th Cir. 2000) (citing Waltman); Waltman, 875 F.2d at 479 (appropriateness of employer's remedial action under Title VII will depend on the "severity and persistence of the harassment and the effectiveness of any initial remedial steps"); Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 309-10 (5th Cir. 1987); holding that a company's quick decision to remove the harasser from the victim was adequate remedial action).

[90] See Intlekofer v. Turnage, 973 F.2d 773, 779-780 (9th Cir. 1992)(holding that the employer's response was insufficient and that more severe disciplinary action was

000103

necessary in situations in which counseling, separating the parties, and warnings of possible discipline were ineffective in ending the harassing behavior).

[91] Offering assistance in changing living arrangements is one of the actions required of colleges and universities by the Campus Security Act in cases of rape and sexual assault. See 20 U.S.C. 1092(f).

[92] See section on "Harassment by Other Students or Third Parties."

[93] University of California at Santa Cruz, OCR Case No. 09-93-2141 (extensive individual and group counseling); Eden Prairie Schools, Dist. #272, OCR Case No. 05-92-1174 (counseling).

[94] Even if the harassment stops without the school's involvement, the school may still need to take steps to prevent or deter any future harassment — to inform the school community that harassment will not be tolerated. Wills v. Brown University, 184 F.3d 20, 28 (1st Cir. 1999) (difficult problems are posed in balancing a student's request for anonymity or limited disclosure against the need to prevent future harassment); Fuller v. City of Oakland, 47 F.3d 1522, 1528-29 (9th Cir. 1995) (Title VII case).

[95] 34 CFR 106.8(b) and 106.71, incorporating by reference 34 CFR 100.7(e). The Title IX regulations prohibit intimidation, threats, coercion, or discrimination against any individual for the purpose of interfering with any right or privilege secured by Title IX.

[96] Tacoma School Dist. No. 10, OCR Case No. 10-94-1079 (due to the large number of students harassed by an employee, the extended period of time over which the harassment occurred, and the failure of several of the students to report the harassment, the school committed as part of corrective action plan to providing training for students); Los Medanos College, OCR Case No. 09-84-2092 (as part of corrective action plan, school committed to providing sexual harassment seminar for campus employees); Sacramento City Unified School Dist., OCR Case No. 09-83-1063 (same as to workshops for management and administrative personnel and in-service training for non-management personnel).

[97] In addition, if information about the incident is contained in an "education record" of the student alleging the harassment, as defined in the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, the school should consider whether FERPA would prohibit the school from disclosing information without the student's consent. Id. In evaluating whether FERPA would limit disclosure, the Department does not interpret FERPA to override any federally protected due process rights of a school employee accused of harassment.

[98] 34 CFR 106.8(b). This requirement has been part of the Title IX regulations since their inception in 1975. Thus, schools have been required to have these procedures in place since that time. At the elementary and secondary level, this responsibility generally lies

000104

with the school district.  At the postsecondary level, there may be a procedure for a particular campus or college or for an entire university system.

[99] Fenton Community High School Dist. #100, OCR Case 05-92-1104.

[100] While a school is required to have a grievance procedure under which complaints of sex discrimination (including sexual harassment) can be filed, the same procedure may also be used to address other forms of discrimination.

[101] See generally Meritor, 477 U.S. at 72-73 (holding that "mere existence of a grievance procedure" for discrimination does not shield an employer from a sexual harassment claim).

[102] The Family Educational Rights and Privacy Act (FERPA) does not prohibit a student from learning the outcome of her complaint, i.e., whether the complaint was found to be credible and whether harassment was found to have occurred.  It is the Department's current position under FERPA that a school cannot release information to a complainant regarding disciplinary action imposed on a student found guilty of harassment if that information is contained in a student's education record unless — (1) the information directly relates to the complainant (e.g., an order requiring the student harasser not to have contact with the complainant); or (2) the harassment involves a crime of violence or a sex offense in a postsecondary institution.  See note 97.  If the alleged harasser is a teacher, administrator, or other non-student employee, FERPA would not limit the school's ability to inform the complainant of any disciplinary action taken.

[103] The section in the guidance on "Recipient's Response" provides examples of reasonable and appropriate corrective action.

[104] 34 CFR 106.8(a).

[105] Id.

[106] See Meritor, 477 U.S. at 72-73.

[107] University of California, Santa Cruz, OCR Case No. 09-93-2131.  This is true for formal as well as informal complaints.  See University of Maine at Machias, OCR Case No. 01-94-6001 (school's new procedures not found in violation of Title IX in part because they require written records for informal as well as formal resolutions).  These records need not be kept in a student's or employee's individual file, but instead may be kept in a central confidential location.

[108] For example, in Cape Cod Community College, OCR Case No. 01-93-2047, the College was found to have violated Title IX in part because the person identified by the school as the Title IX coordinator was unfamiliar with Title IX, had no training, and did not even realize he was the coordinator.

000105

[109] Indeed, in <u>University of Maine at Machias</u>, OCR Case No. 01-94-6001, OCR found the school's procedures to be inadequate because only formal complaints were investigated. While a school isn't required to have an established procedure for resolving informal complaints, they nevertheless must be addressed in some way. However, if there are indications that the same individual may be harassing others, then it may not be appropriate to resolve an informal complaint without taking steps to address the entire situation.

[110] <u>Academy School Dist. No 20</u>, OCR Case No. 08-93-1023 (school's response determined to be insufficient in a case in which it stopped its investigation after complaint filed with police); <u>Mills Public School Dist.</u>, OCR Case No. 01-93-1123, (not sufficient for school to wait until end of police investigation).

[111] <u>Cf.</u> <u>EEOC v. Board of Governors of State Colleges and Universities</u>, 957 F.2d 424 (7th Cir. 1992), <u>cert. denied</u>, 506 U.S. 906 (1992).

[112] The First Amendment applies to entities and individuals that are State actors. The receipt of Federal funds by private schools does not directly subject those schools to the U.S. Constitution. See <u>Rendell-Baker v. Kohn</u>, 457 U.S. 830, 840 (1982). However, all actions taken by OCR must comport with First Amendment principles, even in cases involving private schools that are not directly subject to the First Amendment.

[113] See, e.g., <u>George Mason University</u>, OCR Case No. 03-94-2086 (law professor's use of a racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment); <u>Portland School Dist. 1J</u>, OCR Case No. 10-94-1117 (reading teacher's choice to substitute a less offensive term for a racial slur when reading an historical novel aloud in class constituted an academic decision on presentation of curriculum, not racial harassment).

[114] See <u>Iota Xi Chapter of Sigma Chi Fraternity v. George Mason University</u>, 993 F.2d 386 (4th Cir. 1993) (fraternity skit in which white male student dressed as an offensive caricature of a black female constituted student expression).

[115] See <u>Florida Agricultural and Mechanical University</u>, OCR Case No. 04-92-2054 (no discrimination in case in which campus newspaper, which welcomed individual opinions of all sorts, printed article expressing one student's viewpoint on white students on campus.)

[116] <u>Tinker v. Des Moines Indep. Community Sch. Dist.</u>, 393 U.S. 503, 506 (1969) (neither students nor teachers shed their constitutional rights to freedom of expression at the schoolhouse gates); <u>Cf.</u> <u>Cohen v. San Bernardino Valley College</u>, 92 F.3d 968, 972 (9th Cir. 1996) (holding that a college professor could not be punished for his longstanding teaching methods, which included discussion of controversial subjects such as obscenity and consensual sex with children, under an unconstitutionally vague sexual harassment policy); <u>George Mason University</u>, OCR Case No. 03-94-2086 (law professor's use of a

000106

racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment.)

[117] See, e.g., University of Illinois, OCR Case No. 05-94-2104 (fact that university's use of Native American symbols was offensive to some Native American students and employees was not dispositive, in and of itself, in assessing a racially hostile environment claim under Title VI.)

[118] See Meritor, 477 U.S. at 67 (the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not affect the conditions of employment to a sufficient degree to violate Title VII), quoting Henson, 682 F.2d at 904; cf. R.A.V. v. City of St. Paul, 505 U.S. 377, 389 (1992) (citing with approval EEOC's sexual harassment guidelines); Monteiro, 158 F.3d at 1032-34 (9th Cir. 1998) (citing with approval OCR's racial harassment investigative guidance).

[119] Compare Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986) (Court upheld discipline of high school student for making lewd speech to student assembly, noting that "[t]he undoubted freedom to advocate unpopular and controversial issues in schools must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior."), with Iota Xi, 993 F.2d 386 (holding that, notwithstanding a university's mission to create a culturally diverse learning environment and its substantial interest in maintaining a campus free of discrimination, it could not punish students who engaged in an offensive skit with racist and sexist overtones).

000107

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE FOR CIVIL RIGHTS

October 26, 2010

Dear Colleague:

In recent years, many state departments of education and local school districts have taken steps to reduce bullying in schools.  The U.S. Department of Education (Department) fully supports these efforts.  Bullying fosters a climate of fear and disrespect that can seriously impair the physical and psychological health of its victims and create conditions that negatively affect learning, thereby undermining the ability of students to achieve their full potential.  The movement to adopt anti-bullying policies reflects schools' appreciation of their important responsibility to maintain a safe learning environment for all students.  I am writing to remind you, however, that some student misconduct that falls under a school's anti-bullying policy also may trigger responsibilities under one or more of the federal antidiscrimination laws enforced by the Department's Office for Civil Rights (OCR).  As discussed in more detail below, by limiting its response to a specific application of its anti-bullying disciplinary policy, a school may fail to properly consider whether the student misconduct also results in discriminatory harassment.

The statutes that OCR enforces include Title VI of the Civil Rights Act of 1964[1] (Title VI), which prohibits discrimination on the basis of race, color, or national origin; Title IX of the Education Amendments of 1972[2] (Title IX), which prohibits discrimination on the basis of sex; Section 504 of the Rehabilitation Act of 1973[3] (Section 504); and Title II of the Americans with Disabilities Act of 1990[4] (Title II).  Section 504 and Title II prohibit discrimination on the basis of disability.[5] School districts may violate these civil rights statutes and the Department's implementing regulations when peer harassment based on race, color, national origin, sex, or disability is sufficiently serious that it creates a hostile environment and such harassment is encouraged, tolerated, not adequately addressed, or ignored by school employees.[6]  School personnel who understand their legal obligations to address harassment under these laws are in the best position to prevent it from occurring and to respond appropriately when it does.  Although this letter focuses on the elementary and secondary school context, the legal principles also apply to postsecondary institutions covered by the laws and regulations enforced by OCR.

Some school anti-bullying policies already may list classes or traits on which bases bullying or harassment is specifically prohibited.  Indeed, many schools have adopted anti-bullying policies that go beyond prohibiting bullying on the basis of traits expressly protected by the federal civil

---

[1] 42 U.S.C. § 2000d *et seq.*

[2] 20 U.S.C. § 1681 *et seq.*

[3] 29 U.S.C. § 794.

[4] 42 U.S.C. § 12131 *et seq.*

[5] OCR also enforces the Age Discrimination Act of 1975, 42 U.S.C. § 6101 *et seq.*, and the Boy Scouts of America Equal Access Act, 20 U.S.C. § 7905.  This letter does not specifically address those statutes.

[6] The Department's regulations implementing these statutes are in 34 C.F.R. parts 100, 104, and 106.  Under these federal civil rights laws and regulations, students are protected from harassment by school employees, other students, and third parties.  This guidance focuses on peer harassment, and articulates the legal standards that apply in administrative enforcement and in court cases where plaintiffs are seeking injunctive relief.

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in
some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972,
as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity
or sexual orientation) and 14021 (on sex discrimination in educational environments).

Page 2- Dear Colleague Letter: Harassment and Bullying

rights laws enforced by OCR—race, color, national origin, sex, and disability—to include such
bases as sexual orientation and religion.  While this letter concerns your legal obligations under
the laws enforced by OCR, other federal, state, and local laws impose additional obligations on
schools.[7]  And, of course, even when bullying or harassment is not a civil rights violation,
schools should still seek to prevent it in order to protect students from the physical and
emotional harms that it may cause.

Harassing conduct may take many forms, including verbal acts and name-calling; graphic and
written statements, which may include use of cell phones or the Internet; or other conduct that
may be physically threatening, harmful, or humiliating.  Harassment does not have to include
intent to harm, be directed at a specific target, or involve repeated incidents.  Harassment
creates a hostile environment when the conduct is sufficiently severe, pervasive, or persistent
so as to interfere with or limit a student's ability to participate in or benefit from the services,
activities, or opportunities offered by a school.  When such harassment is based on race, color,
national origin, sex, or disability, it violates the civil rights laws that OCR enforces.[8]

A school is responsible for addressing harassment incidents about which it knows or reasonably
should have known.[9]  In some situations, harassment may be in plain sight, widespread, or
well-known to students and staff, such as harassment occurring in hallways, during academic or
physical education classes, during extracurricular activities, at recess, on a school bus, or
through graffiti in public areas.  In these cases, the obvious signs of the harassment are
sufficient to put the school on notice.  In other situations, the school may become aware of
misconduct, triggering an investigation that could lead to the discovery of additional incidents
that, taken together, may constitute a hostile environment.  In all cases, schools should have
well-publicized policies prohibiting harassment and procedures for reporting and resolving
complaints that will alert the school to incidents of harassment.[10]

When responding to harassment, a school must take immediate and appropriate action to
investigate or otherwise determine what occurred.  The specific steps in a school's investigation
will vary depending upon the nature of the allegations, the source of the complaint, the age of
the student or students involved, the size and administrative structure of the school, and other
factors.  In all cases, however, the inquiry should be prompt, thorough, and impartial.

If an investigation reveals that discriminatory harassment has occurred, a school must take
prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile

---

[7] For instance, the U.S. Department of Justice (DOJ) has jurisdiction over Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c (Title IV), which prohibits discrimination on the basis of race, color, sex, religion, or national origin by public elementary and secondary schools and public institutions of higher learning.  State laws also provide additional civil rights protections, so districts should review these statutes to determine what protections they afford (*e.g.*, some state laws specifically prohibit discrimination on the basis of sexual orientation).

[8] Some conduct alleged to be harassment may implicate the First Amendment rights to free speech or expression.  For more information on the First Amendment's application to harassment, see the discussions in OCR's Dear Colleague Letter: First Amendment (July 28, 2003), *available at* http://www.ed.gov/about/offices/list/ocr/firstamend.html, and OCR's *Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 19, 2001) (*Sexual Harassment Guidance*), *available at* http://www.ed.gov/about/offices/list/ocr/docs/shguide.html.

[9] A school has notice of harassment if a responsible employee knew, or in the exercise of reasonable care should have known, about the harassment. For a discussion of what a "responsible employee" is, see OCR's *Sexual Harassment Guidance*.

[10] Districts must adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee sex and disability discrimination complaints, and must notify students, parents, employees, applicants, and other interested parties that the district does not discriminate on the basis of sex or disability.  *See* 28 C.F.R. § 35.106; 28 C.F.R. § 35.107(b); 34 C.F.R. § 104.7(b); 34 C.F.R. § 104.8; 34 C.F.R. § 106.8(b); 34 C.F.R. § 106.9.

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent with some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

Page 3- Dear Colleague Letter: Harassment and Bullying

environment and its effects, and prevent the harassment from recurring. These duties are a school's responsibility even if the misconduct also is covered by an anti-bullying policy, and regardless of whether a student has complained, asked the school to take action, or identified the harassment as a form of discrimination.

Appropriate steps to end harassment may include separating the accused harasser and the target, providing counseling for the target and/or harasser, or taking disciplinary action against the harasser. These steps should not penalize the student who was harassed. For example, any separation of the target from an alleged harasser should be designed to minimize the burden on the target's educational program (*e.g.*, not requiring the target to change his or her class schedule).

In addition, depending on the extent of the harassment, the school may need to provide training or other interventions not only for the perpetrators, but also for the larger school community, to ensure that all students, their families, and school staff can recognize harassment if it recurs and know how to respond. A school also may be required to provide additional services to the student who was harassed in order to address the effects of the harassment, particularly if the school initially delays in responding or responds inappropriately or inadequately to information about harassment. An effective response also may need to include the issuance of new policies against harassment and new procedures by which students, parents, and employees may report allegations of harassment (or wide dissemination of existing policies and procedures), as well as wide distribution of the contact information for the district's Title IX and Section 504/Title II coordinators.[11]

Finally, a school should take steps to stop further harassment and prevent any retaliation against the person who made the complaint (or was the subject of the harassment) or against those who provided information as witnesses. At a minimum, the school's responsibilities include making sure that the harassed students and their families know how to report any subsequent problems, conducting follow-up inquiries to see if there have been any new incidents or any instances of retaliation, and responding promptly and appropriately to address continuing or new problems.

When responding to incidents of misconduct, schools should keep in mind the following:

- The label used to describe an incident (*e.g.*, bullying, hazing, teasing) does not determine how a school is obligated to respond. Rather, the nature of the conduct itself must be assessed for civil rights implications. So, for example, if the abusive behavior is on the basis of race, color, national origin, sex, or disability, and creates a hostile environment, a school is obligated to respond in accordance with the applicable federal civil rights statutes and regulations enforced by OCR.

- When the behavior implicates the civil rights laws, school administrators should look beyond simply disciplining the perpetrators. While disciplining the perpetrators is likely a necessary step, it often is insufficient. A school's responsibility is to eliminate the

---

[11] Districts must designate persons responsible for coordinating compliance with Title IX, Section 504, and Title II, including the investigation of any complaints of sexual, gender-based, or disability harassment. *See* 28 C.F.R. § 35.107(a); 34 C.F.R. § 104.7(a); 34 C.F.R. § 106.8(a).

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

Page 4– Dear Colleague Letter: Harassment and Bullying

hostile environment created by the harassment, address its effects, and take steps to ensure that harassment does not recur.  Put differently, the unique effects of discriminatory harassment may demand a different response than would other types of bullying.

Below, I provide hypothetical examples of how a school's failure to recognize student misconduct as discriminatory harassment violates students' civil rights.[12]  In each of the examples, the school was on notice of the harassment because either the school or a responsible employee knew or should have known of misconduct that constituted harassment.  The examples describe how the school should have responded in each circumstance.

### Title VI:  Race, Color, or National Origin Harassment

- *Some students anonymously inserted offensive notes into African-American students' lockers and notebooks, used racial slurs, and threatened African-American students who tried to sit near them in the cafeteria.  Some African-American students told school officials that they did not feel safe at school.  The school investigated and responded to individual instances of misconduct by assigning detention to the few student perpetrators it could identify.  However, racial tensions in the school continued to escalate to the point that several fights broke out between the school's racial groups.*

  In this example, school officials failed to acknowledge the pattern of harassment as indicative of a racially hostile environment in violation of Title VI.  Misconduct need not be directed at a particular student to constitute discriminatory harassment and foster a racially hostile environment.  Here, the harassing conduct included overtly racist behavior (*e.g.*, racial slurs) and also targeted students on the basis of their race (*e.g.*, notes directed at African-American students).  The nature of the harassment, the number of incidents, and the students' safety concerns demonstrate that there was a racially hostile environment that interfered with the students' ability to participate in the school's education programs and activities.

  Had the school recognized that a racially hostile environment had been created, it would have realized that it needed to do more than just discipline the few individuals whom it could identify as having been involved.  By failing to acknowledge the racially hostile environment, the school failed to meet its obligation to implement a more systemic response to address the unique effect that the misconduct had on the school climate.  A more effective response would have included, in addition to punishing the perpetrators, such steps as reaffirming the school's policy against discrimination (including racial harassment), publicizing the means to report allegations of racial harassment, training faculty on constructive responses to racial conflict, hosting class discussions about racial harassment and sensitivity to students of other races, and conducting outreach to involve parents and students in an effort to identify problems and improve the school climate.  Finally, had school officials responded appropriately

---

[12] Each of these hypothetical examples contains elements taken from actual cases.

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

and aggressively to the racial harassment when they first became aware of it, the school might have prevented the escalation of violence that occurred.[13]

- *Over the course of a school year, school employees at a junior high school received reports of several incidents of anti-Semitic conduct at the school. Anti-Semitic graffiti, including swastikas, was scrawled on the stalls of the school bathroom. When custodians discovered the graffiti and reported it to school administrators, the administrators ordered the graffiti removed but took no further action. At the same school, a teacher caught two ninth-graders trying to force two seventh-graders to give them money. The ninth-graders told the seventh-graders, "You Jews have all of the money, give us some." When school administrators investigated the incident, they determined that the seventh-graders were not actually Jewish. The school suspended the perpetrators for a week because of the serious nature of their misconduct. After that incident, younger Jewish students started avoiding the school library and computer lab because they were located in the corridor housing the lockers of the ninth-graders. At the same school, a group of eighth-grade students repeatedly called a Jewish student "Drew the dirty Jew." The responsible eighth-graders were reprimanded for teasing the Jewish student.*

The school administrators failed to recognize that anti-Semitic harassment can trigger responsibilities under Title VI. While Title VI does not cover discrimination based solely on religion,[14] groups that face discrimination on the basis of actual or perceived shared ancestry or ethnic characteristics may not be denied protection under Title VI on the ground that they also share a common faith. These principles apply not just to Jewish students, but also to students from any discrete religious group that shares, or is perceived to share, ancestry or ethnic characteristics (*e.g.*, Muslims or Sikhs). Thus, harassment against students who are members of any religious group triggers a school's Title VI responsibilities when the harassment is based on the group's actual or perceived shared ancestry or ethnic characteristics, rather than solely on its members' religious practices. A school also has responsibilities under Title VI when its students are harassed based on their actual or perceived citizenship or residency in a country whose residents share a dominant religion or a distinct religious identity.[15]

In this example, school administrators should have recognized that the harassment was based on the students' actual or perceived shared ancestry or ethnic identity as Jews (rather than on the students' religious practices). The school was not relieved of its responsibilities under Title VI because the targets of one of the incidents were not actually Jewish. The harassment was still based on the perceived ancestry or ethnic characteristics of the targeted students. Furthermore, the harassment negatively affected the ability and willingness of Jewish students to participate fully in the school's

---

[13] More information about the applicable legal standards and OCR's approach to investigating allegations of harassment on the basis of race, color, or national origin is included in *Racial Incidents and Harassment Against Students at Educational Institutions: Investigative Guidance*, 59 Fed. Reg. 11,448 (Mar. 10, 1994), *available at* http://www.ed.gov/about/offices/list/ocr/docs/race394.html.

[14] As noted in footnote seven, DOJ has the authority to remedy discrimination based solely on religion under Title IV.

[15] More information about the applicable legal standards and OCR's approach to investigating complaints of discrimination against members of religious groups is included in OCR's Dear Colleague Letter: Title VI and Title IX Religious Discrimination in Schools and Colleges (Sept. 13, 2004), *available at* http://www2.ed.gov/about/offices/list/ocr/religious-rights2004.html.

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

Page 6- Dear Colleague Letter: Harassment and Bullying

education programs and activities (*e.g.*, by causing some Jewish students to avoid the library and computer lab). Therefore, although the discipline that the school imposed on the perpetrators was an important part of the school's response, discipline alone was likely insufficient to remedy a hostile environment. Similarly, removing the graffiti, while a necessary and important step, did not fully satisfy the school's responsibilities. As discussed above, misconduct that is not directed at a particular student, like the graffiti in the bathroom, can still constitute discriminatory harassment and foster a hostile environment. Finally, the fact that school officials considered one of the incidents "teasing" is irrelevant for determining whether it contributed to a hostile environment.

Because the school failed to recognize that the incidents created a hostile environment, it addressed each only in isolation, and therefore failed to take prompt and effective steps reasonably calculated to end the harassment and prevent its recurrence. In addition to disciplining the perpetrators, remedial steps could have included counseling the perpetrators about the hurtful effect of their conduct, publicly labeling the incidents as anti-Semitic, reaffirming the school's policy against discrimination, and publicizing the means by which students may report harassment. Providing teachers with training to recognize and address anti-Semitic incidents also would have increased the effectiveness of the school's response. The school could also have created an age-appropriate program to educate its students about the history and dangers of anti-Semitism, and could have conducted outreach to involve parents and community groups in preventing future anti-Semitic harassment.

**Title IX: Sexual Harassment**

- *Shortly after enrolling at a new high school, a female student had a brief romance with another student. After the couple broke up, other male and female students began routinely calling the new student sexually charged names, spreading rumors about her sexual behavior, and sending her threatening text messages and e-mails. One of the student's teachers and an athletic coach witnessed the name calling and heard the rumors, but identified it as "hazing" that new students often experience. They also noticed the new student's anxiety and declining class participation. The school attempted to resolve the situation by requiring the student to work the problem out directly with her harassers.*

Sexual harassment is unwelcome conduct of a sexual nature, which can include unwelcome sexual advances, requests for sexual favors, or other verbal, nonverbal, or physical conduct of a sexual nature. Thus, sexual harassment prohibited by Title IX can include conduct such as touching of a sexual nature; making sexual comments, jokes, or gestures; writing graffiti or displaying or distributing sexually explicit drawings, pictures, or written materials; calling students sexually charged names; spreading sexual rumors; rating students on sexual activity or performance; or circulating, showing, or creating e-mails or Web sites of a sexual nature.

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

Page 7 - Dear Colleague Letter: Harassment and Bullying

In this example, the school employees failed to recognize that the "hazing" constituted sexual harassment. The school did not comply with its Title IX obligations when it failed to investigate or remedy the sexual harassment. The conduct was clearly unwelcome, sexual (*e.g.*, sexual rumors and name calling), and sufficiently serious that it limited the student's ability to participate in and benefit from the school's education program (*e.g.*, anxiety and declining class participation).

The school should have trained its employees on the type of misconduct that constitutes sexual harassment. The school also should have made clear to its employees that they could not require the student to confront her harassers. Schools may use informal mechanisms for addressing harassment, but only if the parties agree to do so on a voluntary basis. Had the school addressed the harassment consistent with Title IX, the school would have, for example, conducted a thorough investigation and taken interim measures to separate the student from the accused harassers. An effective response also might have included training students and employees on the school's policies related to harassment, instituting new procedures by which employees should report allegations of harassment, and more widely distributing the contact information for the district's Title IX coordinator. The school also might have offered the targeted student tutoring, other academic assistance, or counseling as necessary to remedy the effects of the harassment.[16]

## Title IX:  Gender-Based Harassment

- *Over the course of a school year, a gay high school student was called names (including anti-gay slurs and sexual comments) both to his face and on social networking sites, physically assaulted, threatened, and ridiculed because he did not conform to stereotypical notions of how teenage boys are expected to act and appear (e.g., effeminate mannerisms, nontraditional choice of extracurricular activities, apparel, and personal grooming choices). As a result, the student dropped out of the drama club to avoid further harassment. Based on the student's self-identification as gay and the homophobic nature of some of the harassment, the school did not recognize that the misconduct included discrimination covered by Title IX. The school responded to complaints from the student by reprimanding the perpetrators consistent with its anti-bullying policy. The reprimands of the identified perpetrators stopped the harassment by those individuals. It did not, however, stop others from undertaking similar harassment of the student.*

As noted in the example, the school failed to recognize the pattern of misconduct as a form of sex discrimination under Title IX. Title IX prohibits harassment of both male and female students regardless of the sex of the harasser—*i.e.*, even if the harasser and target are members of the same sex. It also prohibits gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping. Thus, it can be sex discrimination if students are harassed either for exhibiting what is perceived as a stereotypical characteristic for their

---

[16] More information about the applicable legal standards and OCR's approach to investigating allegations of sexual harassment is included in OCR's *Sexual Harassment Guidance*, *available at* http://www.ed.gov/about/offices/list/ocr/docs/shguide.html.

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

Page 8- Dear Colleague Letter: Harassment and Bullying

sex, or for failing to conform to stereotypical notions of masculinity and femininity. Title IX also prohibits sexual harassment and gender-based harassment of all students, regardless of the actual or perceived sexual orientation or gender identity of the harasser or target.

Although Title IX does not prohibit discrimination based solely on sexual orientation, Title IX does protect all students, including lesbian, gay, bisexual, and transgender (LGBT) students, from sex discrimination. When students are subjected to harassment on the basis of their LGBT status, they may also, as this example illustrates, be subjected to forms of sex discrimination prohibited under Title IX. The fact that the harassment includes anti-LGBT comments or is partly based on the target's actual or perceived sexual orientation does not relieve a school of its obligation under Title IX to investigate and remedy overlapping sexual harassment or gender-based harassment. In this example, the harassing conduct was based in part on the student's failure to act as some of his peers believed a boy should act. The harassment created a hostile environment that limited the student's ability to participate in the school's education program (*e.g.*, access to the drama club). Finally, even though the student did not identify the harassment as sex discrimination, the school should have recognized that the student had been subjected to gender-based harassment covered by Title IX.

In this example, the school had an obligation to take immediate and effective action to eliminate the hostile environment. By responding to individual incidents of misconduct on an *ad hoc* basis only, the school failed to confront and prevent a hostile environment from continuing. Had the school recognized the conduct as a form of sex discrimination, it could have employed the full range of sanctions (including progressive discipline) and remedies designed to eliminate the hostile environment. For example, this approach would have included a more comprehensive response to the situation that involved notice to the student's teachers so that they could ensure the student was not subjected to any further harassment, more aggressive monitoring by staff of the places where harassment occurred, increased training on the scope of the school's harassment and discrimination policies, notice to the target and harassers of available counseling services and resources, and educating the entire school community on civil rights and expectations of tolerance, specifically as they apply to gender stereotypes. The school also should have taken steps to clearly communicate the message that the school does not tolerate harassment and will be responsive to any information about such conduct.[17]

## Section 504 and Title II:  Disability Harassment

- *Several classmates repeatedly called a student with a learning disability "stupid," "idiot," and "retard" while in school and on the school bus. On one occasion, these students tackled him, hit him with a school binder, and threw his personal items into the garbage. The student complained to his teachers and guidance counselor that he was continually being taunted and teased. School officials offered him counseling services and a*

---

[17] Guidance on gender-based harassment is also included in OCR's *Sexual Harassment Guidance*, *available at* http://www.ed.gov/about/offices/list/ocr/docs/shguide.html.

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

Page 9- Dear Colleague Letter: Harassment and Bullying

*psychiatric evaluation, but did not discipline the offending students. As a result, the harassment continued. The student, who had been performing well academically, became angry, frustrated, and depressed, and often refused to go to school to avoid the harassment.*

In this example, the school failed to recognize the misconduct as disability harassment under Section 504 and Title II. The harassing conduct included behavior based on the student's disability, and limited the student's ability to benefit fully from the school's education program (*e.g.*, absenteeism). In failing to investigate and remedy the misconduct, the school did not comply with its obligations under Section 504 and Title II.

Counseling may be a helpful component of a remedy for harassment. In this example, however, since the school failed to recognize the behavior as disability harassment, the school did not adopt a comprehensive approach to eliminating the hostile environment. Such steps should have at least included disciplinary action against the harassers, consultation with the district's Section 504/Title II coordinator to ensure a comprehensive and effective response, special training for staff on recognizing and effectively responding to harassment of students with disabilities, and monitoring to ensure that the harassment did not resume.[18]

I encourage you to reevaluate the policies and practices your school uses to address bullying[19] and harassment to ensure that they comply with the mandates of the federal civil rights laws. For your convenience, the following is a list of online resources that further discuss the obligations of districts to respond to harassment prohibited under the federal antidiscrimination laws enforced by OCR:

- *Sexual Harassment: It's Not Academic* (Revised 2008):
  http://www.ed.gov/about/offices/list/ocr/docs/ocrshpam.html

- *Dear Colleague Letter: Sexual Harassment Issues* (2006):
  http://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html

- *Dear Colleague Letter: Religious Discrimination* (2004):
  http://www2.ed.gov/about/offices/list/ocr/religious-rights2004.html

- *Dear Colleague Letter: First Amendment* (2003):
  http://www.ed.gov/about/offices/list/ocr/firstamend.html

---

[18] More information about the applicable legal standards and OCR's approach to investigating allegations of disability harassment is included in OCR's Dear Colleague Letter: Prohibited Disability Harassment (July 25, 2000), *available at* http://www2.ed.gov/about/offices/list/ocr/docs/disabharassltr.html.

[19] For resources on preventing and addressing bullying, please visit http://www.bullyinginfo.org, a Web site established by a federal Interagency Working Group on Youth Programs. For information on the Department's bullying prevention resources, please visit the Office of Safe and Drug-Free Schools' Web site at http://www.ed.gov/offices/OESE/SDFS. For information on regional Equity Assistance Centers that assist schools in developing and implementing policies and practices to address issues regarding race, sex, or national origin discrimination, please visit http://www.ed.gov/programs/equitycenters.

Not for Reliance for Certain Purposes. This document expresses policy that is inconsistent in some respects with the Department's regulations implementing Title IX of the Education Amendments of 1972, as amended in 2020, as well as Executive Orders 13988 (on combating discrimination based on gender identity or sexual orientation) and 14021 (on sex discrimination in educational environments).

Page 10– Dear Colleague Letter: Harassment and Bullying

- *Sexual Harassment Guidance* (Revised 2001):
  http://www.ed.gov/about/offices/list/ocr/docs/shguide.html

- *Dear Colleague Letter: Prohibited Disability Harassment* (2000):
  http://www.ed.gov/about/offices/list/ocr/docs/disabharassltr.html

- *Racial Incidents and Harassment Against Students* (1994):
  http://www.ed.gov/about/offices/list/ocr/docs/race394.html

Please also note that OCR has added new data items to be collected through its Civil Rights Data Collection (CRDC), which surveys school districts in a variety of areas related to civil rights in education. The CRDC now requires districts to collect and report information on allegations of harassment, policies regarding harassment, and discipline imposed for harassment. In 2009-10, the CRDC covered nearly 7,000 school districts, including all districts with more than 3,000 students. For more information about the CRDC data items, please visit http://www2.ed.gov/about/offices/list/ocr/whatsnew.html.

OCR is committed to working with schools, students, students' families, community and advocacy organizations, and other interested parties to ensure that students are not subjected to harassment. Please do not hesitate to contact OCR if we can provide assistance in your efforts to address harassment or if you have other civil rights concerns.

For the OCR regional office serving your state, please visit: http://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm, or call OCR's Customer Service Team at 1-800-421-3481.

I look forward to continuing our work together to ensure equal access to education, and to promote safe and respectful school climates for America's students.

Sincerely,

/s/

Russlynn Ali
Assistant Secretary for Civil Rights



**U.S. Department of Justice**
*Civil Rights Division*



**U.S. Department of Education**
*Office for Civil Rights*

July 24, 2013

Dr. Joel Shawn
Superintendent
Arcadia Unified School District
234 Campus Drive
Arcadia, CA  91007

(In reply, please refer to DOJ Case No. DJ 169-12C-70, OCR Case No. 09-12-1020)

Dear Dr. Shawn:

In October 2011, after receiving separate complaints, the U.S. Department of Justice, Civil Rights Division (DOJ) and the U.S. Department of Education, Office for Civil Rights (OCR) initiated a joint investigation of the Arcadia Unified School District (the "District") into allegations of sex-based discrimination against a middle school student in the district (the "Student").  The complaints, filed pursuant to Title IX of the Education Amendments of 1972, 42 U.S.C. 1681 (Title IX) and its implementing regulations and Title IV of the Civil Rights Act of 1964, 42 U.S.C. 2000c *et seq.* (Title IV), alleged that the District was discriminating against the Student based on sex by denying him equal access to the District's education program and activities because he is transgender.[1]  Specifically, the complaints alleged that the District prohibited the Student from accessing facilities consistent with his male gender identity, including restrooms and locker rooms at school, as well as sex-specific overnight accommodations at a school-sponsored trip to an off-site academic camp in October 2011.  DOJ and OCR (collectively, the "United States") jointly investigated the allegations.

Prior to the conclusion of the investigation, the District expressed an interest in voluntarily resolving this case and entered into a resolution agreement that commits the District to take specific actions.  This letter summarizes the information gathered during the investigation and how the complaints were resolved.[2]

Title IX and its implementing regulations, 34 C.F.R. § 106.31, prohibit discrimination on the basis of sex in education programs and activities operated by recipients of federal financial assistance.  Title IV prohibits discrimination by public schools against students based on race, color, national origin, sex, and religion.  OCR investigated its complaint under its Title IX

---

[1] A transgender person has a gender identity (one's internal sense of gender) that is different from the individual's assigned sex (i.e., the gender designation listed on one's original birth certificate).

[2] Certain personally identifiable information gathered during this investigation has been omitted from this letter to protect the Student's privacy.

authority.  DOJ investigated its complaint under its Title IV authority.  The District is a public school district that receives federal funds, and therefore is subject to the requirements of both Title IX and Title IV.  In the context of this investigation, the United States applied the same legal standards under Title IX and Title IV.

School districts are responsible for providing students with a nondiscriminatory educational environment.  Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  Under the Title IX regulations, a school district may not treat individuals differently on the basis of sex with regard to any aspect of services, benefits, or opportunities it provides.  34 C.F.R. §§ 106.31(a)-(b).  All students, including transgender students and students who do not conform to sex stereotypes, are protected from sex-based discrimination under Title IX and Title IV.[3]

## Summary of Investigation

The Student, a rising ninth grader in the District, has attended school in the District since Kindergarten.  The Student was a seventh grader at a middle school in the District at the time of the complaints.  The Student, who was assigned the female sex at birth, identified as a boy from a very young age.  With his family's support, he began consistently to assert his male gender identity and commenced a gender transition from female to male during his fifth grade year, the 2009-2010 school year, while attending an elementary school in the District.[4]

During that school year, the Student participated in a District-sponsored overnight academic camp trip for fifth graders, where he was assigned to a girls' cabin.  At the camp, the Student was teased and socially ostracized by his female cabin-mates, who did not perceive him to be a girl.  At school, he faced some harassment from classmates because of his masculine clothing and hairstyle, which did not conform to female stereotypes.  For example, on one occasion, a classmate referred to him as "it."  Based on these incidents, the Student and his family decided to commence his gender transition over spring break of that year.  To effectuate

---

[3] *See, e.g., Pratt v. Indian River Cent. Sch. Dist.,* No. 7:09-CV-0411, 2011 WL 1204804, at *11 (N.D.N.Y. Mar. 29, 2011); *Doe v. Brimfield Grade Sch.,* 552 F. Supp. 2d 816, 823 (C.D. Ill. 2008); *Montgomery v. Independent Sch. Dist. No. 709,* 109 F. Supp. 2d 1081, 1090 (D. Minn. 2000); Letter of Findings, Tehachapi Unified School District, OCR Case No. 09-11-1031, DOJ Case No. DJ 169-11E-38, at 2 (June 30, 2011), available at http://www.justice.gov/crt/about/edu/documents/tehachapiagreement.pdf.  In the employment context, federal courts and administrative agencies have applied Title VII of the Civil Rights Act of 1964, the federal law prohibiting sex discrimination, to discrimination against transgender individuals based on sex, including nonconformity with sex stereotypes and gender identity.  *See, e.g., Glenn v. Brumby,* 663 F.3d 1312, 1315-20 (11th Cir. 2011); *Barnes v. City of Cincinnati,* 401 F.3d 729, 737 (6th Cir. 2005); *Smith v. City of Salem,* 378 F.3d 566, 572-75 (6th Cir. 2004); *Schroer v. Billington,* 577 F. Supp. 2d 293, 303-08 (D.D.C. 2008); *Macy v. Holder,* Appeal No. 0120120821, 2012 WL 1435995, at *4-11 (U.S. Equal Emp't Opportunity Comm'n Apr. 20, 2012).  Courts rely on Title VII precedent to analyze discrimination "on the basis of sex" under Title IX.  *See, e.g., Franklin v. Gwinnett Cnty. Pub. Sch.,* 503 U.S. 60, 74 (1992); *Murray v. N.Y. Univ. Coll. of Dentistry,* 57 F.3d 243, 249 (2nd Cir. 1995).

[4] A gender transition is the experience by which a transgender person goes from living and identifying as one's assigned sex to living and identifying as the sex consistent with one's gender identity.  A gender transition often includes a "social transition," during which an individual begins to live and identify as the sex consistent with the individual's gender identity, with or without certain medical treatments or procedures.

his transition, the Student, among other things, adopted a new, traditionally male first name; expressed a desire to be referred to with masculine pronouns; and continued outwardly to present as a male, including in his clothing and hairstyle. The Student's parents worked with his teacher and school administrators to ensure a smooth transition. According to the District and the Student's family, the Student's classmates, notified of the transition by their teacher, accepted him as male immediately, and the harassment of the Student ceased. With the consent of the Student's parents and the school, the Student used a gender-neutral restroom for the remainder of his fifth grade year.

The Student completed elementary school without further incident and has not experienced any peer harassment while in middle school. He has consistently and uniformly identified and presented as male in school and all other aspects of his life, including through his traditionally masculine clothing and hairstyle, adoption of a male name, and preference to be called by masculine pronouns. All of the witnesses interviewed by OCR consistently indicated that the Student is accepted and treated as a boy by his classmates and teachers. Although some students know his transgender status (including students with whom he went to elementary school), a number of his current middle school classmates do not. As part of his transition, the Student is under the care of healthcare professionals.

In October 2011, DOJ and OCR received complaints alleging that: (1) the District prohibited the Student from using sex-specific restroom and locker room facilities designated for boys during his sixth and seventh grade years, and (2) the District refused to permit the Student to stay in a cabin with other male students at an overnight camp sponsored by the District in October 2011 during his seventh grade year, requiring instead that he stay in a cabin separate from all of his classmates with his parent or another adult chaperone. After receiving the complaints, DOJ and OCR jointly pursued an investigation of these allegations. The investigation included site visits by OCR staff to the District schools attended by the Student and the overnight camp site; interviews with District administrators and faculty, camp administrators, the Student and his family, parents of some of the Student's classmates, California Department of Education ("CDE") officials, administrators in other California school districts with policies addressing transgender and gender nonconforming students, and other gender identity experts; and a review of documentation provided by the Student's family and the District.

### 1. Access to Restrooms and Locker Rooms

The student entered the sixth grade at his middle school in the 2010-2011 school year. Prior to the start of that school year, the Student's parents met with middle school and District administrators to discuss the Student's transgender status. During this meeting, the Student and his parents requested that the District permit the Student to use male-designated restrooms and locker rooms at the middle school, in accordance with the Student's and family's wishes, as informed by medically appropriate standards of care recommended by the Student's healthcare providers.[5] Citing generalized concerns about safety and privacy, the District refused this

---

[5] At various points, including prior to the seventh grade camp trip, the Student's parents provided the District information, including from his healthcare providers, that the medically-appropriate standard of care for a transgender adolescent is for the young person to be supported in their social transition to his or her self-identified gender, and that schools should therefore treat a transgender student as the gender consistent with his or her gender identity in all settings, including routine activities and access to sex-specific facilities.

request, requiring instead that the Student use the private restroom in the school health office as both a restroom and changing area for physical education (P.E.) class. The health office is located on the first floor of the school, some distance away from the school gym and the location of the Student's sixth grade classes. The Student's parents agreed to this arrangement because, at the time, they remained unsure of the best arrangements for their son. Nevertheless, over the course of his sixth grade year, the Student became increasingly unhappy with the arrangement because it made him feel "different" and called unwanted attention to his situation with other classmates. Based on these problems, in summer 2011 following completion of the Student's sixth grade year, the parents renewed their request that the Student be permitted to use the male-designated facilities in the seventh grade. The District refused to reconsider the earlier arrangement.

In both sixth grade and seventh grade, the Student regularly missed class time in both P.E. and other subjects because of the distance of the health office from the gym and his classrooms. For P.E., all students are required to change clothes before and after P.E. In sixth grade, the Student was dismissed early from the class preceding P.E. to ensure that he had adequate time to change his clothes. His sixth grade P.E. teacher sometimes dismissed him early in order to give him time to change out of his gym clothes. On several occasions, the Student's P.E. teacher instructed the students who were in the locker room not to change into their gym clothes; because the Student was not in the locker room, the Student did not receive this instruction and was the only student to come to class in his gym clothes, calling further unwanted attention to him. Because he was required to store his gym clothes in a bin under the cot used by students who were not feeling well, when retrieving his gym clothes the Student sometimes faced questions from other students in the health office. The restroom arrangement created similar difficulties. To use the restroom during class time, the Student was required to walk across campus, missing class time and facing questions from classmates about the length of time he was away. The Student occasionally found the health office locked, requiring him to find an employee to unlock it for him. Similar difficulties occurred on other occasions, such as during an evening dance, when the Student was unwilling to ask for special permission to leave the dance area and look for an employee to unlock the health office for him. Eventually, the Student avoided using the restroom altogether.

There is no dispute the District treated the student differently than other students because of his gender identity. During the investigation, the District advised the United States, as it had the Student and his parents, that its decision to restrict the Student's access to all student restrooms and locker rooms was motivated by concerns related to the safety and privacy of the Student and other students. In November 2011, OCR toured school facilities, including the male-designated restrooms and locker rooms, as well as the health office facility that the Student was required to use for a restroom and changing area. OCR observed that the boys' locker room had non-functional showers and private changing areas. Witnesses, including the Student's P.E. teacher, the school's former principal, the vice-principal, the complainants, and other parents consistently stated that students did not fully disrobe when changing for P.E. Additionally, the District's superintendent and deputy superintendent, the school principal, former principal and vice-principal, the Student's guidance counselor, and seven teachers, including the Student's P.E. teacher, consistently reported that the middle school has an excellent safety record, and that there were no known instances of peer-on-peer harassment in the restrooms, locker rooms, or elsewhere in the school, including any involving the Student. During the investigation, OCR

also interviewed the director of a summer camp that the Student attended the summer before sixth grade, which was housed in his middle school building, during which he used male-designated facilities at the school with the camp's knowledge and without incident.

Despite these facts, District officials acknowledged that, at the time of the complaints, they had not considered any reasonable alternative arrangements for the Student's use of restroom and changing facilities that would have been less burdensome on the Student.

### 2. Access to Field Trip Accommodations

In October 2011, the District sponsored an overnight trip for all seventh graders to an academic camp at a private outdoor educational camp facility in California. The facility has cabins as sleeping accommodations. The academic camp trip is considered by students to be a highlight of the seventh grade year, in part because it is the first overnight school-sponsored trip without parent chaperones. In August 2011, the Student's parents contacted the District to request that the Student be allowed to stay in a cabin with male peers at the camp. The District refused the parent's request, requiring as a condition of the Student's participation in the trip that he stay in a private cabin on his own, separate from all of his classmates and chaperoned by his parent or a District administrator.

Before the trip, all students, including the Student, were permitted to submit a list of classmates with whom they wished to share a cabin. Several of the Student's male friends, including boys who were aware of his transgender status, requested the Student as a cabin-mate. The Student submitted a request listing these classmates as well. The District did not permit him to stay in a cabin with these students. The Student became very upset by the District's decision to require him to stay in his own cabin and became very distracted from his school work. Until several days before the camp, the Student considered not participating in the trip at all. At this time, the family filed the complaints with OCR and DOJ.

After receiving the complaints and reviewing supporting documentation provided by the Student's attorney, OCR and DOJ separately contacted the District by telephone regarding its plans for the Student for the rapidly approaching camp trip. During those calls, the District confirmed its plan for the Student to stay in his own cabin with his parent and indicated that it would not change the plan prior to the camp. As with the facilities at school, the District referenced generalized safety and privacy concerns in prohibiting the Student from staying in a cabin with other students. The District also referenced advice provided by CDE and camp staff in support of their decisions.

The Student stayed in a separate cabin with his parent. At the camp, the Student was permitted to participate in camp activities with a group of boys from another cabin, but did not enter any student cabin during break periods or free time because he did not want to violate the District's rules and no one had told him that it was acceptable to do so.[6] As a result, he was sad and upset throughout the trip. The Student faced questions from other students about his cabin arrangement. Because the Student was not comfortable being truthful about his circumstances, the Student felt that this dishonesty created a distance between him and his peers.

---

[6] The Student's parent stated that a counselor of the boys' cabin had invited the Student to enter the cabin during break periods or free time, but that the Student did not feel comfortable absent explicit permission from the District.

In November 2011, OCR also visited the private camp facility and interviewed camp administrators.  The toilet, sink, and shower areas were all separate, single-stall, individually-locking rooms, such that no student would shower, use the restroom, or be required to change in front of other students.  The camp administrators stated that they had presented several options to the District that would have allowed the Student to stay in a cabin with his classmates, such as assigning a second adult chaperone to the Student's cabin or permitting him to lodge with a smaller number of boys who were aware of his status.  However, the District acknowledged that it did not present these options to the Student or his family.  The camp administrators and District confirmed that the District independently made the final decision to require the Student to stay in a separate cabin with his parent.  The District also stated that it sought advice on the camp accommodations from CDE, and that CDE agreed that the separate cabin was an acceptable arrangement for the Student.  However, CDE staff told OCR and DOJ that the District provided limited information regarding the camp and the Student's circumstances, and that they were not informed that the Student was well-accepted by his peers, some of whom had requested him as a cabin-mate, or that the camp administrators offered alternative sleeping accommodations.

In February 2012, during the pendency of the United States' investigation and as a result of a change in state law, the Student's parents obtained an identification document for the Student reflecting the Student's male gender; they provided this document to the District. Subsequently, the District began permitting the Student to use the boys' restrooms and locker rooms at the middle school in April 2012.  Since that time, the Student has used the male-designated facilities without experiencing any harassment and the District has indicated that there have been no incidents related to the Student's use of those facilities.  Although since April 2012 the District has permitted the Student to use the male-designated facilities, it has not developed any policies or procedures addressing the treatment of transgender students.

In January 2013, the Student's family notified the United States of its continuing questions and concerns about the permanence of the existing arrangements, particularly in light of the Student's impending matriculation at the District's high school.

On April 23, 2013, the United States shared with the District concerns about the District's response to the family's request that the Student be permitted access to sex-specific facilities prior to 2012, including that the District had not considered reasonable alternatives that would have been less burdensome on the Student during his sixth and seventh grade years. Additionally, the United States shared concerns about the District's unwillingness to recognize the Student's consistent and uniform gender presentation in the absence of an identification document.  The United States also conveyed the family's concern about future arrangements to the District.  Lastly, the United States shared with the District, and the District affirmed, that its investigation had not revealed safety or privacy issues for the Student or other students at the time of the complaints.

### Voluntary Resolution Agreement

The District, without admitting any violation of federal law, voluntarily agreed to enter into the attached Resolution Agreement with the United States to resolve the complaints. The Resolution Agreement memorializes the District's previous decisions to permit the Student to use male-designated facilities at school and on school-sponsored trips and to otherwise treat the Student as a boy in all respects. The District has also agreed to take other actions to ensure that the District continues to treat all students, including the Student and other transgender students, in a nondiscriminatory manner, including by amending its policies and procedures, training staff, and ensuring appropriate supports for the Student and other transgender students who request it.

### Conclusion

The United States has determined that, once implemented, the Resolution Agreement will resolve the issues in this complaint. Therefore, the United States is closing this complaint as of the date of this letter. The United States will monitor the implementation of the enclosed Resolution Agreement and may reopen the investigation if the District does not comply with the Agreement. The United States is notifying the Complainant of the closure of this complaint concurrently. This concludes the United States' investigation of this complaint and should not be interpreted to address the District's compliance with any other regulatory provision or to address any issues other than those addressed in this letter.

This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.

It is unlawful to harass, coerce, intimidate or discriminate against any individual who has filed a complaint, assisted in a compliance review, or participated in actions to secure protected rights.

Under the Freedom of Information Act, this document and related records may be released upon request or made public by the United States. In the event that the United States receives such a request or intends to make these documents public, the respective agency will seek to protect, to the extent provided by law, personal information that, if released, could reasonably be expected to constitute an unwarranted invasion of privacy.

The United States thanks you and your staff for your cooperation during this investigation. If you have any questions regarding this letter, please contact DOJ attorneys Whitney M. Pellegrino or Joseph J. Wardenski at (202) 514-4092, or OCR attorneys Zachary Pelchat, Suzanne Taylor, or Kendra Fox-Davis at (415) 486-5555.

Sincerely,

Anurima Bhargava, Chief
U.S. Department of Justice
Civil Rights Division
Educational Opportunities Section

Arthur Zeidman, Director
U.S. Department of Education
Office for Civil Rights
San Francisco Regional Office

Encl.

## RESOLUTION AGREEMENT

Between the Arcadia Unified School District,
the U.S. Department of Education, Office for Civil Rights, and
the U.S. Department of Justice, Civil Rights Division

OCR Case Number 09-12-1020
DOJ Case Number 169-12C-70

## BACKGROUND AND JURISDICTION

The U.S. Department of Education, Office for Civil Rights ("OCR") and the U.S. Department of Justice, Civil Rights Division ("DOJ") (jointly referred to as the "United States") investigated a complaint ("Complaint") filed against the Arcadia Unified School District ("District"), pursuant to Title IX of the Education Amendments of 1972 ("Title IX") and Title IV of the Civil Rights Act of 1964, 42 U.S.C. 2000c *et seq.* ("Title IV"). The Complaint alleged discrimination on the basis of sex against a student in the District ("Student"). The Student is a transgender boy who has consistently and uniformly presented as a boy at school and in all other aspects of his life for several years, as supported by documentation provided to the District by his family. The Student has been known, treated, and accepted as a male by his family, teachers, and classmates. Specifically, the Complaint alleged that the District denied the Student educational opportunities on the basis of sex when, because the Student is transgender, it prohibited him from accessing (1) sex-specific facilities designated for male students at school for use during school and extracurricular activities, and (2) sex-specific student cabins for male students during a school-sponsored overnight academic camp. Without admitting any unlawful conduct, in order to resolve the Complaint, the District agrees to implement this Resolution Agreement ("Agreement"), which includes individual and District-wide measures.

## DEFINITIONS

For the specific purposes of this Agreement, the following definitions apply:

A.    "Gender-based discrimination" is a form of sex discrimination, and refers to differential treatment or harassment of a student based on the student's sex, including gender identity, gender expression, and nonconformity with gender stereotypes, that results in the denial or limitation of education services, benefits, or opportunities. Conduct may constitute gender-based discrimination regardless of the actual or perceived sex, gender identity, or sexual orientation of the persons experiencing or engaging in the conduct.

B.    "Sex assigned at birth" and "assigned sex" refer to the gender designation listed on one's original birth certificate.

C.    "Gender expression" refers to external cues that one uses to represent or communicate one's gender to others, such as behavior, clothing, hairstyles, activities, voice, mannerisms, or body characteristics.

D.   "Gender identity" refers to one's internal sense of gender, which may be different from one's assigned sex, and which is consistently and uniformly asserted, or for which there is other evidence that the gender identity is sincerely held as part of the student's core identity.

E.   "Transgender" describes an individual whose gender identity is different from the individual's assigned sex.  "Transgender boy" and "transgender male" refer to an individual assigned the female sex at birth who has a male gender identity.  An individual can express or assert a transgender gender identity in a variety of ways, which may but do not always include specific medical treatments or procedures.  Medical treatments or procedures are not considered a prerequisite for one's recognition as transgender.  For purposes of this Agreement, a "transgender student" is a student who consistently and uniformly asserts a gender identity different from the student's assigned sex, or for which there is documented legal or medical evidence that the gender identity is sincerely held as part of the student's core identity.

F.   "Gender transition" refers to the experience by which a transgender person goes from living and identifying as one's assigned sex to living and identifying as the sex consistent with one's gender identity.  A gender transition often includes a "social transition," during which an individual begins to live and identify as the sex consistent with the individual's gender identity, with or without certain medical treatments or procedures.

G.   "Gender stereotypes" refers to stereotypical notions of masculinity and femininity, including expectations of how boys or girls represent or communicate one's gender to others, such as behavior, clothing, hairstyles, activities, voice, mannerisms, or body characteristics.

H.   "Gender nonconformity" refers to one's gender expression, gender characteristics, or gender identity that does not conform to gender stereotypes.

I.   "Sex-specific facilities" refers to facilities and accommodations used by students at school or during school-sponsored activities and trips, and include, but are not limited to, restrooms, locker rooms, and overnight facilities.

J.   "Parent" means a student's parent(s) or legal guardian(s).

## **TERMS OF THE AGREEMENT**

## I.   **EXPERT CONSULTANT**

A.   No later than ninety (90) calendar days after execution of this Agreement, the District will engage one or more third-party consultants with expertise in child and adolescent gender identity, including discrimination against transgender and gender nonconforming youth, to support and assist the District in implementing this Agreement.

2

B.    The consultant(s) will be agreed upon by both the District and the United States.

C.    The District will promptly notify the United States if it intends to retain additional or alternative consultants during the term of this Agreement for purposes of implementing this Agreement.

D.    The District will be responsible for all costs, if any, associated with the retention of expert consultants.

## II.    INDIVIDUAL MEASURES

A.    For the duration of the Student's enrollment in the District, the District will continue to:

1.    provide the Student access to sex-specific facilities designated for male students at school consistent with his gender identity; however, the Student may request access to private facilities based on privacy, safety, or other concerns;

2.    provide the Student access to sex-specific facilities designated for male students at all District-sponsored activities, including overnight events and extracurricular activities on and off campus, consistent with his gender identity; however, the Student may request access to private facilities based on privacy, safety, or other concerns;

3.    treat the Student the same as other male students in all respects in the education programs and activities offered by the District; and

4.    ensure that any school records containing the Student's birth name or reflecting the Student's assigned sex, if any, are treated as confidential, personally identifiable information; are maintained separately from the Student's records; and are not disclosed to any District employees, students, or others without the express written consent of the Student's parents or, after the Student turns 18 or is emancipated, the Student.

B.    The District will notify the Student and his parents that they may, at any point during the Student's enrollment in the District, request that the District establish a support team to ensure the Student has access and opportunity to participate in all programs and activities, and is otherwise protected from gender-based discrimination at school. If the District receives such a request, it will form a support team that will:

1.    include, at a minimum, the Student, his parents, an advocate or representative of the parents' choice (if any), a medical professional of the

3

parents' choice (if any), and relevant District personnel familiar with the Student;[1]

2.    develop a Student-specific support plan to provide the Student with safe and equitable access to all school and District facilities and activities, addressing any particular issues raised by the Student or his parents;

3.    document its meetings, recommendations, and decisions, including, but not limited to, the date and location of each meeting, the names and positions of all participants, the basis for its recommendations and decisions, and supporting third-party opinions and information considered and/or relied upon in the meeting; and

4.    at least once each school year and at any time upon the request of the Student or his parents, review the Student's particularized circumstances to determine whether existing arrangements related to the Student's gender identity, gender transition, or transgender status are meeting his educational needs and ensuring that the Student has equal access to and equal opportunity to participate in the District's education programs and activities.  Once constituted, the support team will be in place for the remainder of the Student's enrollment in the District or until his parents request in writing that it be terminated.

## III.    DISTRICT-WIDE MEASURES

A.    <u>Policies, Procedures, and Regulations</u>

1.    No later than November 30, 2013, the District, in consultation with its consultant(s) and following approval by the United States, will revise all of its policies, procedures, regulations, and related documents and materials (e.g., complaint forms, handbooks, notices to students and parents, website information) related to discrimination (including harassment) to:

a.    specifically include gender-based discrimination as a form of discrimination based on sex, and

b.    state that gender-based discrimination includes discrimination based on a student's gender identity, gender expression, gender transition, transgender status, or gender nonconformity.

2.    No later than January 31, 2014, the District, with the assistance of the consultant(s) and following approval by the United States, will ensure that its policies, procedures, and regulations applicable to or governing student

---

[1] The District will not bear the costs of the student's medical professional or advocate, if any.

participation in all programs and activities offered by the District provide all students, including transgender students and other students who do not conform to sex stereotypes, equal access to and equal opportunity to participate in all such programs and activities in a manner that does not discriminate based on sex.  The District will:

    a.    identify all existing policies and regulations applicable to or governing students' access to and participation in programs and activities offered by the District, and revise those policies and regulations as necessary to ensure that all students, including gender nonconforming and transgender students, are provided with equal access to all such programs and activities;

    b.    modify current policies or develop a comprehensive gender-based non-discrimination policy to ensure that all students, including transgender students, are protected from gender-based discrimination and have equal access to and  equal opportunity to participate in all education programs and activities offered by the District; and

    c.    develop an implementation guide for site administrators, faculty, and staff addressing the application of the District's gender-based discrimination policies, as adopted or modified under ¶ III.A.2.b. above, to transgender and gender nonconforming students.

3.    If the District is notified by a student, parent, or representative that the student is undertaking, planning to undergo, or has completed a gender transition, the District will promptly inform the notifying individual and the student of their right to request a support team of appropriate individuals to ensure that the student has equal access to and equal opportunity to participate in the District's programs and activities.

B.    <u>Instruction and Professional Development</u>

1.    Starting with the 2013-2014 school year, and then annually thereafter for the term of this Agreement, the District, in consultation with its consultant(s) and the United States, will provide training to all certificated District-level and school-based administrators regarding the District's obligations to prevent and address gender-based discrimination; implementation of the policies, procedures, and regulations adopted under this Agreement; and best practices for creating a nondiscriminatory school environment for transgender students.  The initial training will be conducted no later than March 31, 2014.  Site administrators will, throughout each school year, provide this information to all faculty and staff during existing trainings, meetings, and other appropriate opportunities.  No later than March 31, 2014, and by November 1 of each school year thereafter, the District will submit a plan, for the United

000130

States' review and approval, indicating how it intends to provide this information to faculty and staff.

2.   Consistent with the policies and procedures adopted in this Agreement and with applicable law, the District, in consultation with its consultant(s), will, in its bullying prevention and sexual harassment programs, provide age-appropriate instruction to all students on gender-based discrimination and will provide examples of prohibited conduct, including harassment, in various school-related contexts, including the types of conduct prohibited with respect to sex-specific facilities and elsewhere at school.

## IV.   MONITORING AND REPORTING

A.   For all policies, procedures, regulations, and other materials revised under this Agreement, the District will provide draft documents to the United States for its review no later than thirty (30) calendar days before the applicable deadline for implementation. The United States will provide comments no later than thirty (30) calendar days after its receipt of the draft documents. The parties will work in good faith to resolve any disagreements by the applicable deadline for implementation.

B.   The District will provide documentation of its compliance with this Agreement through written compliance reports, which will be produced to the United States on February 15 and August 15 of the first year this Agreement is in force, and annually thereafter on August 15 for each year this Agreement is in place. The first report will be due on February 15, 2014 and will contain information for the period running from the date of the execution of this Agreement through January 31, 2014. Each subsequent report will contain information for the period ending July 31 of the respective year. Each report will contain the following information and documents:

1.   the name(s), position(s), employer(s) or professional affiliation(s), and contact information of each consultant retained by the District in connection with this Agreement, as well as the start and end dates of each individual's services;

2.   a copy of all relevant policies, procedures, regulations, and related materials (e.g., handbooks) that were implemented, revised, or rescinded during the reporting period;

3.   a copy or detailed description of all gender-based discrimination or harassment complaints or incidents that occurred during the reporting period, including documentation or a detailed written description of the District's response to each incident;

4.   whether the District was notified during the reporting period that any student was undertaking, planning to undergo, or had completed a gender

6

000131

transition; and, if so, whether the District notified each such student and his/her parent of their right to request a support team; and whether any requests for a support team were made;

5.      for all support teams formed or that were in place during the reporting period (including for the Student), the names and positions of the team members, documentation of the request for the formation of the team, date(s) the team met, and any documentation of its meetings, recommendations, and decisions;

6.      a detailed description or documentation related to all trainings provided to District employees pursuant to this Agreement, including the date(s) of each training; and the name, position, and school/work site of each employee who was required, but did not attend the training;

7.      a detailed written description of any changes to the District's bullying prevention and sexual harassment programs made pursuant to this Agreement, including a copy of all relevant instructional materials; and

8.      a detailed written description of the District's compliance with the individual measures required by Section II of this Agreement, as well as all documentation related to the Student's support team and support plan.

C.      The District will provide all reports, documents, and information required to be produced to the United States pursuant to this Agreement in electronic form, usable by the United States, or in written form if the data in electronic form would not be usable, in accordance with the timelines set herein.

D.      The District will produce to the United States all reports, documents, and information required by this Agreement, including those containing students' personally identifiable information ("PII") from education records. Pursuant to the law enforcement exception to the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g(b)(1)(C) and (3), which applies to the United States in this matter, the United States may receive documents containing PII from education records in connection with the enforcement of the federal legal requirements which relate to federally supported education programs. *See* 20 U.S.C § 1232g(b)(1)(C)(ii). The United States will maintain the confidentiality of all such information produced by the District, consistent with the Privacy Act of 1974, 5 U.S.C. § 552a, the Freedom of Information Act, 5 U.S.C. § 552, and FERPA.

000132

## V.    ENFORCEMENT

A.    The United States may enforce the terms of this Agreement, Title IX, Title IV, and all other applicable federal laws.

B.    OCR will not initiate enforcement action and DOJ will not initiate litigation regarding the Complaint provided that the District implements the provisions of this Agreement in good faith.[2]

C.    If OCR or DOJ determines that the District has failed to comply with the terms of this Agreement or has failed to comply in a timely manner, one or both agencies will so notify the District in writing and will attempt to resolve the issue(s) in good faith with the District.  If the United States is unable to reach a satisfactory resolution of the issue(s) within sixty (60) calendar days of providing notice to the District, OCR may initiate administrative compliance proceedings[3] and DOJ may initiate civil enforcement proceedings in federal court.

D.    The District understands that the United States will monitor this Agreement until it determines that the District has fulfilled the terms of this Agreement.  Sections I and III of this Agreement may not be terminated prior to June 30, 2016.  Section II of this Agreement may not be terminated prior to the Student's withdrawal or graduation from the District, whichever is sooner.

E.    The District further understands that the United States retains the right to evaluate the District's compliance with this Agreement, including the right to conduct site visits, observe trainings, interview District staff and students (including *ex parte* communications with students and employees other than school and District administrators), and, if necessary, request additional reports or data.

---

[2] As of the date of this Agreement, litigation is not "reasonably foreseeable" concerning the matters described herein.  To the extent that any party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described herein, the party is no longer required to maintain such a litigation hold.  Nothing in this paragraph relieves any party of any other obligations imposed by this Agreement.

[3] OCR may initiate compliance proceedings under 34 C.F.R §§ 100.8-100.12 and 34 C.F.R Part 101.

000133

**FOR THE UNITED STATES OF AMERICA:**

For the U.S. Department of Education:

ARTHUR ZEIDMAN
Director
OCR San Francisco

Zachary Pelchat
Suzanne Taylor
Kendra Fox-Davis
Gayle Sakowski
U.S. Department of Education
Office for Civil Rights
50 Beale Street, Suite 7200
San Francisco, CA 94105
Tel: (415) 486-5555
Fax: (415) 486-5570

Date: July 24, 2013

For the U.S. Department of Justice:

ANURIMA BHARGAVA
Chief
Educational Opportunities Section

Whitney M. Pellegrino
Joseph J. Wardenski
U.S. Department of Justice
Civil Rights Division
Educational Opportunities Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel: (202) 514-4092
Fax: (202) 514-8337

Date: July 24, 2013

9

000134

**FOR THE ARCADIA UNIFIED SCHOOL
DISTRICT:**

DAVID VANNASDALL
Deputy Superintendent, Educational Services
and Programs
Arcadia Unified School District
234 Campus Drive
Arcadia, CA 91006
Tel: (626) 821-8300
Fax: (626) 821-8647

Date:   7-24-13

10

000135

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

### Questions and Answers on Title IX and Sexual Violence[1]

Title IX of the Education Amendments of 1972 ("Title IX")[2] is a federal civil rights law that prohibits discrimination on the basis of sex in federally funded education programs and activities. All public and private elementary and secondary schools, school districts, colleges, and universities receiving any federal financial assistance (hereinafter "schools", "recipients", or "recipient institutions") must comply with Title IX.[3]

On April 4, 2011, the Office for Civil Rights (OCR) in the U.S. Department of Education issued a Dear Colleague Letter on student-on-student sexual harassment and sexual violence ("DCL").[4] The DCL explains a school's responsibility to respond promptly and effectively to sexual violence against students in accordance with the requirements of Title IX.[5] Specifically, the DCL:

- Provides guidance on the unique concerns that arise in sexual violence cases, such as a school's independent responsibility under Title IX to investigate (apart from any separate criminal investigation by local police)  and address sexual violence.

---

[1] The Department has determined that this document is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), *available at* www.whitehouse.gov/sites/default/files/omb/fedreg/2007/012507_good_guidance.pdf. The Office for Civil Rights (OCR) issues this and other policy guidance to provide recipients with information to assist them in meeting their obligations, and to provide members of the public with information about their rights, under the civil rights laws and implementing regulations that we enforce. OCR's legal authority is based on those laws and regulations. This guidance does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations. If you are interested in commenting on this guidance, please send an e-mail with your comments to OCR@ed.gov, or write to the following address: Office for Civil Rights, U.S. Department of Education, 400 Maryland Avenue, SW, Washington, D.C. 20202.
[2] 20 U.S.C. § 1681 *et seq*.
[3] Throughout this document the term "schools" refers to recipients of federal financial assistance that operate educational programs or activities. For Title IX purposes, at the elementary and secondary school level, the recipient generally is the school district; and at the postsecondary level, the recipient is the individual institution of higher education. An educational institution that is controlled by a religious organization is exempt from Title IX to the extent that the law's requirements conflict with the organization's religious tenets. 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12(a). For application of this provision to a specific institution, please contact the appropriate OCR regional office.
[4] Available at http://www.ed.gov/ocr/letters/colleague-201104.html.
[5] Although this document and the DCL focus on sexual violence, the legal principles generally also apply to other forms of sexual harassment.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

- Provides guidance and examples about key Title IX requirements and how they relate to sexual violence, such as the requirements to publish a policy against sex discrimination, designate a Title IX coordinator, and adopt and publish grievance procedures.

- Discusses proactive efforts schools can take to prevent sexual violence.

- Discusses the interplay between Title IX, the Family Educational Rights and Privacy Act ("FERPA"),[6] and the Jeanne Clery Disclosure of Campus Securit  and Campus Crime Statistics Act ("Clery Act")[7] as it relates to a complainant's right to know the outcome of his or her complaint, including relevant sanctions imposed on the perpetrator.

- Provides examples of remedies and enforcement strategies that schools and OCR may use to respond to sexual violence.

The DCL supplements OCR's *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, issued in 2001 (*2001 Guidance*).[8] The *2001 Guidance* discusses in detail the Title IX requirements related to sexual harassment of students by school employees, other students, or third parties. The DCL and the *2001 Guidance* remain in full force and we recommend reading these Questions and Answers in conjunction with these documents.

In responding to requests for technical assistance, OCR has determined that elementary and secondary schools and postsecondary institutions would benefit from additional guidance concerning their obligations under Title IX to address sexual violence as a form of sexual harassment. The following questions and answers further clarify the legal requirements and guidance articulated in the DCL and the *2001 Guidance* and include examples of proactive efforts schools can take to prevent sexual violence and remedies schools may use to end such conduct, prevent its recurrence, and address its effects. In order to gain a complete understanding of these legal requirements and recommendations, this document should be read in full.


Authorized by

   /s/

Catherine E. Lhamon                          April 29, 2014
Assistant Secretary for Civil Rights

---

[6] 20 U.S.C. §1232g; 34 C.F.R. Part 99.
[7] 20 U.S.C. §1092(f).
[8] Available at http://www.ed.gov/ocr/docs/shguide.html.

000137

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

## Notice of Language Assistance
## Questions and Answers on Title IX and Sexual Violence

**Notice of Language Assistance:** If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

**給英語能力有限人士的通知:** 如果您不懂英語，或者使用英语有困难，您可以要求獲得向大眾提供的語言協助服務，幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊，請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339),或電郵: Ed.Language.Assistance@ed.gov.。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức của Bộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

**영어 미숙자를 위한 공고:** 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에 일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로 제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800-USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는 이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkol sa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вам предоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877-8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**TABLE OF CONTENTS**

**Notice of Language Assistance** ...................................................................................................... iii

**A.  A School's Obligation to Respond to Sexual Violence** ............................................................. 1

    A-1.  What is sexual violence? ............................................................................................ 1

    A-2.  How does Title IX apply to student-on-student sexual violence? ....................................... 1

    A-3.  How does OCR determine if a hostile environment has been created? ............................. 1

    A-4.  When does OCR consider a school to have notice of student-on-student sexual violence? ...................................................................................................................... 2

    A-5.  What are a school's basic responsibilities to address student-on-student sexual violence? ...................................................................................................................... 2

    A-6.  Does Title IX cover employee-on-student sexual violence, such as sexual abuse of children? ....................................................................................................................... 3

**B.  Students Protected by Title IX** ............................................................................................... 5

    B-1.  Does Title IX protect all students from sexual violence? ................................................. 5

    B-2.  How should a school handle sexual violence complaints in which the complainant and the alleged perpetrator are members of the same sex? ............................................... 5

    B-3.  What issues may arise with respect to students with disabilities who experience sexual violence? ......................................................................................................... 6

    B-4.  What issues arise with respect to international students and undocumented students who experience sexual violence? .................................................................... 7

    B-5.  How should a school respond to sexual violence when the alleged perpetrator is not affiliated with the school? ..................................................................................... 9

**C.  Title IX Procedural Requirements** ........................................................................................ 9

    C-1.  What procedures must a school have in place to prevent sexual violence and resolve complaints? ..................................................................................................... 9

    C-2.  What information must be included in a school's notice of nondiscrimination? ............. 10

    C-3.  What are a Title IX coordinator's responsibilities? ........................................................ 10

    C-4.  Are there any employees who should not serve as the Title IX coordinator? .................. 11

    C-5.  Under Title IX, what elements should be included in a school's procedures for responding to complaints of sexual violence? .............................................................. 12

    C-6.  Is a school required to use separate grievance procedures for sexual violence complaints? ................................................................................................................ 14

000139

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**D. Responsible Employees and Reporting** ...................................................................**14**

    D-1. Which school employees are obligated to report incidents of possible sexual violence to school officials? ...................................................................14

    D-2. Who is a "responsible employee"? ...................................................................15

    D-3. What information is a responsible employee obligated to report about an incident of possible student-on-student sexual violence? ...................................................16

    D-4. What should a responsible employee tell a student who discloses an incident of sexual violence? ...................................................................16

    D-5. If a student informs a resident assistant/advisor (RA) that he or she was subjected to sexual violence by a fellow student, is the RA obligated under Title IX to report the incident to school officials? ...................................................................17

**E. Confidentiality and a School's Obligation to Respond to Sexual Violence** ...................**18**

    E-1. How should a school respond to a student's request that his or her name not be disclosed to the alleged perpetrator or that no investigation or disciplinary action be pursued to address the alleged sexual violence? ...................................................18

    E-2. What factors should a school consider in weighing a student's request for confidentiality? ...................................................................21

    E-3. What are the reporting responsibilities of school employees who provide or support the provision of counseling, advocacy, health, mental health, or sexual assault-related services to students who have experienced sexual violence? .................22

    E-4. Is a school required to investigate information regarding sexual violence incidents shared by survivors during public awareness events, such as "Take Back the Night"? ...................................................................24

**F. Investigations and Hearings** ...................................................................**24**

    F-1. What elements should a school's Title IX investigation include? ...................................24

    F-2. What are the key differences between a school's Title IX investigation into allegations of sexual violence and a criminal investigation? ...................................27

    F-3. How should a school proceed when campus or local law enforcement agencies are conducting a criminal investigation while the school is conducting a parallel Title IX investigation? ...................................................................28

    F-4. Is a school required to process complaints of alleged sexual violence that occurred off campus? ...................................................................29

    F-5. Must a school allow or require the parties to be present during an entire hearing? ........30

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

F-6.   May every witness at the hearing, including the parties, be cross-examined? ................ 31

F-7.   May the complainant's sexual history be introduced at hearings? ................................... 31

F-8.   What stages of the investigation are included in the 60-day timeframe referenced
       in the DCL as the length for a typical investigation? ........................................................ 31

**G. Interim Measures** ...................................................................................................................**32**

G-1.   Is a school required to take any interim measures before the completion of its
       investigation?..................................................................................................................... 32

G-2.   How should a school determine what interim measures to take? ................................... 33

G-3.   If a school provides all students with access to counseling on a fee basis, does that
       suffice for providing counseling as an interim measure?.................................................. 33

**H. Remedies and Notice of Outcome** .........................................................................................**34**

H-1.   What remedies should a school consider in a case of student-on-student sexual
       violence? ............................................................................................................................ 34

H-2.   If, after an investigation, a school finds the alleged perpetrator responsible and
       determines that, as part of the remedies for the complainant, it must separate the
       complainant and perpetrator, how should the school accomplish this if both
       students share the same major and there are limited course options? ........................... 36

H-3.   What information must be provided to the complainant in the notice of the
       outcome? ............................................................................................................................ 36

**I. Appeals** ....................................................................................................................................**37**

I-1.   What are the requirements for an appeals process? ........................................................ 37

I-2.   Must an appeal be available to a complainant who receives a favorable finding but
       does not believe a sanction that directly relates to him or her was sufficient? ............... 38

**J. Title IX Training, Education and Prevention** ..........................................................................**38**

J-1.   What type of training on Title IX and sexual violence should a school provide to its
       employees?......................................................................................................................... 38

J-2.   How should a school train responsible employees to report incidents of possible
       sexual harassment or sexual violence? ............................................................................. 39

J-3.   What type of training should a school provide to employees who are involved in
       implementing the school's grievance procedures?........................................................... 40

J-4.   What type of training on sexual violence should a school provide to its students?.......... 41

000141

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**K.  Retaliation** ................................................................................................................**42**

  K-1.  Does Title IX protect against retaliation? ..........................................................  42

**L.  First Amendment** .......................................................................................................**43**

  L-1.  How should a school handle its obligation to respond to sexual harassment and sexual violence while still respecting free-speech rights guaranteed by the Constitution? ...................................................................................................  43

**M.  The Clery Act and the Violence Against Women Reauthorization Act of 2013** ......................**44**

  M-1.  How does the Clery Act affect the Title IX obligations of institutions of higher education that participate in the federal student financial aid programs? ......................  44

  M-2.  Were a school's obligations under Title IX and the DCL altered in any way by the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, including Section 304 of that Act, which amends the Clery Act? ......................................................  44

**N.  Further Federal Guidance** ..................................................................... .................................**45**

  N-1.  Whom should I contact if I have additional questions about the DCL or OCR's other Title IX guidance? ..........................................................................................................  45

  N-2.  Are there other resources available to assist a school in complying with Title IX and preventing and responding to sexual violence? ................................................................  45

000142

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**A.  A School's Obligation to Respond to Sexual Violence**

**A-1.  What is sexual violence?**

Answer:  Sexual violence, as that term is used in this document and prior OCR guidance, refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent (*e.g.*, due to the student's age or use of drugs or alcohol, or because an intellectual or other disability prevents the student from having the capacity to give consent). A number of different acts fall into the category of sexual violence, including rape, sexual assault, sexual battery, sexual abuse, and sexual coercion. Sexual violence can be carried out by school employees, other students, or third parties. All such acts of sexual violence are forms of sex discrimination prohibited by Title IX.

**A-2.  How does Title IX apply to student-on-student sexual violence?**

Answer:  Under Title IX, federally funded schools must ensure that students of all ages are not denied or limited in their ability to participate in or benefit from the school's educational programs or activities on the basis of sex. A school violates a student's rights under Title IX regarding student-on-student sexual violence when the following conditions are met: (1) the alleged conduct is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's educational program, *i.e.* creates a hostile environment; and (2) the school, upon notice, fails to take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects.[9]

**A-3.  How does OCR determine if a hostile environment has been created?**

Answer:  As discussed more fully in OCR's *2001 Guidance*, OCR considers a variety of related factors to determine if a hostile environment has been created; and also considers the conduct in question from both a subjective and an objective perspective. Specifically, OCR's standards require that the conduct be evaluated from the perspective of a reasonable person in the alleged victim's position, considering all the circumstances. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical. Indeed, a single or isolated incident of sexual violence may create a hostile environment.

---

[9] This is the standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief. *See 2001 Guidance* at ii-v, 12-13.  The standard in private lawsuits for monetary damages is actual knowledge and deliberate indifference. *See Davis v. Monroe Cnty Bd. of Educ.*, 526 U.S. 629, 643 (1999).

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**A-4.  When does OCR consider a school to have notice of student-on-student sexual violence?**

**Answer:**  OCR deems a school to have notice of student-on-student sexual violence if a responsible employee knew, or in the exercise of reasonable care should have known, about the sexual violence. See question D-2 regarding who is a responsible employee.

A school can receive notice of sexual violence in many different ways. Some examples of notice include: a student may have filed a grievance with or otherwise informed the school's Title IX coordinator; a student, parent, friend, or other individual may have reported an incident to a teacher, principal, campus law enforcement, staff in the office of student affairs, or other responsible employee; or a teacher or dean may have witnessed the sexual violence.

The school may also receive notice about sexual violence in an indirect manner, from sources such as a member of the local community, social networking sites, or the media. In some situations, if the school knows of incidents of sexual violence, the exercise of reasonable care should trigger an investigation that would lead to the discovery of additional incidents. For example, if school officials receive a credible report that a student has perpetrated several acts of sexual violence against different students, that pattern of conduct should trigger an inquiry as to whether other students have been subjected to sexual violence by that student. In other cases, the pervasiveness of the sexual violence may be widespread, openly practiced, or well-known among students or employees. In those cases, OCR may conclude that the school should have known of the hostile environment. In other words, if the school would have found out about the sexual violence had it made a proper inquiry, knowledge of the sexual violence will be imputed to the school even if the school failed to make an inquiry. A school's failure to take prompt and effective corrective action in such cases (as described in questions G-1 to G-3 and H-1 to H-3) would violate Title IX even if the student did not use the school's grievance procedures or otherwise inform the school of the sexual violence.

**A-5.  What are a school's basic responsibilities to address student-on-student sexual violence?**

**Answer:**  When a school knows or reasonably should know of possible sexual violence, it must take immediate and appropriate steps to investigate or otherwise determine what occurred (subject to the confidentiality provisions discussed in Section E). If an investigation reveals that sexual violence created a hostile environment, the school must then take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

effects. But a school should not wait to take steps to protect its students until students have already been deprived of educational opportunities.

Title IX requires a school to protect the complainant and ensure his or her safety as necessary, including taking interim steps before the final outcome of any investigation.[10] The school should take these steps promptly once it has notice of a sexual violence allegation and should provide the complainant with periodic updates on the status of the investigation. If the school determines that the sexual violence occurred, the school must continue to take these steps to protect the complainant and ensure his or her safety, as necessary. The school should also ensure that the complainant is aware of any available resources, such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance, and the right to report a crime to campus or local law enforcement. For additional information on interim measures, see questions G-1 to G-3.

If a school delays responding to allegations of sexual violence or responds inappropriately, the school's own inaction may subject the student to a hostile environment. If it does, the school will also be required to remedy the effects of the sexual violence that could reasonably have been prevented had the school responded promptly and appropriately. For example, if a school's ignoring of a student's complaints of sexual assault by a fellow student results in the complaining student having to remain in classes with the other student for several weeks and the complaining student's grades suffer because he or she was unable to concentrate in these classes, the school may need to permit the complaining student to retake the classes without an academic or financial penalty (in addition to any other remedies) in order to address the effects of the sexual violence.

**A-6. Does Title IX cover employee-on-student sexual violence, such as sexual abuse of children?**

**Answer:** Yes. Although this document and the DCL focus on student-on-student sexual violence, Title IX also protects students from other forms of sexual harassment (including sexual violence and sexual abuse), such as sexual harassment carried out by school employees. Sexual harassment by school employees can include unwelcome sexual advances; requests for sexual favors; and other verbal, nonverbal, or physical conduct of a sexual nature, including but not limited to sexual activity. Title IX's prohibition against

---

[10] Throughout this document, unless otherwise noted, the term "complainant" refers to the student who allegedly experienced the sexual violence.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

sexual harassment generally does not extend to legitimate nonsexual touching or other nonsexual conduct. But in some circumstances, nonsexual conduct may take on sexual connotations and rise to the level of sexual harassment. For example, a teacher repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment. Early signs of inappropriate behavior with a child can be the key to identifying and preventing sexual abuse by school personnel.

A school's Title IX obligations regarding sexual harassment by employees can, in some instances, be greater than those described in this document and the DCL. Recipients should refer to OCR's *2001 Guidance* for further information about Title IX obligations regarding harassment of students by school employees. In addition, many state and local laws have mandatory reporting requirements for schools working with minors. Recipients should be careful to satisfy their state and local legal obligations in addition to their Title IX obligations, including training to ensure that school employees are aware of their obligations under such state and local laws and the consequences for failing to satisfy those obligations.

With respect to sexual activity in particular, OCR will always view as unwelcome and nonconsensual sexual activity between an adult school employee and an elementary school student or any student below the legal age of consent in his or her state. In cases involving a student who meets the legal age of consent in his or her state, there will still be a strong presumption that sexual activity between an adult school employee and a student is unwelcome and nonconsensual. When a school is on notice that a school employee has sexually harassed a student, it is responsible for taking prompt and effective steps reasonably calculated to end the sexual harassment, eliminate the hostile environment, prevent its recurrence, and remedy its effects. Indeed, even if a school was not on notice, the school is nonetheless responsible for remedying any effects of the sexual harassment on the student, as well as for ending the sexual harassment and preventing its recurrence, when the employee engaged in the sexual activity in the context of the employee's provision of aid, benefits, or services to students (*e.g.*, teaching, counseling, supervising, advising, or transporting students).

A school should take steps to protect its students from sexual abuse by its employees. It is therefore imperative for a school to develop policies prohibiting inappropriate conduct by school personnel and procedures for identifying and responding to such conduct. For example, this could include implementing codes of conduct, which might address what is commonly known as grooming – a desensitization strategy common in adult educator sexual misconduct. Such policies and procedures can ensure that students, parents, and

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

school personnel have clear guidelines on what are appropriate and inappropriate interactions between adults and students in a school setting or in school-sponsored activities. Additionally, a school should provide training for administrators, teachers, staff, parents, and age-appropriate classroom information for students to ensure that everyone understands what types of conduct are prohibited and knows how to respond when problems arise.[11]

**B.   Students Protected by Title IX**

**B-1.  Does Title IX protect all students from sexual violence?**

**Answer:**  Yes. Title IX protects all students at recipient institutions from sex discrimination, including sexual violence. Any student can experience sexual violence: from elementary to professional school students; male and female students; straight, gay, lesbian, bisexual and transgender students; part-time and full-time students; students with and without disabilities; and students of different races and national origins.

**B-2.  How should a school handle sexual violence complaints in which the complainant and the alleged perpetrator are members of the same sex?**

**Answer:**  A school's obligation to respond appropriately to sexual violence complaints is the same irrespective of the sex or sexes of the parties involved. Title IX protects all students from sexual violence, regardless of the sex of the alleged perpetrator or complainant, including when they are members of the same sex. A school must investigate and resolve allegations of sexual violence involving parties of the same sex using the same procedures and standards that it uses in all complaints involving sexual violence.

Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity and OCR accepts such complaints for investigation. Similarly, the actual or perceived sexual orientation or gender identity of the parties does not change a school's obligations. Indeed, lesbian, gay, bisexual, and transgender (LGBT) youth report high rates of sexual harassment and sexual violence. A school should investigate and resolve allegations of sexual violence regarding LGBT students using the same procedures and standards that it

---

[11] For additional informational on training please see the Department of Education's Resource and Emergency Management for Schools Technical Assistance Center – Adult Sexual Misconduct in Schools: Prevention and Management Training, available at http://rems.ed.gov/Docs/ASM_Marketing_Flyer.pdf.

000147

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

uses in all complaints involving sexual violence. The fact that incidents of sexual violence may be accompanied by anti-gay comments or be partly based on a student's actual or perceived sexual orientation does not relieve a school of its obligation under Title IX to investigate and remedy those instances of sexual violence.

If a school's policies related to sexual violence include examples of particular types of conduct that violate the school's prohibition on sexual violence, the school should consider including examples of same-sex conduct. In addition, a school should ensure that staff are capable of providing culturally competent counseling to all complainants. Thus, a school should ensure that its counselors and other staff who are responsible for receiving and responding to complaints of sexual violence, including investigators and hearing board members, receive appropriate training about working with LGBT and gender-nonconforming students and same-sex sexual violence. See questions J-1 to J-4 for additional information regarding training.

Gay-straight alliances and similar student-initiated groups can also play an important role in creating safer school environments for LGBT students. On June 14, 2011, the Department issued guidance about the rights of student-initiated groups in public secondary schools under the Equal Access Act. That guidance is available at http://www2.ed.gov/policy/elsec/guid/secletter/110607.html.

**B-3. What issues may arise with respect to students with disabilities who experience sexual violence?**

**Answer:** When students with disabilities experience sexual violence, federal civil rights laws other than Title IX may also be relevant to a school's responsibility to investigate and address such incidents.[12] Certain students require additional assistance and support. For example, students with intellectual disabilities may need additional help in learning about sexual violence, including a school's sexual violence education and prevention programs, what constitutes sexual violence and how students can report incidents of sexual

---

[12] OCR enforces two civil rights laws that prohibit disability discrimination. Section 504 of the Rehabilitation Act of 1973 (Section 504) prohibits disability discrimination by public or private entities that receive federal financial assistance, and Title II of the American with Disabilities Act of 1990 (Title II) prohibits disability discrimination by all state and local public entities, regardless of whether they receive federal funding. *See* 29 U.S.C. § 794 and 34 C.F.R. part 104; 42 U.S.C. § 12131 *et seq.* and 28 C.F.R. part 35. OCR and the U.S. Department of Justice (DOJ) share the responsibility of enforcing Title II in the educational context. The Department of Education's Office of Special Education Programs in the Office of Special Education and Rehabilitative Services administers Part B of the Individuals with Disabilities Education Act (IDEA). 20 U.S.C. 1400 *et seq.* and 34 C.F.R. part 300. IDEA provides financial assistance to states, and through them to local educational agencies, to assist in providing special education and related services to eligible children with disabilities ages three through twenty-one, inclusive.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

violence. In addition, students with disabilities who experience sexual violence may require additional services and supports, including psychological services and counseling services. Postsecondary students who need these additional services and supports can seek assistance from the institution's disability resource office.

A student who has not been previously determined to have a disability may, as a result of experiencing sexual violence, develop a mental health-related disability that could cause the student to need special education and related services. At the elementary and secondary education level, this may trigger a school's child find obligations under IDEA and the evaluation and placement requirements under Section 504, which together require a school to evaluate a student suspected of having a disability to determine if he or she has a disability that requires special education or related aids and services.[13]

A school must also ensure that any school reporting forms, information, or training about sexual violence be provided in a manner that is accessible to students and employees with disabilities, for example, by providing electronically-accessible versions of paper forms to individuals with print disabilities, or by providing a sign language interpreter to a deaf individual attending a training. See question J-4 for more detailed information on student training.

**B-4.  What issues arise with respect to international students and undocumented students who experience sexual violence?**

**Answer:** Title IX protects all students at recipient institutions in the United States regardless of national origin, immigration status, or citizenship status.[14] A school should ensure that all students regardless of their immigration status, including undocumented students and international students, are aware of their rights under Title IX. A school must also ensure that any school reporting forms, information, or training about sexual violence be provided in a manner accessible to students who are English language learners. OCR recommends that a school coordinate with its international office and its undocumented student program coordinator, if applicable, to help communicate information about Title IX in languages that are accessible to these groups of students. OCR also encourages schools to provide foreign national complainants with information about the U nonimmigrant status and the T nonimmigrant status. The U nonimmigrant status is set

---

[13] See 34 C.F.R. §§ 300.8; 300.111; 300.201; 300.300-300.311 (IDEA); 34 C.F.R. §§ 104.3(j) and 104.35 (Section 504). Schools must comply with applicable consent requirements with respect to evaluations. See 34 C.F.R. § 300.300.
[14] OCR enforces Title VI of the Civil Rights Act of 1964, which prohibits discrimination by recipients of federal financial assistance on the basis of race, color, or national origin. 42 U.S.C. § 2000d.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

aside for victims of certain crimes who have suffered substantial mental or physical abuse as a result of the crime and are helpful to law enforcement agency in the investigation or prosecution of the qualifying criminal activity.[15]  The T nonimmigrant status  is available for victims of severe forms of human trafficking who generally comply with a law enforcement agency in the investigation or prosecution of the human trafficking and who would suffer extreme hardship involving unusual and severe harm if they were removed from the United States.[16]

A school should be mindful that unique issues may arise when a foreign student on a student visa experiences sexual violence. For example, certain student visas require the student to maintain a full-time course load (generally at least 12 academic credit hours per term), but a student may need to take a reduced course load while recovering from the immediate effects of the sexual violence. OCR recommends that a school take steps to ensure that international students on student visas understand that they must typically seek prior approval of the designated school official (DSO) for student visas to drop below a full-time course load. A school may also want to encourage its employees involved in handling sexual violence complaints and counseling students who have experienced sexual violence to approach the DSO on the student's behalf if the student wishes to drop below a full-time course load. OCR recommends that a school take steps to ensure that its employees who work with international students, including the school's DSO, are trained on the school's sexual violence policies and that employees involved in handling sexual violence complaints and counseling students who have experienced sexual violence are aware of the special issues that international students may encounter. See questions J-1 to J-4 for additional information regarding training.

A school should also be aware that threatening students with deportation or invoking a student's immigration status in an attempt to intimidate or deter a student from filing a Title IX complaint would violate Title IX's protections against retaliation. For more information on retaliation see question K-1.

---

[15] For more information on the U nonimmigrant status, see http://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/questions-answers-victims-criminal-activity-u-nonimmigrant-status.
[16] For more information on the T nonimmigrant status, see http://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-human-trafficking-t-nonimmigrant-status.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**B-5. How should a school respond to sexual violence when the alleged perpetrator is not affiliated with the school?**

**Answer:** The appropriate response will differ depending on the level of control the school has over the alleged perpetrator. For example, if an athlete or band member from a visiting school sexually assaults a student at the home school, the home school may not be able to discipline or take other direct action against the visiting athlete or band member. However (and subject to the confidentiality provisions discussed in Section E), it should conduct an inquiry into what occurred and should report the incident to the visiting school and encourage the visiting school to take appropriate action to prevent further sexual violence. The home school should also notify the student of any right to file a complaint with the alleged perpetrator's school or local law enforcement. The home school may also decide not to invite the visiting school back to its campus.

Even though a school's ability to take direct action against a particular perpetrator may be limited, the school must still take steps to provide appropriate remedies for the complainant and, where appropriate, the broader school population. This may include providing support services for the complainant, and issuing new policy statements making it clear that the school does not tolerate sexual violence and will respond to any reports about such incidents. For additional information on interim measures see questions G-1 to G-3.

**C. Title IX Procedural Requirements**

*Overview*

**C-1. What procedures must a school have in place to prevent sexual violence and resolve complaints?**

**Answer:** The Title IX regulations outline three key procedural requirements. Each school must:

(1) disseminate a notice of nondiscrimination (see question C-2);[17]

(2) designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX (see questions C-3 to C-4);[18] and

---

[17] 34 C.F.R. § 106.9.
[18] *Id.* § 106.8(a).

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

(3) adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee sex discrimination complaints (see questions C-5 to C-6).[19]

These requirements apply to all forms of sex discrimination and are particularly important for preventing and effectively responding to sexual violence.

Procedural requirements under other federal laws may also apply to complaints of sexual violence, including the requirements of the Clery Act.[20] For additional information about the procedural requirements in the Clery Act, please see http://www2.ed.gov/admins/lead/safety/campus.html.

*Notice of Nondiscrimination*

**C-2.   What information must be included in a school's notice of nondiscrimination?**

**Answer:**  The notice of nondiscrimination must state that the school does not discriminate on the basis of sex in its education programs and activities, and that it is required by Title IX not to discriminate in such a manner. The notice must state that questions regarding Title IX may be referred to the school's Title IX coordinator or to OCR. The school must notify all of its students and employees of the name or title, office address, telephone number, and email address of the school's designated Title IX coordinator.[21]

*Title IX Coordinator*

**C-3.   What are a Title IX coordinator's responsibilities?**

**Answer:**  A Title IX coordinator's core responsibilities include overseeing the school's response to Title IX reports and complaints and identifying and addressing any patterns or systemic problems revealed by such reports and complaints. This means that the Title IX coordinator must have knowledge of the requirements of Title IX, of the school's own policies and procedures on sex discrimination, and of all complaints raising Title IX issues throughout the school. To accomplish this, subject to the exemption for school counseling employees discussed in question E-3, the Title IX coordinator must be informed of all

_____

[19] *Id.* § 106.8(b).
[20] All postsecondary institutions participating in the Higher Education Act's Title IV student financial assistance programs must comply with the Clery Act.
[21] For more information on notices of nondiscrimination, please see OCR's Notice of Nondiscrimination (August 2010), available at http://www.ed.gov/ocr/docs/nondisc.pdf.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

reports and complaints raising Title IX issues, even if the report or complaint was initially filed with another individual or office or if the investigation will be conducted by another individual or office. The school should ensure that the Title IX coordinator is given the training, authority, and visibility necessary to fulfill these responsibilities.

Because the Title IX coordinator must have knowledge of all Title IX reports and complaints at the school, this individual (when properly trained) is generally in the best position to evaluate a student's request for confidentiality in the context of the school's responsibility to provide a safe and nondiscriminatory environment for all students. A school may determine, however, that another individual should perform this role. For additional information on confidentiality requests, see questions E-1 to E-4. If a school relies in part on its disciplinary procedures to meet its Title IX obligations, the Title IX coordinator should review the disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX as discussed in question C-5.

In addition to these core responsibilities, a school may decide to give its Title IX coordinator additional responsibilities, such as: providing training to students, faculty, and staff on Title IX issues; conducting Title IX investigations, including investigating facts relevant to a complaint, and determining appropriate sanctions against the perpetrator and remedies for the complainant; determining appropriate interim measures for a complainant upon learning of a report or complaint of sexual violence; and ensuring that appropriate policies and procedures are in place for working with local law enforcement and coordinating services with local victim advocacy organizations and service providers, including rape crisis centers. A school must ensure that its Title IX coordinator is appropriately trained in all areas over which he or she has responsibility. The Title IX coordinator or designee should also be available to meet with students as needed.

If a school designates more than one Title IX coordinator, the school's notice of nondiscrimination and Title IX grievance procedures should describe each coordinator's responsibilities, and one coordinator should be designated as having ultimate oversight responsibility.

**C-4.  Are there any employees who should not serve as the Title IX coordinator?**

**Answer:**  Title IX does not categorically preclude particular employees from serving as Title IX coordinators. However, Title IX coordinators should not have other job responsibilities that may create a conflict of interest. Because some complaints may raise issues as to whether or how well the school has met its Title IX obligations, designating

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

the same employee to serve both as the Title IX coordinator and the general counsel (which could include representing the school in legal claims alleging Title IX violations) poses a serious risk of a conflict of interest. Other employees whose job responsibilities may conflict with a Title IX coordinator's responsibilities include Directors of Athletics, Deans of Students, and any employee who serves on the judicial/hearing board or to whom an appeal might be made. Designating a full-time Title IX coordinator will minimize the risk of a conflict of interest.

*Grievance Procedures*

**C-5.  Under Title IX, what elements should be included in a school's procedures for responding to complaints of sexual violence?**

**Answer:**  Title IX requires that a school adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints of sex discrimination, including sexual violence. In evaluating whether a school's grievance procedures satisfy this requirement, OCR will review all aspects of a school's policies and practices, including the following elements that are critical to achieve compliance with Title IX:

(1)  notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;

(2)  application of the grievance procedures to complaints filed by students or on their behalf alleging sexual violence carried out by employees, other students, or third parties;

(3)  provisions for adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and alleged perpetrator to present witnesses and evidence;

(4)  designated and reasonably prompt time frames for the major stages of the complaint process (see question F-8);

(5)  written notice to the complainant and alleged perpetrator of the outcome of the complaint (see question H-3); and

(6)  assurance that the school will take steps to prevent recurrence of any sexual violence and remedy discriminatory effects on the complainant and others, if appropriate.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

To ensure that students and employees have a clear understanding of what constitutes sexual violence, the potential consequences for such conduct, and how the school processes complaints, a school's Title IX grievance procedures should also explicitly include the following in writing, some of which themselves are mandatory obligations under Title IX:

(1)    a statement of the school's jurisdiction over Title IX complaints;

(2)    adequate definitions of sexual harassment (which includes sexual violence) and an explanation as to when such conduct creates a hostile environment;

(3)    reporting policies and protocols, including provisions for confidential reporting;

(4)    identification of the employee or employees responsible for evaluating requests for confidentiality;

(5)    notice that Title IX prohibits retaliation;

(6)    notice of a student's right to file a criminal complaint and a Title IX complaint simultaneously;

(7)    notice of available interim measures that  may be taken to protect the student in the educational setting;

(8)    the evidentiary standard that must be used (preponderance of the evidence) (*i.e.*, more likely than not that sexual violence occurred) in resolving a complaint;

(9)    notice of potential remedies for students;

(10)  notice of potential sanctions against perpetrators; and

(11)  sources of counseling, advocacy, and support.

For more information on interim measures, see questions G-1 to G-3.

The rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights. Procedures that ensure the Title IX rights of the complainant, while at the same time according any federally guaranteed due process to both parties involved, will lead to sound and supportable decisions. Of course, a school should ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

A school's procedures and practices will vary in detail, specificity, and components, reflecting differences in the age of its students, school size and administrative structure, state or local legal requirements (*e.g.*, mandatory reporting requirements for schools working with minors), and what it has learned from past experiences.

**C-6. Is a school required to use separate grievance procedures for sexual violence complaints?**

**Answer:** No. Under Title IX, a school may use student disciplinary procedures, general Title IX grievance procedures, sexual harassment procedures, or separate procedures to resolve sexual violence complaints. However, any procedures used for sexual violence complaints, including disciplinary procedures, must meet the Title IX requirement of affording a complainant a prompt and equitable resolution (as discussed in question C-5), including applying the preponderance of the evidence standard of review. As discussed in question C-3, the Title IX coordinator should review any process used to resolve complaints of sexual violence to ensure it complies with requirements for prompt and equitable resolution of these complaints. When using disciplinary procedures, which are often focused on the alleged perpetrator and can take considerable time, a school should be mindful of its obligation to provide interim measures to protect the complainant in the educational setting. For more information on timeframes and interim measures, see questions F-8 and G-1 to G-3.

**D.  Responsible Employees and Reporting**[22]

**D-1. Which school employees are obligated to report incidents of possible sexual violence to school officials?**

**Answer:** Under Title IX, whether an individual is obligated to report incidents of alleged sexual violence generally depends on whether the individual is a responsible employee of the school. A responsible employee must report incidents of sexual violence to the Title IX coordinator or other appropriate school designee, subject to the exemption for school counseling employees discussed in question E-3. This is because, as discussed in question A-4, a school is obligated to address sexual violence about which a responsible employee knew or should have known. As explained in question C-3, the Title IX coordinator must be informed of all reports and complaints raising Title IX issues, even if the report or

---

[22] This document addresses only Title IX's reporting requirements. It does not address requirements under the Clery Act or other federal, state, or local laws, or an individual school's code of conduct.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

complaint was initially filed with another individual or office, subject to the exemption for school counseling employees discussed in question E-3.

**D-2.  Who is a "responsible employee"?**

**Answer**:  According to OCR's *2001 Guidance*, a responsible employee includes any employee: who has the authority to take action to redress sexual violence; who has been given the duty of reporting incidents of sexual violence or any other misconduct by students to the Title IX coordinator or other appropriate school designee; or whom a student could reasonably believe has this authority or duty.[23]

A school must make clear to all of its employees and students which staff members are responsible employees so that students can make informed decisions about whether to disclose information to those employees. A school must also inform all employees of their own reporting responsibilities and the importance of informing complainants of: the reporting obligations of responsible employees; complainants' option to request confidentiality and available confidential advocacy, counseling, or other support services; and complainants' right to file a Title IX complaint with the school and to report a crime to campus or local law enforcement.

Whether an employee is a responsible employee will vary depending on factors such as the age and education level of the student, the type of position held by the employee, and consideration of both formal and informal school practices and procedures. For example, while it may be reasonable for an elementary school student to believe that a custodial staff member or cafeteria worker has the authority or responsibility to address student misconduct, it is less reasonable for a college student to believe that a custodial staff member or dining hall employee has this same authority.

As noted in response to question A-4, when a responsible employee knows or reasonably should know of possible sexual violence, OCR deems a school to have notice of the sexual violence. The school must take immediate and appropriate steps to investigate or otherwise determine what occurred (subject to the confidentiality provisions discussed in Section E), and, if the school determines that sexual violence created a hostile environment, the school must then take appropriate steps to address the situation. The

---

[23] The Supreme Court held that a school will only be liable for money damages in a private lawsuit where there is actual notice to a school official with the authority to address the alleged discrimination and take corrective action. *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290 (1998), and *Davis*, 524 U.S. at 642. The concept of a "responsible employee" under OCR's guidance for administrative enforcement of Title IX is broader.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

school has this obligation regardless of whether the student, student's parent, or a third party files a formal complaint. For additional information on a school's responsibilities to address student-on-student sexual violence, see question A-5. For additional information on training for school employees, see questions J-1 to J-3.

**D-3.  What information is a responsible employee obligated to report about an incident of possible student-on-student sexual violence?**

**Answer:** Subject to the exemption for school counseling employees discussed in question E-3, a responsible employee must report to the school's Title IX coordinator, or other appropriate school designee, all relevant details about the alleged sexual violence that the student or another person has shared and that the school will need to determine what occurred and to resolve the situation. This includes the names of the alleged perpetrator (if known), the student who experienced the alleged sexual violence, other students involved in the alleged sexual violence, as well as relevant facts, including the date, time, and location. A school must make clear to its responsible employees to whom they should report an incident of alleged sexual violence.

To ensure compliance with these reporting obligations, it is important for a school to train its responsible employees on Title IX and the school's sexual violence policies and procedures. For more information on appropriate training for school employees, see question J-1 to J-3.

**D-4.  What should a responsible employee tell a student who discloses an incident of sexual violence?**

**Answer**: Before a student reveals information that he or she may wish to keep confidential, a responsible employee should make every effort to ensure that the student understands: (i) the employee's obligation to report the names of the alleged perpetrator and student involved in the alleged sexual violence, as well as relevant facts regarding the alleged incident (including the date, time, and location), to the Title IX coordinator or other appropriate school officials, (ii) the student's option to request that the school maintain his or her confidentiality, which the school (*e.g.*, Title IX coordinator) will consider, and (iii) the student's ability to share the information confidentially with counseling, advocacy, health, mental health, or sexual-assault-related services (*e.g.*, sexual assault resource centers, campus health centers, pastoral counselors, and campus mental health centers). As discussed in questions E-1 and E-2, if the student requests confidentiality, the Title IX coordinator or other appropriate school designee responsible for evaluating requests for confidentiality should make every effort to respect this request

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

and should evaluate the request in the context of the school's responsibility to provide a safe and nondiscriminatory environment for all students.

**D-5.** **If a student informs a resident assistant/advisor (RA) that he or she was subjected to sexual violence by a fellow student, is the RA obligated under Title IX to report the incident to school officials?**

**Answer:** As discussed in questions D-1 and D-2, for Title IX purposes, whether an individual is obligated under Title IX to report alleged sexual violence to the school's Title IX coordinator or other appropriate school designee generally depends on whether the individual is a responsible employee.

The duties and responsibilities of RAs vary among schools, and, therefore, a school should consider its own policies and procedures to determine whether its RAs are responsible employees who must report incidents of sexual violence to the Title IX coordinator or other appropriate school designee.[24] When making this determination, a school should consider if its RAs have the general authority to take action to redress misconduct or the duty to report misconduct to appropriate school officials, as well as whether students could reasonably believe that RAs have this authority or duty. A school should also consider whether it has determined and clearly informed students that RAs are generally available for confidential discussions and do not have the authority or responsibility to take action to redress any misconduct or to report any misconduct to the Title IX coordinator or other appropriate school officials. A school should pay particular attention to its RAs' obligations to report other student violations of school policy (*e.g.*, drug and alcohol violations or physical assault). If an RA is required to report other misconduct that violates school policy, then the RA would be considered a responsible employee obligated to report incidents of sexual violence that violate school policy.

If an RA is a responsible employee, the RA should make every effort to ensure that *before* the student reveals information that he or she may wish to keep confidential, the student understands the RA's reporting obligation and the student's option to request that the school maintain confidentiality. It is therefore important that schools widely disseminate policies and provide regular training clearly identifying the places where students can seek confidential support services so that students are aware of this information. The RA

---

[24] Postsecondary institutions should be aware that, regardless of whether an RA is a responsible employee under Title IX, RAs are considered "campus security authorities" under the Clery Act. A school's responsibilities in regard to crimes reported to campus security authorities are discussed in the Department's regulations on the Clery Act at 34 C.F.R. § 668.46.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

should also explain to the student (again, before the student reveals information that he or she may wish to keep confidential) that, although the RA must report the names of the alleged perpetrator (if known), the student who experienced the alleged sexual violence, other students involved in the alleged sexual violence, as well as relevant facts, including the date, time, and location to the Title IX coordinator or other appropriate school designee, the school will protect the student's confidentiality to the greatest extent possible. Prior to providing information about the incident to the Title IX coordinator or other appropriate school designee, the RA should consult with the student about how to protect his or her safety and the details of what will be shared with the Title IX coordinator. The RA should explain to the student that reporting this information to the Title IX coordinator or other appropriate school designee does not necessarily mean that a formal complaint or investigation under the school's Title IX grievance procedure must be initiated if the student requests confidentiality. As discussed in questions E-1 and E-2, if the student requests confidentiality, the Title IX coordinator or other appropriate school designee responsible for evaluating requests for confidentiality should make every effort to respect this request and should evaluate the request in the context of the school's responsibility to provide a safe and nondiscriminatory environment for all students.

Regardless of whether a reporting obligation exists, all RAs should inform students of their right to file a Title IX complaint with the school and report a crime to campus or local law enforcement. If a student discloses sexual violence to an RA who is a responsible employee, the school will be deemed to have notice of the sexual violence even if the student does not file a Title IX complaint. Additionally, all RAs should provide students with information regarding on-campus resources, including victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance. RAs should also be familiar with local rape crisis centers or other off-campus resources and provide this information to students.

**E.  Confidentiality and a School's Obligation to Respond to Sexual Violence**

**E-1.  How should a school respond to a student's request that his or her name not be disclosed to the alleged perpetrator or that no investigation or disciplinary action be pursued to address the alleged sexual violence?**

**Answer:**  Students, or parents of minor students, reporting incidents of sexual violence sometimes ask that the students' names not be disclosed to the alleged perpetrators or that no investigation or disciplinary action be pursued to address the alleged sexual violence. OCR strongly supports a student's interest in confidentiality in cases involving sexual violence. There are situations in which a school must override a student's request

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

for confidentiality in order to meet its Title IX obligations; however, these instances will be limited and the information should only be shared with individuals who are responsible for handling the school's response to incidents of sexual violence. Given the sensitive nature of reports of sexual violence, a school should ensure that the information is maintained in a secure manner. A school should be aware that disregarding requests for confidentiality can have a chilling effect and discourage other students from reporting sexual violence. In the case of minors, state mandatory reporting laws may require disclosure, but can generally be followed without disclosing information to school personnel who are not responsible for handling the school's response to incidents of sexual violence.[25]

Even if a student does not specifically ask for confidentiality, to the extent possible, a school should only disclose information regarding alleged incidents of sexual violence to individuals who are responsible for handling the school's response. To improve trust in the process for investigating sexual violence complaints, a school should notify students of the information that will be disclosed, to whom it will be disclosed, and why. Regardless of whether a student complainant requests confidentiality, a school must take steps to protect the complainant as necessary, including taking interim measures before the final outcome of an investigation. For additional information on interim measures see questions G-1 to G-3.

For Title IX purposes, if a student requests that his or her name not be revealed to the alleged perpetrator or asks that the school not investigate or seek action against the alleged perpetrator, the school should inform the student that honoring the request may limit its ability to respond fully to the incident, including pursuing disciplinary action against the alleged perpetrator. The school should also explain that Title IX includes protections against retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs. This includes retaliatory actions taken by the school and school officials. When a school knows or reasonably should know of possible retaliation by other students or third parties, including threats, intimidation, coercion, or discrimination (including harassment), it must take immediate

---

[25] The school should be aware of the alleged student perpetrator's right under the Family Educational Rights and Privacy Act ("FERPA") to request to inspect and review information about the allegations if the information directly relates to the alleged student perpetrator and the information is maintained by the school as an education record. In such a case, the school must either redact the complainant's name and all identifying information before allowing the alleged perpetrator to inspect and review the sections of the complaint that relate to him or her, or must inform the alleged perpetrator of the specific information in the complaint that are about the alleged perpetrator. *See* 34 C.F.R. § 99.12(a) The school should also make complainants aware of this right and explain how it might affect the school's ability to maintain complete confidentiality.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and ensure  his or her safety as necessary. See question K-1 regarding retaliation.

If the student still requests that his or her name not be disclosed to the alleged perpetrator or that the school not investigate or seek action against the alleged perpetrator, the school will need to determine whether or not it can honor such a request while still providing a safe and nondiscriminatory environment for all students, including the student who reported the sexual violence. As discussed in question C-3, the Title IX coordinator is generally in the best position to evaluate confidentiality requests. Because schools vary widely in size and administrative structure, OCR recognizes that a school may reasonably determine that an employee other than the Title IX coordinator, such as a sexual assault response coordinator, dean, or other school official, is better suited to evaluate such requests. Addressing the needs of a student reporting sexual violence while determining an appropriate institutional response requires expertise and attention, and a school should ensure that it assigns these responsibilities to employees with the capability and training to fulfill them. For example, if a school has a sexual assault response coordinator, that person should be consulted in evaluating requests for confidentiality. The school should identify in its Title IX policies and procedures the employee or employees responsible for making such determinations.

If the school determines that it can respect the student's request not to disclose his or her identity to the alleged perpetrator, it should take all reasonable steps to  respond to the complaint consistent with the request. Although a student's request to have his or her name withheld may limit the school's ability to respond fully to an individual allegation of sexual violence, other means may be available to address the sexual violence. There are steps a school can take to limit the effects of the alleged sexual violence and prevent its recurrence without initiating formal action against the alleged perpetrator or revealing the identity of the student complainant. Examples include providing increased monitoring, supervision, or security at locations or activities where the misconduct occurred; providing training and education materials for students and employees; changing and publicizing the school's policies on sexual violence; and conducting climate surveys regarding sexual violence. In instances affecting many students, an alleged perpetrator can be put on notice of allegations of harassing behavior and be counseled appropriately without revealing, even indirectly, the identity of the student complainant. A school must also take immediate action as necessary to protect the student while keeping the identity of the student confidential. These actions may include providing support services to the student and changing living arrangements or course schedules, assignments, or tests.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**E-2.** **What factors should a school consider in weighing a student's request for confidentiality?**

**Answer:** When weighing a student's request for confidentiality that could preclude a meaningful investigation or potential discipline of the alleged perpetrator, a school should consider a range of factors.

These factors include circumstances that suggest there is an increased risk of the alleged perpetrator committing additional acts of sexual violence or other violence (e.g., whether there have been other sexual violence complaints about the same alleged perpetrator, whether the alleged perpetrator has a history of arrests or records from a prior school indicating a history of violence, whether the alleged perpetrator threatened further sexual violence or other violence against the student or others, and whether the sexual violence was committed by multiple perpetrators). These factors also include circumstances that suggest there is an increased risk of future acts of sexual violence under similar circumstances (e.g., whether the student's report reveals a pattern of perpetration (e.g., via illicit use of drugs or alcohol) at a given location or by a particular group). Other factors that should be considered in assessing a student's request for confidentiality include whether the sexual violence was perpetrated with a weapon; the age of the student subjected to the sexual violence; and whether the school possesses other means to obtain relevant evidence (e.g., security cameras or personnel, physical evidence).

A school should take requests for confidentiality seriously, while at the same time considering its responsibility to provide a safe and nondiscriminatory environment for all students, including the student who reported the sexual violence. For example, if the school has credible information that the alleged perpetrator has committed one or more prior rapes, the balance of factors would compel the school to investigate the allegation of sexual violence, and if appropriate, pursue disciplinary action in a manner that may require disclosure of the student's identity to the alleged perpetrator. If the school determines that it must disclose a student's identity to an alleged perpetrator, it should inform the student prior to making this disclosure. In these cases, it is also especially important for schools to take whatever interim measures are necessary to protect the student and ensure the safety of other students. If a school has a sexual assault response coordinator, that person should be consulted in identifying safety risks and interim measures that are necessary to protect the student. In the event the student requests that the school inform the perpetrator that the student asked the school not to investigate or seek discipline, the school should honor this request and inform the alleged perpetrator that the school made the decision to go forward. For additional information on interim measures see questions G-1 to G-3. Any school officials responsible for

000163

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

discussing safety and confidentiality with students should be trained on the effects of trauma and the appropriate methods to communicate with students subjected to sexual violence. See questions J-1 to J-3.

On the other hand, if, for example, the school has no credible information about prior sexual violence committed by the alleged perpetrator and the alleged sexual violence was not perpetrated with a weapon or accompanied by threats to repeat the sexual violence against the complainant or others or part of a larger pattern at a given location or by a particular group, the balance of factors would likely compel the school to respect the student's request for confidentiality. In this case the school should still take all reasonable steps to respond to the complaint consistent with the student's confidentiality request and determine whether interim measures are appropriate or necessary. Schools should be mindful that traumatic events such as sexual violence can result in delayed decisionmaking by a student who has experienced sexual violence. Hence, a student who initially requests confidentiality might later request that a full investigation be conducted.

**E-3.    What are the reporting responsibilities of school employees who provide or support the provision of counseling, advocacy, health, mental health, or sexual assault-related services to students who have experienced sexual violence?**

**Answer:**  OCR does not require campus mental-health counselors, pastoral counselors, social workers, psychologists, health center employees, or any other person with a professional license requiring confidentiality, or who is supervised by such a person, to report, without the student's consent, incidents of sexual violence to the school in a way that identifies the student. Although these employees may have responsibilities that would otherwise make them responsible employees for Title IX purposes, OCR recognizes the importance of protecting the counselor-client relationship, which often requires confidentiality to ensure that students will seek the help they need.

Professional counselors and pastoral counselors whose official responsibilities include providing mental-health counseling to members of the school community are not required by Title IX to report *any* information regarding an incident of alleged sexual violence to the Title IX coordinator or other appropriate school designee.[26]

---

[26] The exemption from reporting obligations for pastoral and professional counselors under Title IX is consistent with the Clery Act. For additional information on reporting obligations under the Clery Act, see Office of Postsecondary Education, *Handbook for Campus Safety and Security Reporting* (2011), available at http://www2.ed.gov/admins/lead/safety/handbook.pdf. Similar to the Clery Act, for Title IX purposes, a pastoral counselor is a person who is associated with a religious order or denomination, is recognized by that religious

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

OCR recognizes that some people who provide assistance to students who experience sexual violence are not professional or pastoral counselors. They include all individuals who work or volunteer in on-campus sexual assault centers, victim advocacy offices, women's centers, or health centers ("non-professional counselors or advocates"), including front desk staff and students. OCR wants students to feel free to seek their assistance and therefore interprets Title IX to give schools the latitude not to require these individuals to report incidents of sexual violence in a way that identifies the student without the student's consent.[27] These non-professional counselors or advocates are valuable sources of support for students, and OCR strongly encourages schools to designate these individuals as confidential sources.

Pastoral and professional counselors and non-professional counselors or advocates should be instructed to inform students of their right to file a Title IX complaint with the school and a separate complaint with campus or local law enforcement. In addition to informing students about campus resources for counseling, medical, and academic support, these persons should also indicate that they are available to assist students in filing such complaints. They should also explain that Title IX includes protections against retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs. This includes retaliatory actions taken by the school and school officials. When a school knows or reasonably should know of possible retaliation by other students or third parties, including threats, intimidation, coercion, or discrimination (including harassment), it must take immediate and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and ensure his or her safety as necessary.

In order to identify patterns or systemic problems related to sexual violence, a school should collect aggregate data about sexual violence incidents from non-professional counselors or advocates in their on-campus sexual assault centers, women's centers, or

---

order or denomination as someone who provides confidential counseling, and is functioning within the scope of that recognition as a pastoral counselor. A professional counselor is a person whose official responsibilities include providing mental health counseling to members of the institution's community and who is functioning within the scope of his or her license or certification. This definition applies even to professional counselors who are not employees of the school, but are under contract to provide counseling at the school. This includes individuals who are not yet licensed or certified as a counselor, but are acting in that role under the supervision of an individual who is licensed or certified. An example is a Ph.D. counselor-trainee acting under the supervision of a professional counselor at the school.

[27] Postsecondary institutions should be aware that an individual who is counseling students, but who does not meet the Clery Act definition of a pastoral or professional counselor, is not exempt from being a campus security authority if he or she otherwise has significant responsibility for student and campus activities. See fn. 24.

000165

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

health centers. Such individuals should report only general information about incidents of sexual violence such as the nature, date, time, and general location of the incident and should take care to avoid reporting personally identifiable information about a student. Non-professional counselors and advocates should consult with students regarding what information needs to be withheld to protect their identity.

**E-4. Is a school required to investigate information regarding sexual violence incidents shared by survivors during public awareness events, such as "Take Back the Night"?**

**Answer:** No. OCR wants students to feel free to participate in preventive education programs and access resources for survivors. Therefore, public awareness events such as "Take Back the Night" or other forums at which students disclose experiences with sexual violence are not considered notice to the school for the purpose of triggering an individual investigation unless the survivor initiates a complaint. The school should instead respond to these disclosures by reviewing sexual assault policies, creating campus-wide educational programs, and conducting climate surveys to learn more about the prevalence of sexual violence at the school. Although Title IX does not require the school to investigate particular incidents discussed at such events, the school should ensure that survivors are aware of any available resources, including counseling, health, and mental health services. To ensure that the entire school community understands their Title IX rights related to sexual violence, the school should also provide information at these events on Title IX and how to file a Title IX complaint with the school, as well as options for reporting an incident of sexual violence to campus or local law enforcement.

**F.  Investigations and Hearings**

*Overview*

**F-1. What elements should a school's Title IX investigation include?**

**Answer:** The specific steps in a school's Title IX investigation will vary depending on the nature of the allegation, the age of the student or students involved, the size and administrative structure of the school, state or local legal requirements (including mandatory reporting requirements for schools working with minors), and what it has learned from past experiences.

For the purposes of this document the term "investigation" refers to the process the school uses to resolve sexual violence complaints. This includes the fact-finding investigation and any hearing and decision-making process the school uses to determine: (1) whether or not the conduct occurred; and, (2) if the conduct occurred, what actions

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

the school will take to end the sexual violence, eliminate the hostile environment, and prevent its recurrence, which may include imposing sanctions on the perpetrator and providing remedies for the complainant and broader student population.

In all cases, a school's Title IX investigation must be adequate, reliable, impartial, and prompt and include the opportunity for both parties to present witnesses and other evidence. The investigation may include a hearing to determine whether the conduct occurred, but Title IX does not necessarily require a hearing.[28] Furthermore, neither Title IX nor the DCL specifies who should conduct the investigation. It could be the Title IX coordinator, provided there are no conflicts of interest, but it does not have to be. All persons involved in conducting a school's Title IX investigations must have training or experience in handling complaints of sexual violence and in the school's grievance procedures. For additional information on training, see question J-3.

When investigating an incident of alleged sexual violence for Title IX purposes, to the extent possible, a school should coordinate with any other ongoing school or criminal investigations of the incident and establish appropriate fact-finding roles for each investigator. A school should also consider whether information can be shared among the investigators so that complainants are not unnecessarily required to give multiple statements about a traumatic event. If the investigation includes forensic evidence, it may be helpful for a school to consult with local or campus law enforcement or a forensic expert to ensure that the evidence is correctly interpreted by school officials.  For additional information on working with campus or local law enforcement see question F-3.

If a school uses its student disciplinary procedures to meet its Title IX obligation to resolve complaints of sexual violence promptly and equitably, it should recognize that imposing sanctions against the perpetrator, without additional remedies, likely will not be sufficient to eliminate the hostile environment and prevent recurrence as required by Title IX. If a school typically processes complaints of sexual violence through its disciplinary process and that process, including any investigation and hearing, meets the Title IX requirements discussed above and enables the school to end the sexual violence, eliminate the hostile environment, and prevent its recurrence, then the school may use that process to satisfy its Title IX obligations and does not need to conduct a separate Title IX investigation. As discussed in question C-3, the Title IX coordinator should review the disciplinary process

---

[28] This answer addresses only Title IX's requirements for investigations. It does not address legal rights or requirements under the U.S. Constitution, the Clery Act, or other federal, state, or local laws.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

to ensure that it: (1) complies with the prompt and equitable requirements of Title IX; (2) allows for appropriate interim measures to be taken to protect the complainant during the process; and (3) provides for remedies to the complainant and school community where appropriate. For more information about interim measures, see questions G-1 to G-3, and about remedies, see questions H-1 and H-2.

The investigation may include, but is not limited to, conducting interviews of the complainant, the alleged perpetrator, and any witnesses; reviewing law enforcement investigation documents, if applicable; reviewing student and personnel files; and gathering and examining other relevant documents or evidence. While a school has flexibility in how it structures the investigative process, for Title IX purposes, a school must give the complainant any rights that it gives to the alleged perpetrator. A balanced and fair process that provides the same opportunities to both parties will lead to sound and supportable decisions.[29] Specifically:

- Throughout the investigation, the parties must have an equal opportunity to present relevant witnesses and other evidence.

- The school must use a preponderance-of-the-evidence (*i.e.*, more likely than not) standard in any Title IX proceedings, including any fact-finding and hearings.

- If the school permits one party to have lawyers or other advisors at any stage of the proceedings, it must do so equally for both parties. Any school-imposed restrictions on the ability of lawyers or other advisors to speak or otherwise participate in the proceedings must also apply equally.

- If the school permits one party to submit third-party expert testimony, it must do so equally for both parties.

- If the school provides for an appeal, it must do so equally for both parties.

- Both parties must be notified, in writing, of the outcome of both the complaint and any appeal (see question H-3).

---

[29] As explained in question C-5, the parties may have certain due process rights under the U.S. Constitution.

000168

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

*Intersection with Criminal Investigations*

**F-2.  What are the key differences between a school's Title IX investigation into allegations of sexual violence and a criminal investigation?**

**Answer:**  A criminal investigation is intended to determine whether an individual violated criminal law; and, if at the conclusion of the investigation, the individual is tried and found guilty, the individual may be imprisoned or subject to criminal penalties. The U.S. Constitution affords criminal defendants who face the risk of incarceration numerous protections, including, but not limited to, the right to counsel, the right to a speedy trial, the right to a jury trial, the right against self-incrimination, and the right to confrontation. In addition, government officials responsible for criminal investigations (including police and prosecutors) normally have discretion as to which complaints from the public they will investigate.

By contrast, a Title IX investigation will never result in incarceration of an individual and, therefore, the same procedural protections and legal standards are not required. Further, while a criminal investigation is initiated at the discretion of law enforcement authorities, a Title IX investigation is not discretionary; a school has a duty under Title IX to resolve complaints promptly and equitably and to provide a safe and nondiscriminatory environment for all students, free from sexual harassment and sexual violence. Because the standards for pursuing and completing criminal investigations are different from those used for Title IX investigations, the termination of a criminal investigation without an arrest or conviction does not affect the school's Title IX obligations.

Of course, criminal investigations conducted by local or campus law enforcement may be useful for fact gathering if the criminal investigation occurs within the recommended timeframe for Title IX investigations; but, even if a criminal investigation is ongoing, a school must still conduct its own Title IX investigation.

A school should notify complainants of the right to file a criminal complaint and should not dissuade a complainant from doing so either during or after the school's internal Title IX investigation. Title IX does not require a school to report alleged incidents of sexual violence to law enforcement, but a school may have reporting obligations under state, local, or other federal laws.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**F-3.** **How should a school proceed when campus or local law enforcement agencies are conducting a criminal investigation while the school is conducting a parallel Title IX investigation?**

**Answer:** A school should not wait for the conclusion of a criminal investigation or criminal proceeding to begin its own Title IX investigation. Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, it is important for a school to understand that during this brief delay in the Title IX investigation, it must take interim measures to protect the complainant in the educational setting. The school should also continue to update the parties on the status of the investigation and inform the parties when the school resumes its Title IX investigation. For additional information on interim measures see questions G-1 to G-3.

If a school delays the fact-finding portion of a Title IX investigation, the school must promptly resume and complete its fact-finding for the Title IX investigation once it learns that the police department has completed its evidence gathering stage of the criminal investigation. The school should not delay its investigation until the ultimate outcome of the criminal investigation or the filing of any charges. OCR recommends that a school work with its campus police, local law enforcement, and local prosecutor's office to learn when the evidence gathering stage of the criminal investigation is complete. A school may also want to enter into a memorandum of understanding (MOU) or other agreement with these agencies regarding the protocols and procedures for referring allegations of sexual violence, sharing information, and conducting contemporaneous investigations. Any MOU or other agreement must allow the school to meet its Title IX obligation to resolve complaints promptly and equitably, and must comply with the Family Educational Rights and Privacy Act ("FERPA") and other applicable privacy laws.

The DCL states that in one instance a prosecutor's office informed OCR that the police department's evidence gathering stage typically takes three to ten calendar days, although the delay in the school's investigation may be longer in certain instances. OCR understands that this example may not be representative and that the law enforcement agency's process often takes more than ten days. OCR recognizes that the length of time for evidence gathering by criminal investigators will vary depending on the specific circumstances of each case.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

*Off-Campus Conduct*

**F-4.  Is a school required to process complaints of alleged sexual violence that occurred off campus?**

**Answer:**  Yes. Under Title IX, a school must process all complaints of sexual violence, regardless of where the conduct occurred, to determine whether the conduct occurred in the context of an education program or activity or had continuing effects on campus or in an off-campus education program or activity.

A school must determine whether the alleged off-campus sexual violence occurred in the context of an education program or activity of the school; if so, the school must treat the complaint in the same manner that it treats complaints regarding on-campus conduct. In other words, if a school determines that the alleged misconduct took place in the context of an education program or activity of the school, the fact that the alleged misconduct took place off campus does not relieve the school of its obligation to investigate the complaint as it would investigate a complaint of sexual violence that occurred on campus.

Whether the alleged misconduct occurred in this context may not always be apparent from the complaint, so a school may need to gather additional information in order to make such a determination. Off-campus education programs and activities are clearly covered and include, but are not limited to: activities that take place at houses of fraternities or sororities recognized by the school; school-sponsored field trips, including athletic team travel; and events for school clubs that occur off campus (*e.g.*, a debate team trip to another school or to a weekend competition).

Even if the misconduct did not occur in the context of an education program or activity, a school must consider the effects of the off-campus misconduct when evaluating whether there is a hostile environment on campus or in an off-campus education program or activity because students often experience the continuing effects of off-campus sexual violence while at school or in an off-campus education program or activity. The school cannot address the continuing effects of the off-campus sexual violence at school or in an off-campus education program or activity unless it processes the complaint and gathers appropriate additional information in accordance with its established procedures.

Once a school is on notice of off-campus sexual violence against a student, it must assess whether there are any continuing effects on campus or in an off-campus education program or activity that are creating or contributing to a hostile environment and, if so, address that hostile environment in the same manner in which it would address a hostile environment created by on-campus misconduct. The mere presence on campus or in an

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

off-campus education program or activity of the alleged perpetrator of off-campus sexual violence can have continuing effects that create a hostile environment. A school should also take steps to protect a student who alleges off-campus sexual violence from further harassment by the alleged perpetrator or his or her friends, and a school may have to take steps to protect other students from possible assault by the alleged perpetrator. In other words, the school should protect the school community in the same way it would had the sexual violence occurred on campus. Even if there are no continuing effects of the off-campus sexual violence experienced by the student on campus or in an off-campus education program or activity, the school still should handle these incidents as it would handle other off-campus incidents of misconduct or violence and consistent with any other applicable laws. For example, if a school, under its code of conduct, exercises jurisdiction over physical altercations between students that occur off campus outside of an education program or activity, it should also exercise jurisdiction over incidents of student-on-student sexual violence that occur off campus outside of an education program or activity.

*Hearings*[30]

**F-5.  Must a school allow or require the parties to be present during an entire hearing?**

**Answer:**  If a school uses a hearing process to determine responsibility for acts of sexual violence, OCR does not require that the school allow a complainant to be present for the entire hearing; it is up to each school to make this determination. But if the school allows one party to be present for the entirety of a hearing, it must do so equally for both parties. At the same time, when requested, a school should make arrangements so that the complainant and the alleged perpetrator do not have to be present in the same room at the same time. These two objectives may be achieved by using closed circuit television or other means. Because a school has a Title IX obligation to investigate possible sexual violence, if a hearing is part of the school's Title IX investigation process, the school must not require a complainant to be present at the hearing as a prerequisite to proceed with the hearing.

_____

[30] As noted in question F-1, the investigation may include a hearing to determine whether the conduct occurred, but Title IX does not necessarily require a hearing. Although Title IX does not dictate the membership of a hearing board, OCR discourages schools from allowing students to serve on hearing boards  in cases involving allegations of sexual violence.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**F-6.  May every witness at the hearing, including the parties, be cross-examined?**

**Answer:**  OCR does not require that a school allow cross-examination of witnesses, including the parties, if they testify at the hearing. But if the school allows one party to cross-examine witnesses, it must do so equally for both parties.

OCR strongly discourages a school from allowing the parties to personally question or cross-examine each other during a hearing on alleged sexual violence. Allowing an alleged perpetrator to question a complainant directly may be traumatic or intimidating, and may perpetuate a hostile environment. A school may choose, instead, to allow the parties to submit questions to a trained third party (*e.g.*, the hearing panel) to ask the questions on their behalf. OCR recommends that the third party screen the questions submitted by the parties and only ask those it deems appropriate and relevant to the case.

**F-7.  May the complainant's sexual history be introduced at hearings?**

**Answer:**  Questioning about the complainant's sexual history with anyone other than the alleged perpetrator should not be permitted. Further, a school should recognize that the mere fact of a current or previous consensual dating or sexual relationship between the two parties does not itself imply consent or preclude a finding of sexual violence. The school should also ensure that hearings are conducted in a manner that does not inflict additional trauma on the complainant.

*Timeframes*

**F-8.  What stages of the investigation are included in the 60-day timeframe referenced in the DCL as the length for a typical investigation?**

**Answer:**  As noted in the DCL, the 60-calendar day timeframe for investigations is based on OCR's experience in typical cases. The 60-calendar day timeframe refers to the entire investigation process, which includes conducting the fact-finding investigation, holding a hearing or engaging in another decision-making process to determine whether the alleged sexual violence occurred and created a hostile environment, and determining what actions the school will take to eliminate the hostile environment and prevent its recurrence, including imposing sanctions against the perpetrator and providing remedies for the complainant and school community, as appropriate. Although this timeframe does not include appeals, a school should be aware that an unduly long appeals process may impact whether the school's response was prompt and equitable as required by Title IX.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

OCR does not require a school to complete investigations within 60 days; rather OCR evaluates on a case-by-case basis whether the resolution of sexual violence complaints is prompt and equitable. Whether OCR considers an investigation to be prompt as required by Title IX will vary depending on the complexity of the investigation and the severity and extent of the alleged conduct. OCR recognizes that the investigation process may take longer if there is a parallel criminal investigation or if it occurs partially during school breaks. A school may need to stop an investigation during school breaks or between school years, although a school should make every effort to try to conduct an investigation during these breaks unless so doing would sacrifice witness availability or otherwise compromise the process.

Because timeframes for investigations vary and a school may need to depart from the timeframes designated in its grievance procedures, both parties should be given periodic status updates throughout the process.

**G.  Interim Measures**

**G-1.  Is a school required to take any interim measures before the completion of its investigation?**

**Answer:**  Title IX requires a school to take steps to ensure equal access to its education programs and activities and protect the complainant as necessary, including taking interim measures before the final outcome of an investigation. The school should take these steps promptly once it has notice of a sexual violence allegation and should provide the complainant with periodic updates on the status of the investigation. The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow the complainant to change academic and extracurricular activities or his or her living, transportation, dining, and working situation as appropriate. The school should also ensure that the complainant is aware of his or her Title IX rights and any available resources, such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance, and the right to report a crime to campus or local law enforcement. If a school does not offer these services on campus, it should enter into an MOU with a local victim services provider if possible.

Even when a school has determined that it can respect a complainant's request for confidentiality and therefore may not be able to respond fully to an allegation of sexual violence and initiate formal action against an alleged perpetrator, the school must take immediate action to protect the complainant while keeping the identity of the complainant confidential. These actions may include: providing support services to the

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

complainant; changing living arrangements or course schedules, assignments, or tests; and providing increased monitoring, supervision, or security at locations or activities where the misconduct occurred.

**G-2.  How should a school determine what interim measures to take?**

**Answer:**  The specific interim measures implemented and the process for implementing those measures will vary depending on the facts of each case. A school should consider a number of factors in determining what interim measures to take, including, for example, the specific need expressed by the complainant; the age of the students involved; the severity or pervasiveness of the allegations; any continuing effects on the complainant; whether the complainant and alleged perpetrator share the same residence hall, dining hall, class, transportation, or job location; and whether other judicial measures have been taken to protect the complainant (*e.g*., civil protection orders).

In general, when taking interim measures, schools should minimize the burden on the complainant. For example, if the complainant and alleged perpetrator share the same class or residence hall, the school should not, as a matter of course, remove the complainant from the class or housing while allowing the alleged perpetrator to remain without carefully considering the facts of the case.

**G-3.  If a school provides all students with access to counseling on a fee basis, does that suffice for providing counseling as an interim measure?**

**Answer:**  No. Interim measures are determined by a school on a case-by-case basis. If a school determines that it needs to offer counseling to the complainant as part of its Title IX obligation to take steps to protect the complainant while the investigation is ongoing, it must not require the complainant to pay for this service.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**H.  Remembers and Notice of Outcome**[31]

**H-1.  What remedies should a school consider in a case of student-on-student sexual violence?**

**Answer:**  Effective remedial action may include disciplinary action against the perpetrator, providing counseling for the perpetrator, remedies for the complainant and others, as well as changes to the school's overall services or policies. All services needed to remedy the hostile environment should be offered to the complainant. These remedies are separate from, and in addition to, any interim measure that may have been provided prior to the conclusion of the school's investigation. In any instance in which the complainant did not take advantage of a specific service (*e.g.*, counseling) when offered as an interim measure, the complainant should still be offered, and is still entitled to, appropriate final remedies that may include services the complainant declined as an interim measure. A refusal at the interim stage does not mean the refused service or set of services should not be offered as a remedy.

If a school uses its student disciplinary procedures to meet its Title IX obligation to resolve complaints of sexual violence promptly and equitably, it should recognize that imposing sanctions against the perpetrator, without more, likely will not be sufficient to satisfy its Title IX obligation to eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects. Additional remedies for the complainant and the school community may be necessary. If the school's student disciplinary procedure does not include a process for determining and implementing these remedies for the complainant and school community, the school will need to use another process for this purpose.

Depending on the specific nature of the problem, remedies for the complainant may include, but are not limited to:

- Providing an effective escort to ensure that the complainant can move safely between classes and activities;

---

[31] As explained in question A-5, if a school delays responding to allegations of sexual violence or responds inappropriately, the school's own inaction may subject the student to be subjected to a hostile environment. In this case, in addition to the remedies discussed in this section, the school will also be required to remedy the effects of the sexual violence that could reasonably have been prevented had the school responded promptly and appropriately.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

- Ensuring the complainant and perpetrator do not share classes or extracurricular activities;

- Moving the perpetrator or complainant (if the complainant requests to be moved) to a different residence hall or, in the case of an elementary or secondary school student, to another school within the district;

- Providing comprehensive, holistic victim services including medical, counseling and academic support services, such as tutoring;

- Arranging for the complainant to have extra time to complete or re-take a class or withdraw from a class without an academic or financial penalty; and

- Reviewing any disciplinary actions taken against the complainant to see if there is a causal connection between the sexual violence and the misconduct that may have resulted in the complainant being disciplined.[32]

Remedies for the broader student population may include, but are not limited to:

- Designating an individual from the school's counseling center who is specifically trained in providing trauma-informed comprehensive services to victims of sexual violence to be on call to assist students whenever needed;

- Training or retraining school employees on the school's responsibilities to address allegations of sexual violence and how to conduct Title IX investigations;

- Developing materials on sexual violence, which should be distributed to all students;

- Conducting bystander intervention and sexual violence prevention programs with students;

- Issuing policy statements or taking other steps that clearly communicate that the school does not tolerate sexual violence and will respond to any incidents and to any student who reports such incidents;

---

[32] For example, if the complainant was disciplined for skipping a class in which the perpetrator was enrolled, the school should review the incident to determine if the complainant skipped class to avoid contact with the perpetrator.

Page 35 – Questions and Answers on Title IX and Sexual Violence

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

- Conducting, in conjunction with student leaders, a campus climate check to assess the effectiveness of efforts to ensure that the school is free from sexual violence, and using that information to inform future proactive steps that the school will take;

- Targeted training for a group of students if, for example, the sexual violence created a hostile environment in a residence hall, fraternity or sorority, or on an athletic team; and

- Developing a protocol for working with local law enforcement as discussed in question F-3.

When a school is unable to conduct a full investigation into a particular incident (*i.e.*, when it received a general report of sexual violence without any personally identifying information), it should consider remedies for the broader student population in response.

**H-2. If, after an investigation, a school finds the alleged perpetrator responsible and determines that, as part of the remedies for the complainant, it must separate the complainant and perpetrator, how should the school accomplish this if both students share the same major and there are limited course options?**

**Answer:** If there are limited sections of required courses offered at a school and both the complainant and perpetrator are required to take those classes, the school may need to make alternate arrangements in a manner that minimizes the burden on the complainant. For example, the school may allow the complainant to take the regular sections of the courses while arranging for the perpetrator to take the same courses online or through independent study.

**H-3. What information must be provided to the complainant in the notice of the outcome?**

**Answer:** Title IX requires both parties to be notified, in writing, about the outcome of both the complaint and any appeal. OCR recommends that a school provide written notice of the outcome to the complainant and the alleged perpetrator concurrently.

For Title IX purposes, a school must inform the complainant as to whether or not it found that the alleged conduct occurred, any individual remedies offered or provided to the complainant or any sanctions imposed on the perpetrator that directly relate to the complainant, and other steps the school has taken to eliminate the hostile environment, if the school finds one to exist, and prevent recurrence. The perpetrator should not be notified of the individual remedies offered or provided to the complainant.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Sanctions that directly relate to the complainant (but that may also relate to eliminating the hostile environment and preventing recurrence) include, but are not limited to, requiring that the perpetrator stay away from the complainant until both parties graduate, prohibiting the perpetrator from attending school for a period of time, or transferring the perpetrator to another residence hall, other classes, or another school. Additional steps the school has taken to eliminate the hostile environment may include counseling and academic support services for the complainant and other affected students. Additional steps the school has taken to prevent recurrence may include sexual violence training for faculty and staff, revisions to the school's policies on sexual violence, and campus climate surveys. Further discussion of appropriate remedies is included in question H-1.

In addition to the Title IX requirements described above, the Clery Act requires, and FERPA permits, postsecondary institutions to inform the complainant of the institution's final determination and any disciplinary sanctions imposed on the perpetrator in sexual violence cases (as opposed to all harassment and misconduct covered by Title IX) not just those sanctions that directly relate to the complainant.[33]

## I.  Appeals

**I-1.    What are the requirements for an appeals process?**

**Answer:**  While Title IX does not require that a school provide an appeals process, OCR does recommend that the school do so where procedural error or previously unavailable relevant evidence could significantly impact the outcome of a case or where a sanction is substantially disproportionate to the findings. If a school chooses to provide for an appeal of the findings or remedy or both, it must do so equally for both parties. The specific design of the appeals process is up to the school, as long as the entire grievance process, including any appeals, provides prompt and equitable resolutions of sexual violence complaints, and the school takes steps to protect the complainant in the educational setting during the process. Any individual or body handling appeals should be trained in the dynamics of and trauma associated with sexual violence.

If a school chooses to offer an appeals process it has flexibility to determine the type of review it will apply to appeals, but the type of review the school applies must be the same regardless of which party files the appeal.

---

[33] 20 U.S.C. § 1092(f) and 20 U.S.C. § 1232g(b)(6)(A).

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**I-2.  Must an appeal be available to a complainant who receives a favorable finding but does not believe a sanction that directly relates to him or her was sufficient?**

**Answer:**  The appeals process must be equal for both parties. For example, if a school allows a perpetrator to appeal a suspension on the grounds that it is too severe, the school must also allow a complainant to appeal a suspension on the grounds that it was not severe enough. See question H-3 for more information on what must be provided to the complainant in the notice of the outcome.

**J.   Title IX Training, Education and Prevention**[34]

**J-1.  What type of training on Title IX and sexual violence should a school provide to its employees?**

**Answer:**  A school needs to ensure that responsible employees with the authority to address sexual violence know how to respond appropriately to reports of sexual violence, that other responsible employees know that they are obligated to report sexual violence to appropriate school officials, and that all other employees understand how to respond to reports of sexual violence. A school should ensure that professional counselors, pastoral counselors, and non-professional counselors or advocates also understand the extent to which they may keep a report confidential. A school should provide training to all employees likely to witness or receive reports of sexual violence, including teachers, professors, school law enforcement unit employees, school administrators, school counselors, general counsels, athletic coaches, health personnel, and resident advisors. Training for employees should include practical information about how to prevent and identify sexual violence, including same-sex sexual violence; the behaviors that may lead to and result in sexual violence; the attitudes of bystanders that may allow conduct to continue; the potential for revictimization by responders and its effect on students; appropriate methods for responding to a student who may have experienced sexual violence, including the use of nonjudgmental language; the impact of trauma on victims; and, as applicable, the person(s) to whom such misconduct must be reported. The training should also explain responsible employees' reporting obligation, including what should be included in a report and any consequences for the failure to report and the procedure for responding to students' requests for confidentiality, as well as provide the contact

---

[34] As explained earlier, although this document focuses on sexual violence, the legal principles apply to other forms of sexual harassment. Schools should ensure that any training they provide on Title IX and sexual violence also covers other forms of sexual harassment. Postsecondary institutions should also be aware of training requirements imposed under the Clery Act.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

information for the school's Title IX coordinator. A school also should train responsible employees to inform students of: the reporting obligations of responsible employees; students' option to request confidentiality and available confidential advocacy, counseling, or other support services; and their right to file a Title IX complaint with the school and to report a crime to campus or local law enforcement. For additional information on the reporting obligations of responsible employees and others see questions D-1 to D-5.

There is no minimum number of hours required for Title IX and sexual violence training at every school, but this training should be provided on a regular basis. Each school should determine based on its particular circumstances how such training should be conducted, who has the relevant expertise required to conduct the training, and who should receive the training to ensure that the training adequately prepares employees, particularly responsible employees, to fulfill their duties under Title IX. A school should also have methods for verifying that the training was effective.

**J-2. How should a school train responsible employees to report incidents of possible sexual harassment or sexual violence?**

**Answer:** Title IX requires a school to take prompt and effective steps reasonably calculated to end sexual harassment and sexual violence that creates a hostile environment (*i.e.*, conduct that is sufficiently serious as to limit or deny a student's ability to participate in or benefit from the school's educational program and activity). But a school should not wait to take steps to protect its students until students have already been deprived of educational opportunities.

OCR therefore recommends that a school train responsible employees to report to the Title IX coordinator or other appropriate school official any incidents of sexual harassment or sexual violence that may violate the school's code of conduct or may create or contribute to the creation of a hostile environment. The school can then take steps to investigate and prevent any harassment or violence from recurring or escalating, as appropriate. For example, the school may separate the complainant and alleged perpetrator or conduct sexual harassment and sexual violence training for the school's students and employees. Responsible employees should understand that they do not need to determine whether the alleged sexual harassment or sexual violence actually occurred or that a hostile environment has been created before reporting an incident to the school's Title IX coordinator. Because the Title IX coordinator should have in-depth knowledge of Title IX and Title IX complaints at the school, he or she is likely to be in a better position than are other employees to evaluate whether an incident of sexual

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

harassment or sexual violence creates a hostile environment and how the school should respond. There may also be situations in which individual incidents of sexual harassment do not, by themselves, create a hostile environment; however when considered together, those incidents may create a hostile environment.

**J-3.    What type of training should a school provide to employees who are involved in implementing the school's grievance procedures?**

**Answer:** All persons involved in implementing a school's grievance procedures (*e.g.*, Title IX coordinators, others who receive complaints, investigators, and adjudicators) must have training or experience in handling sexual violence complaints, and in the operation of the school's grievance procedures. The training should include information on working with and interviewing persons subjected to sexual violence; information on particular types of conduct that would constitute sexual violence, including same-sex sexual violence; the proper standard of review for sexual violence complaints (preponderance of the evidence); information on consent and the role drugs or alcohol can play in the ability to consent; the importance of accountability for individuals found to have committed sexual violence; the need for remedial actions for the perpetrator, complainant, and school community; how to determine credibility; how to evaluate evidence and weigh it in an impartial manner; how to conduct investigations; confidentiality; the effects of trauma, including neurobiological change; and cultural awareness training regarding how sexual violence may impact students differently depending on their cultural backgrounds.

In rare circumstances, employees involved in implementing a school's grievance procedures may be able to demonstrate that prior training and experience has provided them with competency in the areas covered in the school's training. For example, the combination of effective prior training and experience investigating complaints of sexual violence, together with training on the school's current grievance procedures may be sufficient preparation for an employee to resolve Title IX complaints consistent with the school's grievance procedures. In-depth knowledge regarding Title IX and sexual violence is particularly helpful. Because laws and school policies and procedures may change, the only way to ensure that all employees involved in implementing the school's grievance procedures have the requisite training or experience is for the school to provide regular training to all individuals involved in implementing the school's Title IX grievance procedures even if such individuals also have prior relevant experience.

000182

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**J-4.** **What type of training on sexual violence should a school provide to its students?**

**Answer:** To ensure that students understand their rights under Title IX, a school should provide age-appropriate training to its students regarding Title IX and sexual violence. At the elementary and secondary school level, schools should consider whether sexual violence training should also be offered to parents, particularly training on the school's process for handling complaints of sexual violence. Training may be provided separately or as part of the school's broader training on sex discrimination and sexual harassment. However, sexual violence is a unique topic that should not be assumed to be covered adequately in other educational programming or training provided to students. The school may want to include this training in its orientation programs for new students; training for student athletes and members of student organizations; and back-to-school nights. A school should consider educational methods that are most likely to help students retain information when designing its training, including repeating the training at regular intervals. OCR recommends that, at a minimum, the following topics (as appropriate) be covered in this training:

- Title IX and what constitutes sexual violence, including same-sex sexual violence, under the school's policies;
- the school's definition of consent applicable to sexual conduct, including examples;
- how the school analyzes whether conduct was unwelcome under Title IX;
- how the school analyzes whether unwelcome sexual conduct creates a hostile environment;
- reporting options, including formal reporting and confidential disclosure options and any timeframes set by the school for reporting;
- the school's grievance procedures used to process sexual violence complaints;
- disciplinary code provisions relating to sexual violence and the consequences of violating those provisions;
- effects of trauma, including neurobiological changes;
- the role alcohol and drugs often play in sexual violence incidents, including the deliberate use of alcohol and/or other drugs to perpetrate sexual violence;
- strategies and skills for bystanders to intervene to prevent possible sexual violence;
- how to report sexual violence to campus or local law enforcement and the ability to pursue law enforcement proceedings simultaneously with a Title IX grievance; and
- Title IX's protections against retaliation.

The training should also encourage students to report incidents of sexual violence. The training should explain that students (and their parents or friends) do not need to determine whether incidents of sexual violence or other sexual harassment created a

000183

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

hostile environment before reporting the incident. A school also should be aware that persons may be deterred from reporting incidents if, for example, violations of school or campus rules regarding alcohol or drugs were involved. As a result, a school should review its disciplinary policy to ensure it does not have a chilling effect on students' reporting of sexual violence offenses or participating as witnesses. OCR recommends that a school inform students that the school's primary concern is student safety, and that use of alcohol or drugs never makes the survivor at fault for sexual violence.

It is also important for a school to educate students about the persons on campus to whom they can confidentially report incidents of sexual violence. A school's sexual violence education and prevention program should clearly identify the offices or individuals with whom students can speak confidentially and the offices or individuals who can provide resources such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance. It should also identify the school's responsible employees and explain that if students report incidents to responsible employees (except as noted in question E-3) these employees are required to report the incident to the Title IX coordinator or other appropriate official. This reporting includes the names of the alleged perpetrator and student involved in the sexual violence, as well as relevant facts including the date, time, and location, although efforts should be made to comply with requests for confidentiality from the complainant. For more detailed information regarding reporting and responsible employees and confidentiality, see questions D-1 to D-5 and E-1 to E-4.

### K. Retaliation

**K-1. Does Title IX protect against retaliation?**

**Answer:** Yes. The Federal civil rights laws, including Title IX, make it unlawful to retaliate against an individual for the purpose of interfering with any right or privilege secured by these laws. This means that if an individual brings concerns about possible civil rights problems to a school's attention, including publicly opposing sexual violence or filing a sexual violence complaint with the school or any State or Federal agency, it is unlawful for the school to retaliate against that individual for doing so. It is also unlawful to retaliate against an individual because he or she testified, or participated in any manner, in an OCR or school's investigation or proceeding. Therefore, if a student, parent, teacher, coach, or other individual complains formally or informally about sexual violence or participates in an OCR or school's investigation or proceedings related to sexual violence, the school is prohibited from retaliating (including intimidating, threatening, coercing, or in any way

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

discriminating against the individual) because of the individual's complaint or participation.

A school should take steps to prevent retaliation against a student who filed a complaint either on his or her own behalf or on behalf of another student, or against those who provided information as witnesses.

Schools should be aware that complaints of sexual violence may be followed by retaliation against the complainant or witnesses by the alleged perpetrator or his or her associates. When a school knows or reasonably should know of possible retaliation by other students or third parties, it must take immediate and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and witnesses and ensure their safety as necessary. At a minimum, this includes making sure that the complainant and his or her parents, if the complainant is in elementary or secondary school, and witnesses know how to report retaliation by school officials, other students, or third parties by making follow-up inquiries to see if there have been any new incidents or acts of retaliation, and by responding promptly and appropriately to address continuing or new problems. A school should also tell complainants and witnesses that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation, but will also take strong responsive action if it occurs.

**L.   First Amendment**

**L-1.   How should a school handle its obligation to respond to sexual harassment and sexual violence while still respecting free-speech rights guaranteed by the Constitution?**

**Answer:**  The DCL on sexual violence did not expressly address First Amendment issues because it focuses on unlawful physical sexual violence, which is not speech or expression protected by the First Amendment.

However, OCR's previous guidance on the First Amendment, including the 2001 Guidance, OCR's July 28, 2003, Dear Colleague Letter on the First Amendment,[35] and OCR's October 26, 2010, Dear Colleague Letter on harassment and bullying,[36] remain fully in effect. OCR has made it clear that the laws and regulations it enforces protect students from prohibited discrimination and do not restrict the exercise of any expressive activities or speech protected under the U.S. Constitution. Therefore, when a school works to prevent

---

[35] Available at http://www.ed.gov/ocr/firstamend.html.
[36] Available at http://www.ed.gov/ocr/letters/colleague-201010.html.

000185

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

and redress discrimination, it must respect the free-speech rights of students, faculty, and other speakers.

Title IX protects students from sex discrimination; it does not regulate the content of speech. OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a hostile environment under Title IX. Title IX also does not require, prohibit, or abridge the use of particular textbooks or curricular materials.[37]

**M.  The Clery Act and the Violence Against Women Reauthorization Act of 2013**

**M-1.  How does the Clery Act affect the Title IX obligations of institutions of higher education that participate in the federal student financial aid programs?**

**Answer:**  Institutions of higher education that participate in the federal student financial aid programs are subject to the requirements of the Clery Act as well as Title IX. The Clery Act requires institutions of higher education to provide current and prospective students and employees, the public, and the Department with crime statistics and information about campus crime prevention programs and policies. The Clery Act requirements apply to many crimes other than those addressed by Title IX. For those areas in which the Clery Act and Title IX both apply, the institution must comply with both laws. For additional information about the Clery Act and its regulations, please see http://www2.ed.gov/admins/lead/safety/campus.html.

**M-2.  Were a school's obligations under Title IX and the DCL altered in any way by the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, including Section 304 of that Act, which amends the Clery Act?**

**Answer:**  No. The Violence Against Women Reauthorization Act has no effect on a school's obligations under Title IX or the DCL. The Violence Against Women Reauthorization Act amended the Violence Against Women Act and the Clery Act, which are separate statutes. Nothing in Section 304 or any other part of the Violence Against Women Reauthorization Act relieves a school of its obligation to comply with the requirements of Title IX, including those set forth in these Questions and Answers, the 2011 DCL, and the *2001 Guidance*. For additional information about the Department's negotiated rulemaking related to the Violence Against Women Reauthorization Act please see http://www2.ed.gov/policy/highered/reg/hearulemaking/2012/vawa.html.

---

[37] 34 C.F.R. § 106.42.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**N.  Further Federal Guidance**

**N-1.  Whom should I contact if I have additional questions about the DCL or OCR's other Title IX guidance?**

**Answer:**  Anyone who has questions regarding this guidance, or Title IX should contact the OCR regional office that serves his or her state. Contact information for OCR regional offices can be found on OCR's webpage at https://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm. If you wish to file a complaint of discrimination with OCR, you may use the online complaint form available at http://www.ed.gov/ocr/complaintintro.html or send a letter to the OCR enforcement office responsible for the state in which the school is located. You may also email general questions to OCR at ocr@ed.gov.

**N-2.  Are there other resources available to assist a school in complying with Title IX and preventing and responding to sexual violence?**

**Answer:**  Yes. OCR's policy guidance on Title IX is available on OCR's webpage at http://www.ed.gov/ocr/publications.html#TitleIX. In addition to the April 4, 2011, Dear Colleague Letter, OCR has issued the following resources that further discuss a school's obligation to respond to allegations of sexual harassment and sexual violence:

- Dear Colleague Letter: Harassment and Bullying (October 26, 2010), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf

- *Sexual Harassment: It's Not Academic* (Revised September 2008), http://www2.ed.gov/about/offices/list/ocr/docs/ocrshpam.pdf

- *Revised Sexual Harassment Guidance: Harassment of Students by Employees, Other Students, or Third Parties* (January 19, 2001), http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf

000187

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

In addition to guidance from OCR, a school may also find resources from the Departments of Education and Justice helpful in preventing and responding to sexual violence:

- Department of Education's Letter to Chief State School Officers on Teen Dating Violence Awareness and Prevention (February 28, 2013) https://www2.ed.gov/policy/gen/guid/secletter/130228.html

- Department of Education's National Center on Safe Supportive Learning Environments http://safesupportivelearning.ed.gov/

- Department of Justice, Office on Violence Against Women http://www.ovw.usdoj.gov/



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

## Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities[*]

The Office for Civil Rights (OCR) of the U.S. Department of Education (Department) has received a number of questions about the legality, under the Department's regulations implementing Title IX of the Education Amendments of 1972 (Title IX), of single-sex elementary and secondary classes and extracurricular activities offered by recipients of funding from the Department.[1]

Although Title IX prohibits discrimination on the basis of sex in federally funded education programs and activities, regulations issued by the Department authorize schools to offer single-sex classes or extracurricular activities under certain circumstances.[2]  In order to ensure that schools subject to Title IX comply with the Department's requirements if they choose to offer single-sex classes and extracurricular activities, OCR provides the following responses to questions that schools should consider when assessing their compliance with Title IX.  Although this document focuses on single-sex classes, some of the legal principles will also apply to single-sex schools.  In order to gain a complete understanding of these legal requirements and recommendations, this document should be read in full.

Authorized by

  /s/

Catherine E. Lhamon                              December 1, 2014
Assistant Secretary for Civil Rights

---

[*] The Department has determined that this document is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), *available at* www.whitehouse.gov/sites/default/files/omb/fedreg/2007/012507_good_guidance.pdf.  OCR issues this and other policy guidance to provide recipients with information to assist them in meeting their obligations, and to provide members of the public with information about their rights, under the civil rights laws and implementing regulations that it enforces.  OCR's legal authority is based on those laws and regulations.  This guidance does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations.  If you are interested in commenting on this guidance, please send an e-mail with your comments to OCR@ed.gov, or write to the following address: Office for Civil Rights, U.S. Department of Education, 400 Maryland Avenue, SW, Washington, D.C. 20202.

[OCR-00082]

*Notice of Language Assistance*

**Notice of Language Assistance:** If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

給英語能力有限人士的通知：如果您不懂英語，或者使用英語有困難，您可以要求獲得向大眾提供的語言協助服務，幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊，請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339)，或電郵：Ed.Language.Assistance@ed.gov.。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức của Bộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

영어 미숙자를 위한 공고: 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에 일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로 제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800-USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는 이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkol sa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вам предоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877-8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov

**TABLE OF CONTENTS**

**Notice of Language Assistance** ................................................................................. ii

**Overview of Title IX's Application to Single-Sex Classes and Extracurricular Activities** ............. 1

1.  What types of schools are covered by the Department's Title IX regulations on single-sex classes? ........................................................................................ 1

2.  Are there other legal considerations beyond the Title IX regulations discussed in this guidance document that apply to single-sex classes? ................................................. 1

3.  Does this document address single-sex schools? ................................................... 2

4.  May schools offer single-sex classes and extracurricular activities under the Department's Title IX regulations? ........................................................................ 3

5.  What kinds of classes and activities does this document address? ................................. 3

6.  Is a class that is open to all students but in which only members of one sex enroll covered by the Title IX regulations described in this document? ...................................... 4

7.  What criteria must be met to offer single-sex classes under the Department's Title IX regulations? .......................................................................................... 4

**Justification for Offering a Single-Sex Class** ............................................................... 5

8.  Does a recipient need a justification for each single-sex class or activity it offers? ........... 5

9.  When must a recipient establish its justification for a single-sex class? ........................... 5

10. In what ways can a school identify an important objective for offering a single-sex class? ................................................................................................ 5

11. What kind of evidence may a recipient use to show that the single-sex nature of a class is substantially related to achieving an important objective? ................................... 8

12. May a recipient demonstrate a substantial relationship using a claim that a certain strategy, other than single-sex, is more effective for most members of one sex? .......... 11

**Evenhanded Offerings** ................................................................................................ 12

   13.  What is the evenhandedness requirement? ...................................................... 12

   14.  How does the evenhandedness analysis apply if a recipient is asserting the diversity objective? ..................................................................................................... 12

   15.  How does the evenhandedness analysis apply if a recipient is asserting the needs objective? ..................................................................................................... 14

**Voluntariness** .......................................................................................................... 15

   16.  Who decides whether a student enrolls in a single-sex class? ......................... 15

   17.  May a recipient assign students to a single-sex class as long as it permits students to opt out of the class? ..................................................................................... 15

   18.  May a recipient make it easier to enroll in a single-sex class than it is to enroll in a coeducational class? ......................................................................................... 15

   19.  How does the breadth of class offerings affect voluntariness? ....................... 16

   20.  What additional steps should a recipient take to ensure that participation in a single-sex class is completely voluntary? ......................................................... 16

**Substantially Equal Coeducational Option** ............................................................ 17

   21.  Must a recipient offer a substantially equal coeducational option for every single-sex class offered? .............................................................................................. 17

   22.  What factors will OCR consider in determining whether a coeducational class is substantially equal to the single-sex class? ..................................................... 18

**Periodic Evaluations** ............................................................................................... 20

   23.  How often must a recipient conduct an evaluation of its single-sex programs? ............. 20

   24.  What is the purpose of these evaluations? ...................................................... 20

   25.  Must the periodic evaluation address the way a single-sex class is taught? ................... 21

   26.  How should the evaluations be made available to the public? ......................... 23

   27.  How will OCR determine whether a periodic evaluation demonstrates that a single-sex class is still substantially related to the recipient's important objective? ................. 23

000192

28.  What is the role of the recipient's Title IX coordinator in conducting these evaluations?.................................................................................... 24

**Employment**............................................................................................... **25**

29.  May a recipient assign teachers to single-sex classes based on the sex of the teacher? ...................................................................................... 25

**Other Federal Protections for Students in Single-Sex Classes**............................. **25**

30.  May a recipient exclude students with disabilities or English language learners from a single-sex class so long as it permits them to participate in the substantially equal coeducational class? ........................................................ 25

31.  How do the Title IX requirements on single-sex classes apply to transgender students? ....................................................................................... 25

**Additional Topics**......................................................................................... **26**

32.  Which set of regulations governs a school within a school—the regulations governing single-sex schools or the regulations governing single-sex classes?............... 26

33.  How can I contact OCR to get additional information or to file a complaint? .................. 26

000193

*Overview of Title IX's Application to Single-Sex Classes and Extracurricular Activities\**

1.  **What types of schools are covered by the Department's Title IX regulations on single-sex classes?**

    **Answer:** Coeducational elementary and secondary schools and school districts that receive Federal financial assistance from the Department must comply with the Department's Title IX regulations in 34 C.F.R. § 106.34(b) on single-sex classes if they intend to offer such classes. (OCR often refers to these schools and school districts as "recipients.") In practice, the regulations regarding single-sex classes apply to every public school (including traditional, charter, and magnet schools) because every public school is part of a local education agency that receives financial assistance from the Department. The regulations also apply to the few private coeducational schools that receive Federal financial assistance from the Department[3] and wish to offer single-sex classes.[†]

2.  **Are there other legal considerations beyond the Title IX regulations discussed in this guidance document that apply to single-sex classes?**

    **Answer:** Yes. While this document only addresses the requirements of the Department's Title IX regulations, public school districts and schools that are currently offering or are interested in offering single-sex classes must comply with the Constitution of the United States and other applicable Federal laws. The Equal Protection Clause of the Fourteenth Amendment prohibits discrimination on the basis of sex by public schools.[4] In addition, Title IV of the Civil Rights Act of 1964 (Title IV) prohibits public school boards from denying students the equal protection of the laws based on sex,[5] and the Equal Educational Opportunities Act (EEOA) prohibits some forms of student assignment to schools if the assignment results in sex segregation.[6]

---

[*] The Department's regulations clarified in this document apply to all single-sex classes and extracurricular activities covered by 34 C.F.R. § 106.34(b). For simplicity, OCR generally uses the term "classes" or "classes and activities" to refer to "classes and extracurricular activities."

[†] A private school that is controlled by a religious organization is exempt from Title IX even when it receives Federal financial assistance to the extent that the law's requirements conflict with the organization's religious tenets. 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12(a). For application of this provision to a specific institution, please contact the appropriate OCR regional office. (See the response to Question 33 to determine which regional office serves your location.)

All of these legal requirements are enforced in different ways. OCR has authority to investigate a potential Title IX violation in response to a complaint or proactively through a compliance review and may refer a matter to the Department of Justice (DOJ) if voluntary compliance cannot be achieved.[7] DOJ also has independent authority to enforce the Equal Protection Clause, Title IV, and the EEOA. Additionally, an individual may bring a private lawsuit against a school district or school for alleged violations of Title IX, the Equal Protection Clause, or the EEOA, and DOJ may seek to intervene in such a suit.

Therefore, when public school districts and schools offer single-sex classes, they must ensure that they comply with the Constitution and all applicable Federal laws, not just Title IX. State and local rules cannot limit or override the requirements of Federal laws, including Title IX and its regulations, but States and localities may have constitutions, laws, or regulations that impose additional limitations regarding the offering of single-sex classes.[8]

OCR recommends that a school district or school consult with legal counsel prior to offering single-sex classes.

3. **Does this document address single-sex schools?**

**Answer:** This document focuses on the Department's Title IX regulations pertaining to single-sex classes in public elementary and secondary schools. There are separate Title IX regulations in 34 C.F.R. § 106.34(c) that govern public, nonvocational single-sex schools. Generally, a school district may offer a single-sex nonvocational elementary or secondary school under Title IX only if it offers a substantially equal single-sex or coeducational school to students of the excluded sex.[9] However, single-sex nonvocational private schools are not governed by the Department's Title IX regulation requiring a substantially equal single-sex or coeducational school. By contrast, vocational schools that receive Federal financial assistance may never be limited to one sex.[10] There are also Department Title IX regulations that apply to admissions to single-sex nonvocational public and private colleges and universities.[11]

As noted in the response to Question 2, public single-sex schools are subject to the Equal Protection Clause of the Fourteenth Amendment and other Federal statutes as well as Title IX. The Department requires grant applicants that seek funds or other forms of Federal financial assistance for the establishment or operation of a public single-sex school to demonstrate the school's compliance with Title IX, the Equal Protection Clause of the Fourteenth Amendment, and all other applicable laws and regulations. Failure to demonstrate compliance with these requirements may lead to a rejection of the grant application or disqualification from receipt of continuation funds or other financial assistance.

4. **May schools offer single-sex classes and extracurricular activities under the Department's Title IX regulations?**

   **Answer:** Yes.  The Department's Title IX regulations permit offering single-sex classes under certain circumstances.  The general rule under Title IX is that a recipient may not exclude, separate, deny benefits to, or otherwise treat differently any person on the basis of sex in its education programs or activities—including classes and extracurricular activities—unless expressly authorized to do so under Title IX or the Department's implementing regulations.[12]  The Department's Title IX regulations identify the following categories for which a recipient may intentionally separate students by sex: [13]

   - Contact sports in physical education classes;[14]

   - Classes or portions of classes in elementary and secondary schools that deal primarily with human sexuality;[15] and

   - Nonvocational classes and extracurricular activities within a coeducational, nonvocational elementary or secondary school if certain criteria are met.[16]

5. **What kinds of classes and activities does this document address?**

   **Answer**: This document focuses on the last exception noted in the response to Question 4—nonvocational classes and extracurricular activities in a coeducational, nonvocational elementary or secondary school receiving Federal financial assistance.  These include any single-sex curricular activity (such as a class or a field trip) and any single-sex extracurricular activity (such as a before-school or after-school activity, lunch, or recess).  The requirements regarding this exception apply to single-sex classes and activities whether they are provided directly by a school district or school or through another entity.[17]

   Vocational classes are not discussed further in this document because they may never be offered on a single-sex basis.[18]  For purposes of this document, vocational classes are those classes that have as their primary purpose the preparation of students to pursue a technical, skilled, or semi-skilled occupation or trade; or to pursue study in a technical field, consistent with the definition of "institution of vocational education" in 34 C.F.R. § 106.2(o).[19]

   OCR does not address interscholastic, club, or intramural athletics in this document because extracurricular athletics are governed by separate Title IX regulations.[20]

6. **Is a class that is open to all students but in which only members of one sex enroll covered by the Title IX regulations described in this document?**

**Answer**: No. The regulations described in this document apply to a class that excludes students of one sex from enrolling or otherwise participating in that class.

By contrast, a class is not subject to the regulations described in this document if it is open to members of both sexes, even if students of only one sex, or a substantially disproportionate number of students of one sex, enroll. If such disproportion exists in a coeducational class, however, it may be an indication of inappropriate steering or other discrimination in counseling or guidance. Title IX requires that, if such disproportion exists, the school ensure that the disproportionate enrollment is not the result of discrimination on the basis of sex, including in counseling or guidance of students or applicants for admission.[21]

7. **What criteria must be met to offer single-sex classes under the Department's Title IX regulations?**

**Answer:** The Department's Title IX regulations permit a nonvocational elementary or secondary school to offer a nonvocational single-sex class if it has a two-part justification for doing so that demonstrates that:

- each single-sex class is based on the recipient's "important objective" either to

  - improve its students' educational achievement through its overall established policies to provide diverse educational opportunities (the diversity objective), or

  - to meet the particular, identified educational needs of its students (the needs objective); and

- the single-sex nature of the class is "substantially related" to achieving that important objective.[22]

In addition to establishing a justification for offering a single-sex class, in order to comply with the Department's Title IX regulations, the recipient must:

- implement its objective in an evenhanded manner;

- ensure that student enrollment in the single-sex class is completely voluntary;

- provide a substantially equal coeducational class in the same subject; and

000197

- conduct periodic evaluations to determine whether the class complies with Title IX, and if not, modify or discontinue the class to ensure compliance with Title IX.

Each of these elements is discussed below.

*Justification for Offering a Single-Sex Class*

**8. Does a recipient need a justification for each single-sex class or activity it offers?**

**Answer:** Yes.  A specific, individual justification (demonstrating the recipient's objective and the substantial relationship between the objective and the single-sex nature of the class or activity) is necessary for each single-sex class or activity.  A recipient may not offer single-sex classes in multiple grades or subjects without separately justifying each class.  At the elementary school level, where a class typically covers many subjects, the recipient must separately justify the use of single-sex classes for each subject.  This requirement applies to each single-sex curricular activity and each single-sex extracurricular activity offered by the school.

**9. When must a recipient establish its justification for a single-sex class?**

**Answer:** A recipient must establish its justification prior to offering the single-sex class.[23]

Although OCR does not pre-approve class offerings or offer legal advisory opinions, OCR will request documentation of the justification during a complaint investigation or compliance review.  OCR will review the justification to ensure that it was the actual reason that motivated the offering of that single-sex class, rather than an after-the-fact explanation prepared in response to the complaint or investigation.[24]  A recipient is not required to prepare a written justification, but in the absence of a written justification, OCR will assume that the recipient did not establish its justification prior to offering the single-sex class and that any justification was established after the initiation of the complaint investigation or compliance review, unless the recipient can prove otherwise.  Therefore, it is strongly recommended that the recipient articulate its justification in writing prior to offering the single-sex class and preserve that documentation for at least as long as the recipient offers the single-sex class in question and for a reasonable time after the class ends.  This documentation may also assist the recipient as it periodically evaluates its single-sex offerings, as discussed in more detail in response to Questions 23 through 28.

**10. In what ways can a school identify an important objective for offering a single-sex class?**

**Answer:** To offer a single-sex class, a school district or school must first identify an important objective that the particular single-sex class is intended to address.  The Title IX

regulations on single-sex classes describe the following two important objectives, one of which must be the basis for offering a single-sex class.

- Diversity Objective: "To improve educational achievement of its students, through a recipient's overall established policy to provide diverse educational opportunities, provided that the single-sex nature of the class or extracurricular activity is substantially related to achieving that objective."[25]

  To meet this objective, a recipient must first identify the educational achievement it seeks to improve through the diverse educational opportunities it offers and the proposed single-sex class.[26]  Recipients may not rely on the diversity objective if the only type of nontraditional class offered is a single-sex class.[27]  Rather, the recipient must offer a range of diverse educational opportunities beyond single-sex and coeducational classes.  Diverse offerings in a school might include, for example, a variety of electives, a variety of curricula (such as a science, technology, engineering, math (STEM) focus or International Baccalaureate classes), co-op or internship opportunities, or the option to take classes at other schools.

  - *Example A*[*]: The students at Options High School earn high grades and above-average scores on State exams, but their enrollment in Advanced Placement (AP) classes is low.  Options High School would like to increase enrollment in AP classes in an effort to improve its students' college preparedness.  As part of its college-preparedness effort, Options High School offers diverse educational opportunities, including AP classes, a variety of electives, a STEM-focused curriculum option, and a visual and performing arts-focused curriculum option.  Many students who are not enrolled in AP classes have expressed interest in taking AP classes in a single-sex setting.  The high school would like to add single-sex AP classes to its class offerings in order to increase enrollment in AP classes and thus improve college preparedness.  Under these circumstances, attempting to improve its students' college preparedness through single-sex AP classes is an appropriate use of the diversity objective.

---

[*] This document provides guidance on a number of Title IX requirements applicable to single-sex classes, including justification/important objective; substantial relationship; evenhandedness; voluntariness; a substantially equal coeducational class; and periodic evaluations.  Each example in this document is intended to illustrate the principles discussed in the response in which the example appears.  Each example also presumes compliance with all the Title IX requirements discussed elsewhere in the document and should be read with that understanding.

- <u>Needs Objective</u>: "To meet the particular, identified educational needs of its students, provided that the single-sex nature of the class or extracurricular activity is substantially related to achieving that objective."[28]

   Unlike the diversity objective, to meet the needs objective, the recipient must identify a particular educational need in its student body, evidenced by limited or deficient educational achievement, which is not being met by coeducational classes.[29]

   o *Example B*: Underperforming Elementary School wants to address the fact that its male third-grade students routinely score "not proficient" on the State reading exam.  Attempting to increase male students' performance to proficient on a State exam through the offering of a single-sex third-grade reading class is an appropriate use of the needs objective.

   The needs objective also encompasses certain social needs that students may have.  The Department recognizes that a school's educational mission may extend beyond strictly academic objectives, and that classes and activities may provide social benefits that can have a positive effect on students' educational outcomes.[30]

   o *Example C*: A high school's Title IX coordinator has received a number of reports of dating violence among the school's students.  All of the reports came from female complainants and were about male aggressors.  Many of the female complainants have expressed a fear of interacting with male students.  To address the issue, the school offers an after-school, extracurricular program to provide all students with information about dating violence, the cycle of abuse, anger management, and effective methods for ending a violent relationship.  The school offers the program to students on a single-sex basis, with boys meeting on one night and girls meeting a different night, as well as a coeducational option.

   Given the circumstances at this school, attempting to decrease the prevalence of dating violence among students by offering a single-sex extracurricular activity is an appropriate use of the needs objective.

Regardless of which objective it chooses, the recipient must meet the other Title IX requirements discussed in this document, including showing that the single-sex nature of the class is substantially related (*see* the responses to Questions 11 and 12) to meeting the identified objective.

Administrative convenience will never justify the offering of single-sex classes.[31]

○ *Example D*: Shortcut Elementary School's fourth-grade class is half female and half male. The fourth-grade students have lunch and recess from 10:30 a.m. to 11:30 a.m., with half an hour allotted for lunch and half an hour for recess. Half of the students have lunch first, followed by recess. The other half of the students go to recess first, followed by lunch. To make it easier for teachers to know whether students are attending their assigned lunch/recess block, Shortcut Elementary has divided the students by sex, with all fourth-grade girls in the first group and all fourth-grade boys in the second group. This is not an appropriate justification for operating single-sex lunch and recess.

**11. What kind of evidence may a recipient use to show that the single-sex nature of a class is substantially related to achieving an important objective?**

**Answer:** The substantial relationship between the single-sex nature of the class and the school's important objective must be directly supported by evidence (as described below) gathered and evaluated prior to offering the single-sex class. Below are examples of types of evidence that a recipient may use to demonstrate the required substantial relationship. A recipient may use more than one type of evidence to determine whether a substantial relationship exists. Regardless of the evidence used, the justification may "not rely on overbroad generalizations about the different talents, capacities, or preferences of" either sex, so, likewise, the evidence cited in the justification may not rely on these overly broad generalizations.[32]

Comparator schools: The recipient may obtain data demonstrating a substantial relationship through the use of comparator schools. To do this, the recipient must: (1) identify comparator schools with a student population and school and class setting (*e.g.*, grades served, curricular offerings, geographic location, admissions requirements, educational benefits, etc.) that are similar to the population and setting of the recipient's school; and (2) obtain data showing that the comparator schools achieved the recipient's important objective in the relevant subject or with respect to the relevant educational or social need through the use of single-sex classes. When identifying comparator schools, the recipient should consider factors that may distinguish two schools, such as socioeconomic differences among the student population, differences in admissions policies and criteria, or resources available through private funding.

If the recipient can identify appropriate comparator schools that have offered single-sex classes in the same subjects and grades, the recipient should ensure that the comparator school's success in each class is substantially related to the single-sex nature of the class rather than other simultaneously used strategies (*e.g.*, tutoring, extended class sessions, weekend academic programming, etc.). If the comparator school used other strategies in

its single-sex class, the recipient will need to take further steps in order to show a substantial relationship between its important objective and the single-sex nature of the class because it would be very difficult to determine whether any success in the comparator school was due to the single-sex nature of the class or the other strategies that were used. One way for the recipient school to demonstrate that the single-sex nature of the class contributed to the students' success is to try the other strategies used by the comparator school in a coeducational setting at the recipient's school prior to offering a single-sex class and to compare the results relative to the important objective that the recipient seeks to achieve.

- o *Example E*: A majority of seventh-grade boys at Evidentiary Middle School have scored "not proficient" on the State science exam for the past three years. The school has identified a public school in a neighboring district, Comparator Middle School, which has dramatically increased its seventh-grade boys' scores on the State science exam over the past five years. Comparator Middle School is roughly the same size as Evidentiary Middle School, and both schools serve students at the same grade level and of similar socioeconomic status. Evidentiary Middle School would like to implement Comparator Middle School's science program in hopes that Evidentiary's seventh-grade boys will achieve similar success.

  In achieving its gains, Comparator Middle School offered a single-sex science class for seventh-grade boys. The State science exam scores of male students in that class increased significantly. The all-boys science class used a newly developed curriculum and textbook, implemented a double-period science class, offered after-school tutoring to all students in the class, and implemented a mandatory robotics-themed Saturday school for the seventh-grade students in those classes.

  Evidentiary Middle School implemented these same sex-neutral strategies in its coeducational seventh-grade science classes: it adopted the curriculum and textbook used by Comparator, increased class time to make science a double-period class, offered after-school tutoring, and implemented the same mandatory robotics-themed Saturday school. It offered these classes on a coeducational basis for three years, but the science scores of its seventh-grade boys remained stagnant. At that point, consistent with the needs objective, Evidentiary decided to offer an all-boys seventh-grade science class in conjunction with the sex-neutral strategies listed above.

Given these facts, OCR would find that Evidentiary Middle School had shown a substantial relationship between its objective of increasing its seventh-grade male students' proficiency on the State science exam and the single-sex nature of the boys science class it decided to offer.

o  *Example F*: Most girls at Scientific High School do not enroll in AP Chemistry, though their grades and scores on State science exams suggest that they would be good candidates for the class.  Boys at Scientific High School do enroll in AP Chemistry and all students otherwise take advantage of the school's widely diverse class offerings.  Consistent with the diversity objective, Scientific High School would like to improve the educational achievement of its students by increasing female enrollment in AP Chemistry by further expanding its class offerings to include an all-girls AP Chemistry class.

Scientific High School has identified two schools in nearby districts that have implemented an all-girls AP Chemistry class.  These schools are approximately the same size as Scientific High School, and all three schools serve students at the same grade level and of similar socioeconomic status.  All three are neighborhood schools with no specific admissions requirements, and all students receive transportation to and from school through the applicable district.

Over the last three years, since the implementation of those classes, the enrollment rate of female students in AP Chemistry has steadily increased at both of the two comparator schools.  Female enrollment in those schools' coeducational AP Chemistry classes has stayed roughly the same.  The schools did not change any other aspect of their AP Chemistry programs; the single-sex classes are identical to their coeducational counterparts.

Given these facts, OCR would find that, through its overall policy to provide diverse educational opportunities, Scientific High School had shown a substantial relationship between the single-sex nature of the girls science class and its important objective of improving the educational achievement of its students by increasing female enrollment in AP Chemistry.

Research Evidence: Research evidence demonstrating the effectiveness of single-sex classes in circumstances sufficiently similar to the school's circumstances may also satisfy the substantial relationship requirement.  A 2005 Department-commissioned survey found the results of available research on the general use of single-sex education were equivocal.[33]  Nonetheless, to satisfy the substantial relationship requirement, OCR will accept a research study that: 1) employs a rigorous research design for causal inference; 2) demonstrates the

effectiveness of the single-sex nature of the class with respect to the specific important objective at issue (*e.g.*, improving achievement in Algebra or reducing infractions requiring discipline); and 3) includes a sample that overlaps with the proposed populations or settings (*e.g.*, ninth-grade girls in low-income communities) that the recipient is targeting. The standards set forth in the Department's *What Works Clearinghouse Procedures and Standards Handbook*[34] provide an appropriate guide for assessing the strength of a study of the effectiveness of the intervention (*e.g.*, limiting a class to a single sex) in addressing the school's important objective.

- o *Example G:* Town Elementary School would like to offer an all-boys fourth-grade class to reduce the discipline problems of the boys in that grade. Before it offers this class, Town Elementary School finds a research study that meets the What Works Clearinghouse Procedures and Standards and concludes that boys ages five through ten in all-boys classrooms committed fewer infractions leading to discipline than boys in coeducational "control" classes with identical rules and procedures for discipline, curricula, educational strategies, teacher-student ratio, and student population (e.g., eligibility for free and reduced-price lunch).[35] The population and settings of the single-sex and coeducational classes examined in the study are almost identical to those of Town Elementary School's fourth-grade classes. Absent facts distinguishing the research classes from Town Elementary School's classes, OCR would find this study is sufficient to show a substantial relationship between the school's objective of reducing discipline and the single-sex nature of the class.

**12. May a recipient demonstrate a substantial relationship using a claim that a certain strategy, other than single-sex, is more effective for most members of one sex?**

**Answer**: Claims that a certain strategy (such as a teaching method or a specific learning environment) is more effective for most members of one sex will not be sufficient, standing alone, to show a substantial relationship between the single-sex nature of a class and the important objective. This is because such a strategy may be equally effective regardless of whether it is implemented in a single-sex or a coeducational setting. If the recipient wants to use that strategy in a single-sex setting, the recipient still needs to show that students will benefit from the fact that the class is single-sex. Therefore, even assuming a recipient had evidence showing that a certain strategy was particularly effective for one sex, the recipient would need further evidence showing that the exclusion of the other sex was necessary to make the strategy effective or, at least, substantially more effective. (This showing could be made through the use of comparator schools or research evidence, described in the response to Question 11.)

o   *Example H:* A majority of third-grade girls at Cold Elementary School are underperforming on State science tests.  Cold Elementary School would like to implement an all-girls third-grade class that keeps the classroom temperature ten degrees higher than the school's other classrooms, because the school's principal has read an article suggesting that girls learn better in warmer temperatures and boys learn better in colder temperatures.  The article did not cite to any studies comparing students in coeducational warm or cold classes with students in single-sex warm or cold classes, but rather simply concluded that all girls will learn better in a warm environment and that all boys will learn better in a cold environment.  Even if this research were reliable, it would not prove that boys would learn better in a cold environment with no girls, or that girls would learn better in a warm environment with no boys.

Thus, the school cannot show a substantial relationship between the single-sex nature of the class and the anticipated increase in girls' State science test scores. If the school believes temperature affects educational outcomes, it can offer a coeducational "warm" and a coeducational "cool" classroom and use criteria, other than the student's sex, to decide which students would attend each of those coeducational classrooms, such as allowing students and parents to choose the learning environment they believe best suits each student.

### *Evenhanded Offerings*

**13. What is the evenhandedness requirement?**

**Answer**: A recipient must treat male and female students evenhandedly in implementing its important objective.[36]  The evenhandedness requirement means that a recipient offering single-sex classes must provide equal educational opportunities to students regardless of their sex, with the end result that both sexes receive substantially equal classes.[37]

**14. How does the evenhandedness analysis apply if a recipient is asserting the diversity objective?**

**Answer:** If the recipient asserts the diversity objective, and it has identified single-sex classes for which it can demonstrate a substantial relationship to its important objective, it must still ensure that the choice of diverse educational opportunities, including single-sex or coeducational classes, is offered evenhandedly to male and female students.  To do this, it must conduct a thorough and impartial assessment of what single-sex classes to offer to each sex, and then offer those classes evenhandedly to its students.[38]  Thus, under the diversity objective, if a recipient is able to justify single-sex classes for both sexes, offering single-sex classes for only one sex will likely violate the evenhandedness requirement,

unless the recipient can show that it evenhandedly gauged the interest of both sexes and the excluded sex was not interested in having the option to enroll in single-sex classes. Likewise, if one sex is offered single-sex classes in the school's core subjects, while the other sex is only offered single-sex classes in the school's non-core subjects, OCR would not find that the recipient is offering classes in an evenhanded manner.

- o   *Example I*: Advanced High School would like to use single-sex classes to increase enrollment of both male and female students in its AP Physics, English, or American History classes.  Advanced High School has already determined that it can meet the requisite regulatory requirements of the Department's Title IX regulations for all of these classes, but because of staffing concerns, the school can only offer single-sex classes in one subject.  Advanced High School conducted a survey to determine which subject male students would prefer; the male students chose AP Physics.  Because it could only devote one teacher to single-sex classes, Advanced High School did not survey its female students, but decided instead to offer the female students a single-sex AP Physics class, as well.

     This would violate the evenhandedness requirement.  Even though all students are being offered identical single-sex classes, taught by the same teacher, the assessment of which class to offer favored the male students.

This does not mean, however, that male and female students must always be offered single-sex classes in the same subjects.  To ensure evenhandedness, once it has completed its justification for each single-sex class, a recipient may wish to collect pre-enrollment information from parents[*] and students or survey parents and students about interest in enrolling in single-sex classes in each subject.  If students of one sex lack interest in a single-sex class in a certain subject, the recipient would not be required to provide them a single-sex class in that subject.

- o   *Example J:* Nearby Middle School is considering adding single-sex classes to the diverse array of other classes it offers.  Having documented its justification for the addition of single-sex classes in Pre-Algebra, American History, English, and Geometry, the school surveys all parents and students to determine whether students would be interested in taking any of these classes on a single-sex basis. Forty eighth-grade boys express interest in all-male Pre-Algebra and American

---

[*] When this document refers to "parents," the term encompasses both parents and legal guardians.

History classes, while only two girls request these classes on a single-sex basis. Thirty-five eighth-grade girls request all-female English and Geometry classes, while no boys request these classes on a single-sex basis. In this scenario, Nearby Middle School may offer the all-male Pre-Algebra and American History classes and all-female English and Geometry classes to its eighth-grade students without violating the evenhandedness requirement.

**15. How does the evenhandedness analysis apply if a recipient is asserting the needs objective?**

**Answer**: If the recipient asserts the needs objective, the evenhandedness analysis is different from the analysis used under the diversity objective. Under the needs objective, the recipient must first conduct an assessment to identify the educational needs of its students, and then determine how to meet those needs on an evenhanded basis.[39] If a recipient has evidence demonstrating that a single-sex class in a particular subject would meet the particular, identified educational needs of students of both sexes and that the single-sex nature of the classes is substantially related to meeting the needs for both sexes, then if the recipient offers a single-sex class in that subject, it must do so for both sexes. On the other hand, if the evidence shows that the single-sex class in that subject would meet the particular, identified needs of only one sex or that the single-sex nature of the class would be substantially related to meeting the needs of only one sex, a recipient may not offer the single-sex class to students of the other sex. That recipient would instead have to determine, based on its assessment of the educational needs of both sexes, whether a single-sex class in another subject should be offered to the excluded sex, in order to meet the evenhandedness requirement.[40]

o *Example K:* Faraway High School intends to offer an all-boys AP English class because the percentage of its male students passing the AP English exam is far below the district average. The school's female students pass the AP English exam at a rate higher than the district average. The reverse is true with respect to AP Physics: the percentage of girls passing the AP Physics exam is far below the district average, while the boys' scores suggest no deficiency.

Under these circumstances, Faraway High School may provide an all-boys AP English class without offering an all-girls AP English class because there is no particular identified need for such an all-girls class. To meet the evenhandedness requirement, however, in light of data showing its female students' deficiency on the AP Physics exam, the school must first research whether an all-girls AP Physics class would be substantially related to increasing

female students' proficiency on that exam.  If so, then the school must offer the female-only AP Physics class as well.

*Voluntariness*

**16. Who decides whether a student enrolls in a single-sex class?**

**Answer**: The Department's Title IX regulations require that student "enrollment in a single-sex class or extracurricular activity" be "completely voluntary."[41]  To meet this requirement, OCR strongly encourages recipients to obtain the affirmative consent from the parents to enroll a student in a single-sex class.[42]  Nevertheless, OCR will defer to State law to determine whether a student or the student's parents will have ultimate decision-making authority regarding whether a student will be enrolled in a single-sex class.  If State law is silent, a recipient may use its educational judgment, based on the age and circumstances of its students and its normal class assignment procedures.  The affirmative consent of the designated decision-maker, whether the parent or the student, must be received before assigning a student to a single-sex class.

**17. May a recipient assign students to a single-sex class as long as it permits students to opt out of the class?**

**Answer**: No.  Regardless of whether the authority rests with the student or the parent, the decision-maker must affirmatively opt into a single-sex class; the student may not simply be assigned to a single-sex class by the school and then be permitted to opt out.[43]  If no affirmative consent is received, the student must be enrolled in a coeducational class.[44]  OCR recommends that such affirmative consent come in the form of a written, signed document.[45]

**18. May a recipient make it easier to enroll in a single-sex class than it is to enroll in a coeducational class?**

**Answer:** No.  A school cannot use a less stringent class enrollment procedure for its single-sex classes than it does for its coeducational classes.  In order for the choice to be completely voluntary, a school may not influence the choice to enroll in one class over the other.  In assessing whether a decision to enroll in a single-sex class was voluntary, OCR will consider, among other things, whether the choice was influenced by extraneous factors.  For example, any authorization (*e.g.*, a permission slip) or procedure (*e.g.*, a pre-enrollment meeting with a guidance counselor) that is required for enrolling in a coeducational class, but not for enrolling in the single-sex counterpart would render involuntary the choice to enroll in the single-sex class.

**19. How does the breadth of class offerings affect voluntariness?**

**Answer:** For the single-sex class to be voluntary, a recipient must offer a substantially equal coeducational class in the same subject.[46]  (Factors for determining substantial equality are discussed in the response to Question 22.)  If a student is forced to choose between taking a single-sex class in a particular subject and not taking a class in that subject, the choice to take the single-sex class is not voluntary.  Likewise, if the only honors class in a given subject is a single-sex class, a student's selection of that single-sex class will not be considered voluntary.  And if a student must take a single-sex class in order to avoid a coeducational option that is set at a remedial level, the single-sex class will also not be considered voluntary.  (Classes with such differences may also violate the requirement of offering a substantially equal coeducational class, discussed in the responses to Questions 21 and 22.)

**20. What additional steps should a recipient take to ensure that participation in a single-sex class is completely voluntary?**

**Answer:** Because an uninformed decision may, in many circumstances, not be completely voluntary, OCR recommends that recipients provide pre-enrollment information about each class to students and parents in sufficient time and in a manner that is accessible to those with disabilities and with limited English proficiency so that the decision-maker can make an informed choice.[47]

This pre-enrollment information should explain that the decision-maker has the option of choosing between the coeducational and single-sex class;[48] describe the similarities and differences between the coeducational and single-sex classes; and provide a summary of the recipient's justification for offering the single-sex option.  OCR recommends that pre-enrollment disclosures specify that parents and students have the option of reviewing the recipient's full justification (and any periodic evaluations, described in the responses to Questions 23 through 28) upon request.  In providing this pre-enrollment information, recipients must ensure that the information is conveyed in a way that does not pressure parents to enroll students in a single-sex class.

> o *Example L*: Steering Elementary School is planning to implement single-sex fifth-grade reading and math classes for both boys and girls.  To comply with the Title IX regulatory requirements for establishing new single-sex classes, over the summer, the school sends an information packet to every parent of an incoming fifth-grade student that includes: the school's justification for its single-sex classes; the data upon which the school relied in developing its justification; a statement that substantially equal coeducational reading and math classes are available; and a description of the differences between the single-sex and

coeducational classes.  In each packet are two consent forms—one for the reading class and one for the math class—allowing parents to opt in to each single-sex class.  The form states that if a parent does not return the form for a given class, his or her child will be placed in a substantially equal coeducational class.

A week before school starts, the principal of Steering Elementary School calls all of the parents who have not returned the consent forms to remind them of the option to enroll their children in single-sex classes.  He encourages them to take advantage of the single-sex classes, and explains that if there is not enough interest to sustain them, the school will not be able to provide the classes to anyone.  He explains that many people are interested in the single-sex classes, and warns parents against being the individuals who "hold up" implementation of the "unique and beneficial opportunity."

Although the elementary school's practice of sending an impartial information packet home to parents, along with an appropriate opt-in form, is a good one, OCR would consider the principal's later behavior to be inappropriate pressure to enroll in a single-sex class.  His warning inappropriately suggested that a parent should consider factors outside of his or her child's educational well-being (including ensuring that other students have access to single-sex classes).  Any consent forms received after the principal's phone calls would not be valid.

### *Substantially Equal Coeducational Option*

**21. Must a recipient offer a substantially equal coeducational option for every single-sex class offered?**

**Answer**: Yes.  A recipient that offers a single-sex class must provide all other students, including students of the excluded sex, with a substantially equal coeducational class in the same subject.[49]  At least one substantially equal coeducational section must be offered in each subject for which there is a single-sex class, and more than one section may be needed because every student who requests a coeducational option must be enrolled in one.  Once the preferences of students seeking a coeducational class are met, a school may offer more than one single-sex section in a given subject if enrollment in that subject warrants it.

- o   *Example M*: If a school offers each of its 50 eighth-grade boys the choice between single-sex or coeducational Algebra classes, and 40 choose a single-sex class and 10 choose a coeducational class, the school may offer two single-sex sections and only one coeducational section of Algebra.  This is permissible, so long as every student who sought the coeducational option was enrolled in a

substantially equal coeducational class. (Additionally, the school may also be required to provide a substantially equal single-sex class for its eighth-grade girls, consistent with the evenhandedness requirement discussed in the responses to Questions 13 through 15.)[50]

A school is not obligated to provide a single-sex class to any individual student, even if that student opted into the single-sex class. The school must consider the number of students interested in the option and the school's need to provide a substantially equal coeducational class for all other students, including students of the excluded sex. Thus, in the example above, if all of the eighth-grade boys opted into the single-sex Algebra class, resulting in the substantially equal coeducational class enrolling only girls, the school could not honor all of the requests for the single-sex boys class, because doing so would deny the girls a substantially equal coeducational class.

**22. What factors will OCR consider in determining whether a coeducational class is substantially equal to the single-sex class?**

**Answer**: OCR will consider all relevant factors, both individually and in the aggregate, in determining whether a coeducational class is substantially equal to the single-sex class.[51] Although the single-sex and coeducational classes do not need to be identical with respect to each factor, they need to be substantially equal. This means that if one class is significantly superior with respect to one factor, or slightly superior with respect to many factors, the classes are likely not substantially equal.[52] The Department's Title IX regulations include a non-exhaustive list of factors, each of which is addressed individually below, that OCR will consider while conducting a complaint investigation or compliance review. OCR will consider all relevant factors in determining whether a coeducational class and a single-sex class are substantially equal.[53] Whether information is relevant will depend on the specific facts and circumstances of each case, because each single-sex class seeks to achieve a different objective and may be offered in a different way.

- The admissions criteria and policies;

  - *Example N*: College-Bound High School offers single-sex and coeducational classes in AP Spanish. Both the coeducational and single-sex AP Spanish classes were open only to students with a grade point average of 3.5 or higher and who participate in a summer language program. On these facts, OCR would consider the admissions criteria and policies to be substantially equal.

- The educational benefits provided, including the quality, range, and content of curriculum and other services, and the quality and availability of books, instructional materials, and technology;

  o *Example O:* Tech-Savvy Middle School offers single-sex and coeducational biology classes. The coeducational classes follow a curriculum that uses textbooks with corresponding videos, which the students watch on a DVD player in the classroom, to teach lessons. The single-sex classes incorporate individually issued laptops, which allow for interactive, technology-based lessons, into the curriculum. On these facts, OCR would not consider the educational benefits provided to be substantially equal.

- The qualifications of faculty and staff;

  o *Example P:* Tenured Middle School ensures that an equal proportion of first- and second-year teachers as compared to more experienced teachers are assigned to its single-sex and coeducational Pre-Algebra classes. All of the Pre-Algebra teachers have a background in mathematics and receive training on teaching the school's Pre-Algebra curriculum. Prior to teaching the class, each teacher must demonstrate content knowledge and competencies in the relevant teaching methods. On these facts, OCR would consider the qualifications of the faculty of the classes to be substantially equal.

- Geographic accessibility;[54]

  o *Example Q:* Centrally Located High School offers one all-male and one all-female chemistry class onsite. For students wishing to take this class on a coeducational basis, Centrally Located High School has entered into an agreement with Distant High School, 15 miles away, which will accept Centrally Located High School's students. Because of traffic in the district, it would take students approximately 30 minutes each way to travel to the class at Distant High School, resulting in an hour of lost instruction time. On these facts, OCR would not consider the geographic accessibility of the classes to be substantially equal.

- The quality, accessibility, and availability of facilities and resources provided to the class;

  o *Example R:* Updated High School offers both coeducational and single-sex Chemistry classes. The coeducational Chemistry class is held in a chemistry lab that was original to the building, constructed in 1970. Updated High School added a new wing in 2010, which includes a new chemistry lab that offers state-of-the-art equipment and incorporates interactive technology. The single-sex

000212

Chemistry classes are held in the new lab.  On these facts, OCR would not consider the facilities and resources of the classes to be substantially equal.

- Intangible features, such as the reputation of faculty.

  o *Example S:* Connected High School offers two single-sex journalism classes: one for boys and one for girls.  A journalist for a local newspaper teaches both of these classes.  The journalist is well connected in the local media community, and in the past, she has assisted students with obtaining internships at local media outlets.  The school also offers a coeducational journalism class that is taught by an individual with a degree in English, but who has never worked in the field or been involved in a school journalism program.  On these facts, OCR would not consider the reputation of the faculty (an intangible feature) of the two classes to be substantially equal.

### *Periodic Evaluations*

**23. How often must a recipient conduct an evaluation of its single-sex programs?**

**Answer**: The recipient must evaluate each of its single-sex classes, and the original justification behind each single-sex class, at least every two years.[55]  A recipient may decide to conduct evaluations more frequently (because its own findings have identified concerns or for other reasons).  If OCR investigates a recipient and identifies compliance problems, OCR may require the recipient to conduct more frequent evaluations.[56]

**24. What is the purpose of these evaluations?**

**Answer**: The recipient must use these periodic evaluations to ensure that each single-sex class it offers is based upon genuine justifications, does not rely on overly broad generalizations about either sex, and continues to be substantially related to the achievement of the important objective (*see* the responses to Questions 7 through 12).[57]  The periodic evaluations should also confirm that substantially equal single-sex classes are offered if necessary to comply with the evenhandedness requirement (*see* the responses to Questions 13 through 15), and that a substantially equal coeducational alternative to each single-sex class is available (*see* the responses to Questions 21 and 22).  The periodic evaluations must assess evidence and data related to the recipient's single-sex classes, rather than relying on the comparator school or research evidence used at the justification stage (*see* the response to Question 27).

**25. Must the periodic evaluation address the way a single-sex class is taught?**

**Answer**: Yes.  Because of the risk that single-sex classes may lead to the adoption of classroom methods or strategies that revert to sex stereotypes, the Department's Title IX regulations require that the recipient ensure that each single-sex class is operated in a manner that does not "rely on overly broad generalizations about the different talents, capacities, or preferences of either sex."[58]  Thus, classroom methods or strategies should be chosen on the basis of their effectiveness in teaching the individual students in the class, without regard to the sex of those students.  Of course, it may be difficult to ascertain why certain methods or strategies were chosen, so the following information is intended to help schools understand how OCR will conduct its analysis during a complaint investigation or compliance review.

If identical classroom methods and strategies—including choices about classroom activities and environment—are used in single-sex classes for boys and in single-sex classes for girls (or in a single-sex class and a coeducational class), the evaluation of the way the classes are taught is complete.  This is because the use of the same methods and strategies for classes for boys and classes for girls offers no reason to believe the decision to use those methods and strategies was based on overly broad generalizations about either sex.

But if different classroom methods or strategies are used in single-sex classes for boys than are used in single-sex classes for girls (or in a single-sex class in comparison with its coeducational counterpart), then the recipient must evaluate whether the decision to adopt these different methods or strategies was made in reliance on overly broad generalizations.  In some cases, the different methods or strategies used in single-sex classes may simply be the result of the professional choices of an individual teacher without regard to the sex of his or her students.  If the recipient can show that the teacher would have selected identical methods and strategies even if he or she were teaching a single-sex class of the opposite sex or a coeducational class, OCR will likely conclude that the school did not use overly broad generalizations about either sex.  In determining whether the recipient has made this showing, OCR will consider such factors as the methods and strategies historically used by the teacher, and the timing of any changes in the teacher's methods and strategies.

If, however, the methods or strategies were selected because of the sex of the students in the class, the risk of sex stereotypes is at its greatest because methods and strategies that are based on sex ignore the differences among students of the same sex.  When a teaching method or strategy is, in fact, selected on the basis of the sex of the students, its use must be directly supported by evidence demonstrating that the particular method or strategy is more effective for one sex than the other or is more effective when used in a single-sex setting.  (The response to Question 12 addresses the appropriate way to assess whether

strategies that are purported to be more effective for one sex may be used in a single-sex setting.)  It would not be enough to show that there is evidence about differences between boys and girls that does not directly involve that particular teaching method or strategy.  For example, while there is, of course, evidence that biological differences between males and females exist,[59] evidence of general biological differences is not sufficient to allow teachers to select different teaching methods or strategies for boys and girls.[60]

- o  *Example T:* Quiet Elementary School created single-sex fourth-grade classes for both boys and girls.  During the school year, the teachers of the single-sex classes became aware of studies that show that girls are born with a significantly more sensitive sense of hearing than boys, and that the differences grow larger as the children grow older.  Relying on those studies, the school decided that the boys class would incorporate speaking in a loud tone, while the girls class would not.

  A periodic evaluation of the boys class would indicate reliance on overly broad generalizations about the sexes with respect to teaching methods.  Use of the specific teaching method (loud talking) would not comply with Title IX because the teachers did not rely on evidence that directly linked that particular teaching method or strategy to improved educational achievement for boys.  Instead, they relied on a purported biological difference (that there are, on average, biological differences in the hearing sensitivity of the sexes) to conclude that the particular teaching method or strategy was appropriate.  This general difference between the sexes, even if true, does not by itself provide evidence that loud talking will be more effective in teaching for one sex than the other or more effective in a single-sex setting.  The leap from the biological differences to the use of a particular teaching method or strategy for students of one sex, without the support of evidence regarding the educational effectiveness of the method or strategy for one sex over the other, resulted in an overly broad generalization (that loud talking would improve boys' ability to learn).  Because of the overly broad generalization, the school would have to discontinue its use of this teaching method for the all-boys class.

  The teaching method itself is permissible.  A recipient is still free to incorporate loud talking in a coeducational class or in single-sex classes for both boys and girls.  But a recipient may not limit that method of instruction only to the single-sex class for boys on the basis of the overly broad generalization described above.

000215

**26. How should the evaluations be made available to the public?**

**Answer**: OCR recommends wide distribution of the evaluations, through the recipient's website and otherwise.  Like the initial justification, these evaluations could be useful to parents who are deciding whether to enroll their children in single-sex classes and would help ensure the choice is completely voluntary.

**27. How will OCR determine whether a periodic evaluation demonstrates that a single-sex class is still substantially related to the recipient's important objective?**

**Answer**: OCR will consider all relevant sources of evidence in determining whether the single-sex nature of the class remains substantially related to the recipient's important objective.  Whether evidence is relevant will depend on the specific facts and circumstances of each case, because each single-sex class seeks to achieve a different objective and may be offered in a different way.  The evidence presented in a recipient's periodic evaluation must be related to the recipient's single-sex classes, rather than the evidence relied upon in the justification stage.  Possible sources of evidence include, but are not limited to: students' grades; students' scores on standardized statewide or districtwide exams; discipline rates; attendance data; enrollment data; and educators' observation and evaluation of the effectiveness of each class.

Because the biennial evaluations must show that the single-sex nature of the class results in achievement of, or progress toward, the recipient's important objective, a comparison between the students in the single-sex class and the substantially equal coeducational class is appropriate.[61]  To best assess the effectiveness of each class, OCR recommends that schools monitor the progress of the individual students in each class from year to year.  This will help ensure that any comparison between a single-sex class and a substantially equal coeducational class controls for variations among students.  Positive or negative changes related to the recipient's objective for all students in the single-sex class should be averaged together; the same should be done for students in the coeducational class.  The school can then compare these averages to see how students in the single-sex class fared in comparison to their peers in the substantially equal coeducational class.  The same procedure should be used to assess the single-sex class the following year.  If, based on these averages, a coeducational class outperforms a substantially equal single-sex class, it is likely that OCR would find that the single-sex class is not substantially related to the recipient's objective.  Of course, the evidence will vary based on the school's objective.  For example, if the school implemented a single-sex class in an attempt to lower discipline rates, discipline statistics should be analyzed.

o  *Example U*: A middle school offers three substantially equal sections of tenth-grade American Literature: an all-girls class, an all-boys class, and a coeducational class.  The school's objective is to increase proficiency on the State English exam.  At the end of the first school year, to gather information for the periodic evaluation required at the end of the second school year, each student's score on the state English exam is compared to his or her score on the previous year's exam.  The school averages the change in scores of students in the all-girls class, the all-boys class, and the coeducational class, respectively.  The proficiency rate of students in the coeducational class increased slightly.  By contrast, the proficiency rates of the students in the all-boys and all-girls classes both increased significantly.  The difference in average increases between the single-sex classes and the coeducational class is statistically significant.  The averages are similar the following year.  Under these circumstances, the evidence in this periodic evaluation would suffice to show a continuing substantial relationship between the single-sex nature of the classes and the objective to increase student's proficiency on the State English exam.  Note, however, that the school must continue to conduct biennial evaluations to show that a substantial relationship between the single-sex nature of the classes and the school's objective persists.

Every recipient's ability to continue each single-sex class will depend on the recipient's circumstances, the particular objective articulated in the recipient's justification, and whether the comparative class data over time demonstrate a substantial relationship between that objective and the single-sex nature of the class.  A recipient's evaluation should analyze and explain all factors that influenced the achievement of, or failure to achieve, the recipient's objective.

**28. What is the role of the recipient's Title IX coordinator in conducting these evaluations?**

**Answer**: Every recipient must designate an employee to coordinate its efforts to comply with Title IX.[62]  The Title IX coordinator is responsible for overseeing the school's response to Title IX reports and complaints and identifying and addressing any patterns or systemic problems revealed by such reports and complaints.  This means that the Title IX coordinator must have knowledge of the requirements of Title IX, of the school's own policies and procedures on sex discrimination, and of all complaints raising Title IX issues throughout the school.  The Title IX coordinator must also track and review complaints to identify and correct any systemic compliance issues.  This would include any complaints that single-sex classes are being offered in violation of Title IX.  Because of these responsibilities, OCR recommends that the Title IX coordinator be involved in assessing the compliance of the

recipient's single-sex classes, both when determining whether and how single-sex classes can be offered and during the recipient's periodic review of single-sex offerings.

*Employment*

**29. May a recipient assign teachers to single-sex classes based on the sex of the teacher?**

**Answer**: No.  A recipient must not assign teachers to single-sex classes on the basis that boys should be taught by men and girls should be taught by women or vice versa.[63]  Title IX prohibits recipients from discriminating on the basis of sex in: employment; recruitment; compensation and benefits; job assignment, classification, and structure; and consideration and selection of individuals for jobs in any education program or activity operated by a recipient.[64]  Although Title IX allows employment decisions based on sex "provided it is shown that sex is a bona-fide occupational qualification for that action,"[65] a school may not, for example, assign a male teacher, on the basis of his sex, to teach an all-boys class because the school thinks male students will prefer, respond better to, or learn more effectively from, a man.[66]

*Other Federal Protections for Students in Single-Sex Classes*

**30. May a recipient exclude students with disabilities or English language learners from a single-sex class so long as it permits them to participate in the substantially equal coeducational class?**

**Answer**: No.  Students with disabilities or English language learners may not be excluded from single-sex classes because of their need for special education or related aids and services or English language services.[67]  Schools must ensure that students with disabilities participating in single-sex classes receive needed special education and related services in accordance with their individualized education programs, developed under Part B of the Individuals with Disabilities Education Act[68] (including, if applicable, the Part B educational placement provisions), or their plans developed under Section 504 of the Rehabilitation Act of 1973.  Likewise, the school must provide the same English language services in single-sex classes as in coeducational classes.

**31. How do the Title IX requirements on single-sex classes apply to transgender students?**

**Answer:** All students, including transgender students and students who do not conform to sex stereotypes, are protected from sex-based discrimination under Title IX.  Under Title IX, a recipient generally must treat transgender students consistent with their gender identity in all aspects of the planning, implementation, enrollment, operation, and evaluation of single-sex classes.

*Additional Topics*

**32. Which set of regulations governs a school within a school—the regulations governing single-sex schools or the regulations governing single-sex classes?**

**Answer:** If a recipient operates a single-sex school within another school or two single-sex academies, OCR will consider these to be single-sex classes within a coeducational school unless the two entities are administratively separate from each other.[69]  This is a fact-specific inquiry and will depend on the specific organization of the school within a school.

- o *Example V:* A district operates dual single-sex academies that are housed in the same facility and share the same principal and certain support staff.  The district claims that it need not comply with the Department's Title IX regulations on single-sex classes because each academy is a single-sex school.  Because the two academies are not administratively separate, OCR would instead view the academies as one coeducational school offering single-sex classes in every subject.

**33. How can I contact OCR to get additional information or to file a complaint?**

**Answer:** A recipient, parent, student, or other member of the public who has a question or concern about a particular single-sex offering may contact the appropriate OCR regional enforcement office.  To determine which OCR regional enforcement office handles inquiries and complaints in your State, please call 1-800-421-3481 or 1-800-877-8339 (TDD) or check OCR's website at http://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm.

**OTHER FEDERAL LEGAL RESOURCES RELATED TO SINGLE-SEX EDUCATION:**

Department of Education Title IX regulations:  34 C.F.R. part 106, available at
http://www2.ed.gov/policy/rights/reg/ocr/34cfr106.pdf

OCR Dear Colleague Letter on Single-Sex Title IX Regulations, dated January 31, 2007, available
at http://www.ed.gov/ocr/letters/single-sex-20070131.pdf

Final Rule:  Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
Federal Financial Assistance, 71 Fed. Reg. 62,530 (October 25, 2006), available at
http://www2.ed.gov/legislation/FedRegister/finrule/2006-4/102506a.pdf

Brief for the United States as *Amicus Curiae*, *Doe v. Vermilion Parish Sch. Bd.*, No. 10-30378 (5th
Cir.) (filed June 4, 2010), available at
http://www.justice.gov/crt/about/app/briefs/vermillion_brief.pdf

000220

---

[1] 20 U.S.C. §§ 1681-1688.

[2] *Id.*; *see also* 34 C.F.R. § 106.34.

[3] Private elementary and secondary schools are subject to the Department's regulatory requirements for single-sex classes if they receive Federal financial assistance directly from the Department or indirectly through an intermediary. Private elementary and secondary schools are not considered recipients of Federal financial assistance if the only form of assistance that they receive is through their students' participation in programs conducted by public school districts that are funded under Federal programs such as Title I of the Elementary and Secondary Education Act of 1965 or the Individuals with Disabilities Education Act. These private schools are not subject to these regulations, but public school districts must ensure that their programs, including services to private school students, are consistent with Title IX. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Final Regulations, 71 Fed. Reg. 62,530, 62,530 n.7 (Oct. 25, 2006).

[4] U.S. Const. amend. XIV, § 1; *see also United States v. Virginia*, 518 U.S. 515, 531, 533 (1996) (holding, in a challenge to an all-male public postsecondary institution, that a party "seek[ing] to defend gender-based government action" under the Equal Protection Clause "must demonstrate an exceedingly persuasive justification for that action," which means the government "must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives" (citations, brackets, and internal quotation marks omitted)).

[5] 42 U.S.C. §§ 2000c to c-9.

[6] 20 U.S.C. §§ 1703(c), 1705, 1720(c); *see also* 71 Fed. Reg. at 62,533 n.18 (referencing same).

[7] 34 C.F.R. § 106.71 (incorporating by reference 34 C.F.R. §§ 100.6-100.11 and 34 C.F.R. part 101).

[8] 34 C.F.R. § 106.6(b); *see also* 71 Fed. Reg. at 62,533 n.18 ("Public school and private school recipients also may be subject to State or local laws prohibiting single-sex classes or schools.").

[9] 34 C.F.R. § 106.34(c).

[10] 34 C.F.R. § 106.35; 34 C.F.R. § 106.2(o) (defining "institution of vocational education").

[11] 34 C.F.R. § 106.15(c)–(e).

[12] 20 U.S.C. §§ 1681-1688; 34 C.F.R. § 106.34(a).

[13] In addition to these exceptions, the Department's Title IX regulations do not prohibit schools from employing the following facially neutral tests or criteria even if they have a disproportionate effect on persons on the basis of sex: the grouping of students in physical education classes and activities by ability as assessed by objective standards of individual performance developed and applied without regard to sex; and the use of requirements based on vocal range or quality that may result in a chorus or choruses of one or predominantly one sex. 34 C.F.R. § 106.34(a)(2) and (4).

[14] 34 C.F.R. § 106.34(a)(1).

[15] 34 C.F.R. § 106.34(a)(3).

[16] 34 C.F.R. § 106.34(b).

[17] 34 C.F.R. § 106.34(b)(5).

[18] 34 C.F.R. § 106.35; 34 C.F.R. Appendix A to Part 106; *see also* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Notice of Proposed Rulemaking, 69 Fed. Reg. 11,276, 11,278 (Mar. 9, 2004) ("Even in these elementary and secondary schools that are not vocational schools, the proposed amendments do not change the applicability of the current general regulatory prohibition against single-sex vocational education classes.").

[19] This document refers to vocational classes because the Department's Title IX regulations refer to "nonvocational" classes. The Department currently prefers the term "career and technical" courses.

[20] The Department's Title IX regulations governing athletics appear at 34 C.F.R. §§ 106.41 and 106.37(c).

[21] 34 C.F.R. § 106.36(c).

[22] 34 C.F.R. § 106.34(b)(1)(i).

[23] 71 Fed. Reg. at 62,533 (citing *Virginia*, 518 U.S. at 533) ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation.").

[24] *Id.*

[25] 34. C.F.R. § 106.34(b)(1)(i)(A).

[26] "For example, a recipient may seek to achieve an educational benefit for its students such as improvement in class work." 71 Fed. Reg. at 62,534 n.26.

[27] 71 Fed. Reg. at 62,535.

[28] 34 C.F.R. § 106.34(b)(1)(i)(B).

[29] 71 Fed. Reg. at 62,535 & n.30.

[30] 71 Fed. Reg. at 62,536.

[31] 71 Fed. Reg. at 62,535 (citing *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 151-52 (1980) and *Frontiero v. Richardson*, 411 U.S. 677, 689-90 (1973)).

[32] 71 Fed. Reg. at 62,533 (citing *Virginia*, 518 U.S. at 533).

[33] The 2005 Department-commissioned survey of research on single-sex schooling found that for "many outcomes, there is no evidence of either benefit or harm." OFFICE OF PLANNING, EVALUATION AND POLICY DEVELOPMENT, U.S. DEPARTMENT OF EDUCATION, SINGLE-SEX VERSUS COEDUCATIONAL SCHOOLING: A SYSTEMATIC REVIEW x (2005), *available at* http://www2.ed.gov/rschstat/eval/other/single-sex/single-sex.pdf.

[34] The WWC Procedures and Standards Handbook is available at http://ies.ed.gov/ncee/wwc/pdf/reference_resources/wwc_procedures_v3_0_standards_handbook.pdf.

[35] This example, like all the examples provided in this document, is based on hypothetical facts to help readers understand how OCR would evaluate a recipient's single-sex class for compliance with the Department's Title IX regulations. A recipient cannot rely on the hypothetical research described in this example to show a substantial relationship between its important objective and the single-sex nature of the class.

[36] 34 C.F.R. § 106.34(b)(1)(ii).

[37] 71 Fed. Reg. at 62,536 (citing *Virginia*, 518 U.S. at 554).

[38] 71 Fed. Reg. at 62,536.

[39] *Id*.

[40] *Id*. at 62,536-37 ("[A]lthough a single-sex class would not be required in that subject, evenhanded implementation of the recipient's objective does require the recipient to determine, based on its assessment of educational needs of students, whether a class in another subject should be offered on a single-sex basis to meet the particular, identified needs of the students of the excluded sex.").

[41] 34 C.F.R. § 106.34(b)(1)(iii).

[42] 71 Fed. Reg. at 62,537.

[43] *Id*.; *Doe v. Wood Cnty. Bd. of Educ.*, 888 F. Supp. 2d 771, 776 (S.D. W. Va. 2012) ("An opt-out provision is insufficient to meet the requirement that single-sex classes be 'completely voluntary.'").

[44] 71 Fed. Reg. at 62,537; *Doe*, 888 F. Supp. 2d at 776 ("[T]he Department of Education regulations require an affirmative assent by parents or guardians before placing children in single-sex classrooms.").

[45] 71 Fed. Reg. at 62,537; *Doe*, 888 F. Supp. 2d at 776 ("Such affirmative assent would preferably come in the form of a written, signed agreement by the parent explicitly opting *into* a single-sex program.").

[46] 71 Fed. Reg. at 62,537.

[47] *Doe*, 888 F. Supp. 2d at 777 ("The close proximity of the notices to the beginning of the school year, after students have already enrolled, suggest[s] that their choice was not fully voluntary.").

[48] 71 Fed. Reg. at 62,537.

[49] 34 C.F.R. § 106.34(b)(1)(iv).

[50] 34 C.F.R. § 106.34(b)(2).

[51] 34 C.F.R. § 106.34(b)(3); 71 Fed. Reg. at 62,538.

[52] 71 Fed. Reg. at 62,538.

[53] 34 C.F.R. § 106.34(b)(3); *see also* 71 Fed. Reg. at 62,538.

[54] 71 Fed. Reg. at 62,538 ("[There are] situations in which geographic accessibility will be relevant for classes. For example, if a recipient operates a consortium of schools whereby students at three neighboring high schools [take classes at all three schools, the] location, *i.e.*, geographic accessibility, of the classes in the same subject, would be relevant to the issue of substantial equality.").

[55] 34 C.F.R. § 106.34(b)(4).

[56] 71 Fed. Reg. at 62,539.

[57] 34 C.F.R. § 106.34(b)(4)(i).

[58] *Id.*

[59] *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women, however, are enduring . . . .").

[60] *See J.E. B. v. Alabama*, 511 U.S. 127, 139 n.11 (1994) ("We have made abundantly clear in past cases that gender classifications that rest on impermissible stereotypes violate the Equal Protection Clause, even when some statistical support can be conjured up for the generalization.").

[61] 71 Fed. Reg. at 62,539 ("Part of the periodic evaluation requirement involves an assessment of the degree to which the recipient's important objective has been achieved and an assessment of whether the single-sex nature of the class is substantially related to achievement of the recipient's objective.").

[62] 34 C.F.R. § 106.8(a).

[63] 71 Fed. Reg. at 62,534 ("Among other things, the Title IX regulations prohibit recipients from making job assignments on the basis of sex, § 106.51(b)(4), and from classifying jobs as being for males or females, § 106.55(a).  Both of these provisions would prohibit schools from assigning teachers to single-sex classes based on their sex.").

[64] 34 C.F.R. part 106, subpart E.

[65] 34 C.F.R. § 106.61.

[66] *Id.* ("A recipient shall not take action pursuant to this section [regarding bona-fide occupational qualifications] which is based upon . . . preference based on sex of the recipient, employees, students, or other persons.").

[67] 29 U.S.C. § 794 (Section 504 of the Rehabilitation Act of 1973) and 34 C.F.R. part 104; 42 U.S.C. §§ 12131-12165 (Title II of the Americans with Disabilities Act of 1990) and 28 C.F.R. part 35; 42 U.S.C. §§ 2000d to d-7 (Title VI of the Civil Rights Act of 1964) and 34 C.F.R. part 100.  OCR enforces Section 504 as it applies to recipients of Federal financial assistance from the Department and shares enforcement responsibility with the U.S. Department of Justice for Title II in the education context.  Title II prohibits discrimination on the basis of disability by public entities, including public school districts, in their services, programs, and activities, regardless of receipt of Federal funds.

[68] 20 U.S.C. §§ 1411-1414; 34 C.F.R. part 300.

[69] 34 C.F.R. § 106.34(c)(4).

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**U.S. Department of Justice**
*Civil Rights Division*

**U.S. Department of Education**
*Office for Civil Rights*

### Dear Colleague Letter on Transgender Students
### Notice of Language Assistance

If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

**給英語能力有限人士的通知:** 如果您不懂英語，或者使用英语有困难，您可以要求獲得向大眾提供的語言協助服務，幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊，請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339),或電郵: Ed.Language.Assistance@ed.gov。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức của Bộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

**영어 미숙자를 위한 공고:** 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에 일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로 제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800-USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는 이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkol sa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вам предоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877-8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

**U.S. Department of Justice**
*Civil Rights Division*

**U.S. Department of Education**
*Office for Civil Rights*

May 13, 2016

Dear Colleague:

Schools across the country strive to create and sustain inclusive, supportive, safe, and nondiscriminatory communities for all students. In recent years, we have received an increasing number of questions from parents, teachers, principals, and school superintendents about civil rights protections for transgender students. Title IX of the Education Amendments of 1972 (Title IX) and its implementing regulations prohibit sex discrimination[1] in educational programs and activities operated by recipients of Federal financial assistance.[1] This prohibition encompasses discrimination based on a student's gender identity, including discrimination based on a student's transgender status. This letter summarizes a school's Title IX obligations regarding transgender students and explains how the U.S. Department of Education (ED) and the U.S. Department of Justice (DOJ) evaluate a school's compliance with these obligations.

ED and DOJ (the Departments) have determined that this letter is *significant guidance*.[2] This guidance does not add requirements to applicable law, but provides information and examples to inform recipients about how the Departments evaluate whether covered entities are complying with their legal obligations. If you have questions or are interested in commenting on this guidance, please contact ED at ocr@ed.gov or 800-421-3481 (TDD 800-877-8339); or DOJ at education@usdoj.gov or 877-292-3804 (TTY: 800-514-0383).

Accompanying this letter is a separate document from ED's Office of Elementary and Secondary Education, *Examples of Policies and Emerging Practices for Supporting Transgender Students*. The examples in that document are taken from policies that school districts, state education agencies, and high school athletics associations around the country have adopted to help ensure that transgender students enjoy a supportive and nondiscriminatory school environment. Schools are encouraged to consult that document for practical ways to meet Title IX's requirements.[3]

**Terminology**

☐ *Gender identity* refers to an individual's internal sense of gender. A person's gender identity may be different from or the same as the person's sex assigned at birth.

☐ *Sex assigned at birth* refers to the sex designation recorded on an infant's birth certificate should such a record be provided at birth.

☐ *Transgender* describes those individuals whose gender identity is different from the sex they were assigned at birth. A *transgender male* is someone who identifies as male but was assigned the sex of female at birth; a *transgender female* is someone who identifies as female but was assigned the sex of male at birth.

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

☐ *Gender transition* refers to the process in which transgender individuals begin asserting the sex that corresponds to their gender identity instead of the sex they were assigned at birth. During gender transition, individuals begin to live and identify as the sex consistent with their gender identity and may dress differently, adopt a new name, and use pronouns consistent with their gender identity. Transgender individuals may undergo gender transition at any stage of their lives, and gender transition can happen swiftly or over a long duration of time.

**Compliance with Title IX**

As a condition of receiving Federal funds, a school agrees that it will not exclude, separate, deny benefits to, or otherwise treat differently on the basis of sex any person in its educational programs or activities unless expressly authorized to do so under Title IX or its implementing regulations.[4] The Departments treat a student's gender identity as the student's sex for purposes of Title IX and its implementing regulations. This means that a school must not treat a transgender student differently from the way it treats other students of the same gender identity. The Departments' interpretation is consistent with courts' and other agencies' interpretations of Federal laws prohibiting sex discrimination.[5]

The Departments interpret Title IX to require that when a student or the student's parent or guardian, as appropriate, notifies the school administration that the student will assert a gender identity that differs from previous representations or records, the school will begin treating the student consistent with the student's gender identity. Under Title IX, there is no medical diagnosis or treatment requirement that students must meet as a prerequisite to being treated consistent with their gender identity.[6] Because transgender students often are unable to obtain identification documents that reflect their gender identity (*e.g.*, due to restrictions imposed by state or local law in their place of birth or residence),[7] requiring students to produce such identification documents in order to treat them consistent with their gender identity may violate Title IX when doing so has the practical effect of limiting or denying students equal access to an educational program or activity.

A school's Title IX obligation to ensure nondiscrimination on the basis of sex requires schools to provide transgender students equal access to educational programs and activities even in circumstances in which other students, parents, or community members raise objections or concerns. As is consistently recognized in civil rights cases, the desire to accommodate others' discomfort cannot justify a policy that singles out and disadvantages a particular class of students.[8]

   1. *Safe and Nondiscriminatory Environment*

Schools have a responsibility to provide a safe and nondiscriminatory environment for all students, including transgender students. Harassment that targets a student based on gender identity, transgender status, or gender transition is harassment based on sex, and the Departments enforce Title IX accordingly.[9] If sex-based harassment creates a hostile environment, the school must take prompt and effective steps to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects. A school's failure to treat students consistent with their gender identity may create or contribute to a hostile environment in violation of Title IX. For a more detailed discussion of Title IX

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

requirements related to sex-based harassment, see guidance documents from ED's Office for Civil Rights (OCR) that are specific to this topic.[10]

### 2. Identification Documents, Names, and Pronouns

Under Title IX, a school must treat students consistent with their gender identity even if their education records or identification documents indicate a different sex. The Departments have resolved Title IX investigations with agreements committing that school staff and contractors will use pronouns and names consistent with a transgender student's gender identity.[11]

### 3. Sex-Segregated Activities and Facilities

Title IX's implementing regulations permit a school to provide sex-segregated restrooms, locker rooms, shower facilities, housing, and athletic teams, as well as single-sex classes under certain circumstances.[12] When a school provides sex-segregated activities and facilities, transgender students must be allowed to participate in such activities and access such facilities consistent with their gender identity.[13]

☐ **Restrooms and Locker Rooms**. A school may provide separate facilities on the basis of sex, but must allow transgender students access to such facilities consistent with their gender identity.[14] A school may not require transgender students to use facilities inconsistent with their gender identity or to use individual-user facilities when other students are not required to do so. A school may, however, make individual-user options available to all students who voluntarily seek additional privacy.[15]

☐ **Athletics.** Title IX regulations permit a school to operate or sponsor sex-segregated athletics teams when selection for such teams is based upon competitive skill or when the activity involved is a contact sport.[16] A school may not, however, adopt or adhere to requirements that rely on overly broad generalizations or stereotypes about the differences between transgender students and other students of the same sex (*i.e.*, the same gender identity) or others' discomfort with transgender students.[17] Title IX does not prohibit age-appropriate, tailored requirements based on sound, current, and research-based medical knowledge about the impact of the students' participation on the competitive fairness or physical safety of the sport.[18]

☐ **Single-Sex Classes**. Although separating students by sex in classes and activities is generally prohibited, nonvocational elementary and secondary schools may offer nonvocational single-sex classes and extracurricular activities under certain circumstances.[19] When offering such classes and activities, a school must allow transgender students to participate consistent with their gender identity.

☐ **Single-Sex Schools**. Title IX does not apply to the admissions policies of certain educational institutions, including nonvocational elementary and secondary schools, and private undergraduate colleges.[20] Those schools are therefore permitted under Title IX to set their own

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

sex-based admissions policies. Nothing in Title IX prohibits a private undergraduate women's college from admitting transgender women if it so chooses.

☐ **Social Fraternities and Sororities**. Title IX does not apply to the membership practices of social fraternities and sororities.[21] Those organizations are therefore permitted under Title IX to set their own policies regarding the sex, including gender identity, of their members. Nothing in Title IX prohibits a fraternity from admitting transgender men or a sorority from admitting transgender women if it so chooses.

☐ **Housing and Overnight Accommodations**. Title IX allows a school to provide separate housing on the basis of sex.[22] But a school must allow transgender students to access housing consistent with their gender identity and may not require transgender students to stay in single-occupancy accommodations or to disclose personal information when not required of other students. Nothing in Title IX prohibits a school from honoring a student's voluntary request for single-occupancy accommodations if it so chooses.[23]

☐ **Other Sex-Specific Activities and Rules**. Unless expressly authorized by Title IX or its implementing regulations, a school may not segregate or otherwise distinguish students on the basis of their sex, including gender identity, in any school activities or the application of any school rule. Likewise, a school may not discipline students or exclude them from participating in activities for appearing or behaving in a manner that is consistent with their gender identity or that does not conform to stereotypical notions of masculinity or femininity (*e.g.*, in yearbook photographs, at school dances, or at graduation ceremonies).[24]

### 4. *Privacy and Education Records*

Protecting transgender students' privacy is critical to ensuring they are treated consistent with their gender identity. The Departments may find a Title IX violation when a school limits students' educational rights or opportunities by failing to take reasonable steps to protect students' privacy related to their transgender status, including their birth name or sex assigned at birth.[25] Nonconsensual disclosure of personally identifiable information (PII), such as a student's birth name or sex assigned at birth, could be harmful to or invade the privacy of transgender students and may also violate the Family Educational Rights and Privacy Act (FERPA).[26] A school may maintain records with this information, but such records should be kept confidential.

☐ **Disclosure of Personally Identifiable Information from Education Records**. FERPA generally prevents the nonconsensual disclosure of PII from a student's education records; one exception is that records may be disclosed to individual school personnel who have been determined to have a legitimate educational interest in the information.[27] Even when a student has disclosed the student's transgender status to some members of the school community, schools may not rely on this FERPA exception to disclose PII from education records to other school personnel who do not have a legitimate educational interest in the information. Inappropriately disclosing (or requiring students or their parents to disclose) PII from education records to the school community may

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

violate FERPA and interfere with transgender students' right under Title IX to be treated consistent with their gender identity.

☐ **Disclosure of Directory Information**. Under FERPA's implementing regulations, a school may disclose appropriately designated directory information from a student's education record if disclosure would not generally be considered harmful or an invasion of privacy.[28] Directory information may include a student's name, address, telephone number, date and place of birth, honors and awards, and dates of attendance.[29] School officials may not designate students' sex, including transgender status, as directory information because doing so could be harmful or an invasion of privacy.[30] A school also must allow eligible students (*i.e.*, students who have reached 18 years of age or are attending a postsecondary institution) or parents, as appropriate, a reasonable amount of time to request that the school not disclose a student's directory information.[31]

☐ **Amendment or Correction of Education Records**. A school may receive requests to correct a student's education records to make them consistent with the student's gender identity. Updating a transgender student's education records to reflect the student's gender identity and new name will help protect privacy and ensure personnel consistently use appropriate names and pronouns.

o   Under FERPA, a school must consider the request of an eligible student or parent to amend information in the student's education records that is inaccurate, misleading, or in violation of the student's privacy rights.[32] If the school does not amend the record, it must inform the requestor of its decision and of the right to a hearing. If, after the hearing, the school does not amend the record, it must inform the requestor of the right to insert a statement in the record with the requestor's comments on the contested information, a statement that the requestor disagrees with the hearing decision, or both. That statement must be disclosed whenever the record to which the statement relates is disclosed.[33]

o   Under Title IX, a school must respond to a request to amend information related to a student's transgender status consistent with its general practices for amending other students' records.[34] If a student or parent complains about the school's handling of such a request, the school must promptly and equitably resolve the complaint under the school's Title IX grievance procedures.[35]

* * *

We appreciate the work that many schools, state agencies, and other organizations have undertaken to make educational programs and activities welcoming, safe, and inclusive for all students.

Sincerely,

　　　/s/                                              /s/

　　　Catherine E. Lhamon                      Vanita Gupta
　　　Assistant Secretary for Civil Rights      Principal Deputy Assistant Attorney General for Civil Rights
　　　U.S. Department of Education              U.S. Department of Justice

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

---

[1] 20 U.S.C. §§ 1681–1688; 34 C.F.R. Pt. 106; 28 C.F.R. Pt. 54. In this letter, the term *schools* refers to recipients of Federal financial assistance at all educational levels, including school districts, colleges, and universities. An educational institution that is controlled by a religious organization is exempt from Title IX to the extent that compliance would not be consistent with the religious tenets of such organization. 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12(a).

[2] Office of Management and Budget, Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), www.whitehouse.gov/sites/default/files/omb/fedreg/2007/012507_good_guidance.pdf.

[3] ED, *Examples of Policies and Emerging Practices for Supporting Transgender Students* (May 13, 2016), www.ed.gov/oese/oshs/emergingpractices.pdf. OCR also posts many of its resolution agreements in cases involving transgender students online at www.ed.gov/ocr/lgbt.html. While these agreements address fact-specific cases, and therefore do not state general policy, they identify examples of ways OCR and recipients have resolved some issues addressed in this guidance.

[4] 34 C.F.R. §§ 106.4, 106.31(a). For simplicity, this letter cites only to ED's Title IX regulations. DOJ has also promulgated Title IX regulations. *See* 28 C.F.R. Pt. 54. For purposes of how the Title IX regulations at issue in this guidance apply to transgender individuals, DOJ interprets its regulations similarly to ED. State and local rules cannot limit or override the requirements of Federal laws. *See* 34 C.F.R. § 106.6(b).

[5] *See, e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 79 (1998); *G.G. v. Gloucester Cnty. Sch. Bd.*, No. 15-2056, 2016 WL 1567467, at *8 (4th Cir. Apr. 19, 2016); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566, 572-75 (6th Cir. 2004); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215–16 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187, 1201–02 (9th Cir. 2000); *Schroer v. Billington*, 577 F. Supp. 2d 293, 306-08 (D.D.C. 2008); *Macy v. Dep't of Justice*, Appeal No. 012012082 (U.S. Equal Emp't Opportunity Comm'n Apr. 20, 2012). *See also* U.S. Dep't of Labor (USDOL), Training and Employment Guidance Letter No. 37-14, *Update on Complying with Nondiscrimination Requirements: Discrimination Based on Gender Identity, Gender Expression and Sex Stereotyping are Prohibited Forms of Sex Discrimination in the Workforce Development System* (2015), wdr.doleta.gov/directives/attach/TEGL/TEGL_37-14.pdf; USDOL, Job Corps, Directive: Job Corps Program Instruction Notice No. 14-31, *Ensuring Equal Access for Transgender Applicants and Students to the Job Corps Program* (May 1, 2015), https://supportservices.jobcorps.gov/Program%20Instruction%20Notices/pi_14_31.pdf; DOJ, Memorandum from the Attorney General, *Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964* (2014), www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/18/title_vii_memo.pdf; USDOL, Office of Federal Contract Compliance Programs, Directive 2014-02, *Gender Identity and Sex Discrimination* (2014), www.dol.gov/ofccp/regs/compliance/directives/dir2014_02.html.

[6] *See Lusardi v. Dep't of the Army*, Appeal No. 0120133395 at 9 (U.S. Equal Emp't Opportunity Comm'n Apr. 1, 2015) ("An agency may not condition access to facilities—or to other terms, conditions, or privileges of employment—on the completion of certain medical steps that the agency itself has unilaterally determined will somehow prove the bona fides of the individual's gender identity.").

[7] *See G.G.*, 2016 WL 1567467, at *1 n.1 (noting that medical authorities "do not permit sex reassignment surgery for persons who are under the legal age of majority").

[8] 34 C.F.R. § 106.31(b)(4); *see G.G.*, 2016 WL 1567467, at *8 & n.10 (affirming that individuals have legitimate and important privacy interests and noting that these interests do not inherently conflict with nondiscrimination principles); *Cruzan v. Special Sch. Dist. No. 1*, 294 F.3d 981, 984 (8th Cir. 2002) (rejecting claim that allowing a transgender woman "merely [to be] present in the women's faculty restroom" created a hostile environment); *Glenn*, 663 F.3d at 1321 (defendant's proffered justification that "other women might object to [the plaintiff]'s restroom use" was "wholly irrelevant"). *See also Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (recognizing that "mere negative attitudes, or fear . . . are not permissible bases for" government action).

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

---

[9] *See, e.g.,* Resolution Agreement, *In re Downey Unified Sch. Dist., CA*, OCR Case No. 09-12-1095, (Oct. 8, 2014), www.ed.gov/documents/press-releases/downey-school-district-agreement.pdf (agreement to address harassment of transgender student, including allegations that peers continued to call her by her former name, shared pictures of her prior to her transition, and frequently asked questions about her anatomy and sexuality); Consent Decree, *Doe v. Anoka-Hennepin Sch. Dist. No. 11, MN* (D. Minn. Mar. 1, 2012), www.ed.gov/ocr/docs/investigations/05115901-d.pdf (consent decree to address sex-based harassment, including based on nonconformity with gender stereotypes); Resolution Agreement, *In re Tehachapi Unified Sch. Dist., CA*, OCR Case No. 09-11-1031 (June 30, 2011), www.ed.gov/ocr/docs/investigations/09111031-b.pdf (agreement to address sexual and gender-based harassment, including harassment based on nonconformity with gender stereotypes). *See also Lusardi,* Appeal No. 0120133395, at *15 ("Persistent failure to use the employee's correct name and pronoun may constitute unlawful, sex-based harassment if such conduct is either severe or pervasive enough to create a hostile work environment").

[10] *See, e.g.,* OCR, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (2001), www.ed.gov/ocr/docs/shguide.pdf; OCR, *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010), www.ed.gov/ocr/letters/colleague-201010.pdf; OCR, *Dear Colleague Letter: Sexual Violence* (Apr. 4, 2011), www.ed.gov/ocr/letters/colleague-201104.pdf; OCR, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), www.ed.gov/ocr/docs/qa-201404-title-ix.pdf.

[11] *See, e.g.,* Resolution Agreement, *In re Cent. Piedmont Cmty. Coll., NC*, OCR Case No. 11-14-2265 (Aug. 13, 2015), www.ed.gov/ocr/docs/investigations/more/11142265-b.pdf (agreement to use a transgender student's preferred name and gender and change the student's official record to reflect a name change).

[12] 34 C.F.R. §§ 106.32, 106.33, 106.34, 106.41(b).

[13] *See* 34 C.F.R. § 106.31.

[14] 34 C.F.R. § 106.33.

[15] *See, e.g.,* Resolution Agreement, *In re Township High Sch. Dist. 211, IL,* OCR Case No. 05-14-1055 (Dec. 2, 2015), www.ed.gov/ocr/docs/investigations/more/05141055-b.pdf (agreement to provide any student who requests additional privacy "access to a reasonable alternative, such as assignment of a student locker in near proximity to the office of a teacher or coach; use of another private area (such as a restroom stall) within the public area; use of a nearby private area (such as a single-use facility); or a separate schedule of use.").

[16] 34 C.F.R. § 106.41(b). Nothing in Title IX prohibits schools from offering coeducational athletic opportunities.

[17] 34 C.F.R. § 106.6(b), (c). An interscholastic athletic association is subject to Title IX if (1) the association receives Federal financial assistance or (2) its members are recipients of Federal financial assistance and have ceded controlling authority over portions of their athletic program to the association. Where an athletic association is covered by Title IX, a school's obligations regarding transgender athletes apply with equal force to the association.

[18] The National Collegiate Athletic Association (NCAA), for example, reported that in developing its policy for participation by transgender students in college athletics, it consulted with medical experts, athletics officials, affected students, and a consensus report entitled *On the Team: Equal Opportunity for Transgender Student Athletes* (2010) by Dr. Pat Griffin & Helen J. Carroll (*On the Team*), https://www.ncaa.org/sites/default/files/NCLR_TransStudentAthlete%2B(2).pdf. *See* NCAA Office of Inclusion, *NCAA Inclusion of Transgender Student-Athletes* 2, 30-31 (2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf (citing *On the Team*). The *On the Team* report noted that policies that may be appropriate at the college level may "be unfair and too complicated for [the high school] level of competition." *On the Team* at 26. After engaging in similar processes, some state interscholastic athletics associations have adopted policies for participation by transgender students in high school athletics that they determined were age-appropriate.

[19] 34 C.F.R. § 106.34(a), (b). Schools may also separate students by sex in physical education classes during participation in contact sports. *Id.* § 106.34(a)(1).

[20] 20 U.S.C. § 1681(a)(1); 34 C.F.R. § 106.15(d); 34 C.F.R. § 106.34(c) (a recipient may offer a single-sex public nonvocational elementary and secondary school so long as it provides students of the excluded sex a "substantially

Rescinded: This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

_____

equal single-sex school or coeducational school").

[21] 20 U.S.C. § 1681(a)(6)(A); 34 C.F.R. § 106.14(a).

[22] 20 U.S.C. § 1686; 34 C.F.R. § 106.32.

[23] *See, e.g.,* Resolution Agreement, *In re Arcadia Unified. Sch. Dist., CA*, OCR Case No. 09-12-1020, DOJ Case No. 169-12C-70, (July 24, 2013), www.justice.gov/sites/default/files/crt/legacy/2013/07/26/arcadiaagree.pdf (agreement to provide access to single-sex overnight events consistent with students' gender identity, but allowing students to request access to private facilities).

[24] *See* 34 C.F.R. §§ 106.31(a), 106.31(b)(4). *See also, In re Downey Unified Sch. Dist., CA, supra* n. 9; *In re Cent. Piedmont Cmty. Coll., NC, supra* n. 11.

[25] 34 C.F.R. § 106.31(b)(7).

[26] 20 U.S.C. § 1232g; 34 C.F.R. Part 99. FERPA is administered by ED's Family Policy Compliance Office (FPCO). Additional information about FERPA and FPCO is available at www.ed.gov/fpco.

[27] 20 U.S.C. § 1232g(b)(1)(A); 34 C.F.R. § 99.31(a)(1).

[28] 34 C.F.R. §§ 99.3, 99.31(a)(11), 99.37.

[29] 20 U.S.C. § 1232g(a)(5)(A); 34 C.F.R. § 99.3.

[30] Letter from FPCO to Institutions of Postsecondary Education 3 (Sept. 2009), www.ed.gov/policy/gen/guid/fpco/doc/censuslettertohighered091609.pdf.

[31] 20 U.S.C. § 1232g(a)(5)(B); 34 C.F.R. §§ 99.3. 99.37(a)(3).

[32] 34 C.F.R. § 99.20.

[33] 34 C.F.R. §§ 99.20-99.22.

[34] *See* 34 C.F.R. § 106.31(b)(4).

[35] 34 C.F.R. § 106.8(b).



UNDER REVIEW (as of April 30, 2021).
This document and the underlying issues are under review in light of Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Iden ity or Sexual Orienta ion and recent case law. OCR and CRT are committed to ensuring hat all students, including LGBTQ students, are able to learn and hrive in a safe environment. Please note that this notation does not have the effect of reinstating prior guidance.

**U.S. Department of Justice**
*Civil Rights Division*

**U.S. Department of Education**
*Office for Civil Rights*

### Dear Colleague Letter
### Notice of Language Assistance

If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

**給英語能力有限人士的通知:** 如果您不懂英語, 或者使用英语有困难, 您可以要求獲得向大眾提供的語言協助服務, 幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊, 請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339),或電郵: Ed.Language.Assistance@ed.gov。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức của Bộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY:     1-800-877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

**영어 미숙자를 위한 공고:** 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에 일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로 제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800-USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는 이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkol sa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вам предоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877-8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov.

UNDER REVIEW (as of April 30, 2021).
This document and the underlying issues are under review in light of Executive Order 13988 on Preventing and Combating Discrimination on  he
Basis of Gender Iden ity or Sexual Orienta ion and recent case law. OCR and CRT are committed to ensuring  hat all students, including LGBTQ
students, are able to learn and  hrive in a safe environment.  Please note that this notation does not have the effect of reinstating prior guidance.





**U.S. Department of Justice**
*Civil Rights Division*

**U.S. Department of Education**
*Office for Civil Rights*

February 22, 2017

Dear Colleague:

The purpose of this guidance is to inform you that the Department of Justice and the Department of Education are withdrawing the statements of policy and guidance reflected in:

- Letter to Emily Prince from James A. Ferg-Cadima, Acting Deputy Assistant Secretary for Policy, Office for Civil Rights at the Department of Education dated January 7, 2015; and

- Dear Colleague Letter on Transgender Students jointly issued by the Civil Rights Division of the Department of Justice and the Department of Education dated May 13, 2016.

These guidance documents take the position that the prohibitions on discrimination "on the basis of sex" in Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 et seq., and its implementing regulations, see, e.g., 34 C.F.R. § 106.33, require access to sex-segregated facilities based on gender identity.  These guidance documents do not, however, contain extensive legal analysis or explain how the position is consistent with the express language of Title IX, nor did they undergo any formal public process.

This interpretation has given rise to significant litigation regarding school restrooms and locker rooms. The U.S. Court of Appeals for the Fourth Circuit concluded that the term "sex" in the regulations is ambiguous and deferred to what the court characterized as the "novel" interpretation advanced in the guidance.  By contrast, a federal district court in Texas held that the term "sex" unambiguously refers to biological sex and that, in any event, the guidance was "legislative and substantive" and thus formal rulemaking should have occurred prior to the adoption of any such policy.  In August of 2016, the Texas court preliminarily enjoined enforcement of the interpretation, and that nationwide injunction has not been overturned.

In addition, the Departments believe that, in this context, there must be due regard for the primary role of the States and local school districts in establishing educational policy.

In these circumstances, the Department of Education and the Department of Justice have decided to withdraw and rescind the above-referenced guidance documents in order to further and more completely consider the legal issues involved.  The Departments thus will not rely on the views expressed within them.

UNDER REVIEW (as of April 30, 2021).
This document and the underlying issues are under review in light of Executive Order 13988 on Preventing and Combating Discrimination on  he Basis of Gender Iden ity or Sexual Orienta ion and recent case law. OCR and CRT are committed to ensuring  hat all students, including LGBTQ students, are able to learn and  hrive in a safe environment.  Please note that this notation does not have the effect of reinstating prior guidance.

Dear Colleague Letter                                                                                                    Page 2 of 2


Please note that this withdrawal of these guidance documents does not leave students without protections from discrimination, bullying, or harassment.  All schools must ensure that all students, including LGBT students, are able to learn and thrive in a safe environment.  The Department of Education Office for Civil Rights will continue its duty under law to hear all claims of discrimination and will explore every appropriate opportunity to protect all students and to encourage civility in our classrooms. The Department of Education and the Department of Justice are committed to the application of Title IX and other federal laws to ensure such protection.

This guidance does not add requirements to applicable law.  If you have questions or are interested in commenting on this letter, please contact the Department of Education at ocr@ed.gov or 800-421-3481 (TDD: 800-877-8339); or the Department of Justice at education@usdoj.gov or 877-292-3804 (TTY: 800-514-0383).

Sincerely,


      /s/                                                  /s/
Sandra Battle                                        T.E. Wheeler, II
Acting Assistant Secretary for Civil Rights          Acting Assistant Attorney General for Civil Rights
U.S. Department of Education                          U.S. Department of Justice



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE FOR CIVIL RIGHTS

ASSISTANT SECRETARY

March 9, 2020

The Honorable Mark E. Green
U.S. House of Representatives
Washington, D.C. 20515

Dear Representative Green:

Thank you for your letter to Secretary of Education Betsy DeVos dated October 1, 2019, regarding Title IX of the Education Amendments of 1972 (Title IX). Your letter has been forwarded to the U.S. Department of Education's (Department's) Office for Civil Rights (OCR), and I am pleased to respond on behalf of the Secretary.

As you know, OCR is responsible for enforcing Title IX, and the Department remains committed to the full, fair, and effective enforcement of that statute. In your letter, you ask that the Department clarify how it intends to enforce Title IX and its implementing regulations. Specifically, your letter asks whether a school would be in jeopardy of losing funding or being sanctioned under Title IX if the school permitted faculty and students to use biological pronouns or no pronouns at all. Your letter also asks whether a Department document titled "Instructions to the Field re Complaints Involving Transgender Students" from June 6, 2017, supports such an interpretation.

By itself, refusing to use transgender students' preferred pronouns is not a violation of Title IX and would not trigger a loss of funding or other sanctions. To the extent any prior OCR sub-regulatory guidance, field instructions, or communications are inconsistent with this approach, they are inoperative.

However, sex-based harassment, including that predicated on sex stereotyping, is covered by Title IX if it is sufficiently serious to deny or limit a student's ability to participate in or benefit from an education program or activity. Thus, harassing a student—including acts of verbal, nonverbal, or physical aggression, intimidation, or hostility—based on the student's failure to conform to stereotypical notions of masculinity and femininity can constitute discrimination on the basis of sex under Title IX in certain circumstances. Schools have a responsibility to protect students against such harassment.

OCR will continue to address all complaints of sex discrimination against individuals whether or not the individual is transgender, consistent with OCR's jurisdiction under the federal civil rights laws it enforces. Every school and every school leader has a responsibility to protect all students and ensure every child is respected and can learn in an accepting environment.

Thank you for your interest in ensuring a safe learning environment for all students that is free from discrimination. If you have further questions or concerns, please contact Jordan Harding,

Page 2

Principal Deputy Assistant Secretary, delegated the duties of Assistant Secretary for Legislation and Congressional Affairs, at (202) 401-0020.

Sincerely,

Kenneth L. Marcus
Assistant Secretary for Civil Rights

Act regulations at 34 CFR 668.46(a). Postsecondary institutions are already familiar with the Clery Act [789] and the Department's implementing regulations, and although the Clery Act does not apply to elementary and secondary schools, requiring schools, colleges, and universities to reference the same range of sex offenses under both the Clery Act and Title IX will harmonize compliance obligations under both statutes (for postsecondary institutions) while providing elementary and secondary school recipients with a preexisting Federal reference to sex offenses rather than a new definition created by the Department solely for Title IX purposes. In response to commenters' concerns that reference to the Clery Act regulations leaves these final regulations subject to changes to the Clery Act regulations, the final regulations now reference sexual assault by citing to the Clery Act statute (and as to dating violence, domestic violence, and stalking, the VAWA statute [790]), rather than to the Clery Act regulations. The Clery Act statute references sex offenses as defined in the FBI UCR, [791] a national crime reporting program designed to standardize crime statistics across jurisdictions. At the same time, this modification preserves the benefit of harmonizing Clery Act and Title IX obligations that arise from a recipient's awareness of sex offenses.

The Department disagrees that the Clery Act's definition of sexual assault is biased or discriminatory against men. Although under the FBI UCR definitions it is possible that, for example, oral sex performed on an unconscious woman may be designated as a different offense than oral sex performed on an unconscious man, the difference is not discriminatory or unfairly biased against men, because any such difference results from differentiation between a penetrative versus non-penetrative act, yet under the FBI UCR both offenses fall under the term sexual assault, and further, penetrative acts against both men and women (and touching the genitalia of men, and of women) all fall under FBI UCR sex offenses. While conduct might be classified differently based on whether the victim was male or female, such offenses would fall under the term sexual assault. All the sex offenses designated under the Clery Act as sexual assault represent serious violations of a person's bodily and emotional autonomy, regardless of whether a particular sexual assault is categorized as rape, fondling, or other forcible or non-forcible sex offense under the FBI UCR.

For similar reasons, the Department declines to adopt the alternative definitions of sexual assault proposed by commenters. The Department believes that, with the final regulations' modification to reference the Clery Act and VAWA statutes rather than solely the Clery Act regulations, "sexual assault" under § 106.30 is appropriately broad, capturing all conduct falling under forcible and non-forcible sex offenses determined by reference to the FBI UCR, while facilitating postsecondary institution recipients' understanding of their obligations under both the Clery Act and Title IX and providing an appropriate reference for elementary and secondary schools to protect students from sex offenses under Title IX.

The Department disagrees that the definitions of rape and fondling in the FBI UCR are too narrow. The violative sex acts covered by offenses described in the FBI UCR were designed to cover a broad range of sexual misconduct regardless of how different jurisdictions have defined such offenses under State criminal laws, [792] an approach that lends itself to the purpose of these final regulations, which is to ensure that recipients across all jurisdictions include a variety of sex offenses as discrimination under Title IX.

The Department disagrees that including statutory rape and incest makes the sexual assault category too broad, and declines to adopt the specific alternative definitions of sexual assault proposed by commenters. The Department believes that, in response to commenters' concerns, the final regulations appropriately capture a broad range of sex offenses referenced in the Clery Act and VAWA (which refer to the FBI UCR without specifying whether to look to the SRS or NIBRS, foreclosing any problem resulting from the FBI's transition from the SRS to the NIBRS system) while leaving recipients the discretion to select particular definitions of consent (and what constitutes a lack of consent) that best reflect each recipient's values and community standards and adopt a broader or narrower definition of, e.g., fondling by specifying which body parts are considered "private" or whether the touching must occur underneath or over a victim's clothing. Regardless of how narrowly or broadly a recipient defines "consent" with respect to the FBI UCR's categories of forcible and nonforcible sex offenses, the Department believes that any such offenses would constitute conduct jeopardizing equal access to education in violation of Title IX without raising constitutional concerns, and that the § 106.45 grievance process gives complainants and respondents opportunity to fairly resolve factual allegations of such conduct.

*Changes:* The third prong of the § 106.30 definition of sexual harassment now references "sexual assault" per the Clery Act at 20 U.S.C. 1092(f)(6)(A)(v) (instead of referencing the Clery Act regulations at 34 CFR 668.46); and adds reference to VAWA to include "dating violence" as defined in 34 U.S.C. 12291(a)(10), "domestic violence" as defined in 34 U.S.C. 12291(a)(8), and "stalking" as defined in 34 U.S.C. 12291(a)(30).

Gender-Based Harassment

*Comments:* A number of commenters discussed issues related to gender-based harassment, sexual orientation, and gender identity.

---

[789] The Clery Act applies to institutions of higher education that receive Federal student financial aid under Title IV of the Higher Education Act of 1965, as amended; *see* discussion under the "Clery Act" subsection of the "Miscellaneous" section of this preamble.

[790] VAWA at 34 U.S.C. 12291(a)(10), (a)(8), and (a)(30), defines dating violence, domestic violence, and stalking, respectively.

[791] The Clery Act, 20 U.S.C. 1092(f)(6)(A)(v) defines "sexual assault" to mean an "offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation." The FBI UCR, in turn, consists of two crime reporting systems: The Summary Reporting System (SRS) and the National Incident-Based Reporting System (NIBRS). U.S. Dep't. of Justice, Criminal Justice Information Services, *SRS to NIBRS: The Path to Better UCR Data* (Mar. 28, 2017). The current Clery Act regulations, 34 CFR 668.46(a), direct recipients to look to the SRS for a definition of rape and to NIBRS for a definition of fondling, statutory rape, and incest as the offenses falling under "sexual assault." The FBI has announced it will retire the SRS and transition to using only the NIBRS in January 2021. Federal Bureau of Investigation, Criminal Justice Information Services, Uniform Crime Reporting (UCR) Program, *National Incident-Based Reporting System* (NIBRS), *https://www.fbi.gov/services/cjis/ucr/nibrs.* NIBRS' forcible and nonforcible sex offenses consist of: Rape, sodomy, and sexual assault with an object (as well as fondling, statutory rape, and incest, as noted above). Thus, reference to the Clery Act will continue to cover the same range of sex offenses under the FBI UCR regardless of whether or when the FBI phases out the SRS.

[792] In explaining one of the two systems used in the FBI UCR, the FBI has stated: "The definitions used in the NIBRS [National Incident-Based Reporting System] must be generic in order not to exclude varying state statutes relating to the same type of crime. Accordingly, the offense definitions in the NIBRS are based on common-law definitions found in *Black's Law Dictionary,* as well as those used in the *Uniform Crime Reporting Handbook*

and the NCIC Uniform Offense Classifications. Since most state statutes are also based on common-law definitions, even though they may vary as to the specifics, most should fit into the corresponding NIBRS offense classifications." U.S. Dep't. of Justice, Uniform Crime Reporting System, *National Incident-Based Reporting System* (2011), *https://ucr.fbi.gov/nibrs/2011/resources/nibrs-offense-definitions.*

Some commenters expressed the general view that LGBTQ individuals need to be protected and were concerned that the proposed rules would make campuses even more unsafe for LGBTQ students and have a negative impact on addressing issues of gender-based discrimination and harassment.

Several commenters stated the LGBTQ community experiences sexual violence at much higher rates.

Some commenters expressed specific concerns about the impact of the proposed rules, including the definition of sexual harassment, on transgender individuals.

A few commenters also stated that transgender students should be treated consistent with their gender identity. Some commenters specifically asked the Department to maintain protections presumably found in the withdrawn Letter from James A. Ferg-Cadima, Acting Deputy Assistant Secretary for Policy, Office for Civil Rights at the Department of Education regarding transgender students' access to facilities such as restrooms dated January 7, 2015, and "Dear Colleague Letter on Transgender Students" jointly issued by the Civil Rights Division of the Department of Justice and the Office for Civil Rights of the Department of Education, dated May 13, 2016.[793]

Some commenters expressed concern that the proposed rules promote heterosexuality as the normal or preferred sexual orientation and therefore fail to recognize and capture the identities and experiences of the LGBTQ community and recommended that the Department explicitly state that Title IX protections apply to members of the LGBTQ community.

One commenter believed that all public school districts should adopt and enforce policies stating that harassment for any reason, including on the basis of gender identity, will not be tolerated and that appropriate disciplinary measures will be taken and urged the Department to add language to the proposed rules making clear that such harassment is within the meaning of Title IX.

Some commenters urged the Department to include specific language referring to sexual harassment based on gender identity, including transgender and gender-nonconforming identities or expressions and expressed concern about the lack of such language in the proposed rules. Some of these commenters noted that some courts have interpreted Title IX, Title VII, and similar statutes to prohibit discrimination on the basis of gender identity and sexual orientation because discrimination on either of these bases of discrimination is discrimination on the basis of sex. One commenter acknowledged that contrary case law exists, but asserted Title IX clearly prohibits discrimination on the basis of sex stereotyping which underlies discrimination, harassment, and assaults against LGBTQ people.[794]

On the other hand, one commenter stated that Title IX is about sex and not gender identity and urged the Department to make clear that biology, not gender identity, determines the definition of men and women.

Another commenter asserted that the Department's use of the phrase "on the basis of sex" in defining sexual harassment is limiting. This commenter asserted that the phrase "on the basis of sex" minimizes and confines experiences of gender discrimination and gender-based violence to a binary understanding by aligning it with sex assigned at birth.

Another commenter urged the Department to keep transgender males out of female sports categories as it is unfair to women and girls in competitions.

One commenter stated that OCR has long understood that gender-based discrimination, even where discrimination is not sexual in nature, might also fall under Title IX by creating a hostile environment for students. The commenter expressed concern that the term gender only appears once in a footnote in the proposed rules and asked how students' gender presentation, gender identity, and sexual orientation can be considered under the proposed rules and whether the Department made a conscious decision not to include gender and sexual orientation.

Another commenter asked the Department to clarify whether gender-based harassment is still covered under Title IX and whether incidents of sexual exploitation are to be included in these grievance procedures.

Other commenters were generally concerned that the proposed rules would discourage participation of women and gender nonconforming students in academia. One commenter asserted that the single greatest danger to women's health is men. The commenter reminded the Department that Title IX helps protect women (as well as those who have been harassed or assaulted) and asked the Department not to endanger women.

Another commenter recommended that the Department add language stating that sexual harassment is bi-directional (male-to-female and female-to-male).

*Discussion:* The Department appreciates the concerns of the commenters. Prior to this rulemaking, the Department's regulations did not expressly address sexual harassment. We believe that sexual harassment is an important issue, meriting regulations with the force and effect of law rather than mere guidance documents, which cannot create legally binding obligations.[795]

Title IX, 20 U.S.C. 1681(a), expressly prohibits discrimination "on the basis of sex," which is why the Department incorporates the phrase "on the basis of sex" in the definition of sexual harassment in § 106.30. The word "sex" is undefined in the Title IX statute. The Department did not propose a definition of "sex" in the NPRM and declines to do so in these final regulations.

The focus of these regulations remains prohibited conduct. For example, the first prong of the Department's definition of sexual harassment concerns an employee of the recipient conditioning the provision of an educational aid, benefit, or service on an individual's participation in unwelcome sexual conduct, which is commonly referred to as *quid pro quo* sexual harassment. Any individual may experience *quid pro quo* sexual harassment. The second prong of the § 106.30 definition of sexual harassment involves unwelcome conduct on the basis of sex determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; any individual may experience this form of harassment, as well. The third prong of the sexual harassment definition in these final regulations is sexual assault, dating violence, domestic violence, or stalking on the basis of sex as defined in the Clery Act and VAWA, respectively, and again, any individual may be sexually assaulted or experience dating violence, domestic violence, or stalking on the basis of sex. Thus, any individual—irrespective of sexual orientation or gender identity—

---

[793] *See* U.S. Department of Education & U.S. Department of Justice, Dear Colleague Letter (Feb. 22, 2017) (withdrawing letters), *https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf*.

[794] Commenters cited, *e.g.: R.G. & G.R. Harris Funeral Homes Inc.* v. *Equal Employment Opportunity Comm'n*, 884 F.3d 560 (6th Cir.), appeal docketed, No. 18–107 (U.S. August 16, 2019); *Zarda* v. *Altitude Express, Inc.*, 883 F.3d 100 (2d Cir.), appeal docketed, No. 17–1623 (U.S. June 1, 2018).

[795] *Perez* v. *Mortgage Bankers Ass'n*, 525 U.S. 92, 96–97 (2015).

may be victimized by the type of conduct defined as sexual harassment to which a recipient must respond under these final regulations.

Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current regulations, which the Department did not propose to revise in this rulemaking, reflect this presupposition. For example, 20 U.S.C. 1681(a)(2), which concerns educational institutions commencing planned changes in admissions, refers to "an institution which admits only students of one sex to being an institution which admits students of both sexes." Similarly, 20 U.S.C. 1681(a)(6)(B) refers to "men's" and "women's" associations as well as organizations for "boys" and "girls" in the context of organizations "the membership of which has traditionally been limited to persons of one sex." Likewise, 20 U.S.C. 1681(a)(7)(A) refers to "boys'" and "girls'" conferences. Title IX does not prohibit an educational institution "from maintaining separate living facilities for the different sexes" pursuant to 20 U.S.C. 1686. Additionally, the Department's current Title IX regulations expressly permit sex-specific housing in 34 CFR 106.32 ("[h]ousing provided by a recipient to students of one sex, when compared to that provided to students of the other sex"), separate intimate facilities on the basis of sex in 34 CFR 106.33 ("separate toilet, locker room, and shower facilities on the basis of sex" with references to "one sex" and "the other sex"), separate physical education classes on the basis of sex in 34 CFR 106.34 ("[t]his section does not prohibit separation of students by sex within physical education classes or activities during participation in wrestling, boxing, rugby, ice hockey, football, basketball, and other sports the purpose or major activity of which involves bodily contact"), separate human sexuality classes on the basis of sex in 34 CFR 106.34 ("[c]lasses or portions of classes in elementary and secondary schools that deal primarily with human sexuality may be conducted in separate sessions for boys and girls"), and separate teams on the basis of sex for contact sports in 34 CFR 106.41 ("a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport"). In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes. For

example, the Department's justification for not allowing schools to use "a single standard of measuring skill or progress in physical education classes . . . [if doing so] has an adverse effect on members of one sex" [796] was that "if progress is measured by determining whether an individual can perform twenty-five push-ups, the standard may be virtually out-of-reach for many more women than men because of the difference in strength between average persons of each sex." [797]

The Department declines to take commenters' suggestions to include a definition of the word "sex" in these final regulations because defining sex is not necessary to effectuate these final regulations and has consequences that extend outside the scope of this rulemaking. These final regulations primarily address a form of sex discrimination—sexual harassment—that does not depend on whether the definition of "sex" involves solely the person's biological characteristics (as at least one commenter urged) or whether a person's "sex" is defined to include a person's gender identity (as other commenters urged). Anyone may experience sexual harassment, irrespective of gender identity or sexual orientation. As explained above, the Department acknowledged physiological differences based on biological sex in promulgating regulations to implement Title IX with respect to physical education. Defining "sex" will have an effect on Title IX regulations that are outside the scope of this rulemaking, such as regulations regarding discrimination (e.g., different treatment) on the basis of sex in athletics. The scope of matters addressed by the final regulations is defined by the subjects presented in the NPRM, and the NPRM did not propose to define sex. The Department declines to address that matter in these final regulations. The Department will continue to look to the Title IX statute and the Department's Title IX implementing regulations with respect to the meaning of the word "sex" for Title IX purposes.

To address a commenter's assertion that Title IX prohibits sex stereotyping that underlies discrimination against LGBTQ individuals, the Department

notes that some of the cases the commenter cited are cases under Title VII and are on appeal before the Supreme Court of the United States. The most recent position of the United States in these cases is (1) that the ordinary public meaning of "sex" at the time of Title VII's passage was biological sex and thus the appropriate construction of the word "sex" does not extend to a person's sexual orientation or transgender status, and (2) that discrimination based on transgender status does not constitute sex stereotyping but a transgender plaintiff may use sex stereotyping as evidence to prove a sex discrimination claim if members of one sex (e.g., males) are treated less favorably than members of the other sex (e.g., females).[798] Although the U.S. Attorney General and U.S. Solicitor General interpret the word "sex" solely within the context of Title VII, the current position of the United States may be relevant as to the public meaning of the word "sex" in other contexts as well. As explained above, the Department does not define "sex" in these final regulations. These final regulations focus on prohibited conduct, irrespective of a person's sexual orientation or gender identity. Whether a person has been subjected to the conduct defined in § 106.30 as sexual harassment does not necessarily require reliance on a sex stereotyping theory. Nothing in these final regulations, or the way that sexual harassment is defined in § 106.30, precludes a theory of sex stereotyping from underlying unwelcome conduct on the basis of sex that constitutes sexual harassment as defined in § 106.30.

With respect to sexual harassment as a form of sex discrimination in these final regulations, the Department's position in these final regulations

---

[796] 34 CFR 106.43.

[797] U.S. Dep't of Health, Education, and Welfare, General Administration, Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 40 FR 24128, 24132 (June 4, 1975). Through that rulemaking, the Department promulgated § 86.34(d), which is substantially similar to the Department's current regulation 34 CFR 106.43.

[798] See Brief of Respondent Equal Employment Opportunity Commission at 16, 22–27, 50–53, R.G. & G.R. Harris Funeral Homes Inc. v. Equal Employment Opportunity Comm'n, 884 F.3d 560 (6th Cir.), appeal docketed, No. 18–107 (U.S. August 16, 2019), https://www.supremecourt.gov/DocketPDF/18/18-107/112655/20190816163010995_18-107bsUnitedStates.pdf; accord Amicus Curiae Brief for the United States in Bostock and Zarda, https://www.supremecourt.gov/DocketPDF/17/17-1618/113417/20190823143040818_17-1618bsacUnitedStates.pdf, Bostock v. Clayton County, Ga., 723 F. App'x 964 (11th Cir.), appeal docketed, No. 17–1618 (U.S. June 1, 2018); Zarda v. Altitude Express, Inc., 883 F.3d 100 (2d Cir.), appeal docketed, No. 17–1623 (U.S. June 1, 2018); see also Memorandum from the U.S. Attorney General to the U.S. Attorneys & Heads of Department Components, "Revised Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964" (Oct. 4, 2017) https://www.justice.gov/ag/page/file/1006981/download ("Attorney General's Memorandum").

remains similar to its position in the 2001 Guidance, which provides:

Although Title IX does not prohibit discrimination on the basis of sexual orientation, sexual harassment directed at gay or lesbian students that is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's program constitutes sexual harassment prohibited by Title IX under the circumstances described in this guidance. For example, if a male student or a group of male students target a gay student for physical advances, serious enough to deny or limit the victim's ability to participate in or benefit from the school's program, the school would need to respond promptly and effectively, as described in this guidance, just as it would if the victim were heterosexual. On the other hand, if students heckle another student with comments based on the student's sexual orientation (*e.g.,* ''gay students are not welcome at this table in the cafeteria''), but their actions do not involve conduct of a sexual nature, their actions would not be sexual harassment covered by Title IX.[799]

. . . [G]ender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, but not involving conduct of a sexual nature, is also a form of sex discrimination to which a school must respond[.] For example, the repeated sabotaging of female graduate students' laboratory experiments by male students in the class could be the basis of a violation of Title IX.

These final regulations provide a definition of sexual harassment that differs in some respects from the definition of sexual harassment in the 2001 Guidance, as explained in more detail in the ''Adoption and Adaption of the Supreme Court's Framework to Address Sexual Harassment'' section, the ''Sexual Harassment'' subsection in the ''Section 106.30 Definitions'' section, and throughout this preamble. These final regulations include sexual harassment as unwelcome conduct on the basis of sex that a reasonable person would determine is so severe, pervasive, and objectively offensive that it denies a person equal educational access; this includes but is not limited to unwelcome conduct of a sexual nature, and may consist of unwelcome conduct based on sex or sex stereotyping. The Department will not tolerate sexual harassment as defined in § 106.30 against any student, including LGBTQ students.

For similar reasons to those discussed above, the Department declines to address discrimination on the basis of gender identity or other issues raised in the Department's 2015 letter regarding transgender students' access to facilities such as restrooms and the 2016 ''Dear Colleague Letter on Transgender Students.''

These final regulations concern sexual harassment and not the participation of individuals, including transgender individuals, in sports or other competitive activities. We do not believe these final regulations serve to discourage the participation of women in a recipient's education programs and activities, including sports or other competitive activities.

These final regulations address sexual exploitation to the extent that sexual exploitation constitutes sexual harassment as defined in § 106.30, and the grievance process in § 106.45 applies to all formal complaints alleging sexual harassment.

Sexual harassment is not limited to being bi-directional (male-to-female and female-to-male). As explained above, these final regulations focus on prohibited conduct, irrespective of the identity of the complainant and respondent. As explained above, any person may experience sexual harassment as a form of sex discrimination, irrespective of the identity of the complainant or respondent.

*Changes:* None.

*Comments:* One commenter urged the Department to require that all policies, information, education, training, reporting options, and adjudication processes be accessible and fair and balanced to all students regardless of race, ethnicity, disability, sexual orientation, or other potentially disenfranchising characteristics. One commenter recommended that the Department remove ''sex discrimination issues'' from the summary section of the preamble because the scope is too narrow and inconsistent with the spirit of Title IX and discrimination in higher education extends beyond sex discrimination. This commenter also stated that the proposed rules refer to recipients' responsibilities related to actionable harassment under Title IX, but the commenter suggested that the term discrimination would be more appropriate because sex- and gender-based harassment is only one form of discrimination that Title IX prohibits. One commenter stated that if the scope of the proposed rules must be limited to sexual harassment, this scope should be clearly stated in the preamble to not give the impression that other forms of

discrimination included in Title IX do not require due process.

*Discussion:* Title IX expressly prohibits discrimination on the basis of sex and not race, disability, or other protected characteristics, and the Department does not have the legal authority to promulgate regulations addressing discrimination on the basis of protected characteristics, other than sex, under Title IX. The Department enforces other statutes such as Title VI, which prohibits discrimination on the basis of race, color, and national origin. The Department's other regulations specifically address discrimination based on these and other protected characteristics.

These final regulations require that all policies, information, education, training, reporting options, and adjudication processes be accessible and fair for all students. For example, any complainant will be offered supportive measures, even if that person does not wish to file a formal complaint under § 106.44(a). Any respondent will receive the due process protections in the § 106.45 grievance process before the imposition of any disciplinary sanctions for sexual harassment under § 106.44(a). Additionally, the recipient's non-discrimination statement, designation of a Title IX Coordinator, policy, grievance procedures, and training materials should be readily accessible to all students pursuant to § 106.8 and § 106.45(b)(10)(i)(D).

For the reasons previously explained, the Department does not define sex in these final regulations, as these final regulations focus on prohibited conduct, namely sexual harassment as a form of sex discrimination. As previously explained, the Department's definition of sexual harassment applies for the protection of any person who experiences sexual harassment, regardless of sexual orientation or gender identity.

Although these final regulations constitute the Department's first promulgation of regulations that address sexual harassment, these final regulations also make revisions to pre-existing regulations and regulations such as regulations in subpart A and subpart B of Part 106 that generally address sex discrimination but do not specifically address sexual harassment. For example, the Department revises § 106.8, which concerns the designation of a Title IX Coordinator who will address all forms of discrimination on the basis of sex and not just sexual harassment. The Department clarifies in § 106.8(c) that a recipient must adopt and publish grievance procedures that provide for the prompt and equitable

---

[799] 2001 Guidance at 3.



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS, REGION IV**

61 FORSYTH ST., SOUTHWEST, SUITE 19T10
ATLANTA, GA 30303-8927

REGION IV

ALABAMA
FLORIDA
GEORGIA
TENNESSEE

August 31, 2020

**By U.S. Mail & E-mail**



Re:    OCR Complaint No. 04-20-1409
       Letter of Notification

Dear ███████ :

On June 11, 2020, the U.S. Department of Education (Department), Office for Civil Rights (OCR), received your complaint against Shelby County Schools (District). You (Complainant) allege that the District discriminated against your ███████ (the Student), a rising ███████ School (School), on the basis of her sex. Specifically, you allege that the School denied the Student the ███████ for the 2020-2021 school year due to "homophobic bigot[ry]" and because the Student "didn't date guys" and "likes girls." You also allege that the head coach of the ███████ discriminated against the Student by selecting someone else ███████ "that isn't gay."

OCR enforces Title IX of the Education Amendments of 1972 (Title IX), as amended, 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in any education program or activity receiving Federal financial assistance from the Department. Because the District receives Federal financial assistance from the Department, OCR has jurisdiction over it pursuant to Title IX.

Title IX does not mention discrimination on the basis of a student's sexual orientation. However, the U.S. Supreme Court recently held that discrimination on the basis of an individual's status as homosexual constitutes sex discrimination within the meaning of Title VII of the Civil Rights Act of 1964. *See Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1741 (2020) ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex.").

The Department does not enforce Title VII. Indeed, Congress specifically designed Title VII to apply only to workplaces. *Bostock*, 140 S. Ct. at 1737 ("[I]n Title VII, Congress outlawed discrimination in the workplace."). By contrast, in cases addressing educational environments

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness
by fostering educational excellence and ensuring equal access.
www.ed.gov*

**[OCR-000119]**

under Title IX, the U.S. Supreme Court has recognized the significant differences between workplaces and schools. It has held that courts "must bear in mind that schools are unlike the adult workplace." *Davis v. Monroe*, 526 U.S. 629, 651 (1999). In *Bostock* itself, the Court firmly rejected the idea that its holding would sweep across all statutory or regulatory provisions that prohibit sex discrimination. *Bostock,* 140 S. Ct. at 1753 ("[N]one of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today."). Thus, *Bostock* does not control the Department's interpretation of Title IX.

However, with respect to complaints that a school's action or policy excludes a person from participation in, denies a person the benefits of, or subjects a person to discrimination under an education program or activity, on the basis of sex, the *Bostock* opinion guides OCR's understanding that discriminating against a person based on their homosexuality or identification as transgender generally involves discrimination on the basis of their biological sex.[1]

The Department has determined that it possesses jurisdiction over your complaint that the Student was discriminated against on the basis of her biological sex, by reason of her sexual orientation.[2] Because OCR has determined that it has jurisdiction and that the complaint was timely filed, OCR is opening the complaint for investigation of the issue set forth below. Please note that opening the complaint for investigation in no way implies that OCR has made a determination on the merits of the complaint. During the investigation, OCR is a neutral fact-finder, collecting and analyzing relevant evidence from you, the District, and other sources, as appropriate. OCR will ensure that its investigation is legally sufficient and fully responds to the allegations in accordance with the provisions of the *Case Processing Manual*, available at http://www.ed.gov/ocr/docs/ocrcpm.html.

Accordingly, OCR will investigate whether the District discriminated against the Student on the basis of sex in violation of Title IX and its implementing regulation at 34 C.F.R. Part 106.

Please be advised that the District must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a law enforced by OCR. If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, we will seek to protect personally identifiable information that could reasonably be expected to constitute an unwarranted invasion of personal privacy if released, to the extent provided by law.

---

[1] By contrast, *Bostock* does not impact OCR's regulations or enforcement of Title IX regarding schools that separate students by biological sex in the context of intimate facilities—such as locker rooms and bathrooms—or sports teams, athletic opportunities, or other substantive areas for which Title IX includes specific statutory and regulatory exemptions outlining when consideration of biological sex is permitted. Additionally, educational institutions controlled by a religious organization are exempt from Title IX to the extent that the organization's religious tenets conflict with applications of Title IX. Of course, recipients need not locate a specific exception in Title IX or its implementing regulations in order to establish that their conduct which considers sex does not constitute discrimination under Title IX.

[2] We note that *Bostock* is based on the express assumption that sex is defined by reference to biological sex. *See Bostock*, 141 S. Ct. at 1739.

Page 3 of 3
OCR Complaint #04-20-1409

If you have any questions, please contact the assigned investigator, ████████, at ████████████, or ██████████, or me at ████████████.

Sincerely,

Kimberly M. Richey
Acting Assistant Secretary for Civil Rights

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE FOR CIVIL RIGHTS
32 OLD SLIP, 26TH FLOOR
NEW YORK, NEW YORK 10005

TIMOTHY C. J. BLANCHARD
DIRECTOR
NEW YORK OFFICE

August 31, 2020

*Sent via email only to:*

**MIZEL001@hartford.gov**
Lori Mizerak
Assistant Corporation Counsel
City of Hartford
550 Main Street, Room 210
Hartford, Connecticut 06103
Attorney for Hartford Public Schools

**dmonastersky@HL-Law.com**
David S. Monastersky, Esq.
Howd & Ludorf, LLC
65 Wethersfield Avenue
Hartford, Connecticut 06114
Attorney for Glastonbury Public Schools
   and Canton Public Schools

**pjmurphy@goodwin.com** &
**lyoder@goodwin.com**
Peter J. Murphy, Esq.
Linda L. Yoder, Esq.
Shipman & Goodwin, LLP
One Constitution Plaza
Hartford, Connecticut 06103-1919
Attorneys for Connecticut Interscholastic Athletic Conference
   and Danbury Public Schools

**jzelman@fordharrison.com**
Johanna Zelman, Esq.
Ford Harrison
CityPlace II
185 Asylum Street, Suite 610
Hartford, Connecticut 06103
Attorney for Bloomfield Public Schools
   and Cromwell Public Schools

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 2 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Re:  Case No. 01-19-4025

    Connecticut Interscholastic Athletic Conference

    Case No. 01-19-1252
    Glastonbury Public Schools

    Case No. 01-20-1003
    Bloomfield Public Schools

    Case No. 01-20-1004
    Canton Public Schools

    Case No. 01-20-1005
    Cromwell Public Schools

    Case No. 01-20-1006
    Danbury Public Schools

    Case No. 01-20-1007
    Hartford Public Schools

Dear Attorneys Mizerak, Monastersky, Murphy, Yoder, and Zelman:

The U.S. Department of Education, Office for Civil Rights (OCR) issues this Revised Letter of Impending Enforcement Action[1] in the above-referenced cases. The earlier Letter of Impending Enforcement Action, dated May 15, 2020, has been updated in light of the Supreme Court's holding in *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020).

The Complainant filed complaints against the Connecticut Interscholastic Athletic Conference (CIAC) and the Glastonbury Board of Education (Glastonbury) on behalf of three high school student-athletes and their parents. The Complainant alleged that the CIAC's policy permitting certain biologically male student-athletes to participate in interscholastic athletics (Article IX, Section B of the CIAC By-Laws, adopted May 9, 2013, and titled, "Transgender Participation" (hereinafter referred to as the Revised Transgender Participation Policy)) discriminated against female student-athletes competing in interscholastic girls' track in the state of Connecticut on the basis of their sex.[2] Specifically, the Complainant alleged that the Revised Transgender Participation Policy denied girls opportunities to compete, including in state and regional meets, and to receive public recognition critical to college recruiting and scholarship opportunities. The

---

[1] Section 305 of OCR's *Case Processing Manual* states as follows: "When following the expiration of the 10 calendar day period referenced in CPM subsection 303(g) . . . the recipient does not enter into a resolution agreement to resolve the identified areas of non-compliance, OCR will prepare a Letter of Impending Enforcement Action."

[2] For the purposes of this letter, the terms "male" and "female" are defined by biological sex. *See Mem. from U.S. Attorney General to U.S. Attorneys Heads of Department Components* (Oct. 4, 2017), available at https://www.justice.gov/ag/page/file/1006981/download; *see also Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1739 (2020) (leaving undisturbed the government's position, and noting that the Court proceeded "on the assumption that 'sex' signified what the employers suggest, referring only to biological distinctions between male and female.").

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 3 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Complainant further alleged that implementation of the Revised Transgender Participation Policy by Glastonbury, the school attended by one of the complainant student-athletes (Student 1), denied opportunities to girls competing in interscholastic girls' track on the basis of their sex. In addition, the Complainant alleged that the CIAC retaliated against one of the complainant parents (Parent 1), after Parent 1 complained about the Revised Transgender Participation Policy; and that a Glastonbury track coach retaliated against Student 1 for her and her parent's (Parent 2's) advocacy against the Revised Transgender Participation Policy.

Pursuant to OCR's *Case Processing Manual* (the *Manual*),[3] Section 103, OCR also opened an investigation of Bloomfield Public Schools (Bloomfield) and Hartford Public Schools (Hartford), based on allegations that these school districts allowed a biologically male student-athlete (Student A) to participate on their girls' track teams. OCR also opened an investigation of Cromwell Public Schools (Cromwell), based on allegations that this school district allowed a biologically male student-athlete (Student B) to participate on its girls' track team. Additionally, OCR opened an investigation of Canton Public Schools (Canton) and Danbury Public Schools (Danbury), the school districts attended by the other two complainant student-athletes (Students 2 and 3, respectively), following a determination that these school districts may have been involved in alleged acts of discrimination related to the complaints filed against the CIAC and Glastonbury. OCR investigated whether these school districts denied athletic benefits and opportunities to female student-athletes competing in interscholastic girls' track through implementation of the Revised Transgender Participation Policy, or limited the eligibility or participation of any female student-athletes competing in interscholastic girls' track through implementation of the Revised Transgender Participation Policy.

**Summary of Findings**

As detailed below, the actions of the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury resulted in the loss of athletic benefits and opportunities for female student-athletes. One complainant student-athlete explained to OCR that no matter how hard she trained, she felt that she could never be good enough to defeat Students A and B. She also stated that female student-athletes were missing out on great opportunities to succeed and felt that female student-athletes could be "completely eradicated from their own sports." Another complainant student-athlete explained to OCR that she felt that she could not fairly compete against Students A and B, because they had a physical advantage over her. In this sense, they were denied the opportunities that Connecticut male student-athletes had of being able to compete, on a level playing field, for the benefits that flow from success in competitive athletics. OCR determined that the participation of Students A and B in girls' track events resulted in lost benefits and opportunities for female student-athletes.

OCR determined that the CIAC, by permitting the participation of certain male student-athletes in girls' interscholastic track in the state of Connecticut, pursuant to the Revised Transgender Participation Policy, denied female student-athletes athletic benefits and opportunities, including advancing to the finals in events, higher level competitions, awards, medals, recognition, and the possibility of greater visibility to colleges and other benefits. Accordingly, OCR determined that

---

[3] https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 4 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

the CIAC denied athletic benefits and opportunities to female student-athletes competing in interscholastic girls' track in the state of Connecticut through the Revised Transgender Participation Policy, in violation of the regulation implementing Title IX of the Education Amendments of 1972 (Title IX), at 34 C.F.R. § 106.41(a).

OCR determined that the participation of Glastonbury, Canton, and Danbury in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Students 1, 2, and 3, and other female student-athletes competing against Students A and B, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). Even though Glastonbury, Canton, and Danbury purported to operate separate teams for members of each sex, Glastonbury, Canton, and Danbury placed female student-athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes. The athletic events in which the female student-athletes competed were coeducational; female student-athletes were denied the opportunity to compete in events that were exclusively female, whereas male student-athletes were able to compete in events that were exclusively male. Accordingly, the districts' participation in the athletic events sponsored by the CIAC denied female student-athletes athletic opportunities that were provided to male student-athletes. Glastonbury's, Canton's, and Danbury's obligations to comply with the regulation implementing Title IX are not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R § 106.6(c).

Student A participated in girls' outdoor track during school year 2017-2018 on the Bulkeley (Hartford) team; and participated in girls' indoor and outdoor track during school year 2018-2019 on Bloomfield's team. OCR determined that the participation of Hartford and Bloomfield in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student A's participating in events against Students 1, 2, and 3, and against other female student-athletes, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). Student B participated in girls' indoor and outdoor track during school years 2017-2018 and 2018-2019 on Cromwell's team. OCR determined that the participation of Cromwell in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student B's participating in events against Students 1, 2, and 3, and against other female student-athletes, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). Hartford's, Bloomfield's, and Cromwell's obligations to comply with the regulation implementing Title IX are not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R. § 106.6(c).

For the aforementioned reasons, OCR also determined that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury treated student-athletes differently based on sex, by denying benefits and opportunities to female students that were available to male students.

With respect to the retaliation allegation filed against the CIAC, there was insufficient evidence to substantiate the Complainant's allegation that the CIAC retaliated against Parent 1 after Parent 1 complained about the Revised Transgender Participation Policy. With respect to the retaliation

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 5 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

allegation filed against Glastonbury, there was insufficient evidence to substantiate the Complainant's allegation that Glastonbury retaliated against Student 1.

Nothing in this letter should be interpreted to impute misconduct on the part of any biologically male students who participated in these competitions.

### Investigation and Issuance of Letter of Impending Enforcement Action

During the course of the investigation, OCR interviewed the Executive Director of the CIAC; administrators and staff from Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury; and the students and parents on whose behalf the complaint was filed. In addition, OCR reviewed documentation that the Complainant, the CIAC, the school districts, and some of the students and parents submitted. OCR also reviewed publicly available information regarding the CIAC and its member school student-athletes.

At the conclusion of the investigations, OCR informed the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury of its findings and determinations that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury had discriminated against female student-athletes. OCR requested that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury enter into resolution agreements to remedy the violations. Because the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury did not enter into resolution agreements, OCR issued letters of impasse to the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury on March 17, 2020, in which it advised the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that it would issue this letter if each did not reach an agreement with OCR within 10 calendar days of the date of its impasse letter.[4] OCR issues this Letter of Impending Enforcement Action because the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury have to date failed to voluntarily enter into resolution agreements to remedy the identified violations.

### Jurisdiction

OCR is responsible for enforcing Title IX, as amended, 20 U.S.C. § 1681 et seq., and its implementing regulations at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in education programs and activities receiving financial assistance from the U.S. Department of Education (the Department).

OCR has jurisdiction over the CIAC as follows:

   a) The CIAC is a direct recipient of Federal funding from the Department through a grant awarded by the Department's Office of Special Education Programs (OSEP) to support the Special Olympics Unified Champion Schools program administered by the CIAC.

---

[4] In emails dated March 27, 2020, OCR informed the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that in view of their COVID-19-related duties and responsibilities, OCR was extending the 10-calendar-day deadline to respond to OCR's proposed resolution agreement for a period of 30 days, to April 27, 2020.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 6 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

b) The CIAC is also an indirect recipient of Federal funding. The CIAC is governed by member school representatives who devote official time and district resources to the CIAC (e.g., determine athletic eligibility, make rules for athletic competitions, run state boys' and girls' tournaments, and control state championships). In addition, the CIAC receives revenue through the sale of tickets to tournament contests—revenue that would otherwise go to the schools—and by the assessment of entry fees on schools for participation in various tournaments. The CIAC is also an indirect recipient of Departmental financial assistance through Special Olympics of Connecticut (which receives grant money from OSEP) because several employees of Special Olympics of Connecticut provide to the CIAC technical assistance in the administration of the Special Olympics Unified Champion Schools program.

c) The CIAC's member schools also have ceded controlling authority over Connecticut's high school athletic program to the CIAC, whose purpose is to supervise, direct, and control interscholastic athletics in Connecticut. In addition to the CIAC's governance by local school representatives (noted above), the Connecticut General Assembly's Office of Legislative Research stated that school districts have the power to organize athletic programs and decide in what sports to compete, adding, "Boards have delegated authority over the organization of interscholastic high school athletics to [the CIAC]. CIAC regulates high school sports, promulgates eligibility and safety and health rules for teams, and organizes and controls games and championships."

OCR has jurisdictional authority under Title IX to investigate Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury, because each is a recipient of financial assistance from the Department.

## I.    ATHLETIC BENEFITS AND OPPORTUNITIES

**Findings of Fact**

*The CIAC's Organizational Structure*

The CIAC is the only association governing interscholastic athletic programs for secondary schools in Connecticut.[5] The CIAC is a division of the Connecticut Association of Schools (CAS). Any public or parochial school accredited by the Connecticut State Department of Education, as well as any private school or academy, and any private school holding associate institutional membership in the CAS can become a member of the CIAC. The CIAC currently has 188 member schools. Member schools sign an annual Membership Agreement, pay annual dues, and agree to abide by the CAS Constitution and the CIAC By-Laws and Eligibility Rules. During school year 2018-2019, the CIAC authorized its member schools to participate in 14 boys' sports and 13 girls' sports. The CIAC By-Laws allow female athletes to participate on boys' teams, but do not permit

---

[5] *See* CIAC Handbook 2019-2020, Section 2.2 ("The CIAC is the only Association which governs interscholastic athletic programs for secondary schools in Connecticut.").

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 7 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

male athletes to participate on girls' teams. The CIAC administers its athletics programs by way of the CAS Constitution, by-laws, and tournament regulations.[6]

The CIAC has 27 committees corresponding to each of the CIAC-sanctioned sports. Each committee includes representatives from member schools, including principals, coaches, and athletic directors, as well as former coaches. These committees coordinate the activities of the sports, including game rules, playing conditions, tournament policies, and sportsmanship initiatives. The by-laws, along with the CAS constitution, are published every year as part of the CIAC Handbook, which is available on the CIAC website.[7] The Handbook includes detailed rules and regulations governing athletic administration, scheduling, and eligibility, among other topics. The CAS Legislative Body is authorized to make changes to the CAS Constitution and the by-laws. The principals of the CIAC member schools are the voting delegates to the Legislative Body. The CAS Constitution states that any voting member school may submit a proposed change to the by-laws/regulations through its representative. The CIAC Board of Control is the governing body for high school interscholastic sports in Connecticut and has 14 voting and 3 non-voting members; the Board of Control has representatives from large, medium, and small schools, urban and rural schools, as well as public, parochial, and technical schools.[8] The by-laws require that the Board of Control consider any proposed change to a by-law/regulation, act upon it, and submit any proposed by-law/regulation change to member schools for a vote at the annual meeting of the Legislative Body. The by-laws, including the rules, regulations, and policies contained therein, as well as the tournament regulations are binding on its member schools,[9] and the CIAC has the authority to penalize schools for violation of the by-laws.[10]

During interviews, district staff members confirmed that the districts regarded the by-laws, rules, and regulations, including the Revised Transgender Participation Policy, as binding. The witnesses further stated that they regarded the CIAC as the only athletic association in Connecticut

---

[6] The by-laws constitute the general rules and policies for athletic administration and participation in the CIAC. Specific policies, such as the Revised Transgender Participation Policy, are contained within the by-laws. Further policies regarding sport-specific tournament participation ("tournament regulations") are published each season in a sports information packet.

[7] http://www.casciac.org/pdfs/ciachandbook_1920.pdf (site last visited on April 24, 2020).

[8] The CIAC Board of Control is elected each year by the Legislative Body at the Annual Meeting of the CAS. The CIAC Board of Control meets monthly during the school year.

[9] *See* the CIAC Handbook 2019-2020, Section 2.4 ("Each member school has the responsibility of knowing and adhering to all CIAC rules and regulations and administering its athletic programs according to those rules.").

[10] *See* the CIAC Handbook 2019-2020, Section 3.0, CIAC By-Laws, Article III, Section C ("The Board of Control shall have the power to assess and to enforce such penalties, including fines, against member schools, principals, athletic directors, coaches and/or members of the coaching staff, as it deems suitable for violations of its Bylaws, Regulations, Rules, Standards of Courtesy, Fair Play and Sportsmanship, Code of Ethics, or any other standard of conduct or any other provision of this Handbook."). Witnesses OCR interviewed, including the CIAC Executive Director and administrators of member schools, stated that, in general, member schools are responsible for ensuring their own compliance with the CIAC's rules and for self-reporting any violations of those rules. Member schools can also report other schools for potential violations. The CIAC Executive Director informed OCR that, to date, no member school has self-reported or reported another member school for a violation of the Revised Transgender Participation Policy.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 8 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

that could provide sufficient competitive opportunities for their students.[11] Witnesses told OCR that if their schools were to withdraw from the CIAC, they likely would encounter difficulties scheduling games against other schools and would be unable to participate in statewide competitions. An Athletic Director for one of the Districts advised OCR that a CIAC member school would not benefit from playing against a nonmember school because it would not add to the school's record for purposes of qualifying for the state championship. The same Athletic Director also stated that having a state-wide association makes all of the athletics programs stronger and more consistent with set rules for play and eligibility.

### *The CIAC's Adoption of its Revised Transgender Participation Policy*

The CIAC stated that its Board of Control began discussions regarding transgender participation in athletics during school year 2007-2008. During its 56th Annual Meeting, held on May 8, 2008, the CIAC membership adopted a by-law change concerning the eligibility of transgender athletes, adding new language to Article IX of the CIAC by-laws (the 2008 policy). Specifically, the 2008 policy allowed transgender student-athlete participation only in accordance with the gender stated on the student's birth certificate unless the student had undergone "sex reassignment."[12] The 2008 policy set forth specific requirements for post-pubescent sex reassignment, including surgery; legal recognition of the reassignment by proper governmental authorities; hormonal therapy; and a two-year waiting period post-surgical and anatomical changes.[13] The 2008 policy also provided that a student-athlete seeking participation as a result of a sex reassignment would be able to appeal eligibility determinations through the CIAC's eligibility appeal process. The stated rationale for the 2008 policy was that "[w]hile the eligibility of transgendered students has not yet been a 'live' issue in Connecticut, the CIAC Board felt that it should be pro-active and have a policy in place for any future eventualities."[14] The 2008 policy remained in effect until 2013. The CIAC advised OCR that, during that time period, the CIAC did not receive any requests for a student-athlete to participate on a team that was different from the student's "assigned gender at birth."

The CIAC stated that in 2012, after the Connecticut Legislature passed Public Act 11-55, expanding the scope of Connecticut's anti-discrimination laws to prohibit discrimination on the basis of "gender identity or expression,"[15] the CIAC decided to review and revise the 2008 policy.

---

[11] The CIAC Executive Director stated that there are private schools within Connecticut, such as Taft, Choate, and Kent, that do not belong to the CIAC. These schools belong to the Founders League, whose website describes the league as comprising "highly selective college preparatory schools." The Founders League includes ten schools from Connecticut and one school from New York. The Founders League holds its Championship in 13 boys' sports and 12 girls' sports separately, and the CIAC precludes any Founders League schools from competing in any post-season events hosted by the CIAC. Witnesses opined that they did not know if the Founders League was a feasible alternative for a public school in lieu of becoming a member of the CIAC.

[12] https://www.casciac.org/pdfs/ciachandbook_1213.pdf (site last visited on April 24, 2020)

[13] Under the 2008 policy, a student-athlete who had undergone sex reassignment before puberty was not subject to the requirements detailed above.

[14] The CIAC Annual Meeting minutes. https://www.casciac.org/pdfs/adopted_bylaw_changes_CIAC.pdf (site last visited on April 24, 2020).

[15] P.A. 11-55, which became effective on October 1, 2011, defines "gender identity or expression" as follows:

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). See also www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 9 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

The CIAC did so at its Annual Meeting, held on May 9, 2013, when the current Revised Transgender Participation Policy was enacted.  This Policy states, in relevant part:

> [T]his policy addresses eligibility determinations for students who have a gender identity that is different from the gender listed on their official birth certificates. . . . Therefore, for purposes of sports participation, the CIAC shall defer to the determination of the student and his or her local school regarding gender identification.   In this regard, the school district shall determine a student's eligibility to participate in a CIAC gender specific sports team based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season.  Accordingly, when a school district submits a roster to the CIAC it is verifying that it has determined that the students listed on a gender specific sports team are entitled to participate on that team due to their gender identity and that the school district has determined that the expression of the student's gender identity is bona fide and not for the purpose of gaining an unfair advantage in competitive athletics. . . .  The CIAC has concluded that [these] criteria [are] sufficient to preclude the likelihood that a student will claim a particular gender identity for the purpose of gaining a perceived advantage in athletic competition.[16]

---

"Gender identity or expression" means a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth, which gender-related identity can be shown by providing evidence including, but not limited to, medical history, care or treatment of the gender-related identity, consistent and uniform assertion of the gender-related identity or any other evidence that the gender-related identity is sincerely held, part of a person's core identity or not being asserted for an improper purpose.

See Conn. Gen. Stat. § 46a-51. Specifically, with respect to the public schools, P.A. 11-55 amended § 10-15c of the Connecticut General Statutes to prohibit discrimination on the basis of gender identity or expression, among other bases.  The legislative history of P.A. 11-55 indicates that the topic of athletics was briefly raised during the Connecticut House proceedings on May 19, 2011, in a discussion between Rep. Fox (the bill's proponent) and Rep. Shaban.  In response to Rep. Shaban's question concerning whether, under the bill, a high school boy who wanted to play on the school's girls' basketball team could not be prohibited from doing so, Rep. Fox indicated that he believed, but was not certain, that in that context the intent of the bill was to apply only to a male athlete who had undertaken what Rep. Shaban had described as "affirmative physical changes." Conn. Gen. Assembly House Proceedings 2011, Vol. 54, Part 12 (May 19, 2011) at 4017-4022.

[16] The CIAC informed OCR that the Revised Transgender Participation Policy has been in effect since its adoption on May 9, 2013. The CIAC stated to OCR that the policy contained in the revised by-law no longer required student-athletes to undergo medical treatment or sex reassignment surgery in order to participate in athletics consistent with their gender identity, nor would a student-athlete be required to seek permission from the CIAC in order to participate under the policy in accordance with the student's gender identity; rather, the policy required member schools to submit rosters that reflected the gender identities of their students.  The CIAC further stated that this decision was based on "a determination that a member school is in the best position to identify and confirm that a student-athlete's gender is consistent with the student's gender identity at school and to place the student on the correct team roster." Accordingly, the Board of Control determined that students would not be required to disclose their transgender status to the CIAC.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 10 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Thus, the Revised Transgender Participation Policy eliminated any requirement that transgender student-athletes provide any medical information or documentation to the CIAC or its member schools.

The Connecticut State Department of Education (CSDE) issued a document entitled, "Guidance on Civil Rights Protections and Supports for Transgender Students – Frequently Asked Questions," dated September 2017 (the 2017 FAQs).[17]   The 2017 FAQs state, in relevant part:

> For issues concerning participation in interscholastic competitive sports, schools and districts should consult their counsel and the Connecticut Interscholastic Athletic Association ("CIAC").[18]

On October 11, 2018, the CAS Board of Directors requested that an ad hoc committee examine all the CIAC rules and regulations that relate to gender.  The meeting minutes of the CIAC stated that the purpose of the review was to ensure that the regulations were in alignment with state law.[19]   The CIAC established a Gender By-Law Subcommittee in December 2018 to review all of the by-laws relating to gender in order to confirm the current policies and practices or make recommendations for improvements.  In its report to the CIAC Board of Control, dated April 4, 2019, the Subcommittee concluded that the by-laws reviewed were "in alignment with Connecticut law and the CAS-CIAC mission."[20]

### *The CIAC's and School Districts' Implementation of the Revised Transgender Participation Policy*

School district witnesses interviewed stated that none of the districts had a specific written procedure or practice in place to implement the Revised Transgender Participation Policy, but that they followed or would follow the plain language of the policy.  Districts that had not had a transgender student request to participate in athletics stated that should they receive a request from a transgender student to participate in athletics, they would look at the gender identity listed in the student's current school records and then whether the gender identity the student is expressing during the day is consistent with the gender identity listed in the student's school records; e.g., whether the student has requested to use a name and pronouns consistent with that sex.  Witnesses stated that often this process would involve the student's parents, particularly if the student were

---

[17]  https://portal.ct.gov/-/media/SDE/Title-IX/transgender_guidance_faq.pdf?la=en (site last visited on April 24, 2020).  This guidance indicates that the CIAC is responsible for establishing statewide policies for transgender participation in interscholastic competitive sports.

[18]  2017 FAQs, p. 7.  *See* https://portal.ct.gov/-/media/SDE/Title-IX/transgender_guidance_faq.pdf?la=en (site last visited on April 24, 2020).

[19]  https://portal.ct.gov/-/media/SDE/Title-IX/transgender_guidance.pdf?la=en (site last visited on April 24, 2020).

[20]  The CAS mission statement is as follows: "The Connecticut Association of Schools provides exemplary programs and services that promote excellence in the education of all children."  The CIAC mission statement is as follows: "The CIAC believes that interscholastic athletic programs and competition are an integral part of a student's academic, social, emotional and physical development. The CIAC promotes the academic mission of schools and honorable competition. As such, the CIAC serves as the regulatory agency for high school interscholastic athletic programs and exists to assure quality experiences that reflect high ethical standards and expectations for fairness, equity and sportsmanship for all student-athletes and coaches. The CIAC provides leadership and support for member schools through the voluntary services of dedicated school administrators, athletic directors, coaches and consultants."

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 11 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

a minor and school records needed to be changed; but that once the student had established his or her gender identity, the school would place the student on the roster of the team associated with that gender. Witnesses from districts that have had transgender students request to participate in athletics detailed a similar internal process; namely, that upon a request from a transgender student, they would review the student's records, speak with the student's teachers/counselors, meet with the student's parents, and if all was consistent, thereafter, place the student on the team roster associated with the student's gender identity.

Every district confirmed to OCR that it believed that no specific documentation, medical or otherwise, was required in order for the district to comply with the policy. District administrators reported that they had not received specific training regarding implementation of the Revised Transgender Participation Policy, although some stated that they had attended workshops or presentations on the topic of transgender athletes generally. Principals and athletics directors interviewed by OCR indicated that transgender student-athlete participation had been discussed either formally or informally at annual professional development conferences, as well as during professional association meetings, and through their respective regional conferences. Witnesses from the districts stated, and the CIAC confirmed to OCR, that the CIAC has not questioned any decisions made by a member school under the policy, nor has it investigated any rosters submitted by member schools with respect to the policy. Glastonbury noted that, in the past, when it had a transgender student wish to participate in athletics, the student's parent offered to provide medical documentation to support their request under the Revised Transgender Policy; however, the CIAC advised Glastonbury that the information was not required.

Additionally, multiple district witnesses stated to OCR that, according to their understanding of the Revised Transgender Participation Policy, it is not the school's or district's role to determine a student's gender. Witnesses from Bloomfield, Danbury, Glastonbury, and Hartford stated that the student initiates the process and informs the district of the student's gender identity; and the district's role is to review the current school records, speak with school staff regarding the student's current gender expression during the school day, and then place the student on the appropriate roster. Witnesses from Bloomfield and Cromwell also stated that if a student were to initially register with the school under a gender identity that differed from the student's biological sex, the school would place the student on the roster of the gender identified in the school registration records; i.e., the district and student would not need to have a discussion or review the student's participation under the Revised Transgender Participation Policy. Both Cromwell and Bloomfield have used this process in their districts.

### *Concerns Raised by Parents and Others to the CIAC Regarding the Policy and the Participation of Biologically Male Students in Track Events*

In 2019, the CIAC received several emails from parents of Connecticut high school students, in which the parents expressed concerns about the policy and specifically about the participation in female track events of biologically male students.

From January 2019 to March 2019, the CIAC received four emails from the father of a female student-athlete at Glastonbury High School (Parent 3). On January 29, 2019, Parent 3 sent an email to the CIAC stating that he and many parents of other female track athletes, as well many of

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 12 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

the athletes themselves, believed that the policy was unfair to female track athletes[21] and that the policy raised safety concerns as well, particularly with respect to sports involving physical contact.[22] With respect to track, he suggested that a compromise could be reached whereby a boy identifying as a girl would be able to compete but would not have the results used for purposes of conference or state records or for all-conference or all-state selection. Parent 3 requested a meeting with the CIAC officials to discuss the topic.[23]

On February 17, 2019, Parent 3 sent an email to the CIAC stating that the transgender policy affected the outcome of the CIAC State Open Girls Indoor Track Championship held on February 16, 2019. Specifically, he stated that the performance of a transgender athlete "with all the physiological and anatomical attributes of a male athlete" in the Championship had enabled Bloomfield High School to win the team championship over Glastonbury. Parent 3 again urged the CIAC to change the policy. On February 25, 2019, the Executive Director of the CIAC responded to Parent 3, stating that Parent 3's correspondence would be provided to a CIAC subcommittee reviewing the policy.

On March 3, 2019, Parent 3 sent an email to the CIAC again urging the CIAC to change the policy. He further stated that at the New England Regional Indoor Track Championship, held on March 2, 2019, a biologically male athlete finished first in the 55-meter and 300-meter sprints and had helped Bloomfield win first place over Glastonbury in the girls' 4 x 400 meter relay. On March 10, 2019, Parent 3 sent an email to the CIAC stating that the National Scholastic Athletic Foundation, an organization that hosts the New Balance National high school track and field competition, had established a policy whereby female transgender athletes are required to meet applicable rules established by the National Scholastic Athletics Foundation, USA Track & Field, and International Olympic Committee, which required such athletes to demonstrate that they had undergone hormone treatment. Parent 3 stated that when Bloomfield's girls' 4 x 400 team recently competed in the New Balance Nationals, it did so without the participation of its biologically male athlete, and that this resulted in a slower time than Bloomfield's team had achieved at the New England championships, when the biologically male athlete had competed.

From February 2019 to March 2019, the CIAC received three emails from a parent (Parent 4). On February 25, 2019, Parent 4 sent an email to the CIAC expressing concerns about the fairness of the policy.[24] He stated "the current unfair competitive balance at the State Open has cost 7

---

[21] In part, Parent 3 stated as follows: "Should a boy who identifies as a girl with all of the physiological and anatomical advantages of a boy be able to compete in Connecticut Girls Indoor Track, obtain medals over other girls who have trained hard and care deeply about the results, eradicate existing girls event and state track records and push what would have been the final girl qualifier out of selection for All-Conference and All-State honors?"

[22] In part, Parent 3 stated as follows: "Should safety be compromised in girls high school track or other girls sports such as basketball, soccer or lacrosse to accommodate a boy who identifies as a girl with all of the physiological and anatomical advantages of a boy?"

[23] In addition, Parent 3 attached a copy of an email dated January 27, 2019, that he had sent to officials from the Glastonbury District. In this email, Parent 3 expressed his concerns about the policy's fairness and safety, and he described several recent track meets in which a transgender athlete had finished ahead of other athletes. Parent 3 asked the Glastonbury officials to make efforts to have the policy changed.

[24] Specifically, he stated that "there are many, myself included, who cannot begin to fathom the policy of the CIAC that has allowed the competitive record of Connecticut Girls High School Track and Field Competitions to be altered

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 13 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Connecticut student/athletes the opportunity to compete at the New England Championship" and "[t]his results in a significant negative impact to these cisgender girls through no fault of their own." He also stated the policy unfairly denied these elite athletes an opportunity to gain additional exposure with college coaches and recruiters. In addition, he stated that "[a]t the heart of the competitive fairness issue regarding competition between transgender girls and cisgender girls is the abundance of testosterone present in young biological males."

Further, Parent 4 stated that the CIAC maintains different qualifying standards for girls' and boys' track, which he contended was an acknowledgment that there was a measurable difference in the performance capabilities between genders. He requested that the CIAC adjust the results of the 2019 State Girls Open Competition so as not to include the results of the transgender athletes, and he requested that the policy be changed going forward. He offered several suggestions for a new policy (e.g., establishing a new competitive category for transgender athletes).

The Executive Director of the CIAC responded the same day, stating that Parent 4's correspondence would be shared with the subcommittee reviewing the Revised Transgender Participation Policy. On March 1, 2019, Parent 4 sent an email to the CIAC, stating that he would like to arrange a meeting with the members of the subcommittee reviewing the policy. On March 5, 2019, Parent 4 sent an email to the CIAC stating that, during the New England Indoor Regional Championships on March 2, 2019, spectators from other states had expressed "surprise and concern" that Connecticut permitted transgender athletes to participate.

On June 20, 2019, the CIAC received an email from the mother of a rising female high school student in Connecticut (Parent 5). Parent 5 expressed her concern that the policy was unfair to female athletes because it would allow "genetic males (no matter how they identify themselves) to usurp genetically female athletes in competition."

In a letter to the CIAC, dated April 11, 2017, a head track coach at a Connecticut high school stated that Student B was at a great advantage unless or until the student began taking hormone blockers. He also referred to average high school testosterone levels according to the Mayo Clinic. He then argued that Student B had gender characteristics that females cannot compete with, and that Student B was taking advantage of the CIAC's policies and rules. He requested that the CIAC find a solution that allowed Students A and B to compete but also protected female athletes.

### The CIAC's Rules for Girls' Indoor and Outdoor Track Competition

The CIAC is organized into various boards and committees, including one committee for each CIAC-sanctioned sport. Each year, the CIAC committee for the respective sport publishes a "Sports Packet/Information Sheet" for the season. The Sports Packet/Information Sheets for girls' indoor and outdoor track set forth, among other things, the procedures for entering student-athletes

---

by the tabulation and classification of results that include transgender athletes that has now spread its impact to not only athletes that have competed directly in these events, but now also their teammates, especially 75 members of the Glastonbury Girls Indoor Track Team, when team records and scoring are impacted."

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 14 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

in events; how many events a student-athlete may participate in;[25] submitting qualifying performances; entrance fees; rules regarding electronic devices; protest procedures; scrimmages; and, regular season score reporting.

The CIAC sets the rules for athletic eligibility and competition across the state. Each sport is divided into divisions/classes, based on the size of the school. The CIAC sports committees determine the tournament or championship class divisions for each sport based on the grade 9-12 enrollments of each school as of October 1 of the past school year. A school can have different classes for each of its sports, and a school's class/division can change depending on the year. The Sports Packet/Information Sheet for each sport sets forth the class/divisions for the current year. For example, during school year 2018-2019, for girls' indoor track, the CIAC had the following classes, from smallest school enrollment to largest: Class S, Class M, Class L, and Class LL. For girls' outdoor track, the CIAC had the following classes: Class S, Class M, Class MM, Class L, and Class LL.

There are eleven conferences/leagues[26] that are based mostly on geographic location, which can include schools from the different CIAC classes. The CIAC does not set regular season competitive schedules; these are set by the individual member schools, individually or through conferences/leagues.[27] However, the CIAC does mandate certain "season limitations," including when the opening day of practice occurs, the minimum number of required practice days prior to the first contest, the maximum number of games or meets played per week, and the maximum number of contests scheduled per season.[28]

For post-season competition, if they met qualifying standards,[29] participants in girls' indoor and outdoor track can participate in a conference/league championship; a class statewide championship; the State Open Championship; and the New England Regional Championship. Each of the eleven conferences/leagues holds a conference/league championship at the end of the indoor and outdoor seasons; and each class holds a class statewide championship at the end of the indoor and outdoor seasons. A student-athlete's eligibility to compete at the indoor and outdoor track State Open Championships is determined by the finish order at the respective class statewide

---

[25] For both girls' indoor and outdoor track, the sport packets state that a competitor shall not compete in more than three events including relays, and any athlete on the tournament roster shall not be entered in more than three events excluding relays; e.g., an athlete may be entered in the 4 x 800, 1600, 3200, and 4 x 400 events, but can only run or be a competitor in three events. A contestant becomes a competitor when the contestant reports to the clerk of course. The rules also state that a competitor who competes in three events at any of the class meets cannot enter any other event at the State Open Championship. The stated rationale is that class championship meets and the State Open are really one meet because advancing to the State Open Championship is predicated on class meet performance. Athletes listed as alternates for relay events may only run if they ran two events or fewer at the class meet; i.e., they are still limited to three events.

[26] http://ciacsports.com/site/?page_id=131 (site last visited on April 24, 2020).

[27] *See* CIAC Handbook, Section 5.0 ("The CIAC has no jurisdiction over regular season interscholastic scheduling problems except as these relate to violation of CIAC policies. Schedul[ing] of interscholastic contests within CIAC season limitations is the responsibility of individual schools and/or leagues.")

[28] *See id.* at page 47.

[29] Schools may only enter athletes who meet the minimum requirements for the event as established by the sports committee for that year, as set forth in the sports information packet.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 15 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

championships as set forth in the Sports Packet/Information Sheet.[30] For example, for indoor track for school year 2018-2019, the top 14 finishers in all events in class statewide championships for Classes LL, L, M, and S were eligible to compete in the indoor State Open Championship. For outdoor track for school year 2018-2019, the top 5 finishers in each of the class statewide championships automatically qualified for the outdoor State Open Championship, as well as all athletes who obtained the special (automatic) standard for their event at the class statewide championship.[31]

The CIAC awards medals to the top 6 competitors based on the order of finish in events at the State Open Championships (both indoor and outdoor), and the top 6 competitors also qualify for the New England Regional Championships.[32] Thereafter, a student may go on to compete at the national championships, held by the National Scholastic Athletics Foundation (the New Balance Indoor and Outdoor Championships), based on the student's qualifying time.[33]

The CIAC uses a point system to award points by school to determine a school state champion for indoor and outdoor track. For indoor track, the CIAC uses team scoring based on six places (from first to sixth place, the CIAC awards 10, 8, 6, 4, 2 and 1 points, respectively) for all events. For outdoor track, the CIAC uses team scoring based on eight places (from first to eighth; 10, 8, 6, 5, 4, 3, 2 and 1 points) only when an eight lane track is used; otherwise the CIAC uses team scoring based on six places (from first to sixth; 10, 8, 6, 4, 2 and 1 points) for the event. The points earned by each school are then tallied, and the CIAC ranks schools in the order of points from highest to lowest to determine the state champion.[34]

---

[30] The Sports Packet/Information Sheet provides information about the Class/Division Championships and the State Open Championship; including qualifying distances and times for entry into the class championships, as well as eligibility to compete in the State Open Championship.

[31] From at least school years 2012-2013 through 2016-2017, the outdoor sports packet set a CIAC State Open Championship qualifying standard for each event. For the 100-meter dash, the qualifying standard was 12.60 for all years and for the 200-meter dash, the qualifying standard was 26.70 for all years except 2016-2017, when it was lowered to 26.14. The sports packets during those years stated that the automatic standard approximated the 8th place finish established in the prior year State Open. Starting in school year 2017-2018, and continuing in school year 2018-2019, per the Sports Packet, "The special standard will be set each year after the class meets have ended. The special standard will be determined by looking at the performance rankings for each event that includes the top five (5) qualifying performances from each of the class meets. The 12th place performance from the qualifiers will become the automatic standard for that year. All athletes who meet that standard during the current year's class championship will advance to the open."

[32] For outdoor track, the 7th and 8th place finishers in the final for any event will be considered as alternates.

[33] The National Scholastic Athletics Foundation's Transgender Participation Policy & Procedure, updated December 2019, allows for a transgender student-athlete to submit a qualified entry into a National Scholastic Athletics Foundation competition or make a written request for participation, which the National Scholastic Athletics Foundation then evaluates on a case-by-case basis, including evaluation by an Eligibility Committee comprising at least one medical professional, event director, active age-appropriate coach, and lawyer. The Eligibility Committee can request any information it believes relevant to the application, including but not limited to interviews with the athlete and/or parents/guardians and coaches, and a review of relevant medical and legal records. The policy states that a male-to-female athlete who is not taking hormone treatments related to gender transition may not compete in female competitions, but that a female-to-male athlete not taking testosterone related to gender transition may compete in male competitions.

[34] In the outdoor State Open Championship, seeding is done electronically based on an athlete's performance at the Class meets. An athlete's seed determines the athlete's lane assignment; the athlete with the fastest projected time based on performance at the Class meets is assigned to a middle lane (usually lane 4) and athletes are then placed in lanes in order of seed, working towards the outside lanes.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 16 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

### *Complainant Students and Competition Against Students A and B*

The complaint was filed on behalf of three high school female students competing in girls' track in the state of Connecticut: Student 1, attending Glastonbury High School (School 1); Student 2, attending Canton High School (School 2); and Student 3, attending Danbury High School (School 3). The Complainant specifically complained about two students who participated in girls' track in the state of Connecticut: Student A, who competed for Bulkeley High School in the Hartford School District (School A1) in the spring of school year 2017-2018, and Bloomfield High School (School A2) during school year 2018-2019 to the present; and Student B attending Cromwell High School (School B). The CIAC's list of sanctioned sports includes boys' track. Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury each maintained boys' track teams.

In order to determine the impact of the Revised Transgender Participation Policy on Students 1, 2, and 3, OCR reviewed the participation of Students 1, 2, 3, A, and B in post-season conference/league championships, class championships, State Open Championships, and the New England Regional Championships. OCR reviewed information for school years 2017-2018 and 2018-2019.

### *Student 1*

OCR determined that Student 1 was enrolled at School 1 as a 10th grade student during school year 2017-2018, and as an 11th grade student during school year 2018-2019. Student 1 was a student-athlete on School 1's girls' varsity indoor and outdoor track teams. Regionally, School 1 participated in the Central Connecticut Conference (CCC). Statewide, School 1 participated in Class LL for indoor and outdoor track.

The Complainant asserted that pursuant to the Revised Transgender Participation Policy, and the resulting participation of Students A and B, the CIAC denied Student 1 opportunities to advance to the finals in an event, to advance to higher levels of competition, and/or win titles at events such as the CIAC Outdoor State Open Championship, held on June 4, 2018; the CIAC Indoor State Open Championship, held on February 16, 2019; and the Indoor New England Regional Championship, held on June 8, 2019.

During an interview with OCR, Student 1 stated that she and other female student-athletes with whom she had spoken found it very difficult to go into a race knowing that no matter what they do, they would never be good enough to win. In a video provided by the Complainant, Student 1 asserted that by permitting transgender athletes to participate in girls' track competitions, she and other athletes had lost opportunities to compete at track meets, to win titles, and to gain attention from college coaches. She further stated that women have fought hard for many years to have opportunities and a voice in sports; and that it is upsetting to realize that no matter how hard she and other female student-athletes train, they will never be good enough to compete against transgender athletes. Student 1 also stated: "I respect these transgender athletes, and I understand that they are just following CIAC policy. But at the same time, it is demoralizing and frustrating for me and for other girls."

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 17 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

The Athletic Director for School 1 acknowledged that some parents had complained that their children did not place at certain meets, but she stated that she was unaware of whether any female students had lost out on competitive opportunities, awards, or wins.  School 1's Athletic Director denied that any of the female student-athletes on the girls' indoor or outdoor track teams were denied participation opportunities as a result of having transgender athletes participate in track events.  She stated that student-athletes were eligible to participate in all meets that the District participated in if they met the requirements.  School 1's Assistant Athletic Director stated that she is aware of Student 1's complaint that she was deprived of an opportunity to advance to the New England Regional Championship due to the participation of transgender athletes.

### *Student 2*

Student 2 was enrolled at School 2 as a 10th grade student during school year 2017-2018, and as an 11th grade student during school year 2018-2019.  During school years 2017-2018 and 2018-2019, Student 2 was a student-athlete on School 2's varsity girls' indoor and outdoor track teams.  Regionally, School 2 participated in the North Central Connecticut Conference (NCCC).  Statewide, School 2 participated in Class S for indoor and outdoor track.

The Complainant asserted that, pursuant to the Revised Transgender Participation Policy and the resulting participation of Students A and B, the CIAC denied Student 2 opportunities to advance to higher levels of competition and/or win titles at events such as the 2017 Outdoor State Open Championship, held on June 6, 2017; the New England Regional Championship, held on June 10, 2017; the Class S Indoor Championship held on February 10, 2018; the Outdoor State Open Championship, held on June 4, 2018; the Class S Indoor Championship, held on February 7, 2019; the Indoor State Open Championship, held on February 16, 2019; the Class S Outdoor Championship, held on May 30, 2019; and the Outdoor State Open Championship, held on June 3, 2019.

During an interview with OCR, Student 2 stated that, in addition to the impact the participation of Students A and B had on her and other female student-athletes' ability to win titles and awards, their participation also has had an impact on her and other female student-athletes' ability to obtain recognition from media and college coaches.  Student 2's mother (Parent 1) noted that some biologically female track student-athletes had lost out on media recognition because the winner of an event at the state championships gets the opportunity to be interviewed by reporters, while the second and third place finishers do not.  Specifically, Parent 1 stated that at the state championships there is a bank of reporters waiting to interview the winners and the winners' names are put in the local papers, and that student-athletes typically do not receive any media recognition when they come in second.  Further, Student 2 stated that the participation of Student A, in particular, had an impact on her ability to set class records for the CIAC Class S 100-meter and 200-meter races.

School 2's principal stated that no student-athletes were prohibited from participating; student-athletes went to every meet that the school participated in, and all student-athletes who qualified for state tournaments had the opportunity to compete.  However, the principal acknowledged that, at the state level, some people might argue that a transgender athlete defeated a District student (i.e., Student 2); therefore, that student lost out on an award.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 18 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

### *Student 3*

OCR determined that Student 3 was enrolled at School 3 as a 9th grade student during school year 2018-2019.  Regionally, School 3 participated in the Fairfield County Interscholastic Athletic Conference (FCIAC).  Statewide, School 3 participated in Class LL for indoor and outdoor track. During school year 2018-2019, Student 3 was a student-athlete on School 3's girls' varsity outdoor track team.

The Complainant asserted that, pursuant to the Revised Transgender Participation Policy and the resulting participation of Students A and B, the CIAC denied Student 3 opportunities to advance to higher levels of competition and/or win titles at events, such as the Outdoor State Open Championship, held on June 3, 2019.  During an interview with OCR, Student 3 stated that when competing against transgender athletes, it was frustrating for her to know that she would not be able to do as well as she otherwise could do.  In a video the Complainant provided, Student 3 asserted that even before she gets to the track, she already knows that she is not going to win first or second place if she races against transgender athletes; and that no matter how hard she works, she will not be able to win the top spot.

### ***Competition Against Students A and B***

Descriptions of some of the girls' track indoor and outdoor post-season events in which Students 1, 2, and/or 3 participated with Students A and/or B during school years 2017-2018 and 2018-2019 are set forth below.

1. During school year 2017-2018, in the Indoor State Open Championships, Student B participated in the 55-meter dash.  In the preliminary for the 55-meter dash, Student B placed 2nd and Student 2 placed 16th.  The top 8 finishers advanced to the finals; however, even though Student 2 would not have advanced to the finals even absent Student B's participation, Student B's finish in the top 8 in the preliminary denied an opportunity for the 9th place finisher to advance to the finals.  See chart summarizing the results:

| 2017-2018 Indoor State Open Championships Girls 55-Meter Dash Preliminaries (Top 7 Advance to Finals) | | | | | |
|---|---|---|---|---|---|
| **Place** | **Student** | **Time** | **School** | **Seed** | **Heat** |
| 1 | * | 7.26q | * | 7.31 | 1 |
| **2** | **Student B** | 7.30q | School B | 7.31 | 1 |
| 3 | * | 7.34q | * | 7.39 | 3 |
| 4 | * | 7.35q | * | 7.28 | 2 |
| 5 | * | 7.40q | * | 7.39 | 3 |
| 6 | * | 7.42q | * | 7.48 | 3 |
| 7 | * | 7.43q | * | 7.38 | 2 |
| 8 | * | 7.44 | * | 7.44 | 1 |
| 9T | * | 7.53 | * | 7.47 | 3 |
| 9T | * | 7.53 | * | 7.40 | 2 |

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 19 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

| 2017-2018 Indoor State Open Championships Girls 55-Meter Dash Preliminaries (Top 7 Advance to Finals) | | | | | |
|---|---|---|---|---|---|
| **Place** | **Student** | **Time** | **School** | **Seed** | **Heat** |
| … | … | … | … | … | |
| 16 | Student 2 | 7.78 | School 2 | 7.46 | 2 |

2. During school year 2017-2018, in the Outdoor State Open Championships, Student A and Student B participated in the 100-meter dash. In the preliminary for the 100-meter dash, Student A placed 1st and Student B placed 4th. The top 8 finishers advanced to the finals, including Student 2 (who placed 2nd) and Student 1 (who placed 8th); however, Student A's and Student B's finishes in the top 8 in the preliminary denied an opportunity for two female student-athletes to advance to the finals. In the finals of the 100-meter dash, Student A placed 1st, Student B placed 2nd; Student 2 placed 4th; and Student 1 placed 6th. The top six finishers were awarded medals and advanced to the New England Regional Championships, including Student 1 and Student 2; however, Student A's and Student B's finishes in 1st and 2nd place, respectively, denied an opportunity for two female student-athletes to advance to the New England Regional Championships, along with the benefit of receiving a medal for the Outdoor State Open Championships.[35] Student A placed 1st at the preliminaries of the 100-meter dash at New England Regional Championships. The top 8 finishers advanced to the finals, including Student 2 (who placed 7th);[36] however, Student A's finish in the top 8 in the preliminary denied an opportunity for a female student-athlete to advance to the finals.[37] See charts summarizing the results below:

| 2017-2018 Outdoor State Open Championships Girls 100-Meter Dash Preliminaries (Top 8 Advance to Finals) | | | | | |
|---|---|---|---|---|---|
| **Place** | **Student** | **Time** | **School** | **Seed** | **Heat** |
| **1** | **Student A** | 11.75q | School A1 | 11.77 | 3 |
| 2 | Student 2 | 12.26q | School 2 | 12.61 | 2 |
| 3 | * | 12.38q | * | 12.33 | 1 |
| **4** | **Student B** | 12.39q | School B | 12.22 | 2 |
| 5 | * | 12.46q | * | 12.57 | 3 |
| 6 | * | 12.52q | * | 12.74 | 2 |
| 7 | * | 12.54q | * | 12.34 | 1 |
| 8 | Student 1 | 12.58q | School 1 | 12.91 | 3 |
| 9 | * | 12.63 | * | 12.73 | 3 |
| 10 | * | 12.64 | * | 12.68 | 2 |
| … | … | … | … | … | … |
| 25 | * | 13.17 | * | 12.98 | |

---

[35] Student A, Student B, and Student 2 also participated in the 200-meter dash, and finished 1st, 7th and 10th, respectively, in the final. Student A's 1st place finish denied an opportunity for one female student-athlete to advance to the New England Regional Championships in the 200-meter dash, along with the benefit of receiving a medal for the Outdoor State Open Championships.

[36] Student 1 placed 25th.

[37] In the finals of the 100-meter dash, Student A placed 1st, while Student 2 placed 7th.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 20 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

**2017-2018 Outdoor State Open Championships**
**Girls 100-Meter Dash Finals**

| Place | Student | Time | School | Points |
|---|---|---|---|---|
| **1** | **Student A** | 11.72# | School A1 | 10 |
| **2** | **Student B** | 12.29 | School B | 8 |
| 3 | * | 12.36 | * | 6 |
| 4 | Student 2 | 12.39 | School 2 | 5 |
| 5 | * | 12.47 | * | 4 |
| 6 | Student 1 | 12.67 | School 1 | 3 |
| 7 | * | 12.71 | * | 2 |
| 8 | * | 12.80 | * | 1 |

**2017-2018 Outdoor New England Regional Championships**
**Girls 100-Meter Dash Preliminaries (Top 8 Advance to Finals)**

| Place | Student | Time | School | Heat | Tie-breaker | State |
|---|---|---|---|---|---|---|
| **1** | **Student A** | 12.46q | School A1 | 5 | | CT |
| 2 | * | 12.59q | * | 4 | | MA |
| 3 | * | 12.64q | * | 3 | | MA |
| 4 | * | 12.65q | * | 1 | | MA |
| 5 | * | 12.81q | * | 1 | 12.805 | CT |
| 6 | * | 12.81q | * | 2 | 2.809 | CT |
| 7 | Student 2 | 12.82q | School 2 | 2 | | CT |
| 8 | * | 12.92q | * | 5 | | RI |
| 9 | * | 12.94 | * | 3 | | MA |
| 10 | * | 12.95 | * | 5 | | MA |
| … | … | … | … | … | … | … |
| 25 | Student 1 | 13.5010 | School 1 | 3 | 13.497 | CT |
| | | | | | | |
| 33 | * | 13.84 | * | 1 | | RI |

**2017-2018 Outdoor New England Regional Championships**
**100-Meter Dash Finals**

| Place | Student | Time | School | Tie breaker | State |
|---|---|---|---|---|---|
| **1** | **Student A** | 11.97 | School A1 | | CT |
| 2 | * | 12.26 | * | | MA |
| 3 | * | 12.31 | * | | MA |
| 4 | * | 12.50 | * | | MA |
| 5 | * | 12.56 | * | 12.554 | CT |
| 6 | * | 12.56 | * | 12.559 | CT |
| 7 | Student 2 | 12.58 | School 2 | | CT |
| 8 | * | 12.69 | * | | RI |

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 21 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

3. During school year 2018-2019, in the Indoor Class S Statewide Championships, Student A and Student B participated in the 55-meter dash. In the preliminary for the 55-meter dash, Student A placed 1st and Student B placed 2nd. The top 7 finishers advanced to the finals, including Student 2 (who placed 3rd); however, Student A's and Student B's finishes in the top 7 in the preliminary denied an opportunity for two female student-athletes to advance to the finals. In the finals of the 55-meter dash, Student A placed 1st, Student 2 placed 2nd, and Student B placed 3rd. The top 14 finishers advanced to the State Open Championship. While all three student-athletes advanced to the State Open Championship, Student A's and Student B's participation denied an opportunity to two female student-athletes to participate in the State Open Championship for the 55-meter dash.[38] See charts summarizing results below:

| Place | Athlete | Time | High School | Heat |
|---|---|---|---|---|
| **2018-2019 Indoor Class S Statewide Championships** **Girls 55-Meter Dash Preliminaries (Top 7 Advance to Finals)** | | | | |
| 1 | **Student A** | 7.16q | School A2 | 8 |
| 2 | **Student B** | 7.30q | School B | 6 |
| 3 | Student 2 | 7.38q | School 2 | 7 |
| 4 | * | 7.61q | * | 1 |
| 5 | * | 7.63q | School A2 | 1 |
| 6 | * | 7.63q | * | 5 |
| 7 | * | 7.68q | * | 3 |
| 8 | * | 7.70 | * | 5 |
| 9 | * | 7.71 | * | 2 |
| 10 | * | 7.74 | * | 4 |
| . . . . | . . . . | . . . . | . . . . | . . . . |
| 48 | * | 8.37 | * | 3 |

| Place | Athlete | Time | High School | Points |
|---|---|---|---|---|
| **2018-2019 Indoor Class S Statewide Championships** **Girls 55-Meter Dash Finals** | | | | |
| 1 | **Student A** | 7.03 | School A2 | 10 |
| 2 | Student 2 | 7.27 | School 2 | 8 |
| 3 | **Student B** | 7.33 | School B | 6 |
| 4 | * | 7.48 | * | 4 |
| 5 | * | 7.51 | School A2 | 2 |
| 6 | * | 7.53 | * | 1 |
| 7 | * | 7.54 | * | - |

4. During school year 2018-2019, in the Indoor State Open Championship, Student A and Student B participated in the 55-meter dash. In the preliminary for the 55-meter dash, Student A placed 1st and Student B placed 2nd. The top 7 finishers advanced to the

---

[38] Student A also placed 1st in the finals of the 300-meter dash, which denied an opportunity to one girl to participate in the State Open Championship for the 300-meter dash.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 22 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

finals, including Student 2 (who placed 4th); however, Student A's and Student B's finishes in the top 7 in the preliminary would have denied an opportunity for two female student-athletes to advance to the finals, including Student 1 (who placed 8th). In the finals of the 55-meter dash, Student A placed 1st, Student B placed 2nd, and Student 2 placed 3rd. The top six finishers are awarded medals and advance to the New England Regional Championships; however, Student A's and Student B's finishes in 1st and 2nd place, respectively, denied an opportunity for two female student-athletes to advance to the New England Regional Championships, along with the benefit of receiving a medal for the Outdoor State Open Championships.[39] Further, since Student 2 placed 3rd, Student A's and Student B's participation denied an opportunity to Student 2 to place 1st in the 55-meter dash and receive the benefit of a 1st place medal. In the Indoor New England Regional Championship, in the preliminaries for the 55-meter dash, Student A placed 2nd, Student B placed 3rd, and Student 2 placed 8th. The top 8 finishers advanced to the finals. Although all three advanced to the finals, Student A's and Student B's 2nd and 3rd place finishes, respectively, denied an opportunity to two female student-athletes to advance to the finals. In the finals of the 55-meter dash, Student A placed 1st, Student B placed 3rd, and Student 2 placed 8th. See charts summarizing results below:

**2018-2019 Indoor State Open Championships**
**Girls 55-Meter Dash Preliminaries (Top 7 Advance to Finals)**

| Place | Athlete | Time | High School | Heat |
|-------|---------|------|-------------|------|
| **1** | **Student A** | 7.00q | School A2 | 3 |
| **2** | **Student B** | 7.07q | School B | 3 |
| 3 | * | 7.24q | * | 2 |
| 4 | Student 2 | 7.27q | School 2 | 1 |
| 5 | * | 7.27q | * | 1 |
| 6 | * | 7.29q | * | 2 |
| 7 | * | 7.34q | * | 3 |
| 8 | Student 1 | 7.37 | School 1 | 2 |
| 9 | * | 7.41 | * | 3 |
| 10 | * | 7.45 | * | 2 |
| . . . . | . . . . | . . . . | . . . . | . . . . |
| 16 | * | 7.85 | School A2 | 2 |

**2018-2019 Indoor State Open Championships**
**Girls 55-Meter Dash Final**

| Place | Athlete | Time | High School | Points |
|-------|---------|------|-------------|--------|
| **1** | **Student A** | 6.95 | School A2 | 10 |
| **2** | **Student B** | 7.01 | School B | 8 |
| 3 | Student 2 | 7.23 | School 2 | 6 |

---

[39] Student A also placed 1st in the finals of the 300 meter dash in the Indoor State Open Championships, which denied an opportunity to a female student-athlete to advance to the New England Regional Championships, along with the benefit of receiving a medal for the Indoor State Open Championships.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 23 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

**2018-2019 Indoor State Open Championships**
**Girls 55-Meter Dash Final**

| Place | Athlete | Time | High School | Points |
|-------|---------|------|-------------|--------|
| 4 | * | 7.24 | * | 4 |
| 5 | * | 7.26 | * | 2 |
| 6 | * | 7.33 | * | 1 |
| 7 | * | 7.39 | * | - |

**2018-2019 Indoor New England Regional Championships**
**Girls 55-Meter Dash Preliminaries (Top 8 Advance to Finals)**

| Place | Athlete | Time | High School | Heat |
|-------|---------|------|-------------|------|
| 1 | * | 7.08q | * MA | 2 |
| **2** | **Student A** | 7.09q | School A2- CT | 4 |
| **3** | **Student B** | 7.24q | School B- CT | 3 |
| 4 | * | 7.28q | *- MA | 3 |
| 5 | * | 7.29q | *- MA | 4 |
| 6 | * | 7.30q | * -CT | 1 |
| 7 | * | 7.30q | *- MA | 1 |
| 8 | Student 2 | 7.30q | School 2 - CT | 1 |
| 9 | * | 7.39 | *- MA | 1 |
| 10 | * | 7.40 | * - RI | 4 |
| . . . . | . . . . | . . . . | . . . . | . . . . |
| 30 | * | 7.92 | * - VT | 3 |

**2018-2019 Indoor New England Regional Championships**
**Girls 55-Meter Dash Finals**

| Place | Athlete | Time | High School |
|-------|---------|------|-------------|
| **1** | **Student A** | 6.94 | School A2- CT |
| 2 | * | 7.04 | * - MA |
| **3** | **Student B** | 7.17 | School B- CT |
| 4 | * | 7.23 | * - MA |
| 5 | * | 7.27 | * - MA |
| 6 | * | 7.27 | * - CT |
| 7 | * | 7.31 | * - MA |
| 8 | Student 2 | 7.32 | School 2 - CT |

5.  During school year 2018-2019, in the Outdoor Class S Statewide Championships, Student A participated in the 100-meter dash and the 200-meter dash; and Student B participated in the 100-meter dash. In the preliminary for the 100-meter dash, Student A placed 2nd and Student B placed 3rd. The top 8 finishers advanced to the finals, including Student 2 (who placed 1st); however, Student A's and Student B's finishes in the top 8 in the preliminary denied an opportunity for two female student-athletes to advance to the finals. In the finals of the 100-meter dash, Student A placed 1st, Student 2 placed 2nd, and Student B placed 3rd. While all three student-athletes advanced to the

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 24 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

State Open Championship, Student A's participation denied Student 2 the benefit of a 1st place finish in the Class S Statewide Championship for the 100-meter dash. Similarly, in the finals of the 200-meter dash, Student A placed 1st and Student 2 placed 2nd.[40] While both students advanced to the State Open Championship, Student A's participation denied Student 2 the benefit of a 1st place finish in the Class S Statewide Championship for the 200-meter dash. See charts summarizing results below:

**2018-2019 Outdoor Class S Statewide Championships**
**Girls 100-Meter Dash Preliminaries (Top 8 Advance to Finals)**

| Place | Student | Time | School | Heat |
|---|---|---|---|---|
| 1 | Student 2 | 12.14 | School 2 | 4 |
| 2 | **Student A** | 12.18 | School A2 | 5 |
| 3 | **Student B** | 12.50 | School B | 3 |
| 4 | * | 12.73 | * | 1 |
| 5 | * | 13.05 | * | 1 |
| 6 | * | 13.08 | * | 2 |
| 7 | * | 13.16 | School A2 | 4 |
| 8 | * | 13.22 | * | 5 |
| 9 | * | 13.27 | * | 3 |
| 10 | * | 13.30 | * | 4 |
| … | … | … | … | … |
| 35 | * | 14.28 | * | 5 |

**2018-2019 Outdoor Class S Statewide Championships**
**Girls 100-Meter Dash Finals**

| Place | Student | Time | School | Points |
|---|---|---|---|---|
| **1** | **Student A** | 11.93# | School A2 | 10 |
| **2** | Student 2 | 12.02 | School 2 | 8 |
| **3** | **Student B** | 12.28 | School B | 6 |
| 4 | * | 12.82 | * | 5 |
| 5 | * | 12.86 | * | 4 |
| 6 | * | 13.13 | * | 3 |
| 7 | * | 13.14 | * | 2 |
| 8 | * | 13.31 | School A2 | 1 |

**2018-2019 Class S Statewide Championships**
**Girls 200-Meter Dash Finals**

| Place | Student | Time | School | Heat | Points |
|---|---|---|---|---|---|
| 1 | **Student A** | 24.47# | School A2 | 6 | 10 |
| 2 | Student 2 | 24.79 | School 2 | 6 | 8 |
| 3 | * | 25.92 | School A2 | 6 | 6 |
| 4 | * | 26.17 | * | 6 | 5 |

---

[40] Student B scratched.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 25 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

| 2018-2019 Class S Statewide Championships<br>Girls 200-Meter Dash Finals | | | | | |
|---|---|---|---|---|---|
| Place | Student | Time | School | Heat | Points |
| 5 | * | 26.30 | * | 3 | 4 |
| 6 | * | 26.41 | * | 6 | 3 |
| 7 | * | 26.76 | School A2 | 6 | 2 |
| 8 | * | 26.85 | * | 3 | 1 |
| 9 | * | 26.93 | * | 5 | |
| 10 | * | 27.02 | * | 6 | |
| … | … | … | … | … | … |
| 32 | * | 28.95 | * | 2 | |
| … | … | … | … | … | … |
| -- | **Student B** | SCR | School B | | |

6. During school year 2018-2019, in the Outdoor State Open Championship, Student A and Student B participated in the 100-meter dash. In the preliminary for the 100-meter dash, Student A placed 1st and Student B placed 5th. The top 8 finishers advanced to the finals, including Student 2 (who placed 3rd) and Student 3 (who placed 4th)[41]; however, Student A's and Student B's finishes in the top 8 in the preliminary denied an opportunity for two female student-athletes to advance to the finals. In the finals of the 100-meter dash, Student 2 placed 1st, Student 3 placed 3rd, and Student B placed 4th.[42] The top 6 finishers were awarded medals and advanced to the New England Regional Championships; however, Student B's finish in 4th place denied an opportunity for a female student-athlete to advance to the New England Regional Championships, along with the benefit of receiving a medal for the Outdoor State Open Championships. Student A, Student 2 and Student 3 also participated in the 200-meter dash and finished 1st, 4th, and 3rd, respectively, in the final. Student A's 1st place finish denied an opportunity for one female student-athlete to advance to the New England Regional Championships, along with the benefit of receiving a medal for the Outdoor State Open Championships. Student A placed 1st in the finals of the 200-meter dash at the Outdoor New England Regional Championships; Student 3 placed 3rd and Student 2 placed 5th. See charts summarizing results below:

| 2018-2019 Outdoor State Open Championships<br>Girls 100-Meter Dash Preliminaries (Top 8 Advance to Finals) | | | | | |
|---|---|---|---|---|---|
| Place | Student | Time | School | Heat | Tie |
| 1 | **Student A** | 11.64q | School A2 | 3 | |
| 2 | * | 11.98q | * | 1 | |
| 3 | Student 2 | 12.07q | School 2 | 2 | |
| 4 | Student 3 | 12.11q | School 3 | 3 | |
| 5 | **Student B** | 12.20q | School B | 1 | |
| 6 | * | 12.44q | * | 2 | 12.433 |

---

[41] Student 1 placed 14th.

[42] Student A had a false start and was disqualified.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 26 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

**2018-2019 Outdoor State Open Championships**
**Girls 100-Meter Dash Preliminaries (Top 8 Advance to Finals)**

| Place | Student | Time | School | Heat | Tie |
|---|---|---|---|---|---|
| 7 | * | 12.44q | * | 1 | 12.436 |
| 8 | * | 12.45q | * | 3 | |
| 9 | * | 12.50 | * | 3 | |
| 10 | * | 12.56 | * | 1 | |
| *** | | | | | |
| 14 | Student 1 | 12.79 | School 1 | 3 | |
| *** | | | | | |
| 24 | * | 13.25 | * | 3 | |

**2018-2019 Outdoor State Open Championships**
**Girls 100-Meter Dash Finals**

| Place | Student | Time | School | Points | Tie |
|---|---|---|---|---|---|
| 1 | Student 2 | 11.67 | School 2 | 10 | |
| 2 | * | 11.92 | * | 8 | |
| 3 | Student 3 | 12.04 | School 3 | 6 | |
| **4** | **Student B** | 12.22 | School B | 5 | |
| 5 | * | 12.36 | * | 4 | |
| 6 | * | 12.38 | * | 3 | 12.375 |
| 7 | * | 12.38 | * | 2 | 12.378 |
| -- | **Student A** | FS | School A2 | | |

**2018-2019 Outdoor State Open Championships**
Girls 200 Meter Dash Finals

| Place | Student | Time | School | Heat | Points |
|---|---|---|---|---|---|
| **1** | **Student A** | 24.33 | School A2 | 3 | 10 |
| 2 | * | 24.75 | * | 3 | 8 |
| 3 | Student 3 | 25.01 | School 3 | 3 | 6 |
| 4 | Student 2 | 25.24 | School 2 | 3 | 5 |
| 5 | * | 25.38 | * | 3 | 4 |
| 6 | * | 25.55 | * | 3 | 3 |
| 7 | * | 25.63 | * | 2 | 2 |
| 8 | * | 25.79 | * | 2 | 1 |
| 9 | * | 26.28 | * | 2 | |
| 10 | * | 26.44 | * | 2 | |
| … | … | … | … | … | … |
| -- | Student 1 | DNS | School 1 | 2 | |

*Team School Championships Involving Students A and B*

OCR reviewed the race results for the 2018-2019 Indoor State Open Championship and confirmed the following order of finish of schools for the state championship:

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

- School A2 – 54 points
- School 1 – 39 points
- School 3 – 34 points
- Hillhouse – 34 points
- Norwich Free Academy – 21 points

OCR further confirmed that School A2 earned 10 points for each of Student A's 1st place finishes. OCR determined that other School A2 student-athletes at the meet earned the team the following points:

- 2nd place in the 300-meter dash, earning School A2 8 points,
- 1st place in the 600-meter run, earning School A2 10 points;
- 5th place in the 4 x 200 relay, earning School A2 2 points; and
- 3rd place in the shot put, earning School A2 6 points

OCR also reviewed the results for the 2018-2019 Outdoor State Open Championships, held on June 3, 2019. OCR determined that School A2 placed 3rd (38 points) in the team championship, a full 20 points behind School 2, which placed first (58 points) and Windsor, which placed 2nd (43 points). The top 5 finishers were as follows:

- School 3 – 58 points
- Windsor – 43 points
- School A2 – 38 points
- Norwich Free Academy – 32 points
- Immaculate – 30 points

Student A participated in the 100-meter dash, the 200-meter dash, and the 4 x 400 relay in the 2018-2019 Indoor State Open Championship, and earned 10 points for School A2 for Student A's first place finish in the 200-meter dash; and was also on School A2's 4 x 400 relay team, which placed 1st and also earned 10 points for School A2.

*School Districts Investigated by OCR*

**Glastonbury:**

Glastonbury advised OCR that as a CIAC member school, it must comply with all of the CIAC's by-laws, policies, rules, and regulations, including the Revised Transgender Participation Policy. Glastonbury reported that it does not currently have any transgender students of which it is aware participating in its athletics program. Glastonbury stated that it must allow students to participate on the athletics team consistent with their gender identity because of state law and the Revised Transgender Participation Policy. Glastonbury stated that it has not challenged the CIAC's Revised Transgender Participation Policy because it is consistent with the requirements of state law, with which Glastonbury already must comply.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 28 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Glastonbury's Athletic Director stated that no female athletes were denied participation on any of their athletic teams as a result of having transgender athletes participate, and that student-athletes were eligible to participate in all meets that the District participated in if they met the requirements (i.e., qualifying marks, selection for relay team which is a determination made at the coaching level). The Athletic Director stated that the complaint filed with OCR addresses what is perceived as an inability to win.

Glastonbury's Principal stated that some district parents complained that a female student was affected by having a transgender student from another team participate in track events. The principal advised OCR that she never verified the times or records brought to her attention, nor did she make a determination regarding the allegations.

In emails dated May 2-10, 2018, Parent 2 requested guidance from the Athletic Director regarding the participation of Student A in girls' track events and whether it was consistent with the CIAC's Revised Transgender Participation Policy. The Athletic Director stated that she had spoken with someone at the CIAC who indicated that Student A would have had to declare her gender identity prior to the start of the school year in August. Parent 2 stated that she informed the CIAC that Student A participated as a male during the indoor season and then as a female during the outdoor season in 2017-2018; and stated that the CIAC advised her that it would be following up with School A1. On May 10, 2018, the Athletic Director advised Parent 2 that she was following up and had placed a call to the CIAC. In an email dated May 11, 2018, the Athletic Director responded to Parent 2, advising her that based on her reading of the CIAC rule, as well as confirmation she received from the CIAC, Student A's participation was in compliance with the Revised Transgender Participation Policy. She noted that if Parent 2 had been told Student A had to declare prior to the start of the school year, that was misinformation, as that requirement is nowhere in the language of the policy. The Athletic Director advised Parent 2 that she also shared this information with the track coach.

On May 23, 2018, Parent 2 advised the Athletic Director via email that she had been discussing transgender eligibility with her legislative office and wanted to make the Athletic Director aware. In an email dated May 29, 2018, Parent 2 asked the Athletic Director if students declaring a gender identity are required to produce any supporting documentation, or if there is a waiting period. In an email dated June 6, 2018, Parent 2 advised the Athletic Director that she intended to request a meeting with the CIAC regarding the transgender policy; the Athletic Director acknowledged the email and stated that there had been articles and some troubling behavior around the issue, and advised that a letter to the CIAC was probably the best route for the parent to take.

In an email dated July 2, 2018, to the Athletic Director, Parent 2 stated that the CIAC had refused to entertain any policy changes in response to her correspondence with them; it was her understanding that member schools set policy; and she wanted to meet with the Athletic Director to share her research. The Athletic Director responded attempting to schedule a time to meet. Thereafter, in an email dated July 18, 2018, Parent 2 forwarded to the Athletic Director copies of responses she had received from the CIAC Executive Director. In the email, she stated that, although the CIAC stated that the state legislature needed to make a change, her state representatives informed her that athletics policies fall under the CIAC's jurisdiction.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 29 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

In an email dated January 27, 2019, to School 1 administrators, Parent 3 alleged that Student A, whom Parent 3 identified as a boy who identifies as a girl, was participating in track and creating an unfair and unsafe environment in girls track.  He provided, as an example, that during the 4 x 400 relay event on January 26, 2019, in the second leg, Student A "had physicality" with a runner from Windsor, resulting in a significant lead for Bloomfield.  The student-athlete running the last leg of the relay for Windsor was unable to close the gap that Student A had created.  He also provided an example that at the Yale Invitational held on January 12, 2019, a student-athlete came in second to Student A, despite having run a faster time than 182 other girls in the 300-meter sprint.  He asked that the unsafe and unfair situation be addressed now before it affected other sports.

In response, on January 29, 2019, the District's school board chair emailed Parent 3 and thanked him for sharing his experiences and concerns, but noted that the CIAC handbook indicated that it would be contrary to state and federal law to preclude transgender students from participating.  She stated that, accordingly, she did not believe that exclusion was an option, but advised that this was just her opinion.

In an email dated February 17, 2019, to School 1 administrators and the CIAC Executive Director, among others, Parent 3 asserted that the Revised Transgender Participation Policy directly affected the outcome of School 1's winning the 2018-2019 Indoor State Open Championship held on February 16, 2019.  Specifically, Parent 3 stated that School A2 earned the highest number of points due to the participation of Student A, who earned 20 points for the team by herself.  Parent 3 alleged that, but for Student A's participation, School 1 would have won the state title.  Specifically, Parent 3 asserted that School A2 was only able to win because Student A placed first in two separate events, earning School A2's team 20 of its total 54 points.  Parent 3 also noted that Student A participated on the 4 x 400 relay, which earned the school 8 points for second place.  Parent 3 acknowledged in his email that it was possible that School A2 still would have placed 2nd in the 4 x 400 relay, even if another athlete had run in Student A's place.[43]

In an email dated February 25, 2019, to School 1 administrators and the CIAC Executive Director, among others, Parent 4 questioned the inclusion of transgender athletes' competitive times in results, which he argued affected all of the other athletes competing.  Parent 4 further stated that recognizing the transgender athletes' results insulted the "current cisgender record holder who has worked hard and competed fairly."  Parent 4 also asserted that the potential to compete for a college scholarship was at stake because the participation of transgender athletes resulted in other athletes not being able to compete at the New England Regionals, expand their résumés, and gain additional exposure to college recruiters and coaches.  Parent 4 alleged that the CIAC was violating its own rules by allowing transgender athletes to compete; and asked that the results of the State Open Championship be recalculated, and points redistributed, and that the Revised Transgender Participation Policy be changed for the outdoor 2019 season.  Parent 4 also suggested potential solutions to continue to allow transgender athletes to compete but change the competitive categories or "which scores count."

---

[43] Parent 3 further asked that the CIAC adopt the NCAA and IOC policy, whereby a transgender athlete must undergo hormone treatment for one year before being able to compete; allow transgender athletes to run in events as exhibition participants where their results do not count; or "another fair and safe solution."

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 30 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

In an email dated March 3, 2019, to School 1 administrators and the CIAC Executive Director, among others, Parent 3 followed up on his original request that the Revised Transgender Participation Policy be revised. Parent 3 alleged that the policy prevented deserving girls from qualifying for the New England Regionals. For example, Parent 3 stated that at the New England Regionals on March 2, 2019, a Bloomfield transgender athlete (Student A) placed first in the 55-meter and 300-meter dash events. He also stated that by participating in the 4 x 400-meter relay event, Student A provided Bloomfield with a .06 second lead over Glastonbury in the final results.

In an email dated March 5, 2019, to School 1 administrators and the CIAC Executive Director, among others, Parent 4 stated that no other states at the New England Regionals had transgender student-athletes participating, and many people "expressed surprise and concern that their cisgender girls were forced to compete against transgender girls." In another email dated March 5, 2019, to School 1 administrators, Parent 4 requested a meeting to review the current policy regarding transgender athletes and its impact on competitive fairness; and alleged that "cisgender girls are being deprived of fair and equal opportunity."

In an email dated March 7, 2019, to the District Superintendent, a parent (Parent 5) stated her opinion that the CIAC should adopt NCAA standards regarding transgender participation. In an email dated March 10, 2019, to School 1 administrators and the CIAC Executive Director, Parent 3 advised that the National Scholastic Athletic Foundation (NSAF), which hosts the national championships, had released statements regarding its transgender policy, which required athletes to take gender affirming hormones. Parent 3 then stated that at the New England Regionals on March 2, 2019, Bloomfield beat Glastonbury in the 4 x 400 relay with Student A participating on Bloomfield's team. He then noted that at the New Balance National championships held over March 8-10, 2019, Glastonbury's 4 x 400 relay team came in 14th in the nation, while Bloomfield's came in 34th, running without Student A.

On March 15, 2019, Parent 2 and the Parent 4 met with the Athletic Director and the Principal. The Principal stated that Parent 2 wanted School 1 to put forth a request for the CIAC to change its policy, and she communicated to them that the school was comfortable with the CIAC's following the state law and was not willing to ask the CIAC to change their policy. The Athletic Director did not recall that Parent 2 and Parent 4 raised any specific concerns about the policy, other than that the policy set up an uneven playing field. The Athletic Director stated that it was difficult to keep Parent 2 focused on what was Parent 2's real issue, as Parent 2 had started talking about separate math classes. The Athletic Director stated that she did not leave the meeting with any clear understanding of what Parent 2 was saying. She noted that Parent 2 and Parent 4 also wanted to show them photos of other non-district students, which they refused to discuss due to Family and Educational Rights and Privacy Act of 1974 (FERPA). In an email dated March 18, 2019, following their meeting, Parent 2 summarized her continued concerns that the transgender policy may violate Title IX; included information from her state legislative office that there is no law to be changed and that any changes would be the responsibility of the CIAC and member schools; and provided examples of contradictions within the CIAC policies, relative to co-ed teams.

On March 18, 2019, Parent 3 requested a meeting with administrators at School 1 to discuss the transgender policy. In an email dated March 25, 2019, to School 1 administrators, Parent 3 stated

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

that he learned that the CIAC had sent out a survey to member schools regarding the transgender policy. He included links to resources in his email and urged School 1 not to just "rubber stamp" the policy. In response to his request, on April 2, 2019, the principal and School 1's Athletic Director met with Parent 3. Both the principal and Athletic Director described the meeting as lasting thirty minutes, per Parent 3's request. The Athletic Director stated that, during the meeting, Parent 3 discussed biological differences and the challenges female athletes face, and what could happen when transgender athletes participate in other sports. The principal stated that Parent 3 was focused on the safety of his child with allowing a transgender student to participate in track. The principal stated that she communicated to Parent 3 that the district was not looking at asking the CIAC to change the transgender policy. On April 2, 2019, Parent 3 emailed the principal and Athletic Director thanking them for meeting with him; he emphasized two points relative to the fairness of the policy and the implications if an elite transgender athlete were ever to participate. He also included resources related to Oregon's policy, as well an NSAF's press release regarding transgender participation.

In an email dated April 12, 2019, to the District Director of Health and Physical Education, K-12 (the Director), Parent 2 acknowledged their recent conversation regarding Title IX; asked the Director for clarification regarding why the principal, as a voting CIAC member, could set different athletic expectations for girls and boys teams and questioned why that did not violate Title IX. Parent 2 also questioned why the CIAC had separate competitions for boys and girls if the CIAC's purpose was just participation, and whether the concept of gender fluidity would satisfy Title IX when there was no distinction between the sexes.

*Canton:*

Canton advised OCR that it was required to comply with the CIAC's Revised Transgender Participation Policy because the CIAC is the governing body for interscholastic athletics. Canton also noted that the Revised Transgender Participation Policy follows state law. Canton reported that it does not currently have any transgender students of which it is aware participating in its athletics program, nor has it challenged the CIAC's Revised Transgender Participation Policy.

*Danbury:*

Danbury stated that it was required to follow the Revised Transgender Participation Policy because the CIAC is the governing body of athletics for the state and it is required to follow all of the CIAC rules, regulations, and policies. Danbury reported that it does not currently have any transgender students of which it is aware participating in its athletics program. Danbury stated that it has not expressed concerns about the policy to the CIAC.

*Hartford (School A1):*

Student A was a 10th grade student who participated on School A1's athletics program during school year 2017-2018.[44] During the indoor track season of school year 2017-2018, Student A

---

[44] During school year 2017-2018, Student A attended another school in Hartford that does not have a sports program; as a result, Student A participated in athletics through School A1's program.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 32 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

was a student-athlete on School A1's boys' indoor track team. During the outdoor track season of school year 2017-2018, Student A was a student-athlete on School A1's girls' outdoor track team. School A1 staff stated that as a CIAC member, School A1 is required to follow the CIAC policy and is also required to follow state law.

*Bloomfield:*

Student A was enrolled in School A2 in Bloomfield as an 11th grade student during school year 2018-2019. Bloomfield stated that as a member of the CIAC, it is required to follow the CIAC rules regarding participation, eligibility, and other matters, including the Revised Transgender Participation Policy.[45] Bloomfield denied that Student A's participation has had a negative impact on other female students in the district, as Bloomfield does not cut any students from the girls' indoor or outdoor track teams; therefore, anyone who wishes to participate can. Bloomfield staff opined that while a student may have lost to a transgender student, overall, everyone's performance has benefited from the participation of Student A; and that participation in athletics is not about winning.

*Cromwell:*

Student B was enrolled in School B in Cromwell as a 10th grade student during school year 2017-2018, and as an 11th grade student during school year 2018-2019. During school years 2017-2018 and 2018-2019, Student B was a student-athlete on School B's varsity girls' indoor and outdoor track teams.

Cromwell stated that it has one transgender student (Student B) participating in its interscholastic athletics program, and noted that Student B's records since her enrollment at School B in school year 2016-2017 have indicated that she was female; accordingly, Student B was placed on female rosters. Cromwell staff stated that they are required to follow the Revised Transgender Participation Policy as it is set by the CIAC, which is their governing body. Cromwell staff stated that none of their district students have been affected negatively by Student B's participation.

**Legal Standards**

Subpart D of the regulation implementing Title IX prohibits discrimination on the basis of sex in education programs and activities. 34 C.F.R. § 106.31(b)(7) of Subpart D states that in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex, limit any person in the enjoyment of any right, privilege, advantage, or opportunity. 34 C.F.R. § 106.41 of Subpart D specifically applies to athletics. The regulation implementing Title IX, at 34 C.F.R. § 106.41(a), states that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person, or otherwise be discriminated against, in

---

[45] Bloomfield denied that it has received any requests from students to participate in its interscholastic athletics program pursuant to the Revised Transgender Participation Policy. Bloomfield stated that it currently has a transgender student participating on its girls track team (Student A), but noted that the student registered and enrolled at School A2 as a female, i.e., the student's school records indicated that she was female; therefore, Bloomfield was not required to make any determinations pursuant to the policy.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 33 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

any interscholastic athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis. The regulation implementing Title IX, at 34 C.F.R. § 106.41(b), states that, notwithstanding the requirements of 34 C.F.R. § 106.41(a), a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.[46]  The regulation implementing Title IX, at 34 C.F.R. § 106.6(c), states that the obligation to comply with the regulation is not obviated or alleviated by any rule or regulation of any athletic or other league, which would render any student ineligible to participate or limit the eligibility or participation of any student, on the basis of sex, in any education program or activity operated by a recipient.[47]

The Supreme Court's holding in *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020), does not alter the relevant legal standard under 34 C.F.R. § 106.41, or how that provision interacts with 34 C.F.R. § 106.31 or 34 C.F.R. § 106.6. In *Bostock*, the U.S. Supreme Court held that an employer violated Title VII of the Civil Rights Act of 1964 by terminating a transgender employee on the basis of their transgender status. *See Bostock*, 140 S. Ct. at 1743 ("For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex."). However, the Court expressly declined to decide questions about how its interpretation of Title VII would affect other statutes:

> The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. And, under Title VII itself, they say sex-segregated bathrooms, locker rooms, and dress codes will prove unsustainable after our decision today. But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today.

*Id.* at 1753. Indeed, the Court clearly stated that the "only question before [it] is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Id.*

The Court's holding was consistent with the position of the transgender employee who filed suit in a companion case to *Bostock*—*R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, 140 S. Ct. 1731 (2020). During oral argument before the U.S. Supreme Court, the employee's counsel conceded that the outcome of the case was not relevant, one way or another, to the question of whether a recipient's willingness to allow a biological male who identified as a transgender female to compete against biological females constituted a violation under Title IX:

---

[46] Where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try out for the team offered unless the sport involved is a contact sport. 34 C.F.R. § 106.41(b).

[47] OCR understands that the CIAC and the individual school districts maintain that the Revised Transgender Participation Policy is consistent with, and required by, Connecticut state law. OCR takes no view on the requirements of Connecticut law except to note that the duty to comply with Title IX and its implementing regulation is independent of any such requirements.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 34 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

> JUSTICE GINSBURG:  [T]his is a question of someone who has transitioned from male to female … and wants to play on the female team. She is not questioning separate female/male teams. But she was born a man. *She has transitioned.  She wants to play on the female team.  Does it violate Title IX which prohibits gender-based discrimination*?

> MR. COLE:  Right.  And I think *the question again would not be affected even by the way that the Court decides this case*, because the question would be, is it permissible to have sex-segregated teams, yes, where they involve competitive skill or – or contact sports, and then the question would be, how do you apply that permissible sex segregation to a transgender individual?

Oral Arg. Tr., *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, No. 18-107, at 17-18, *available at*  https://www.supremecourt.gov/oral_arguments/argument_transcripts/2019/18-107_c18e.pdf. (emphasis added).  After reviewing *Bostock*, the Office for Civil Rights concurs with counsel for the employee's concession in *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, that the *Bostock* holding does not alter the legal authority for sex-segregated teams under Title IX.  Even if *Bostock* applied to Title IX—a question the Supreme Court expressly declined to address—its reasoning would only confirm that Title IX does not permit a biologically male student to compete against females on a sex-segregated team or in a sex-segregated league.

As an initial matter, despite some similarities, Title IX differs from Title VII in important respects. Title IX has different operative text, is subject to different statutory exceptions, and is rooted in a different Congressional power.  *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 275, 286-87 (1998).  Significantly, unlike Title VII, one of Title IX's crucial purposes is protecting women's and girls' athletic opportunities.  Indeed, Title IX was passed, and implemented by regulations, to prohibit discrimination on the basis of sex in education programs and activities and to protect equal athletic opportunity for students who are biological females, including providing for sex-segregated athletics.  Congress specifically mandated that the Department of Education consider promulgating regulations to address sports.  After first enacting Title IX, Congress subsequently passed another statute, entitled the Javits Amendment, which instructed the Secretary of Education to publish regulations "implementing the provisions of Title IX . . . which shall include with respect to intercollegiate activities reasonable provisions considering the nature of the particular sports."  Public Law 93–380 (HR 69), Section 844, 88 Stat 484 (August 21, 1974). Congress indicated in the same bill that following the publication of those regulations, Congress itself would review the regulations and determine whether they were "inconsistent with the Act from which [they] derive[] [their] authority."  *Id*.

Pursuant to the Javits Amendment, the Secretary of Health, Education, and Welfare subsequently published Title IX regulations, including regulatory text identical to the current text of the athletics regulations.  After Congressional review over six days of hearings, Congress ultimately allowed the regulations to go into effect, consistent with its prior statement that Congress itself would review the regulations to ensure consistency with Title IX.  *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 287 (2d Cir. 2004) (laying out the history of the Javits Amendment, and the response from Congress to the regulations promulgated thereunder).  In doing so, Congress deemed the Department's athletics regulations to be consistent with Title IX.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 35 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

The Department's regulations validly clarify the scope of a recipient's non-discrimination duties under Title IX in the case of sex-specific athletic teams. *See Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) ("The degree of deference [to the Department of Education] is particularly high in Title IX cases because Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX."). Specifically, although the Department's regulations have long generally prohibited schools from "provid[ing] any athletics separately" on the basis of sex, they permit schools to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(a), (b). In those circumstances, men and women are not similarly situated because of their physiological differences, and separating them based on sex is accordingly not prohibited by Title IX. *See Bostock*, 140 S. Ct. at 1740 ("To 'discriminate against' a person, then, would seem to mean treating that individual worse than others who are similarly situated."). Thus, schools may offer separate-sex teams. Indeed, such separate-sex teams have long ensured that female student athletes are afforded an equal opportunity to participate. 34 C.F.R. § 106.41(c)(1). Those regulations authorize single-sex teams because physiological differences are relevant.

Even assuming that the Court's reasoning in *Bostock* applies to Title IX—a question the Court expressly did not decide—the Court's opinion in *Bostock* would not affect the Department's position that its regulations authorize single-sex teams under the terms of 34 C.F.R. § 106.41(b). The *Bostock* decision states, "An individual's homosexuality or transgender status is not relevant to employment decisions" because an employee's sex is not relevant to employment decisions, and "[se]x plays a necessary and undisguisable role in the decision" to fire an employee because of the employee's homosexual or transgender status. *Bostock*, 140 S. Ct. at 1741, 1737. Conversely, however, there are circumstances in which a person's sex *is* relevant, and distinctions based on the two sexes in such circumstances are permissible because the sexes are not similarly situated. Congress recognized as much in Title IX itself when it provided that nothing in the statute should be construed to prohibit "separate living facilities for the different sexes." *See, e.g.*, 20 U.S.C. §1686; *see also* 34 C.F.R. § 106.32(b) (permitting schools to provide "separate housing on the basis of sex" as long as housing is "[p]roportionate" and "comparable"); 34 C.F.R. § 106.33 (permitting "separate toilet, locker room, and shower facilities on the basis of sex," so long as the facilities "provided for students of one sex shall be comparable to such facilities provided for students of the other sex").

The Court's opinion in *Bostock* also does not affect the Department's position that its regulations authorize single-sex teams based only on biological sex at birth—male or female—as opposed to a person's gender identity. The Court states that its ruling is based on the "assumption" that sex is defined by reference to biological sex, and its ruling in fact rests on that assumption. *See Bostock*, 140 S. Ct. at 1741 ("[T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth."). The logic that an employer must treat males and females as similarly situated comparators for Title VII purposes necessarily relies on the premise that there are two sexes, and that the biological sex of the individual employee is necessary to determine whether discrimination because of sex occurred. Where separating students based on sex is

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

permissible—for example, with respect to sex-specific sports teams—such separation must be based on biological sex.

Additionally, if *Bostock*'s reasoning under Title VII were applied to policies regarding single-sex sports teams under Title IX, it would confirm that the Department's regulations authorize single-sex teams only based on biological sex.   In *Bostock*, the Court took the position that "homosexuality and transgender status are inextricably bound up with sex," such that "when an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex." *See id.* at 1742, 1744.  Under that logic, special exceptions from single-sex sports teams based on homosexuality or transgender status would themselves generally constitute unlawful sex discrimination, because homosexuality and transgender status are not physiological differences relevant to the separation of sports teams based on sex.  In other words, if *Bostock* applies, it would require that a male student-athlete who identifies as female not be treated better or worse than other male student-athletes.  If the school offers separate-sex teams, the male student-athlete who identifies as female must play on the male team, just like any other male student-athlete.  For all of these reasons, the Department continues to interpret 34 C.F.R. § 106.41(b), regarding operation of athletic teams "for members of *each sex*" (emphasis added), to mean operation of teams for biological males, and for biological females, and does not interpret Title IX to authorize separate teams based on each person's transgender status, or for members of each gender identity.  When a recipient provides "separate teams for members of each sex" under 34 C.F.R. § 106.41(b), the recipient must separate those teams on the basis of biological sex, and not on the basis of homosexual or transgender status.

The holding in *Bostock* addressed the context of an employment situation in which a distinction based on sex was prohibited and not permitted under Title VII.  The *Bostock* holding does not alter the legal authority for single-sex athletic teams under Title IX because Title IX and its implementing regulations permit certain distinctions based on sex under 34 C.F.R. 106.41(b).  The Office for Civil Rights therefore issues this Revised Letter of Impending Enforcement Action to clarify that it will continue to proceed with bringing the recipients in this matter into compliance with Title IX.

## Analysis and Conclusions

The Complainant alleged that the CIAC's Revised Transgender Participation Policy discriminated against female student-athletes competing in interscholastic girls' track in the state of Connecticut on the basis of their sex.  Specifically, the Complainant alleged that as a result of the CIAC's Revised Transgender Participation Policy, Students A and B were permitted to compete in girls' track athletic competitions, which resulted in female student-athletes being denied the benefits of an education program or activity and the opportunities to participate in higher level and/or post-season competitions.

### The CIAC:

OCR determined that the CIAC, by purporting to provide sex-segregated teams under 34 C.F.R. § 106.41(b) yet permitting the participation of biologically male students in girls' interscholastic track in the state of Connecticut, pursuant to the Revised Transgender Participation Policy, denied

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 37 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

female student-athletes benefits and opportunities, including to advance to the finals in events; to advance to higher level competitions, such as the State Open Championship or the New England Regional Championship; to win individual and team state championships, along with the benefit of receiving medals for these events; to place higher in any of the above events; to receive awards and other recognition; and possibly to obtain greater visibility to colleges and other benefits. For these same reasons, OCR also determined that the CIAC treated students differently based on sex, by denying opportunities and benefits to female student-athletes that were available to male student-athletes, including the opportunity to compete on and against teams comprised of members of one sex. Indeed, CIAC also treated male student-athletes whose gender identity does not align with their sex more favorably than other male student-athletes, by affording them the opportunity to compete on and against teams comprised of members of the opposite sex.

With respect to the three student-athletes on whose behalf the complaint was filed (Student 1, Student 2, and Student 3), Student A's and Student B's 1st and 2nd place finishes, respectively, in the preliminaries of the 2018-2019 Indoor State Open Championship for the 55-meter dash, denied Student 1, who placed 8th, the opportunity of advancing to the finals in this event, since only the top 7 finishers advanced to the finals. Student A's and Student B's participation in girls' interscholastic track in the state of Connecticut, pursuant to the Revised Transgender Participation Policy had the most significant impact on Student 2. Specifically, Student A's 1st place finish, in the finals of the 2018-2019 Outdoor Class S Statewide Championship for the 100-meter dash and the 200-meter dash, denied Student 2, who placed 2nd in both events, the benefit of a 1st place finish; and Student A's and Student B's 1st and 2nd place finishes, in the 2018-2019 Indoor State Open Championship for the 55-meter dash, denied an opportunity for Student 2, who placed 3rd, to place 1st in the event and receive the benefit of a 1st place medal. Denying a female student a chance to win a championship due to the lack of opportunity to compete on and against teams comprised solely of members of one sex, is inconsistent with Title IX's mandate of equal opportunity for both sexes.[48] Accordingly, OCR determined that the CIAC denied athletic benefits and opportunities to female student-athletes competing in interscholastic girls' track in the state of Connecticut through the Revised Transgender Participation Policy, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). OCR also has concerns that additional violations may have resulted from the Policy and from Student A's and B's participation in girls' track, including but not limited to losses or lowered placement in regular season meets; losses or lowered placement in conference championships; and an inability for some female student-athletes to participate generally in a race at any level (not just championship level).

With respect to the Team Championships for the 2018-2019 Indoor State Open Championship, absent Student A's participation, School A2 earned 26 points in 4 different events. Adding the 8 points for the 4 x 200 relay, in which School A2 may have placed and earned points even without Student A, School A2 would have earned 34 points, behind School 1, which had 39 points. Subtracting the 8 relay points would have also placed School A behind School 3. Thus, Student A's participation may have denied School 1 and its female student-athletes the benefit of a team

---

[48] See *McCormick v. School District of Mamaroneck*, 370 F.3d 275, 294-95 (2d Cir. 2004) ("A primary purpose of competitive athletics is to strive to be the best. . . . Treating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions—is inconsistent with Title IX's mandate of equal opportunity for both sexes.").

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 38 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

championship, and may have denied School 3, and other schools, the benefit of a higher placement.[49]

**Glastonbury**:

OCR determined that the participation of Glastonbury in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 1, and other female student-athletes competing against Students A and B, denied athletic benefits and opportunities to Student 1 and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). Further, Glastonbury is not providing separate teams for each sex as permitted under 34 C.F.R. § 106.41(b). Glastonbury placed female student-athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes. The athletic events in which the female student-athletes competed were coeducational; female student athletes were denied the opportunity to compete in events that were exclusively female, whereas male students were able to compete in events that were exclusively male. Accordingly, the districts' participation in the athletic events sponsored by the CIAC denied female student-athletes athletic opportunities that were provided to male student-athletes. Glastonbury's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R § 106.6(c).

The participation of Glastonbury in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 1, and other female student-athletes competing against Students A and B, denied Student 1 the opportunity to place higher in events, such as the 100-meter dash at the 2017-2018 Outdoor State Championship and New England Regional Championship; the 55-meter dash at the 2018-2019 Indoor CCC Regional Championship; and the 200-meter dash at the 2018-2019 Outdoor State Championship. Student A's and Student B's 1st and 2nd place finishes, respectively, in the preliminaries of the 2018-2019 Indoor State Open Championship for the 55-meter dash, denied Student 1, who placed 8th, the opportunity of advancing to the final in this event, since only the top 7 finishers advanced to the finals.

**Canton**:

OCR determined that the participation of Canton in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 2, and other female student-athletes, competing against Students A and B, denied athletic benefits and opportunities to Student 2, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. Section 106.41(a). Further, Canton is not providing separate teams for each sex as permitted under 34 C.F.R. § 106.41(b). Canton placed female student-athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes. The athletic events in which the female student-athletes competed were

---

[49] With respect to the 2018-2019 Outdoor State Open Championships, held on June 3, 2019. The top five finishers were as follows: School 3: 58 points; Windsor: 43 points; School A2: 38 points; Norwich Free Academy: 32 points; Immaculate: 30 points. Student A's participation earned school A2 an additional 10 to 20 points and a third-place finish when School A2 might otherwise have finished no better than 5th.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

coeducational; female student athletes were denied the opportunity to compete in events that were exclusively female, whereas male students were able to compete in events that were exclusively male. Accordingly, the districts' participation in the athletic events sponsored by the CIAC denied female student-athletes athletic opportunities that were provided to male student-athletes. Canton's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R § 106.6(c).

The participation of Canton in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 2, and other female student-athletes competing against Students A and B, denied Student 2 the opportunity to place higher in events, such as the Class S Outdoor Championships; the Indoor and Outdoor State Open Championships; and the New England Regional Championships. Specifically, Student A's and Student B's 1st and 2nd place finishes respectively, in the 2018-2019 Indoor State Open Championship for the 55-meter dash, denied an opportunity for Student 2, who placed 3rd, to place 1st in the event and receive the benefit of a 1st place medal. Student A's 1st place finish, in the finals of the 2018-2019 Outdoor Class S Statewide Championship for the 100-meter dash and the 200-meter dash, denied Student 2, who placed 2nd in both events, the benefit of a 1st place finish. Student A's 1st place finish in the finals of the State Open Championship in the 200-meter dash denied Student 2, who finished 4th, the benefit of a top-three finish.

**Danbury**:

OCR determined that the participation of Danbury in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 3, and other female student-athletes, competing against Students A and B, denied athletic benefits and opportunities to Student 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. Section 106.41(a). Further, Danbury is not providing separate teams for each sex as permitted under 34 C.F.R. § 106.41(b). Danbury placed female student-athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes. The athletic events in which the female student-athletes competed were coeducational; female student athletes were denied the opportunity to compete in events that were exclusively female, whereas male students were able to compete in events that were exclusively male. Accordingly, the districts' participation in the athletic events sponsored by the CIAC denied female student-athletes athletic opportunities that were provided to male student-athletes. Danbury's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R § 106.6(c).

The participation of Danbury in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 3, and other female student-athletes competing against Students A and B, denied Student 3 the opportunity to place higher in events, such as at the Outdoor State Open Championships and the New England Regional Championships. Specifically, Student A's 1st place finish in the finals of the State Open Championship in the 200-meter dash denied Student 3, who finished 3rd, the benefit of placing 2nd in the event; and Student A's 1st place finish in the finals of the 200-meter dash at the Outdoor New England Regional Championships denied Student 3, who finished 3rd the benefit of placing 2nd in the event.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 40 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

### Hartford (School A1):

Student A participated in girls' outdoor track on School A1's team in Hartford during school year 2017-2018. OCR determined that the participation of School A1 in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student A's participating in events against Students 1, 2, and 3, and against other female student-athletes, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). Further, Hartford is not providing separate teams for each sex as permitted under 34 C.F.R. § 106.41(b). Hartford's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R. § 106.6(c).

### Bloomfield:

Student A participated in girls' indoor and outdoor track for Bloomfield during school year 2018-2019. OCR determined that the participation of Bloomfield in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student A's participating in events against Students 1, 2, and 3, and against other female student-athletes, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. Section 106.41(a). Further, Bloomfield is not providing separate teams for each sex as permitted under 34 C.F.R. § 106.41(b). Bloomfield's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R. § 106.6(c).

### Cromwell:

Student B participated in girls' indoor and outdoor track for Cromwell during school years 2017-2018 and 2018-2019. OCR determined that the participation of Cromwell in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student B's participating in events against Students 1, 2, and 3, and against other female student-athletes, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). Further, Cromwell is not providing separate teams for each sex as permitted under 34 C.F.R. § 106.41(b). Cromwell's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R. § 106.6(c).

For the aforementioned reasons, OCR also determined that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury treated student-athletes differently based on sex, by denying opportunities and benefits to female student-athletes that were available to male student-athletes.

## II.    RETALIATION

The Complainant also alleged that (1) the CIAC retaliated against Parent 1, after Parent 1 complained about the Revised Transgender Participation Policy, by informing Parent 1, in March

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 41 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

2019, that the CIAC's Executive Director would no longer accept communications from her; and (2) that Glastonbury's track coach retaliated against Student 1, for her and Parent 2's advocacy against the Revised Transgender Participation Policy, by (a) replacing Student 1 on the sprint medley relay team in February 2019; (b) telling Student 1 and her parents that he could not give a good report to college coaches about her in March and May 2019; (c) denying Student 1 a position as a team captain in March 2019; and (d) suggesting that Student 1 should leave the outdoor track team due to her schedule, in March and May 2019.

**Findings of Fact**

### 1. Allegation Regarding the CIAC's Retaliation

OCR determined that the CIAC Handbook in effect during school year 2018-2019 sets forth the CIAC's "Communication Protocol Rules, Regulations and Interpretations" (Communication Protocol). According to the Communication Protocol, the CIAC Board of Control is the official body charged with the responsibility of interpreting the CIAC's rules and regulations. The Communication Protocol provides, in pertinent part, that "[i]nquiries to the CIAC office from parents, student-athletes, coaches and the public requesting an interpretation of the rules and regulations will be referred back to the member school principal or his/her designee." In addition, Section 4.21 of the CIAC Handbook, "Regulation Interpretation/CIAC Protocol in Providing Decisions to School Personnel and Public (Effective July 1, 2006)," provides, in pertinent part, "The CIAC staff will not discuss CIAC rules and regulations with anyone other than school administrators and athletic directors. Telephone inquiries from parents and coaches will not be honored. **All calls from anyone other than the athletic director or school administrator will be referred back to the school.**" (Emphasis in original.)

OCR determined that Parent 1 initially contacted the CIAC about the policy when she sent a letter dated February 21, 2018, to the CIAC's former Executive Director, in which she requested that the CIAC establish a rule to address transgender athletes' participating in the girls' state championship track competitions. In an email dated March 10, 2018, the former Executive Director responded by acknowledging that issues surrounding transgender student-athlete participation are complicated; advising Parent 1 that the CIAC's policy is directly aligned with state anti-discrimination law, including the state's definition of gender to include gender identity; and reminding Parent 1 that most high school athletes are minors and are therefore afforded a unique level of legal protection regarding their right to privacy.

On January 24, 2019, Parent 1 sent an email to the CIAC's current Executive Director, attaching a letter in which she again requested that the CIAC establish a rule for transgender athletes' participating in state championship track competitions and setting forth her own proposal for the placement and scoring of transgender female athletes participating in state championships.[50] The

---

[50] Specifically, Parent 1 proposed the following: "Male-to-female transgender athletes who have not yet undergone hormone therapy should compete as exhibition athletes, with results not included for scoring and placing. This would ensure that the needs of both of these protected classes are met. The transgender athletes would still be able to **participate** on the team in which they identify and the female-born athletes would be afforded the opportunity to **compete** in a race that is not clouded by questions of unfair advantage." (Emphasis in original.)

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 42 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Executive Director responded by email the same day, advising Parent 1 that the appropriate process for addressing her proposal would be to speak with the athletic director or principal at her child's school, as policy or rule proposals "may be submitted through member leagues, sport committees, member principals, [the Connecticut Association of Athletic Directors], or the Connecticut High School Coaches Association." Parent 1 replied to the director's email that same day, January 24, 2019, stating that she would follow up with the principal and athletic director at her child's school to see if they would be willing to submit her proposal.

OCR determined that on February 1, 2019, the principal and the Executive Director spoke by telephone, regarding Parent 1's letter and proposal. The Executive Director memorialized the call in an email to the principal that same day, in which he stated that the CIAC would be convening a gender subcommittee meeting on February 7, 2019, with the task of reviewing all the CIAC bylaws, processes, procedures in which gender plays a role, including the Revised Transgender Participation Policy; and that he would share a redacted copy of Parent 1's letter with the subcommittee members, in order "to provide all points of view to ensure a rich discussion among committee members."

OCR determined that in response to Parent 1's request, made through her building principal, for an in-person meeting with a CIAC representative, the Executive Director attended a meeting at the school with Parent 1 and the principal on February 28, 2019. The Executive Director stated that, at the meeting, he explained to Parent 1 why the CIAC believed that the Revised Transgender Participation Policy was in alignment with Title IX and Connecticut state law, and advised Parent 1 that he believed that Title IX did not apply to the parent's concerns because Title IX does not address winning. Following the meeting, that same day, Parent 1 sent an email to the Executive Director, in which she thanked him for visiting the school and wrote that "[i]t was helpful to hear from you directly regarding the transgender policy and to understand what the CIAC process will be for reviewing this issue."

OCR determined that on March 28, 2019, Parent 1 sent an email to the Executive Director, in which she attached a letter and included links to several websites concerning issues related to the Revised Transgender Participation Policy. The Executive Director responded by email that same day, stating that he had read her email, and cordially reminded her that any further correspondence to the CIAC should come through her principal. The Complainant did not provide, nor did OCR find, evidence of any further communications between Parent 1 and the Executive Director.

The Executive Director denied that he banned Parent 1 from sending communications to him. Rather, the Executive Director stated that he treated Parent 1 in a manner consistent with how he treated other individuals in similar situations, by reminding her of the CIAC's policy that communications must go through the member school's representative. OCR determined that the Executive Director has responded in a similar manner to other parents who sought to communicate directly with him in a similar fashion. OCR determined that none of the similarly situated parents had engaged in protected activities.

## 2. Allegations Regarding Glastonbury Track Coach Retaliation

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 43 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

The Complainant also alleged that a Glastonbury track coach retaliated against Student 1, for her and Parent 2's advocacy against the Revised Transgender Participation Policy, by (a) replacing Student 1 on the sprint medley relay team in February 2019; (b) telling Student 1 and her parents that he could not give a good report to college coaches about her in March and May 2019; (c) denying Student 1 a position as a team captain in March 2019; and (d) suggesting that Student 1 should leave the outdoor track team due to her schedule, in March and May 2019.

**Allegation (a)**:

OCR determined that a team made up of students from Glastonbury's girls' indoor track team competed at the 2019 New Balance Nationals Track and Field championships ("Nationals"). The track coach stated that the meet is not a CIAC or school-sanctioned meet; therefore, any student who participates does so on an individual basis, not on behalf of Glastonbury. The track coach stated that, accordingly, the Glastonbury coaches do not choose who may attend the meet or choose which athletes will participate in which events. Rather, the individual students choose, on their own, whether to compete in the meet, and who will compete in the events, including relays. The track coach further stated that it was his understanding that Student 1 was not selected to run in a relay at the meet, but he denied that he played a role in this decision. He further stated that his understanding was that the other athletes decided that Student 1 would not compete in the relay, but he did not know why they had made that decision.

Student 1 confirmed that it is each individual student-athlete's decision whether to attend Nationals, if she qualifies; however, she stated that for relay events, a track coach was responsible for signing up the various teams. Parent 2 indicated that this is to prevent students from different schools entering themselves as a single "power team." Student 1 stated that although she had a qualifying time for the sprint medley relay in December 2018,[51] she was not asked to join the sprint medley relay team for Nationals in March 2019. Student 1 stated that, during the regular season, coaches pick the best athletes that are capable of running times that they would like to see for an overall split in the event, but that she was not fully aware of how the coaches make those determinations. Student 1 acknowledged that she was not sure which coach picked the sprint medley relay team for Nationals, but she assumed that a coach picked the team because that was what was done for all other meets during the season.

**Allegation (b):**

The Complainant stated that at the first practice of the outdoor season on March 16, 2019, the track coach told Parent 4 that he had nothing good to say about Student 1 to a college coach; and on or about May 1, 2019, the track coach told Student 1 that he could not give a good report of her to college coaches.

The track coach denied that he told either Student 1 or her parents that he could not give a good report to college coaches about Student 1. The track coach stated that it is his practice to be completely honest with college coaches, to ensure that college coaches continue to trust and rely

---

[51] The records Glastonbury provided indicate that Student 1 participated on a sprint medley relay team during a meet held on December 22, 2018.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 44 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

on his recommendations of athletes. The track coach stated that because of this, on or about March 16, 2019, in the course of a discussion with Parent 4 about the Student 1's workouts and her college future, he told Parent 4 that he is "100% honest with a college coach when asked any questions about any of the athletes."[52] The track coach stated that he had also told Student 1 that he would be 100% honest with college coaches, although he did not recall the date of this conversation or the specific context in which the subject was raised. The track coach also advised OCR that Student 1 has not requested that he give a recommendation or report to any college coach on her behalf, nor has any college coach requested information about Student 1.

Student 1 denied that the track coach told her that he would be honest with any college coaches, and instead maintained that the track coach told her, and Parent 4, that he did not have anything good to say about her and could not give a good report about her. Student 1 stated that the track coach made this statement to her one day when she was letting him know that she was leaving practice for work. Student 1 confirmed that she has not asked the track coach to speak with any coaches on her behalf.

**Allegation (c):**

The Complainant stated that the track coach told Student 1 that he did not select her as team captain because she departed early from practice on Fridays for work, despite her having served as team captain during the indoor season and not receiving any complaints about her as a captain. The track coach stated that students who wish to be considered for a team captain position are required to submit a written statement concerning their interest at the beginning of each season, indoor and outdoor. All of the coaches then select the team captains as a group. If there are any disagreements among the coaches, the track coach makes the final decision regarding the selection. The track coach stated that the qualifications for team captain are hard work, dedication, leadership, sportsmanship, and appropriately representing the high school. The track coach stated that the number of captains for the team typically ranges from three to seven for each season, depending on the size of the team and the number of qualified athletes who apply.

The track coach stated that in December 2018, Student 1 was selected as a captain for the indoor season 2018-2019; but that the decision was not unanimous because at least two coaches questioned Student 1's qualifications for a captain position, stating that they believed that she had not shown enough leadership, dedication and maturity.[53] The track coach stated that despite the concerns raised by other coaches, he chose Student 1 to be a captain for that season because he had observed her helping new athletes on the team and he believed that she would step up to the challenge.

The track coach stated that in March 2019, Student 1 applied to be a captain for the outdoor season 2018-2019. He stated that after speaking with all of the coaches, it was unanimous that they would not select Student 1 to be a captain for a number of reasons. He stated that the main reason was that during the indoor season (December 2018 – January 2019), Student 1 had, on several

---

[52] The track coach stated that in reply to his remark, Parent 4 stated that he understood.

[53] Specifically, an assistant track coach stated that he had concerns about Student 1's being selected as captain because he did not believe that Student 1 had the maturity to be a captain.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 45 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

occasions, displayed poor sportsmanship at meets by ripping off her headband and storming away at the conclusion of her race.  In addition, the track coach stated, and another coach confirmed, that during the indoor season, Student 1 often skipped her sprint workouts in favor of spending more time doing her long jump workouts; or claimed that she had an injury and could not do her sprint workouts, despite being able to do her long jump workouts and being cleared by the trainer.  An assistant coach confirmed that during the indoor season, Student 1 failed to follow his instructions during practice, often did not complete her workouts, and exhibited poor sportsmanship at meets.  Both the assistant coach and another coach agreed that Student 1 should not be selected as a captain for the outdoor season.  The track coach stated that during a prior school year, he declined to select a student as team captain because she similarly failed to demonstrate leadership qualities/maturity.  Glastonbury stated that this student had not engaged in protected activities.

**Allegation (d):**

The Complainant alleged that on or about March 25, 2019, the track coach told Student 1 that she should consider leaving the team if she did not attend full practice every day.  The Complainant alleged that the track coach had not asked other student-athletes to leave the team due to missing practices for work commitments.  The Complainant also alleged that on or about May 1, 2019, the track coach complained to Student 1 about her missing Friday practices.

The track coach denied that he had an issue with Student 1's leaving practice early on Fridays and denied that he specifically told her that she should leave the team.  The track coach stated that he and the other coaches emphasized the importance of practice during meetings held at the beginning of the season with the student-athletes and their parents; but he denied having told any students recently, including Student 1, that they should consider leaving the team if they did not attend full practice every day.  The track coach further stated that he was aware that Student 1 left practice early on Fridays for work; and stated that he did not object to this, particularly because the team often ends practice early on Fridays during the winter when the gym is used for high school basketball games and because Friday practices are typically lighter prior to the track team competitions on the weekends.

**Legal Standards**

The regulation implementing Title IX, at 34 C.F.R. § 106.71, incorporates by reference 34 C.F.R. § 100.7(e) of the regulation implementing Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., which provides that no recipient or other person shall intimidate, threaten, coerce or discriminate against any individual for the purpose of interfering with any right or privilege secured by regulations enforced by OCR or because one has made a complaint, testified, assisted or participated in any manner in an investigation, proceeding, or hearing held in connection with a complaint.  The following three elements must be satisfied to establish a prima facie case of retaliation: (1) an individual engaged in a protected activity; (2) an individual experienced an adverse action caused by the recipient; and (3) there is some evidence of a causal connection between the adverse action and the protected activity.  When a prima facie case of retaliation has been established, OCR then determines whether there is a facially legitimate, non-retaliatory

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

reason for the adverse action; and if so, whether the facially legitimate, non-retaliatory reason is a pretext for retaliation.

## Analysis and Conclusions

### 1. Allegation Regarding the CIAC's Retaliation

The Complainant alleged that the CIAC retaliated against Parent 1, after Parent 1 complained about the Revised Transgender Participation Policy, by informing Parent 1, in March 2019, that the CIAC's Executive Director would no longer accept communications from her. OCR determined that Parent 1 engaged in protected activity on February 22, 2018, January 24, 2019, and March 28, 2019, when she sent emails expressing concern regarding the Revised Transgender Participation Policy to the CIAC's Executive Director;[54] and on February 28, 2019, when Parent 1 met with the Executive Director in person to discuss her concerns about the policy. OCR determined that the CIAC was aware of Parent 1's protected activity.

OCR determined, however, that the CIAC proffered a legitimate, non-retaliatory reason for the Executive Director's statement to Parent 1 that "further correspondence to CIAC has to come through your principal"; namely, that the CIAC staff typically did not communicate directly with parents and Parent 1 should have communicated her concerns with the athletic director or school administrator. OCR determined that the proffered reason was not a pretext for retaliation, as the Executive Director's instruction was consistent with the CIAC policy and the Executive Director's directives to other parents who had not engaged in protected activities. Therefore, OCR determined that there was insufficient evidence to substantiate the Complainant's allegation that the CIAC retaliated against Parent 1, after Parent 1 complained about the Revised Transgender Participation Policy, by informing Parent 1, in March 2019, that the Executive Director would no longer accept communications from her. Accordingly, OCR will take no further action with respect to this allegation.

### 2. Allegations Regarding Glastonbury Track Coach Retaliation

OCR determined that Parent 2 engaged in protected activity by sending emails to the Athletic Director in May, June, and July 2018, expressing her concerns that as a result of the Revised Transgender Participation Policy "[c]isgender girls are no longer provided opportunities in scholastic athletics that are equal and proportionate to the opportunities that boys are provided"; meeting with the Athletic Director, the principal, and the superintendent, on or about August 1, 2018, to discuss these concerns; meeting with the Athletic Director and Parent 4, on or about March 15, 2019, to again discuss these concerns; and telephoning and sending an email to the School's Title IX Coordinator in March and April 2019. OCR determined that Parent 2 also engaged in protected activity in May and June 2018, and in March 2019, when she sent emails to the track coach regarding her objections to the policy and a petition that she had initiated in opposition to

---

[54] As discussed previously, Parent 1 communicated with the former the Executive Director in her email on February 22, 2018; and with the current Executive Director from January 24, 2019, onward.

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

the policy. OCR determined that the Glastonbury track coach was aware of the Parent 2's protected activity.

With respect to Allegation (a), OCR determined that neither the track coach nor any other Glastonbury employee denied Student 1 an opportunity to participate on a sprint medley relay team at the New Balance Nationals. Rather, the students themselves chose who would participate. Accordingly, OCR could not substantiate that the track coach or other Glastonbury employee subjected Student 1 to an adverse action. Absent an adverse action, OCR does not proceed further with retaliation analysis. Accordingly, OCR will take no further action regarding Allegation (a).

With respect to Allegation (b), OCR must often weigh conflicting evidence in light of the facts and circumstances of each case and determine whether the preponderance of evidence supports the allegation. Here, OCR did not find that the preponderance of the evidence supported the Complainant's assertion that the track coach told Parent 2 or Student 1 that he would not give a good report about Student 1 to college coaches. Based on the foregoing, OCR determined that there was insufficient evidence to substantiate that the track coach subjected Student 1 to the alleged adverse action. Absent an adverse action, OCR does not proceed further with a retaliation analysis. Accordingly, OCR will take no further action regarding Allegation (b).

With respect to Allegation (c), OCR determined that the Glastonbury proffered a legitimate, non-retaliatory reason for not selecting Student 1 as a captain for the spring 2019 outdoor season; namely, that track coaches had concerns about Student 1's maturity and dedication after the winter 2018 indoor season. Even assuming that the track coach also told Student 1 that the decision had to do with her leaving practice early on Fridays, OCR determined that would still be a legitimate, non-retaliatory reason for not selecting her. OCR determined that the proffered reasons were not a pretext for retaliation, as other coaches corroborated the reasons for the decision and the track coach gave an example of another student who had not been re-selected as captain based on similar behaviors, who had not engaged in protected activities. Additionally, OCR determined that there was no causal connection between the protected activity and the alleged adverse action, as the track coach selected Student 1 as a captain for the indoor season after she and Parent 2 had engaged in protected activities in 2018 and prior to their again engaging in protected activities in 2019. Therefore, OCR determined that there was insufficient evidence to substantiate the Complainant's allegation that the Glastonbury track coach retaliated against Student 1, for her and Parent 2's advocacy against the Revised Transgender Participation Policy, by denying Student 1 a position as a team captain in March 2019. Accordingly, OCR will take no further action regarding Allegation (c).

With respect to Allegation (d), OCR must often weigh conflicting evidence in light of the facts and circumstances of each case and determine whether the preponderance of evidence supports the allegation. Here, OCR did not find that the preponderance of the evidence supported the Complainant's assertion that the track coach told Student 1 in March 2019 and May 2019, that she should consider leaving the team if she had to leave practice early. Based on the foregoing, OCR determined that there was insufficient evidence to substantiate that the track coach subjected Student 1 to the alleged adverse action. Absent an adverse action, OCR does not proceed further with a retaliation analysis. Accordingly, OCR will take no further action regarding Allegation (d).

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 48 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

**Attempts to Resolve the Complaint**

Via e-mail on February 12, 2020, OCR notified the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that it had determined that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury violated Title IX, and provided a proposed resolution agreement (the Agreement) to each that would resolve OCR's compliance concerns. During subsequent telephone calls with counsel for the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury, held during the period of February 13, 2020, through March 13, 2020, OCR informed counsel for the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury of the specific violation, and explained the nature of the violations and the basis of its findings. On multiple occasions during these communications, OCR informed counsel for the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury of the 90-calendar day timeframe for negotiations as set forth in Section 303(f) of the *Manual*. OCR also informed counsel for the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that the *Manual* states that OCR may end the negotiation period at any time prior to the expiration of the 90-calendar day period when it is clear that agreement will not be reached. On March 12, 2020, counsel for Bloomfield, Hartford, and Cromwell, and on March 13, 2020, counsel for the CIAC, Glastonbury, Canton and Danbury, informed OCR that their clients would not sign the Agreements.

On March 17, 2020, OCR issued impasse letters to the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury notifying the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that the negotiations had reached an impasse and a final agreement had not been reached. Further, the letter informed the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that in accordance with the *Manual*, Section 303(g), if an agreement was not reached within 10 calendar days of the date of the letter, i.e., by March 30, 2020, OCR would issue a Letter of Impending Enforcement Action indicating that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury are in violation of Title IX. OCR also referred the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury to the *Manual*, at https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf, in particular, Sections 303-305 and 601-602, for more information.

In emails dated March 27, 2020, OCR informed the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that in view of their COVID-19-related duties and responsibilities, OCR was extending the ten-calendar day-deadline to respond to OCR's proposed resolution agreements for a period of 30 days, to April 27, 2020; and that if agreement was not reached by that date, OCR would issue a Letter of Impending Enforcement Action pursuant to Section 305 of the *Manual*. None of the entities in this matter—the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury entered into a resolution agreement with OCR to remedy the violations, and a Letter of Impending Enforcement Action was sent on May 15, 2020. No response to that Letter was received, either before or after the Court's decision in *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020), on June 15, 2020.

Based on the failure of the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury to resolve the identified areas of noncompliance, OCR will either initiate administrative proceedings to suspend, terminate, or refuse to grant or continue and defer financial assistance to

ARCHIVED AND NOT FOR RELIANCE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under Executive Order 12866 and the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007). *See also* www.ed.gov/ocr/docs/investigations/more/01194025-a5.pdf.

Page 49 of 49 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury, or refer the cases to the U.S. Department of Justice for judicial proceedings to enforce any rights of the United States under its laws. OCR will take further enforcement action after no fewer than 10 calendar days from the date of this letter if resolution of these complaints has not yet been reached. This letter constitutes a formal statement of OCR's interpretation of Title IX and its implementing regulations and should be relied upon, cited, and construed as such. Congress explicitly delegated to the OCR the task of prescribing standards for athletic programs under Title IX. As a result, the degree of deference to the Department is particularly high in Title IX cases.

This Letter of Impending Enforcement Action is not intended and should not be interpreted to address the compliance of the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury with any other regulatory provision or to address any issues other than those addressed in this letter. The complainant may file a private suit in federal court whether or not OCR finds a violation.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

If you have any questions, please contact Nadja Allen Gill, Compliance Team Leader, at (646) 428-3801, or nadja.r.allen.gill@ed.gov.

Kimberly M. Richey
Acting Assistant Secretary for Civil Rights

cc:    Glenn Lungarini, CIAC Executive Director, via email only
       Alan B. Bookman, Glastonbury Superintendent, via email only
       Kevin D. Case, Canton Superintendent, via email only
       Dr. Enza Macri, Cromwell Superintendent, via email only
       Dr. Sal V. Pascarella, Danbury Superintendent, via email only
       Dr. James Thompson, Jr., Bloomfield Superintendent, via email only
       Dr. Leslie Torres-Rodriguez, Hartford Superintendent, via email only
       Roger G. Brooks, Alliance Defending Freedom, Complainant, via email only

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF THE GENERAL COUNSEL

**Date:  January 8, 2021**

**MEMORANDUM FOR KIMBERLY M. RICHEY
ACTING ASSISTANT SECRETARY
OF THE OFFICE FOR CIVIL RIGHTS**

*Re: Bostock v. Clayton Cty., 140 S. Ct. 1731 (2020)*

The U.S. Department of Education's (Department) Office for Civil Rights (OCR) enforces Title IX of the Education Amendments of 1972 (Title IX), as amended, 20 U.S.C. § 1681, *et seq.*, and its implementing regulations at 34 C.F.R. Part 106, prohibiting discrimination on the basis of sex in any education program or activity receiving Federal financial assistance.  You have asked the Office of the General Counsel a series of questions regarding the effect of the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), with respect to Title IX.  Our answers are presented below.

**Question 1:    Does the *Bostock* decision construe Title IX?**

**Answer:**  No.  *Bostock v. Clayton Cty.,* 140 S. Ct. 1731 (2020) construes the prohibition on sex discrimination in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Title VII). The Court decided the case narrowly, specifically refusing to extend its holding to Title IX and other differently drafted statutes.  *Id.* at 1753.  The Department does not have authority to enforce Title VII.  Our understanding is OCR occasionally receives cases alleging discrimination filed by employees.  OCR's Case Processing Manual describes OCR's views on its jurisdiction over employment-related complaints.

Title IX, which the Department does have authority to enforce, prohibits sex discrimination in education programs or activities receiving Federal financial assistance. But Title IX text is very different from Title VII text in many important respects.  Title IX, for example, contains numerous exceptions authorizing or allowing sex-separate activities and intimate facilities to be provided separately on the basis of biological sex or for members of each biological sex.  *Compare* 42 U.S.C. §§ 2000e-1, 2000e-2 *with* 20 U.S.C. §§ 1681(a), 1686.  However, Title VII and Title IX both use the term "sex", and it is here *Bostock* may have salience.  *Bostock* compels us to interpret a statute in accord with the ordinary public meaning of its terms at the time of its enactment.  *Bostock*, 140 S. Ct. at 1738 (citations omitted).  And as explained below, specifically in the answer to Question 2, the Department's longstanding construction of the term "sex" in Title IX to mean biological sex, male or female, is the only construction consistent with the ordinary public meaning of "sex" at the time of Title IX's enactment.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy  hat is inconsistent in many respects with Execu ive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

**Question 2:    Does *Bostock* affect the meaning of "sex" as that term is used in Title IX?**

**Answer:**  No.  *Bostock* does not affect the meaning of "sex" as that term is used in Title IX for at least two reasons.  First, as we pointed out in response to Question 1, *Bostock* does not construe Title IX.  However, it is worth noting the Court's assumption that the ordinary public meaning of the term "sex" in Title VII means biological distinctions between male and female.  *See Bostock*, 140 S. Ct. at 1738–39; *see also* 1784–91 (Appendix A) (Alito, J. dissenting).[1]  This is consistent with and further supports the Department's long-standing construction of the term "sex" in Title IX to mean biological sex, male or female.

Second, statutory and regulatory text and structure, contemporaneous Supreme Court authorities, and the Department's historic practice demonstrate that the ordinary public meaning of the term "sex" at the time of Title IX's enactment could *only* have been, as Justice Gorsuch put it, "biological distinctions between male and female."  *See* 20 U.S.C. §§ 1681(a), 1686; *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth"); 34 CFR §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61; *see also Bostock*, 140 S. Ct. at 1739, 1784–91 (Appendix A) (Alito, J. dissenting); *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983) ("discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex."); *General Elec. Co v. Gilbert*, 429 U.S. 125, 146, 149 (1976) (Brennan, J. and Marshall, J. dissenting) ("*Geduldig* itself obliges the Court to determine whether the exclusion of a sex-linked disability from the universe of compensable disabilities was actually the product of neutral, persuasive actuarial considerations, or rather stemmed from a policy that purposefully downgraded women's role in the labor force. . . . [T]he Court simply disregards a history of General Electric practices that have served *to undercut the*

---

[1]The Court's assumption that "sex" as used in Title VII means the biological distinctions between male and female drove the reasoning.

> [T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female.  If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified *as male at birth* for traits or actions that it tolerates in an employee identified *as female at birth*."

140 S. Ct. at 1741 (emphasis added).  In other words, a male employee who identifies as female nonetheless remains a biological male.  Therefore, when an employer discriminates against such a person for certain "traits or actions" otherwise tolerated in a biological female, *Bostock* holds the employer violated Title VII.

*Bostock* uses a "but for" analysis to determine whether an employee's homosexuality or transgender status is covered by Title VII's bar on sex discrimination.  *See Bostock* at 1742.  We believe the same "but for" analysis would logically extend to individuals who allege discrimination on the basis that they are heterosexual or non-transgender.  Nevertheless, we note no reason to believe the Court's logic necessarily leads to the conclusion that all forms of sexual orientation are covered by Title VII.

000296

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy  hat is inconsistent in many respects with Execu ive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

*employment opportunities of women who become pregnant while employed*.") (citations and footnote omitted).[2]

> As stated in the Preamble to the Title IX Final Rule published on May 19, 2020:

> Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current regulations . . . reflect this presupposition.  For example, 20 U.S.C. 1681(a)(2), which concerns educational institutions commencing planned changes in admissions, refers to ''an institution which admits only students of one sex to being an institution which admits students of both sexes.'' Similarly, 20 U.S.C. 1681(a)(6)(B) refers to ''men's'' and ''women's'' associations as well as organizations for ''boys'' and ''girls'' in the context of organizations ''the membership of which has traditionally been limited to persons of one sex.'' Likewise, 20 U.S.C. 1681(a)(7)(A) refers to ''boys''' and ''girls''' conferences. Title IX does not prohibit an educational institution ''from maintaining separate living facilities for the different sexes'' pursuant to 20 U.S.C. 1686.

> . . . .

> In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes. For example, the Department's justification for not allowing schools to use "a single standard of measuring skill or progress in physical education classes . . . [if doing so] has an adverse effect on members of one sex" was that "if progress is measured by determining whether an individual can perform twenty-five push-ups, the standard may be virtually out-of-reach for many more women than men because of the difference in strength between average persons of each sex."

U.S. Dep't of Educ., Office for Civil Rights, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, Final Rule, 85 Fed. Reg. 30,178 (May 19, 2020).

> Additional evidence that the term "sex" and human biology are inextricably linked under Title IX may be found in the Department's regulations expressly prohibiting discrimination related to a student or employee's pregnancy.  34 C.F.R. § 106.40(b)(1).  These regulations are valid only because they effectuate Title IX's prohibition against sex discrimination.  *See* 20 U.S.C. § 1682. Courts have recognized, quite correctly in our view, that discrimination on the basis of pregnancy constitutes discrimination on the basis of female physiology and is therefore prohibited under Title

---

[2] *Gilbert* and *Newport News* are Title VII cases.  *Frontiero* is a due process case.  However, all are roughly contemporaneous with the enactment of Title IX and the promulgation of the Department's regulations, and all suggest the ordinary public meaning of "sex" at the time of Title IX's enactment was biological sex, male or female, not transgender status or homosexuality.

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy  hat is inconsistent in many respects with Execu ive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

IX. *Conley v. Nw. Fla. State College*, 145 F. Supp. 3d 1073, 1077 (N.D. Fl. 2015). Biological males, regardless of transgender status or surgical interventions, are incapable of bearing children.

The Title IX regulations became effective only after direct and extensive Congressional review, including six days of House hearings to determine whether the regulations were "consistent with the law and with the intent of the Congress in enacting the law." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 531–33 (internal quotation marks omitted). Accordingly, they carry extra weight and interpretative authority. *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001); *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc*., 468 U.S. 837, 842–45 (1984). Additionally, the Title IX statute has been amended repeatedly since the Title IX regulations were adopted, *see, e.g.*, *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286–87 (2d Cir. 2004) (discussing amendments made by the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, § 3(a), 102 Stat. 28, 28–29 (1988)), and although the matter has been the subject of some debate within Congress, Congress has not disturbed these regulations. *See North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 531–35 (1982) ("Where an agency's statutory construction has been 'fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.") (citations and internal quotation marks omitted).

Consequently, based on controlling authorities, we must give effect to the ordinary public meaning at the time of enactment and construe the term "sex" in Title IX to mean biological sex, male or female. Congress has the authority to rewrite Title IX and redefine its terms at any time. To date, however, Congress has chosen not to do so.

**Question 3:  How should OCR view allegations that a recipient targets individuals for discriminatory treatment on the basis of a person's transgender status or homosexuality?**

**Answer:** Although *Bostock* expressly does not decide issues arising under Title IX or other differently drafted laws, the logic of *Bostock* may, in some cases, be useful in guiding OCR's understanding as to whether the alleged discrimination on the basis of a person's transgender status or homosexuality necessarily takes into account the person's biological sex and, thus, constitutes discrimination on the basis of sex. Depending on the facts, complaints involving discrimination on the basis of transgender status or homosexuality might fall within the scope of Title IX's non-discrimination mandate because they allege sex discrimination. *See Bostock*, 140 S. Ct. at 1741, 1737 ("Sex plays a necessary and undisguisable role in the decision" to fire an employee because of the employee's homosexual or transgender status).

However, we emphasize that Title IX and its implementing regulations, unlike Title VII, may *require* consideration of a person's biological sex, male or female. 20 U.S.C. §§ 1681(a), 1686; 34 CFR §§ 106.32(b), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61. Consequently, we believe a recipient generally would not violate Title IX by, for example, recording a student's biological sex in school records, or referring to a student using sex-based pronouns that correspond to the student's biological sex, or refusing to permit a student to participate in a program or activity lawfully provided for members of the opposite sex, regardless of transgender status or homosexuality.

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy  hat is inconsistent in many respects with Execu ive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

**Question 4: After *Bostock*, how should OCR view allegations of employment discrimination or sexual harassment based on an individual's transgender status or homosexuality?**

**Answer:** We address the employment and harassment aspects of this question separately below.

A.    Employment

In *Bostock*, the Supreme Court considered "whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex'" under Title VII. *Bostock*, 140 S. Ct. at 1753. Assuming the term "sex" in Title VII means biological sex, male or female, the Supreme Court held: "An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids." *Id*. at 1737. Title IX also prohibits termination of an employee on the basis of sex, meaning a person's biological sex, male or female. By analogy to *Bostock*, terminating an employee on the basis of the employee's homosexuality or transgender status implicates that employee's sex and, thus, is at least in part discrimination on the basis of the employee's biological sex. An individual employee's sex is "not relevant to the selection, evaluation, or compensation of employees." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (plurality opinion). Even Title VII, however, recognizes that there are circumstances where an individual's sex is relevant to employment and expressly provides that an employer may consider sex "in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e)(1). If a person's sex is a bona fide occupational qualification, "such that consideration of sex with regard to such action is essential to successful operation of the employment function concerned," then Title IX and its implementing regulations, like Title VII, would not prohibit discrimination on the basis of sex. 34 C.F.R. § 106.61; *see also* 34 C.F.R. §§ 106.55(c), 106.59.

B.    Sexual Harassment

In the Title IX Final Rule, issued on May 19, 2020, the Department for the first time recognized and defined sexual harassment as a form of sex discrimination with regulations that had the force and effect of law. 85 Fed. Reg. 30,026. Under our regulations, "sexual harassment" means conduct on the basis of sex that satisfies one or more of the following:

(1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct (hereinafter referred to as "*quid pro quo* sexual harassment");

(2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or

000299

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy  hat is inconsistent in many respects with Execu ive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

(3) "Sexual assault" as defined in 20 U.S.C. § 1092(f)(6)(A)(v), "dating violence" as defined in 34 U.S.C. § 12291(a)(10), "domestic violence" as defined in 34 U.S.C. § 12291(a)(8), or "stalking" as defined in 34 U.S.C. 12291(a)(30).

34 C.F.R. § 106.30(a).

The preamble acknowledged "[a]nyone may experience sexual harassment, irrespective of gender identity or sexual orientation," 85 Fed. Reg. 30,178, and stated the "final regulations focus on prohibited conduct, irrespective of the identity of the complainant and respondent," 85 Fed. Reg. 30,179.  Under 34 C.F.R. § 106.30(a), the Department continues to interpret "conduct on the basis of sex" as conduct on the basis of a person's biological sex.  Consistent with *Bostock*, harassment on the basis of a person's transgender status or homosexuality may implicate that person's biological sex and, thus, may at least in part constitute "conduct on the basis of sex." Accordingly, unwelcome conduct on the basis of transgender status or homosexuality may, if so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity on the basis of their transgender status or homosexuality, constitute sexual harassment prohibited by Title IX.  34 C.F.R. § 106.30(a).

**Question 5:    How does the Department interpret Title IX and its implementing regulations in light of *Bostock* with respect to athletics, intimate facilities, religious exemptions, and other sex-segregated programs or activities addressed under Title IX and its regulations?**

**Answer:**  Our answer to this question is based on three propositions.  First, *Bostock* applies only to Title VII.  *Compare* 42 U.S.C. § 2000e, *et seq. with* 20 U.S.C. §§ 1681, *et seq.*  It does not purport to construe, much less abrogate, Title IX's statutory and regulatory text permitting or requiring biological sex to be taken into account in an educational setting.[3]  Second, the ordinary public meaning of "sex" at the time of Title IX's enactment was biological sex, male or female, not transgender status or sexual orientation.  Third, the Department's regulations recognizing the male/female biological binary carry extra weight and interpretative authority because they were the product of uniquely robust and direct Congressional review.  *Bell*, 456 U.S. at 531–32 (describing Congressional review of regulations implementing Title IX); *see also Mead Corp.*, 533 U.S. at 226–27; *Chevron*, 468 U.S. at 842–45.  Consequently, our view is that *Bostock's* holding and reasoning, to the extent relevant, support the Department's position that Title IX's statutory and regulatory provisions permit, and in some cases require, biological sex, male or female, to be taken into account in an education program or activity.[4]  *See* 20 U.S.C. §§ 1681(a), 1686; 34 CFR

---

[3]*Bostock* emphasized that general non-discrimination statutes often contain exceptions that override a general duty in some circumstances.  *See, e.g.*, 140 S. Ct. at 1754 ("As a result of its deliberations in adopting the law, Congress included an express statutory exception for religious organizations [in Title VII].").  Even under Title VII (concerning workplace discrimination), the *Bostock* Court expressly left open the issue of sex-segregated facilities and policies.

[4]This Memorandum does not presume to exhaust the ways recipients may lawfully consider sex under Title IX in their programs and activities, and there may be circumstances not addressed by this document under which a recipient's consideration of sex does not constitute unlawful discrimination under Title IX.

000300

This document expresses policy  hat is inconsistent in many respects with Execu ive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

ARCHIVED AND NOT FOR RELIANCE.

§§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61; *see also Brown & Williamson Tobacco Corp.*, 529 U.S. at 133; *Yates*, 574 U.S. at 537-38; *Davis*, 489 U.S. at 809.

A.    Athletics

    We believe the ordinary public meaning of controlling statutory and regulatory text requires a recipient providing separate athletic teams to separate participants solely based on their biological sex, male or female, and not based on transgender status or homosexuality, to comply with Title IX.

    Under Title IX and its regulations, a person's biological sex *is* relevant for the considerations involving athletics, and distinctions based thereon are permissible and may be required because the sexes are not similarly situated. 34 CFR § 106.41. Biological females and biological males are different in ways that are relevant to athletics because of physiological differences between males and females. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women, however, are enduring."); *Frontiero*, 411 U.S. at 686 (plurality opinion) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth"). Accordingly, schools must consider students' biological sex when determining whether male and female student athletes have equal opportunities to participate. *See McCormick*, 370 F.3d at 287 ("[I]dentical scheduling for boys and girls is not required. Rather, compliance is assessed by first determining whether a difference in scheduling has a negative impact on one sex, and then determining whether that disparity is substantial enough to deny members of that sex equality of athletic opportunity."); *Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1192 (9th Cir. 1989) (quoting *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("The record makes clear that due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team. Thus, athletic opportunities for women would be diminished")).

    *Bostock* does not diminish the relevance of biological sex in athletics, and does not address the validity of the Department's historic measures to ensure biological females (girls and women) have equal opportunities to participate in athletics because males and females are not similarly situated with respect to athletic competition.[5] Unlike Title VII, one of Title IX's crucial purposes is protecting women's and girls' athletic opportunities. Indeed, Title IX was enacted, and its regulations promulgated, to prohibit discrimination on the basis of sex in education programs and activities and to protect equal athletic opportunities for students who are biological females, including by providing for sex-segregated athletics.

    The fact is, Congress specifically mandated that the Department consider promulgating regulations to address sports. After first enacting Title IX, Congress subsequently passed another

---

[5]Although the Department does not address Equal Protection Clause claims regarding separate athletic teams for biological females and biological males, the Department's position on such claims is stated in its Brief for the United States as Amicus Curiae Supporting Appellants and Urging Reversal in *Hecox v. Little*, Nos. 20-35813, 20-35815, U.S. Court of Appeals for the Ninth Circuit (filed Nov. 19, 2020).

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy  hat is inconsistent in many respects with Execu ive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

statute, entitled the Javits Amendment, instructing the Secretary of Health, Education, and Welfare to publish regulations "implementing the provisions of Title IX . . . which shall include with respect to intercollegiate activities reasonable provisions considering the nature of the particular sports." Public Law 93–380 (HR 69), § 844, 88 Stat 484, 612 (August 21, 1974).  Congress reserved the right to review the regulations following publication to determine whether they were "inconsistent with the Act from which [they] derive[] [their] authority."  *Id.*

The Secretary of Health, Education, and Welfare subsequently published Title IX regulations, including regulatory text identical to the current text of the Department's athletics regulations.  *Compare* Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities, 40 Fed. Reg. 24,128, 21,142–43 (June 4, 1975) (promulgating § 86.41 Athletics) *with* 34 C.F.R. § 106.41.  After Congressional review, including over six days of hearings, Congress allowed the regulations to go into effect. *See McCormick*, 370 F.3d at 287 (laying out the history of the Javits Amendment, and the response from Congress to the regulations promulgated thereunder).  Consequently, the regulations validly and authoritatively clarify the scope of a recipient's non-discrimination duties under Title IX in the case of sex-specific athletic teams. *See Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) ("The degree of deference [to the Department of Education] is particularly high in Title IX cases because Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX.").

34 C.F.R. § 106.41 prohibits a recipient from discriminating on the basis of sex with respect to providing athletic programs or activities, permits a recipient to provide sex-segregated teams for competitive activities or contact sports, and obligates a recipient to provide equal athletic opportunity for members of both sexes.[6]  As it has for over forty years, the Department must interpret 34 C.F.R. § 106.41(b), regarding operation of athletic teams "for members of *each sex*," and 34 C.F.R. § 106.41(c), regarding equal athletic opportunity for "members of *both sexes*" (emphasis added), to mean operation of teams and equal opportunity for biological males, and for biological females.  Based on statutory text and regulatory history, it seems clear that if a recipient chooses to provide "separate teams for members of each sex" under 34 C.F.R. § 106.41(b), then it must separate those teams solely on the basis of biological sex, male or female, and not on the basis of transgender status or sexual orientation, to comply with Title IX.[7]

---

[6] Specifically, 34 C.F.R. § 106.41(a) provides a general rule that recipients shall not provide athletics separately based on sex.  However, 34 C.F.R. § 106.41(b) permits a recipient to operate or sponsor separate teams for members of each sex where selection for the teams is based on competitive skill, or the activity is a contact sport, and also provides that where a recipient operates or sponsors a team in a particular sport for members of one sex with no such team for members of the opposite sex, then members of the excluded sex must be allowed to try out for the team unless it is for a contact sport.  Finally, 34 C.F.R. § 106.41(c) obligates a recipient to provide "equal athletic opportunity for members of both sexes" by taking into account specified factors in deciding what athletic programs to offer.

[7] Different treatment based on transgender status or homosexuality would generally constitute unlawful sex discrimination because students who do not identify as transgender or homosexual cannot generally be treated worse than students who identify as transgender or homosexual.  *See*

000302

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy  hat is inconsistent in many respects with Execu ive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

B.    Intimate Facilities

As discussed above, the ordinary public meaning of the term "sex" at the time of Title IX's enactment was biological sex, male or female. That too was the meaning given to the term when it was used in the Department's implementing regulations approved by Congress. *See, e.g.*, *Bell*, 456 U.S. at 531–32; 34 CFR §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61. 34 C.F.R. § 106.33 permits schools to provide separate bathrooms, locker rooms, and showers "on the basis of sex," as long as the school provides comparable facilities for "each sex." Therefore, we believe the plain ordinary public meaning of the controlling statutory and regulatory text requires a recipient providing "separate toilet, locker room, and shower facilities on the basis of sex" to regulate access based on biological sex.

Our opinion is contrary to the holding of a divided panel of the Fourth Circuit Court of Appeals in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020). There, the court held denying a biological female who identified as a male access to intimate facilities reserved for males violated Title IX and acknowledged that "*Bostock* expressly does not answer this 'sex-separated restroom' question." *Id.* at 618 (citing *Bostock* 140 S. Ct. at 1753). The court's analysis of 34 C.F.R. § 106.33, in its entirety, was:

> [T]he Board emphasizes a Department of Education implementing regulation, 34 C.F.R. § 106.33, which interprets Title IX to allow for "separate toilet, locker room, and shower facilities on the basis of sex," so long as they are "comparable" to each other. But Grimm does not challenge sex-separated restrooms; he challenges the Board's discriminatory exclusion of himself from the sex-separated restroom matching his gender identity. And the implementing regulation cannot override the statutory prohibition against *discrimination* on the basis of sex. All it suggests is that the act of creating sex-separated restrooms in and of itself is not discriminatory—not that, in applying bathroom policies to students like Grimm, the Board may rely on its own discriminatory notions of what "sex" means.

> As explained above, Grimm consistently and persistently identified as male. He had been clinically diagnosed with gender dysphoria, and his treatment provider identified using the boys restrooms as part of the appropriate treatment. Rather than contend with Grimm's serious medical need, the Board relied on its own invented classification, "biological gender," for which it turned to the sex on his birth certificate. And even when Grimm provided the school with his amended birth certificate, the Board *still* denied him access to the boys restrooms. For these reasons, we hold that the Board's application of its restroom policy against Grimm violated Title IX.

*Id.* at 618–19 (citations omitted) (emphasis in original).

---

*Bostock*, 140 S. Ct. at 1747. ("But, as we've seen, discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second.")

000303

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy  hat is inconsistent in many respects with Execu ive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Our opinion is also contrary to a divided Eleventh Circuit panel decision, *Adams by and through Kasper v. School Board of St. Johns County*, 968 F. 3d 1286 (11th Cir. 2020). There, the court also held that denying a biological female who identified as a male access to intimate facilities reserved for males violated Title IX. Specifically:

> The School Board believes 34 C.F.R. § 106.33 of the Title IX implementing regulations forecloses Mr. Adams's discrimination claim. Section 106.33 reads:

>> A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.

> The School Board argues that the use of the term "sex" in this regulation clearly means "biological sex," or sex assigned at birth. Thus, it asserts that dividing restrooms by sex assigned at birth—requiring transgender boys to use the girls' restroom and transgender girls to use the boys' restroom—cannot be discriminatory under Title IX. The Board considers Mr. Adams a "biological female," and it seeks to exclude him from the boys' restroom on this basis. But Mr. Adams's discrimination claim does not contradict the implementing regulations for two reasons. First, Mr. Adams is not challenging § 106.33's provision of separate restrooms for girls and boys. He is simply seeking access to the boys' restroom as a transgender boy. And second, the regulation does not mandate how to determine a transgender student's "sex." Thus, we perceive no conflict between the text of § 106.33 and Mr. Adams's successful claim of discrimination.

*Id*. at 1308. The court reasoned that Title IX and its accompanying regulations contain no definition of the term "sex" and "the plain language of the regulation sheds no light on whether Mr. Adams's 'sex' is female as assigned at his birth or whether his 'sex' is male as it reads on his driver's license and his birth certificate." *Id*. at 1310. It explicitly rejected the argument which *Bostock* relied upon, reading the term "sex" to mean "biological sex" and not transgender status. And it concluded the traditional understanding of biological sex to be "narrow" and "unworkable." *Id.*

We are unpersuaded by the Title IX analysis in both *Adams* and *Grimm* for at least three reasons. First, as described above in response to Question 3, we believe, based on our review of the statutory text, regulatory history, and cited authorities, that the ordinary public meaning of the term "sex" at the time of Title IX's enactment was biological sex, male or female. The notion that "because neither Title IX nor the regulation define 'sex' or 'on the basis of sex,' the statute and regulation cannot be presumed to mean 'biological sex'" is at odds with controlling interpretative canons. *Compare Bostock*, 140 S. Ct. at 1738 *with Adams*, 968 F. 3d at 1310. And if the terms "sex" and "on the basis of sex" are truly ambiguous, then the Department's longstanding construction, reflected in the implementing regulations and reaffirmed in the Title IX Final Rule is entitled to deference and is for now controlling.

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy  hat is inconsistent in many respects with Execu ive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

Second, *Adams* and *Grimm* failed to rigorously analyze Title IX's plain text, *compare Bostock,* 140 S. Ct. at 1738–1743, or to fairly address the legal consequence of the Department's unique implementing regulations, *see Bell*, 456 U.S. at 531–32.  In *Adams*, for example, the majority variously argued *Bostock* does not endorse reading the term "sex" to mean "biological sex"; Title IX and its regulations do not define "sex"; and the traditional understanding of biological sex is "narrow and unworkable."  *Adams,* 968 F. 3d at 1310.  In *Grimm*, the court asserted "the implementing regulation cannot override the statutory prohibition against *discrimination* on the basis of sex," arguing the act of creating sex-separated restrooms in and of itself is not discriminatory but relying on "discriminatory notions of what 'sex' means" is unlawful. *Grimm*, 972 F.3d at 618 (footnote omitted). Both panels assuredly should have engaged in the textual analysis mandated by controlling Supreme Court authorities, *see New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538–39 (2019), determined the term's ordinary public meaning at the time of enactment, and addressed the interplay of the entire statutory and regulatory text. [8]

Third, the Department issued its Title IX regulation on May 19, 2020 stating, "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current regulations . . . reflect this presupposition." 85 Fed. Reg. 30,178.  "In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes."  *Id.  Adams* and *Grimm* were decided more than two months after publication of the Title IX rule and its interpretative preamble.  Yet neither discussed the Department's interpretation.  As *Adams* suggests, the Department's views on the meaning of "sex" in Title IX should have been given deference, or, at a minimum, addressed in the panel decisions, particularly because the statutory and regulatory definition of "sex," or supposed lack thereof, was purportedly critical to the outcome in both cases.  *See Adams*, 968 F.3d at 1310 (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019)); *Chevron,* 467 U.S. at 842–44.

---

[8]For example, *Grimm's* panel reasoned:

> In the Title IX context, discrimination "mean[s] treating that individual worse than others who are similarly situated."  In light of our equal protection discussion above, this should sound familiar: Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender. Unlike the other boys, he had to use either the girls restroom or a single-stall option. In that sense, he was treated worse than similarly situated students.

*Grimm*, 972 F.3d at 618.  However, Grimm was not treated "worse than similarly situated students" because under the Department's regulations the proper comparator should have been biological females not biological males.

000305

ARCHIVED AND NOT FOR RELIANCE.
This document expresses policy  hat is inconsistent in many respects with Execu ive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

C.    Religious Exemptions

The holding in *Bostock* does not affect the statutory exemption from Title IX, 20 U.S.C. § 1681(a)(3), and its implementing regulations, 34 C.F.R. § 106.12, for an educational institution controlled by a religious organization. *Maxon, et al. v. Fuller Theological Seminary*, No. 2:19-cv-09969 (C.D. Cal. Oct. 7, 2020), *appeal docketed*, No. 20-56156 (9th Cir. Nov. 4, 2020).  For example, *Bostock* acknowledged the express statutory exception in Title VII for religious organizations and expressed "deep[] concern[] with preserving the promise of the free exercise of religion enshrined in our Constitution[.]"  *Bostock*, 140 S. Ct. at 1753–54.  Thus, the Court "recognized that the First Amendment can bar the application of employment discrimination laws[.]" *Id*. at 1754 (citing *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 188 (2012)).  Accordingly, the Department's regulations implementing Title IX do not and lawfully could not require a recipient to restrict "any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution," including the free exercise of religion.  34 C.F.R. § 106.6(d)(1).

Additionally, the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb, *et seq*., "operates as a kind of super statute, displacing the normal operation of other federal laws [] [such that] it might supersede Title VII's commands in appropriate cases." *Bostock*, 140 S. Ct. at 1753–54.  The Department also acknowledges that RFRA operates as a super statute that might supersede Title IX's commands in appropriate cases.  Office of the General Counsel, U.S. Dep't of Educ., Guidance Regarding Department of Education Grants and Executive Order 13798, 85 Fed. Reg. 61,736, 61,738–39 (Sept. 30, 2020) ("Congress expressly applied RFRA to all Federal law, statutory or otherwise, whether adopted before or after its enactment.  RFRA therefore applies to all laws governing ED programs, including but not limited to nondiscrimination laws such as Title IX") (footnotes omitted).  Although OCR does not have jurisdiction over complaints lodged under RFRA, schools and individuals may inform the Department of a burden or potential burden under RFRA, using the process provided in the Department's Guidance Regarding Department of Education Grants and Executive Order 13798, here.

D.    Other Sex-Segregated Programs or Activities Addressed Under Title IX and its Regulations

Title IX and its implementing regulations address other circumstances under which it is permissible to provide education programs or activities based on distinctions between the two biological sexes.  Examples include, but are not limited to, the following:

- The admissions policies of any public institution of undergraduate higher education that traditionally and continually from its establishment has had a policy of admitting only students of one sex.  20 U.S.C. § 1681(a)(5).
- The membership practices of certain organizations such as a social fraternity or social sorority whose members are primarily students at an institution of higher education.  20 U.S.C. § 1681(a)(6)(A).

000306

This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

ARCHIVED AND NOT FOR RELIANCE.

- Organizations such as the Girl Scouts whose membership "has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age." 20 U.S.C. § 1681(a)(6)(B).
- Separate mother-daughter and father-son activities. 20 U.S.C. § 1681(a)(8).
- A school's decision to provide separate housing for members of each sex. 20 U.S.C. § 1686.
- A recipient's decision to provide single-sex classes, extracurricular activities, or schools subject to specific regulatory requirements on the basis of sex. 34 C.F.R. § 106.34(b)-(c).
- A recipient's decision to separate students in physical education classes involving contact sports based on each student's sex, or to conduct separate sessions in human sexuality classes for students of each sex. 34 C.F.R. § 106.34(a)(1), (a)(3).

For the reasons discussed in response to Questions 2, 3, 5(A), and 5(B), the term "sex" with respect to these and other similar programs or activities should be construed to mean biological sex, male or female.

Please contact us if we may be of further assistance.

U.S. DEPARTMENT OF EDUCATION
THE OFFICE OF THE GENERAL COUNSEL

Reed
Rubinstein

Digitally signed by
Reed Rubinstein
Date: 2021.01.08
14:28:38 -05'00'

Reed D. Rubinstein,
Principal Deputy General Counsel delegated
the authority and duties of the General Counsel

# Presidential Documents

Executive Order 13988 of January 20, 2021

## Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1.** *Policy.* Every person should be treated with respect and dignity and should be able to live without fear, no matter who they are or whom they love. Children should be able to learn without worrying about whether they will be denied access to the restroom, the locker room, or school sports. Adults should be able to earn a living and pursue a vocation knowing that they will not be fired, demoted, or mistreated because of whom they go home to or because how they dress does not conform to sex-based stereotypes. People should be able to access healthcare and secure a roof over their heads without being subjected to sex discrimination. All persons should receive equal treatment under the law, no matter their gender identity or sexual orientation.

These principles are reflected in the Constitution, which promises equal protection of the laws. These principles are also enshrined in our Nation's anti-discrimination laws, among them Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. 2000e *et seq.*). In *Bostock* v. *Clayton County,* 590 U.S.__(2020), the Supreme Court held that Title VII's prohibition on discrimination "because of . . . sex" covers discrimination on the basis of gender identity and sexual orientation. Under *Bostock's* reasoning, laws that prohibit sex discrimination—including Title IX of the Education Amendments of 1972, as amended (20 U.S.C. 1681 *et seq.*), the Fair Housing Act, as amended (42 U.S.C. 3601 *et seq.*), and section 412 of the Immigration and Nationality Act, as amended (8 U.S.C. 1522), along with their respective implementing regulations—prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary.

Discrimination on the basis of gender identity or sexual orientation manifests differently for different individuals, and it often overlaps with other forms of prohibited discrimination, including discrimination on the basis of race or disability. For example, transgender Black Americans face unconscionably high levels of workplace discrimination, homelessness, and violence, including fatal violence.

It is the policy of my Administration to prevent and combat discrimination on the basis of gender identity or sexual orientation, and to fully enforce Title VII and other laws that prohibit discrimination on the basis of gender identity or sexual orientation. It is also the policy of my Administration to address overlapping forms of discrimination.

**Sec. 2.** *Enforcing Prohibitions on Sex Discrimination on the Basis of Gender Identity or Sexual Orientation.* (a) The head of each agency shall, as soon as practicable and in consultation with the Attorney General, as appropriate, review all existing orders, regulations, guidance documents, policies, programs, or other agency actions ("agency actions") that:

(i) were promulgated or are administered by the agency under Title VII or any other statute or regulation that prohibits sex discrimination, including any that relate to the agency's own compliance with such statutes or regulations; and

(ii) are or may be inconsistent with the policy set forth in section 1 of this order.

(b) The head of each agency shall, as soon as practicable and as appropriate and consistent with applicable law, including the Administrative Procedure Act (5 U.S.C. 551 *et seq.*), consider whether to revise, suspend, or rescind such agency actions, or promulgate new agency actions, as necessary to fully implement statutes that prohibit sex discrimination and the policy set forth in section 1 of this order.

(c) The head of each agency shall, as soon as practicable, also consider whether there are additional actions that the agency should take to ensure that it is fully implementing the policy set forth in section 1 of this order. If an agency takes an action described in this subsection or subsection (b) of this section, it shall seek to ensure that it is accounting for, and taking appropriate steps to combat, overlapping forms of discrimination, such as discrimination on the basis of race or disability.

(d) Within 100 days of the date of this order, the head of each agency shall develop, in consultation with the Attorney General, as appropriate, a plan to carry out actions that the agency has identified pursuant to subsections (b) and (c) of this section, as appropriate and consistent with applicable law.

**Sec. 3**. *Definition*. ''Agency'' means any authority of the United States that is an ''agency'' under 44 U.S.C. 3502(1), other than those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(5).

**Sec. 4**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

000309

**Federal Register**/Vol. 86, No. 14/Monday, January 25, 2021/Presidential Documents    **7025**

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2021.*

[FR Doc. 2021–01761
Filed 1–22–21; 11:15 am]
Billing code 3295–F1–P

000310

## Presidential Documents

Executive Order 14021 of March 8, 2021

### Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1.** *Policy.* It is the policy of my Administration that all students should be guaranteed an educational environment free from discrimination on the basis of sex, including discrimination in the form of sexual harassment, which encompasses sexual violence, and including discrimination on the basis of sexual orientation or gender identity. For students attending schools and other educational institutions that receive Federal financial assistance, this guarantee is codified, in part, in Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 *et seq.,* which prohibits discrimination on the basis of sex in education programs or activities receiving Federal financial assistance.

**Sec. 2.** *Review of Agency Actions.* (a) Within 100 days of the date of this order, the Secretary of Education, in consultation with the Attorney General, shall review all existing regulations, orders, guidance documents, policies, and any other similar agency actions (collectively, agency actions) that are or may be inconsistent with the policy set forth in section 1 of this order, and provide the findings of this review to the Director of the Office of Management and Budget.

(i) As part of the review required under subsection (a) of this section, the Secretary of Education shall review the rule entitled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 85 FR 30026 (May 19, 2020), and any other agency actions taken pursuant to that rule, for consistency with governing law, including Title IX, and with the policy set forth in section 1 of this order.

(ii) As soon as practicable, and as appropriate and consistent with applicable law, the Secretary of Education shall review existing guidance and issue new guidance as needed on the implementation of the rule described in subsection (a)(i) of this section, for consistency with governing law, including Title IX, and with the policy set forth in section 1 of this order.

(iii) The Secretary of Education shall consider suspending, revising, or rescinding—or publishing for notice and comment proposed rules suspending, revising, or rescinding—those agency actions that are inconsistent with the policy set forth in section 1 of this order as soon as practicable and as appropriate and consistent with applicable law, and may issue such requests for information as would facilitate doing so.

(b) The Secretary of Education shall consider taking additional enforcement actions, as appropriate and consistent with applicable law, to enforce the policy set forth in section 1 of this order as well as legal prohibitions on sex discrimination in the form of sexual harassment, which encompasses sexual violence, to the fullest extent permissible under law; to account for intersecting forms of prohibited discrimination that can affect the availability of resources and support for students who have experienced sex discrimination, including discrimination on the basis of race, disability, and national origin; to account for the significant rates at which students

who identify as lesbian, gay, bisexual, transgender, and queer (LGBTQ+) are subject to sexual harassment, which encompasses sexual violence; to ensure that educational institutions are providing appropriate support for students who have experienced sex discrimination; and to ensure that their school procedures are fair and equitable for all.

**Sec. 3**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 8, 2021.*

[FR Doc. 2021–05200
Filed 3–10–21; 8:45 am]
Billing code 3295–F1–P

000312

# Exhibit B
# Dear Educator Letter and
# Joint Fact Sheet



**Letter to Educators on Title IX's 49th Anniversary**
**Notice of Language Assistance**

**Notice of Language Assistance:** If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

**給英語能力有限人士的通知**：如果您不懂英語，或者使用英语有困难，您可以要求獲得向大眾提供的語言協助服務，幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊，請致電 1-800-USA-LEARN (1-800-872-5327)
(聽語障人士專線：1-800-877-8339), 或電郵：Ed.Language.Assistance@ed.gov。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức củaBộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

**영어 미숙자를 위한 공고:** 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800- USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는
이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkolsa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вампредоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877- 8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov.



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

June 23, 2021

Dear Educator:

On this 49th anniversary of the passage of Title IX of the Education Amendments of 1972—our nation's most powerful legal tool for combating sex discrimination in education—I take this opportunity to highlight a selection of resources available for you to ensure that the education environment you provide is free from sex discrimination in all forms. Among these resources is our recent public notice clarifying Title IX's protection against discrimination based on sexual orientation and gender identity.

The U.S. Department of Education's Office for Civil Rights works to ensure that Title IX's mandate protects students in all aspects of their education, including recruitment, admissions, and counseling; financial assistance; athletics; protections from sex-based harassment, which encompasses sexual assault and other forms of sexual violence; treatment of pregnant and parenting students; discipline; equal access to classes and activities; and treatment of lesbian, gay, bisexual, transgender, queer and intersex (LGBTQI+) students.

I encourage you to review OCR's recent report, Education in a Pandemic: The Disparate Impacts of COVID-19 on America's Students, in which we address the disparities based on sex, including sexual orientation and gender identity, as well as race, disability, and other characteristics experienced by students both before and during the pandemic in K-12 and postsecondary settings. On this anniversary of Title IX, I recognize the particular vulnerability of LGBTQI+ students and the often overwhelming challenges these students face in education compared to their peers, including feeling less safe, experiencing poor mental health, facing a higher risk of suicide, being more likely to miss school, and facing a disproportionate risk of being homeless.

I also want to bring to your attention OCR's public notice based on the Supreme Court's recent decision in *Bostock v. Clayton County*, 140 S. Ct. 1731, 590 U.S. ___ (2020), which clarifies that Title IX's protection against sex discrimination encompasses discrimination based on sexual orientation and gender identity. Specifically, OCR clarifies that the Supreme Court's decision in *Bostock* applies to the Department's interpretation of Title IX. In its decision, the Supreme Court explained that "it is impossible to discriminate against a person" because of their sexual orientation or gender identity "without discriminating against that individual based on sex." *Id.* at 1741. That reasoning applies regardless of whether the individual is an adult in a workplace or a student in school.

Consistent with this notice, OCR will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department. For more information, please see our accompanying fact sheet in which OCR and the U.S. Department of Justice's Civil Rights Division provide examples of the kinds of incidents we can investigate.

OCR has also updated its website to provide the resources mentioned above and to provide additional information and resources for LGBTQI+ students.

On Title IX more generally, you might find it useful to review this Overview of the Law and these Answers to Frequently Asked Questions about Sex Discrimination.

We realize educators may have questions about the Department's 2020 amendments to the Title IX regulations, and we appreciate that so many of you shared your insights and experiences during our virtual public hearing on Title IX held on June 7-11, 2021. We are reviewing the comments we received and, as previously noted, anticipate issuing a notice of proposed rulemaking to amend the regulations. In addition, we plan to issue a question-and-answer document to provide additional clarity about how OCR interprets schools' existing obligations under the 2020 amendments, including the areas in which schools have discretion in their procedures for responding to reports of sexual harassment.

If you have questions or would like additional information or technical assistance, please visit us at www.ed.gov/ocr or contact OCR at 800-421-3481 (TDD: 800-877-8339) or at ocr@ed.gov.

We at OCR share with you the responsibility to ensure that all students have equal access to education, regardless of race, color, national origin, sex, disability, or age. Thank you for all that you do to support all of our nation's students and to ensure that they have the opportunity to learn and thrive in school.

Sincerely,

Suzanne B. Goldberg
Acting Assistant Secretary for Civil Rights



# Confronting Anti–LGBTQI+ Harassment in Schools
## A Resource for Students and Families

Many students face bullying, harassment, and discrimination based on sex stereotypes and assumptions about what it means to be a boy or a girl. Students who are lesbian, gay, bisexual, transgender, queer, intersex, nonbinary, or otherwise gender non-conforming may face harassment based on how they dress or act, or for simply being who they are. It is important to know that discrimination against students based on their sexual orientation or gender identity is a form of sex discrimination prohibited by federal law. It is also important that LGBTQI+ students feel safe and know what to do if they experience discrimination.

Public elementary and secondary schools, as well as public and private colleges and universities, have a responsibility to investigate and address sex discrimination, including sexual harassment, against students because of their perceived or actual sexual orientation or gender identity. When schools fail to respond appropriately, the Educational Opportunities Section of the Civil Rights Division (CRT) at the U.S. Department of Justice and the Office for Civil Rights (OCR) at the U.S. Department of Education can help by enforcing federal laws that protect students from discrimination. CRT and OCR can also provide information to assist schools in meeting their legal obligations.

## Examples of the kinds of incidents
## CRT and OCR can investigate:

A lesbian high school student wants to bring her girlfriend to a school social event where students can bring a date. Teachers refuse to sell her tickets, telling the student that bringing a girl as a date is "not appropriate for school." Teachers suggest that the student attend alone or bring a boy as a date.

When he starts middle school, a transgender boy introduces himself as Brayden and tells his classmates he uses he/him pronouns. Some of his former elementary school classmates "out" him to others, and every day during physical education class call him transphobic slurs, push him, and call him by his former name. When he reports it to the school's administrators, they dismiss it, saying: "you can't expect everyone to agree with your choices."

A community college student discloses he's gay during a seminar discussion. Leaving class, a group of students calls him a homophobic slur, and one bumps him into the wall. A professor witnesses this, but does nothing. Over the next month, the harassment worsens. The student goes to his dean after missing several lectures out of fear. The college interviews one, but not all, of the harassers, does nothing more, and never follows up with the student.

An elementary school student with intersex traits dresses in a gender neutral way, identifies as nonbinary, and uses they/them pronouns. The student's teacher laughs when other students ask if they are "a boy or a girl" and comments that there is "only one way to find out." The teacher tells the class that there are only boys and girls and anyone who thinks otherwise has something wrong with them. The student tells an administrator, who remarks "you have to be able to laugh at yourself sometimes."

On her way to the girls' restroom, a transgender high school girl is stopped by the principal who bars her entry. The principal tells the student to use the boys' restroom or nurse's office because her school records identify her as "male." Later, the student joins her friends to try out for the girls' cheerleading team and the coach turns her away from tryouts solely because she is transgender. When the student complains, the principal tells her "those are the district's policies."




**U.S. Department of Justice**
*Civil Rights Division*

**U.S. Department of Education**
*Office for Civil Rights*

# What if a Student Experiences Discrimination in School?

If you have been treated unfairly or believe a student has been treated unfairly—for example, treated differently, denied an educational opportunity, harassed, bullied, or retaliated against—because of sexual orientation or gender identity, there are a number of actions you can take:

**1**    **Notify a teacher or school leader** (for example, a principal or student affairs staff) immediately. If you don't get the help you need, file a formal complaint with the school, school district, college, or university. Keep records of your complaint(s) and responses you receive.

**2**    **Write down the details** about what happened, where and when the incident happened, who was involved, and the names of any witnesses. Do this for every incident of discrimination, and keep copies of any related documents or other information.

**3**    If you are not proficient in English, you have the right to **ask the school to translate or interpret information** into a language you understand. If you have communication needs because of a disability, you have the right to receive accommodations or aids and services that provide you with effective communication.

**4**    Counseling and other mental health support can sometimes be helpful for a student who has been harassed or bullied. **Consider seeking mental health resources** if needed.

**5**    **Consider filing a complaint** with the Civil Rights Division of the U.S. Department of Justice at **civilrights.justice.gov** (available in several different languages), or with the Office for Civil Rights at the U.S. Department of Education at **www.ed.gov/ocr/complaintintro.html** (to file a complaint in English) or **www.ed.gov/ocr/docs/howto.html** (to file a complaint in multiple languages).

*"All students should be able to learn in a safe environment, free from discrimination and harassment. The Civil Rights Division stands with LGBTQI+ students and will fight to protect their right to an education regardless of who they are or whom they love."*

– **Kristen Clarke, Assistant Attorney General for Civil Rights, Department of Justice**

*"The Department of Education strives to ensure that all students—including LGBTQI+ students—have access to supportive, inclusive school environments that allow them to learn and thrive in all aspects of their educational experience. Federal law prohibits discrimination based on sexual orientation and gender identity, and we are here to help schools, students, and families ensure that these protections are in full force."*

– **Suzanne B. Goldberg, Acting Assistant Secretary for Civil Rights, Department of Education**

