UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

STATE OF TEXAS,

    *Plaintiff,*

v.

MIGUEL CARDONA, in his official capacity as
Secretary of Education, *et al.*,

    *Defendants.*

No. 4:23-cv-00604-O

TEXAS'S MEMORANDUM IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Table of Contents ................................................................................................................ ii

Introduction .......................................................................................................................... 1

Background ........................................................................................................................... 2

    I.    Title IX in Texas. ................................................................................................... 2

    II.   The June 22 Notice. ............................................................................................... 3

    III.  The June 23 Letter and Fact Sheet. ........................................................................ 5

    IV.  Texas Laws and School Policies. ............................................................................ 7

Standard of Review ............................................................................................................... 7

Argument .............................................................................................................................. 8

    I.    The Transgender Mandate constitutes final agency action. ................................... 8

    II.   Texas has standing. ............................................................................................... 12

        A.   Texas's sovereign injury. ............................................................................... 13

        B.   Texas's procedural injury. .............................................................................. 14

        C.   Texas is entitled to special solicitude in the standing inquiry. ...................... 15

        D.   Enforcement actions. ..................................................................................... 15

        E.   Texas's injuries are traceable to the Department's guidance.......................... 18

        F.   Texas's injuries are redressable by this Court. .............................................. 18

    III.  This Court should enjoin the Notice, Letter, and Fact Sheet because Texas has established every element for a permanent injunction.................................................. 19

        A.   Texas succeeds on the merits. ....................................................................... 19

    1.    The Notice, Letter, and Fact Sheet are not in accordance with law because they are inconsistent with Title IX. ........................................................................................ 19

    2.    The Notice, Letter, and Fact Sheet are substantive rules that are invalid because they were adopted without conducting the notice-and-comment rulemaking required by the APA. 26

        A.   Texas is suffering irreparable harm.............................................................. 29

        B.   The balance of the equities and public interest favor Texas. ........................ 30

    IV.  This Court should also award declaratory and vacation relief. ........................... 31

        A.   Declaratory relief is proper. ........................................................................... 31

B.    The Court should vacate the challenged agency actions. ...............................................31

Conclusion ........................................................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) (en banc) .................................................................... *passim*

*Alfred L. Snapp & Son, Inc. V. Puerto Rico, ex rel., Barez*,
  458 U.S. 592 (1982) ................................................................................................. 13

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................... 7

*Azar v. Allina Health Servs.*,
  139 S. Ct. 1804 (2019) ............................................................................................. 28

*Barrick Goldstrike Mines Inc. v. Browner*,
  215 F.3d 45 (D.C. Cir. 2000) ..................................................................................... 8

*Bennett v. Spear*,
  520 U.S. 154 (1997) .............................................................................................. 7, 10

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020) ....................................................................................... *passim*

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................... 7

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
  779 F.3d 258 (5 th Cir. 2015) ................................................................................... 16

*In re Core Comm'n, Inc.*,
  531 F.3d 849 (D.C. Cir. 2008) (Griffith, J., concurring) ........................................ 32

*Ctr. for Auto Safety v. NHTSA*,
  452 F.3d 798 (D.C. Cir. 2006) ................................................................................... 9

*Cummings v. Premier Rehab Keller, PLLC*,
  596 U.S. 212 (2022) ................................................................................................. 26

*Czyzewski v. Jevic Holding Corp.*,
  137 S. Ct. 973 (2017) ............................................................................................... 16

*Daimler Trucks N. Am. LLC v. E.P.A.*,
  737 F.3d 95 (D.C. Cir. 2013) ................................................................................... 33

*Davis v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999).........................................................................................26

*Dennis Melancon, Inc. v. City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012) .....................................................................30

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) .................................................................................. 20

*EME Homer City Generation, L.P. v. E.P.A.*,
    795 F.3d 118 (D.C. Cir. 2015) (Kavanaugh, J.) .......................................32

*Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*,
    968 F.3d 357 (5th Cir. 2020) ..................................................................... 17

*First Nat. Bank of Ariz. v. Cities Serv. Co.*,
    391 U.S. 253 (1968) ....................................................................................7

*Grove City Coll. v. Bell*,
    465 U.S. 555 (1984) .................................................................................. 24

*Jobs, Training & Servs., Inc. v. E. Tex. Council of Gov'ts*,
    50 F.3d 1318 (5th Cir. 1995) .......................................................................8

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .......................................................................... 12, 17

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) .................................................................................. 19

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*,
    370 F.3d 275 (2d Cir. 2004) .....................................................................23

*Nat. Res. Def. Council v. EPA*,
    489 F.3d 1250 (D.C. Cir. 2007) (Randolph, J., concurring) .....................32

*Nat. Res. Def. Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) .................................................9, 10, 33, 34

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) (Kavanaugh, J.).........................................9

*Nat'l Pork Producers Council v. EPA*,
    635 F.3d 738 (5th Cir. 2011) ...................................................................... 11

*Neese v. Becerra*,
    640 F. Supp. 3d 668 (N.D. Tex. 2022) (Kacsmaryk, J.) .......................4, 22

v

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................... 31

*North Carolina v. EPA,*
    531 F.3d 896 (D.C. Cir. 2008) ........................................................... 34

*Pelcha v. MW Bancorp, Inc.,*
    988 F.3d 318 (6th Cir. 2021) ....................................................... 4, 25

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) ............................................................................... 26

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015) ...................................................................... 10, 27

*Perrin v. United States,*
    444 U.S. 37 (1979) ............................................................................. 21

*POET Biorefining, LLC v. EPA,*
    970 F.3d 392 (D.C. Cir. 2020) ............................................................. 9

*Pros. & Patients for Customized Care v. Shalala,*
    56 F.3d 592 (5th Cir. 1995) ......................................................... 9, 10

*Religious Sisters of Mercy v. Azar,*
    513 F. Supp. 3d 1113 (D.N.D. 2021) ............................................... 12

*Shalala v. Guernsey Mem'l Hosp.,*
    514 U.S. 87 (1995) ............................................................................. 29

*Shell Offshore Inc. v. Babbitt,*
    238 F.3d 622 (5th Cir. 2001) ........................................................... 29

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    985 F.3d 1032 (D.C. Cir. 2021) ....................................................... 33

*Stringer v. Whitley,*
    942 F.3d 715 (5th Cir. 2019) ........................................................... 14

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ........................................................................... 14

*Syncor Int'l Corp. v. Shalala,*
    127 F.3d 90 (D.C. Cir. 1997) ............................................................... 8

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
    566 U.S. 560 (2012) ........................................................................... 21

*Tennessee v. United States Dep't of Educ.*,
  615 F. Supp. 3d 807 (E.D. Tenn. 2022) ...................................................30

*Tex. Off. of Pub. Util. Couns. v. FCC*,
  183 F.3d 393 (5th Cir. 1999) ...................................................... 13

*Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n*,
  989 F.3d 368 (5th Cir. 2021) ...................................................33

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
  No. 6:23-CV-59-JDK, 2023 WL 4977746 (E.D. Tex. Aug. 3, 2023) (Kernodle,
  J.) ................................................................................... 32, 33

*Texas v. Becerra*,
  577 F. Supp. 3d 527 (N.D. Tex. 2021) ...................................................30

*Texas v. Becerra*,
  623 F. Supp. 3d 696 (N.D. Tex. 2022) (Hendrix, J.) ...........................13, 15

*Texas v. Biden (MPP)*,
  20 F.4th 928 (5th Cir. 2021) .................................................9, 14, 18, 19

*Texas v. EEOC*,
  827 F.3d 372 (5th Cir. 2016), *opinion withdrawn on reh'g*, 838 F.3d 511 (5th Cir.
  2016) ...............................................................................9

*Texas v. EEOC*,
  933 F.3d 433 (5th Cir. 2019)...................................................... *passim*

*Texas v. United States*,
  201 F. Supp. 3d 810 (N.D. Tex. 2016) (O'Connor, J.) ...........................1

*Texas v. United States*,
  328 F. Supp. 3d 662 (S.D. Tex. 2018)...........................................28, 29

*Texas v. United States*,
  524 F. Supp. 3d 598 (S.D. Tex. 2021) ........................................... 28

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) . Action.......................................... *passim*

*Texas v. United States (DACA)*,
  50 F.4th 498 (5th Cir. 2022) ...................................................32, 34

*Texas v. United States*,
  No. 1:18-CV-00068, 2021 WL 3025857 (S.D. Tex. July 16, 2021) (Hanen, J.) .....................19

*U.S. Army Corps of Eng'rs v. Hawkes,*
    578 U.S. 590 (2016)...................................................................................9

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
    136 S. Ct. 1807 (2016) .............................................................................10

*U.S. Dep't of Lab. v. Kast Metals Corp.,*
    744 F.2d 1145 (5th Cir. 1984) ............................................................... 28

*United States Fish & Wildlife Serv. v. Sierra Club, Inc.,*
    141 S. Ct. 777 (2021) ............................................................................. 11

*United States v. Texas,*
    143 S. Ct. 1964 (2023) ........................................................................... 16

*United States v. Virginia,*
    518 U.S. 515 (1996)................................................................................ 21

*Valley v. Rapides Parish Sch. Bd.,*
    118 F.3d 1047 (5th Cir. 1997) ............................................................... 31

*Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.,*
    16 F.4th 1130 (5th Cir. 2021)........................................................... 30, 31

*West Virginia v. Env't Prot. Agency,*
    142 S. Ct. 2587 (2022) ...........................................................................29

*Wisconsin Cent. Ltd. v. United States,*
    138 S. Ct. 2067 (2018) ........................................................................... 21

**Statutes**

5 U.S.C. § 553, 551(5) ...................................................................................27

5 U.S.C. § 553(b)(A) ......................................................................................27

5 U.S.C. § 553(b), (c) .....................................................................................27

5 U.S.C. § 703 ................................................................................................ 31

5 U.S.C. § 704 ..................................................................................................7

5 U.S.C. § 706(2)(A), (C) ............................................................................. 20

20 U.S.C. § 1681 ..............................................................................................3

20 U.S.C. § 1681(a).............................................................................4, 20, 25

20 U.S.C. § 1681(a)(2) ...................................................................................23

20 U.S.C. § 1681(a)(6)(B) ..............................................................................23

20 U.S.C. § 1686 ..................................................................................... 20, 29

42 U.S.C. § 2000e-2(a) .....................................................................................4

42 U.S.C. § 2000e-2(a)(1) ..............................................................................25

Tex. Educ. Code 11.151(b) ...............................................................................6

Tex. Educ. Code § 11.002 .................................................................................2

Tex. Educ. Code § 33.0834 ...................................................................... 13, 18

Tex. Gov't Code §§ 7.021, 7.031 .......................................................................2

Texas Education Code 33.0834 ..........................................................................6

**Other Authorities**

34 C.F.R. § 106.33 ..................................................................................20, 21

34 C.F.R. §§ 106.33, 106.41(b) ......................................................................29

34 C.F.R. § 106.34(a)(1) .................................................................................24

34 C.F.R. § 106.34(a)(3) .................................................................................24

34 C.F.R. § 106.37(c) ......................................................................................21

34 C.F.R. § 106.41(b) ...............................................................................21, 24

85 Fed. Reg. 30,026-01, 30,178 ......................................................................23

85 Fed. Reg. at 30,178 ..............................................................................24, 27

American Heritage Dictionary of the English Language ...........................22, 23

Fed. R. Civ. P. 56(a) .........................................................................................6

Fed. R. Civ. P. 57 ...........................................................................................31

Oxford English Dictionary ............................................................................. 22

Random House College Dictionary ..................................................................23

U.S. Const. art. I, § 8, cl. 1 ................................................................................................26

Webster's New World Dictionary ......................................................................... 22

Webster's Seventh New Collegiate Dictionary .................................................... 22

Webster's Third New International Dictionary ..................................................... 22

## Introduction

For the second time in less than a decade, the U.S. Department of Education ("Department") has attempted to effect radical social change in our nation's schools and workplaces by purporting to "interpret" federal antidiscrimination laws to prohibit discrimination based on sexual orientation and gender identity. Just as they did in 2016, when this Court enjoined the Department's unlawful actions, *see Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016) (O'Connor, J.), the Department has—in a series of related and interlocking actions—once again told States and other regulated parties that they must ignore biological sex when it comes to athletics, bathrooms, locker rooms, and pronouns, or face enforcement actions and loss of federal education funding.

These actions by the Department are procedurally and substantively unlawful, in violation of the Administrative Procedure Act ("APA"). They are procedurally unlawful because they impose new substantive obligations on States and other regulated entities without adhering to the APA's notice-and-comment requirements, which are designed to ensure public participation. And they are substantively unlawful because the agencies' purported "interpretations" of Title IX squarely conflict with the text of that statute.

Contrary to the Department's assertions, these interpretations are not required by the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). *Bostock* held only that terminating an employee "simply for being homosexual or transgender" constitutes discrimination "because of … sex" under Title VII. *Id.* at 1737-38 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court "assum[ed]" that the term "sex" means "biological distinctions between male and female," *id.* at 1739, and it made clear that its decision did not "sweep beyond Title VII

to other federal or state laws that prohibit sex discrimination" or address other issues that were not before the Court such as "sex-segregated bathrooms, locker rooms, and dress codes." *Id.* at 1753. The initial guidance that the Department provided to regulated entities after *Bostock* confirmed that the decision was narrow and did not extend to Title IX or call into question sex-separated living facilities or sex-specific dress codes.

Plaintiff the State of Texas seeks summary judgment on its claims. This Court should declare that Title IX does not apply to discrimination based on sexual orientation or gender identity, set aside (*i.e.*, vacate) the challenged agency actions, and permanently enjoin their implementation and enforcement.

## BACKGROUND

## I.    Title IX in Texas.

Texas administers numerous education programs and operates thousands of educational institutions through its constituent agencies and political subdivisions. While local school districts and charter schools "have the primary responsibility for implementing the state's system of public education," Tex. Educ. Code § 11.002, the Texas Education Agency (TEA) administers federal and state funding and distributes funds to local school districts. Tex. Gov't Code §§ 7.021, 7.031. Texas schools receive substantial federal funds. In fiscal year 2022, TEA distributed approximately $9.29 billion in federal funds to Texas public schools. Appx. 038. In the same fiscal year, Texas public school districts received another approximately $5.47 billion in federal funding, including about $.58 billion received directly from the federal government and about $4.89 billion distributed through entities other than TEA. Appx. 039. Finally, Texas public post-secondary education institutions received approximately $3.5 billion in federal funding during the fiscal year 2021. Texas Higher Education Coordinating Board, Sources and Uses Detail Universities 2021 Report,

https://www.highered.texas.gov/our-work/supporting-our-institutions/institutional-funding-resources/sources-and-uses/ (accessed October 20, 2023). As a condition of receiving federal funding, Title IX applies to these schools. *See* 20 U.S.C. § 1681.

The requirements of Title IX are plain: no person shall "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance" "on the basis of sex." In January 2021, the Department published a memorandum stipulating that *Bostock* did not apply to Title IX and did not require the Department to interpret Title IX in a manner inconsistent with its longstanding implementing regulations.[1] Six months later, the Department issued a notice reversing its interpretation.

## II.     The June 22 Notice.

On June 22, 2021, the Department published a Notice in the Federal Register without an opportunity for comment. Appx.002. This June 22 Notice, which became effective that same day, changed the Department's longstanding position and concluded that "the Department interprets Title IX's prohibition o[f] discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity." Appx.002. The June 22 Notice explained that the Department's stated purpose for changing its position was to be "[c]onsistent with the Supreme Court's ruling and analysis in *Bostock*." Appx.002. The Department concluded that the Notice "will guide the Department in processing complaints and conducting investigations." Appx.004 at 32,639. And the Department's Office for Civil Rights further determined that it "will fully

---

[1]   *See* U.S. Dept. of Educ., Mem. for Kimberly M. Richey Acting Assistant Secretary of the Office for Civil Rights Re: *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) (Jan. 8, 2021), available at https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-01082021.pdf (accessed October 20, 2023).

enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in

education programs and activities that receive Federal financial assistance from the Department."

Appx.004. Specifically, the Department determined:

> [T]he interpretation of sex discrimination set out by the Supreme Court—that
> discrimination "because of … sex" encompasses discrimination based on sexual
> orientation and gender identity—properly guides the Department's interpretation
> of discrimination "on the basis of sex" under Title IX and leads to the conclusions
> that Title IX prohibits discrimination based on sexual orientation and gender
> identity.

Appx.003.

In reaching this determination, the Department decided that "[t]here is textual similarity

between Title VII and Title IX." *Id.* It also alleged that "[a]dditional case law recognizes that the

reasoning of *Bostock* applies to Title IX and that differential treatment of students based on gender

identity or sexual orientation may cause harm," and the Department's interpretation described in

the Notice (purportedly) "is most consistent with the purpose of Title IX[.]" Appx.004. And

third, the Department emphasized that "[t]he U.S. Department of Justice's Civil Rights Division

has concluded that *Bostock*'s analysis applies to Title IX." *Id.*

The Department's interpretation is wrong. For one, Title VII prohibits employment

discrimination "because of such individual's … sex[],"42 U.S.C. § 2000e-2(a), but Title IX

prohibits education discrimination "on the basis of sex," 20 U.S.C. § 1681(a). The statutes thus

contain different language with different results for different contexts. *Neese v. Becerra*, 640 F.

Supp. 3d 668, 675–84 (N.D. Tex. 2022) (Kacsmaryk, J.) (*Bostock* and its reasoning do not apply to

Title IX). And "*Bostock* … was limited only to Title VII itself" and "d[id] not stretch to [other

statutes]." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *see also Adams v. Sch. Bd.

of St. Johns Cnty.*, 57 F.4th 791, 769 (11th Cir. 2022) (en banc) (overturning panel decision upon

which Defendants relied in the Notice, Appx.004, in determining that Title IX prohibits discrimination on the basis of gender identity).

### III.    The June 23 Letter and Fact Sheet.

One day later, on June 23, 2021, the Department's Acting Assistant Secretary for Civil Rights published a "Dear Educator Letter," emphasizing that the Department will "fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department." Appx.009. With the Letter, the Department included a Fact Sheet that the Department's Office for Civil Rights and the Department of Justice's Civil Rights Division jointly issued. Appx.011–012. This Fact Sheet lists "[e]xamples of the kinds of incidents" the Department and DOJ can investigate as discrimination pursuant to Title IX. Appx.011.

Consider one example the Fact Sheet condemns as violating Title IX (all uses of female pronouns *sic*):

> On her way to the girls' restroom, a transgender high school girl is stopped by the principal who bars her entry. The principal tells the student to use the boys' restroom or nurse's office because her school records identify her as "male."

*Id.* Take another example:

> A transgender high school girl student joins her friends to try out for the girls' cheerleading team and the coach turns her away from tryouts solely because she is transgender. When the student complains, the principal tells her "those are the district's policies."

Appx.011. Finally, as a third example, the Fact Sheet explains that referring to a transgender student by a name or pronouns other than the ones the student prefers would be discrimination under Title IX. Appx.001.

Defendants' interpretation of Title IX is plainly contrary to the statute and they violated the APA in publishing it. Their Notice, Letter, and Fact Sheet (altogether, "Transgender Mandate") are being used to threaten Texas school districts and forcing schools to choose between complying with Texas law and risk federal funding or comply with this illegal mandate. For all the reasons detailed below, the Court should find in Plaintiff's favor.

IV.    **Texas Laws and School Policies.**

Texas Education Code 33.0834 prohibits school districts from allowing "a student to compete in an interscholastic athletic competition sponsored or authorized by the district or school that is designated for the biological sex opposite to the student's biological sex." The Board of Trustees of independent school districts "have the exclusive power and duty to govern and oversee the management of the public schools of the district," Tex. Educ. Code 11.151(b), and many Texas school districts have mirrored this statute by promulgating additional policies on related issues. For example, Frisco ISD, Grapevine-Colleyville ISD, and Carroll ISD mandate that schools require bathrooms, lockers, and showers to be separated by biological sex and prohibit them to be assigned based on subjective gender identity. Appx.014, 018, 026. Carroll ISD precludes district employees from "requir[ing] the use of pronouns that are inconsistent with a student's or other person's biological sex." Appx.016. And Granbury ISD prohibits obscene materials, including anything "that [d]epicts or describes … [p]atently offensive representations or descriptions of ultimate sexual acts, normal or perverted, including sexual intercourse, sodomy, and sexual bestiality." Appx.021. Granbury ISD further prohibits its personnel to "teach, instruct, train, or otherwise communicate to any individual or group topics regarding sexual orientation or gender identity unless and until persons or the entire group has fully completed the fifth grade." Appx. 031. And Granbury ISD prohibits its personnel from "teach[ing], instruct[ing], train[ing], or otherwise promot[ing] gender fluidity." *Id.* Keller ISD also regulates instructional resources related to "[g]ender fluidity." Appx. 036. These school districts receive federal funds. Appx. 039.

### Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "[A] material fact is genuine … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotations omitted). "[T]he substantive law will identify which facts are material[,]" and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

A party seeking summary judgment must inform the court of the basis for its motion and identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing summary judgment must then set forth specific facts showing that there is a genuine issue for trial. *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968). "If reasonable minds could differ as to the import of the evidence," then the court should deny the motion. *Anderson*, 477 U.S. at 250.

ARGUMENT

## I.    The Transgender Mandate constitutes final agency action.

As the Fifth Circuit's most relevant precedent instructs, the issue of final agency action should be addressed first because "that analysis contextualizes the standing inquiry." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). The APA allows judicial review only of "final agency action." 5 U.S.C. § 704. Agency action is "final" for the purposes of judicial review if two conditions are met: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). "The

8

Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as 'flexible." *EEOC*, 933 F.3d at 441 (cleaned up).

"Final agency action may result from a series of agency pronouncements rather than a single edict." *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000) (cleaned up). "Hence, a preamble plus a guidance plus an enforcement letter from [an agency] could crystallize an agency position into final agency action." *Id.*; *see also Ciba-Geigy*, 801 F.2d at 436 n.8 (final agency action consisted of a "series of steps taken by EPA" culminating in a letter from an EPA official clarifying the agency's position). By declaring its now-settled position as bound by the outside authority of *Bostock*, the Department cannot now claim a lack of finality. "Such an approach would flout the Supreme Court's repeated instruction to approach finality flexibly and pragmatically." *EEOC*, 933 F.3d at 445 (citations omitted). Where "the challenged action is a definitive statement of the agency's position," the "agency action is final." *Jobs, Training & Servs., Inc. v. E. Tex. Council of Gov'ts*, 50 F.3d 1318, 1324 (5th Cir. 1995); *Barrick Goldstrike Mines*, 215 F.3d at 48 ("a guidance document reflecting a settled agency position and having legal consequences for those subject to regulation may constitute 'final agency action'") (citation omitted).

One way that courts have held that agency "guidance" documents like the Transgender Mandate constitute final and reviewable agency actions under the APA is if they "bind" the agency and its employees "to a particular legal position." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) ("The primary distinction between a substantive rule—really any rule—and a general statement of policy … turns on whether an agency intends to bind itself to a particular legal position."); *accord Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) ("We focus primarily

on whether the rule has binding effect on agency discretion or severely restricts it.") (cleaned up). Action "bind[ing]" an "agenc[y]" to a legal view "gives rise to 'direct and appreciable legal consequences.'" *U.S. Army Corps of Eng'rs v. Hawkes*, 578 U.S. 590, 598 (2016) (citation omitted).

The Transgender Mandate does not merely "remind parties of existing statutory or regulatory duties" but rather imposed new duties and "chang[ed] the text" of the statute it "profess[ed] to interpret." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020); *Texas v. EEOC*, 827 F.3d 372, 385–86 (5th Cir. 2016), *opinion withdrawn on reh'g*, 838 F.3d 511 (5th Cir. 2016) ("the [EEOC] Guidance does not simply repeat the relevant provisions of Title VII. Instead, the Guidance purports to interpret authoritatively [requirements of Title VII]. This court has always considered such a distinction important when deciding whether agency action is 'final' under the APA.").

The Transgender Mandate was issued not to "put[] the public on notice of pre-existing legal obligations," but to "speak with the force of law" and "creat[e] legal effects" for regulated employers, and therefore a "legislative [or substantive] rule." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020). "Interpretive rules thus remind parties of existing statutory duties, or merely track the statutory requirements and thus simply explain something the statute already requires." *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 601–02 (5th Cir. 1995) (cleaned up). But "[i]f an agency pronouncement is to be an interpretive rule or a statement of policy, it cannot effect a substantive change in the regulations." *Id.* (cleaned up). Of course, even policy statements or interpretive rules may sometimes be final agency actions due to their effects. *See Texas v. Biden (MPP)*, 20 F.4th 928, 949 (5th Cir. 2021); *Ctr. for Auto Safety v. NHTSA*, 452 F.3d 798, 807 (D.C. Cir. 2006); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) (Kavanaugh, J.); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105-06 (2015). What matters is

the actual effect of the challenged actions, not how Defendants label them. *See Prof'ls and Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 (5th Cir. 1995).

As explained below, the requirements in the challenged agency actions are not pre-existing legal obligations under *Bostock*. These requirements are therefore legislative rules that impose new duties on States—and all legislative rules are, "by definition, final agency action," *EEOC*, 933 F.3d at 441. Because neither Title VII nor *Bostock* "compels or logically justifies" the Rule, it is a legislative rule issued in violation of the APA's notice-and-comment requirements. *See Wheeler*, 955 F.3d at 84 (because EPA "treated [a judicial decision] as having a legal effect—full vacatur— that the decision disclaimed[,] [it was] a legislative rule").

The Transgender Mandate constitutes final agency action reviewable under the APA. To be considered final agency action, "the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). And the action must be one by which "rights or obligations have been determined, or from which legal consequences will flow." *Id.* (emphases added; cleaned up). Courts take a "pragmatic" approach to finality—looking past the form in which agency actions are announced to their substance. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). Following this pragmatism, the Fifth Circuit recognizes that "guidance letters can mark the 'consummation' of an agency's decision-making process." *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 755 (5th Cir. 2011).

The Transgender Mandate is thus "binding as a practical matter because private parties can rely on it as a norm or safe harbor by which to shape their actions." *EEOC*, 933 F.3d at 444

(cleaned up). As in *EEOC,* the Fact Sheet also invites students to "fil[e] a complaint with the Civil Rights Division of the U.S Department of Justice" for the types of incidents it lists as examples," Appx.012, "thus opening the field of potential plaintiffs." *EEOC*, 933 F.3d at 444 (citation omitted).

## II.    Texas has standing.

Texas has standing to challenge the Transgender Mandate because the Mandate directly regulates the State. When the plaintiff is "an object of the [agency's] action," "there is ordinarily little question that the action … has caused him injury, and that a judgment preventing … the action will redress it." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992). Here, there is no doubt that the State of Texas is "an object of [the agency's] action." Because Texas is an "object" of the challenged actions, all three of the constitutional standing requirements are satisfied. *Id.*

"Whether someone is an object of a regulation is a flexible inquiry rooted in common sense." *EEOC*, 933 F.3d at 446 (citation omitted). "That common sense inquiry is easy here [because the Transgender Mandate] explicitly states that it applies to" entities that receive federal education funding; "[t]hus, by its own terms, the [Transgender Mandate] covers Texas." *Id.*; *see also Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1136 (D.N.D. 2021) ("Plaintiffs, as entities that operate health programs receiving federal financial assistance from HHS, qualify as objects of Section 1557 [of the Affordable Care Act, which incorporates Title IX] and its implementing regulations" and therefore have standing to challenge an interpretation of that statute).

Texas has standing for at least three reasons: (1) Texas has incurred an injury to its sovereign interest in the ability to enforce its own laws; (2) Texas schools are forced to choose

between complying with state law and risk losing federal funding or violating state law; (3) Defendants' failure to conduct notice and comment denied Texas its procedural right to comment on the Mandate.

### A. Texas's sovereign injury.

States have an interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982); *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999). "Pursuant to that interest, states may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law." *Texas v. United States (DAPA)*, 809 F.3d 134, 153 (5th Cir. 2015) (cleaned up and citations omitted), *aff'd by an equally divided court sub nom., United States v. Texas*, 136 S. Ct. 2271, 2272 (2016). These "intrusions are analogous to pressure to change state law." *Id.* At least two of the circumstances injuring sovereign interests as outlined by Texas are at issue here.

The Mandate leaves no doubt that, under its view of Title IX, schools may not prohibit students from competing in athletic competitions designated for the opposite biological sex. *See* Appx. 011. On the other hand, Texas's Education Code requires that students compete in athletic competitions designated for their own biological sex. Tex. Educ. Code § 33.0834. "The Transgender Mandate's interference with the enforcement of state law confers Texas with standing. "Because a state alone has the right to create and enforce its legal code, only the State has the kind of direct stake necessary to satisfy standing in defending the standards embodied in that code." *Texas v. Becerra*, 623 F. Supp. 3d 696, 714 (N.D. Tex. 2022) (Hendrix, J.) (cleaned up).

By threatening to withhold federal funds, the Transgender Mandate encourages Texas schools to violate state law. The Hobson's choice Texas faces—either spending, at a minimum, millions of dollars, to absorb school districts' loss of federal funding or changing its laws—provides Texas the standing to bring these claims. *See MPP*, 20 F.4th at 1002; *see also* Appx. 039 ("The loss of federal funds would require Texas's public schools to either eliminate certain educational services offered using federal funds or find funding from another source."). This is sufficient to establish an injury to Texas's sovereign interest.

### B.  Texas's procedural injury.

A plaintiff can show a cognizable injury if it has been deprived of "a procedural right to protect [its] concrete interests." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). "A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right." *EEOC*, 933 F.3d at 447 (citing *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012)).

Here, Texas has concrete sovereign interests in the creation and enforcement of laws applicable to public education. "And Texas has at least one additional concrete interest in the avoidance of direct injury to" the State of Texas through the loss of federal funds both to the State and to school districts. *See* Appx. 038–39.

The Department promulgated its Notice without public notice and comment. As argued below, this is final agency action that the APA requires to undergo notice and comment. Texas had a right to the notice-and-comment requirement because public notice and comment provides an opportunity for stakeholders to express their concerns and persuade the agency to alter regulations that would harm them.

14

**C. Texas is entitled to special solicitude in the standing inquiry.**

States are entitled to special solicitude when "(1) the State [has] a procedural right to challenge the action in question, and (2) the challenged action affect[s] one of the State's quasi-sovereign interests." *MPP*, 20 F.4th at 969 (citing *Massachusetts v. EPA*, 549 U.S. 497, 516-20 (2007)). Texas clearly satisfies the first prong because it "is asserting a procedural right under the APA to challenge an agency action," *id.* (citation omitted), with respect to all of its claims.

And Texas satisfies the second prong because the challenged agency action here "affect[s] quasi-sovereign interests by imposing substantial pressure on [it] to change [its] laws." *Biden*, 20 F.4th 970 (citation omitted). These interests include:

> states may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law, at least where the state statute at issue regulates behavior or provides for the administration of a state program and does not simply purport to immunize state citizens from federal law.

*DAPA*, 809 F.3d at 153.

"Thus, Texas is entitled to special solicitude in the standing inquiry. If nothing else, that means imminence and redressability are easier to establish here than usual." *MPP*, 20 F.4th at 970 (citation omitted). The remaining prong of the standing analysis—causation (or traceability)—is also subject to the special solicitude doctrine. *See Texas v. United States*, No. 1:18-CV-00068, 2021 WL 3025857, at *9 (S.D. Tex. July 16, 2021) (Hanen, J.) ("The Fifth Circuit has explicitly interpreted special solicitude to lower the level of certainty required in the traditional causation and redressability analysis.").

**D. Enforcement actions.**

"Threat of enforcement is substantial" given "complaints based on violations of policy" or "warnings, statements or other pre-enforcement actions indicating an intent to enforce." *Texas*

15

*v. Becerra*, 623 F. Supp. 3d 696, 716 (N.D. Tex. 2022) (Hendrix, J.) (citing *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006)).

The Letter and Notice both unambiguously state the Department's intent to "fully enforce" its expanded interpretation of Title IX. Current state law and policy is incompatible with the Department's new interpretation of "on the basis of sex." Texas's current policies are just the type of conduct the guidance materials implicate. Therefore, Texas faces a substantial risk of enforcement, an imminent injury.

Indeed, the Department has opened investigations into whether Granbury Independent School District created a hostile environment for its students related to gender identity.[2] On December 6, 2022, the Department's Office for Civil Rights opened an investigation into whether Granbury Independent School District had created a hostile environment for students based on "gender identity"[3] after the American Civil Liberties Union of Texas filed a complaint that relied on the Transgender Mandate as the basis for its allegations of discrimination.[4] The Transgender Mandate is being weaponized to provoke Defendants to use their powers of investigation and

---

[2] *A Texas superintendent ordered librarians to remove LGBTQ-themed books. Now the federal government is investigating.*, The Texas Tribune (Dec. 20, 2022), https://www.texastribune.org/2022/12/20/granbury-books-investigation-civil-rights/ (last visited Oct. 20, 2023).

[3] Talia Richman, *Feds open civil rights investigation into Granbury schools after LGBTQ book removals*, The Dallas Morning News (Dec. 20, 2022), available at https://www.dallasnews.com/news/education/2022/12/20/feds-open-civil-rights-investigation-into-granbury-schools-after-lgbtq-book-removals/ (accessed October 20, 2023).

[4] *See* Granbury Indep. Sch. Dist. Compl. at 5–6, available at https://www.aclutx.org/sites/default/files/aclutx_granbury_isd_title_ix_complaint.pdf (accessed October 20, 2023).

enforcement to pressure Texas to change its laws and policies. Similar complaints have already been filed against other Texas school districts. [5]

The Notice, Letter, and Fact Sheet have led to threats of enforcement.[6] In one instance, on December 6, 2022, the Department's Office for Civil Rights opened an investigation into whether Granbury Independent School District had created a hostile environment for students based on "gender identity"[7] after the American Civil Liberties Union of Texas filed a complaint that relied on the Notice, Letter, and Fact Sheet as the basis for its allegations of discrimination.[8] This shows that private entities are weaponizing the Notice, Letter, and Fact Sheet to provoke Defendants to use their powers of investigation and enforcement to pressure Texas to change its laws and policies.[9]

---

[5]  *See* Frisco Indep. Sch. Dist. Compl. at 4, available at https://www.aclutx.org/sites/default/files/ocr_complaint_letter_for_frisco_isd.pdf (accessed October 20, 2023); Keller Indep. Sch. Dist. Compl. at 6, available at https://www.aclutx.org/sites/default/files/keller_isd_ocr_complaint.pdf (accessed October 20, 2023).

[6]  *See, e.g.*, Meghan Mangrum, *Southlake schools now face 8 investigations into alleged retaliation, discrimination*, The Dallas Morning News (Feb. 9, 2023), available at https://www.dallasnews.com/news/education/2023/02/09/southlake-schools-now-face-8-investigations-into-alleged-retaliation-discrimination/ (accessed October 20, 2023).

[7]  Talia Richman, *Feds open civil rights investigation into Granbury schools after LGBTQ book removals*, The Dallas Morning News (Dec. 20, 2022), available at https://www.dallasnews.com/news/education/2022/12/20/feds-open-civil-rights-investigation-into-granbury-schools-after-lgbtq-book-removals/ (accessed October 20, 2023).

[8]  *See* Granbury Indep. Sch. Dist. Compl. at 5–6, available at https://www.aclutx.org/sites/default/files/aclutx_granbury_isd_title_ix_complaint.pdf (accessed October 20, 2023).

[9]  *See* Frisco Indep. Sch. Dist. Compl. at 4, available at https://www.aclutx.org/sites/default/files/ocr_complaint_letter_for_frisco_isd.pdf (accessed October 20, 2023); Keller Indep. Sch. Dist. Compl. at 6, available at https://www.aclutx.org/sites/default/files/keller_isd_ocr_complaint.pdf (accessed October 20, 2023).

Apart from monetary penalties, the expense and trouble of complying with more expansive rules is a cognizable injury in itself. "An increased regulatory burden typically satisfies the injury in fact requirement." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015). The Department has widened the scope of Title IX to protect a larger range of behavior. Observing an expanded anti-discrimination mandate is more onerous than following a narrower version. Texas schools and educators will need to take new precautions to ensure they implement the federal government's new understanding of sex. Defendants cannot deny that compliance will require efforts around appropriate "education environment" that Texas educators would not need to take absent the Department's new policy, when their Letter emphasizes the need for them. Appx.008.

### E. Texas's injuries are traceable to the Department's guidance.

Texas's injuries are caused by DOE's new guidance, not Title IX. As argued below, "on the basis of sex" is best read to not include sexual orientation or gender identity, and the Department is wrong to think that *Bostock* either requires or permits its new interpretation. Because it is the challenged agency actions rather than Title IX that prohibit discrimination based on sexual orientation or gender identity, the harms are traceable to those actions.

### F. Texas's injuries are redressable by this Court.

This Court can remedy the harm the Department's unlawful Title IX guidance has caused to Texas by declaring the guidance unlawful, setting it aside and enjoining Defendants from conducting enforcement actions based on the guidance. Redressability is satisfied as long as it is "likely" and not merely "speculative" that a favorable judicial decision will redress alleged injuries. *Lujan*, 504 U.S. at 561. The only source of Texas's harms is the Department's new

guidance; accordingly, this Court can redress Texas's injuries by voiding the agency actions through vacatur by negating its applicability via injunction, and by declaring that Title IX's prohibition on sex discrimination does not include sexual orientation or gender identity.

**III.    This Court should enjoin the Notice, Letter, and Fact Sheet because Texas has established every element for a permanent injunction.**

A permanent injunction is proper when a plaintiff has prevailed on the merits, there is no adequate remedy at law for the plaintiff's injury, the balance of the harms favors the plaintiff, and an injunction would serve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Texas has satisfied each of these elements.

**A.  Texas succeeds on the merits.**

**1.  The Notice, Letter, and Fact Sheet are not in accordance with law because they are inconsistent with Title IX.**

The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory … authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Here, neither Title IX nor its implementing regulations provide a basis for the Department and DOJ to define discrimination on the basis of sex in the manner described in the Notice, Letter, and Fact Sheet. *See* 20 U.S.C. § 1686; *see also* 34 C.F.R. § 106.33. Therefore, the guidance documents conflict with Title IX and its implementing regulations and are substantively unlawful under the APA because they exceed Defendants' statutory and regulatory authority. *See* 5 U.S.C. § 706(2)(A), (C).

Defendants' guidance documents are inconsistent with the text of Title IX. That statute provides that recipients of federal funding for education programs or activities shall not discriminate "on the basis of sex." 20 U.S.C. § 1681(a). Title IX also explicitly authorizes

19

separation based on sex in certain situations, including "maintaining separate living facilities for the different sexes, "20 U.S.C. § 1686, and specified single-sex educational institutions, organizations, activities, and scholarship awards, 20 U.S.C. § 1681(a).

The Department's own implementing regulations further emphasize that Title IX permits recipients of federal education funding to separate based on sex in certain circumstances. The regulations confirm that covered educational programs may offer "separate toilet, locker room and shower facilities on the basis of sex" provided that "facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. Furthermore, the regulations mandate that recipients must take sex into consideration when apportioning funding for athletic scholarships, 34 C.F.R. § 106.37(c), and permit recipients to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport," 34 C.F.R. § 106.41(b). These regulations acknowledge the inherent physical differences between men and women, while preventing recipients from "creat[ing] or perpetuat[ing] the legal, social, and economic inferiority of women" or for placing "artificial constraints on an individual's opportunity." *United States v. Virginia*, 518 U.S. 515, 533–34 (1996).

What does "sex" mean in Title IX? Nothing in the plain language of the statute defines or allows Defendants to interpret "sex" as meaning "gender identity" or "sexual orientation." Instead, "sex" means only "biological sex." "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). Therefore, this Court should look to the ordinary meaning of the word "sex" when Congress enacted Title IX in 1972. *Wisconsin*

*Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018). One way of discerning the ordinary, contemporary meaning of a word is by examining sources such as reliable dictionaries published around the time of the statute's enactment. *See, e.g.*, *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566-67 (2012). "[W]hen Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, *i.e.*, discrimination between males and females." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (en banc).

Myriad reputable and contemporary dictionaries affirm the conclusion that "sex" in Title IX refers only to "biological sex." For example, the 1961 edition of the Oxford English Dictionary defined "sex" as "[t]he sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these." *Neese v. Becerra*, 640 F. Supp. 3d 668, 678 n.6 (N.D. Tex. 2022). The 1969 edition of Webster's Seventh New Collegiate Dictionary defined "sex" as "either of two divisions of organisms distinguished respectively as male or female," "female" as "an individual that bears young or produces eggs as distinguished from one that begets young," and "male" as "of, relating to, or being the sex that begets young by performing the fertilizing function." *Adams*, 57 F.4th at 812. The 1971 edition of Webster's Third New International Dictionary defined "sex" as "[t]he sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change[.]" *Neese*, 640 F. Supp. 3d at 678 n.6.

The 1972 edition of Webster's New World Dictionary defined "sex" as "either of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their

reproductive functions." *Adams*, 57 F.4th at 812. The 1976 edition of the American Heritage Dictionary of the English Language defined "sex" as "[t]he property or quality by which organisms are classified according to their reproductive functions." *Id*. The 1978 edition of the Oxford English dictionary defined sex as "[e]ither of the two divisions of organic beings distinguished as male and female respectively," female as "[b]elonging to the sex which bears offspring," and "male" as "[o]f or belonging to the sex which begets offspring, or performs the fecundating function of generation[.]" *Id*.

The 1979 edition of the American Heritage Dictionary of the English Language contained an identical definition of "sex." *Id*. The 1980 edition of the Random House College Dictionary defined "sex" as "either the male or female division of a species, esp[ecially] as differentiated with reference to the reproductive functions." *Id*. Furthermore, until its change in position when issuing the challenged guidance documents, the Department continuously interpreted the word "sex" in Title IX to mean only biological sex – not sexual orientation, and not gender identity. *See, e.g.*, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026-01, 30,178 ("Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current regulations ... reflect this presupposition.").

The presupposition that "sex" in Title IX refers only to biological sex is further buttressed by the statutory and historical context. *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004) (citing 117 Cong. Rec. 30,407 (1971) (statement of Senator Bayh that proposed Title IX would not require co-ed football teams or locker rooms) and 118 Cong. Rec. 5,807 (1972) (statement of Senator Bayh that Title IX would maintain personal

privacy in athletic facilities)). *See* 20 U.S.C. § 1681(a)(2) (noting that an educational institution may amend its admissions policies from admitting "only students of one sex to being an institution which admits students of both sexes"); 20 U.S.C. § 1681(a)(6)(B) (describing organizations "the membership of which has been traditionally limited to persons of one sex"); 85 Fed. Reg. at 30,178 ("In promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes.").

Title IX's endorsement of separation based on biological sex addresses personal privacy concerns. *See Grove City Coll. v. Bell*, 465 U.S. 555, 567 (1984) (noting that "where they are consistent with the plain language of Title IX," Senator Bayh's remarks are authoritative when construing Title IX) (internal quotations omitted)). The provisions of Title IX and its implementing regulations that anticipate separation based on biological sex sought to alleviate those concerns and permit facilities historically separated by sex to continue those practices in situations in which physical differences between the two sexes are material. *See* 34 C.F.R. § 106.34(a)(1) (permitting "separation of students by sex within physical education classes or activities during participation in … sports the purpose or major activity of which involves bodily contact"); 34 C.F.R. § 106.34(a)(3) (providing that "classes in elementary and secondary schools that deal primarily with human sexuality may be conducted in separate sessions for boys and girls"); 34 C.F.R. § 106.41(b) (allowing recipients to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport").

In the Transgender Mandate, Defendants try to justify their unreasonable position by pointing to *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020). But *Bostock* cannot salvage their construction of Title IX for at least three reasons.

First, the holding in *Bostock* applied only to Title VII—not Title IX. The Supreme Court emphasized that "other federal or state laws that prohibit sex discrimination" were not before it, the Court had "not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today…The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual because of such individual's sex" under Title VII. *Id.* at 1753 (internal quotations omitted). *Bostock* held only that an "employer who fires an individual merely for being gay or transgender defies the law." *Id.* at 1754; *see Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("[T]he rule in *Bostock* extends no further than Title VII."); *id.* ("*Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself."); *Adams*, 57 F.4th at 808 (holding that *Bostock's* reasoning applies only to Title VII, and describing the argument that it applies to Title IX as "faulty").

Second, the reasoning in *Bostock* does not apply to Title IX. Defendants conflate Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a), with Title VII's prohibition on discrimination "because of … sex," 42 U.S.C. § 2000e-2(a)(1). But the *Bostock* court ruled that the phrase "because of" in Title VII mandated a sweeping but-for causation requirement. *Bostock*, 140 S. Ct. at 1739. That standard leads to the conclusion that "[w]hen an employer fires an employee because she is homosexual or transgender two causal factors may be in

play—*both* the individual's sex *and* something else (the sex to which the individual is attracted to or with which the individual identifies)." *Id.* at 1742.

On the other hand, Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). "On the basis of sex" does not mean "on the basis of gender identity" or "on the basis of sexual orientation." For the reasons discussed above, "sex" means "biological sex."

Third, even if there were ambiguity on whether Title IX adopts DOE's definition of "sex," that ambiguity to be resolved in favor of the State since conditions on federal funding must be stated clearly. *Adams*, 57 F.4th at 815. Title IX does not give adequate notice to recipients of federal funding that they could be liable for the conduct described in the challenged guidance documents. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). Congress enacted Title IX pursuant to its powers under the Spending Clause. *Adams*, 57 F. 4th at 815; U.S. Const. art. I, § 8, cl. 1; *Davis*, 526 U.S. at 640 ("[W]e have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause[.]"). If Congress intends to impose a condition on the grant of federal funding under Title IX, it must do so unambiguously. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *Adams*, 57 F.4th at 815. "Recipients cannot knowingly accept the deal with the Federal Government unless they would clearly understand the obligations that would come along with doing so." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219 (2022) (internal quotations omitted).

This clear statement rule is required when imposing a condition on federal funding because "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Adams*, 57 F.4th at 815 (citing *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981). The use of

the word "sex" in Title IX does not put educational institutions and programs on notice that by accepting funding from the federal government for educational services and activities, they are prohibited from providing separate athletic teams or bathrooms for the two sexes. *See Adams,* 57 F.4th at 816. Texas's interpretation of "sex" as meaning "biological sex" "would only violate Title IX if the meaning of 'sex' unambiguously meant something other than biological sex," thereby providing notice to Texas "that its understanding of the word 'sex' was incorrect." *Adams*, 57 F.4th at 816.  It does not.  *Id.*  That is clear not only from historical practice but from Defendants' longstanding interpretation of Title IX and its implementing regulations, which "include provisions that presuppose sex as a binary classification."  85 Fed. Reg. at 30,178.

Defendants have no authority to override Congress's legislative judgment that Title IX prohibits discrimination in certain circumstances based only upon biological sex. The Transgender Mandate's attempt to do so conflicts with Title IX and the Department's own implementing regulations. This Court should therefore grant summary judgment to Texas on Count I of its Complaint.

> ### 2.  The Notice, Letter, and Fact Sheet are substantive rules that are invalid because they were adopted without conducting the notice-and-comment rulemaking required by the APA.

The Department and DOJ were required to go through notice-and-comment rulemaking to issue the challenged notice, letter and fact sheet. *See* 5 U.S.C. § 553(b), (c). They did not, and therefore each of the three challenged documents should be "held unlawful and set aside" as issued "without observance of procedure required by law[.]" *Id.* § 706(s)(D).

The APA requires federal agencies to follow a three-step notice and comment process when formulating, amending, or repealing an administrative rule. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95-96 (2015); 5 U.S.C. § 553, 551(5). The agency rules that must undergo this formal

rulemaking process include "statements of general or particular applicability and future effect that are designed to implement, interpret, or prescribe law or policy." *Perez*, 575 U.S. at 95–96 (citing 5 U.S.C. § 551(4)). Although the APA exempts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" from notice and comment procedures, 5 U.S.C. § 553(b)(A), those exceptions "must be narrowly construed." *DAPA*, 809 F.3d at 171.

A narrow reading of those exceptions "protects the vital interests notice and comment is intended to protect." *Texas v. United States*, 524 F. Supp. 3d 598, 657 (S.D. Tex. 2021). "[N]otice and comment ensures those affected by a proposed rule have a voice in the rule-making process and assists the agency in crafting rules that better account for the costs and benefits of agency action." *Id.*; *see also U.S. Dep't of Lab. v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984) ("Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated.") (internal quotations omitted).

"Agencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019). "On the contrary, courts have long looked to the contents of the agency's action, not the agency's self-serving label, when deciding whether statutory notice and comment demands apply." *Id.* Courts must be "mindful but suspicious of the agency's own characterization," and "focus[] primarily on whether the rule had binding effect on agency discretion or severely restricts it." *DAPA*, 809 F.3d at 171. Hence, courts determine whether an agency's pronouncement is an interpretative rule or a substantive rule by analyzing "whether the rule (1) imposes any rights and obligations and (2)

27

genuinely leaves the agency and its decision-makers free to exercise discretion." *Id.* (cleaned up). "These factors are not treated like different elements of a cause of action, both of which must be proved; but instead a matter of judgment is involved in distinguishing between rules however discretionary in form, that effectively circumscribe administrative choice." *Texas v. United States*, 328 F. Supp. 3d 662, 731 (S.D. Tex. 2018) (internal quotations omitted). "An agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding. *Id.* (cleaned up). Additionally, an agency rule is substantive and notice and comment rulemaking is required if it "adopt[s] a new position inconsistent with any of the [agency's] existing regulations." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 88 (1995).

In this case, the Notice, Letter, and Fact Sheet are subject to notice and comment rulemaking because they are substantive or legislative rules. *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001) (equating "legislative rules" and "substantive rules"). They impose sweeping new obligations on recipients of federal education funding to refrain from discrimination based on gender identity or sexual orientation, and do not leave the Department, DOJ, and their decisionmakers free to exercise discretion regarding the scope of Title IX's prohibition on discrimination on the basis of sex. *DAPA*, 809 F.3d at 171. The challenged documents are substantive because they impose more than "derivative, incidental, or mechanical burdens" on Texas and because they "change[] the substantive standards by which" Defendants enforce Title IX and its implementing regulations, *DAPA*, 809 F.3d at 176—standards that can only be set by Congress. *See West Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2608 (2022). Indeed, the guidance documents directly affect billions of dollars in funding for educational programs.

Appx. 038–39. The obligation not to discriminate on the basis of sexual orientation or gender identity is nowhere within the text of Title IX. *See* 20 U.S.C. § 1686. Furthermore, the challenged guidance documents directly conflict with Department regulations explicitly permitting recipients of Title IX funding to maintain separate living facilities, bathrooms, locker rooms, shower facilities, and sports teams in accordance with biological sex. *See* 34 C.F.R. §§ 106.33, 106.41(b).

The APA obligated Defendants to provide Texas with notice and an opportunity to comment on the challenged guidance documents because they are legislative rules. The guidance documents impose far-reaching new obligations on every educational institution throughout the nation that receives Title IX funds. Defendants' failure to follow the proper procedure under the APA entitles Texas to a grant of summary judgment on Count II of its Complaint. *See Tennessee v. United States Dep't of Educ.*, 615 F. Supp. 3d 807, 838 (E.D. Tenn. 2022) (finding the same challenged guidance documents to be "legislative rules that create new rights and obligations" and granting preliminary injunctive relief invalidating the guidance for failure to comply with the APA's notice and comment procedures).

### A. Texas is suffering irreparable harm.

Texas is suffering significant irreparable harm from the Transgender Mandate. In certain cases, a "'substantial financial injury' may be 'sufficient to show irreparable injury.'" *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1143 (5th Cir. 2021) (quoting *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)). But generally, it is "well established that an injury is irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984)).

Here, Texas suffers both substantial financial injuries and injuries that cannot be undone through monetary means. As discussed above, an injury to Texas's sovereign interests is irreparable. What's more, Texas and its school districts are threatened with losing billions of dollars in federal funding for noncompliance with this unlawful mandate. Moreover, because the federal government "generally enjoy[s] sovereign immunity for any monetary damages," *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142, Texas cannot compel the federal government to reimburse it. The implementation of the Transgender Mandate strips Texas of its sovereign interest ability to create and enforce its own laws, and it pushes Texas schools to their proverbial knees by forcing them to choose between (1) complying with state law and risk losing federal funding or (2) violating state law. No amount of money can restore that injury. Accordingly, the many injuries to Texas's financial and sovereign interests are irreparable and should be protected with an injunction from this Court.

**B.  The balance of the equities and public interest favor Texas.**

When the government is a party, the balance-of-equities and public-interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2016). The Court must weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997).

## IV.    This Court should also award declaratory and vacation relief.

### A. Declaratory relief is proper.

"The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. The APA expressly contemplates declaratory relief: "The form of proceeding for judicial review … includ[es] actions for declaratory judgments or writs of prohibitory or mandatory injunction[.]" 5 U.S.C. § 703. Texas has established that the Transgender Mandate violates the APA, and it is entitled to a declaration delineating the rights and legal relations among themselves and the Defendants. The Court should thus declare that the Notice, Letter, and Fact Sheet are unlawful, and that the prohibition on sex discrimination in Title IX does not include sexual orientation or gender identity.

### B. The Court should vacate the challenged agency actions.

In general, the propriety of vacatur is based on two factors: "(1) the seriousness of the deficiencies of the action, that is, how likely the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur." *Texas v. United States* (*DACA*), 50 F.4th 498, 529 (5th Cir. 2022) (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)).

Vacatur is necessary because "remand without vacatur creates a risk that an agency may drag its feet and keep in place an unlawful agency rule. *EME Homer City Generation, L.P. v. E.P.A.*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.). Remanding without vacatur would "invite[] agency indifference." *In re Core Comm'n, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) (urging courts "to consider the alternatives to the open-ended remand without vacatur"); *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1262–64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the

effectiveness of the court's decision and agencies naturally treat it as such."). And "[b]ecause vacatur is the default remedy ... defendants bear the burden to prove that vacatur is unnecessary." *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:23-CV-59-JDK, 2023 WL 4977746, at *13–14 (E.D. Tex. Aug. 3, 2023) (Kernodle, J.) (citation omitted).

Here, the Transgender Mandate suffers from severe deficiencies that cannot be justified on remand, and no disruptive consequences will result from vacatur.

### 1. The federal government cannot justify the severe deficiencies of the Notice, Letter, and Fact Sheet on remand.

Regarding the first factor of vacatur, the federal government will not be able to justify its decision to create law that Congress did not pass and that the Supreme Court did not allow. Broadly speaking, remand to an agency "is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) (citing *Central and South West Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000)).

Under the first factor, remand without vacatur is proper only where the agency failed "adequately to explain why it chose one approach rather than another for one aspect of an otherwise permissible rule." *Texas Med. Ass'n*, 2023 WL 4977746, at *13–14 (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009)). And for violation of the notice-and-comment requirements, a total "[f]ailure to provide the required notice and to invite public comment[,] is a fundamental flaw that normally requires vacatur of the rule." *Wheeler*, 955 F.3d at 85; *see also Daimler Trucks N. Am. LLC v. E.P.A.*, 737 F.3d 95, 103 (D.C. Cir. 2013) (noting that "the court typically vacates rules when an agency 'entirely fail[s]' to provide notice and comment"); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C.

Cir. 2021) ("[A]n agency that bypassed required notice and comment rulemaking obviously could not ordinarily keep in place a regulation while it completed that fundamental procedural prerequisite.").

And because the challenged agency actions here are contrary to law, the Department will not be able to substantiate its decision on remand because there is no possibility that it could correct the fundamental errors. When the Fifth Circuit considered the first factor in the propriety of vacatur framework in the DACA case, it concluded that there was "no possibility that DHS could obviate the[] conflicts on remand" because DACA had "severe" deficiencies and "fundamental substantive defects" that "contradict[ed] significant portions of the INA." *DACA*, 50 F.4th at 529. The same holds here.

### 2. Vacatur will not cause disruptive consequences.

As to the second factor—disruptiveness—Defendants may not rely on the "uncertainty that typically attends vacatur of any rule." *Nat. Res. Def. Council*, 955 F.3d at 85 (rejecting agency's disruption argument). And "the threat of disruptive consequences cannot save a rule when its fundamental flaws 'foreclose [the agency] from promulgating the same standards on remand.'" *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (quoting *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261–62 (D.C. Cir. 2007)). No amount of asserted disruptiveness can save the agency actions here from being vacated.

## Conclusion

The Court should grant Plaintiff the State of Texas summary judgment on all its claims, vacate the challenged agency actions, permanently enjoin their implementation, declare them unlawful, and declare that the prohibition on sex discrimination in Title IX does not include sexual orientation or gender identity.

Dated October 21, 2023.

Respectfully submitted.

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

*/s/ Ryan D. Walters*

RYAN D. WALTERS
*Attorney-in-Charge*
Chief, Special Litigation Division
Texas Bar No. 24105085

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

AMY S. HILTON
Special Counsel
Texas Bar No. 24097834

ETHAN SZUMANSKI
Special Counsel
Texas Bar No. 24123966

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
ryan.walters@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
amy.hilton@oag.texas.gov
ethan.szumanski@oag.texas.gov

**Counsel for the State of Texas**

## CERTIFICATE OF SERVICE

I certify that on October 20, 2023, this document was filed through the Court's CM/ECF system, which served it upon all counsel of record.

*/s/ Ryan D. Walters*

RYAN D. WALTERS