UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

STATE OF TEXAS,

    *Plaintiff,*

v.                        No. 4:23-cv-00604-O

MIGUEL CARDONA, in his official capacity as
Secretary of Education, *et al.,*

    *Defendants.*

## APPENDIX TO TEXAS'S MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| A | June 22 Notice [ECF 1-1] | Appx. 2-5 |
| B | June 23 Letter [ECF 1-2] | Appx. 7-9 |
| C | U.S. Department of Justice Civil Rights Division – Fact Sheet | Appx. 11-12 |
| D | Carroll ISD -Facility Standards: Use of Restrooms and Locker Rooms | Appx. 14 |
| E | Carroll ISD – Identifications of Students (Pronouns) | Appx. 16 |
| F | Frisco ISD – Facility Standards: Use of Bathrooms and Changing Facilities | Appx. 18 |
| G | Granbury ISD - Library Materials | Appx. 20-24 |
| H | Grapevine-Colleyville ISD - Buildings, Grounds, and Equipment Management Security: Use of Bathrooms and Changing Facilities | Appx. 26 |
| I | Grapevine-Colleyville ISD – Misc. Instructional Policies Teaching About Controversial Issues: Pronouns Gender Discussion | Appx. 28-33 |
| J | Keller ISD – Instructional Resources, Library Materials: Gender Fluidity | Appx. 35-36 |
| K | Declaration of Michael Meyer | Appx. 38-39 |

Dated October 20, 2023.

Respectfully submitted.

KEN PAXTON
Attorney General

RYAN D. WALTERS
Chief, Special Litigation Division
Texas Bar No. 24105085

BRENT WEBSTER
First Assistant Attorney General

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

ETHAN SZUMANSKI
Assistant Attorney General
Texas Bar No. 24123966

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
ryan.walters@oag.texas.gov
munera.al-fuhaid@oag.texas.gov

**Counsel for the State of Texas**

## CERTIFICATE OF SERVICE

I certify a true and accurate copy of the foregoing document was filed electronically via the Court's CM/ECF system, which automatically serves all counsel of record who are registered to receive notices in this case.

/s/ Ryan D. Walters
RYAN D. WALTERS

Tab A

requirements, Security measures, Waterways.

For the reasons discussed in the preamble, the Coast Guard amends 33 CFR part 165 as follows:

## PART 165—REGULATED NAVIGATION AREAS AND LIMITED ACCESS AREAS

■ 1. The authority citation for part 165 continues to read as follows:

**Authority:** 46 U.S.C. 70034, 70051; 33 CFR 1.05–1, 6.04–1, 6.04–6, and 160.5; Department of Homeland Security Delegation No. 0170.1.

■ 2. Add § 165.T11–057 to read as follows:

### § 165.T11–057 Safety Zone; Southwest Shelter Island Channel Entrance Closure, San Diego, CA.

(a) *Location.* The following area is a safety zone: The Northeast Shelter Island Channel Entrance and all navigable waters of San Diego Bay encompassed by by a three hundred yard circle centered on the coordinate 32°43′13.7″ N, longitude 117°13′7.8″ W.

(b) *Definitions.* As used in this section, *designated representative* means a Coast Guard Patrol Commander, including a Coast Guard coxswain, petty officer, or other officer operating a Coast Guard vessel and a Federal, State, and local officer designated by or assisting the Captain of the Port Sector San Diego (COTP) in the enforcement of the safety zone.

(c) *Regulations.* (1) Under the general safety zone regulations in subpart C of this part, you may not enter the safety zone described in paragraph (a) of this section unless authorized by the COTP or the COTP's designated representative.

(2) To seek permission to enter, contact the COTP or the COTP's representative by VHF Channel 16. Those in the safety zone must comply with all lawful orders or directions given to them by the COTP or the COTP's designated representative.

(d) *Enforcement period.* This section will be enforced from 8:30 a.m. until 10:30 a.m. on June 22, 2021.

Dated: June 16, 2021.

**T.J. Barelli,**

*Captain, U.S. Coast Guard, Captain of the Port Sector San Diego.*

[FR Doc. 2021–13136 Filed 6–21–21; 8:45 am]

**BILLING CODE 9110–04–P**

## DEPARTMENT OF EDUCATION

### 34 CFR Chapter I

### Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County

**AGENCY:** Office for Civil Rights, Department of Education.

**ACTION:** Interpretation.

**SUMMARY:** The U.S. Department of Education (Department) issues this interpretation to clarify the Department's enforcement authority over discrimination based on sexual orientation and discrimination based on gender identity under Title IX of the Education Amendments of 1972 in light of the Supreme Court's decision in *Bostock* v. *Clayton County.* This interpretation will guide the Department in processing complaints and conducting investigations, but it does not itself determine the outcome in any particular case or set of facts.

**DATES:** This interpretation is effective June 22, 2021.

**FOR FURTHER INFORMATION CONTACT:** Alejandro Reyes, Director, Program Legal Group, Office for Civil Rights. Telephone: (202) 245–7272. Email: *Alejandro.Reyes@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll-free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

*Background:* Title IX of the Education Amendments of 1972, 20 U.S.C. 1681–1688, prohibits discrimination on the basis of sex in any education program or activity offered by a recipient of Federal financial assistance. The Department's Office for Civil Rights (OCR) is responsible for the Department's enforcement of Title IX.

OCR has long recognized that Title IX protects all students, including students who are lesbian, gay, bisexual, and transgender, from harassment and other forms of sex discrimination. OCR also has long recognized that Title IX prohibits harassment and other forms of discrimination against all students for not conforming to stereotypical notions of masculinity and femininity. But OCR at times has stated that Title IX's prohibition on sex discrimination does not encompass discrimination based on sexual orientation and gender identity. To provide clarity, the Department issues this Interpretation addressing Title IX's coverage of discrimination based on sexual orientation and gender identity

in light of the Supreme Court decision discussed below.

In 2020, the Supreme Court in *Bostock* v. *Clayton County,* 140 S. Ct. 1731, 590 U.S. ____ (2020), concluded that discrimination based on sexual orientation and discrimination based on gender identity inherently involve treating individuals differently because of their sex. It reached this conclusion in the context of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.,* which prohibits sex discrimination in employment. As noted below, courts rely on interpretations of Title VII to inform interpretations of Title IX.

The Department issues this Interpretation to make clear that the Department interprets Title IX's prohibition on sex discrimination to encompass discrimination based on sexual orientation and gender identity and to provide the reasons for this interpretation, as set out below.

*Interpretation:*

Title IX Prohibits Discrimination Based on Sexual Orientation and Gender Identity.

Consistent with the Supreme Court's ruling and analysis in *Bostock,* the Department interprets Title IX's prohibition on discrimination "on the basis of sex" to encompass discrimination on the basis of sexual orientation and gender identity. As was the case for the Court's Title VII analysis in *Bostock,* this interpretation flows from the statute's "plain terms." *See Bostock,* 140 S. Ct. at 1743, 1748–50. Addressing discrimination based on sexual orientation and gender identity thus fits squarely within OCR's responsibility to enforce Title IX's prohibition on sex discrimination.

### I. The Supreme Court's Ruling in Bostock

The Supreme Court in *Bostock* held that sex discrimination, as prohibited by Title VII, encompasses discrimination based on sexual orientation and gender identity. The Court explained that to discriminate on the basis of sexual orientation or gender identity "requires an employer to intentionally treat individual employees differently because of their sex." 140 S. Ct. at 1742.[1] As the Court also explained,

---

[1] The Court recognized that the parties in *Bostock* each presented a definition of "sex" dating back to Title VII's enactment, with the employers' definition referring to "reproductive biology" and the employees' definition "capturing more than anatomy[.]" 140 S. Ct. at 1739. The Court did not adopt a definition, instead "assum[ing]" the definition of sex provided by the employers that the employees had accepted "for argument's sake." *Id.* As the Court made clear, it did not need to adopt
Continued

when an employer discriminates against a person for being gay or transgender, the employer necessarily discriminates against that person for "traits or actions it would not have questioned in members of a different sex." *Id.* at 1737.

The Court provided numerous examples to illustrate why "it is impossible to discriminate against a person" because of their sexual orientation or gender identity "without discriminating against that individual based on sex." *Id.* at 1741. In one example, when addressing discrimination based on sexual orientation, the Court stated:

> Consider, for example, an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge.

*Id.*

In another example, the Court showed why singling out a transgender employee for different treatment from a non-transgender (*i.e.,* cisgender) employee is discrimination based on sex:

> [T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

*Id.* at 1741–42.

## II. Bostock's Application to Title IX

For the reasons set out below, the Department has determined that the interpretation of sex discrimination set out by the Supreme Court in *Bostock*— that discrimination "because of . . . sex" encompasses discrimination based on sexual orientation and gender identity—properly guides the

Department's interpretation of discrimination "on the basis of sex" under Title IX and leads to the conclusion that Title IX prohibits discrimination based on sexual orientation and gender identity.

a. *There is textual similarity between Title VII and Title IX.*

Like Title VII, Title IX prohibits discrimination based on sex.

Title IX provides, with certain exceptions: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. 1681(a).

Title VII provides, with certain exceptions: "It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[ ] . . . .; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex[ ] . . . ." 42 U.S.C. 2000e–2(a). (Title VII also prohibits discrimination based on race, color, religion, and national origin.)

Both statutes prohibit sex discrimination, with Title IX using the phrase "on the basis of sex" and Title VII using the phrase "because of" sex. The Supreme Court has used these two phrases interchangeably. In *Bostock,* for example, the Court described Title VII in this way: "[I]n Title VII, Congress outlawed discrimination in the workplace *on the basis of* race, color, religion, sex, or national origin." 140 S. Ct. at 1737 (emphasis added); *id.* at 1742 ("[I]ntentional discrimination *based on sex* violates Title VII . . . ." (emphasis added)); *see also Jackson* v. *Birmingham Bd. of Educ.,* 544 U.S. 167, 174 (2005) ("[W]hen a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' '*on the basis of* sex,' in violation of Title IX." (second emphasis added)); *Meritor Sav. Bank* v. *Vinson,* 477 U.S. 57, 64 (1986) ("[W]hen a supervisor sexually harasses a subordinate *because of* the subordinate's sex, that supervisor 'discriminate[s]' *on the basis of sex.*" (emphasis added)).

In addition, both statutes specifically protect *individuals* against

discrimination. In *Bostock,* 140 S. Ct. at 1740–41, the Court observed that Title VII "tells us three times—including immediately after the words 'discriminate against'—that our focus should be on individuals." The Court made a similar observation about Title IX, which uses the term *person,* in *Cannon* v. *University of Chicago,* 441 U.S. 677, 704 (1979), stating that "Congress wanted to avoid the use of federal resources to support discriminatory practices [and] to provide *individual* citizens effective protection against those practices." *Id.* (emphasis added).

Further, the text of both statutes contains no exception for sex discrimination that is associated with an individual's sexual orientation or gender identity. As the Court stated in *Bostock,* "when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule." 140 S. Ct. at 1747. The Court has made a similar point regarding Title IX: "[I]f we are to give Title IX the scope that its origins dictate, we must accord it a sweep as broad as its language." *N. Haven Bd. of Ed.* v. *Bell,* 456 U.S. 512, 521 (1982) (citations and internal alterations omitted). It also bears noting that, in interpreting the scope of Title IX's prohibition on sex discrimination the Supreme Court and lower Federal courts have often relied on the Supreme Court's interpretations of Title VII. *See, e.g., Franklin* v. *Gwinnett Cnty. Pub. Sch.,* 503 U.S. 60, 75 (1992); *Jennings* v. *Univ. of N.C.,* 482 F.3d 686, 695 (4th Cir. 2007); *Frazier* v. *Fairhaven Sch. Comm.,* 276 F.3d 52, 66 (1st Cir. 2002); *Gossett* v. *Oklahoma ex rel. Bd. of Regents for Langston Univ.,* 245 F.3d 1172, 1176 (10th Cir. 2001).

Moreover, the Court in *Bostock* found that "no ambiguity exists about how Title VII's terms apply to the facts before [it]"—*i.e.,* allegations of discrimination in employment against several individuals based on sexual orientation or gender identity. 140 S. Ct. at 1749. After reviewing the text of Title IX and Federal courts' interpretation of Title IX, the Department has concluded that the same clarity exists for Title IX. That is, Title IX prohibits recipients of Federal financial assistance from discriminating based on sexual orientation and gender identity in their education programs and activities. The Department also has concluded for the reasons described in this document that, to the extent other interpretations may exist, this is the best interpretation of the statute.

In short, the Department finds no persuasive or well-founded basis for declining to apply *Bostock's* reasoning—discrimination "because of

---

either definition to conclude that discrimination "because of . . . sex" encompasses discrimination based on sexual orientation and gender identity. *Id.* ("[N]othing in our approach to these cases turns on the outcome of the parties' debate . . . ."). Similar to the Court's interpretation of Title VII, the Department's interpretation of the scope of discrimination "on the basis of sex" under Title IX does not require the Department to take a position on the definition of sex, nor do we do so here.

. . . sex'' under Title VII encompasses discrimination based on sexual orientation and gender identity—to Title IX's parallel prohibition on sex discrimination in federally funded education programs and activities.

*b. Additional case law recognizes that the reasoning of* Bostock *applies to Title IX and that differential treatment of students based on gender identity or sexual orientation may cause harm.*

Numerous Federal courts have relied on *Bostock* to recognize that Title IX's prohibition on sex discrimination encompasses discrimination based on sexual orientation and gender identity. *See, e.g., Grimm* v. *Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *reh'g en banc denied,* 976 F.3d 399 (4th Cir. 2020), *petition for cert filed,* No. 20–1163 (Feb. 24, 2021); *Adams* v. *Sch. Bd. of St. Johns Cnty.,* 968 F.3d 1286, 1305 (11th Cir. 2020), *petition for reh'g en banc pending,* No. 18–13592 (Aug. 28, 2020); *Koenke* v. *Saint Joseph's Univ.,* No. CV 19–4731, 2021 WL 75778, at *2 (E.D. Pa. Jan. 8, 2021); *Doe* v. *Univ. of Scranton,* No. 3:19–CV–01486, 2020 WL 5993766, at *11 n.61 (M.D. Pa. Oct. 9, 2020).

The Department also concludes that the interpretation set forth in this document is most consistent with the purpose of Title IX, which is to ensure equal opportunity and to protect individuals from the harms of sex discrimination. As numerous courts have recognized, a school's policy or actions that treat gay, lesbian, or transgender students differently from other students may cause harm. *See, e.g., Grimm,* 972 F.3d at 617–18 (describing injuries to a transgender boy's physical and emotional health as a result of denial of equal treatment); *Adams,* 968 F.3d at 1306–07 (describing ''emotional damage, stigmatization and shame'' experienced by a transgender boy as a result of being subjected to differential treatment); *Whitaker ex rel. Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034, 1044–46, 1049–50 (7th Cir. 2017) (describing physical and emotional harm to a transgender boy who was denied equal treatment); *Dodds* v. *U.S. Dep't of Educ.,* 845 F.3d 217, 221–22 (6th Cir. 2016) (describing ''substantial and immediate adverse effects on the daily life and well-being of an eleven-year-old'' transgender girl from denial of equal treatment); *Doe,* 2020 WL 5993766, at **1–3 (describing harassment and physical targeting of a gay college student that interfered with the student's educational opportunity); *Harrington ex rel. Harrington* v. *City of Attleboro,* No. 15–CV–12769–DJC, 2018

WL 475000, at **6–7 (D. Mass. Jan. 17, 2018) (describing '' 'wide-spread peer harassment' and physical assault [of a lesbian high school student] because of stereotyping animus focused on [the student's] sex, appearance, and perceived or actual sexual orientation'').

*c. The U.S. Department of Justice's Civil Rights Division has concluded that* Bostock*'s analysis applies to Title IX.*

The U.S. Department of Justice's Civil Rights Division issued a Memorandum from Principal Deputy Assistant Attorney General for Civil Rights Pamela S. Karlan to Federal Agency Civil Rights Directors and General Counsels regarding Application of *Bostock* v. *Clayton County* to Title IX of the Education Amendments of 1972 (Mar. 26, 2021), *https://www.justice.gov/ crt/page/file/1383026/download.*

The memorandum stated that, after careful consideration, including a review of case law, ''the Division has determined that the best reading of Title IX's prohibition on discrimination 'on the basis of sex' is that it includes discrimination on the basis of gender identity and sexual orientation.'' Indeed, ''the Division ultimately found nothing persuasive in the statutory text, legislative history, or caselaw to justify a departure from *Bostock*'s textual analysis and the Supreme Court's longstanding directive to interpret Title IX's text broadly.''

### III. Implementing This Interpretation

Consistent with the analysis above, OCR will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department. As with all other Title IX complaints that OCR receives, any complaint alleging discrimination based on sexual orientation or gender identity also must meet jurisdictional requirements as defined in Title IX and the Department's Title IX regulations, other applicable legal requirements, as well as the standards set forth in OCR's Case Processing Manual, *www.ed.gov/ ocr/docs/ocrcpm.pdf.*[2]

Where a complaint meets applicable requirements and standards as just described, OCR will open an investigation of allegations that an individual has been discriminated against because of their sexual orientation or gender identity in education programs or activities. This includes allegations of individuals being

harassed, disciplined in a discriminatory manner, excluded from, denied equal access to, or subjected to sex stereotyping in academic or extracurricular opportunities and other education programs or activities, denied the benefits of such programs or activities, or otherwise treated differently because of their sexual orientation or gender identity. OCR carefully reviews allegations from anyone who files a complaint, including students who identify as male, female or nonbinary; transgender or cisgender; intersex; lesbian, gay, bisexual, queer, heterosexual, or in other ways.

While this interpretation will guide the Department in processing complaints and conducting investigations, it does not determine the outcome in any particular case or set of facts. Where OCR's investigation reveals that one or more individuals has been discriminated against because of their sexual orientation or gender identity, the resolution of such a complaint will address the specific compliance concerns or violations identified in the course of the investigation.

This interpretation supersedes and replaces any prior inconsistent statements made by the Department regarding the scope of Title IX's jurisdiction over discrimination based on sexual orientation and gender identity. This interpretation does not reinstate any previously rescinded guidance documents.

*Accessible Format:* On request to the contact person listed under **FOR FURTHER INFORMATION CONTACT,** individuals with disabilities can obtain this document in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register.** You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register,** in text or Portable Document Format (PDF). To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit

---

[2] Educational institutions that are controlled by a religious organization are exempt from Title IX to the extent that compliance would not be consistent with the organization's religious tenets. *See* 20 U.S.C. 1681(a)(3).

your search to documents published by the Department.

**Suzanne B. Goldberg,**

*Acting Assistant Secretary for Civil Rights.*

[FR Doc. 2021–13058 Filed 6–21–21; 8:45 am]

**BILLING CODE 4000–01–P**

---

## DEPARTMENT OF COMMERCE

### Patent and Trademark Office

### 37 CFR Part 11

**[Docket No.: PTO–C–2013–0042]**

**RIN 0651–AC91**

### Changes to Representation of Others Before the United States Patent and Trademark Office; Correction

**AGENCY:** United States Patent and Trademark Office, Commerce.

**ACTION:** Final rule; correction.

**SUMMARY:** The United States Patent and Trademark Office (USPTO or Office) is correcting an earlier final rule, "Changes to the Representation of Others Before the United States Patent and Trademark Office," that appeared in the **Federal Register** on May 26, 2021 and which takes effect on June 25, 2021. This document corrects a minor error. No other changes are being made to the underlying final rule.

**DATES:** This rule is effective June 25, 2021.

**FOR FURTHER INFORMATION CONTACT:** William R. Covey, Deputy General Counsel for Enrollment and Discipline and Director of the Office of Enrollment and Discipline, at 571–272–4097.

**SUPPLEMENTARY INFORMATION:** This document corrects an error pertaining to revisions to definitions made in the final rule. Specifically, the Office intended to change the listed definition of "Roster" to "Roster or register." The Code of Federal Regulations editors informed the Office that the original **Federal Register** instruction to "revise" the definition was incorrect. Rather, the correct instruction should be to "remove and add" the intended definition. This document corrects that instruction.

In FR Doc. 2021–10528, appearing on page 28442 in the **Federal Register** of Wednesday, May 26, 2021, the following correction is made:

### § 11.1 [Corrected]

■ On page 28452, in the first column, in part 11, correct amendatory instruction 4 to read as follows:

■ 4. Amend § 11.1 by:

■ a. Revising the definitions of "Conviction or convicted" and "Practitioner;"

■ b. Removing the entry for "Roster" and adding, in alphabetical order, an entry for "Roster or register;" and

■ c. Revising the definitions for "Serious crime" and "State."

The revisions and addition read as follows:

**Andrew Hirshfeld,**

*Commissioner for Patents, Performing the Functions and Duties of the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

[FR Doc. 2021–13145 Filed 6–21–21; 8:45 am]

**BILLING CODE 3510–16–P**

---

## LIBRARY OF CONGRESS

### Copyright Office

### 37 CFR Parts 201, 202, 203, 210, and 370

**[Docket No. 2021–3]**

### Technical Amendments Regarding the Copyright Office's Organizational Structure

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Final rule.

**SUMMARY:** This final rule makes technical changes to the U.S. Copyright Office's regulations pertaining to its organizational structure in light of the agency's recent reorganization. It reflects recent structural changes, updates certain of the Office's division names, and adds a new section for the Copyright Claims Board established by the Copyright Alternative in Small-Claims Enforcement Act of 2020.

**DATES:** Effective July 22, 2021.

**FOR FURTHER INFORMATION CONTACT:** Regan A. Smith, General Counsel and Associate Register of Copyrights, by email at *regans@copyright.gov,* Kevin R. Amer, Deputy General Counsel, by email at *kamer@copyright.gov,* or Joanna R. Blatchly, Attorney-Advisor, by email at *jblatchly@copyright.gov* or by telephone at (202) 707–8350.

**SUPPLEMENTARY INFORMATION:** The Copyright Office is publishing this final rule pursuant to its May 2021 reorganization. This effort is intended to accomplish two goals: (1) Rename divisions and realign certain reporting structures to improve the Office's effectiveness and efficiency; and (2) reflect the agency structure for the new copyright small-claims tribunal established by the Copyright Alternative

in Small-Claims Enforcement ("CASE") Act of 2020.[1] The Register has determined that these changes will optimize business processes and aid in the administration of her functions and duties as Director of the Copyright Office.[2]

*Operational reorganization.* The reorganization reduces the number of direct reports to the Register of Copyrights and is expected to create administrative and cost efficiencies by consolidating operational organizations currently headed by senior-level positions. The reorganization brings the Office of the Chief Financial Officer (renamed the Financial Management Division) and the Copyright Modernization Office (renamed the Product Management Division) under the supervision of the Chief of Operations (renamed the Assistant Register and Director of Operations ("ARDO")). Realigning these divisions under the ARDO consolidates operational support elements under one senior manager, in line with operational structures across the Library of Congress. This consolidation is expected to facilitate Office coordination with centralized Library services, and with similar functional elements of other service units. It is also expected to allow the Office to increase the effectiveness of communications across areas of operational responsibility, in alignment with strategic objectives.

The reorganization renames certain organizational elements and senior positions for purposes of greater clarity and consistency. The Office of Public Records and Repositories is renamed the Office of Copyright Records. As noted above, the Office of the Chief of Operations is renamed the Office of the Director of Operations. The following subordinate offices are also renamed: The Copyright Acquisitions Division ("CAD") is renamed Acquisitions and Deposits ("A&D"); the Administrative Services Office ("ASO") is renamed the Administrative Services Division ("ASD"); and the Receipt Analysis and Control Division ("RAC") is renamed the Materials Control and Analysis Division ("MCA"). The Copyright Modernization Office ("CMO") is renamed the Product Management Division ("PMD").

Further, the Office of the Chief Financial Officer ("CFO") is renamed the Financial Management Division ("FMD") and work units under this division are also renamed, including by

---

[1] Public Law 116–260, sec. 212, 134 Stat. 1182, 2176 (2020).

[2] *See* 17 U.S.C. 701(a).

TAB B

Pursuant to a Federal court order, the Department has been preliminarily "enjoined and restrained from implementing" this document Case 3:24-cv-00060-DCLC-DCP Document 24-1-2 Filed 10/20/23 Page 2 of 41 PageID #: 486 the organizations in Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, Tennessee, South Carolina, South Dakota, and West Virginia. *See State of Tenn., et al. v. U.S. Dep't of Educ.*, No. 3:21-cv-308 (E.D. Tenn.) (July 15, 2022).

**Letter to Educators on Title IX's 49th Anniversary**
**Notice of Language Assistance**



**Notice of Language Assistance:** If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

**給英語能力有限人士的通知:** 如果您不懂英語，或者使用英语有困难，您可以要求獲得向大眾提供的語言協助服務，幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊，請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339), 或電郵: Ed.Language.Assistance@ed.gov。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức củaBộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

**영어 미숙자를 위한 공고:** 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800- USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는 이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkolsa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вампредоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877- 8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov.

Pursuant to a Federal court order, the Department has been preliminarily "enjoined and restrained from implementing" this document against the states of Alabama, Alaska, Arizona, Arkansas, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, Tennessee, South Carolina, South Dakota, and West Virginia. *See State of Tenn., et al. v. U.S. Dep't of Educ.*, No. 3:21-cv-308 (E.D. Tenn.) (July 15, 2022).



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

June 23, 2021

Dear Educator:

On this 49th anniversary of the passage of Title IX of the Education Amendments of 1972—our nation's most powerful legal tool for combating sex discrimination in education—I take this opportunity to highlight a selection of resources available for you to ensure that the education environment you provide is free from sex discrimination in all forms. Among these resources is our recent public notice clarifying Title IX's protection against discrimination based on sexual orientation and gender identity.

The U.S. Department of Education's Office for Civil Rights works to ensure that Title IX's mandate protects students in all aspects of their education, including recruitment, admissions, and counseling; financial assistance; athletics; protections from sex-based harassment, which encompasses sexual assault and other forms of sexual violence; treatment of pregnant and parenting students; discipline; equal access to classes and activities; and treatment of lesbian, gay, bisexual, transgender, queer and intersex (LGBTQI+) students.

I encourage you to review OCR's recent report, Education in a Pandemic: The Disparate Impacts of COVID-19 on America's Students, in which we address the disparities based on sex, including sexual orientation and gender identity, as well as race, disability, and other characteristics experienced by students both before and during the pandemic in K-12 and postsecondary settings. On this anniversary of Title IX, I recognize the particular vulnerability of LGBTQI+ students and the often overwhelming challenges these students face in education compared to their peers, including feeling less safe, experiencing poor mental health, facing a higher risk of suicide, being more likely to miss school, and facing a disproportionate risk of being homeless.

I also want to bring to your attention OCR's public notice based on the Supreme Court's recent decision in *Bostock v. Clayton County*, 140 S. Ct. 1731, 590 U.S. ___ (2020), which clarifies that Title IX's protection against sex discrimination encompasses discrimination based on sexual orientation and gender identity. Specifically, OCR clarifies that the Supreme Court's decision in *Bostock* applies to the Department's interpretation of Title IX. In its decision, the Supreme Court explained that "it is impossible to discriminate against a person" because of their sexual orientation or gender identity "without discriminating against that individual based on sex." *Id.* at 1741. That reasoning applies regardless of whether the individual is an adult in a workplace or a student in school.

Consistent with this notice, OCR will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department. For more information, please see our accompanying fact sheet in which OCR and the U.S. Department of Justice's Civil Rights Division provide examples of the kinds of incidents we can investigate.

OCR has also updated its website to provide the resources mentioned above and to provide additional information and resources for LGBTQI+ students.

On Title IX more generally, you might find it useful to review this Overview of the Law and these Answers to Frequently Asked Questions about Sex Discrimination.

We realize educators may have questions about the Department's 2020 amendments to the Title IX regulations, and we appreciate that so many of you shared your insights and experiences during our virtual public hearing on Title IX held on June 7-11, 2021. We are reviewing the comments we received and, as previously noted, anticipate issuing a notice of proposed rulemaking to amend the regulations. In addition, we plan to issue a question-and-answer document to provide additional clarity about how OCR interprets schools' existing obligations under the 2020 amendments, including the areas in which schools have discretion in their procedures for responding to reports of sexual harassment.

If you have questions or would like additional information or technical assistance, please visit us at www.ed.gov/ocr or contact OCR at 800-421-3481 (TDD: 800-877-8339) or at ocr@ed.gov.

We at OCR share with you the responsibility to ensure that all students have equal access to education, regardless of race, color, national origin, sex, disability, or age. Thank you for all that you do to support all of our nation's students and to ensure that they have the opportunity to learn and thrive in school.

Sincerely,

Suzanne B. Goldberg
Acting Assistant Secretary for Civil Rights

TAB C

**U.S. Department of Justice**
*Civil Rights Division*

**U.S. Department of Education**
*Office for Civil Rights*

Pursuant to a Federal court order, the Departments have been preliminarily "enjoined and restrained from implementing" this document against the states of Alabama, Alaska, Arizona, Arkansas, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, Tennessee, South Carolina, South Dakota, and West Virginia. *See State of Tenn., et al. v. U.S. Dep't of Educ.*, No. 3:21-cv-308 (E.D. Tenn.) (July 15, 2022).

June 2021

# Confronting Anti-LGBTQI+ Harassment in Schools
## A Resource for Students and Families

Many students face bullying, harassment, and discrimination based on sex stereotypes and assumptions about what it means to be a boy or a girl. Students who are lesbian, gay, bisexual, transgender, queer, intersex, nonbinary, or otherwise gender non-conforming may face harassment based on how they dress or act, or for simply being who they are. It is important to know that discrimination against students based on their sexual orientation or gender identity is a form of sex discrimination prohibited by federal law. It is also important that LGBTQI+ students feel safe and know what to do if they experience discrimination.

Public elementary and secondary schools, as well as public and private colleges and universities, have a responsibility to investigate and address sex discrimination, including sexual harassment, against students because of their perceived or actual sexual orientation or gender identity. When schools fail to respond appropriately, the Educational Opportunities Section of the Civil Rights Division (CRT) at the U.S. Department of Justice and the Office for Civil Rights (OCR) at the U.S. Department of Education can help by enforcing federal laws that protect students from discrimination. CRT and OCR can also provide information to assist schools in meeting their legal obligations.

## Examples of the kinds of incidents CRT and OCR can investigate:

A lesbian high school student wants to bring her girlfriend to a school social event where students can bring a date. Teachers refuse to sell her tickets, telling the student that bringing a girl as a date is "not appropriate for school." Teachers suggest that the student attend alone or bring a boy as a date.

When he starts middle school, a transgender boy introduces himself as Brayden and tells his classmates he uses he/him pronouns. Some of his former elementary school classmates "out" him to others, and every day during physical education class call him transphobic slurs, push him, and call him by his former name. When he reports it to the school's administrators, they dismiss it, saying: "you can't expect everyone to agree with your choices."

A community college student discloses he's gay during a seminar discussion. Leaving class, a group of students calls him a homophobic slur, and one bumps him into the wall. A professor witnesses this, but does nothing. Over the next month, the harassment worsens. The student goes to his dean after missing several lectures out of fear. The college interviews one, but not all, of the harassers, does nothing more, and never follows up with the student.

An elementary school student with intersex traits dresses in a gender neutral way, identifies as nonbinary, and uses they/them pronouns. The student's teacher laughs when other students ask if they are "a boy or a girl" and comments that there is "only one way to find out." The teacher tells the class that there are only boys and girls and anyone who thinks otherwise has something wrong with them. The student tells an administrator, who remarks "you have to be able to laugh at yourself sometimes."

On her way to the girls' restroom, a transgender high school girl is stopped by the principal who bars her entry. The principal tells the student to use the boys' restroom or nurse's office because her school records identify her as "male." Later, the student joins her friends to try out for the girls' cheerleading team and the coach turns her away from tryouts solely because she is transgender. When the student complains, the principal tells her "those are the district's policies."

U.S. Department of Justice
Civil Rights Division

U.S. Department of Education
Office for Civil Rights

# What if a Student Experiences Discrimination in School?

If you have been treated unfairly or believe a student has been treated unfairly—for example, treated differently, denied an educational opportunity, harassed, bullied, or retaliated against—because of sexual orientation or gender identity, there are a number of actions you can take:

**1**   **Notify a teacher or school leader** (for example, a principal or student affairs staff) immediately. If you don't get the help you need, file a formal complaint with the school, school district, college, or university. Keep records of your complaint(s) and responses you receive.

**2**   **Write down the details** about what happened, where and when the incident happened, who was involved, and the names of any witnesses. Do this for every incident of discrimination, and keep copies of any related documents or other information.

**3**   If you are not proficient in English, you have the right to **ask the school to translate or interpret information** into a language you understand. If you have communication needs because of a disability, you have the right to receive accommodations or aids and services that provide you with effective communication.

**4**   Counseling and other mental health support can sometimes be helpful for a student who has been harassed or bullied. **Consider seeking mental health resources** if needed.

**5**   **Consider filing a complaint** with the Civil Rights Division of the U.S. Department of Justice at **civilrights.justice.gov** (available in several different languages), or with the Office for Civil Rights at the U.S. Department of Education at **www.ed.gov/ocr/complaintintro.html** (to file a complaint in English) or **www.ed.gov/ocr/docs/howto.html** (to file a complaint in multiple languages).

*"All students should be able to learn in a safe environment, free from discrimination and harassment. The Civil Rights Division stands with LGBTQI+ students and will fight to protect their right to an education regardless of who they are or whom they love."*

**– Kristen Clarke, Assistant Attorney General for Civil Rights, Department of Justice**

*"The Department of Education strives to ensure that all students—including LGBTQI+ students—have access to supportive, inclusive school environments that allow them to learn and thrive in all aspects of their educational experience. Federal law prohibits discrimination based on sexual orientation and gender identity, and we are here to help schools, students, and families ensure that these protections are in full force."*

**– Suzanne B. Goldberg, Acting Assistant Secretary for Civil Rights, Department of Education**



Appx. 012

TAB D

Carroll ISD
220919

FACILITY STANDARDS                                                          CS
                                                                      (LOCAL)

**Use of Restrooms**          To the extent permitted by law, schools shall maintain separate re-
**and Locker Rooms**          strooms, locker rooms, and other similar facilities designated for
                              and used only by persons based on the person's biological sex. In-
                              dividuals shall be required to use the facility that corresponds to
                              their biological sex assigned at birth.

                              This policy does not prohibit the District from providing reasonable
                              accommodations upon request. Reasonable accommodations may
                              be made for any person seeking privacy (i.e., single user re-
                              stroom). Any information related to accommodations shall be han-
                              dled in such a way as to the protect the individual's privacy.

                              In accordance with law, a person's biological sex is identified on
                              the person's official birth certificate provided the statement was:

                              1.   Entered at or near the time of the person's birth; or

                              2.   Modified only to the extent necessary to correct any type of
                                   scrivener or clerical error in the person's biological sex.

                              [See Birth Certificate Statement in FM(LEGAL)]

                              For the purposes of this policy, "restroom or locker room" means a
                              location where a person may reasonably be in a state of undress,
                              including a shower room.

**Appx. 014**

TAB E

District employees, including educators and other District staff, shall not require the use of pronouns that are inconsistent with a student's or other person's biological sex as it appears on the individual's birth certificate or other government-issued record.

In accordance with law, a person's biological sex is identified on the person's official birth certificate provided the statement was:

1.  Entered at or near the time of the person's birth; or

2.  Modified only to the extent necessary to correct any type of scrivener or clerical error in the person's biological sex.

Notwithstanding the provisions above, the District shall not compel District personnel or other students to address or refer to students in any manner that would violate the speaker's constitutionally protected rights.

[See Birth Certificate Statement in FM(LEGAL)]

TAB F

Frisco ISD
043905

FACILITY STANDARDS                                                         CS
                                                                      (LOCAL)

**Use of Bathrooms and Changing Facilities**

To the extent permitted by law, each multiple-occupancy bathroom or changing facility owned or operated by the District shall be designated for and used only by persons based on the person's biological sex. This policy does not prohibit the District from providing reasonable accommodations upon request.

In accordance with law, a person's biological sex is identified on the person's official birth certificate provided the statement was:

1.  Entered at or near the time of the person's birth; or

2.  Modified only to the extent necessary to correct any type of scrivener or clerical error in the person's biological sex.

[See Birth Certificate Statement in FM(LEGAL)]

For the purposes of this policy, "bathroom or changing facility" means a location where a person may reasonably be in a state of undress, including a restroom, locker room, or shower room. Also, for purposes of this policy, "multiple-occupancy bathroom or changing facility" means a location designed or designated for use by more than one person at a time, where a person may be in a state of undress in the presence of another person, regardless of whether the facility provides curtains or partial walls for privacy. The term includes a restroom, locker room, changing room, or a shower room.

Tab G

Granbury ISD
111901

INSTRUCTIONAL RESOURCES                                                      EF
                                                                       (LEGAL)

**School Library**          A district possesses significant discretion to determine the content
                            of its school libraries. A district must, however, exercise its discre-
                            tion in a manner consistent with the First Amendment.

  Removal of Library        Students' First Amendment rights are implicated by the removal of
  Materials                 books from the shelves of a school library. A district shall not re-
                            move materials from a library for the purpose of denying students
                            access to ideas with which the district disagrees. A district may re-
                            move materials because they are pervasively vulgar or based
                            solely upon the educational suitability of the books in question.

                            _Bd. of Educ. v. Pico_, *457 U.S. 853 (1982)*

**Instructional**           Instructional materials selected for use in the public schools shall
**Materials**               be furnished without cost to students attending those schools. Ex-
                            cept as provided by Education Code 31.104(d), a district may not
                            charge a student for instructional material or technological equip-
                            ment purchased by the district with the district's technology and in-
                            structional materials allotment [see CMD]. *Education Code 31.001*

  Parental Access           A parent is entitled to:

                            1.   Review all teaching materials, instructional materials, includ-
                                 ing while the child is participating in virtual or remote learning,
                                 and other teaching aids used in the classroom of the parent's
                                 child;

                            2.   Review each test administered to the child after the test is ad-
                                 ministered; and

                            3.   Observe virtual instruction while the parent's child is partici-
                                 pating in virtual or remote learning to the same extent the par-
                                 ent would be entitled to observe in-person instruction of the
                                 child.

                            A district shall make teaching materials and tests readily available
                            for parental review and may specify reasonable hours for such re-
                            view.

  *Taking Home*             A student's parent is entitled to request that a district allow the stu-
  *Materials*               dent to take home any instructional materials used by the student.
                            Subject to the availability of the instructional materials, a district or
                            school shall honor the request. A student who takes home instruc-
                            tional materials must return the instructional materials to school at
                            the beginning of the next school day if requested to do so by the
                            student's teacher.

  *Students Without*        A district must provide the instructional materials to the student in
  *Reliable Access*         printed format if the student does not have reliable access to tech-
  *to Technology*           nology at the student's home. This requirement does not require a

district to purchase printed copies of instructional materials that the district would not otherwise purchase. A district may comply with this requirement by providing the student a printout of the relevant electronic instructional materials.

*Learning Management System or Online Portal*

A district that uses a learning management system or any online learning portal to assign, distribute, present, or make available instructional materials as defined by Education Code 31.002 [see EFA] to students shall provide login credentials to the system or portal to each student's parent.

*Education Code 26.006*

Harmful Materials

"Harmful material" means material whose dominant theme taken as a whole:

1.  Appeals to the prurient interest of a minor, in sex, nudity, or excretion;

2.  Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and

3.  Is utterly without redeeming social value for minors.

*Penal Code 43.24(a)*

Obscene

"Obscene" means material or a performance:

1.  The average person, applying contemporary community standards, would find that taken as a whole appeals to the prurient interest in sex;

2.  Depicts or describes

    a.  Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, including sexual intercourse, sodomy, and sexual bestiality; or

    b.  Patently offensive representations or descriptions of masturbation, excretory functions, sadism, masochism, lewd exhibition of the genitals, the male or female genitals in a state of sexual stimulation or arousal, covered male genitals in a discernibly turgid state or a device designed and marketed as useful primarily for stimulation of the human genital organs; and

3.  Taken as a whole, lacks serious literary, artistic, political, and scientific value.

*Penal Code 43.21(1)*

**Information Collection and Access**

U.S. ED–Funded Surveys (PPRA)

*Consent Required*

Under the Protection of Pupil Rights Amendment (PPRA), no student shall be required, as part of any program funded in whole or in part by the U.S. Department of Education (ED), to submit to a survey, analysis, or evaluation that reveals information concerning the topics listed at Protected Information, below, without the prior consent of the student (if the student is an adult or emancipated minor), or, in the case of an unemancipated minor, without the prior written consent of the parent. *20 U.S.C. 1232h(b)*

*Parental Inspection*

All instructional materials, including teacher's manuals, films, tapes, or other supplementary material, that will be used in connection with any survey, analysis, or evaluation as part of any program funded in whole or in part by the U.S. ED shall be available for inspection by the parents or guardians of the children. *20 U.S.C. 1232h(a)*

Information Collection Funded by Other Sources

*Policies*

Except as provided by 20 U.S.C. 1232h(a) or (b) [see U.S. ED Funded Surveys, above], as a condition of receiving funds for a program funded in whole or in part by the U.S. ED, a district shall develop and adopt policies, in consultation with parents, pursuant to 20 U.S.C. 1232h(c)(1), regarding the following:

1.    The parent's right to inspect a survey created by a third party before the survey is administered or distributed by a school to the student and any applicable procedures for granting a request by a parent for reasonable access to such survey within a reasonable period of time after the request is received.

2.    A district's arrangements to protect student privacy in the event a survey containing one or more of the items listed under Protected Information, below, is administered or distributed to a student.

3.    The parent's right to inspect any instructional material used in the educational curriculum for the student and any applicable procedures for granting a request by a parent for reasonable access to instructional material within a reasonable period of time after the request is received.

4.    The administration of physical examinations or screenings that a district may administer to the student.

5.    The collection, disclosure, or use of personal information collected from students for the purpose of marketing or selling that information. This provision does not apply to use of personal information collected from students for the exclusive purpose of developing, evaluating, or providing educational products or services for or to students or educational institutions, such as recruiters, book clubs, curriculum and instruc-

**Appx. 022**

INSTRUCTIONAL RESOURCES                                          EF
                                                              (LEGAL)

tional materials used by schools, sale by students of products or services to raise funds for school-related or education-related activities, or student recognition programs.

6. The parent's right to inspect any instrument used in collection of personal information in item 5 above, before the instrument is administered and any applicable procedures for granting a request by a parent for reasonable access to such instrument within a reasonable period of time after the request is received.

A district need not develop and adopt new policies if TEA or the district had in place, on January 8, 2002, policies covering the requirements of 20 U.S.C. 1232h(c)(1). [See CRD, FFAA, FL, and FNG]

*Parental Notification*

A district shall provide for reasonable notice of the adoption or continued use of such policies directly to the parents of the students enrolled in schools served by the district. At a minimum, a district shall:

1. Provide notice at least annually, at the beginning of the school year and within a reasonable time after any substantive change in the policies; and

2. Offer an opportunity for the parent to opt the student out of participation in an activity described below.

A district shall directly notify the parent of a student, at least annually at the beginning of the school year, of the specific or approximate dates during the school year when activities, described below, are scheduled or expected to be scheduled. The following activities require notification under this section:

1. Activities involving the collection, disclosure, or use of personal information collected from students for the purpose of marketing or for selling that information.

2. The administration of any survey containing one or more items described at Protected Information, below.

3. Any nonemergency, invasive physical examination or screening that is required as a condition of attendance, administered and scheduled by the school in advance, and not necessary to protect the immediate health and safety of the student or of other students.

*20 U.S.C. 1232h(c)(1)–(4)* [See FFAA]

INSTRUCTIONAL RESOURCES                                                                 EF
                                                                                    (LEGAL)

Protected
Information

Protected information addressed by 20 U.S.C. 1232h includes:

1.   Political affiliations or beliefs of the student or the student's parents.

2.   Mental and psychological problems of the student or the student's family.

3.   Sex behavior and attitudes.

4.   Illegal, anti-social, self-incriminating, and demeaning behavior.

5.   Critical appraisals of other individuals with whom respondents have close family relationships.

6.   Legally recognized privileged or analogous relationships, such as those of lawyers, physicians, and ministers.

7.   Religious practices, affiliations, or beliefs of the student or student's parent.

8.   Income (other than that required by law to determine eligibility for participation in a program or for receiving financial assistance under such program).

*20 U.S.C. 1232h(b), (c)(1)(B)*

"Personal
Information"
Defined

The term "personal information" means individually identifiable information, including a student's:

1.   First and last name;

2.   Home or physical address, including street name and city or town;

3.   Telephone number; or

4.   Social security identification number.

*20 U.S.C. 1232h(c)(6)(E)*

**Appx. 024**

Tab H

BUILDINGS, GROUNDS, AND EQUIPMENT MANAGEMENT                    CLA
SECURITY                                                     (LOCAL)

**Use of Bathrooms and Changing Facilities**

To the extent permitted by law, each multiple-occupancy bathroom or changing facility owned or operated by the District shall be designated for and used only by persons based on the person's biological sex. This policy does not prohibit the District from providing reasonable accommodations upon request.

In accordance with Education Code 33.0834, a person's biological sex is identified on the person's official birth certificate provided the statement was:

1.  Entered at or near the time of the person's birth; or

2.  Modified only to the extent necessary to correct any type of scrivener or clerical error in the person's biological sex.

For the purposes of this policy, "bathroom or changing facility" means a location where a person may reasonably be in a state of undress, including a restroom, locker room, or shower room. Also, for purposes of this policy, "multiple-occupancy bathroom or changing facility" means a location designed or designated for use by more than one person at a time, where a person may be in a state of undress in the presence of another person, regardless of whether the facility provides curtains or partial walls for privacy. The term includes a restroom, locker room, changing room, or a shower room.

Tab I

Grapevine-Colleyville ISD
220906

MISCELLANEOUS INSTRUCTIONAL POLICIES                                    EMB
TEACHING ABOUT CONTROVERSIAL ISSUES                            (LOCAL)

The District shall address controversial topics in an impartial and objective manner. Teachers shall not use the classroom to transmit personal beliefs regarding political or sectarian issues. Students and educators shall ensure that, to the extent possible, discussions are conducted fairly and courteously.

Pursuant to Education Code 28.0022(a), teachers shall not be compelled to discuss widely debated and currently controversial issues of public policy or social affairs. However, in the event a teacher chooses to discuss a topic described herein, the teacher must explore that topic objectively and free from political bias. [See EMB(LEGAL)]

**Selection of Topics**

A teacher selecting topics for discussion in the classroom shall be adequately informed about the issue and capable of providing instruction on the subject, free from personal bias. In addition, the teacher shall be certain that:

1.   The issue in question is within the range, knowledge, maturity, and comprehension of the students.

2.   The issue is current and educationally significant.

3.   The consideration of the issue does not interfere with required instruction.

4.   Sufficient relevant information on all aspects of the issue is provided.

If a teacher is unsure about a topic of discussion or about the methods to employ, the teacher may discuss the issue with the principal.

**Political Activism**

In accordance with Education Code 28.0022(a)(3), a teacher shall not require, make part of a course, or award a grade or course credit (including extra credit) for a student's:

1.   Work for, affiliation with, or service learning in association with an organization engaged in:

   a.   Lobbying for or against legislation at any level of government if the student's duties involve attempting to influence social or public policy or the outcome of legislation; or

   b.   Social policy advocacy or public policy advocacy;

2.   Political activism, lobbying, or efforts to persuade members of the legislative or executive branch at any level of government to take specific actions by direct communications; or

MISCELLANEOUS INSTRUCTIONAL POLICIES                    EMB
TEACHING ABOUT CONTROVERSIAL ISSUES                   (LOCAL)

3.  Participation in any internship, practicum, or similar activity involving social policy advocacy or public policy advocacy.

However, these limitations do not apply to a student's participation in:

1.  Community charitable projects;

2.  An internship or practicum for which the student receives course credit under a career and technology education program or under the P-TECH program provided the program does not involve the student directly engaging in lobbying, social policy advocacy, or public policy advocacy; or

3.  A program that prepares the student for participation and leadership in this country's democratic process at the federal, state, or local level through the simulation of a governmental process, including the development of public policy. [See EMB(LEGAL)]

**Certain Instructional Requirements and Prohibitions**

In accordance with Education Code 28.0022(a)(4), the District, including its teachers and administrators, shall not:

1.  Require, make part of a course or training, or otherwise instruct employees or students that:

    a.  One race or sex is inherently superior to another race or sex;

    b.  An individual, by virtue of that individual's race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

    c.  An individual should be discriminated against or receive adverse treatment solely or partly because of the individual's race or sex;

    d.  An individual's moral character, standing, or worth is necessarily determined by the individual's race or sex;

    e.  An individual, by virtue of the individual's race or sex, bears responsibility, blame or guilt for actions committed by other members of the same race or sex;

    f.  Meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race or group to oppress members of another race or group;

    g.  The advent of slavery in the territory that is now the United States constituted the true founding of the United States; or

Grapevine-Colleyville ISD
220906

    h.    With respect to their relationship to American values, slavery and racism are anything other than deviations from, betrayals of, or failures to live up to the authentic founding principles of the United States, which include liberty and equality;

2.    Teach, instruct, or train any administrator, teacher, staff member, employee (full-time or part-time), contractor, contract worker, supervisor, assistant, parent volunteer, agent, vendor, or any other individual or group to adopt a concept listed under section 1 above, or

3.    Teach, instruct, train, introduce, discuss, or require understanding of the 1619 Project. [See EMB(LEGAL)]

The District, including its teachers and administrators while acting as agents or representatives of the District, shall not teach, instruct, advocate, promote, or discuss any ideas, beliefs, concepts, theories, principles, rules, thoughts, or impressions that have any connection to, relationship by, or with, refer to, are influenced by, or are otherwise consistent with so-called "Critical Race Theory" or systemic discrimination ideologies including, but not limited to, those ideologies set forth in sections 1 and 3 herein. This provision, together with sections 1 and 3 above, shall be collectively referred to as "Critical Race Theory" or systemic discrimination ideologies or "CRT/SDI".

Any instructional resources, as defined in EFA(LOCAL) and EFB(LOCAL), that adopt, support, or promote the subject matter described herein as CRT/SDI shall be placed and kept solely and exclusively in the District's parental consent area, as defined in EFB(LOCAL).

**District Personnel and Agents**

District personnel and agents, as used herein, shall include and refer to teachers, administrators, staff members, employees (full-time or part-time), contractors, contract workers, supervisors, assistants, parent volunteers, agents, vendors, or any individuals or groups operating on the District's behalf or within the District's educational programs or activities.

**Social and Emotional Learning Concepts**

Most traditional social and emotional learning (SEL) teachings are consistent with the District's general education goals, particularly concepts relating to the development of self-awareness, individualism, self-reliance, self-motivation, communication, conflict resolution, and interpersonal skills that are vital for academic, professional, and life success.

The District's personnel and agents shall continue to support, promote and focus on the following ideologies and concepts, which

are generally consistent with the positive components of SEL, District policy, and the District's education goals[1]:

1. Individualism;

2. A rejection of victimhood mentality;

3. Conflict resolution techniques;

4. Aspiration to serve as business, secular, spiritual, or community leaders;

5. Financial self-sufficiency;

6. Importance of the nuclear family;

7. Liberty;

8. Hard work and perseverance as the basis for a successful society; and

9. The virtues of self-discipline, forgiveness, patience, kindness, determination, hope, thankfulness, reliability, honesty, industry, and responsibility.

However, some SEL concepts conflict with District policy, or are inconsistent with the District's education goals. As such, District personnel and agents, while acting as agents or representatives of the District, shall not teach, instruct, train, or otherwise require District personnel or agents to adopt, support, or otherwise promote SEL concepts that conflict with District policy, or are inconsistent with the District's education goals.

Any instructional resources, as defined in EFA(LOCAL) and EFB(LOCAL), that adopt, support, or promote SEL concepts that conflict with District policy or are inconsistent with the District's education goals shall be placed and kept solely and exclusively in the District's parental consent area, as defined in EFB(LOCAL).

**Gender Identity and Fluidity**

District personnel and agents shall not teach, instruct, train, or otherwise require any other District personnel or agents to teach, instruct, train, or otherwise communicate to any individual or group topics regarding sexual orientation or gender identity unless and until those individual persons or the entire group has fully completed the fifth grade.

District personnel and agents, while acting as agents or representatives of the District, shall not teach, instruct, train, or otherwise promote gender fluidity, as defined herein. Nor shall District per-

---

[1] See also Tex. Educ. Code §29.906

Grapevine-Colleyville ISD
220906

sonnel and agents be required to adopt, support, or promote gender fluidity, as defined herein. This provision shall not be interpreted as requiring, and does not require, any District personnel or agent to violate any rules or regulations propagated by that individual's professional licensing authority.

For purposes of this policy, gender fluidity means any theory or ideology that:

1.  Espouses the view that biological sex is merely a social construct;

2.  Espouses the view that it is possible for a person to be any gender or none (i.e., non-binary) based solely on that person's feelings or preferences; or

3.  Espouses the view that an individual's biological sex should be changed to "match" a self-believed gender that is different from the person's biological sex.

Any instructional resources, as defined in EFA(LOCAL) and EFB(LOCAL), that adopt, support, or promote gender fluidity as defined herein shall be placed and kept solely and exclusively in the District's parental consent area, as defined in EFB(LOCAL).

The District shall not promote, require, or encourage the use of titles or pronoun identifiers for students, teachers, or any other persons in any manner that is inconsistent with the biological sex of such person as listed on:

1.  The person's official birth certificate; or

2.  If the person's official birth certificate is unobtainable, another government-issued record.

A statement of a student's biological sex on the student's official birth certificate is considered to have correctly stated the student's biological sex only if the statement was:

1.  Entered at or near the time of the student's birth; or

2.  Modified to correct any type of scrivener or clerical error in the student's biological sex.[2]

However, to the extent that a student (with the written consent of such student's parent or legal guardian), parent, or legal guardian has specifically requested or directed the use of a specific title or pronoun for that particular student, District personnel interacting with the student may comply with such request at their discretion.

_____

[2] Tex. Educ. Code § 33.0834(c)

Grapevine-Colleyville ISD
220906

MISCELLANEOUS INSTRUCTIONAL POLICIES                                      EMB
TEACHING ABOUT CONTROVERSIAL ISSUES                                      (LOCAL)

District personnel shall not require a student, teacher, administrator, or any other person listed herein to use a title or pronoun in reference to another person that is inconsistent with the biological sex of such person as listed on:

1. The person's official birth certificate; or

2. If the person's official birth certificate is unobtainable, another government-issued record.

A statement of a student's biological sex on the student's official birth certificate is considered to have correctly stated the student's biological sex only if the statement was:

1. Entered at or near the time of the student's birth; or

2. Modified to correct any type of scrivener or clerical error in the student's biological sex.[3]

**Classroom Discussion**

In guiding classroom discussion of controversial issues, teachers shall:

1. Foster students' critical thinking skills.

2. Encourage discussion based on rational analysis.

3. Create an atmosphere in which students learn to respect others' opinions and disagree courteously.

4. Ensure that multiple viewpoints about the issue are presented by introducing an unexpressed viewpoint when necessary.

5. Avoid any attempt to coerce or persuade students to adopt the teacher's point of view.

6. Comply with the instructional requirements and prohibitions imposed under state law.

**Student or Parent Concerns**

A student or parent with concerns regarding instruction about controversial issues shall be directed to the complaint policy at FNG.

**Student-Led Discussions**

The requirements and prohibitions described in this policy are not intended to and shall not prohibit students from forming student-led groups related to the topics described herein or otherwise discussing these topics privately.

---

[3] Tex. Educ. Code § 33.0834(c)

Tab J

Keller ISD
220907

INSTRUCTIONAL RESOURCES                                                      EFB
LIBRARY MATERIALS                                                      (EXHIBIT)

## Content Guidelines

| Theme | Elementary | Intermediate | Middle | High* |
|---|---|---|---|---|
| Profanity | N | M | S | C |
| Passionate and/or extended kissing | N | N | M | P |
| Horror | N | M | S | C |
| Violence | M | S | S | C |
| Bullying | M | S | S | C |
| Drug or alcohol use by minors | N | N | S | C |
| Tobacco use by minors | N | S | S | C |
| Drug or alcohol use by adults | M | S | S | C |
| Glorification of suicide, self-harm, or mental illness | N | N | S | S |
| Brief description of nonsexual nudity | N | M | S | C |
| Illustrations or description of nude intimate body parts | N | N | N | N |
| Detailed descriptions of sexually explicit conduct or sex acts | N | N | N | N |
| Sex scenes or sexual activities | N | N | N | M |
| Discussion or depiction of gender fluidity | N | N | N | N |

N = None

M = Minimal (infrequent) — the content rarely appears throughout the volume

S = Some — the content occasionally appears throughout the volume

C = Common — the content appears throughout the volume but is not a main theme of the volume

P = Prevalent — the content is frequent enough to be a main theme of the volume

Parents of students always have the authority to limit their own student's access to any and all materials in a library

* Books recommended by universities or TXVSN or tested through College Board are separate and apart from general library materials available to all students and are selected independently.

DATE ISSUED: 11/23/2022                                                      1 of 2
LDU 2022.04
EFB(EXHIBIT)-X                                                      **Appx. 035**

INSTRUCTIONAL RESOURCES                                          EFB
LIBRARY MATERIALS                                           (EXHIBIT)

## Terms and Definitions

For purposes of this Content Guideline System, the following terms and definitions will be used to interpret the content guidelines:

**Profanity** — Profane/obscene language that cannot be said on broadcast television or that would not be age-appropriate in a professional setting or for an educator to use in front of a classroom.

**Intimate parts** — The prurient description of naked genitals, pubic area, anus, buttocks, or female nipple of a person. Any material that is part of the approved curriculum is excluded from this definition.

**Sexually explicit conduct** — Descriptions of sexual activity, including sexual intercourse, genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the anus, genitals, or pubic area of any person. Sexually explicit conduct includes sexual abuse.

**Violence** — Behavior involving physical force intended to hurt, abuse, damage, or kill someone or something to include glorification of use of weapons.

**Horror** — Descriptions of behavior arousing feelings of extreme fear, shock, or disgust.

**Bullying** — Descriptions of behavior that seeks to harm, intimidate, or coerce another, especially someone perceived as vulnerable.

**Nonsexual nudity** — Description or depiction of the human body for anatomical, scientific, or biological purposes to satisfy an educational need. This term specifically excludes any description or depiction of the human body intended to satisfy sexual desire of any reasonable person based on prevailing community values.

**Gender fluidity** — Any theory or ideology that:

1.  Espouses the view that gender is merely a social construct;

2.  Espouses the view that it is possible for a person to be any gender or none (i.e., non-binary) based solely on that person's feelings or preferences; or

3.  Supports hormone therapy or other medical treatments or procedures to temporarily or permanently alter a person's body or genetic make-up so that it "matches" a self-believed gender that is different from the person's biological sex (as determined by the person's birth certificate made at or near the time of the person's birth).

Tab K

United States District Court
Northern District of Texas
Fort Worth Division

| | |
|---|---|
| State of Texas, | |
|     *Plaintiff*, | |
| v. | |
| Miguel Cardona, in his official capacity as Secretary of Education; United States Department of Education; Merrick B. Garland, in his official capacity as Attorney General of the United States; and United States Department of Justice, | No. 4:23-cv-00604-O |
|     *Defendants.* | |

### DECLARATION OF MICHAEL MEYER

I, Michael Meyer, have personal knowledge of the matters stated herein, and they are true and correct to the best of my knowledge. I hereby make the following declaration under penalty of perjury:

1. My name is Michael Meyer. I am over 18 years of age, of sound mind, and capable of making this declaration. I have personal knowledge of the facts stated herein.

2. I am the Deputy Commissioner of Finance at the Texas Education Agency (TEA). I have held this position since June 2018.

3. Educational programs and activities in Texas are funded through TEA. *See* Tex. Educ. Code § 7.021; § 7.031.

4. In the 2022 Fiscal Year, approximately $9.29 billion in federal funds were distributed to Texas public schools for educational programs and activities in Texas through TEA, including but not limited to: ongoing programs funded under the Elementary and Secondary Education Act, the Individuals with Disabilities Education Act, and the Strengthening Career and Technical Education for the 21st Century Act (Perkins V), and temporary programs funded through the Elementary and Secondary School

**Appx. 038**

Emergency Relief Fund via the Coronavirus Aid, Relief, and Economic Security Act, the Coronavirus Response and Relief Supplemental Appropriations Act, and the American Rescue Plan Act.

5. Almost all Texas public schools receive federal funds that are distributed by TEA, including Keller Independent School District (ISD), Frisco ISD, Grapevine-Colleyville ISD, Carroll ISD, and Granbury ISD.

6. The information above reflects only the federal funds received by Texas public schools through TEA. In Fiscal Year 2022, public schools in Texas received another approximately $5.47 billion in federal funding, including about $0.58 billion received directly from the federal government and about $4.89 billion distributed through entities other than TEA. In addition, public schools received approximately $27.35 billion in state funding in Fiscal Year 2022.

7. The loss of federal funds would require Texas's public schools to either eliminate certain educational services offered using federal funds or find funding from another source.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 20th day of October, 2023, in Austin, Texas.

Michael Meyer