**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

THE STATE OF TEXAS,

        *Plaintiff,*

    v.

MIGUEL CARDONA, in his official
capacity as Secretary of Education, et al.,

        *Defendants.*

No. 4:23-cv-604-O

**DEFENDANTS' CONSOLIDATED BRIEF IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF THEIR CROSS-
MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CARLOTTA WELLS
Assistant Branch Director

JOHN T. LEWIS (TX Bar No. 24095074)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20530
Tel: (202) 353-0533
Fax: (202) 616-8460
E-mail: john.t.lewis.iii@usdoj.gov

*Attorneys for Defendants*

# TABLE OF CONTENTS

<div align="right">**Page**</div>

Table of Authorities ................................................................................................ iii

Introduction ........................................................................................................... 1

Background ............................................................................................................. 4

I.      Statutory and Regulatory Background ............................................................ 4

II.     The Departments' Response to *Bostock* ........................................................ 5

III.    This Lawsuit .................................................................................................... 7

Legal Standard ...................................................................................................... 7

Argument ............................................................................................................... 8

I.      The Court should dismiss this case for lack of subject-matter jurisdiction. ...... 8

     A.      The challenged documents do not constitute final agency action. ......... 8

          1.     The Challenged Documents do not represent the consummation of ED's views about whether specific policies violate Title IX ............................. 9

          2.     The Challenged Documents do not determine legal rights or obligations. 11

     B.      Texas lacks Article III standing. ............................................................ 13

          1.     Texas fails to identify any cognizable injury in fact. ............................ 14

          2.     Texas cannot show that any injury it faces is caused by the Challenged Documents or will be redressed by enjoining those documents. ............. 21

     C.      Texas's claims are unripe. ..................................................................... 23

          1.     The issues in this case are not fit for decision ....................................... 24

          2.     Texas will not face any hardship until the conclusion of any enforcement action. ................................................................................................... 25

     D.      Texas has an adequate alternative remedy under Title IX. .................... 26

     E.      Title IX's exclusive review scheme precludes jurisdiction in this Court ............. 28

          1.     Title IX's review scheme reflects Congress's intent to limit jurisdiction. 29

          2.     Title IX's review scheme applies to Texas's claims. ............................. 30

II.     In the alternative, the Court should enter judgment for ED ............................ 31

     A.      The Challenged Documents are consistent with Title IX. ..................... 31

          1.     *Bostock* held that discrimination because of sexual orientation or gender identity is discrimination because of sex. ............................................... 32

          2.     *Bostock*'s reasoning applies to Title IX. ................................................ 33

<div align="center">i</div>

3.      Texas fails to provide any basis for not applying *Bostock*'s rationale to Title IX..............................................................................36

B.      The Challenged Documents are, at most, interpretive statements that were not required to undergo notice-and-comment rulemaking...........................................40

III.    If the Court enters judgment for Texas, it should do nothing more than vacate the Challenged Documents. .......................................................................43

A.      Texas is not entitled to injunctive relief. ............................................44

B.      Texas is not entitled to injunctive relief that would sweep more broadly than preventing the application of the Challenged Documents to Texas. ...................45

Conclusion ..................................................................................................47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*,
75 F.4th 760 (7th Cir. 2023) ................................................................................. 22, 35, 47

*Abdullah v. Paxton*,
65 F.4th 204 (5th Cir. 2023) ................................................................................. 14

*ACORN v. Fowler*,
178 F.3d 350 (5th Cir. 1999) ................................................................................. 14

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
57 F.4th 791 (11th Cir. 2022) (en banc) ............................................................... 22

*Am. Tort Reform Ass'n v. OSHA*,
738 F.3d 387 (D.C. Cir. 2013) ............................................................................... 11

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................ 8

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ................................................................................. 18

*Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr.*,
19 F.3d 241 (5th Cir. 1994) ................................................................................... 21

*Ass'n of Am. Med. Colls. v. United States*,
34 F. Supp. 2d 1187 (C.D. Cal. 1998) ................................................................... 28

*Ass'n of Flight Attendants v. Huerta*,
785 F.3d 710 (D.C. Cir. 2015) ............................................................................... 12

*AT&T Co. v. EEOC*,
270 F.3d 973 (D.C. Cir. 2001) ............................................................................... 11

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) ........................................................................................... 30, 31

*Bakersfield City Sch. Dist. of Kern Cnty. v. Boyer*,
610 F.2d 621 (9th Cir. 1979) ................................................................................. 29

*Bank of Louisiana v. FDIC*,
919 F.3d 916 (5th Cir. 2019) ......................................................................... 28, 29, 30

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................................... 8, 9, 21

*Benning v. Georgia,*
  391 F.3d 1299 (11th Cir. 2004) ........................................................ 39

*Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.,*
  577 F.3d 250 (5th Cir. 2009) .......................................................... 45

*Bostock v. Clayton County,*
  140 S. Ct. 1731 (2020) ........................................................... *passim*

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) ................................................................ 26, 27

*Braidwood Mgmt., Inc. v. EEOC,*
  70 F.4th 914 (5th Cir. 2023) .......................................................... 38

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ..................................................................... 46

*California v. Texas*
  141 S. Ct. 2104 (2021) ................................................................. 19

*Cannon v. Univ. of Chicago,*
  441 U.S. 677 (1979) ................................................................... 4, 29

*Canutillo Indep. Sch. Dist. v. Leija,*
  101 F.3d 393 (5th Cir. 1996) .......................................................... 34

*Carder v. Cont'l Airlines, Inc.,*
  636 F.3d 172 (5th Cir. 2011) .......................................................... 34

*Cent. & Sw. Servs. v. EPA,*
  220 F.3d 683 (5th Cir. 2000) .......................................................... 25

*Choice Inc. of Texas v. Greenstein,*
  691 F.3d 710 (5th Cir. 2012) .......................................................... 17

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ...................................................................... 14

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ...................................................... 14, 15, 20, 21

*Cornish v. Dudas,*
  540 F. Supp. 2d 61 (D.D.C. 2008) .................................................... 45

*Crane v. Johnson,*
  783 F.3d 244 (5th Cir. 2015) .......................................................... 21

*CREW v. DOJ,*
  846 F.3d 1235 (D.C. Cir. 2017) ....................................................... 27

*Cutter v. Wilkinson,*
    423 F.3d 579 (6th Cir. 2005) ................................................................ 39

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ........................................................................... 14

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,*
    710 F.3d 579 (5th Cir. 2013) ............................................................... 45

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.,*
    45 F.4th 846 (5th Cir. 2022) ................................................................. 8

*Department of Education v. Brown,*
    600 U.S. 551 (2023) ........................................................................... 17

*DM Arbor Ct., Ltd. v. Houston,*
    988 F.3d 215 (5th Cir. 2021) ............................................................... 24

*Dodds v. United States Dep't of Educ.,*
    845 F.3d 217 (6th Cir. 2016) (per curiam) ........................................... 22, 35, 45

*Doe v. Boyertown Area Sch. Dist.,*
    897 F.3d 518 (3d Cir. 2018) ................................................................ 22, 35

*Doe v. Snyder,*
    28 F.4th 103 (9th Cir. 2022) ............................................................... 22, 35, 38

*Doe v. TCU,*
    601 F. Supp. 3d 78 (N.D. Tex. 2022) ..................................................... 38

*Doe v. William Marsh Rice Univ.,*
    67 F.4th 702 (5th Cir. 2023) ............................................................... 10, 20, 38

*Dressner v. Meba Med. & Benefits Plans,*
    628 F.3d 705 (5th Cir. 2010) ............................................................... 27

*E.T. v. Paxton,*
    41 F.4th 709 (5th Cir. 2022) ............................................................... 15

*EEOC v. Boh Bros. Const. Co.*
    731 F.3d 444 (5th Cir. 2015) ............................................................... 10, 20

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012) ............................................................................. 31

*Fed'n of Ams. for Consumer Choice, Inc. v. U.S. Dep't of Lab.,*
    2023 WL 5682411 (N.D. Tex. 2023) ..................................................... 44

*Flight Training Int'l, Inc. v. FAA,*
    58 F.4th 234 (5th Cir. 2023) ............................................................... 41

*Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*,
   59 F.4th 180 (5th Cir. 2023) ................................................ 26

*Franklin v. Gwinnett Cty. Pub. Sch.*,
   503 U.S. 60 (1992) ................................................................ 34

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ........................................................ 29, 30

*FTC v. Standard Oil Co.*,
   449 U.S. 232 (1980) ............................................................. 30

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
   460 F.3d 13 (D.C. Cir. 2006) ............................................... 46

*Gearlds v. Entergy Servs., Inc.*,
   709 F.3d 448 (5th Cir. 2013) ............................................... 37

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ........................................................ 46

*Golden & Zimmerman, LLC v. Domenech*,
   599 F.3d 426 (4th Cir. 2010) ............................................... 42

*Grabowski v. Arizona Bd. of Regents*,
   69 F.4th 1110 (9th Cir. 2023) .................................... 22, 35, 47

*Grimm v. Gloucester Cty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020) ........................................ *passim*

*Haaland v. Brackeen*,
   143 S. Ct. 1609 (2023) ........................................................ 15

*Haines v. Fed. Motor Carrier Safety Admin.*,
   814 F.3d 417 (6th Cir. 2016) ............................................... 27

*Harrison v. Jefferson Par. Sch. Bd.*,
   78 F.4th 765 (5th Cir. 2023) ............................................... 20

*Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*,
   208 F. Supp. 3d 850 (S.D. Ohio 2016) ...................... 27, 28, 29

*Hinojosa v. Horn*,
   896 F.3d 305 (5th Cir. 2018) ......................................... 26, 28

*Hollis v. Lynch*,
   827 F.3d 436 (5th Cir. 2016) ............................................... 37

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018) .......................................................... 37

*K.P. v. LeBlanc,*
    627 F.3d 115 (5th Cir. 2010) ...................................................................... 14, 15

*Kirtsaeng v. John Wiley & Sons, Inc.,*
    568 U.S. 519 (2013) ...................................................................................... 37

*La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.,*
    70 F.4th 872 (5th Cir. 2023) ........................................................................ 18

*Lakoski v. James,*
    66 F.3d 751 (5th Cir. 1995) .......................................................................... 34

*Laufer v. Mann Hosp., L.L.C.,*
    996 F.3d 269 (5th Cir. 2021) .......................................................................... 7

*Leal v. Becerra,*
    2022 WL 2981427 (5th Cir. 2022) ................................................................ 22

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ...................................................................................... 41

*Louisiana v. Biden,*
    64 F.4th 674 (5th Cir. 2023) ........................................................................ 17

*Louisiana v. U.S. Army Corps of Eng'rs,*
    834 F.3d 574 (5th Cir. 2016) .......................................................................... 9

*Lower Colo. River Auth. v. Papalote Creek II, LLC,*
    858 F.3d 916 (5th Cir. 2017) .................................................................. 23, 24

*Lowrey v. Texas A&M Univ. Sys.,*
    117 F.3d 242 (5th Cir. 1997) ........................................................................ 34

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...................................................................................... 14

*Lujan v. Nat'l Wildlife Fed.,*
    497 U.S. 871 (1990) .................................................................................. 8, 46

*Luminant Generation Co. v. EPA,*
    757 F.3d 439 (5th Cir. 2014) ........................................................................ 11

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ...................................................................................... 46

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ...................................................................................... 18

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) .................................................................................. 15, 16

*Meritor Sav. Bank, FSB v. Vinson*,
    477 U.S. 57 (1986) ................................................................................ 34

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) .............................................................................. 44

*N.J. Hosp. Ass'n v. United States*,
    23 F. Supp. 2d 497 (D.N.J. 1998) ....................................................... 28

*NAACP v. Meese*,
    615 F. Supp. 200 (D.D.C. 1985) .......................................................... 27

*Nat'l Ass'n for Gun Rts., Inc. v. Garland*,
    2023 WL 6613080 (N.D. Tex. 2023) ............................................. 45, 46

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003) ........................................................................ 23, 24

*Nat'l Pork Producers Council v. EPA*,
    635 F.3d 738 (5th Cir. 2011) ............................................................ 9, 10

*Orix Credit All., Inc. v. Wolfe*,
    212 F.3d 891 (5th Cir. 2000) ............................................................... 24

*Overdam v. Texas A&M Univ.*,
    43 F.4th 522 (5th Cir. 2022) ............................................................... 38

*Pelcha v. MW Bancorp, Inc.*
    988 F.3d 318 (6th Cir. 2021) ............................................................... 35

*Pennzoil Co. v. FERC*,
    645 F.2d 394 (5th Cir. 1981) ............................................................... 25

*Peoples Nat'l Bank v. Comptroller of Currency*,
    362 F.3d 333 (5th Cir. 2004) ............................................................... 12

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) .................................................................. 12, 40, 41

*Plummer v. Univ. of Houston*,
    860 F.3d 767 (5th Cir. 2017) ............................................................... 38

*Quicken Loans Inc. v. United States*,
    152 F. Supp. 3d 938 (E.D. Mich. 2015) ......................................... 27, 28

*Ramming v. United States*,
    281 F.3d 158 (5th Cir. 2001) ................................................................. 8

*Rhea Lana, Inc. v. Dep't of Lab.*,
    824 F.3d 1023 (D.C. Cir. 2016) ........................................................... 11

viii

*Roark & Hardee LP v. Austin*,
  522 F.3d 533 (5th Cir. 2008) ........................................................ 26

*Roberts v. Colorado State Bd. of Agric.*,
  998 F.2d 824 (10th Cir. 1993) ...................................................... 45

*Rogers v. Bennett*,
  873 F.2d 1387 (11th Cir. 1989) .................................................... 29

*Rollerson v. Brazos River Harbor Navigation Dist.*,
  6 F.4th 633 (5th Cir. 2021) ................................................... 27, 28

*Rochester Tel. Corp. v. United States*,
  307 U.S. 125 (1939) ...................................................................... 12

*Sackett v. EPA*,
  566 U.S. 120 (2012) ...................................................................... 28

*Sch. of the Ozarks, Inc. v. Biden*,
  41 F.4th 992 (8th Cir. 2022) ................................................ *passim*

*Shalala v. Guernsey Mem'l Hosp.*,
  514 U.S. 87 (1995) ........................................................................ 40

*Shields v. Norton*,
  289 F.3d 832 (5th Cir. 2002) ................................................. 23, 24

*Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality*,
  968 F.3d 419 (5th Cir. 2020) (per curiam) .................................. 15

*Sierra Club v. Peterson*,
  228 F.3d 559 (5th Cir. 2000) .......................................................... 8

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
  251 F.3d 814 (9th Cir. 2001) ....................................................... 45

*Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*,
  57 F.4th 43 (2d Cir. 2022) ..................................................... 22, 35

*Spending Clause. Bennett v. Ky. Dep't of Educ.*,
  470 U.S. 656 (1985) ...................................................................... 39

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ...................................................................... 14

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ........................................................................ 14

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ...................................................................... 17

*Taylor v. Cohen*,
    405 F.2d 277 (4th Cir. 1968) (en banc) ............................................................ 29

*Temple Univ. v. Brown*,
    2001 WL 185535 (E.D. Pa. 2001) ................................................................ 28

*Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*,
    413 F.3d 479 (5th Cir. 2005) ....................................................................... 25

*Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) ............................................................................. 32, 33

*Texas Ass'n of Manufacturers v. U.S. Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2000) ....................................................................... 43

*Texas State LULAC v. Elfant*,
    52 F.4th 248 (5th Cir. 2022) ....................................................... 14, 15, 20, 22

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) ................................................................. 13, 15

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ....................................................................... 41

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) .................................................................. 14, 18

*Texas v. United States*,
    201 F. Supp. 3d 810 (N.D. Tex. 2016) ...................................................... 3, 19

*Texas v. United States*,
    523 U.S. 296 (1998) ................................................................................. 23

*Texas v. United States*,
    606 F. Supp. 3d 437 (S.D. Tex. 2022) ........................................................ 44

*Thomas v. Union Carbide Agric. Prods. Co.*,
    473 U.S. 568 (1985) ................................................................................. 23

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ..................................................................... 28, 29, 31

*Toilet Goods Ass'n, Inc. v. Gardner*,
    387 U.S. 158 (1967) ................................................................................. 25

*Trump v. Hawaii*
    138 S. Ct. 2392 (2018) .......................................................................... 46, 47

*U.S. Steel Corp. v. Fri*,
    364 F. Supp. 1013 (N.D. Ind. 1973) ........................................................... 28

*United States v. Becton*,
    632 F.2d 1294 (5th Cir. 1980) ......................................................... 37

*United States v. Cox*,
    342 F.2d 167 (5th Cir. 1965) ........................................................... 46

*United States v. Texas*
    143 S. Ct. 1964 (2023) ......................................................... 18, 23, 43

*VanDerStok v. Garland*,
    2022 WL 4809376 (N.D. Tex. 2022) ............................................... 46

*VanDerStok v. Garland*,
    2023 WL 4539591 (N.D. Tex. 2023) ............................................... 43

*Walker v. Azar*,
    480 F. Supp. 3d 417 (E.D.N.Y. 2020) ............................................ 35

*Walmart Inc. v. U.S. Department of Justice*,
    21 F.4th 300 (5th Cir. 2021) ..................................................... 25, 26

*Warth v. Seldin*,
    422 U.S. 490 (1975) ....................................................................... 14

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ................................................... 22, 35

*Whitman-Walker Clinic, Inc. v. HHS*,
    485 F. Supp. 3d 1 (D.D.C. 2020) ................................................... 35

*Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*,
    379 U.S. 411 (1965) ....................................................................... 30

*Whole Woman's Health v. Jackson*,
    595 U.S. 30 (2021) ......................................................................... 19

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................... 45

*Yusuf v. Vassar Coll.*,
    35 F.3d 709 (2d Cir. 1994) ............................................................. 38

*Zimmerman v. Austin*,
    881 F.3d 378 (5th Cir. 2018) ......................................................... 16

**Statutes, Rules, and Regulations**

5 U.S.C.
   § 551 ......................................................................................................... 40
   § 553 ..................................................................................................... 40, 41
   § 704 ...................................................................................................... 8, 26

20 U.S.C.
   § 1681 .................................................................................................. *passim*
   § 1682 ......................................................................................................... 5
   §§ 1683, 1234g ................................................................................. 5, 27, 29
   § 1686 ....................................................................................................... 35

42 U.S.C.
   § 2000d-2 .................................................................................................... 5
   § 2000e-2 .................................................................................................. 32

49 U.S.C. § 521 ............................................................................................. 27

Fed. R. Civ. P. 56 ............................................................................................ 8

34 C.F.R.
   § 100.7 .................................................................................................. 4, 20
   § 100.8 .................................................................................................. 5, 20
   § 100.8-10 ................................................................................................ 27
   § 100.11 ............................................................................................... 5, 27
   § 106.33 .................................................................................................. 35
   § 106.37 .................................................................................................. 35
   § 106.81 .................................................................................................... 4
   §§ 100.7(d), 100.8(a) ................................................................................ 5
   §§ 100.9; 100.10 ....................................................................................... 5

86 Fed. Reg. 32,637 (June 22, 2021) .................................................... 6, 7, 22

87 Fed. Reg. 41,390 (July 12, 2022) .......................................................... 10

88 Fed. Reg. 22,860 (Apr. 13, 2023) ................................................. 10, 11, 16

**Other Authorities**

Letter from Jonathan Skrmetti, Tenn. Att'y Gen & Rep., et al., to Miguel Cardona, Sec'y of Ed.
   (Sept. 12, 2022), https://perma.cc/RQ9H-YGR6 ............................................. 17

Letter from Todd Rokita, Ind. Att'y Gen., et al., to Miguel Cardona, Sec'y of Ed. (May 15,
   2023), https://perma.cc/RQ9H-YGR6 ............................................................. 17

## INTRODUCTION

In *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), the Supreme Court held that discrimination because of sexual orientation or gender identity is necessarily discrimination "because of sex" under Title VII of the Civil Rights Act of 1964. After *Bostock*, the Department of Education ("ED") sought to inform administrators, educators, and students of its view that *Bostock*'s reasoning applies to the similar prohibition on sex-based discrimination under Title IX of the Education Amendments of 1972. To that end, ED issued several documents—a "Notice of Interpretation," a "Dear Educator" letter, and a "Fact Sheet" (collectively, the "Challenged Documents")—informing the public that it interpreted Title IX's prohibition of discrimination "on the basis of sex" to encompass discrimination on the basis of sexual orientation and gender identity. Two years later, Texas now challenges those documents under the Administrative Procedure Act, but its claims fail at every turn. *See* Tex.'s Mem. in Supp. of its Mot. for Summ. J., ECF No. 24 (hereinafter "PMSJ").

As a threshold matter, this case should be dismissed for lack of subject-matter jurisdiction. The Challenged Documents do nothing more than articulate a high-level view of how ED believes a recent Supreme Court decision applies to a related statutory context and will not affect Texas in any way unless and until they are invoked in the context of a concrete enforcement proceeding, if ever. In doctrinal terms, Texas's lawsuit suffers from five independent jurisdictional defects:

*First*, the Challenged Documents do not constitute final agency action. They do not reflect the consummation of the agency's views about what specific laws, policies, or circumstances would violate Title IX, and they do not finally determine any rights or obligations.

*Second*, Texas lacks standing to challenge the Challenged Documents. It fails to show a cognizable injury in fact because it cannot identify any state laws or policies that conflict with

the Challenged Documents—which do not themselves mandate that any specific laws or policies violate Title IX—nor any other way in which the Challenged Documents will harm the State. Moreover, Texas will not face any injury from ED until the conclusion of an exhaustive administrative process, with the opportunity for judicial review. Even if the State had alleged a cognizable injury in fact, any such injury is traceable to Title IX itself, rather than the Challenged Documents, and would not be redressed by enjoining those documents.

*Third*, Texas's claims are unripe. They are unfit for adjudication until ED has actually applied the high-level, general observations in the Challenged Documents in the context of a concrete enforcement action with specific facts. And Texas will not suffer any hardship by waiting until ED initiates an enforcement proceeding against the State, at which point it will have every opportunity to challenge the application of *Bostock*'s rationale to Title IX before the agency and in court.

*Fourth*, Texas will have an adequate opportunity for judicial review at the conclusion of a potential enforcement action or in the course of a lawsuit from the Department of Justice. It therefore cannot proceed under the APA.

*Fifth*, Title IX's administrative review provisions are exclusive. Texas is required to press its claims through these procedures, particularly given that they will provide Texas with meaningful judicial review and that the State's claims go to the heart of ED's enforcement standards and expertise.

In the alternative, the Court should enter judgment for ED because both of Texas's claims fail on the merits.

*First*, the interpretation of Title IX articulated in the Challenged Documents is entirely consistent with *Bostock*. There is no material difference between Title VII's prohibition of

discrimination "because of" sex and Title IX's prohibition of discrimination "on the basis of" sex. Under both statutes, "it is impossible" to discriminate against a person for being gay or transgender "without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. Indeed, courts in other contexts have repeatedly treated the language of these two statutory prohibitions as synonymous.

**Second**, ED was not required to promulgate the Challenged Documents through notice-and-comment rulemaking. The Challenged Documents are, at most, interpretive statements that do nothing more than advise the public of ED's construction of Title IX. They do not impose specific duties on anyone, let alone duties that conflict with or go beyond the statute itself.

ED recognizes that the Court preliminarily enjoined several documents dealing with the application of Title IX to discrimination on the basis of gender identity over seven years ago. *See Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016). But these circumstances are significantly different. Unlike the 2016 documents, the Challenged Documents in this case simply offer high-level observations concerning the application of *Bostock*'s rationale to Title IX. And on the merits, *Bostock* is a game-changer. It is clear after *Bostock* that discrimination on the basis of sex encompasses discrimination on the basis of sexual orientation and gender identity—in Title IX not less than in Title VII.

For these reasons, the Court should dismiss the Complaint for lack of subject-matter jurisdiction; alternatively, it should enter judgment for ED.[1]

---

[1]    ED follows Texas in referring to documents contained in Texas's appendix as "Appx.#". ED refers to documents contained only in the Administrative Record, ECF No. 22-1, as "AR#".

# BACKGROUND

## I.      Statutory and Regulatory Background

Title IX prohibits discrimination "on the basis of sex" in "any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Under Title IX, ED is "authorized and directed to effectuate the provisions of section 1681 … by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute." *Id.* § 1682. ED enforces Title IX through administrative actions that can, if a funding recipient fails to comply with Title IX voluntarily, result in a termination of funding to educational programs or a request to DOJ to initiate other legal action. *See id.* Private parties can also bring civil actions under Title IX directly against recipients of federal financial assistance. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 689 (1979).

In enforcing Title IX, ED's investigations typically begin with a complaint from a private party (although ED also has authority to initiate investigations on its own). 34 C.F.R. § 100.7(a), (b) (incorporated by 34 C.F.R. § 106.81). ED generally must "make a prompt investigation" of any complaint that indicates a "possible failure to comply" with Title IX, which "should include, where appropriate, a review of the pertinent practices and policies of the [funding] recipient, the circumstances under which the possible noncompliance with [Title IX] occurred, and other factors relevant to a determination as to whether the recipient has failed to comply with [Title IX]." *Id.* § 100.7(c).

If the investigation "indicates a failure to comply," ED will inform the recipient and must attempt to secure voluntary compliance through "informal means." *Id.* § 100.7(d)(1). If these efforts fail, ED will make a written finding that the recipient is in violation of Title IX and then, if further attempts at voluntary resolution are not successful, it may either refer the matter to DOJ

with a recommendation that proceedings be brought to enforce Title IX or begin administrative proceedings to suspend or terminate federal financial assistance. *Id.* §§ 100.7(d), 100.8(a).

Where ED seeks to achieve compliance through terminating or suspending federal funding, such relief is not effective until: (1) it has advised the recipient of its failure to comply and has "determined that compliance cannot be secured by voluntary means"; (2) "there has been an express finding on the record, after an opportunity for hearing, of a failure" by the recipient to comply with Title IX; and (3) 30 days have expired since the Secretary filed "a full written report of the circumstances and the grounds for such action" with the committees of the House and Senate having legislative jurisdiction over the program involved. *Id.* § 100.8(c); *see* 20 U.S.C. § 1682. This process includes a hearing before a hearing examiner, a decision by a reviewing authority, and, potentially, additional review by the Secretary. 34 C.F.R. §§ 100.9; 100.10. A final decision is subject to judicial review in the court of appeals for the circuit in which the recipient is located. 20 U.S.C. §§ 1683, 1234g(a), (b); 42 U.S.C. § 2000d-2; 34 C.F.R. § 100.11.

## II.    The Departments' Response to *Bostock*

In *Bostock*, 140 S. Ct. 1731, the Supreme Court held that discrimination on the basis of sexual orientation or gender identity is necessarily discrimination "because of sex" under Title VII. On March 26, 2021, the Principal Deputy Assistant Attorney General of the Civil Rights Division of DOJ issued a memorandum to its federal agency partners to share the Division's view that "*Bostock*'s reasoning applies with equal force" to Title IX. Mem. from Pamela S. Karlan, Principal Deputy Ass't Att'y Gen. (Mar. 26, 2021), AR5, *available at* https://perma.cc/TY8Y-UT5H. The memorandum noted that because the "statutory prohibitions against sex discrimination" contained in Titles VII and IX are similar, the Supreme Court and other federal courts "consistently look to interpretations of Title VII to inform Title IX." *Id.* (citation omitted). Specifically, the memorandum reasoned that Title IX's prohibition of

discrimination "on the basis of sex" is sufficiently similar to the language of Title VII's prohibition of discrimination "because of sex" to be considered interchangeable. AR6.

On June 22, 2021, ED published a Notice of Interpretation ("NOI") in the Federal Register "to clarify [its] enforcement authority over discrimination based on sexual orientation and discrimination based on gender identity under Title IX" in light of *Bostock. Enforcement of Title IX of the Education Amendments of 1972 with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of* Bostock v. Clayton County, 86 Fed. Reg. 32,637, 32,637 (June 22, 2021); Appx.2-5. At the outset, ED noted that the interpretation would guide it in processing complaints and conducting investigations, but that "it does not itself determine the outcome in any particular case or set of facts." Appx.2.

In the NOI, ED explained that "[c]onsistent with the Supreme Court's ruling and analysis in *Bostock*, the Department interprets Title IX's prohibition on discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity." Appx.002. ED noted that its interpretation flowed from Title IX's "plain terms," which were similar to those of Title VII, as well as case law recognizing that *Bostock*'s reasoning applies to Title IX. Appx.2-3. ED also stated, "[s]imilar to the Court's interpretation of Title VII, the Department's interpretation of the scope of discrimination 'on the basis of sex' under Title IX does not require the Department to take a position on the definition of sex, nor do we do so here." Appx.2-3 n.1.

The next day, ED issued a "Dear Educator" letter highlighting, among other things, ED's interpretation of Title IX as expressed in the ED NOI. Letter from Suzanne B. Goldberg, Acting Ass't Sec'y of Ed. for C.R. to Educators (June 23, 2021); Appx.7-9. The letter explained that, consistent with the ED NOI, "OCR will fully enforce Title IX to prohibit discrimination based on

sexual orientation and gender identity in education programs and activities that receive Federal

financial assistance from the Department." Appx.9. The letter also included a fact sheet ("Fact

Sheet") jointly issued by ED and DOJ that provided examples of the types of incidents OCR and

DOJ "can investigate" under Title IX, as well as information on how to file complaints.

Appx.11-12. Neither the Dear Educator letter nor the Fact Sheet stated that any of the

hypothetical incidents identified would necessarily constitute discrimination in violation of Title

IX. *See* Appx.7-12.

### III.   This Lawsuit

Nearly two years after ED issued the Challenged Documents, Texas filed its Complaint,

ECF No. 1 (June 14, 2023). The State asserts two claims: (1) that the Challenged Documents are

"not in accordance with law and are in excess of statutory authority because they rely upon the

interpretation of Title VII described in *Bostock* and apply it to Title IX," *id.* ¶ 50; and (2) that

they "are substantive or legislative rules that required notice-and-comment rulemaking," *id.* ¶ 53.

Texas alleges that it has standing to challenge the Challenged Documents because, if enforced,

Texas risks losing federal funding for education, and it may therefore have to consider whether

to change its laws and policies. *Id.* ¶¶ 45-48.

The parties subsequently agreed to, and the Court entered, a consolidated schedule for

briefing cross-dispositive motions in this case, *see* ECF Nos. 20, 21. Texas filed its motion for

summary judgment and supporting appendix on October 20, 2023. *See* ECF Nos. 23, 24.

### LEGAL STANDARD

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting

jurisdiction." *Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269, 271-72 (5th Cir. 2021) (quotations

omitted). "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the

complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or

(3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). To the extent the Court has subject-matter jurisdiction, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

## ARGUMENT

I.    **The Court should dismiss this case for lack of subject-matter jurisdiction.**

This lawsuit suffers from five jurisdictional defects, any one of which is sufficient to warrant dismissal: final agency action, *see* Section I.A; standing, *see* Section I.B; ripeness, *see* Section I.C; the presence of an adequate alternative remedy, *see* Section I.D; and Texas's failure to utilize the review process mandated by Congress, *see* Section I.E.

A.    **The challenged documents do not constitute final agency action.**

Judicial review under the APA is generally limited to "final agency action." 5 U.S.C. § 704. In the Fifth Circuit, finality is "a jurisdictional prerequisite of judicial review." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022) (quotation omitted). To constitute final agency action, an agency's action must (1) represent "the consummation of the agency's decisionmaking process," and (2) conclusively determine legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 167 (1997) (quotations omitted).

As an initial matter, Texas improperly lumps all of the Challenged Documents together under the scaremongering label of a "Transgender Mandate" which, it asserts, constitutes final agency action. *See* PMSJ 8. But plaintiffs in an APA case may challenge only a "specific final agency action"—*i.e.*, "'an identifiable action or event,'" *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 894 (1990)). Texas must

therefore show that *each* of the Challenged Documents constitutes final agency action to mount a challenge to that particular document.

Texas cannot. The only thing that has been "consummated" is the agency's view, expressed in the Notice of Interpretation, that Title IX encompasses discrimination on the basis of sexual orientation and gender identity. Appx.2. That high-level observation does not carry any specific legal obligations. ED has *not* consummated its views on how Title IX applies to specific laws, policies, and contexts involving issues of sexual orientation and gender identity, which are the subject of ongoing notice-and-comment rulemaking. To the extent that the Fact Sheet (referenced in the Dear Educator letter) mentions specific examples, it is to suggest that those are incidents ED "can investigate" if a complainant alleges that they constitute discrimination, not that they would necessarily violate Title IX. Appx.9. These documents also do not impose any specific duties on funding recipients or on the agency's staff. Thus, none of the Challenged Documents constitute final agency action.

### 1.    The Challenged Documents do not represent the consummation of ED's views about whether specific policies violate Title IX.

To qualify as the consummation of the agency's views, an action "must not be of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 178. For example, "[a]gency action may mark the consummation of the agency's decisionmaking process if the agency action is not subject to further agency review, which occurs when the agency has asserted its final position on the factual circumstances underpinning the agency action." *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 581 (5th Cir. 2016) (quotations omitted); *see also Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 755 (5th Cir. 2011) (a "definitive position").

That has not occurred here. The NOI merely represents the consummation of ED's view that Title IX's prohibition on sex discrimination encompasses discrimination on the basis of

sexual orientation and gender identity as a general matter, consistent with *Bostock*. PMSJ 9; *see* Appx.2. Neither the NOI nor the Dear Educator letter and Fact Sheet reflect any judgment by ED that any specific laws, policies, or circumstances violate Title IX—*i.e.*, that any specific examples involve discrimination on the basis of sexual orientation and gender identity and thereby on the basis of sex. Indeed, the NOI makes clear that it "does not itself determine the outcome in any particular case or set of facts," Appx.2, and the Dear Educator letter and the Fact Sheet reiterate that the identified scenarios are "examples of the kind of incidents we *can investigate*" if a complainant alleges that they constitute discrimination, not that they would necessarily constitute a violation of Title IX, Appx.9 (emphasis added); *see also* Appx.11. That is because liability under Title IX is highly fact-dependent, and requires, among other things, the assessment of a recipient's policies themselves, their justifications, and their application in specific cases. *See, e.g.*, *Doe v. William Marsh Rice Univ.*, 67 F.4th 702, 712 (5th Cir. 2023) (applying fact-intensive framework to allegations of gender discrimination); *EEOC v. Boh Bros. Const. Co.*, 731 F.3d 444, 460 (5th Cir. 2013) (sexual harassment "inquiry is necessarily fact-specific").

Moreover, ED is engaged in ongoing rulemaking about how to apply Title IX's general non-discrimination mandate to contexts involving sexual orientation and gender identity. *See, e.g.*, *Sex-Related Eligibility Criteria for Male and Female Athletic Teams*, 88 Fed. Reg. 22,860 (Apr. 13, 2023); *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41,390 (July 12, 2022). In particular, Texas complains that the "Transgender Mandate" does not allow schools to separate athletic teams on the basis of "biological sex," as Texas defines it, *see* PMSJ 13, but one of ED's proposed rules, which underwent notice and comment and is still pending before the agency,

identified an approach that would permit schools to adopt and apply sex-related criteria for athletics eligibility that may result in the exclusion of transgender students from teams consistent with their gender identity in certain circumstances. *See* 88 Fed. Reg. at 22,860-61. ED simply has not yet consummated its views on these subjects beyond the top-line determination that Title IX encompasses discrimination on the basis of sexual orientation and gender identity.

### 2.    The Challenged Documents do not determine legal rights or obligations.

The Challenged Documents also do not determine legal rights or obligations, either generally or in the context of specific circumstances, and so do not satisfy the second prong of the *Bennett* test. An agency typically does not "inflict[] an actual, concrete injury upon the party seeking judicial review" when it "merely expresses its view of what the law requires of a party, even if that view is adverse to the party." *Luminant Generation Co. v. EPA*, 757 F.3d 439, 442 n.7 (5th Cir. 2014) (quoting *AT&T Co. v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001)). Thus, "interpretative rules or statements of policy generally do not qualify [as final agency action] because they are not 'finally determinative of the issues or rights to which [they are] addressed.'" *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) (quoting Judge Harry T. Edwards et al., *Federal Standards of Review* 157 (2d ed. 2013)). To the contrary, any legal consequences from an interpretive statement ultimately flow from the statute it interprets. *See Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016) (noting that letter "created no new legal obligations beyond those the [statute] already imposed").

As interpretive statements go, the Challenged Documents are particularly innocuous. They repeatedly emphasize that they are non-binding. *See* Appx.2, 9. And because they do not conclude that any specific laws, policies or circumstances violate Title IX, by definition they also do not impose specific mandates on regulated parties or the agency's staff. In particular, staff

11

retain discretion to determine whether any particular allegation of discrimination on the basis of sexual orientation or gender identity might constitute sex discrimination. *Cf. Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 998 (8th Cir. 2022) (holding that memorandum applying *Bostock* to Fair Housing Act did not "require that HUD reach the specific enforcement decision that the College's current housing policies violate federal law"), *cert. denied*, 143 S. Ct. 2638 (2023).

Even accepting Texas's mistaken premise that the Challenged Documents impose specific legal obligations, they *still* would not constitute or result in final agency action until they were applied in the context of a concrete enforcement proceeding, if ever. An agency order is not final if it "does not of itself adversely affect a complainant but only affects his rights adversely on the contingency of future administrative action." *Peoples Nat'l Bank v. Comptroller of Currency*, 362 F.3d 333, 337 (5th Cir. 2004) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)). Before Texas would face any risk of losing federal funding, it would have the benefit of an exhaustive administrative process in which it would be able to present all of the arguments it presses in this lawsuit, with appeal before a federal circuit court. And *if* the Challenged Documents were ever invoked in those proceedings, they would not be entitled to *Chevron* deference, because "'[i]nterpretive rules do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'" *Ass'n of Flight Attendants v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015) (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015)) (concluding that interpretive rule was not final agency action).

Texas responds that the Challenged Documents go beyond *Bostock* and the text of Title IX and thereby constitute legislative rather than interpretive rules. *See* PMSJ 10-11.[2] But that

---

[2]   Texas is also incorrect that the Challenged Documents constitute legislative rules that were required to undergo notice and comment. *See infra* Section II.B.

misses the point. Whether or not the Challenged Documents contain *valid* interpretations or applications of *Bostock*, they do not finally determine any legal rights or duties. They simply state what ED believes to be the correct interpretation of Title IX; they do not impose specific obligations on anyone or take positions on whether any specific circumstances would violate Title IX; and they could not possibly have any consequences for Texas unless and until it is subject to an enforcement action in which the Challenged Documents are applied, if ever. Whether an interpretation is right or wrong is not determinative of its interpretive nature.

The Fifth Circuit's decision in *Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019), is not to the contrary. *See* PMSJ 11-12. The document challenged in that case provided, the Court held, detailed direction about when the consideration of criminal records in hiring decisions would give rise to liability under Title VII, and elaborated approaches that employers could use to avoid liability. *EEOC*, 933 F.3d at 437-39. In contrast, the NOI simply concludes that *Bostock* applies to Title IX, and neither "binds" agency employees to a particular outcome nor creates "safe harbors" for funding recipients. *Id.* at 442. While the Fact Sheet referenced in the Dear Educator letter describes stylized examples of individuals who might allege discrimination, it still does not conclude that any specific circumstances would violate Title IX, and so does not create any "safe harbors" (or unsafe harbors). Moreover, private parties remain free to file complaints regarding what they believe to be sex-based discrimination—including discrimination on the basis of sexual orientation or gender identity—even in the absence of the Challenged Documents, so the documents do not "open[] the field of potential plaintiffs" any wider. PMSJ 12.

For these reasons, none of the Challenged Documents constitute final agency action.

### B.   Texas lacks Article III standing.

Texas also does not have standing to challenge any of the Challenged Documents. "Article III of the Constitution limits federal courts' jurisdiction" to the adjudication of "'Cases'

and 'Controversies.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "[A]n essential and unchanging part of the case-or-controversy requirement" is that plaintiffs must have "standing to invoke the authority of a federal court." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (citation omitted). Standing is therefore a "threshold jurisdictional question[,]" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998), determining "the power of the court to entertain the suit," *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

Texas, as the party "invoking federal jurisdiction[,] bears the burden of establishing" standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "While 'general factual allegations of injury resulting from the defendant's conduct may suffice' at the pleadings stage," at summary judgment, a plaintiff "'must point to specific summary judgment evidence showing that it was directly affected'" by the challenged action. *Texas State LULAC v. Elfant*, 52 F.4th 248, 255 n.4 (5th Cir. 2022) (quoting *ACORN v. Fowler*, 178 F.3d 350, 354 (5th Cir. 1999)); *see also Texas v. United States*, 50 F.4th 498, 513-14 (5th Cir. 2022) ("At summary judgment, [a plaintiff] can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts.") (quotation omitted). Specifically, Texas must present evidence showing that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Texas fails to establish any of these three elements.

### 1.   Texas fails to identify any cognizable injury in fact.

"To satisfy [the injury-in-fact] requirement, [a plaintiff] must plead that '[it] has sustained or is in danger of sustaining some direct injury.'" *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). "That injury needs to be 'concrete and particularized,' as well as 'actual or imminent.' Importantly, it cannot be speculative, conjectural, or hypothetical." *Id.* (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 122

(5th Cir. 2010)). "The 'actual or imminent' requirement is satisfied only by evidence of a 'certainly impending' harm or a 'substantial risk' of harm." *Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality*, 968 F.3d 419, 424 (5th Cir. 2020) (per curiam) (quoting *Clapper*, 568 U.S. at 414 & n.5). "Allegations of *possible* future injury do not satisfy the requirements of Art. III." *E.T. v. Paxton*, 41 F.4th 709, 716 (5th Cir. 2022) (emphasis added).

Contrary to Texas's assertions otherwise, merely being an "object" of an alleged rule is insufficient to establish Article III standing. PMSJ 12. A plaintiff must also show that it "suffers … *injuries* as an object," *EEOC*, 933 F.3d at 447 (emphasis added)—*i.e.*, that it was "directly affected" by the challenged policy, *Texas State LULAC*, 52 F.4th at 255 n.4. None of Texas's attempts to do so withstand careful scrutiny.

    a.    **Sovereign Injury.** To start, Texas's bare assertion that the distant prospect of enforcement action "interfere[s] with the enforcement of state law" is insufficient to establish an injury in fact. PMSJ 13-14. The Supreme Court has held that states cannot establish injury by raising "abstract questions ... of sovereignty" and explained that a state's "naked contention that Congress has usurped the reserved powers of the several States by the mere enactment of [a] statute" is insufficient to establish an Article III case or controversy. *Massachusetts v. Mellon*, 262 U.S. 447, 483, 485 (1923). Instead, states must allege that a sovereign interest was "actually invaded or threatened" by the challenged federal action. *Id.* at 485; *cf. Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023) (rejecting the idea that "a State would always have standing to bring constitutional challenges when it is complicit in enforcing federal law").

Texas asserts that the Challenged Documents invade its sovereignty by creating "pressure to change state law." PMSJ 13. But like the funding at issue in *Mellon*, these documents do not directly "require the states to do or to yield anything." *Mellon*, 262 U.S. at 482. If the

Departments enacted them "with the ulterior purpose of tempting [the states] to yield, that purpose may be effectively frustrated by the simple expedient of not yielding." *Id.*; *cf. Zimmerman v. Austin*, 881 F.3d 378, 389 (5th Cir. 2018) ("[S]tanding cannot be conferred by a self-inflicted injury."). The unspecified "pressure" that Texas feels is not a cognizable injury.

In any event, Texas does not identify a single law, policy, or practice, at either a statewide or district level, that conflicts with the Challenged Documents, which do not themselves mandate that any given policy violates Title IX. The best Texas can do is point to Section 33.0834 of the Texas Educational Code, which requires students to compete in athletic competitions based on their "biological sex." PMSJ 13. But the NOI makes plain that it "does not itself determine the outcome in any particular case or set of facts," including in the context of athletics. Appx.2. And the Fact Sheet referenced in the Dear Educator letter provides an example of a student being prohibited from trying out for a girls' cheerleading team "solely because she is transgender" as a case that ED *could investigate*. Appx.11. As mentioned above, ED has proposed a rule (not yet finalized) which outlines the circumstances under which schools would be permitted to adopt and apply sex-related criteria for athletics eligibility that may result in the exclusion of transgender students from teams consistent with their gender identity in certain circumstances. *See* 88 Fed. Reg. at 22,860-61.

Elsewhere in its brief, Texas alludes to various district policies that have an even more attenuated relationship with the Challenged Documents. *See* PMSJ 7. The Challenged Documents do not mandate that the identified policies concerning bathrooms and pronouns violate Title IX, and the documents do not even address policies concerning depictions of sexual acts or curricula. *See, e.g.*, Appx.11-12. None of these policies satisfy Texas's burden either.

Texas's failure to identify any policies prohibited by the Challenged Documents indicates that they do not infringe upon Texas's sovereignty in any meaningful way. Nor has Texas "identified a single concrete example of how it has been forced to modify its behavior as a result of" the Challenged Documents. *Choice Inc. of Texas v. Greenstein*, 691 F.3d 710, 716 (5th Cir. 2012). These failures are striking considering that Texas did not file suit to challenge the Challenged Documents until nearly *two years* after they were issued, *see* Compl.; presumably, if the State felt any real pressure to change its laws, it would have already changed them or, alternatively, filed suit earlier. Without more, these bare assertions and formulaic recitations do not satisfy Texas's burden to set forth facts that establish jurisdiction.

      **b.**    **Procedural Injury.** Next, Texas asserts that ED's decision not to promulgate the Challenged Documents through notice-and-comment rulemaking violated its purported right to comment on them. PMSJ 14. But "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). "Merely being 'denied the ability to file comments' is 'insufficient to create Article III standing.'" *Louisiana v. Biden*, 64 F.4th 674, 683 (5th Cir. 2023) (quoting *Summers*, 555 U.S. at 496); *see also Department of Education v. Brown*, 600 U.S. 551, 562 (2023) (holding that mere denial of notice and comment did not create Article III standing). Texas must also demonstrate a resulting substantive injury which, as explained throughout, it cannot.[3]

---

[3]    Moreover, Texas has hardly been robbed of the opportunity to comment, given that it *has* commented on the notices of proposed rulemaking described above. *See* Letter from Todd Rokita, Ind. Att'y Gen., et al., to Miguel Cardona, Sec'y of Ed. (May 15, 2023), https://perma.cc/RQ9H-YGR6; Letter from Jonathan Skrmetti, Tenn. Att'y Gen & Rep., et al., to Miguel Cardona, Sec'y of Ed. (Sept. 12, 2022), https://perma.cc/RQ9H-YGR6.

   c.      **Special Solicitude.** The special solicitude to which states are sometimes entitled cannot patch these holes in Texas's standing theories. PMSJ 15. As the Supreme Court recently explained in holding that Texas lacked standing to challenge another federal policy, "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *United States v. Texas*, 143 S. Ct. 1964, 1972 n.3 (2023). Justice Gorsuch, joined by Justices Thomas and Barrett, also noted that, "[b]efore *Massachusetts v. EPA*, the notion that States enjoy relaxed standing rules 'ha[d] no basis in our jurisprudence,'" and it has not "played a meaningful role in this Court's decisions in the years since." *Texas*, 143 S. Ct. at 1977 (Gorsuch, J., concurring) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 536 (2007) (Roberts, C.J., dissenting)). For that reason, "it's hard not to think, too, that lower courts should just leave that idea on the shelf in future ones." *Id.*

   Even if special solicitude continues to have some force, it "merely changes 'the normal standards for redressability and immediacy'; it is not a standing shortcut when standing is otherwise lacking." *La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 882 (5th Cir. 2023) (quoting *Texas*, 50 F.4th at 514); *see also Arizona v. Biden*, 40 F.4th 375, 385 (6th Cir. 2022) ("Article III's foundational standing requirements remain for private and public litigants alike."). It "does not absolve States from substantiating a cognizable injury." *La. Dep't of Wildlife & Fisheries*, 70 F.4th at 882. Texas has not, as it must, presented facts demonstrating that it has suffered *any* injury from the Challenged Documents, and special solicitude cannot cure that deficiency.

   d.      **Enforcement Actions.** Ultimately, the linchpin of Texas's standing arguments is the assertion that ED might invoke the Challenged Documents in an enforcement action against the State. PMSJ 16. But there is no "unqualified right to pre-enforcement review" even for

18

"constitutional claims," which Texas does not assert in this action. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021). To demonstrate standing in a pre-enforcement challenge, the State "must show that the likelihood of future enforcement is substantial" enough that it faces "a realistic danger of sustaining a direct injury." *California v. Texas*, 141 S. Ct. 2104, 2114 (2021) (quotations omitted).

Texas cannot make the requisite showing. To the contrary, it is speculative whether any enforcement action against the State will ever occur. While the Challenged Documents provide high-level observations about the application of *Bostock*'s rationale to Title IX, and offer examples of conduct that OCR *can* investigate, they do not mandate either that any investigations must occur or that any particular laws, policies, or practices will ultimately be deemed to violate Title IX upon completion of ED's processes. *Cf. Sch. of the Ozarks*, 41 F.4th at 998. And again, Texas fails to identify any state laws or practices that violate Title IX, as interpreted by the Challenged Documents. There is therefore no indication that "Defendants' Guidelines are clearly designed to target [Texas's] conduct." *Texas*, 201 F. Supp. 3d at 822.

The State's reliance on private administrative complaints also falls short. Regardless of what ED states in a Fact Sheet or any other public-facing document, anybody who believes that they have experienced or are aware of discrimination has and will continue to have the right to file a complaint with ED alleging that a funding recipient has violated Title IX. Ultimately, however, Texas has only cited to one private complaint that has actually yielded an investigation (into Granbury ISD). *See* PMSJ 16. But opening an investigation based on an allegation in no way implies that ED has made a determination with regard to its merit. An investigation is just that—an *investigation*, an action that agencies undertake all the time to gather facts and to decide *whether* conduct complies with the civil rights laws. Moreover, Texas provides no basis for

19

inferring that ED will rely upon the Challenged Documents in assessing whether Granbury ISD's conduct violates Title IX. The Granbury ISD investigation, which may or may not have anything to do with the Challenged Documents, is too slender a reed to support Texas's assertion that enforcement against the State is ongoing or imminent.

Moreover, the opening of an investigation is itself several steps removed from an enforcement action to withhold federal funding. An investigation alone can involve several months of reviewing data and submissions from a funding recipient, in which the recipient has every opportunity to defend its practices. Only if the investigation indicates noncompliance will ED then attempt to secure voluntary compliance through informal means. *See* 34 C.F.R. § 100.7(d)(1). If that fails, ED would issue a written finding that the recipient is in violation of Title IX. *Id.* If the recipient still does not comply voluntarily, ED could either refer the matter to DOJ for enforcement or commence administrative proceedings to terminate federal funding. *See id.* § 100.8(a). All of these steps, both individually and collectively, are rendered even more indefinite by the inherently fact-intensive nature of Title IX's anti-discrimination prohibition. *See, e.g.*, *William Marsh Rice Univ.*, 67 F.4th at 712; *Boh Bros. Const. Co.*, 731 F.3d at 460.

In short, too many "dominoes … would have to fall" before Texas faces any actual or imminent risk of losing federal funding. *Texas State LULAC*, 52 F.4th at 257. Any injury depends "on a speculative chain of possibilities"—including, to the extent that Texas asserts that private parties will file OCR complaints, "guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 410, 413. This chain of events is too attenuated to amount to injury in fact. *See Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 774 (5th Cir. 2023) (injury based on possible loss of funding was similarly attenuated); *Sch. of the Ozarks*, 41 F.4th at 1000 (same).

Texas also asserts that it faces "the expense and trouble of complying with more expansive rules." PMSJ 18. But the Challenged Documents, unlike any regulations that may result from ED's notices of proposed rulemaking, do not constitute rules at all. Moreover, plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416; *see Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr.*, 19 F.3d 241, 244 (5th Cir. 1994) (rejecting idea that "any sincere plaintiff could bootstrap standing by expending its resources in response to actions of another"). Parties frequently have to assess whether their actions conflict with federal law (with or without the benefit of agency guidance), and the costs associated with doing so do not ordinarily give rise to standing. Even if they could, Texas does not specify, estimate, or otherwise describe any such costs, as it must to establish standing on summary judgment. *Cf. Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (rejecting fiscal costs that were "not supported by any facts"). Texas has therefore failed to show injury in fact.

> **2.   Texas cannot show that any injury it faces is caused by the Challenged Documents or will be redressed by enjoining those documents.**

Even assuming that Texas can show a cognizable injury, it barely pays lip service to the causation and redressability requirements. *See* PMSJ 18-19. Perhaps that is because any such injury would be caused by Title IX itself and could not be redressed by enjoining the Challenged Documents, which simply describe how ED views the scope of Title IX. Standing requires "a causal connection between the injury and the *conduct complained of*"—here, the Challenged Documents—and it must be "*likely*, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Bennett*, 520 U.S. at 167 (emphasis added). "Redressability is also a problem when declaring one law unenforceable may not provide relief because a different

21

law independently causes the same injury." *Texas State LULAC*, 52 F.4th at 256 (quoting *Leal v. Becerra*, 2022 WL 2981427, at *2 (5th Cir. 2022)).

In issuing the NOI, ED explained that the Supreme Court's decision in *Bostock* supports the conclusion that "Title IX prohibits discrimination based on sexual orientation and gender identity." 86 Fed. Reg. at 32,638. In other words, Title IX—by its *own force*—prohibits these forms of discrimination. Indeed, multiple appellate courts have reached precisely that conclusion, including even before *Bostock*. *See, e.g.*, *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023) (citing *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017)), *petition for cert. filed*, No. 23-392 (2023); *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023) (citing *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022)); *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616-17 (4th Cir. 2020); *cf. Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.*, 57 F.4th 43, 55 (2d Cir. 2022), *vacated pending en banc reh'g*, No. 21-1365 (2d Cir. 2023); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 536 (3d Cir. 2018); *Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) (per curiam). *But see Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808-09 (11th Cir. 2022) (en banc) (holding that sex-segregated bathrooms do not violate Title IX but not deciding whether Title IX prohibits discrimination on the basis of sexual orientation and gender identity in general).

To the extent Texas faces injury, that injury would be caused by the statute—not the Challenged Documents. Even if the Departments had *never issued* these documents, Texas would still face the same risk of enforcement under Title IX that it does now, as well as the same possibility of losing federal funding, and the same need to expend resources assessing whether its laws are in compliance. By the same token, an order invalidating these documents would not

22

eliminate these risks, "because the agency retains the authority and responsibility to carry out the same enforcement activity based on the statute alone." *Sch. of the Ozarks*, 41 F.4th at 1001; *cf. Texas*, 143 S. Ct. at 1978 (Gorsuch, J., concurring) ("A judicial decree rendering the Guidelines a nullity does nothing to change the fact that federal officials possess the same underlying prosecutorial discretion."). And regardless of what ED does, or what this Court rules, private parties will still be able to file administrative complaints with OCR, and their own lawsuits against Texas, asserting that Title IX prohibits discrimination on the basis of gender identity or sexual orientation. For all of these reasons, Texas does not have standing.

### C.    Texas's claims are unripe.

Texas does not even address the separate requirement that it show that its claims are ripe. Under Article III, "a case or controversy must be ripe for decision, meaning that it must not be premature or speculative." *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002). Ripeness is a justiciability doctrine designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," and "also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (citation omitted). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)).

Because ripeness is jurisdictional, Texas bears the burden of establishing it. *See Lower Colo. River Auth. v. Papalote Creek II, LLC*, 858 F.3d 916, 921 (5th Cir. 2017). Courts assess ripeness by evaluating "[1] the fitness of the issues for judicial decision and [2] the hardship to

the parties of withholding court consideration." *Id.* (quoting *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000)). Both factors point against review.

**1. The issues in this case are not fit for decision.**

Issues are fit for review "when [they] 'would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now.'" *DM Arbor Ct., Ltd. v. Houston*, 988 F.3d 215, 218 (5th Cir. 2021) (quotation omitted). Even where a case presents a "purely legal" question about the lawfulness of "final agency action," it is unripe if "further factual development would 'significantly advance [the court's] ability to deal with the legal issues presented.'" *Nat'l Park Hosp. Ass'n*, 538 U.S. at 812 (quotation omitted).

The issues in this case are presently unfit for decision because it remains to be seen whether the Challenged Documents will have any effect on Texas. ED has not made any statements indicating that it believes specific Texas laws or policies relating to sexual orientation and gender identity violate Title IX, nor has it initiated an enforcement action on such grounds. Unless and until ED has done so, it is "premature" and "speculative" to conclude that the Challenged Documents will affect Texas at all. *Shields*, 289 F.3d at 835. The NOI does interpret Title IX's prohibition of sex discrimination to include discrimination on the basis of sexual orientation or gender identity as a general matter. But whether a particular law or practice *constitutes* discrimination on these bases—and whether it therefore constitutes sex discrimination under Title IX—is, again, uncertain and fact-intensive. In assessing whether Texas is injured by the Challenged Documents and whether the Challenged Documents impose obligations upon Texas that are inconsistent with Title IX, the Court would benefit from a more developed factual record involving specific alleged violations of Title IX.

The Fifth Circuit's decision in *Walmart Inc. v. U.S. Department of Justice* explains why. Walmart sought "several declarations about the precise limits of pharmacists' obligations under the [Controlled Substances Act]." 21 F.4th 300, 306 (5th Cir. 2021). In rejecting Walmart's lawsuit as unripe, the Court reasoned that, even where a case "presents pure legal issues in that they are predominantly questions of statutory interpretation," it is nonetheless unfit for decision if adjudication would "benefit from more concrete facts." *Id.* at 311. Although "it would be theoretically possible to declare as a matter of law whether pharmacies had *any* obligation under the CSA … [,] the question would be easier if the court knew exactly what obligations pharmacies were alleged to have." *Id.*; *Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*, 413 F.3d 479, 483 (5th Cir. 2005) (holding challenge to EPA regulation unripe where "we have no sense of what … activities would fall under EPA's permitting requirements"). Similarly, assessing the relatively high-level observations set forth by the Challenged Documents "is likely to stand on a much surer footing in the context of a specific application … than could be the case in the framework of the generalized challenge made here." *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967). Until then, the issues in this case are unfit for decision.

### 2. Texas will not face any hardship until the conclusion of any enforcement action.

Even where a case presents questions that are fit for review, "the plaintiff must show some hardship in order to establish ripeness." *Cent. & Sw. Servs. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000)). The typical example is where a challenged regulation threatens "intrusion into the [plaintiff's] day-to-day business" or "the imposition of a Hobson's choice" through potential "criminal and civil penalties." *Pennzoil Co. v. FERC*, 645 F.2d 394, 400 (5th Cir. 1981).

Texas will not face hardship by waiting to litigate until such time as ED reaches the conclusion that the State's laws or practices violate Title IX by discriminating on the basis of

sexual orientation or gender identity in the context of a concrete enforcement action. *If* ED were hypothetically to do so, Texas would then have every opportunity to assert its merits arguments—namely, that the Challenged Documents are invalid and that Title IX does not prohibit discrimination on the basis of sexual orientation or gender identity.

For example, if the investigation into Granbury ISD were to yield an enforcement action, Texas would have "an avenue to test its theories" in court, if necessary. *Walmart*, 21 F.4th at 313. Although Texas may fear that the investigation "will proceed more slowly than this [litigation] would," that is "not the 'adverse effects of a strictly legal kind' that are necessary to show that withholding of consideration by th[e] court imposes hardship on" the State. *Id.* Texas will not, for example, incur daily fines, or be at any greater risk of losing federal funding because it was not able to obtain judicial review immediately. *Cf. Roark & Hardee LP v. Austin*, 522 F.3d 533, 545 (5th Cir. 2008). Given that Texas will not suffer any hardship by waiting until the issues in this case have fully crystallized, this case is unripe.

### D.  Texas has an adequate alternative remedy under Title IX.

Even where an agency's action is final, the APA provides jurisdiction only where the challenger lacks another "adequate remedy in a court." 5 U.S.C. § 704; *see also Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*, 59 F.4th 180, 192 (5th Cir. 2023) (characterizing the "adequate remedy" requirement as jurisdictional). In enacting Section 704, "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

To be adequate, an "alternative remedy must provide the petitioner 'specific procedures' by which the agency action can receive judicial review or some equivalent." *Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018*)* (quoting *Bowen*, 487 U.S. at 903). "The adequacy of the relief available need not provide an identical review that the APA would provide, so long as the

alternative remedy offers the 'same genre' of relief." *Id.* (quoting *CREW v. DOJ*, 846 F.3d 1235, 1245 (D.C. Cir. 2017)). Moreover, "the fact that judicial review is delayed by multiple steps of intermediary administrative review does not render the procedure inadequate so long as the agency review is not discretionary." *Id.* at 311; *Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 642 (5th Cir. 2021) ("A legal remedy is not inadequate for purposes of the APA because it is procedurally inconvenient for a given plaintiff....") (quotation omitted).

Texas will have an adequate opportunity for judicial review at the conclusion of an enforcement action, including any action that results from ED's investigation into Granbury ISD.[4] If ED were to seek to withhold Texas's federal funding, the State would have an opportunity for multiple layers of administrative review, *see* 34 C.F.R. § 100.8-10, followed by an opportunity for judicial review in the court of appeals, *see id.* § 100.11; 20 U.S.C. §§ 1234g(a), 1683. "Review by a court of appeals is 'an adequate remedy' within the meaning of the APA." *Dressner v. Meba Med. & Benefits Plans*, 628 F.3d 705, 711 (5th Cir. 2010); *see also Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 428 (6th Cir. 2016) (holding that 49 U.S.C. § 521(b)(9) provided an adequate remedy because it "provides for review by an appellate court following administrative review"). Thus, as at least one district court has held, an entity facing a potential Title IX investigation has "an adequate remedy in court." *Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 864 n.2 (S.D. Ohio 2016).

Alternatively, if DOJ were to file suit in federal court, the state would "almost by definition have an adequate remedy in a court" by defending against the enforcement action. *NAACP v. Meese*, 615 F. Supp. 200, 203 (D.D.C. 1985); *see also Quicken Loans Inc. v. United*

---

[4]   ED assumes for the sake of argument that, as a matter of state law, the State has the authority to sue on behalf of its subsidiary school districts and/or that those districts constitute subdivisions of the State (otherwise, Texas would not have standing to assert their injuries).

*States*, 152 F. Supp. 3d 938, 950 (E.D. Mich. 2015) ("[T]hat enforcement action will adequately provide Quicken with the opportunity to defend against any effort to impose such a legal consequence."); *accord, e.g.*, *Temple Univ. v. Brown*, 2001 WL 185535, at *7 (E.D. Pa. 2001); *N.J. Hosp. Ass'n v. United States*, 23 F. Supp. 2d 497, 501 (D.N.J. 1998); *Ass'n of Am. Med. Colls. v. United States*, 34 F. Supp. 2d 1187, 1193 (C.D. Cal. 1998); *U.S. Steel Corp. v. Fri*, 364 F. Supp. 1013, 1018-19 (N.D. Ind. 1973).

Assuming for the sake of argument that, as Texas alleges, the Granbury ISD investigation is predicated on the Challenged Documents, this case is quite different from those where plaintiffs have been allowed to proceed preemptively under the APA. If and when the Granbury investigation ripens into an enforcement action, Texas will have every opportunity to assert its arguments on the merits. Texas also does not risk incurring "additional … potential liability" by waiting, *Sackett v. EPA*, 566 U.S. 120, 127 (2012); for example, the State is not incurring "additional penalties for each day [it fails] to comply," *Highland*, 208 F. Supp. 3d at 863; *cf. Bank of Louisiana v. FDIC*, 919 F.3d 916, 927 (5th Cir. 2019) ("The Bank was already embroiled in an enforcement proceeding and so need not take any additional risks to assert its constitutional claims.") (quotation omitted). All Texas must endure is the "inconvenien[ce]," *Rollerson*, 6 F.4th at 642, of waiting for "administrative review," *Hinojosa*, 896 F.3d at 310. That is not enough to allow the State to circumvent the statute's review scheme.

### E.    Title IX's exclusive review scheme precludes jurisdiction in this Court.

Leaving aside the APA's restrictions upon judicial review, the *Thunder Basin* doctrine also precludes jurisdiction over this matter in district court. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). Under *Thunder Basin*, statutory review schemes preclude initial review in district court where (1) "the 'statutory scheme' displays a 'fairly discernible' intent to limit jurisdiction," and (2) "the claims at issue 'are of the type Congress intended to be reviewed

within th[e] statutory structure.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 207). Both of these conditions are met.

### 1. Title IX's review scheme reflects Congress's intent to limit jurisdiction.

What Texas ultimately seeks is a court order precluding the Departments from even *initiating an investigation* against the State on the basis of the interpretation articulated in the nonbinding Challenged Documents. With respect to challenges by recipients of federal funding, however, Congress has provided an elaborate administrative enforcement scheme that culminates in the opportunity for judicial review before a court of appeals. *See* 20 U.S.C. §§ 1682, 1683, 1234g(a), (b). "This calibrated structure is, for present purposes, materially the same as review structures the Supreme Court and sister circuits have found expressive of Congress' intent to preclude district court jurisdiction." *Bank of Louisiana*, 919 F.3d at 924; *see Highland*, 208 F. Supp. 3d at 862 ("The enforcement mechanisms of Title IX are indeed similar" to those at issue in *Thunder Basin*.).

Indeed, courts have routinely barred funding recipients and others from circumventing the civil rights laws' administrative processes. *Cf., e.g.*, *Rogers v. Bennett*, 873 F.2d 1387, 1392-93 (11th Cir. 1989); *Bakersfield City Sch. Dist. of Kern Cnty. v. Boyer*, 610 F.2d 621, 624-26 (9th Cir. 1979); *Taylor v. Cohen*, 405 F.2d 277, 279-81 (4th Cir. 1968) (en banc). The fact that Congress also permitted private lawsuits *against* recipients of federal funding, *see Cannon*, 441 U.S. 677, does not mean that *Texas* can circumvent the statutory review scheme in a challenge to how ED interprets its governing statutes. "There is undoubtedly a profound difference between a discrimination victim's right to sue in federal district court under Title IX and a [funding recipient's] right to challenge an agency interpretation in federal district court." *Highland*, 208 F.

Supp. 3d at 862. As to challenges asserted by *funding recipients* against ED's actions under Title IX, Title IX's review scheme is exclusive, and channels all review to the court of appeals.

> ### 2.    Title IX's review scheme applies to Texas's claims.

"Generally, when Congress creates procedures 'designed to permit agency expertise to be brought to bear on particular problems,' those procedures 'are to be exclusive.'" *Free Enter. Fund*, 561 U.S. at 489 (quoting *Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 420 (1965)). The rule can be overcome only if (1) "a finding of preclusion could foreclose all meaningful judicial review"; (2) if the suit is "wholly collateral to a statute's review provisions"; and (3) if the claims are "outside the agency's expertise." *Id.* Again, each of these factors points against allowing Texas's pre-enforcement challenge.

*First*, requiring Texas to wait until enforcement proceedings have ensued would not foreclose meaningful judicial review. "The Supreme Court has held that Congress provides meaningful judicial review by authorizing review of challenges to a final agency order by a federal circuit court," as is the case here. *Bank of Louisiana*, 919 F.3d at 925. Although Texas might assert that having to wait is itself an injury, "'the expense and disruption' of 'protracted adjudicatory proceedings' on a claim do not justify immediate review." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 192 (2023) (quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 244 (1980)).

*Second*, Texas's claims are not collateral to ED's review scheme. A claim is collateral if a party objects to the agency's very "existence" rather than the "standards" it intends to apply in an enforcement proceeding, *Free Enter. Fund*, 561 U.S. at 490—if it objects to the agency's "power generally, not to anything particular about how that power was wielded," *Axon Enter.*, 598 U.S. at 193. But the State's position—that discrimination on the basis of sexual orientation or gender identity does not constitute discrimination on the basis of sex—is fundamentally a

30

challenge to the legal interpretation and standards the agency would apply in an enforcement proceeding. That does not qualify as collateral.

**Third**, Texas's "statutory claims at root require interpretation of the parties' rights and duties under [Title IX], and as such … fall squarely within [ED's] expertise." *Thunder Basin*, 510 U.S. at 214. ED "regularly construes" Title IX, and any enforcement proceedings may also "involve other statutory or constitutional claims that [ED] routinely considers." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 22 (2012). ED's expertise in these matters therefore weighs in favor of allowing the agency to take the first crack at applying the high-level interpretation described in the Challenged Documents to a recipient's policies. After all, "the point of special review provisions" is "to give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to." *Axon Enter.*, 598 U.S. at 186. Texas must therefore proceed through ED's review scheme before suing in federal court.

## II.    In the alternative, the Court should enter judgment for ED.

The Court should dismiss this case for lack of subject-matter jurisdiction without addressing the merits. But if it does reach the merits, it should enter judgment for ED. The Challenged Documents correctly interpret Title IX's prohibition on sex discrimination to encompass discrimination on the basis of sexual orientation and gender identity. *See* Section II.A. Moreover, ED was not required to undergo notice-and-comment rulemaking to promulgate these interpretive documents. *See* Section II.B. Texas is not entitled to relief on either claim.

### A.    The Challenged Documents are consistent with Title IX.

In concluding that discrimination based on sexual orientation and gender identity can constitute discrimination "on the basis of sex" for purposes of Title IX, 20 U.S.C. § 1681, the Challenged Documents correctly apply the Supreme Court's decision in *Bostock*. *See* Appx.2. *Bostock* held that, for purposes of Title VII, "[a]n employer who fires an individual" for being

gay or transgender "fires that person for traits or actions it would not have questioned in members of a different sex." 140 S. Ct. at 1737. The crux of *Bostock*'s reasoning—that sex plays a "necessary and undisguisable role" in such discrimination, *id.*—applies with equal force to Title IX. ED is therefore entitled to judgment on Texas's statutory claim. *See* PMSJ 19-26.

### 1.  *Bostock* held that discrimination because of sexual orientation or gender identity is discrimination because of sex.

In *Bostock*, the Supreme Court concluded that the "express terms" of Title VII encompassed discrimination on the basis of sexual orientation and gender identity. 140 S. Ct. at 1737. Like Title IX, Title VII prohibits discrimination motivated, at least in part, by sex—it prohibits employers from discriminating "because of" sex. 140 S. Ct. at 1738 (quoting 42 U.S.C. § 2000e-2). That "because of" language, the Court expounded, "incorporates the 'simple' and 'traditional' standard of but-for causation"—which is met "whenever a particular outcome would not have happened 'but for' the purported cause." *Id.* (quoting *Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013)).[5] Even where an employer's decision has "multiple but-for causes," "[s]o long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." *Id.* "From the ordinary public meaning of the statute's language at the time of the law's adoption, a straightforward rule emerges: An employer violates Title VII when it intentionally fires an individual employee based in part on sex." *Id.*

Title VII's causation standard compelled the conclusion that discrimination on the basis of sexual orientation and gender identity is discrimination "because of" sex. *Id.* at 1741. "That's because it is impossible" to discriminate against a person for being gay or transgender "without

---

[5]   The Court noted that, in some circumstances, Title VII imposes a "more forgiving" motivating-factor standard, but "because nothing in our analysis depends on the motivating factor test, we focus on the more traditional but-for causation standard." *Id.* at 1739-40.

discriminating against that individual based on sex." *Id.* If, for example, an "employer fires [a] male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague"; similarly, if an employer "fires a transgender person who was identified as a male at birth but who now identifies as a female," but "retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* Either way, "the individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* at 1741-42.

In holding that Title VII's prohibition on sex discrimination covers discrimination on the basis of sexual orientation and gender identity, the Court recognized that "[t]hose who adopted the Civil Rights Act might not have anticipated their work would lead to this particular result." *Id.* at 1737.  However, "the limits of the drafters' imagination supply no reason to ignore the law's demands." *Id.* The Court also rejected the employers' reliance on "naked policy appeals," reiterating that courts are "limited to applying the law's demands as faithfully as [they] can in the cases that come before [them]." *Id.* at 1753. Ultimately, "[o]nly the written word is the law, and all persons are entitled to its benefit." *Id.* at 1737.

### 2. *Bostock*'s reasoning applies to Title IX.

*Bostock*'s reasoning applies with equal force to Title IX's prohibition on sex discrimination. If a school discriminates against a student for being gay or transgender, it has discriminated "on the basis of sex." 20 U.S.C. § 1681. If, for example, a public university refuses to admit a lesbian student because she is attracted to women, but admits similarly situated male students who are attracted to women, the university is discriminating on the basis of sex; the same is true if a university refuses to enroll a transgender woman into an English class who was

assigned male at birth, but enrolls similarly situated students who were assigned female at birth. For a university "to discriminate" against students for being gay or transgender, the university "must intentionally discriminate against individual men and women in part because of sex." *Bostock*, 140 S. Ct. at 1743.

The Supreme Court and the Fifth Circuit have consistently relied upon interpretations of Title VII's anti-discrimination provision in interpreting Title IX's textually similar prohibition. *See, e.g.*, *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 75 (1992) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986), a Title VII case, in analyzing a Title IX claim); *Carder v. Cont'l Airlines, Inc.*, 636 F.3d 172, 180 (5th Cir. 2011) ("Based on its legislative history, this court has interpreted Title IX as being intended to prohibit a wide spectrum of discrimination … in the same manner as Title VII."); *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 248 (5th Cir. 1997) ("[T]he prohibition against employment discrimination in title VII is identical to the proscription of sex discrimination in title IX."); *Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 401 (5th Cir. 1996) (applying Title VII law to a Title IX claim); *Lakoski v. James*, 66 F.3d 751, 756 (5th Cir. 1995) ("Any difference between their prohibitions of sex discrimination is not compelled by statutory language.").

Indeed, multiple circuit courts have held—both before and after *Bostock*—that Title IX prohibits discrimination based on sexual orientation and gender identity. As the Fourth Circuit explained, *Bostock* "guides [its] evaluation of claims under Title IX"; in both contexts, one who discriminates against an individual on the basis of gender identity "is necessarily referring to the individual's sex to determine incongruence between sex and gender, making sex a but-for cause for the discriminator's actions." *Grimm*, 972 F.3d at 616. Similarly, the Seventh Circuit concluded that "*Bostock* strengthens" its pre-*Bostock* precedent holding "that discrimination

34

based on transgender status is a form of sex discrimination." *A.C.*, 75 F.4th at 769 (citing *Whitaker*, 858 F.3d 1034); *see also Grabowski*, 69 F.4th at 1116 (citing *Doe*, 28 F.4th at 114); *cf. Soule*, 57 F.4th at 55; *Doe*, 897 F.3d at 536; *Dodds*, 845 F.3d at 221; *Walker v. Azar*, 480 F. Supp. 3d 417, 430 (E.D.N.Y. 2020); *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 64 (D.D.C. 2020).[6]

The Challenged Documents also do not conflict with any of Title IX's more specific provisions. *See* PMSJ 19, 22-23. Specifically, the Challenged Documents do not prohibit recipients of federal funding from maintaining certain single-sex educational institutions, organizations, activities, or scholarship awards, 20 U.S.C. § 1681(a), or "from maintaining separate living facilities for the different sexes," *id.* § 1686. They also do not establish specific rules for subjects like "toilet, locker room, and shower facilities," 34 C.F.R. § 106.33, athletic scholarships, *id.* § 106.37(c), or any other topics. None of these provisions conflict with ED's high-level observation that discrimination on the basis of sexual orientation or gender identity *can* constitute discrimination on the basis of sex in violation of Title IX. *Grimm*, 972 F.3d at 618.

Moreover, it bears repeating that the NOI "does not itself determine the outcome in any particular case or set of facts." Appx.2. And while the Fact Sheet identifies "[e]xamples of the kinds of incidents [DOJ] and OCR *can investigate*," it does not indicate that any of these incidents would necessarily be deemed to violate Title IX. Appx.11. The Challenged Documents

---

[6]    Texas cites the Eleventh Circuit's decision in *Adams* (PMSJ 24), but that case did not dispute *Bostock*'s statement that, as a general matter, discrimination based on sexual orientation or transgender status "'necessarily entails discrimination based on sex'"; it held only that a bathroom policy that "classifies students on the basis of biological sex" did not "facially discriminate on the basis of transgender status." 57 F.4th at 809 (quoting *Bostock*, 140 S. Ct. at 1747). Texas also cites *Pelcha v. MW Bancorp, Inc.* 988 F.3d 318, 324 (6th Cir. 2021), but that case dealt with the Age Discrimination in Employment Act, not Title IX, and did not involve discrimination on the basis of sexual orientation or gender identity.

instead leave these subjects for future rulemaking or for administrative and judicial determination in the context of concrete enforcement actions. *Cf. Sch. of the Ozarks*, 41 F.4th at 998 ("The Memorandum does not, as the College presupposes, require that HUD reach the specific enforcement decision that the College's current housing policies violate federal law."). Indeed, as mentioned previously, ED is currently engaged in rulemaking to address some of these very questions—underscoring that the Challenged Documents *do not* address them.

For these reasons, the Challenged Documents correctly apply *Bostock* to Title IX in concluding that Title IX's prohibition on sex discrimination encompasses discrimination on the basis of sexual orientation and gender identity, without rendering judgments about how that interpretation might bear on specific policies or circumstances.

### 3.      Texas fails to provide any basis for not applying *Bostock*'s rationale to Title IX.

None of the arguments in Texas's motion justify deviating from *Bostock.*

a.      To start, Texas argues at length that "'sex' means only 'biological sex.'" PMSJ 20; *see also id.* at 20-23. But the Challenged Documents do not interpret the term "sex," to mean "gender identity," "sexual orientation," or otherwise. To the contrary, ED clearly states that "[s]imilar to the Court's interpretation of Title VII [in *Bostock*], the Department's interpretation of the scope of discrimination 'on the basis of sex' under Title IX does not require the Department to take a position on the definition of sex, nor do we do so here." Appx.2 n.1. In other words, even if Texas is right that sex in Title IX means "biological sex" as the State defines that term, it is still "impossible" to discriminate against a person for being gay or transgender "without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741.

b.      Similarly, Texas's efforts to distinguish *Bostock*'s rationale as limited to Title VII fall flat. Texas notes that "the holding in *Bostock* applied only to Title VII—not Title IX." PMSJ

36

24. But it is *Bostock*'s underlying reasoning—which applies with equal force to Title IX—that compels the result here, not *Bostock*'s top-line holding. Even if that reasoning were dicta, it would be no less binding. *See, e.g.*, *Hollis v. Lynch*, 827 F.3d 436, 448 (5th Cir. 2016) ("[W]e are generally bound by Supreme Court dicta…."); *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013) ("Even assuming it is dictum, however, we give serious consideration to this recent and detailed discussion of the law by a majority of the Supreme Court."); *United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980) ("Dicta of the Supreme Court are, of course, another matter[.]").

As to *Bostock*'s reasoning, Texas's argument boils down to the contention that *Bostock* is inapplicable because Title IX prohibits discrimination "on the basis of" sex rather than "because of" sex. PMSJ 24-25. But that semantic distinction does not make a substantive difference to *Bostock's* analysis. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 845 (2018) (quoting *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 540 (2013)) ("[T]here is no 'canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing.'"). Both phrases simply refer to discrimination motivated in some way by sex.

Indeed, *Bostock* itself used the terms "because of," "based on," and "on the basis of" interchangeably. *See, e.g.*, *Bostock*, 140 S. Ct. at 1753 ("employers are prohibited from firing employees *on the basis of*" sexual orientation or transgender status (emphasis added)); *id.* at 1741 ("An employer violates Title VII when it intentionally fires an individual employee *based in part* on sex." (emphasis added)); *id.* ("it is impossible to discriminate against a person" for being gay or transgender "without discriminating against that individual *based on* sex" (emphasis added)); *id.* at 1743 ("For an employer to discriminate against employees" for being gay or transgender, "the employer must intentionally discriminate against individual men and women in

part *because of* sex." (emphasis added)); *id.* at 1747 ("discrimination *based on*" sexual orientation or transgender status "necessarily entails discrimination *based on* sex" (emphasis added)); *see also Snyder*, 28 F.4th at 114 ("*Bostock* used those phrases interchangeably throughout the decision."). The Fifth Circuit recently did the same. *See Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 918 (5th Cir. 2023) (explaining that *Bostock* held that discrimination based on sexual orientation or gender identity is "discrimination … 'on the basis of sex'").

If anything, Title IX's prohibition of discrimination "on the basis of" sex even more clearly encompasses discrimination on the basis of sexual orientation and gender identity than the prohibition contained in Title VII. The Fifth Circuit has repeatedly construed that language to impose a "motivating factor" standard—*i.e.*, to prohibit actions where "gender is a motivating factor in the decision." *William Marsh Rice Univ.*, 67 F.4th at 708-09 (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)); *Overdam v. Texas A&M Univ.*, 43 F.4th 522, 527-28 (5th Cir. 2022); *Plummer v. Univ. of Houston*, 860 F.3d 767, 777-78 (5th Cir. 2017); *see also Doe v. TCU*, 601 F. Supp. 3d 78, 85-86 (N.D. Tex. 2022) (O'Connor, J.). As *Bostock* explained, "[u]nder this more forgiving standard, liability can sometimes follow even if sex *wasn't* a but-for cause of the … challenged decision." 140 S. Ct. at 1740. Nonetheless, the Court concluded that even "the more traditional but-for causation standard" encompassed discrimination on the basis of sexual orientation and gender identity. *Id.* At the very least, Title IX's causation standard is no more permissive of discrimination on the basis of sexual orientation and gender identity than Title VII's and compels the same conclusion.

c.     Finally, Texas's reliance on the Spending Clause belies its confidence that Title IX's text supports its position. Texas asserts that even if Title IX were ambiguous, "that ambiguity [must] be resolved in favor of the State since conditions on federal funding must be

stated clearly." PMSJ 25. But Title IX is no more ambiguous than Title VII. As *Bostock* explained, "no ambiguity exists about how Title VII's terms apply" to discrimination on the basis of sexual orientation and gender identity. 140 S. Ct. at 1749. "[T]he fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Id.* (cleaned up); *see also id.* at 1757 (Alito, J., dissenting) ("According to the Court, the text is unambiguous."). Thus, "*Bostock* forecloses" Texas's argument "that 'on the basis of sex' is ambiguous as to discrimination against transgender persons." *Grimm*, 972 F.3d at 619 n.18.

Even if it were ambiguous how Title IX applies to discrimination on the basis of sexual orientation and gender identity, that still would not implicate the Spending Clause. Recipients of federal funds like Texas are clearly on notice that they must comply with the discrimination prohibition under Title IX, and "the possibility that application of [the condition] might be unclear in [some] contexts" does not render it unenforceable under the Spending Clause. *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 665-66, 673 (1985). Unlike *Pennhurst*, in which the federal law at issue was unclear as to whether the states incurred any obligations at all by accepting federal funds, Title IX expressly conditions receipt of funds on complying with the statute's prohibitions on sex discrimination. *See* 20 U.S.C. § 1681(a). "Nothing more is required under *Pennhurst*, which held that Congress need provide no more than 'clear notice' to the [S]tates that funding is conditioned upon compliance with certain standards." *Cutter v. Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005). Indeed, "so long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004). The Spending Clause cannot save Texas's statutory argument.

In sum, *Bostock*'s rationale compels the interpretation expressed in the Challenged Documents: that Title IX's prohibition on discrimination on the basis of sex encompasses discrimination on the basis of sexual orientation and gender identity. ED is therefore entitled to judgment on Texas's statutory claim.

### B.   The Challenged Documents are, at most, interpretive statements that were not required to undergo notice-and-comment rulemaking.

ED also did not violate the APA's notice-and-comment requirements in promulgating the Challenged Documents. The APA provides that these requirements do not apply to "[interpretive] rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). "[T]he critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Perez*, 575 U.S. at 97 (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)). But the "absence of a notice-and-comment obligation … comes at a price: Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'" *Id.* (quoting *Shalala*, 514 U.S. at 97).

At most, the Challenged Documents are "interpretive rules" that did not require notice and comment.[7] The documents are expressly non-binding and do not purport to have the force or effect of law. Rather, they represent ED's understanding of Title IX's sex discrimination prohibition and merely "advise" the regulated public of that interpretation. *Shalala*, 514 U.S. at 99. If the United States were to bring an enforcement action consistent with the legal

---

[7]   The APA also does not require notice and comment for agency documents that are not rules. 5 U.S.C. § 553. "Rule" is defined to mean "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). The Dear Educator letter and Fact Sheet do not satisfy that definition and so were not required to go through notice and comment.

interpretations espoused in the Challenged Documents, it would rely on Title IX itself as the

basis for the action, not these documents. And the documents would not be "accorded [the]

weight [of law] in the adjudicatory process." *Perez*, 575 U.S. at 97 (quotation omitted). Instead,

it would be up to the court to decide for itself whether the interpretation proposed by the agency

is valid and, if so, whether the evidence presented in a particular case establishes that

discrimination took place.

Texas's argument to the contrary rests on a fundamental misunderstanding of the

applicable law. In Texas's telling, whether a rule is interpretive or substantive depends

"primarily on whether the rule had binding effect on agency discretion or severely restricts it."

PMSJ 27 (quoting *Texas v. United States ("DAPA")*, 809 F.3d 134 (5th Cir. 2015)). That is

incorrect. *DAPA* addressed whether an agency's rule withdrew agency discretion "in the context

of determining whether it was a 'policy statement,' not an interpretive rule." *Flight Training

Int'l, Inc. v. FAA*, 58 F.4th 234, 242 (5th Cir. 2023). Policy statements "are different from

'interpretive rules,' and an agency action need only fall under one of these categories to be

exempt from notice-and-comment procedures." *Id.* (quoting 5 U.S.C. § 553(b)(A)).

"In contrast to policy statements—which are 'issued by an agency to advise the public

prospectively of the manner in which the agency proposes to exercise a discretionary power'—

interpretive rules explain what an agency thinks a statute or regulation actually says." *Id.*

(quoting *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993)). "If the law is mandatory, then it is natural

for an agency's restatement of the law to speak in mandatory terms as well." *Id.* The Fifth Circuit

therefore "join[ed] other Circuits in rejecting the proposition that a rule cannot be interpretive if

it limits discretion or uses binding language." *Id.* Thus, the Challenged Documents may be

interpretive rules regardless of the extent to which they constrain the agency's discretion.

Even if the degree to which a rule restricted the agency's discretion were relevant, the Challenged Documents do not substantially restrict the discretion of ED's staff. The Notice of Interpretation "guide[s] the Department in processing complaints and conducting investigations, but it does not itself determine the outcome in any particular case or set of facts." Appx.2. And while the Fact Sheet identifies "[e]xamples of the kinds of incidents CRT and OCR *can investigate*," it does not indicate that any of these incidents will necessarily be deemed to constitute discrimination or to violate Title IX. Appx.11. ED's staff retain discretion to determine whether a particular complaint warrants investigation and whether any given incident or policy constitutes discrimination on the basis of sex.

Nor do the Challenged Documents "impose sweeping new obligations" on Texas or "change[] the substantive standards" by which Title IX is enforced. PMSJ 28. The documents do not themselves "*determine* the law or the consequences of not following it"; they simply "*inform* [recipients] of what the law, previously enacted or adopted, is." *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 432-33 (4th Cir. 2010). Any obligations upon Texas flow directly from Title IX, and Texas's programs could only be affected if Texas were found to have violated Title IX in a judicial or administrative enforcement action.

Finally, Texas asserts that the Challenged Documents conflict with Title IX and its implementing regulations. PMSJ 29. But that argument rehashes Texas's statutory claim, and fails for the same reasons. The Challenged Documents simply interpret Title IX's prohibition on sex discrimination, consistent with *Bostock*, to proscribe discrimination on the grounds of sexual orientation and gender identity as a general matter. They do not address, and therefore do not conflict with, the regulations concerning sex-separated restrooms and living facilities. The

42

Challenged Documents therefore were not required to undergo notice and comment. For these reasons, the Court should enter judgment for ED on both of Texas's claims.

## III. If the Court enters judgment for Texas, it should do nothing more than vacate the Challenged Documents.

Texas is not entitled to relief on either of its claims. But even if it is, the Court should, at most, vacate the Challenged Documents.[8] It should not issue injunctive relief, let alone relief prohibiting ED from acting on the basis of the underlying interpretation in the Challenged Documents or relief that would sweep beyond the state of Texas. Although Texas's brief suggests that all it seeks is for the Court to vacate and enjoin the application of "the challenged agency actions," PMSJ 34, its proposed order is far broader, and seeks an injunction prohibiting ED from "using the Challenged Documents" or "initiating, continuing, or concluding *any* investigation" on the grounds that discrimination on the basis of sexual orientation or gender identity constitutes sex discrimination, Proposed Order at 2 (emphasis added). Such an order would grossly exceed fundamental principles of equity.

---

[8] Defendants recognize that this Court and the Fifth Circuit have ruled that vacatur is generally an appropriate remedy in an APA action, *see VanDerStok v. Garland*, 2023 WL 4539591, at *18 (N.D. Tex. 2023), *aff'd in part, vacated in part, remanded*, 86 F.4th 179 (5th Cir. 2023), but hereby preserve all arguments that the APA does not permit such a remedy, particularly on a universal basis. *See Texas*, 143 S. Ct. at 1980 (Gorsuch, J., concurring in the judgment, joined by Thomas and Barrett, JJ.) (noting that although the Court has sometimes assumed that vacatur is a permissible remedy if a rule is held invalid in a suit under the APA, it has never squarely decided the question).

Moreover, remand without vacatur would be appropriate if the Court were to hold that the Challenged Documents suffer from a curable defect. As Texas acknowledges, "remand 'is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so.'" PMSJ 32 (quoting *Texas Ass'n of Manufacturers v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2000)). For example, if the Court were to hold that the Challenged Documents are generally consistent with *Bostock*, but that they somehow conflict with Title IX's provisions regarding sex-separated facilities, the Court should remand to ED for a better explanation of its reasoning.

A.        **Texas is not entitled to injunctive relief.**

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). "If a less drastic remedy (such as partial or complete vacatur …) [is] sufficient to redress [the plaintiff's] injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted." *Id.* at 165-66. Texas has not even attempted to show that vacatur would be insufficient to redress its injuries; to the contrary, vacating the Challenged Documents would preclude ED from relying upon them or giving them any legal force (which ED could not do anyway, given that the documents lack the force of law). That is sufficient to redress any purported injury Texas has suffered. *See, e.g.*, *Fed'n of Ams. for Consumer Choice, Inc. v. U.S. Dep't of Lab.*, 2023 WL 5682411, at *30 (N.D. Tex. 2023) ("Vacatur … is a sufficient, tailored remedy for Plaintiffs as the vacatur will negate any threat of injurious actions[.]").[9]

Nor do the equities favor injunctive relief on their own terms. For the reasons explained above, Texas does not face any cognizable injury in fact, and by extension, cannot show irreparable injury. Leaving that aside, however, any injury that Texas faces is not *irreparable*. Before Texas loses funding, it would have the benefit of an extensive administrative process, followed by judicial review. Texas will have every opportunity in that process to argue that ED's enforcement action is impermissibly based on the Challenged Documents and/or that Title IX does not encompass discrimination on the basis of sexual orientation or gender identity. The availability of these remedies similarly alleviates any impingement upon Texas's sovereignty. Texas therefore cannot show that it is "'likely to suffer *irreparable* harm,' that is, harm for which

---

[9]    There is similarly no need to issue a declaratory judgment (PMSJ 31) where vacatur provides complete relief. *See Texas v. United States*, 606 F. Supp. 3d 437, 502 (S.D. Tex. 2022), *rev'd on other grounds*, 599 U.S. 670 (2023).

there is no adequate remedy at law." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) (emphasis added) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

As to the other factors, Texas describes the relevant legal standards and then puzzlingly stops short of explaining how the balance of the equities and public interest actually favor injunctive relief. PMSJ 30. Given that an injunction is "an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements," *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009) (quotation omitted), that lapse is reason enough to withhold injunctive relief. Regardless, those factors cut against an injunction. There is a substantial public interest in achieving Title IX's goal of eliminating discrimination in education. *See, e.g.*, *Dodds*, 845 F.3d at 222; *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001); *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 833 (10th Cir. 1993). And there is also "inherent harm to an agency" in preventing it from enforcing statutes and regulations that "Congress found it in the public interest to direct that [it] develop and enforce." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008). Thus, the balance of the equities tips against entering an injunction that would limit how ED administers one of its governing statutes.

### B.    Texas is not entitled to injunctive relief that would sweep more broadly than preventing the application of the Challenged Documents to Texas.

It would be particularly inappropriate to enter a permanent injunction that would prohibit ED from taking *any* action based on the underlying interpretation of Title IX contained in the Challenged Documents, including against entities other than Texas. The scope of relief is "'dictated by the extent of the violation established,'" and "'should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Nat'l Ass'n for Gun*

*Rts., Inc. v. Garland*, 2023 WL 6613080, at *21 (N.D. Tex. 2023) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), and *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) ("[T]he plaintiff's remedy must be limited to the inadequacy that produced his injury in fact."). Texas is the only plaintiff in this case, and its claims are limited to challenging the Challenged Documents. Neither the Complaint nor its motion provides any basis for relief that would sweep any broader.

Moreover, an injunction precluding ED from taking *any* action based on its interpretation of Title IX would also raise grave separation-of-powers concerns. Such broad language could be construed to bar ED from taking any number of unforeseen and distinct administrative actions based on its understanding of how a binding Supreme Court decision applies to one of its governing statutes. But courts cannot review agency decisions "in the abstract"; they may only "'intervene in the administration of the laws only when, and to the extent that, a specific final agency action has an actual or immediately threatened effect.'" *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18-20 (D.C. Cir. 2006) (quoting *Lujan*, 497 U.S. at 894). Moreover, to the extent any injunction would limit future enforcement actions, it would also impinge upon the Executive's responsibility to "take care that the laws be faithfully executed," including through "legal proceedings and in the prosecution of offenses." *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965).

Finally, any relief—whether vacatur, an injunction, or a declaratory judgment—should be limited to Texas. This Court has recognized that "longstanding principles of equity" confine courts to "redress[ing] particular injuries in particular cases or controversies." *VanDerStok v. Garland*, 2022 WL 4809376, at *2 (N.D. Tex. 2022) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2426 (2018) (Thomas, J., concurring)). Moreover, universal relief "take[s] a toll on the federal

court system" by "preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Id.* (quoting *Hawaii*, 138 S. Ct. at 2426 (Thomas, J., concurring)). Indeed, numerous circuits have adopted ED's interpretation of Title IX. *See, e.g.*, *A.C.*, 75 F.4th at 769; *Grabowski*, 69 F.4th at 1116; *Grimm*, 972 F.3d at 616-17. Nationwide relief would therefore usurp the province of other coordinate federal courts and stretch far beyond redressing Texas's alleged injuries.

## CONCLUSION

The Court should dismiss the Complaint for lack of subject-matter jurisdiction under Rule 12(b)(1). In the alternative, the Court should enter judgment for ED.

Dated: December 1, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CARLOTTA WELLS
Assistant Branch Director

*/s/ John T. Lewis*
JOHN T. LEWIS (TX Bar No. 24095074)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20530
Tel: (202) 353-0533
Fax: (202) 616-8460
E-mail: john.t.lewis.iii@usdoj.gov

*Attorneys for Defendants*

47

**CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2023, a copy of the foregoing was filed

electronically via the Court's ECF system, which effects service upon counsel of record.

*/s/ John T. Lewis*
John T. Lewis