# United States District Court
## Northern District of Texas
## Fort Worth Division

State of Texas,

    *Plaintiff,*

v.

                              No. 4:23-cv-00604-O

Miguel Cardona, in his official capacity as
Secretary of Education, *et al.*,

    *Defendants.*

# Texas's Consolidated Reply in Support of Its Motion for Summary Judgment and Brief in Opposition to Cross-Motion to Dismiss or, In the Alternative, for Summary Judgment

# TABLE OF CONTENTS

Table of Contents ...................................................................................................................... ii

Table of Authorities ................................................................................................................. iii

Introduction .............................................................................................................................. 1

Background ............................................................................................................................... 1

    I.    Title IX in Texas. ........................................................................................................... 1

    II.   The June 22 Notice. ....................................................................................................... 2

    III.  The June 23 Letter and Fact Sheet. .............................................................................. 4

    IV.  Texas Laws and School Policies .................................................................................. 5

Argument .................................................................................................................................. 6

    I.    This Court has subject matter jurisdiction. ................................................................... 6

        A.   The Notice, Letter, and Fact Sheet constitute final agency action. ............................. 6

        B.   Texas has standing to challenge to the Notice, Letter, and Fact Sheet. ...................... 12

        C.   Texas's claims are ripe. .............................................................................................. 23

        D.   Title IX is not an adequate alternative remedy for Texas. ......................................... 26

        E.   Title IX does not preclude this Court's review. ......................................................... 28

    II.   The Notice, Letter, and Fact Sheet are contrary to law. ............................................. 32

    III.  The Notice, Letter, and Fact Sheet constitute a substantive rule requiring notice-and-comment rulemaking. ............................................................................................................... 38

    IV.  Texas is entitled to its requested relief. ..................................................................... 41

        A.   Texas is entitled to declaratory relief. ....................................................................... 41

        B.   Texas is entitled to vacatur of the Notice, Letter, and Fact Sheet. ............................ 41

        C.   Texas is entitled to permanent injunctive relief. ....................................................... 43

        D.   Texas's requested relief is appropriate. ..................................................................... 45

Conclusion .............................................................................................................................. 46

## Table of Authorities

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ..................................................................................24, 26, 27

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018) .........................................................................................46

*Adams v. Sch. Bd. of St. Johns Cnty.*,
   57 F.4th 791 (11th Cir. 2022) (en banc)......................................................3, 37, 38, 39

*Ala. Ass'n of Realtors v. HHS*,
   141 S. Ct. 2485 (2021) .........................................................................................38

*Alaska Dept. of Envtl. Conservation v. EPA*,
   540 U.S. 461 (2004) .............................................................................................10

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
   458 U.S. 592 (1982)..............................................................................................14

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
   No. 2:22-cv-223-Z, 2023 WL 2825871 (N.D. Tex. Apr. 7, 2023) (Kacsmaryk,
   J.), *aff'd in part, vacated in part,* 78 F.4th 210 (5th Cir. 2023) ................................. 24

*Axon Enter., Inc. v. FTC*,
   598 U.S. 175 (2023)........................................................................................ 32, 33

*Azar v. Allina Health Servs.*,
   139 S. Ct. 1804 (2019) .........................................................................................39

*Bakersfield City Sch. Dist. of Kern Cnty. v. Boyer*,
   610 F.2d 621 (9th Cir. 1979) (addressing Title VI of the Civil Rights Act of
   1964)....................................................................................................................31

*Bank of Louisiana v. Fed. Deposit Ins. Corp.*,
   919 F.3d 916 (5th Cir. 2019) ............................................................................ 29, 31

*Barrick Goldstrike Mines Inc. v. Browner*,
   215 F.3d 45 (D.C. Cir. 2000) .......................................................................8, 10, 26

*Bennett v. Spear*,
   520 U.S. 154 (1997) ..............................................................................................7

iii

*Biden v. Texas,*
    597 U.S. 785 (2022) .................................................................................................. 9, 10

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ..................................................................................... *passim*

*Braidwood Mgmt., Inc. v. EEOC,*
    70 F.4th 914 (5th Cir. 2023) .................................................................................. 17, 24

*BST Holdings, L.L.C. v. OSHA,*
    17 F.4th 604 (5th Cir. 2021) .......................................................................................... 46

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ...................................................................................................... 19

*Clarke v. Commodity Futures Trading Comm'n,*
    74 F.4th 627 (5th Cir. 2023) .................................................................................. 7, 9, 11

*Cochran v. SEC,*
    20 F.4th 194 (5th Cir. 2021) .......................................................................................... 33

*Commonwealth of Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ...................................................................................................... 17

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.,*
    779 F.3d 258 (5th Cir. 2015) ......................................................................................... 19

*In re Core Comm'n, Inc.,*
    531 F.3d 849 (D.C. Cir. 2008) (Griffith, J., concurring) ............................................ 43

*Ctr. for Auto Safety v. NHTSA,*
    452 F.3d 798 (D.C. Cir. 2006) ...................................................................................... 13

*Daimler Trucks N. Am. LLC v. E.P.A.,*
    737 F.3d 95 (D.C. Cir. 2013) ........................................................................................ 44

*Data Mktg. P'ship, LP v. United States Dep't of Lab.,*
    45 F.4th 846 (5th Cir. 2022) ..................................................................................... 7, 11

*De La Garza Gutierrez v. Pompeo,*
    741 F. App'x 994 (5th Cir. 2018) ................................................................................. 28

*Dennis Melancon, Inc. v. City of New Orleans,*
    703 F.3d 262 (5th Cir. 2012) ........................................................................................ 45

*Doe 2 v. Shanahan,*
    917 F.3d 694 (D.C. Cir. 2019) (Williams, J., concurring in the result) ..................... 36

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ...........................................................................................45

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) (Alito, J., dissenting) .............................................................29

*EME Homer City Generation, L.P. v. E.P.A.*,
795 F.3d 118 (D.C. Cir. 2015) (Kavanaugh, J.) ...............................................43

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ...........................................................................................38

*Flight Training Int'l, Inc. v. Fed. Aviation Admin.*,
58 F.4th 234 (5th Cir. 2023) ..............................................................................41

*Florida v. Weinberger*,
492 F.2d 488 (5th Cir. 1974) ..............................................................................27

*Franciscan All., Inc. v. Becerra*,
47 F.4th 368 (5th Cir. 2022) ..............................................................................47

*Free Enter. Fund v. Public Company Accounting Oversight Bd.*,
561 U.S. 477 (2010) ...........................................................................................32

*Gen. Land Office v. Biden*,
71 F.4th 264 (5th Cir. 2023) .............................................................................. 22

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ............................................................................. 16

*Her Majesty the Queen in Right of Ontario v. EPA*,
912 F.2d 1525 (D.C. Cir. 1990) ........................................................................ 11

*Jobs, Training & Servs., Inc. v. E. Tex. Council of Gov'ts*,
50 F.3d 1318 (5th Cir. 1995) ...............................................................................8

*Kansas v. United States*,
249 F.3d 1213 (10th Cir. 2001) ..........................................................................46

*Kentucky v. Biden*,
57 F.4th 545 (6th Cir. 2023) ............................................................................. 16

*King v. Burwell*,
576 U.S. 473 (2015) ...........................................................................................38

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .................................................................................13, 14, 23

v

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning,*
   136 S. Ct. 1562 (2016) (Thomas, J., concurring in the judgment) .......................................... 35

*Missouri v. Biden,*
   —F. Supp. 3d—, No. 3:22-cv-01213, 2023 WL 4335270 (W.D. La. July 4,
   2023) (Doughty, J.), *rev'd in part on other grounds,* 83 F.4th 350 (5th Cir. 2023) .................. 22

*Nat. Res. Def. Council v. EPA,*
   489 F.3d 1250 (D.C. Cir. 2007) (Randolph, J., concurring) .................................................... 43

*Nat. Res. Def. Council v. Wheeler,*
   955 F.3d 68 (D.C. Cir. 2020) ............................................................................................. 13, 44

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA,*
   752 F.3d 999 (D.C. Cir. 2014) ................................................................................................. 26

*Nat'l Mining Ass'n v. McCarthy,*
   758 F.3d 243 (D.C. Cir. 2014) (Kavanaugh, J.) ...................................................................... 13

*Nat'l Pork Producers Council v. EPA,*
   635 F.3d 738 (5th Cir. 2011) .............................................................................................. 7, 35

*Nat'l Pork Producers Council v. Ross,*
   598 U.S. 356 (2023) .................................................................................................................. 35

*Natl. Council for Adoption v. Blinken,*
   4 F.4th 106 (D.C. Cir. 2021) ............................................................................................. 12, 42

*Neese v. Becerra,*
   640 F. Supp. 3d 668 (N.D. Tex. 2022) (Kacsmaryk, J.) ................................................. 3, 35, 36

*Neese v. Becerra,*
   No. 2:21-cv-163-Z, 2022 WL 1265925 (N.D. Tex. Apr. 26, 2022) (Kacsmaryk,
   J.) ....................................................................................................................................... 20, 23

*North Carolina v. EPA,*
   531 F.3d 896 (D.C. Cir. 2008) ................................................................................................. 44

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
   523 U.S. 726 (1998) ....................................................................................................... 25, 26, 27

*Opulent Life Church v. City of Holly Springs, Miss.,*
   697 F.3d 279 (5th Cir. 2012) .................................................................................................... 26

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.,*
   656 F.3d 580 (7th Cir. 2011) .................................................................................................... 24

*Pelcha v. MW Bancorp, Inc.*,
    988 F.3d 318 (6th Cir. 2021) ............................................................................3

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ..........................................................................13, 39, 41

*POET Biorefining, LLC v. EPA*,
    970 F.3d 392 (D.C. Cir. 2020) ................................................................ 12, 41

*Pros. & Patients for Customized Care v. Shalala*,
    56 F.3d 592 (5th Cir. 1995) .............................................................................13

*Reckitt Benckiser v. EPA*,
    613 F.3d 1131 (D.C. Cir. 2010) ......................................................................27

*Religious Sisters of Mercy v. Azar*,
    513 F. Supp. 3d 1113 (D.N.D. 2021) .............................................................14

*Roark & Hardee LP v. City of Austin*,
    522 F.3d 533 (5th Cir. 2008) .........................................................................26

*Rogers v. Bennett*,
    873 F.2d 1387 (11th Cir. 1989) ......................................................................31

*Sackett v. EPA*,
    566 U.S. 120 (2012) ..............................................................................7, 9, 28

*Scenic Am., Inc. v. United States Dep't of Transportation*,
    836 F.3d 42 (D.C. Cir. 2016) ......................................................................... 22

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87 (1995) ......................................................................................... 40

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) ..................................................................... 44

*Suitum v. Tahoe Regional Planning Agency*,
    520 U.S. 725 (1997) .......................................................................................25

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ...................................................................................... 20

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) .......................................................................................17

*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997) ...........................................................................8

*Taylor v. Cohen*,
    405 F.2d 277 (4th Cir. 1968) (en banc) ................................................. 31

*Tennessee v. United States Dep't of Educ.*,
    615 F. Supp. 3d 807 (E.D. Tenn. 2022) .............................. 1, 10, 30, 42

*Tex. Off. of Pub. Util. Couns. v. FCC*,
    183 F.3d 393 (5th Cir. 1999) ................................................................14

*Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) ................................................................43

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
    No. 6:23-cv-59-JDK, 2023 WL 4977746 (E.D. Tex. Aug. 3, 2023) (Kernodle,
    J.) ............................................................................................................43

*Texas v. Becerra*,
    623 F. Supp. 3d 696 (N.D. Tex. 2022) (Hendrix, J.) .......................15, 17

*Texas v. Biden (MPP)*,
    20 F.4th 928 (5th Cir. 2021) ................................................... 13, 15, 21

*Texas v. EEOC*,
    633 F. Supp. 3d 824 (N.D. Tex. 2022) (Kacsmaryk, J.) ...................... 40

*Texas v. EEOC*,
    827 F.3d 372 (5th Cir. 2016), *opinion withdrawn on reh'g,* 838 F.3d 511 (5th Cir.
    2016) ..............................................................................................12, 26

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) ........................................................ *passim*

*Texas v. United States*,
    201 F. Supp. 3d 810 (N.D. Tex. 2016) (O'Connor, J.) .................1, 31, 47

*Texas v. United States*,
    328 F. Supp. 3d 662 (S.D. Tex. 2018) ...............................................39, 40

*Texas v. United States*,
    497 F.3d 491 (5th Cir. 2007) ...........................................................25, 26

*Texas v. United States*,
    549 F. Supp. 3d 572 (S.D. Tex. 2021) ...........................................11, 12, 21

*Texas v. United States* (*DACA*),
    50 F.4th 498 (5th Cir. 2022) ...........................................................42, 44

*Texas v. United States (DAPA)*,
809 F.3d 134 (5th Cir. 2015) . Action ................................................ *passim*

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) ................................................................32

*U.S. Army Corps of Eng'rs v. Hawkes*,
578 U.S. 590 (2016)...............................................................8, 27

*United States Telecom Ass'n v. FCC*,
825 F.3d 674 (D.C. Cir. 2016) ............................................... 24

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) ..........................................................38, 40

*L.W. ex rel. Williams v. Skrmetti*,
73 F.4th 408 (6th Cir. 2023) (Sutton, C.J.)...............................36

**Statutes**

5 U.S.C. § 553, 551(5) ..............................................................39

5 U.S.C. § 553(b)(A) ................................................................39

5 U.S.C. § 703 .......................................................................... 42

5 U.S.C. § 704...........................................................................7, 27

5 U.S.C. § 706(2)(A), (C) ....................................................... 33, 34

20 U.S.C. § 1234a .....................................................................30

20 U.S.C. § 1234c .....................................................................30

20 U.S.C. § 1234d(a) ................................................................30

20 U.S.C. § 1234e(a) .................................................................30

20 U.S.C. § 1234g(a) .................................................................30

20 U.S.C. § 1234g(b)–(d) ..........................................................32

20 U.S.C. § 1681 ........................................................................2

20 U.S.C. §§ 1681–1683 ............................................................ 31

20 U.S.C. § 1681(a)....................................................................3, 34

20 U.S.C. § 1682 ......................................................................................29, 30

20 U.S.C. §§ 1682–1683 ....................................................................................32

20 U.S.C. § 1683 ......................................................................................29, 30

20 U.S.C. § 1686 ...........................................................................33, 34, 37, 41

42 U.S.C. § 2000e-2(a) .........................................................................................3

Tex. Educ. Code 11.151(b) ..........................................................................6, 16

Tex. Educ. Code § 11.002 ...................................................................................1

Tex. Educ. Code § 33.0834 ...........................................................................6, 15

Tex. Gov't Code §§ 7.021, 7.031 ........................................................................2

## Other Authorities

34 C.F.R. § 106.33 ......................................................................................33, 34, 37

34 C.F.R. §§ 106.33, 106.41(b) ........................................................................41

34 C.F.R. § 106.41(b) .........................................................................................37

Fed. R. Civ. P. 57 ................................................................................................42

## Introduction

Defendants attempt radical change in our Nation's educational institutions by purporting to "interpret" federal antidiscrimination laws to prohibit discrimination based on sexual orientation and gender identity. Defendants make such an attempt through the use of the Notice, Letter, and Fact Sheet. See ECF No. 24 at 13–16. But those actions by Defendants are procedurally and substantively unlawful, in violation of the Administrative Procedure Act ("APA"). They are procedurally unlawful because they impose new substantive obligations on States and other regulated entities without adhering to the APA's notice-and-comment requirements, which are designed to ensure public participation. And they are substantively unlawful because the agency's purported "interpretations" of Title IX squarely conflict with the text and structure of that statute. Further, contrary to the Department's assertions, these interpretations are not required by the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020). Another federal court has already found these very agency actions unlawful and rejected the same arguments against judicial review advanced by Defendants here. *See Tennessee v. United States Dep't of Educ.*, 615 F. Supp. 3d 807, 830 (E.D. Tenn. 2022). And this very Court rejected these same arguments when it enjoined a previous version of this guidance. *See Texas v. United States*, 201 F. Supp. 3d 810, 826 (N.D. Tex. 2016) (O'Connor, J.). Accordingly, the Court should declare that Title IX does not apply to discrimination based on sexual orientation or gender identity, set aside (*i.e.*, vacate) the challenged agency actions, and permanently enjoin the implementation and enforcement of the interpretations of Title IX advanced there.

## Background

### I.     Title IX in Texas.

Texas administers numerous education programs and operates thousands of educational institutions through its constituent agencies and political subdivisions. While local school districts and charter schools "have the primary responsibility for implementing the state's system of public education," Tex. Educ. Code § 11.002, the Texas Education Agency (TEA) administers federal

and state funding and distributes funds to local school districts. Tex. Gov't Code §§ 7.021, 7.031. Texas schools receive substantial federal funds. In fiscal year 2022, TEA distributed approximately $9.29 billion in federal funds to Texas public schools. ECF No. 24-1 at Appx.038. In the same fiscal year, Texas public school districts received another approximately $5.47 billion in federal funding, including about $.58 billion received directly from the federal government and about $4.89 billion distributed through entities other than TEA. ECF No. 24-1 at Appx.039. Finally, Texas public post-secondary education institutions received approximately $3.5 billion in federal funding during the fiscal year 2021. Texas Higher Education Coordinating Board, Sources and Uses Detail Universities 2021 Report, https://www.highered.texas.gov/our-work/supporting-our-institutions/institutional-funding-resources/sources-and-uses/. As a condition of receiving federal funding, Title IX applies to these schools. *See* 20 U.S.C. § 1681.

The requirements of Title IX are plain: no person shall "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance" "on the basis of sex." In January 2021, the Department published a memorandum stipulating that *Bostock* did not apply to Title IX and did not require the Department to interpret Title IX in a manner inconsistent with its longstanding implementing regulations.[1] Six months later, the Department issued a notice reversing its interpretation.

## II.    The June 22 Notice.

On June 22, 2021, the Department published a Notice in the Federal Register without an opportunity for comment. ECF No. 24-1 at Appx.002. This June 22 Notice, which became effective that same day, changed the Department's longstanding position and concluded that "the Department interprets Title IX's prohibition o[f] discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity." ECF No. 24-1 at Appx.002. The June 22 Notice explained that the Department's stated purpose for changing its position was

---

[1]    *See* U.S. Dept. of Educ., Mem. for Kimberly M. Richey Acting Assistant Secretary of the Office for Civil Rights Re: *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) (Jan. 8, 2021), available at https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-01082021.pdf.

to be "[c]onsistent with the Supreme Court's ruling and analysis in *Bostock*." ECF No. 24-1 at Appx.002. The Department concluded that the Notice "will guide the Department in processing complaints and conducting investigations." ECF No. 24-1 at Appx.004 at 32,639. And the Department's Office for Civil Rights further determined that it "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department." ECF No. 24-1 at Appx.004. Specifically, the Department determined:

> [T]he interpretation of sex discrimination set out by the Supreme Court—that discrimination "because of … sex" encompasses discrimination based on sexual orientation and gender identity—properly guides the Department's interpretation of discrimination "on the basis of sex" under Title IX and leads to the conclusions that Title IX prohibits discrimination based on sexual orientation and gender identity.

ECF No. 24-1 at Appx.003.

In reaching this determination, the Department decided that "[t]here is textual similarity between Title VII and Title IX." *Id*. It also alleged that "[a]dditional case law recognizes that the reasoning of *Bostock* applies to Title IX and that differential treatment of students based on gender identity or sexual orientation may cause harm," and the Department's interpretation described in the Notice (purportedly) "is most consistent with the purpose of Title IX[.]" ECF No. 24-1 at Appx.004. And third, the Department emphasized that "[t]he U.S. Department of Justice's Civil Rights Division has concluded that *Bostock*'s analysis applies to Title IX." *Id*.

The Department's interpretation is wrong. For one, Title VII prohibits employment discrimination "because of such individual's … sex[]," 42 U.S.C. § 2000e-2(a), but Title IX prohibits education discrimination "on the basis of sex," 20 U.S.C. § 1681(a). The statutes thus contain different language with different results for different contexts. *Neese v. Becerra*, 640 F. Supp. 3d 668, 675–84 (N.D. Tex. 2022) (Kacsmaryk, J.) (*Bostock* and its reasoning do not apply to Title IX). And "*Bostock* … was limited only to Title VII itself" and "d[id] not stretch to [other statutes]." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *see also Adams v. Sch. Bd.*

*of St. Johns Cnty.*, 57 F.4th 791, 769 (11th Cir. 2022) (en banc) (overturning panel decision upon which Defendants relied in the Notice, ECF No. 24-1 at Appx.004, in determining that Title IX prohibits discrimination on the basis of gender identity).

### III.    The June 23 Letter and Fact Sheet.

One day later, on June 23, 2021, the Department's Acting Assistant Secretary for Civil Rights published a "Dear Educator Letter," emphasizing that the Department will "fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department." ECF No. 24-1 at Appx.009. With the Letter, the Department included a Fact Sheet that the Department's Office for Civil Rights and the Department of Justice's Civil Rights Division jointly issued. ECF No. 24-1 at Appx.011–012. This Fact Sheet lists "[e]xamples of the kinds of incidents" the Department and DOJ can investigate as discrimination pursuant to Title IX. ECF No. 24-1 at Appx.011.

Consider one example the Fact Sheet condemns as violating Title IX (all uses of female pronouns *sic*):

> On her way to the girls' restroom, a transgender high school girl is stopped by the principal who bars her entry. The principal tells the student to use the boys' restroom or nurse's office because her school records identify her as "male."

*Id.* Take another example:

> A transgender high school girl student joins her friends to try out for the girls' cheerleading team and the coach turns her away from tryouts solely because she is transgender. When the student complains, the principal tells her "those are the district's policies."

ECF No. 24-1 at Appx.011. Finally, as a third example, the Fact Sheet explains that referring to a transgender student by a name or pronouns other than the ones the student prefers would be discrimination under Title IX. ECF No. 24-1 at Appx.001.

Defendants' interpretation of Title IX is plainly contrary to the statute and they violated the APA in issuing it. Their Notice, Letter, and Fact Sheet are being used to threaten Texas school

districts and forcing schools to choose between complying with Texas law and risk federal funding or comply with this illegal mandate. For all the reasons detailed below, the Court should find in Texas's favor.

## IV.    Texas Laws and School Policies

Texas law prohibits school districts from allowing "a student to compete in an interscholastic athletic competition sponsored or authorized by the district or school that is designated for the biological sex opposite to the student's biological sex." Tex. Educ. Code § 33.0834. The Board of Trustees of independent school districts "have the exclusive power and duty to govern and oversee the management of the public schools of the district," Tex. Educ. Code 11.151(b), and many Texas school districts have mirrored this statute by promulgating additional policies on related issues.

For example, Frisco ISD, Grapevine-Colleyville ISD, and Carroll ISD mandate that schools require bathrooms, lockers, and showers to be separated by biological sex and prohibit them to be assigned based on subjective gender identity. ECF No. 24-1 at Appx.014, 018, 026. Carroll ISD precludes district employees from "requir[ing] the use of pronouns that are inconsistent with a student's or other person's biological sex." ECF No. 24-1 at Appx.016. And Granbury ISD prohibits obscene materials, including anything "that [d]epicts or describes … [p]atently offensive representations or descriptions of ultimate sexual acts, normal or perverted, including sexual intercourse, sodomy, and sexual bestiality." ECF No. 24-1 at Appx.021. Granbury ISD further prohibits its personnel to "teach, instruct, train, or otherwise communicate to any individual or group topics regarding sexual orientation or gender identity unless and until persons or the entire group has fully completed the fifth grade." ECF No. 24-1 at Appx. 031. And Granbury ISD prohibits its personnel from "teach[ing], instruct[ing], train[ing], or otherwise promot[ing] gender fluidity." *Id.* Keller ISD also regulates instructional resources related to "[g]ender fluidity." ECF No. 24-1 at Appx. 036. These school districts receive federal funds. ECF No. 24-1 at Appx. 039.

5

**ARGUMENT**

## I.  This Court has subject matter jurisdiction.

Defendants argue that this Court lacks subject matter jurisdiction for a variety of reasons. Defendants specifically contend that (1) the Notice, Letter, and Fact Sheet are not final agency action; (2) Texas lacks Article III standing; (3) Texas's claims are not ripe; (4) Title IX is an adequate alternative remedy; and (5) Title IX's statutory review scheme precludes this Court's review. ECF No. 28 at 8–31. Defendants are wrong on all points.

### A.  The Notice, Letter, and Fact Sheet constitute final agency action.

We start with finality. After all, as the Fifth Circuit's most relevant precedent instructs, the issue of final agency action should be addressed first because "that analysis contextualizes the standing inquiry." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). Finality finds its origins in the Administrative Procedure Act ("APA"), which only allows judicial review of "final" agency action. 5 U.S.C. § 704. Agency action is "final" for the purposes of judicial review if two conditions are met: (1) the agency action "mark[s] the consummation of the agency's decisionmaking process" and is not "merely tentative or interlocutory [in] nature," and (2) the action determines "rights or obligations" and imposes "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as 'flexible.'" *EEOC*, 933 F.3d at 441 (cleaned up). Contra Defendants' allegations, *see* ECF No. 28 at 8–13, both finality prongs are satisfied here.

#### 1.  The Notice, Letter, and Fact Sheet mark the consummation of the Department's decision-making because they are neither tentative nor interlocutory.

To start, the Notice, Letter, and Fact Sheet satisfy the first prong—*i.e.*, mark the consummation of the Department's decision-making—because the agency action they constitute is not subject to further agency review. mark the consummation of the Department's decision-making—because the agency action they constitute is subject to further agency review. Following the above-mentioned pragmatism, the Fifth Circuit recognizes that "guidance letters can mark the 'consummation' of an agency's decision-making process." *Nat'l Pork Producers Council v. EPA*,

6

635 F.3d 738, 755 (5th Cir. 2011). "[T]he key question [for the first finality prong] is whether [the agency action] is 'subject to further agency review.'" *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 638 (5th Cir. 2023); *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 854 (5th Cir. 2022); *Sackett v. EPA*, 566 U.S. 120, 127 (2012).

Indeed, where "the challenged action is a definitive statement of the agency's position," the "agency action is final." *Jobs, Training & Servs., Inc. v. E. Tex. Council of Gov'ts*, 50 F.3d 1318, 1324 (5th Cir. 1995); *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) ("a guidance document reflecting a settled agency position and having legal consequences for those subject to regulation may constitute 'final agency action'") (citation omitted). And one way that courts have held that agency "guidance" documents like the Notice, Letter, and Fact Sheet constitute final and reviewable agency actions under the APA is if they "bind" the agency and its employees "to a particular legal position." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) ("The primary distinction between a substantive rule—really any rule—and a general statement of policy … turns on whether an agency intends to bind itself to a particular legal position."); *accord Texas v. United States (DAPA)*, 809 F.3d 134, 171 (5th Cir. 2015) ("We focus primarily on whether the rule has binding effect on agency discretion or severely restricts it.") (cleaned up). Action "bind[ing]" an "agenc[y]" to a legal view "gives rise to 'direct and appreciable legal consequences.'" *U.S. Army Corps of Eng'rs v. Hawkes*, 578 U.S. 590, 598 (2016) (citation omitted).

Here, the Notice, Letter, and Fact Sheet are not subject to further agency review because they demonstrate the agency's final position on the applicability of *Bostock* to Title IX. The Notice, for example, does not indicate a mere *introduction* to the topic; instead, it "leads to the *conclusion* that Title IX prohibits discrimination based on sexual orientation and gender identity." ECF No. 24-1 at Appx.003 (emphasis added). And as an expression of the Department's conclusions and not its mere initial thoughts, the Notice asserts the Department's final position on the matter. Indeed, the Notice states that it "supersedes and replaces any prior inconsistent statements made

by the Department regarding the scope of Title IX's jurisdiction over discrimination based on sexual orientation and gender identity." ECF No. 24-1 at Appx.003.

Defendants concede that the Notice "represents the consummation of [the Department's] view that Title IX's prohibition on sex discrimination encompasses discrimination on the basis of sexual orientation and gender identity as a general matter." ECF No. 28 at 9–10. That should be the end of the matter. But Defendants rely on the fact that the Department is "engaged in ongoing rulemaking about how to apply Title IX's general non-discrimination mandate to contexts involving sexual orientation and gender identity." ECF No. 28 at 10 (first citing *Sex-Related Eligibility Criteria for Male and Female Athletic Teams*, 88 Fed. Reg. 22,860 (Apr. 13, 2023); and then citing *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41,390 (July 12, 2022)). But "[t]he mere possibility that an agency might reconsider [it] does not suffice to make an otherwise final agency action nonfinal." *Sackett*, 566 U.S. at 127. And "'[t]he mere fact that the agency could—or actually does—reverse course in the future does not change' an action's finality." *Clarke*, 74 F.4th at 639 (quoting *Data Mktg. P'ship*, 45 F.4th at 854). This makes sense. After all, the Supreme Court has indicated that when the action was taken is the relevant time period for evaluating the finality of agency action. *See Biden v. Texas*, 597 U.S. 785, 808 (2022) ("[B]oth the June 1 Memorandum and the October 29 Memoranda, *when they were issued*, marked the consummation of the agency's decisionmaking process and resulted in rights and obligations being determined." (emphasis added) (quotation omitted)).

But then, Defendants argue that Notice, Letter, and Fact Sheet do not satisfy the first finality prong because the Department of Education has not "consummated its views on how Title IX applies to *specific* laws, policies, and contexts involving issues of sexual orientation and gender identity, which are the subject of ongoing notice-and-comment rulemaking." ECF No. 28 at 9 (emphasis in original). Yet, as discussed above, Defendants already conceded that the Notice *does* "represent[] the consummation of [the Department's] view that Title IX's prohibition on sex discrimination encompasses discrimination on the basis of sexual orientation and gender identity

8

*as a general matter.*" ECF No. 28 at 9–10 (emphasis added). In essence, therefore, Defendants argue that the Department of Education "simply has not yet consummated its views on these [specific] subjects beyond the top-line determination that Title IX encompasses discrimination on the basis of sexual orientation and gender identity." ECF No. 28 at 11.

Importantly, however, Defendants cite no precedent that makes such a distinction between broad agency views and more specific agency views. Instead, precedent points the opposite direction. For example, in a separate lawsuit in Tennessee that challenged the exact same agency documents at issue here, the Defendants "did not dispute that the [agency] documents [at issue there] mark[ed] the 'consummation' of their decision-making processes." *Tennessee*, 615 F. Supp. 3d at 830. Thus, Defendants now contest what they formerly conceded.

Defendants maintain that their actions will only be final when they apply these interpretations to particular factual circumstances. ECF No. 28 at 25. But a rule that will eventually result in orders applying it constitutes final agency action despite the application to individual cases having yet to be completed. *See Biden*, 597 U.S. at 809 n.7 ("The fact that the agency could not cease implementing MPP, as directed by the October 29 Memoranda" until the occurrence of a contingent event "did not make the October 29 Memoranda any less the agency's final determination of its employees' obligation to do so once such judicial authorization had been obtained."). All "rules" must be eventually applied via "orders" under the APA, but that does not mean that rules are not subject to judicial review.

Moreover, Defendants misstate the law when they contend that "Texas improperly lumps all of the Challenged Documents together." ECF No. 28 at 21. The Notice, Letter, and Fact Sheet must be viewed in context. After all, a challenged agency action with a "skeletal" explanation may be supplemented by "accompanying explanatory correspondence" from the agency. *Alaska Dept. of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004). That is why, as explained in Texas's motion for summary judgment, ECF No. 24 at 9, "[f]inal agency action may result from a series of agency pronouncements rather than a single edict." *Barrick Goldstrike Mines*, 215 F.3d at 48–49 (cleaned up). That is why "a preamble plus a guidance plus an enforcement letter from [an agency]

could crystallize an agency position into final agency action." *Id.*; *see also Ciba-Geigy*, 801 F.2d at 436 n.8 (final agency action consisted of a "series of steps taken by EPA" culminating in a letter from an EPA official clarifying the agency's position). And that is why an agency may not avoid judicial review "merely by choosing the form of a letter to express its definitive position on a general question of statutory interpretation." *Ciba–Geigy*, 801 F.2d at 438 n.9. After all, this type of approach is consistent with the "flexible and pragmatic way" in which courts apply the finality requirement. *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990). Accordingly, Texas's claims challenging those agency actions satisfy the first finality prong.

### 2. The Notice, Letter, and Fact Sheet bind the agencies and impose legal consequences.

In addition to the first prong of finality, the Notice, Letter, and Fact Sheet also satisfy the second prong of finality when they bind the Defendants and their employees to a particular legal position and cause significant legal consequences for Texas. Generally, when an agency "loses discretion" because of an agency action, "[t]hat's textbook final agency action." *Data Mktg. P'ship, LP*, 45 F.4th at 854. Even if the agency action only removes "*some* of the [agency's] discretion," it still satisfies the second prong of finality. *See, e.g., Clark*, 74 F.4th at 638 (emphasis added). Stated differently, "the existence of some amount of discretion is not determinative." *Texas v. United States*, 549 F. Supp. 3d 572, 602 (S.D. Tex. 2021).

Here, the action reflected in the Notice, Letter, and Fact Sheet bind the agencies and impose legal consequences because it explicitly cabins discretion. For example, the Notice restrains the Department's discretion because it expressly "guide[s] the Department in processing complaints and conducting investigations." ECF No. 24-1 at Appx.002. The Notice also "make[s] clear that the Department interprets Title IX's prohibition on sex discrimination to encompass discrimination based on sexual orientation and gender identity." ECF No. 24-1 at Appx.002. The Notice even states that "the Department has determined that the interpretation of sex discrimination set out by the Supreme Court in *Bostock* … properly guides the Department's interpretation of discrimination 'on the basis of sex' under Title IX and leads to the *conclusion* that

Title IX prohibits discrimination based on sexual orientation and gender identity." ECF No. 24-1 at Appx.003 (emphasis added). In so doing, the Notice restrains what was previously discretionary.

In addition, legal consequences will now be imposed. Specifically, because of this new limit on the Department's discretion, the Office of Civil Rights "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department." ECF No. 24-1 at Appx.004, 009. And the Fact Sheet clarifies that Defendants will "enforc[e] federal laws that protect students from discrimination" based on "perceived or actual sexual orientation or gender identity" when "schools fail to respond appropriately." ECF No. 24-1 at Appx.011.

Thus, contra Defendants' allegations, *see* ECF No. 28 at 11–13, the Notice, Letter, and Fact Sheet do not merely "remind parties of existing statutory or regulatory duties" but rather imposed new duties, "chang[ed] the text" of the statute it "profess[ed] to interpret," and effects[ed] a substantive change in existing law or policy," and is therefore a substantive (or "legislative") rule. *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020). And because those agency documents do not "genuinely leave[] the agency and its decisionmakers free to exercise discretion," it is also a substantive rule. *Texas*, 549 F. Supp. 3d at 600 (citation omitted). And as all substantive rules are, "by definition, final agency action," *EEOC*, 933 F.3d at 441, the Notice, Letter, and Fact Sheet here constitute final agency action.

Further, despite the Defendants' allegations to the contrary, the Notice, Letter, and Fact Sheet constitute a substantive rule because no statutory authority "compels or logically justifies" them. *Natl. Council for Adoption v. Blinken*, 4 F.4th 106, 113 (D.C. Cir. 2021). That's because "the [actions] does not simply repeat the relevant provisions of Title [IX or the other provisions they cite]. Instead, the [actions] purports to interpret authoritatively [those statutory requirements]. This court has always considered such a distinction important when deciding whether agency action is 'final' under the APA." *Texas v. EEOC*, 827 F.3d 372, 385–86 (5th Cir. 2016), *opinion withdrawn on reh'g*, 838 F.3d 511 (5th Cir. 2016).

11

Defendants argue the actions do not constitute a substantive rule. ECF No. 28 at 53–56. But while "[i]nterpretive rules thus remind parties of existing statutory duties, or merely track the statutory requirements and thus simply explain something the statute already requires," *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 601–02 (5th Cir. 1995) (cleaned up), the agency actions here were issued not to "put[] the public on notice of pre-existing legal obligations," but to "speak with the force of law" and "creat[e] legal effects" for regulated employers, and therefore a "legislative [or substantive] rule," *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020). Of course, "[i]f an agency pronouncement is to be an interpretive rule or a statement of policy, it cannot effect a substantive change in the regulations." *Id.* (cleaned up). But even policy statements or interpretive rules may sometimes be final agency actions due to their effects. *See Texas v. Biden (MPP)*, 20 F.4th 928, 949 (5th Cir. 2021); *Ctr. for Auto Safety v. NHTSA*, 452 F.3d 798, 807 (D.C. Cir. 2006); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) (Kavanaugh, J.) ("sometimes even interpretive rules may be subject to pre-enforcement judicial review"); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105-06 (2015) (interpretive rules reviewable under APA). What matters is the actual effect of the challenged actions, not how Defendants label them. *See Shalala*, 56 F.3d at 596. Accordingly, Texas has established that the Notice, Letter, and Fact Sheet—when viewed in context—satisfy the second finality prong by binding the Department and imposing legal consequences.

## B.  Texas has standing to challenge to the Notice, Letter, and Fact Sheet.

Texas has Article III standing to challenge the Notice, Letter, and Fact Sheet because they directly regulate the State through Title IX. When the plaintiff is "an object of the [agency's] action," "there is ordinarily little question that the action … has caused him injury, and that a judgment preventing … the action will redress it." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992). Here, there is no doubt that the State of Texas is "an object of [the agency's] action." Indeed, whether someone is an object of a regulation is a flexible inquiry rooted in common sense." *EEOC*, 933 F.3d at 446 (citation omitted). "That common sense inquiry is easy here [because the challenged action] explicitly states that it applies to" entities that receive federal

education funding; "[t]hus, by its own terms, the [challenged action] covers Texas." *Id.*; *see also Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1136 (D.N.D. 2021) ("Plaintiffs, as entities that operate health programs receiving federal financial assistance from HHS, qualify as objects of Section 1557 [of the Affordable Care Act, which incorporates Title IX] and its implementing regulations" and therefore have standing to challenge an interpretation of that statute). Because Texas is an "object" of the challenged actions, all three of the constitutional standing requirements are satisfied. *Id.*

Defendants insist, however, that Texas lacks Article III standing, asserting that the State has failed to show a redressable injury traceable to the Department's challenged actions. ECF No. 28 at 26. However, Defendants admit that Texas is an object of these guidance documents, *id.* at 28 (apparently conceding this by arguing being the object is not itself sufficient); that current state and local education policies conflict with the guidance set out in the documents, *id.* at 29; and that Texas schools are being investigated because of and pursuant to the documents, *id.* at 32. Based on these and other facts, Texas has more than carried its burden to show "an injury, caused by the agency, which a court can redress." *Lujan*, 504 U.S. at 560–61.

### 1. The Notice, Letter, and Fact Sheet impose several injuries on Texas.

Texas's standing derives from three injuries: (1) the sovereign injury of deprivation of the State's own laws and policies; (2) the imminent danger of enforcement actions that are premised on the challenged actions; and (3) the procedural injury of missing an opportunity to participate in notice-and-comment rulemaking. ECF No. 24 at 22.

#### a. Texas suffers sovereign injuries.

The Notice, Letter, and Fact Sheet first impose sovereign injuries on Texas. Generally, states have an interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982); *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999). "Pursuant to that interest, states may have standing based on (1) federal assertions of authority to regulate matters they believe they

control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law." *DAPA*, 809 F.3d at 153 (cleaned up). These "intrusions are analogous to pressure to change state law." *Id.* More specifically, "[b]ecause a state alone has the right to create and enforce its legal code, only the State has the kind of direct stake necessary to satisfy standing in defending the standards embodied in that code." *Texas v. Becerra*, 623 F. Supp. 3d 696, 714 (N.D. Tex. 2022) (Hendrix, J.) (cleaned up).

Here, at least two of the above-mentioned circumstances injuring sovereign interests are met because the Notice, Letter, and Fact Sheet contradict Texas's laws. For example, on one hand, Texas's Education Code requires that students compete in athletic competitions designated for their own biological sex. Tex. Educ. Code § 33.0834. But on the other hand, the Fact Sheet leaves no doubt that, under its view of Title IX, schools may not prohibit students from competing in athletic competitions designated for the opposite biological sex. *See* ECF No. 24-1 at Appx.011. And by threatening to withhold federal funds, the Notice, Letter, and Fact Sheet give Texas the Hobson's choice of either (1) spending, at a minimum, millions of dollars, to absorb school districts' loss of federal funding; or (2) changing its laws. That choice provides Texas the standing to bring these claims. *See MPP*, 20 F.4th at 1002; *see also* ECF No. 24-1 at Appx.039 ("The loss of federal funds would require Texas's public schools to either eliminate certain educational services offered using federal funds or find funding from another source.").

Defendants claim that "Texas does not identify a single law, policy, or practice, at either a statewide or district level, that conflicts with the Challenged Documents." ECF No. 28 at 16. But then they immediately list one such conflicting state law—Section 33.0834 of the Texas Educational Code—that requires student athletes compete according to their biological sex, and they thereafter proceed to reference the Fact Sheet that lists the very same restriction imposed by state law as something that the Department can investigate as a violation. ECF No. 28 at 29. The Fact Sheet lists a policy whereby a male student is barred from try-outs for an all-female team as a scenario that merits investigation. ECF No. 24-1 at Appx.013. Inexplicably, Defendants stop short of the obvious inference that the Fact Sheet regards a scenario that state law requires as unlawful

under its interpretation of Title IX. Thus, the challenged actions contemplate "federal interference with the enforcement of state law." *DAPA*, 809 F.3d at 153.

The Letter, Notice, and Fact Sheet set out an approach to Title IX that is incompatible with this state law and with the school district policies explained above that were adopted by the authority granted by state law. While one injury suffices for standing, Texas has adduced several additional policies from multiple school districts that conflict with the challenged actions. ECF No. 24 at 17. These policies are authorized under state law, *see* Tex. Educ. Code 11.151(b), so their abrogation by federal action would disrupt the State's sovereignty over its education system.

Vulnerable policies include requirements that students use sex-segregated facilities like bathrooms and locker rooms that match their biological sex. Other policies restrict faculty from requiring or even encouraging the use of pronouns that do not reflect a student's biological sex. Defendants dismiss these examples as too tenuously related to the documents but in a later section of its brief cites a litany of decisions from other circuits that enjoin highly similar policies on the rationale that *Bostock* applies to Title IX. ECF No. 28 at 35 (citing *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) (upholding injunction against school district policy requiring students use bathrooms appropriate for their biological sex); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) (school board's policy that did not allow changing student records to match the student's pronouns and sex-specific information with her chosen gender identity violated Title IX). Defendants are simultaneously claiming that their new, *Bostock*-driven interpretation of Title IX does not portend conflict with these district-level policies while acknowledging that those misguided circuits that agree with this interpretation have enjoined nearly identical policies for being violative of Title IX. These school district policies suffice to give the State standing because those entities excise state authority. *Cf. Kentucky v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023) ("An injunction barring the federal government from enforcing the mandate against the States would also run to the States' subdivisions.").

Far from raising an "abstract question[] … of sovereignty," Texas faces the "threatened operation [of federal regulation] upon rights properly falling under judicial cognizance."

15

*Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 485 (1923). If the Notice, Letter, and Fact Sheet are allowed to stand, Texas schools will be concurrently subject to conflicting regulations. The contents of these actions facially contradict the Texas Education Code and numerous local education policies—each of which is authorized by state law.

### b. Texas suffers injuries from enforcement actions.

On top of sovereign injuries, Texas suffers injuries from the substantial threat of enforcement against the State's school system based on the novel interpretation set forth in the Notice, Letter, and Fact Sheet. To satisfy the imminence prong for a future injury plaintiffs must demonstrate "a credible threat of enforcement" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014) (citation omitted). "Threat of enforcement is substantial" given "complaints based on violations of policy" or "warnings, statements or other pre-enforcement actions indicating an intent to enforce." *Texas v. Becerra*, 623 F. Supp. 3d 696, 716 (N.D. Tex. 2022) (Hendrix, J.) (citing *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006)). For instance, in *Texas v. EEOC*, the Court upheld Texas's standing to challenge an agency guidance letter before the agency had taken remedial action, because the letter's contents clearly labeled state policy as "unlawful discrimination." 933 F.3d 433, 446 (5th Cir. 2019). There, the EEOC argued that their guidance materials alone could not injure Texas, but the Fifth Circuit rejected the need for an "immediate injury" when the agency's guidance had taken a position that authorized legal consequences detrimental to the State. *Id.* at 448; *see also Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 924–30 (5th Cir. 2023) (upholding standing to challenge EEOC guidance despite complete lack of action taken against individual plaintiffs).

Here, Texas faces a substantial risk of enforcement, an imminent injury, from the Notice, Letter, and Fact Sheet. That's because the Letter and Notice both unambiguously state the Department's intent to "fully enforce" its expanded interpretation of Title IX reflected in those documents and the attached Fact Sheet. Texas's current law and policies are just the type of conduct these guidance materials condemn.

16

Even more telling, the Notice, Letter, and Fact Sheet have already led to actualized threats of enforcement.[2] Indeed, the Department has opened investigations into whether Granbury Independent School District created a hostile environment for its students related to gender identity.[3] Specifically, on December 6, 2022, the Department's Office for Civil Rights opened an investigation into whether Granbury Independent School District had created a hostile environment for students based on "gender identity"[4] after the American Civil Liberties Union of Texas filed a complaint that relied on the Letter, Notice and Fact Sheet as the basis for its allegations of discrimination.[5] Complaints have also already been filed against other Texas school districts.[6]

What's more, Defendants do not deny that the Department has opened investigations into Texas schools; instead, they insist that such investigations bear too little connection to enforcement to render Texas's fears of future enforcement imminent. ECF No. 28 at 31–34. But in doing so, Defendant mistakenly downplay the salience of an investigation that was launched on the authority of the agency actions challenged here. After all, a responsive investigation strongly indicates that future enforcement is not a "distant prospect," ECF No. 28 at 28, but an imminent

---

[2]    *See, e.g.*, Meghan Mangrum, *Southlake schools now face 8 investigations into alleged retaliation, discrimination*, The Dallas Morning News (Feb. 9, 2023), available at https://www.dallasnews.com/news/education/2023/02/09/southlake-schools-now-face-8-investigations-into-alleged-retaliation-discrimination/ (accessed October 20, 2023).

[3]    *Texas superintendent ordered librarians to remove LGBTQ-themed books. Now the federal government is investigating.*, The Texas Tribune (Dec. 20, 2022), https://www.texastribune.org/2022/12/20/granbury-books-investigation-civil-rights/ (last visited Oct. 20, 2023).

[4]    Talia Richman, *Feds open civil rights investigation into Granbury schools after LGBTQ book removals*, The Dallas Morning News (Dec. 20, 2022), available at https://www.dallasnews.com/news/education/2022/12/20/feds-open-civil-rights-investigation-into-granbury-schools-after-lgbtq-book-removals/ (accessed October 20, 2023).

[5]    *See* Granbury Indep. Sch. Dist. Compl. at 5–6, available at https://www.aclutx.org/sites/default/files/aclutx_granbury_isd_title_ix_complaint.pdf (accessed October 20, 2023).

[6]    *See* Frisco Indep. Sch. Dist. Compl. at 4, available at https://www.aclutx.org/sites/default/files/    ocr_complaint_letter_for_frisco_isd.pdf (accessed October 20, 2023); Keller Indep. Sch. Dist. Compl. at 6, available at https://www.aclutx.org/sites/default/files/keller_isd_ocr_complaint.pdf (accessed October 20, 2023).

possibility. And the fact that the complaint launching the Granbury investigation referenced the Letter, Notice, and Fact Sheet as the basis for its allegations of discrimination, ECF No. 24 at 27, means the Department has acted on a "complaint[] based on violations of policy." The Granbury investigation thus demonstrates that Texas's fears of enforcement are "not too speculative for Article III purposes" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).

Moreover, apart from monetary penalties, the expense and trouble of complying with more expansive rules is a cognizable injury in itself. "An increased regulatory burden typically satisfies the injury in fact requirement." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015). The Department has widened the scope of Title IX to protect a larger range of behavior. Observing an expanded anti-discrimination mandate is more onerous than following a narrower version. Texas schools and educators will need to take new precautions to ensure they implement the federal government's new understanding of sex. Defendants cannot deny that compliance will require efforts around appropriate "education environment" that Texas educators would not need to take absent the Defendants' new policy, when their Letter emphasizes the need for them. ECF No. 24-1 at Appx.008.

But even without an active investigation, the Notice, Letter, and Fact Sheet by themselves convey an intent to enforce sufficient to create standing. Defendants would like to soften the meaning of their documents by characterizing them as statements about what the Department "can" investigate and discipline. ECF No. 28 at 32. By this logic, the purpose of the guidance is to assert the Department's authority to enforce a novel anti-discrimination mandate, without implying an intent to enforce it. But Defendants' twist is again undercut by their documents. The Letter expressly admonishes educators to refrain from "discrimination based on sexual orientation and gender identity." ECF No. 24-1 at Appx.011. Then the Letter directs its readers to the Fact Sheet to specify the sort of conduct in response to which "OCR will fully enforce Title IX", which lists several examples that conflict with current state and local law and policy. *Id.* Per the Notice, the Department's expansive interpretation "will guide the Department in processing complaints,"

18

and the Department "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity." *Id.* at Appx.002, 007.

This language of the Department's Letter, Notice, and Fact Sheet is purposeful. Another bench in this District found guidance documents couched in similar language to prompt a credible threat of enforcement. *See Neese v. Becerra*, No. 2:21-cv-163-Z, 2022 WL 1265925 at *6 (N.D. Tex. Apr. 26, 2022) (Kacsmaryk, J.) (concluding that agency notification did impose anti-discrimination protections giving rise to prospect of enforcement because it repeated that it "will interpret and enforce" the authorizing statute).

### c. Texas suffers procedural injuries.

Finally, Texas suffers procedural injuries from the Notice, Letter, and Fact Sheet because they did no undergo notice-and-comment rulemaking. A plaintiff can show a cognizable injury if it has been deprived of "a procedural right to protect [its] concrete interests." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). "A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right." *EEOC*, 933 F.3d at 447 (citing *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012)).

Generally, Texas has concrete sovereign interests in the creation and enforcement of laws applicable to public education. "And Texas has at least one additional concrete interest in the avoidance of direct injury to" the State through the loss of federal funds both to the State and to its school districts. *See* Appx.038–39.

Despite these interests, however, Defendants promulgated the Notice without public notice and comment. And because the Notice, Letter, and Fact Sheet constitute final agency action that the APA requires to undergo notice and comment, as shown above, Texas had a right to the notice-and-comment requirement. This is especially true because public notice and comment provides an opportunity for stakeholders to express their concerns and persuade the agency to alter regulations that would harm them. That has not happened here, so Texas suffers procedural injury from the Notice, Letter, and Fact Sheet.

Moreover, it bears mention that Defendants argue that caselaw conditions procedural injury on an associated substantive injury, inferring that because (in Defendant's view) Texas does not face an injury to its sovereignty or a direct injury from enforcement it cannot suffer a purely procedural injury, such as lack of notice-and-comment. *See* ECF No. 28 at 30. But as discussed previously, Texas has adequately proven substantive injuries. Accordingly, Texas has successfully established a procedural injury.

### 2. Texas is entitled to special solicitude.

Contrary to Defendants, Texas's burden for standing is lightened by the special solicitude that state litigants enjoy when their claims allege harms to sovereign or quasi-sovereign interests and that implicate a "procedural right to challenge the action in question." *MPP*, 20 F.4th at 969 (citing *Massachusetts v. EPA*, 549 U.S. 497, 516-20 (2007)). States are entitled to special solicitude when "(1) the State [has] a procedural right to challenge the action in question, and (2) the challenged action affect[s] one of the State's quasi-sovereign interests." *Id.*

Texas has met the criteria for special solicitude in this case. Texas clearly satisfies the first prong because it "is asserting a procedural right under the APA to challenge an agency action," *id.* (citation omitted), with respect to both of its claims. And Texas satisfies the second prong because the challenged agency action here "affect[s] quasi-sovereign interests by imposing substantial pressure on [it] to change [its] laws." *MPP*, 20 F.4th 970 (citation omitted). These interests include that:

> states may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law, at least where the state statute at issue regulates behavior or provides for the administration of a state program and does not simply purport to immunize state citizens from federal law.

*DAPA*, 809 F.3d at 153.

"Thus, Texas is entitled to special solicitude in the standing inquiry. If nothing else, that means imminence and redressability are easier to establish here than usual." *MPP*, 20 F.4th at 970 (citation omitted). The remaining prong of the standing analysis—causation (or traceability)—is also subject to the special solicitude doctrine. *See Texas*, 549 F.Supp.3d at 585 ("The Fifth Circuit

20

has explicitly interpreted special solicitude to lower the level of certainty required in the traditional causation and redressability analysis."). Because Texas asserts a procedural right under the APA to challenge the agency actions and its sovereign interests in its education policies are impaired by their provisions, the State is entitled to special solicitude.

Notably, Defendants do not engage with the special solicitude factors; instead, they latch on to dicta from a concurring opinion of three Justices in *United States v. Texas* to suggest this Court dispense with special solicitude entirely. ECF No. 28 at 31 (citing 143 S. Ct. 1964, 1977 (2023) (Gorsuch, J., concurring)). But special solicitude is still binding legal doctrine that this Court is obligated to follow. *See, e.g.*, *Gen. Land Office v. Biden*, 71 F.4th 264, 274 (5th Cir. 2023); *see Missouri v. Biden*, —F. Supp. 3d—, No. 3:22-cv-01213, 2023 WL 4335270, at *64 (W.D. La. July 4, 2023) (explaining continued viability of special solicitude doctrine post-*United States v. Texas*) (Doughty, J.), *rev'd in part on other grounds*, 83 F.4th 350 (5th Cir. 2023).

### 3. Texas's injuries are traceable to the Notice, Letter, and Fact Sheet and redressable by this Court.

As explained below discussing the merits of the contrary-to-law claim, because Texas's injuries are caused by this new guidance, not Title IX itself. This means that all of the State's injuries are traceable to the Notice, Letter, and Fact Sheet. Because it is the challenged agency actions rather than Title IX that prohibit discrimination based on sexual orientation or gender identity, the harms are traceable to those actions.

Unsurprisingly, Defendants claim that the challenged actions contain the correct interpretation of Title IX and therefore do nothing more than reflect statutory meaning. ECF No. 28 at 34–35. As this argument stakes Defendants' response to Texas's traceability on the validity of its interpretation of Title IX, it must stand or fall with the merits of this case. As neither the Supreme Court not the Fifth Circuit has applied the rationale of the Notice, Letter, and Fact Sheet to Title IX, it is those documents rather than Title IX doing the deed.

"[C]ausation and redressability are closely related, and can be viewed as two facets of a single requirement." *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 54 (D.C.

21

Cir. 2016). For the same reasons its injuries are caused by the challenged agency actions here, Texas's injuries are also redressable by this Court. This Court can remedy the harm the unlawful Title IX guidance inflicts on Texas by declaring the guidance unlawful, setting it aside, and enjoining Defendants from conducting enforcement actions based on the guidance or the interpretations advanced within it.

Redressability is satisfied as long as it is "likely" and not merely "speculative" that a favorable judicial decision will redress alleged injuries. *Lujan*, 504 U.S. at 561. The only source of Texas's harms is the Defendants' interpretation of Title IX advanced in the challenged agency actions; accordingly, this Court can redress Texas's injuries by voiding the agency actions through vacatur, by negating their applicability via injunction, and by declaring that Title IX's prohibition on sex discrimination does not include sexual orientation or gender identity.

Defendants claim, however, that the relief Texas has requested will not remedy any of the injuries of which it complains. Because they would be free to penalize gender-identity discrimination under Title IX without the documents that have spurred this suit. ECF No. 28 at 35–36.

But even accepting Defendants' suggestion that it could enforce its radical interpretation on Texas schools, an injunction from this Court restraining Defendants from interpreting or enforcing Title IX as barring discrimination based on sexual orientation or gender identity, *see* ECF No. 23-1, would certainly protect Texas from adverse agency action, documents or no. Specifically, "a court order preventing OCR from using the enforcement mechanisms provided for and available under Title IX when enforcing [its] prohibition on sex discrimination would reduce the harm Plaintiffs allege" *Neese*, 2022 WL 1265925, at *7. Likewise, a declaratory judgment that the documents are unlawful *because* Title IX does not bar discrimination on the basis of sexual orientation or gender identity would be a binding decision precluding administrative action penalizing Texas schools for relevant policies. Finally, contrary to Defendants, vacation of the Letter, Notice, and Fact Sheet would relieve Texas's injuries by nullifying the new anti-discrimination mandate that these actions—not Title IX itself—establish.

22

Another bench in this District has recently explained the standard for redressability (even without special solicitude):

> In this case, a favorable decision would likely relieve Plaintiffs of at least some of the injuries allegedly caused by FDA. *See Larson v. Valente*, 456 U.S. 228, 243 n.15, (1982) ("[Plaintiffs] need not show that a favorable decision will relieve [their] *every* injury."); *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 74–75 (1978) (a "substantial likelihood" of the requested relief redressing the alleged injury is enough); *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (a plaintiff "need only show that a favorable ruling could potentially lessen its injury").

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, No. 2:22-cv-223-Z, 2023 WL 2825871, at *8 (N.D. Tex. Apr. 7, 2023) (Kacsmaryk, J.), *aff'd in part, vacated in part,* 78 F.4th 210 (5th Cir. 2023) (cleaned up). Thus, even if "private parties will still be able to file complaints with OCR, and their own lawsuits against Texas, asserting that Title IX prohibits discrimination on the basis of gender identity or sexual orientation," ECF No. No. 28 at 36, relief from this Court would at least lessen Texas's potential injuries.  That is all that is needed for standing.

## C.  Texas's claims are ripe.

As "there is a fair amount of overlap between Article III standing requirements and the ripeness analysis," *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 930 (5th Cir. 2023) (citing *Texas v. United States*, 497 F.3d 491, 496 (5th Cir. 2007)), for the same reasons Texas has standing, its claims are ripe.

Contra Defendants' assertions, *see* ECF No. 28 at 23–26, all of Texas's claims are ripe for judicial review. That's because "an agency rule, unlike a statute, is typically reviewable without waiting for enforcement." *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 739 (D.C. Cir. 2016) (citation omitted). Where, as here, Congress did nothing to prohibit Texas from seeking pre-enforcement review of the Notice, Letter, or Fact Sheet, the ripeness inquiry all but disappears, and pre-enforcement review is "the norm." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 586 (7th Cir. 2011). To create an exception to that norm, the issues must be somehow unfit for judicial review and the balance of hardships must tip in EEOC's favor. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967); *Owner-Operator*, 656 F.3d at 586–87. More

23

specifically, for a case to be ripe, courts must examine (1) "the fitness of the issues for judicial decision" and (2) the "hardship of the parties withholding court consideration." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). Here, Texas easily satisfies both factors.

**1. Texas's claims are fit for judicial review.**

Fitness for review turns on whether the case "would benefit from further factual development" and "whether judicial intervention would inappropriately interfere with further administrative action." *Ohio Forestry Ass'n*, 523 U.S. at 733. Specifically, a challenge to administrative regulations is fit for review if (1) the questions presented are 'purely legal one[s],' (2) the challenged regulations constitute 'final agency action,' and (3) further factual development would not 'significantly advance [the court's] ability to deal with the legal issues presented.'" *Texas v. United States*, 497 F.3d 491, 498–99 (5th Cir. 2007) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003)).

Texas's claims satisfy those three elements. As to the first element, Texas's claims are purely legal, facial challenges to the agency actions. Facial challenges to regulation are generally ripe the moment the challenged agency action occurs. *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 736 n.10 (1997). Both of Texas's claims—both procedural and substantive—turn on the content of the Notice, Letter, and Fact Sheet, all of which already specify factual situations that Defendants consider unlawful. Nothing more is required to adjudicate Texas's claims. Thus, Texas's claims satisfy the first component of fitness for review.

As to the second and third elements, the discussion above shows that the Notice, Letter, and Fact Sheet constitute final agency action and that Texas has standing to challenge it. This makes the ripeness inquiry straightforward. As the Fifth Circuit explained:

> Having determined that the [EEOC felon-hiring rule] Guidance is "final agency action" under the APA, it follows naturally that Texas's APA claim is ripe for review. Texas's challenge to the EEOC Guidance is a purely legal one, and as such it is unnecessary to wait for further factual development before rendering a decision. Furthermore, Texas faces significant hardships should the court decline to consider its claims. Taking Texas's allegations as true, it must change its hiring practices to

24

ensure compliance with the Guidance, or face the numerous adverse effects already
set forth.

*Texas v. EEOC*, 827 F.3d 372, 388 n.9 (5th Cir. 2016); *see also Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 287–88 (5th Cir. 2012) (facial attack on a regulation raises "purely legal" question and is therefore ripe); *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1008 (D.C. Cir. 2014) ("[Plaintiffs] raise a purely legal challenge to the Regulation [as] exceed[ing] the USDA's authority as granted by Congress and violates various constitutional principles. Thus, it is unnecessary to wait for the Regulation to be applied in order to determine its legality.").

In sum, Texas's claims present purely legal issues that concern final agency action for which Texas has standing. Accordingly, Texas's claims are fit for this Court's review.

### 2. Texas will face sufficient hardship without this Court's grant of relief.

As to hardship, "[t]he Supreme Court has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being 'force[d] ... to modify [one's] behavior in order to avoid future adverse consequences.'" *Texas*, 497 F.3d at 499 (quoting *Oh. Forestry Ass'n*, 523 U.S. at 734). Indeed, the "fear of future sanctions" to "force immediate compliance" with the Notice, Letter, and Fact Sheet is a sufficient hardship. *Oh. Forestry Ass'n*, 523 U.S. at 734. For example, a claim satisfies the hardship prong of ripeness when the "only alternative to obtaining judicial review now is to violate [the agency's] directives ... and then defend an enforcement proceeding on the grounds it raises" in the lawsuit. *Barrick Goldstrike Mines Inc*, 215 F.3d at 49.

Moreover, "[w]here a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, hardship has been demonstrated." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 545 (5th Cir. 2008) (citation omitted); *see also Abbott Labs.*, 387 U.S. at 152 ("These regulations purport to give an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business of all prescription drug companies; its promulgation puts petitioners in a dilemma that it

25

was the very purpose of the Declaratory Judgment Act to ameliorate."); *Reckitt Benckiser v. EPA*, 613 F.3d 1131, 1136–41 (D.C. Cir. 2010) (challenge was ripe because agency's letter asserting authority to bring future enforcement proceedings created "compliance 'dilemma'" for the plaintiff).

That is exactly the case here. It is no secret that Defendants use the threat of withholding funding to compel compliance with their guidance. Thus, Texas should not be put the choice of either abandoning its laws or risking the loss of federal funding. And there is no reason to place "sovereign [States] at such risk when so little would be gained by doing so and so much might be lost." *Florida v. Weinberger*, 492 F.2d 488, 493 (5th Cir. 1974). As a result, delaying review would cause Texas significant hardship by allowing Defendants to use the "fear of future sanctions" to "force immediate compliance" with the guidance. *Oh. Forestry Ass'n*, 523 U.S. at 734; *see also Abbott Labs.*, 387 U.S. at 153.

Overall, Texas's claims against the Notice, Letter, and Fact Sheet are fit for judicial review, and should this Court withhold such review, Texas will suffer substantial hardship. Thus, Texas need not "wait[] for [the agency] to 'drop the hammer' in order to have their day in court." *Hawkes*, 578 U.S. at 600. Accordingly, Texas's claims are ripe.

**D.  Title IX is not an adequate alternative remedy for Texas.**

The APA provides federal courts with jurisdiction over a "final agency action *for which there is no other adequate remedy in a court*." 5 U.S.C. § 704 (emphasis added). Defendants argue that Texas has such an adequate alternative remedy in Title IX of the Social Security Act. ECF No. 28 at 26–28. Specifically, Defendants contend that "Texas will have an adequate opportunity for judicial review at the conclusion of an enforcement action" and during any enforcement action because of its ability to defend itself through that process. ECF No. 28 at 27.

But the procedures of Title IX do not constitute an adequate remedy. A remedy is inadequate when it imposes on the plaintiff "an arduous, expensive, and long administrative process" that does not aid in the determination of the underlying legal question. *Hawkes*, 578 U.S. at 600–01. Indeed, when administrative action imposes immediate consequences on regulated

parties, courts routinely allow pre-enforcement challenges even if the parties could raise the same arguments as defenses in an eventual enforcement action. For example, *Sackett*, 566 U.S. 120, allowed a pre-enforcement challenge to an EPA compliance order even though "judicial review ordinarily comes by way of a civil action brought by the EPA." *Id.* at 127. And because the plaintiffs could not "initiate that process" and instead had to "wait for the Agency to drop the hammer" while accruing daily penalties, "APA review" was the only "adequate remedy." *Id.* at 127, 131.

That same reasoning applies here. The Notice, Letter, and Fact Sheet force Texas to choose between complying with their mandates, which would cause irreparable injury, or violating those agency actions at the risk of significant financial harm. And like the proposed alternatives in *Sackett*, the latter option would require Texas to "wait for the [agency] to drop the hammer," *id.* at 127, since there is no way for Texas to initiate the enforcement action. For an alternative to be adequate, the alternative must "provide the same genre of relief," *De La Garza Gutierrez v. Pompeo*, 741 F. App'x 994, 998 (5th Cir. 2018)—and an inability to obtain equitable pre-enforcement relief (as would be the case when defending in an enforcement action or undergoing the internal Title IX review process) makes an alternative inadequate. And "a plaintiff need not pursue a remedy whose existence is 'doubtful' or 'uncertain,'" nor "run the risk of enforcement proceedings or pursue an 'arduous, expensive, and long' permitting process to seek review of an already-final agency action." *Id.* (citation omitted).

Texas would thus have to undergo the long, arduous, and costly process, all while waiting to get a decision that could pose crippling financial harms to the State, making Defendants' proposed adequate alternative "doubtful" and "uncertain." And contrary to Defendants' arguments, *see* ECF No. 28 at 28, Texas will *not* have the opportunity to assert the same argument here as it would in an enforcement proceeding because, as discussed below, Title IX's statutory review scheme does not contemplate challenges the underlying authority or validity of the challenged agency actions here. Thus, Title IX is not an adequate alternative remedy.

27

### E. Title IX does not preclude this Court's review.

Defendants argue that Title IX includes an exclusive review scheme that precludes this Court' review. *See* ECF No. 28 at 28–31. "Congress may preclude district court jurisdiction either explicitly or implicitly." *Bank of Louisiana v. Fed. Deposit Ins. Corp.*, 919 F.3d 916, 923 (5th Cir. 2019). Here, Congress has done neither.

#### 1. Title IX does not explicitly exclude this Court's review.

To start, Title IX does not represent an explicit preclusion of this Court's jurisdiction. When determining whether a statute explicitly excludes district court review, courts examine the text. *Bank of Louisiana*, 919 F.3d at 923; *see also Elgin v. Dep't of Treasury*, 567 U.S. 1, 25 (2012) (Alito, J., dissenting) ("When dealing with an express preclusion clause like this, we determine the scope of preclusion simply by interpreting the words Congress has chosen.")

Here, the text of Title IX's statutory review scheme fails to establish an explicit preclusion of this Court's jurisdiction. Section 1682 fails to do so, as do section 1683 and section 1234g.

Section 1682 merely explains that compliance with any requirement under Title IX "may be effected" in one of two ways: (1) terminating financial assistance to any recipient of Title IX, or (2) "by any other means authorized by law." 20 U.S.C. § 1682. By explicitly allowing enforcement of Title IX through "any other means authorized by law," section 1682 does not lay out a comprehensive review scheme. Instead, it expressly allows other avenues of relief, such as judicial review. Hence, section 1682 does not preclude this Court's ability to review this case. In fact, its textual open door to relief swings even wider when looking at the text of its companion statutory provision: section 1683.

Section 1683 even goes further than section 1682 in that it expressly *allows* judicial review. Specifically, under section 1683, any "agency action taken pursuant to section 1682 … *shall* be subject to judicial review." 20 U.S.C. § 1683 (emphasis added). And when any agency terminates or refuses to grant or continue financial assistance—and that agency action is "not otherwise subject to judicial review"—section 1683 further allows "any person aggrieved (*including any State*

or political subdivision thereof and any agency of either)" to "obtain judicial review of such action." 20 U.S.C. § 1683 (emphasis added). Therefore, section 1683's explicit allowance of judicial review of agency actions falls far short of expressly precluding this Court's review.

And finally, the text of section 1234g fails to expressly preclude this Court's review here because it does not even apply to this case. Section 1234g only applies when a Title IX recipient is adversely affected by one (or more) of three types of final agency actions: (1) when  the Secretary makes a preliminary departmental determination that a recipient has made an unallowable expenditure;[7] (2) when the Secretary withholds future funds from a recipient after having reason to believe that the recipient failed to comply with the legal requirements;[8] or (3) when the Secretary issues a complaint in order to compel compliance through a cease and desist order.[9] *See* 20 U.S.C. § 1234g(a). None of these agency actions represent the type of agency action that Texas challenges here. Texas is instead challenging Defendants' claimed authority to enforce Title IX in the way prescribed by the challenged actions, not the particular enforcement mechanisms themselves. Stated differently, Texas is challenging the issuance of "rules, regulations, or orders of general applicability" pursuant to section 1682, not the withholding of funds or other specific enforcement measure under section 1234g. Thus, section 1234g's statutory review scheme is inapplicable to this case. Accordingly, Title IX falls short of expressly precluding this Court's jurisdiction. And the court that has already enjoined the same agency actions at issue in this case has already rejected Defendants' arguments on this point. *Tennessee*, 615 F. Supp. 3d at 836 ("[T]he express language of Title IX does not foreclose all judicial review.").

### 2.  Title IX does not implicitly preclude this Court's review.

Defendants further fail to establish that Title IX implicitly precludes this Court's review here. To find an implicit preclusion of a district court's jurisdiction, a court must make two determinations: (1) that "it is 'fairly discernible' from the 'text, structure, and purpose' of the

---

[7] *See* 20 U.S.C. § 1234a.
[8] *See* 20 U.S.C. § 1234d(a); 20 U.S.C. § 1234c.
[9] *See* 20 U.S.C. § 1234e(a); 20 U.S.C. § 1234c.

statutory scheme that Congress intended to preclude district court jurisdiction," *Bank of Louisiana*, 919 F.3d at 923 (quoting *Elgin*, 567 U.S. at 10); and (2) that "the 'claims at issue are of the type Congress intended to be reviewed within the statutory structure,'" *id.* (cleaned up) (quoting *Free Enter. Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010)). Neither of those prongs are met here.

### a.  Title IX does not indicate an intent to preclude this Court's review.

Title IX first does not establish a fairly discernable intent to preclude this Court's review because it does not provide a comprehensive or elaborate statutory review framework. Indeed, contrary to Defendants' unsupported allegations and drive-by references to the pertinent Title IX statutes, *see* ECF No. 28 at 29, precedent shows that Title IX is *not* "an elaborate statutory framework" and does *not* constitute the type of "statutory scheme that would preclude Plaintiffs from bringing these claims in federal district court." *Texas v. United States*, 201 F. Supp. 3d 810, 826 (N.D. Tex. 2016) (O'Connor, J.). And this is especially true because "the Supreme Court has held that Title IX's enforcement provisions, codified at Title 20 U.S.C. §§ 1681–1683, does not provide the exclusive statutory remedy for violations." *Id.* at 826–27 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979)). Therefore, Defendants fail to show that Title IX provides "an elaborate administrative enforcement scheme that culminates in the opportunity for judicial review before a court of appeals." ECF No. 28 at 29.

Defendants argue that "courts have routinely barred funding recipients and others from circumventing the civil rights laws' administrative processes." ECF No. 28 at 29. But none of the cases Defendants cite address Title IX. *See Rogers v. Bennett*, 873 F.2d 1387, 1392–93 (11th Cir. 1989) (addressing the Education of the Handicapped Act); *Bakersfield City Sch. Dist. of Kern Cnty. v. Boyer*, 610 F.2d 621, 624–26 (9th Cir. 1979) (addressing Title VI of the Civil Rights Act of 1964); *Taylor v. Cohen*, 405 F.2d 277, 279–81 (4th Cir. 1968) (en banc) (same). And jurisdiction-stripping questions are statute-specific, making the cases Defendants cite inapposite.

Overall, Title IX's lacks an elaborate or comprehensive statutory structure, and Defendants have failed to prove otherwise. Accordingly, Title IX does not contain a fairly discernible intent to preclude this Court's review.

### b. Texas's claims are not of the type Congress intended to be reviewed within Title IX's statutory structure.

Texas's claims also do not represent the type of claims that Congress intended to be reviewed within Title IX's statutory structure because those claims fail to satisfy the three factors that are colloquially known as "the *Thunder Basin* factors." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023). These three factors require a court to determine (1) whether precluding the district court's jurisdiction would "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral to [the] statute's review provisions;" and (3) whether the claim is "outside the agency's expertise." *Id.* (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)).

Here, all three factors show that judicial review is allowed for Texas's challenges. *First*, precluding this Court's review of Texas's claims would foreclose all meaningful judicial review of the claim. For one, sections 1682 and 1683 expressly allow judicial review over any "rules, regulations, or orders of general applicability" issued by the Department of Education. 20 U.S.C. §§ 1682–1683. But more, as discussed above, Texas's claims fall outside the scope of section 1234g. Thus, while section 1234g allows subsequent litigation in a court of appeals at the conclusion of an administrative hearing process over those certain types of claims, 20 U.S.C. § 1234g(b)–(d), at no point during that administrative process will section 1234g allow Texas to challenge Defendants' authority to proceed at all. Accordingly, precluding this Court's review will foreclose all meaningful judicial review of Texas's challenges to the challenged agency rules themselves. *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 490 (determining that the preclusion of jurisdiction would foreclose all meaningful judicial review when the statutory scheme provided for judicial review only over some agency actions, but not others).

*Second*, Texas's claims are wholly collateral to the statute's review provisions. "[W]hether a claim is collateral to the relevant statutory-review scheme depends on whether that scheme is intended to provide the sort of relief sought by the plaintiff." *Cochran v. SEC*, 20 F.4th 194, 207 (5th Cir. 2021). For example, a claim is wholly collateral if it is "challenging the [agency's] power to proceed at all, rather than actions taking in the agency proceedings." *Axon Enter., Inc.*, 598 U.S. at 192. In this case, Texas is not challenging a particular enforcement action by Defendants that finds Texas not in conformity with the challenged actions; instead, it is challenging the legitimacy of Defendants' interpretation of Title IX and their authority to promulgate such actions at all. Nor do Texas's claims "address the sorts of procedural or evidentiary matters [that the Secretary or the Board] often resolves on its way to a merits decision." *Id.* at 193. Because Texas is challenging Defendants' power to proceed at all and not particular attempts to enforce compliance against the State, its claims are "wholly collateral" to the statutory review scheme.

*Third*, and finally, Texas's claims are outsides Defendants' expertise. Claims generally fall outside an agency's expertise when they "raise 'standard questions of administrative' and constitutional law, detached from 'considerations of agency policy.'" *Id.* at 905. Texas's claims are entirely comprised of administrative law issues, not policy ones. Accordingly, Texas's challenges to the challenged actions fall outside the Defendants' expertise and are instead within the expertise of this Court.

## II.    The Notice, Letter, and Fact Sheet are contrary to law.

Generally, the APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory … authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

Here, neither Title IX nor its implementing regulations provide a basis for Defendants to define discrimination on the basis of sex in the manner described in the Notice, Letter, and Fact Sheet. *See* 20 U.S.C. § 1686; *see also* 34 C.F.R. § 106.33. Therefore, the guidance documents

conflict with Title IX and its implementing regulations and are substantively unlawful under the APA because they exceed Defendants' statutory and regulatory authority. *See* 5 U.S.C. § 706(2)(A), (C). Thus, Defendants are first wrong that the Notice, Letter, and Fact Sheet represent correct interpretations of Title IX because—as Texas discussed previously, *see* ECF No. 24 at 29–36—the Notice, Letter, and Fact Sheet are inconsistent with Title IX and thus not in accordance with law. Indeed, those agency documents conflict with Title IX's text, contradict Title IX's implementing regulations, and ignore relevant physiological differences between the two sexes that justify differential treatment in certain contexts such as living facilities and athletics.

As Texas previously explained, the term "sex" in Title IX means biological sex. ECF No. 24 at 29–36. Defendants apparently concede this point but maintain that to discriminate "on the basis of sex" means discrimination based on sexual orientation and gender identity is covered. ECF No. 28 at 49–51.

This analysis of the text, context, and implementing regulations of Title IX show that the Notice, Letter, and Fact Sheet conflicts with Title IX because it condemns what Title IX allows. Specifically, Title IX authorizes separation based on sex in certain situations—such as "maintaining separate living facilities for the different sexes," 20 U.S.C. § 1686, and permitting specified single-sex educational institutions, organizations, activities, and scholarship awards, 20 U.S.C. § 1681(a). Title IX's implementing regulations further confirm that covered educational programs may offer "separate toilet, locker room and shower facilities on the basis of sex" provided that "facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. Note that under Defendants' interpretation of "on the basis of sex" as inherently including discrimination based on sexual orientation or gender identity, this provision explicitly allows discrimination based on those categories—because it blesses "separate toilet, locker room and shower facilities *on the basis of sex*."

But the challenged actions here actually condemn separating students based on their biological sex as it pertains to the use of restrooms and school sports. *See* ECF No. 24-1 at

Appx.004, 008–009, 011. For example, the Fact Sheet uses as a negative example a school principal who prevents a biological male who identifies as a female from using the girls' restroom and from participating on the girls' cheerleading team. ECF No. 24-1 at Appx.011. Yet, as discussed above, Title IX's own text and implementing regulations would side with the school's principal, thus displaying the patent conflict between the challenged agency actions here and Title IX.

Defendants point out that courts have used the terms "because of," "based on," and "on the basis of" interchangeably. ECF No. 28 at 37–38. That makes no difference. They "read too much into too little," because "'[t]he language of an opinion is not always to be parsed as though we were dealing with language of a statute.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (2023) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)); *Neese v. Becerra*, 640 F. Supp. 3d 668, 678 (N.D. Tex. 2022) ("just because a *judicial opinion* employs two phrases interchangeably in one context does not mean *Congress* employed those same terms interchangeably in a different context."). The Supreme Court's "opinions dispose of discrete cases and controversies and they must be read with a careful eye to context." *Nat'l Pork Producers Council*, 598 U.S. at 374–75 (citing *Cohens v. Virginia*, 6 Wheat. 264, 399–400, 19 U.S. 264 (1821) (Marshall, C. J.)).

The dispositive question is what *Congress* intended. And Congress's use of different language indicates that it intended "to convey a different meaning." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562, 1578 (2016) (Thomas, J., concurring in the judgment). Therefore, given the textual differences between Title VII and Title IX, what is discrimination under one statute is not necessarily discrimination under the other.

Defendants nonetheless proceed to make the same mistake as the challenged documents and rely on *Bostock* to argue that the challenged agency actions here do not contradict Title IX. But Defendants' efforts fail. "*Bostock* decided only what *Bostock* decided." *Neese v. Becerra*, 640 F. Supp. 3d 668, 676 (N.D. Tex. 2022). *Bostock* concerned only Title VII, expressly noted that "other federal or state laws that prohibit sex discrimination"—like Title IX—were not "before" the Court and refused to "prejudge any such question" about what those statutes require. *Bostock*, 590

34

U.S. at 680. And while Defendants contend that "it is *Bostock*'s underlying reasoning—which applies with equal force to Title IX—that compels the result here, not *Bostock*'s top-line holding," ECF No. 28 at 37, precedent says otherwise. Indeed, "[o]ne cannot rely on the words and reasoning of *Bostock* itself to explain why the Court prejudged what the Court expressly refused to prejudge." *Neese*, 640 F. Supp. 3d at 676. *Bostock*'s "reasoning applies only to Title VII, as *Bostock* itself and [] subsequent cases make clear." *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 420 (6th Cir. 2023) (Sutton, C.J.).

Overall, Defendants' attempts to conflate Title VII and Title IX fail. The plain language and statutory structure of Title IX make clear that "sex" means biological sex and that the Notice, Letter, and Fact Sheet simply cannot be reconciled with Title IX or its longstanding regulations. Accordingly, the Notice, Letter, and Fact Sheet contradict Title IX and are thus not in accordance with law.

Defendants curiously maintain that the Notice, Letter, and Fact Sheet "do not prohibit recipients of federal funding from maintaining certain single-sex educational institutions, organizations, activities, or scholarship awards … or from maintaining separate living facilities for the different sexes … or establish specific rules for subjects like toilet, locker room, and shower facilities." ECF No. 28 at 48. But Defendants merely "try to work around [those concessions] with a linguistic device" because the challenged actions treat subjective identity as the determination of "sex." *Doe 2 v. Shanahan*, 917 F.3d 694, 723 (D.C. Cir. 2019) (Williams, J., concurring in the result) (noting plaintiffs' concession that military may have sex-specific standards but maintaining that "sex" should be determined by subjective gender identity). It is no consolation to tell schools they may still have sex-specific bathrooms (or sports teams or pronoun usage) so long as they allow exceptions for students who subjectively identify as the opposite sex. *See* ECF No. 24-1 at Appx.011 (Fact Sheet treating transgender students in hypotheticals as entitled to use facilities, access sports teams, and demand to be referred to by pronouns of opposite biological sex).

And this conflict becomes even clearer when looking at the Notice, Letter, and Fact Sheet through the lens of the Spending Clause, which was inapplicable to the Title VII interpreted in

35

*Bostock*. That's because those guidance documents fail to provide adequate notice that recipients of federal funding could be liable for the conduct described in the Notice, Letter, and Fact Sheet. Defendants, of course, disagree and argue that "[r]ecipients of federal funds like Texas are clearly on notice that they must comply with the discrimination prohibition under Title IX, and 'the possibility that application of [the condition] might be unclear in [some] contexts' does not render it unenforceable under the Spending Clause." ECF No. 28 at 39 (quoting *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 665–66, 673 (1985)).

But Title IX fails to provide clear notice of Defendants' proposed requirements. Title IX does not unambiguously prohibit discrimination based on sexual orientation or gender identity. Nor does it unambiguously prohibit institutions from separating athletic teams or living facilities based on biological sex. Instead, both Title IX and its implementing regulations expressly allow sex-separated facilities, *see* 20 U.S.C. § 1686; 34 C.F.R. § 106.33, and longstanding regulations expressly authorize sex-separated sports teams, 34 C.F.R. § 106.41(b). As result, "schools across the country separate bathrooms based on biological sex and colleges and universities across the country separate living facilities based on biological sex," so the idea that Texas "could or should have been on notice that its policy of separating male and female bathrooms violates Title IX and its precepts is untenable." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 816 (11th Cir. 2022) (en banc). *Bostock* not only proceeded on an understanding of the term "sex" as used in Title VII to mean biological sex, but it expressly held that its interpretation was unexpected. 590 U.S. at 649, 653, 674–81. That holding cannot be reconciled with an argument that Congress spoke clearly on this "unexpected" condition Defendants ask this Court to read into Title IX. If both parties did not expect the outcome, there could be no meeting of the minds sufficient to establish liability for precisely the type of discrimination alleged here.

After all, "[a] safeguard of our federalist system is the demand that Congress provide the States with a clear statement when imposing a condition on federal funding because 'legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.'" *Adams*, 57 F.4th at 815

36

(quoting *Pennhurst*, 451 U.S. at 17). Overall, Title IX falls far short of providing adequate notice to Texas of the sort of requirements imposed by the challenged actions, and "absent a clear statement from Congress, such a reading of Title IX would offend first principles of statutory interpretation and judicial restraint." *Adams*, 57 F.4th at 817.

Interpreting Title IX as including a radical restructuring of longstanding norms of the Nation's schools would violate another rule of interpretation. Congress must "speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). The Major Questions Doctrine is a principle of statutory interpretation under which courts will not assume that Congress has assigned to the Executive Branch questions of "deep 'economic and political significance'" unless Congress has done so expressly. *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

In *West Virginia v. EPA*, the Supreme Court explained that the Major Questions Doctrine required applying "common sense as to the manner in which Congress would have been likely to delegate such power to the agency at issue … Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices." 142 S. Ct. 2587, 2609 (cleaned up). A central characteristic of our constitutional republic is that "[a]gencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *Id.* Thus, the Supreme Court explained that "Congress typically [does not] use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme … We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* (cleaned up); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). Title IX's language cannot be plausibly read to smuggle in a power for federal agencies to overturn the "unremarkable—and nearly universal—practice[s]" common in States' governance of schools. *Adams*, 57 F.4th at 796.

III.    **The Notice, Letter, and Fact Sheet constitute a substantive rule requiring notice-and-comment rulemaking.**

Finally, the Notice, Letter, and Fact Sheet constitute substantive rules that violated the APA's notice-and-comment rulemaking requirement. The APA requires federal agencies to follow a three-step notice and comment process when formulating, amending, or repealing an administrative rule. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95-96 (2015); 5 U.S.C. § 553, 551(5). The agency rules that must undergo this formal rulemaking process include "statements of general or particular applicability and future effect that are designed to implement, interpret, or prescribe law or policy." *Perez*, 575 U.S. at 95–96 (citing 5 U.S.C. § 551(4)). Although the APA exempts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" from notice and comment procedures, 5 U.S.C. § 553(b)(A), those exceptions "must be narrowly construed." *DAPA*, 809 F.3d at 171.

"Agencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019). "On the contrary, courts have long looked to the contents of the agency's action, not the agency's self-serving label, when deciding whether statutory notice and comment demands apply." *Id*. Courts must be "mindful but suspicious of the agency's own characterization," and "focus[] primarily on whether the rule had binding effect on agency discretion or severely restricts it." *DAPA*, 809 F.3d at 171. Hence, courts determine whether an agency's pronouncement is an interpretative rule or a substantive rule by analyzing "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *Id*. (cleaned up). "These factors are not treated like different elements of a cause of action, both of which must be proved; but instead a matter of judgment is involved in distinguishing between rules however discretionary in form, that effectively circumscribe administrative choice." *Texas v. United States*, 328 F. Supp. 3d 662, 731 (S.D. Tex. 2018) (internal quotations omitted). "An agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding. *Id*. (cleaned up).

38

Additionally, an agency rule is substantive and notice and comment rulemaking is required if it "adopt[s] a new position inconsistent with any of the [agency's] existing regulations." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 88 (1995).

As discussed in prior briefing, the Notice, Letter, and Fact Sheet are subject to notice and comment. They create significant new obligations on recipients of federal education funding to refrain from discrimination based on gender identity or sexual orientation, and they do not leave the Department, DOJ, and their decisionmakers free to exercise discretion regarding the scope of Title IX's prohibition on discrimination on the basis of sex. *DAPA*, 809 F.3d at 171. They are more than "derivative, incidental, or mechanical burdens" on Texas, and they "change[] the substantive standards by which" Defendants enforce Title IX and its implementing regulations, *id.* at 176—standards that can only be set by Congress. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022). Indeed, the guidance documents directly affect billions of dollars in funding for educational programs. *See* ECF No. 24-1 at Appx.038–39.

Defendants argue, however, that the Notice, Letter, and Fact Sheet are "interpretive rules" that do not merit notice-and-comment rulemaking. ECF No. 28 at 40. They specifically assert that those documents are expressly non-binding, do not purport to have the force or effect of law, "represent [the Department's] understanding of Title IX's sex discrimination prohibition[,] and merely 'advise' the regulated parties of that interpretation." ECF No. 28 at 40.

But the fact that the Notice, Letter, and Fact Sheet themselves state that they are not binding misunderstands the law and reality. After all, when an agency action "'broadly condemn[s]' an employment practice, it 'leaves no room for [the agency's] staff not to issue referrals to the Attorney General when an employer" or other relevant entity implements the condemned practice. *Texas v. EEOC*, 633 F. Supp. 3d 824, 840 (N.D. Tex. 2022) (Kacsmaryk, J.) (quoting *Texas v. EEOC*, 933 F.3d 433, 443 (5th Cir. 2019)). And because the Notice, Letter, and Fact Sheet condemn what Title IX allows and *Bostock* does not address, their prohibitions are "binding as a practical matter because private parties can rely on it as a norm or safe harbor by which to shape their actions." *EEOC*, 933 F.3d at 444 (cleaned up). As in *EEOC*, this becomes

39

even clearer when the Fact Sheet also invites students to "fil[e] a complaint with the Civil Rights Division of the U.S Department of Justice" for the types of incidents it lists as examples," Appx.012, "thus opening the field of potential plaintiffs," *EEOC*, 933 F.3d at 444 (citation omitted). Hence, the fact that the challenged documents themselves state they are not binding is of no relevance.

But more, an interpretive rule "clarifies, rather than creates, law." *Flight Training Int'l, Inc. v. Fed. Aviation Admin.*, 58 F.4th 234, 240 (5th Cir. 2023) (quoting *Shalala*, 56 F.3d at 602. And interpretive rules "advise the public of the agency's construction of the *statutes* and *rules* which it administers," not the Supreme Court opinions of which it is aware. *Perez*, 575 U.S. at 97 (citation omitted). Here, in contrast, the Notice, Letter, and Fact Sheet "go beyond informing the public and expressing the agencies' views as to *Bostock*'s effect in interpreting Title VII and Title IX." *EEOC,* 633 F. Supp. 3d at 839–40. Indeed, they do not merely "remind parties of existing statutory or regulatory duties" but rather imposed new duties, "chang[ed] the text" of the statute it "profess[ed] to interpret," and effects[ed] a substantive change in existing law or policy," and is therefore a substantive (or "legislative") rule. *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020). That's because the obligation not to discriminate on the basis of sexual orientation or gender identity is nowhere within the text of Title IX. *See* 20 U.S.C. § 1686. Furthermore, the challenged guidance documents directly conflict with Department regulations explicitly permitting recipients of Title IX funding to maintain separate living facilities, bathrooms, locker rooms, shower facilities, and sports teams in accordance with biological sex. *See* 34 C.F.R. §§ 106.33, 106.41(b).

Put simply, "[t]he hallmark of a legislative rule is that it 'modifies or adds to a legal norm.'" *Flight Training Int'l, Inc.*, 58 F.4th at 241. And that is precisely what the Notice, Letter, and Fact Sheet accomplished: an unlawful modification of Title IX.

Further, despite the Defendants' allegations to the contrary, the Notice, Letter, and Fact Sheet are legislative rules because no statutory authority "compels or logically justifies" them. *Natl. Council for Adoption v. Blinken*, 4 F.4th 106, 113 (D.C. Cir. 2021). That's because "the

40

[challenged actions] do[] not simply repeat the relevant provisions of Title [IX or the other provisions they cite]. Instead, the [challenged actions] purport[] to interpret authoritatively [those statutory requirements]. This court has always considered such a distinction important when deciding whether agency action is 'final' under the APA." *EEOC*, 827 F.3d at 385–86. Accordingly, Texas has established that the Notice, Letter, and Fact Sheet are substantive— "legislative"—rules that required notice-and-comment rulemaking. *See Tennessee*, 615 F. Supp. 3d at 838 (granting preliminary injunctive relief for failure to comply with the APA's notice and comment procedures because the same guidance documents challenged here were "legislative rules that create new rights and obligations").

## IV.    Texas is entitled to its requested relief.

### A.  Texas is entitled to declaratory relief.

"The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. The APA expressly contemplates declaratory relief: "The form of proceeding for judicial review … includ[es] actions for declaratory judgments or writs of prohibitory or mandatory injunction[.]" 5 U.S.C. § 703. Texas has established that the challenged actions violate the APA, and it is entitled to a declaration delineating the rights and legal relations among itself and the Defendants. The Court should thus declare that the Notice, Letter, and Fact Sheet are unlawful, and that the prohibition on sex discrimination in Title IX does not include sexual orientation or gender identity.

### B.  Texas is entitled to vacatur of the Notice, Letter, and Fact Sheet.

In general, the propriety of vacatur is based on two factors: "(1) the seriousness of the deficiencies of the action, that is, how likely the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur." *Texas v. United States* (*DACA*), 50 F.4th 498, 529 (5th Cir. 2022) (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)).

Vacatur is necessary because "remand without vacatur creates a risk that an agency may drag its feet and keep in place an unlawful agency rule. *EME Homer City Generation, L.P. v. E.P.A.*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.). Remanding without vacatur would "invite[] agency indifference." *In re Core Comm'n, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) (urging courts "to consider the alternatives to the open-ended remand without vacatur"); *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1262–64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."). And "[b]ecause vacatur is the default remedy ... defendants bear the burden to prove that vacatur is unnecessary." *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:23-cv-59-JDK, 2023 WL 4977746, at *13–14 (E.D. Tex. Aug. 3, 2023) (Kernodle, J.) (citation omitted).

Here, the challenged actions suffer from severe deficiencies that cannot be justified on remand, and no disruptive consequences will result from vacatur.

### 1. Defendants cannot justify the severe deficiencies of the Notice, Letter, and Fact Sheet, on Remand.

Regarding the first factor of vacatur, the federal government will not be able to justify its decision to create law that Congress did not pass and that the Supreme Court did not allow. Broadly speaking, remand to an agency "is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) (citing *Central and South West Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000)).

Under the first factor, remand without vacatur is proper only where the agency failed "adequately to explain why it chose one approach rather than another for one aspect of an otherwise permissible rule." *Texas Med. Ass'n*, 2023 WL 4977746, at *13–14 (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009)). And for violation of the notice-and-comment requirements, a total "[f]ailure to provide the required notice and to invite public comment[,] is a fundamental flaw that normally requires vacatur of the rule." *Wheeler*, 955 F.3d at

85; *see also Daimler Trucks N. Am. LLC v. E.P.A.*, 737 F.3d 95, 103 (D.C. Cir. 2013) (noting that "the court typically vacates rules when an agency 'entirely fail[s]' to provide notice and comment"); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021) ("[A]n agency that bypassed required notice and comment rulemaking obviously could not ordinarily keep in place a regulation while it completed that fundamental procedural prerequisite.").

And because the challenged agency actions here are contrary to law, the Department will not be able to substantiate its decision on remand because there is no possibility that it could correct the fundamental errors. When the Fifth Circuit considered the first factor in the propriety of vacatur framework in the DACA case, it concluded that there was "no possibility that DHS could obviate the[] conflicts on remand" because DACA had "severe" deficiencies and "fundamental substantive defects" that "contradict[ed] significant portions of the INA." *DACA*, 50 F.4th at 529. The same holds here.

## 2. Vacatur will not cause disruptive consequences.

As to the second factor—disruptiveness—Defendants may not rely on the "uncertainty that typically attends vacatur of any rule." *Nat. Res. Def. Council*, 955 F.3d at 85 (rejecting agency's disruption argument). And "the threat of disruptive consequences cannot save a rule when its fundamental flaws 'foreclose [the agency] from promulgating the same standards on remand.'" *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (quoting *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261–62 (D.C. Cir. 2007)). No amount of asserted disruptiveness can save the agency actions here from being vacated.

## C. Texas is entitled to permanent injunctive relief.

A permanent injunction is proper when a plaintiff has prevailed on the merits, there is no adequate remedy at law for the plaintiff's injury, the balance of the harms favors the plaintiff, and an injunction would serve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Texas has satisfied each of these elements.

43

      **1.  Texas succeeds on the merits.**

As explained above, the Notice, Letter, and Fact Sheet are contrary to law and failed to undergo the notice-and-comment rulemaking process required for substantive rules.  Defendants' interpretation of Title IX is unlawful.

      **2.  Texas will suffer irreparable harm.**

Not only are the Notice, Letter, and Fact Sheet substantively and procedural unlawful, but they also will impose irreparable harm on Texas. 2016)). But generally, it is "well established that an injury is irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984)).

Here, Texas suffers both substantial financial injuries and injuries that cannot be undone through monetary means. As discussed above, an injury to Texas's sovereign interests is irreparable. What's more, Texas and its school districts are threatened with losing billions of dollars in federal funding for noncompliance with this unlawful mandate. Moreover, because the federal government "generally enjoy[s] sovereign immunity for any monetary damages," *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142, Texas cannot compel the federal government to reimburse it.

Defendants contest this point and argue that Texas injuries are not irreparable because Texas "would have the benefit of an extensive administrative process, followed by judicial review." ECF No. 28 at 44. But that misunderstands the administrative review scheme of Title IX. As discussed above, any such administrative process is inapplicable to Texas's claims in this case and would only further harm Texas. Defendants' arguments thus fail.

Moreover, Texas's injuries are not only limited to a loss of funding. Notice, Letter, and Fact Sheet also strip Texas of its sovereign interest and ability to create and enforce its own laws. And the sovereign-stripping impact of those agency documents imposes irreparable injuries on Texas. After all, Texas's "inability to enforce its duly enacted" laws "inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see also, e.g.*, *Kansas v. United States*,

249 F.3d 1213, 1227 (10th Cir. 2001) (irreparable harm where agency action put its "sovereign interests and public policies at stake"). Together, therefore, the injuries to Texas's financial and sovereign interests are irreparable and should be protected with an injunction.

### 3. The balance of the equities and public interest favor an injunction.

Finally, the remaining injunction factors—the balance of the equities and the public interest—tilt in Texas's favor. While Defendants contend that "[t]here is a substantial public interest in achieving Title IX's goal of eliminating discrimination in education" and that "there is also 'inherent harm to an agency' in preventing it from enforcing statutes and regulations, ECF No. 28 at 45, any such claimed interest in carrying out the Notice, Letter, and Fact Sheet is "illegitimate," as the federal government has no interest "in enforcing an unlawful" agency action. *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

Therefore, an injunction that redresses Texas injuries serves the public interest and does not harm the Defendants. Accordingly, the balance of equities and the public interest weighs in favor of Texas.

### D. Texas's requested relief is appropriate.

To alleviate the harms and injuries that Texas suffers from the Notice, Letter, and Fact Sheet, Texas requested that this Court should declare that Title IX does not apply to discrimination based on sexual orientation or gender identity, set aside (*i.e.*, vacate) the challenged agency actions, and permanently enjoin their implementation and enforcement of Title IX as including discrimination based on sexual orientation or gender-identity. ECF No. 23-1. Defendants argue, however, that Texas's requested relief goes too far, and this Court should go no farther than vacating the challenged documents. *See* ECF No. 28 at 43–47.

Defendants are wrong. For starters, Defendants' arguments seem to rely on what the Fifth Circuit has termed a "false dichotomy" or the notion that "a lawsuit challenging a regulation and a lawsuit challenging the underlying statute are different." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 378 (5th Cir. 2022). But "a challenge to an agency regulation is necessarily a challenge to the

underlying statute as well[] … because an agency literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *Id.* (internal quotations omitted). As a result, Defendants' arguments "rest[] on the faulty premise that the plaintiffs were 'suing' a regulation" because "the right way to view the plaintiffs' suit was as challenging '*one* Government action that causes their harm: the [Government's] threatened enforcement of the [statute], *through* its implementing regulation.'" *Id.* (emphasis in original) (quoting *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1650 (2022)).

In a previous challenge to the Department's issuance of a guidance document on this subject, this Court has previously granted injunctive relief against the Department interpreting Title IX as including discrimination based on sexual orientation or gender identity:

> Defendants are enjoined from enforcing the Guidelines against Plaintiffs and their respective schools, school boards, and other public, educationally-based institutions. Further, while this injunction remains in place, Defendants are enjoined from initiating, continuing, or concluding any investigation based on Defendants' interpretation that the definition of sex includes gender identity in Title IX's prohibition against discrimination on the basis of sex. Additionally, Defendants are enjoined from using the Guidelines or asserting the Guidelines carry weight in any litigation initiated following the date of this Order.

*Texas*, 201 F. Supp. 3d at 836 (O'Connor, J.). The harm done to Texas arises from Defendants' wrongful interpretation and application of Title IX. The Court should grant the State full relief by enjoining such actions, whether through the specific challenged guidance documents ort otherwise.

## CONCLUSION

The Court should grant Plaintiff the State of Texas summary judgment on all its claims, vacate the challenged agency actions, permanently enjoin their implementation, declare them unlawful, and declare that the prohibition on sex discrimination in Title IX does not include sexual orientation or gender identity. Defendants' cross-motion for summary judgment and motion to dismiss should be denied.

Dated February 29, 2024.

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

Respectfully submitted.

*/s/ Ryan D. Walters*
RYAN D. WALTERS
*Attorney-in-Charge*
Chief, Special Litigation Division
Texas Bar No. 24105085

AMY S. HILTON
Special Counsel
Texas Bar No. 24097834

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ETHAN SZUMANSKI
Special Counsel
Texas Bar No. 24123966

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
ryan.walters@oag.texas.gov
amy.hilton@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
ethan.szumanski@oag.texas.gov

**Counsel for the State of Texas**

## CERTIFICATE OF SERVICE

I certify that on February 29, 2024, this document was filed through the Court's CM/ECF system, which served it upon all counsel of record.

*/s/ Ryan D. Walters*
RYAN D. WALTERS

47