**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| THE STATE OF TEXAS,<br><br>   *Plaintiff*,<br><br> v.<br><br>MIGUEL CARDONA, in his official capacity as Secretary of Education, et al.,<br><br>   *Defendants*. | No. 4:23-cv-604-O |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR CROSS-MOTION TO
DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CARLOTTA WELLS
Assistant Branch Director

JOHN T. LEWIS (TX Bar No. 24095074)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20530
Tel: (202) 353-0533
Fax: (202) 616-8460
E-mail: john.t.lewis.iii@usdoj.gov

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................................................ ii

Introduction .......................................................................................................................... 1

Argument .............................................................................................................................. 3

I.      The Court should dismiss this case for lack of subject-matter jurisdiction. ...................... 3

     A.      The Challenged Documents do not constitute final agency action......................... 3

     B.      Texas lacks Article III standing. ........................................................................... 6

     C.      Texas's claims are unripe. .................................................................................... 10

     D.      Texas has an adequate alternative remedy under Title IX. .................................. 13

     E.      Title IX's exclusive review scheme precludes jurisdiction in this Court. ............ 14

II.      In the alternative, the Court should enter judgment for ED................................................ 15

     A.      The Challenged Documents are consistent with Title IX. ................................... 15

     B.      The Challenged Documents are, at most, interpretive statements that were not required to undergo notice-and-comment rulemaking.......................................... 22

III.      If the Court enters judgment for Texas, it should limit any relief consistent with fundamental principles of equity. ..................................................................................... 24

Conclusion ........................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) ................................................. 21

*Am. Min. Cong. v. Mine Safety & Health Admin.*,
  995 F.2d 1106 (D.C. Cir. 1993) ............................................... 23

*Am. Tort Reform Ass'n v. OSHA*,
  738 F.3d 387 (D.C. Cir. 2013) ............................................... 3, 4

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000) ............................................... 5

*Axon Enter., Inc. v. FTC*,
  598 U.S. 175 (2023) ......................................................... 15

*Bank of Louisiana v. FDIC*,
  919 F.3d 916 (5th Cir. 2019) ............................................... 14

*Barrick Goldstrike Mines Inc. v. Browner*,
  215 F.3d 45 (D.C. Cir. 2000) ............................................... 4

*Bennett v. Ky. Dep't of Educ.*,
  470 U.S. 656 (1985) ......................................................... 20

*Bennett v. Spear*,
  520 U.S. 154 (1997) ......................................................... 3

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) ................................................... *passim*

*Braidwood Mgmt., Inc. v. EEOC*,
  70 F.4th 914 (5th Cir. 2023) ............................................... 9

*Burrage v. United States*,
  571 U.S. 204 (2014) ......................................................... 18

*California v. Texas*,
  141 S. Ct. 2104 (2021) ..................................................... 6

*Cannon v. University of Chicago*,
  441 U.S. 677 (1979) .................................................... 14, 15

*Choice Inc. v. Greenstein*,
    691 F.3d 710 (5th Cir. 2012) ............................................................ 10

*Ciba-Geigy Corp. v. EPA*,
    801 F.2d 430 (D.C. Cir. 1986) ......................................................... 11

*Clarke v. CFTC*,
    74 F.4th 627 (5th Cir. 2023) ............................................................. 5

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
    140 S. Ct. 1009 (2020) ..................................................................... 18

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
    45 F.4th 846 (5th Cir. 2022) .............................................................. 5

*Doe v. William Marsh Rice Univ.*,
    67 F.4th 702 (5th Cir. 2023) ............................................................ 16

*Flight Training Int'l, Inc. v. FAA*,
    58 F.4th 234 (5th Cir. 2023) ............................................................ 22

*Franciscan Alliance v. Becerra*,
    47 F.4th 368 (5th Cir. 2022) ..................................................... 24, 25

*Garcia v. Vilsack*,
    563 F.3d 519 (D.C. Cir. 2009) ......................................................... 14

*Gearlds v. Entergy Servs., Inc.*,
    709 F.3d 448 (5th Cir. 2013) ............................................................ 17

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998) .......................................................................... 15

*Golden & Zimmerman, LLC v. Domenech*,
    599 F.3d 426 (4th Cir. 2010) ........................................................... 23

*Hinojosa v. Horn*,
    896 F.3d 305 (5th Cir. 2018) ..................................................... 13, 14

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018) .......................................................................... 18

*Lower Colo. River Auth. v. Papalote Creek II, LLC*,
    858 F.3d 916 (5th Cir. 2017) ........................................................... 11

*Lujan v. Nat'l Wildlife Fed.*,
    497 U.S. 871 (1990) ............................................................................ 4

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ............................................................................ 7

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) .......................................................................... 24

*Nat'l Council for Adoption v. Blinken*,
  4 F.4th 106 (D.C. Cir. 2021) ............................................................ 23

*Neese v. Becerra*,
  640 F. Supp. 3d 668 (N.D. Tex. 2022) ....................................... 16, 17

*Peoples Nat'l Bank v. Off. of Comptroller of Currency of the U.S.*,
  362 F.3d 333 (5th Cir. 2004) .............................................................. 4

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ............................................................................ 22

*Roark & Hardee LP v. Austin*,
  522 F.3d 533 (5th Cir. 2008) ............................................................ 12

*Rochester Tel. Corp. v. United States*,
  307 U.S. 125 (1939) ............................................................................ 5

*Rollerson v. Brazos River Harbor Navigation Dist.*,
  6 F.4th 633 (5th Cir. 2021) .............................................................. 13

*Sackett v. EPA*,
  566 U.S. 120 (2012) .......................................................................... 13

*Sch. Dist. v. U.S. Dep't of Educ.*,
  208 F. Supp. 3d 850 (S.D. Ohio 2016) ......................................... 13, 14

*Sch. of the Ozarks, Inc. v. Biden*,
  41 F.4th 992 (8th Cir. 2022) .......................................................... 5, 8

*Sierra Club v. Peterson*,
  228 F.3d 559 (5th Cir. 2000) .............................................................. 4

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ............................................................................ 9

*Taylor-Travis v. Jackson St. Univ.*,
  984 F.3d 1107 (5th Cir. 2021) .......................................................... 18

*Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*,
  413 F.3d 479 (5th Cir. 2005) ............................................................ 12

iv

*Tex. State LULAC v. Elfant,*
   52 F.4th 248 (5th Cir. 2022) ............................................................... 6

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019) ........................................................ 9, 22, 23

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ............................................................... 22

*Texas v. United States,*
   201 F. Supp. 3d 810 (N.D. Tex. 2016) ...................................... *passim*

*Texas v. United States,*
   523 U.S. 296 (1998) ........................................................................... 10

*Thunder Basin Coal Co. v. Reich,*
   510 U.S. 200 (1994) ..................................................................... 14, 15

*Toilet Goods Ass'n v. Gardner,*
   387 U.S. 158 (1967) ........................................................................... 12

*Trudeau v. Univ. of N. Tex.,*
   861 F. App'x 604 (5th Cir. 2021) ...................................................... 18

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
   578 U.S. 590 (2016) ........................................................................... 13

*Walmart Inc. v. U.S. Department of Justice,*
   21 F.4th 300 (5th Cir. 2021) ......................................................... 11, 12

*Wittmer v. Phillips 66 Co.,*
   915 F.3d 328 (5th Cir. 2019) ............................................................... 17


## Statutes and Regulations

5 U.S.C. § 704 ...................................................................................... 13

15 U.S.C. § 78n(b) ............................................................................... 23

20 U.S.C.
   § 1234g ............................................................................................. 14
   § 1681(a) .................................................................................... *passim*
   § 1682 ............................................................................................... 14
   § 1683 ............................................................................................... 14
   § 1686 ......................................................................................... 19, 20

34 C.F.R. § 106.33 ......................................................................... 19, 20

**Other Authorities**

*Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance: Sex-Related Eligibility Criteria for Male & Female Athletic Teams,* 88 Fed. Reg. 22860 (Apr. 13, 2023).* ........................................................................ 8

*Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance,* 89 Fed. Reg. 33474 (Apr. 29, 2024) ...................................................... 4

**INTRODUCTION**

In its opening brief, the Department of Education ("ED") explained that Texas's challenge to three non-binding, informational documents (collectively, the "Challenged Documents"), which do nothing more than inform the public of ED's interpretation of certain language in Title IX, should be dismissed for lack of subject-matter jurisdiction. Because the Challenged Documents do not create any legal rights or obligations or conclude that any specific laws, policies, or circumstances violate Title IX, Texas's challenge suffers from no less than five jurisdictional defects: the lack of final agency action, standing, or ripeness, the existence of an adequate alternative remedy, and the exclusivity of Title IX's administrative review provisions. *See* Defs.' Consol. MSJ Br., ECF No. 28 ("DMSJ"). Texas's reply brief misapprehends the meaning and effect of the Challenged Documents and provides no basis for allowing this case to proceed. *See* Tex.'s Consol. Reply, ECF No. 31 ("Tex. Reply").

Indeed, ED has now issued final regulations concerning how Title IX's general non-discrimination mandate applies to contexts involving sexual orientation and gender identity. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474 (Apr. 29, 2024) ("Final Rule"). The Final Rule was promulgated after an extensive notice-and-comment process in which Texas fully voiced its objections to ED's proposed interpretation of Title IX. *See* Comment, Tex. Att'y Gen. Ken Paxton, Dkt. No. ED-2021-OCR-0166 (Sept. 12, 2022), https://perma.cc/U3A6-KM72. The Final Rule will take effect on August 1, 2024, and, once effective, will bind both recipients of federal financial assistance and the agency's staff in the exercise of their enforcement responsibilities. *Id.* The Final Rule therefore provides all the more reason why this speculative and premature case should be dismissed.

1

In light of these jurisdictional deficiencies, it would be inappropriate for the Court to address the merits of this case or ED's interpretation of Title IX. Regardless, the Challenged Documents correctly interpret Title IX. With respect to sexual orientation and gender identity, Title IX's prohibition on discrimination "on the basis of" sex is materially indistinguishable from Title VII's prohibition on discrimination "because of" sex. At most, Title IX's text requires nothing more than a showing of but-for causation—the same causation standard that the Supreme Court concluded was dispositive in *Bostock v. Clayton County*, 590 U.S. 644 (2020). And in either context, an individual's sex is necessarily a but-for cause of alleged discrimination on the basis of sexual orientation or gender identity. Indeed, it is telling that Texas has not identified a single reason why the distinction in statutory draftsmanship between Title VII and Title IX makes any substantive difference. Discrimination on the basis of sexual orientation and gender identity is discrimination "on the basis of sex" under Title IX.

In other words, the only thing that the Challenged Documents *actually do*—inform the public of ED's non-binding, high-level interpretation that Title IX's prohibition on sex discrimination encompasses discrimination on the basis of sexual orientation and gender identity—is perfectly consistent with both the text of Title IX and *Bostock*. Unlike the guidelines that the Court preliminarily enjoined in *Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016), the Challenged Documents do not reach any conclusions about how ED's interpretation would apply to specific circumstances. The Court need not resolve these questions to decide this case. Nor should it, given that ED has engaged in separate Title IX rulemaking efforts relating to these questions—efforts which are not part of Texas's challenge or properly before this Court.

For these reasons, the Court should dismiss this case for lack of subject-matter jurisdiction; alternatively, it should enter judgment for ED.

## ARGUMENT

I.      **The Court should dismiss this case for lack of subject-matter jurisdiction.**

A.      **The Challenged Documents do not constitute final agency action.**

As ED explained in its opening brief, the only thing that the agency "consummat[ed],"

*Bennett v. Spear*, 520 U.S. 154, 157 (1997), in the Challenged Documents is a non-binding

interpretation of Title IX's prohibition on sex discrimination as encompassing discrimination on

the basis of sexual orientation and gender identity. DMSJ at 9-10. Neither the NOI nor the Dear

Educator letter and Fact Sheet reflect any judgment by ED that any specific laws, policies, or

circumstances violate Title IX (i.e., that any specific or actual examples constitute discrimination

on the basis of sex). *Id.* at 10-11. Moreover, none of the Challenged Documents determine legal

rights or obligations because they are not "finally determinative of the issues or rights to which

[they are] addressed." *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013)

(quotation omitted); *see* DMSJ at 11-13. Texas has therefore failed to show final agency action.

Texas wrongly assumes that because ED consummated its general interpretation of Title

IX in the Notice of Interpretation, the Dear Educator letter and Fact Sheet reflect specific

conclusions about how that interpretation would apply in specific circumstances. Tex. Reply at

8-9. To the contrary, the NOI states that it "does not itself determine the outcome in any

particular case or set of facts," Appx.2, and the Dear Educator letter and the Fact Sheet reiterate

that the identified scenarios are "examples of the kind of incidents we can investigate" if a

complainant alleges that they constitute discrimination, not that they necessarily constitute a

violation of Title IX, Appx.9 (emphasis added); *see also* Appx.11. The point is not that, as Texas

claims, ED expressed conclusions about how Title IX would apply to specific circumstances

while claiming that it might revisit those conclusions, Tex. Reply at 8; it is that ED *never*

*reached any conclusions about those applications at all*, leaving those questions for future

rulemaking or for determination in concrete factual contexts in the course of enforcement

proceedings. And, indeed, ED's Final Rule addresses some of these subjects.

Texas's arguments regarding the consummation factor invoke inapposite case law. For

instance, ED does not "maintain" that its interpretation of Title IX will have been consummated

only once it has been applied to "particular factual circumstances," Tex. Reply at 9; the

Challenged Documents *do* reflect the consummation of ED's interpretation of Title IX as

covering sexual orientation and gender identity-based discrimination, but they *do not* reflect the

consummation of any views about how that interpretation might apply in specific circumstances.

Nor is this a case, as Texas asserts, where "[f]inal agency action" has resulted from a "series of

agency pronouncements." *Id.* (quoting *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45,

48-49 (D.C. Cir. 2000)). ED has taken *multiple* discrete actions—informing the public of its

interpretation of Title IX, and then informing the public of circumstances that ED can

investigate—and each "identifiable action" must be assessed on its own terms. *Sierra Club v.

Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871,

899 (1990)). Texas is trying to create the false impression that ED reached conclusions about

how its interpretation of Title IX would apply in specific circumstances. But the only decision

ED consummated is that the agency understands Title IX's prohibition on sex discrimination to

encompass discrimination based on sexual orientation and gender identity—full stop.

Regardless, none of the Challenged Documents impose legal consequences. *See Am. Tort

Reform Ass'n*, 738 F.3d at 395. Even accepting Texas's mistaken premise that the Challenged

Documents limit the agency's discretion, Tex. Reply at 10-11, Texas has not addressed the

principle that an agency order is not final if it "does not of itself adversely affect [a] complainant

but only affects his rights adversely on the contingency of future administrative action." *Peoples

*Nat'l Bank v. Off. of Comptroller of Currency of the U.S.*, 362 F.3d 333, 337 (5th Cir. 2004)

(quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)). That is the case here,

where Texas would not face any risk of losing federal funding until after an exhaustive

administrative process and the option of an appeal to a federal circuit court, or at the conclusion

of any judicial enforcement proceedings. DMSJ at 12. In such proceedings, Texas would have

every opportunity to make its arguments about the meaning of Title IX, and ED's interpretation

of Title IX, as expressed in the NOI, would not be binding on a reviewing court.

Moreover, the Challenged Documents do not limit the discretion of the agency's staff in

any meaningful way. They are expressly non-binding; they do not conclude that any specific

laws, policies, or circumstances violate Title IX; and they do not impose any specific mandates

on regulated parties or the agency's staff. *Id.* at 11-12; *see Sch. of the Ozarks, Inc. v. Biden*, 41

F.4th 992, 998 (8th Cir. 2022) (holding that memorandum applying *Bostock* to Fair Housing Act

did not "require that HUD reach the specific enforcement decision that the College's current

housing policies violate federal law"). They neither require specific action by Texas nor

eliminate any "safe harbor" that might otherwise exist. *Cf. Texas*, 201 F. Supp. 3d at 825.

Texas's responses are unavailing. Texas cites both *Data Marketing Partnership* and

*Clarke*, Tex. Reply at 10, but the critical feature of both cases that this case lacks was the

existence of regulations stating that regulated parties were entitled to rely on the documents at

issue. *Clarke v. CFTC*, 74 F.4th 627, 638 (5th Cir. 2023) (quoting *Data Mktg. P'ship, LP v. U.S.*

*Dep't of Lab.*, 45 F.4th 846, 854 (5th Cir. 2022)). Indeed, the quotes Texas extracts from the

Challenged Documents simply illustrate how dissimilar they are from actions that courts have

deemed final. *See, e.g.*, *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000)

(holding that action was final where it "reads like a ukase[:] [i]t commands, it requires, it orders,

it dictates"); *Texas*, 201 F. Supp. 3d at 830 n.19 ("[T]he DOJ/DOE Letter uses the words 'must,' and various forms of the word 'require' numerous times throughout the document."). Texas certainly cannot identify any cases holding that an agency's statements that it intends to fully enforce one of the statutes that Congress *directed* it to enforce—i.e., that the agency will do its job—amounts to final agency action. *See* Tex. Reply at 11. That leaves only the State's argument that the Challenged Documents constitute legislative rules, which is addressed *infra* Section II.B. For these reasons, none of the Challenged Documents constitute final agency action.

> ### B.     Texas lacks Article III standing.

ED's opening brief also explained that Texas's purported injuries are either not cognizable or speculative, DMSJ at 14-21, and that any injuries the State might suffer are traceable to Title IX itself, not to the Challenged Documents, *id.* at 21-23. Texas appears to agree that, whether or not the State is an "object" of the Challenged Documents in some abstract sense, it bears the burden of showing that the Challenged Documents have caused it to suffer an injury in fact that would be redressed by an order setting them aside. Tex. Reply at 12-13. Yet Texas puzzlingly asserts that ED has "admit[ted]" both that the State's policies conflict with the Challenged Documents and that ED is conducting investigations based on those documents. *Id.* at 13. ED has done no such thing, and it is Texas's failure to adduce "evidence," *Tex. State LULAC v. Elfant*, 52 F.4th 248, 255 n.4 (5th Cir. 2022), rather than supposition, concerning these points that dooms its theories of standing.

In this case, Texas' theories of injury require it to show that "the likelihood of future enforcement" based on the Challenged Documents "is substantial" enough that it faces "a realistic danger of sustaining a direct injury." *California v. Texas*, 141 S. Ct. 2104, 2114 (2021) (quotations omitted). As Texas seems to concede, Tex. Reply at 15, the "naked contention" that an agency "has usurped the reserved powers of the several States" is insufficient to establish

injury. DMSJ at 15 (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 483, 485 (1923)). Indeed, the possibility of enforcement based on purported conflicts between the Challenged Documents and Texas's laws, resulting in what Texas claims is a forced choice between changing its laws or losing funding, is the gravamen of all of the State's theories of injury, including those based on sovereignty, Tex. Reply at 14, procedural injury, *id.* at 19-20, and special solicitude, *id.* at 20-21. That is why Texas seeks an order "enjoining Defendants from conducting enforcement actions based on the guidance or the interpretations advanced within it." *Id.* at 22.

However, Texas's reply brief again fails to substantiate any risk of enforcement. Texas reiterates its belief that the Fact Sheet specifically "leaves *no doubt* that, under its view of Title IX, schools may not prohibit students from competing in athletic competitions designated for the opposite biological sex." Tex. Reply at 14 (emphasis added). That is incorrect in several ways. First, the Notice indicates that the Department's mere interpretation of Title IX as encompassing sexual orientation and gender identity "does not itself determine the outcome in any particular case or set of facts." Appx.2. Second, the Fact Sheet describes a hypothetical set of circumstances where a student is prohibited from trying out for a girls' cheerleading team "solely because she is transgender" as an example that ED "can investigate," not as one that would necessarily involve a violation of Title IX. Appx.11; *see also* Appx.9 ("[O]ur accompanying fact sheet … provide[s] examples of the kinds of incidents we *can investigate*.") (emphasis added).

Texas tries to convert the Challenged Documents into a set of commands by taking certain statements from those documents out of context. *See* Tex. Reply at 18-19. But encouraging educators not to engage in unlawful discrimination, making plain that ED will "fully enforce" Title IX, and indicating that ED's overarching interpretation of Title IX's prohibition on sex discrimination will guide its actions are, again, routine statements agencies make in the

course of providing information to regulated parties. Such statements cannot convert a set of examples into specific prohibitions. *See Sch. of the Ozarks*, 41 F.4th at 998.

In Texas's view, it is "obvious" that interpreting Title IX's prohibition on sex discrimination to encompass sexual orientation and gender identity would prohibit schools from "requir[ing] student athletes [to] compete according to their biological sex." Tex. Reply at 14. But that is not obvious, and it is not what the Challenged Documents express. Indeed, ED explicitly states in the Final Rule that it evaluates nondiscrimination on the basis of sex in athletics differently than it does in other aspects of a recipient's education program or activity and has therefore proposed a rule (not yet finalized) which outlines the circumstances under which schools would be permitted to adopt and apply sex-related criteria for athletics eligibility that may result in the exclusion of transgender students from teams consistent with their gender identity in certain circumstances. *See* Final Rule, 89 Fed. Reg. 33474; *Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance: Sex-Related Eligibility Criteria for Male & Female Athletic Teams*, 88 Fed. Reg. 22860, 22860-61 (Apr. 13, 2023). If it were "obvious" that ED's interpretation of Title IX forbade schools from applying exclusionary sex-related criteria in all circumstances, it would make no sense for ED to then engage in notice-and-comment rulemaking to propose rules that identify when states *may* apply such criteria in the athletics context consistent with Title IX. Texas's attempt to extract a hard-and-fast rule fails because the Challenged Documents simply do not establish *any* such rules.

The same is true of Texas's other purported conflicts between the Fact Sheet and the policies of Texas school districts. The circumstances concerning sex-segregated facilities and pronouns are, to reiterate, merely "*[e]xamples* of the kinds of incidents CRT and OCR *can investigate*." Appx.11. Texas points to circuit decisions that have held that specific policies

discriminate on the basis of sexual orientation and/or gender identity and therefore constitute prohibited sex discrimination, Tex. Reply at 15, but the *Challenged Documents* do not reach these conclusions. Nor do these cases rely upon the Challenged Documents, further underscoring that those documents have no binding force and are not the cause of any tension that might exist between certain state policies and the text of Title IX. Whether some circuits have interpreted Title IX to prohibit specific policies in certain circumstances does not mean that *ED* has or would enforce Title IX that way, much less that ED has done so in *these* Documents.

Texas's own cases underscore the gap between what the State has purportedly shown and what courts have treated as a substantial enforcement risk. In *Susan B. Anthony List v. Driehaus*, for example, the plaintiffs alleged that the state election commission had already "found probable cause to believe" that plaintiffs had violated state law; that commission proceedings were "not a rare occurrence"; and that third parties had treated "the specter of enforcement" as "substantial." 573 U.S. 149, 164-65 (2014). There, the plaintiffs were subject to specific legal requirements that, the Court determined based on available evidence, the commission was likely to enforce against them. *Cf. Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 926 (5th Cir. 2023) (Plaintiffs "admit they are breaking EEOC guidance, which the EEOC does not seriously contest."); *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) ("The Guidance … deems unlawful the hiring practices of multiple Texas agencies by rejecting across-the-board felon hiring screens."). In contrast, the Challenged Documents at issue here articulate no such requirements and were not "clearly designed to target [Texas's] conduct." *Texas*, 201 F. Supp. 3d at 822.

Nor does the investigation into Granbury ISD show that Texas faces an imminent risk of enforcement based upon the Challenged Documents. Texas's assertions about the nature and scope of the Granbury investigation are taken solely from a complaint filed by a private party.

Tex. Reply at 17. ED's decision to open an investigation does not portend a conclusion that the complainant's factual allegations amount to a violation of Title IX. Moreover, ED's investigation was opened pursuant to Title IX and was not "launched on the authority" of the Challenged Documents, *id.*; as noted above, those documents have no legally binding effect. Finally, any injury to Granbury ISD, or to the State, is not imminent as it could come only at the end of an exhaustive administrative process in which the recipient would have every opportunity to contest ED's legal interpretations and conclusions. *See* DMSJ at 20.

Ultimately, Texas's account of how the Challenged Documents might implicate the state's laws and policies does not hold up to scrutiny. Texas asserts that the Fact Sheet leaves "no doubt" that ED's interpretation of Title IX conflicts with state law, and that Texas therefore faces a "Hobson's choice" between losing millions of dollars or having to change its policies. Tex. Reply at 14. Yet the Challenged Documents were promulgated *almost three years ago* (two years before Texas filed this lawsuit), thus undercutting the State's claim of pressure to change its policies or practices. Moreover, Texas still has not "identified a single concrete example of how it has been forced to modify its behavior as a result of" the Challenged Documents. *Choice Inc. v. Greenstein*, 691 F.3d 710, 716 (5th Cir. 2012). The State's lack of urgency in moving to forestall this purportedly grave threat to its laws and finances belies its assertions of harm.[1]

### C.  Texas's claims are unripe.

For similar reasons, Texas's claims rest on "contingent future events that may not occur as anticipated, or indeed may not occur at all," and are therefore unripe. *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation omitted); *see* DMSJ at 23-26. Although Texas cites several

---

[1]  Texas attempts to shore up its arguments on causation and redressability by focusing on its request that the Court enjoin ED from acting on its interpretation of Title IX. Tex. Reply at 21-23. That relief would be improper, as explained below. *See infra* Part III.

out-of-circuit cases in an effort to shift the burden on ripeness to ED, *see* Tex. Reply at 23-24, it does not and cannot dispute that, "[a]s the party asserting federal jurisdiction," the State bears the "burden of demonstrating that jurisdiction is proper." *Lower Colo. River Auth. v. Papalote Creek II, LLC*, 858 F.3d 916, 921 (5th Cir. 2017) (quotation omitted) To do so, Texas must show that the issues are "fit[] … for judicial decision" and that it would face "hardship" from "withholding court consideration" at this juncture. *Id.* at 924 (quotation omitted). It cannot show either.

This case is closely analogous to the Fifth Circuit's decision in *Walmart Inc. v. U.S. Department of Justice*, which Texas fails to distinguish. *See* DMSJ at 25. In *Walmart*, the Fifth Circuit reiterated that the fitness inquiry considers "whether the issue presented is a purely legal one, whether consideration of that issue would benefit from *a more concrete setting*, and whether the agency's action is sufficiently final." 21 F.4th 300, 311 (5th Cir. 2021) (quoting *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986)) (emphasis added). It added, however, that "[f]ailure on *even one* of the three prongs can render a case unfit for judicial review." *Id.* (emphasis added). The Court concluded that, although Walmart's claims "present[ed] pure legal issues in that they are predominantly questions of statutory interpretation," and so it "would be theoretically possible to declare" Walmart's obligations "as a matter of law[,] … the question would be easier if the court knew exactly what obligations pharmacies were alleged to have and could therefore assess whether those obligations accorded with the governing regulations." *Id.* Walmart also failed to show hardship because it "ha[d] the ability to test the government's regulatory position in court by raising its theories as defenses." *Id.* at 313.

*Walmart* disposes with all of Texas's ripeness arguments. Even if Texas were right that its claims assert "purely legal, facial challenges" to the Challenged Documents, Tex. Reply at 24, the adjudication of those challenges would plainly benefit from a "more concrete setting" in

which the Court would know precisely "what obligations" Texas is alleged to have, *Walmart*, 21

F.4th at 311. Contrary to Texas's assertions, and quite unlike the detailed guidance challenged in

*Texas v. EEOC*, the Challenged Documents do not "specify factual situations that Defendants

consider unlawful." Tex. Reply at 24. Nor is there any record showing that ED either has

determined that specific Texas laws or policies violate Title IX or has initiated an enforcement

action on such grounds. *Cf. Texas*, 201 F. Supp. 3d at 824 (noting that "Defendants asserted at

the hearing that Plaintiffs are not in compliance"). The adjudication of Texas's claims is

therefore "likely to stand on a much surer footing in the context of a specific application … than

could be the case in the framework of the generalized challenge made here." *Toilet Goods Ass'n*

*v. Gardner*, 387 U.S. 158, 164 (1967); *see also Tex. Indep. Producers & Royalty Owners Ass'n*

*v. EPA*, 413 F.3d 479, 483 (5th Cir. 2005) (challenge to EPA regulation unripe where "we have

no sense of what … activities would fall under EPA's permitting requirements").

Nor can Texas show any cognizable hardship that it would face by waiting until it "has

the ability to test the government's regulatory position in court by raising its theories as

defenses." *Walmart*, 21 F.4th at 313. The State asserts that it needs to obtain judicial review lest

it "be put [to] the choice of either abandoning its laws or risking the loss of federal funding."

Tex. Reply at 25-26. But Texas will not actually face that choice until the conclusion of any

enforcement proceedings, if ever. This is not the typical ripeness case, where a plaintiff faces

mounting fines for every day it is out of compliance, or where a plaintiff alleges some ongoing

chill of its constitutionally protected rights. *Cf. Roark & Hardee LP v. Austin*, 522 F.3d 533, 545-

47 (5th Cir. 2008). Texas will be no worse off by waiting until its disagreement with ED's

interpretation of Title IX has crystallized in the context of concrete enforcement proceedings—

particularly given that Texas already waited two years to file this case.

**D.      Texas has an adequate alternative remedy under Title IX.**

ED's opening brief also demonstrated that Texas has an adequate alternative remedy by defending against any enforcement action that ED might bring before the agency or in court, and so cannot proceed under the APA. DMSJ at 26-28 (citing 5 U.S.C. § 704). The State's primary response is simply to assert, without any corroborating factual support, that Title IX's administrative processes are arduous. Tex. Reply at 26-27. But neither "the fact that judicial review is delayed by multiple steps of intermediary administrative review," *Hinojosa v. Horn*, 896 F.3d 305, 311 (5th Cir. 2018) (per curiam), nor that the administrative process may be "procedurally inconvenient," *Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 642 (5th Cir. 2021), is sufficient to render a remedy inadequate under the APA. Texas has failed to show that Title IX's scheme imposes burdens beyond those part of any administrative process.

Title IX's processes are also less burdensome than those held to be inadequate in the cases Texas cites. In both *Hawkes* and *Sackett*, the plaintiffs would have faced escalating daily fines for violating the Act, which is not the case here. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016); *Sackett v. EPA*, 566 U.S. 120, 127 (2012). Moreover, even the Army Corps of Engineers in *Hawkes* characterized its proposed alternative remedy as "arduous, expensive, and long." 578 U.S. at 601. Texas has made no comparable showing. Thus, by "impos[ing] no immediate penalties for non-compliance" and allowing judicial review "after an adverse funding-termination decision," Title IX affords Texas an adequate remedy. *Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 863-64 & n.2 (S.D. Ohio 2016).

The fact that Title IX's processes do not contemplate "pre-enforcement" relief does not render them inadequate. Tex. Reply at 26. If the inability to seek such relief alone rendered a process inadequate, then the costs suffered by the plaintiffs in *Hawkes* and *Sackett* while awaiting enforcement would have been irrelevant. An alternative process merely needs to

provide the "same genre" of relief that would be available under the APA, not an "identical" remedy (i.e., it needs only to provide "a direct and guaranteed path to judicial review" for the "specific … wrong the Plaintiffs assert"). *Horn*, 896 F.3d at 310, 312; *see Garcia v. Vilsack*, 563 F.3d 519, 525 (D.C. Cir. 2009) ("The relevant question under the APA, then, is not whether" the remedy is "as effective as an APA lawsuit," but whether it is "adequate."). The relevant "wrong" would be any decision by ED to terminate funding, which could only happen after an impartial administrative process, and Texas would be able to challenge that decision and any underlying interpretation of Title IX, should it occur.

      **E.**      **Title IX's exclusive review scheme precludes jurisdiction in this Court.**

Separately, Title IX's review procedures implicitly preclude Texas's claims under *Thunder Basin*. DMSJ at 28-31. If the Department were to conclude in a future proceeding that Texas had violated Title IX and it then moved to terminate funding, 20 U.S.C. § 1682, that action would be "subject to such judicial review as may otherwise be provided by law for similar action taken by [ED] on other grounds," *id.* § 1683 (i.e., in the court of appeals, *id.* § 1234g). "This calibrated structure is, for present purposes, materially the same as review structures the Supreme Court and sister circuits have found expressive of Congress' intent to preclude district court jurisdiction." *Bank of Louisiana v. FDIC*, 919 F.3d 916, 924 (5th Cir. 2019).

Texas again relies on *Cannon v. University of Chicago*, 441 U.S. 677 (1979), which recognized a private right of action for *victims* of discrimination, in asserting that these provisions do not evince an intent to limit the availability of judicial review for *recipients*. But Texas overlooks the "profound difference between a discrimination victim's right to sue [a recipient] in federal district court under Title IX and a school district's right to challenge an agency interpretation in federal district court." *Highland Loc. Sch. Dist.*, 208 F. Supp. 3d at 863. That is why courts have frequently required recipients to pursue the administrative process even

under statutes, like Title VI and Section 504 of the Rehabilitation Act, that afford private rights of action to students alleging discrimination. *See* DMSJ at 29 (collecting cases). Texas does not provide any "statute-specific" reason, Tex. Reply at 30, why the answer would be any different under Title IX, particularly since *Cannon* itself recognized that "Title IX was patterned after Title VI of the Civil Rights Act of 1964." 441 U.S. at 694. If Title VI's private right of action can coexist with its preclusive review scheme for recipients, then so can Title IX's.

Texas's claims about the scope of Title IX are also precisely the sort of claims that "Congress intended to be reviewed within th[e] statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994); *see* DMSJ 30-31. The State's arguments about the *Thunder Basin* factors all revolve around the same mistaken premise: that it asserts a so-called "structural" challenge to ED's authority. Tex. Reply at 31; *cf. Axon Enter., Inc. v. FTC*, 598 U.S. 175, 195 (2023) (referring to "claims that the structure, or even existence, of an agency violates the Constitution"). This is instead a bread-and-butter challenge to how an agency interprets a statute that Congress directed it to enforce. Nor can the State seriously contend that ED lacks expertise in the meaning of Title IX; Congress bestowed primary enforcement authority on ED, which has applied and enforced the statute for more than 50 years. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280-81 (1998) ("The express statutory means of enforcement is administrative."). Thus, the Court should dismiss this case for lack of subject-matter jurisdiction.

## II.     In the alternative, the Court should enter judgment for ED.

### A.     The Challenged Documents are consistent with Title IX.

In its opening brief, ED explained that the logic of *Bostock* compels the conclusion that Title IX's prohibition on discrimination "on the basis of" sex, like Title VII's parallel prohibition on discrimination "because of" sex, encompasses discrimination on the basis of sexual orientation and gender identity. DMSJ at 31-40. The Challenged Documents therefore correctly

interpret Title IX to cover those bases of sex discrimination, while leaving questions about how Title IX might apply to specific laws, policies, and circumstances to be worked out in subsequent rulemaking and enforcement proceedings. *See id.* at 35-36. Texas's responses are not persuasive.

1.      The crux of Texas's rebuttal is that "*Bostock* decided only what *Bostock* decided," Tex. Reply at 34 (quoting *Neese v. Becerra*, 640 F. Supp. 3d 668, 676 (N.D. Tex. 2022), *appeal pending*, No. 23-10078 (5th Cir.)), and so, Texas says, ED cannot rely upon *Bostock* to justify its interpretation of Title IX's text. But even putting *Bostock* aside, the plain language of Title IX's prohibition on sex discrimination is properly read to encompass discrimination on the basis of sexual orientation and gender identity. In the Challenged Documents, ED did not take a position on the definition of sex, Appx. 2-3 n.1; nevertheless, ED's interpretation is entirely consistent with interpreting sex to refer to sex assigned at birth, or as Texas puts it, "biological sex." At most, Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a), requires a showing of but-for causation, under which discrimination is prohibited if it would not have occurred "but for" sex, even if the discriminatory act might have had multiple causes.[2] Whenever a school discriminates against a student on the basis of gender identity or sexual orientation, sex is a but-for cause of that discrimination; the school is singling out the student for differential treatment on the basis of traits or actions that it would have tolerated in a student of a different sex. Thus, it is impossible to discriminate against a person for being gay or transgender without discriminating against that individual based on their sex.

---

[2]   Title IX may incorporate a motivating-factor standard, *see* DMSJ at 38 (citing, e.g., *Doe v. William Marsh Rice Univ.*, 67 F.4th 702, 712 (5th Cir. 2023)), a "more forgiving standard" under which "liability can sometimes follow even if sex *wasn't* a but-for cause of the … challenged decision," *Bostock*, 590 U.S. at 657. However, the Court need not decide which standard Title IX incorporates, because both a but-for standard and a motivating-factor standard would encompass discrimination on the basis of sexual orientation and gender identity. *See id.*

*Bostock*'s reasoning reinforces what Title IX's text already makes plain. *See Bostock*, 590 U.S. at 655-62. When it comes to covering discrimination based on sexual orientation and gender identity, the language in Title IX is "indistinguishable" from that in Title VII. *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 337 (5th Cir. 2019) (Ho, J., concurring). Texas cannot dispute either premise of this syllogism: that both Title IX and Title VII require, at most, a showing of but-for causation, or that sex is necessarily a but-for cause of discrimination on the basis of sexual orientation and gender identity. The phrase but-for causation—the critical analytical step in *Bostock*—does not even appear in Texas's reply brief. That omission is telling, and fatal.

Texas is wrong to claim that ED and this Court cannot consider "the words and reasoning of *Bostock*" in interpreting Title IX's parallel language. Tex. Reply at 35 (quoting *Neese*, 640 F. Supp. 3d at 676).[3] That *Bostock* declined to prejudge questions about other statutes that were not necessary to resolve that case does not preclude ED from announcing interpretations that reflect the implications of *Bostock*'s reasoning. Indeed, the Fifth Circuit has instructed that courts must "give serious consideration to a recent and detailed discussion of the law by a majority of the Supreme Court," even "assuming it is dictum." *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013). Texas fails to explain why Title IX's materially indistinguishable text *warrants* a different result, or how sex can be a but-for cause of discrimination on the basis of sexual orientation or gender identity under Title VII, but not Title IX.

---

[3]    Because *Neese* is currently on appeal, the Court should hesitate to give it too much weight. In particular, the plaintiffs in *Neese*, which involved Section 1557 of the Affordable Care Act (a provision that expressly incorporates Title IX's prohibition on sex discrimination), "conceded in the district court that *Bostock* applies to Title IX and section 1557." Br. for Pls.-Appellees at 52, *Neese v. Becerra*, No. 23-10078 (5th Cir. May 26, 2023), ECF No. 35; *see also id.* at 53 (noting that "[i]t is hard to find any daylight between the phrase 'on the basis of' sex in Title IX and 'because of' sex in Title VII"). The idea that *Bostock*'s reasoning does not apply to Title IX *at all* is therefore untenable. *See also Bostock*, 590 U.S. at 724-25 (Alito, J., dissenting) (describing Title IX as a statute "whose terms mirror Title VII's").

The best Texas can do is to say that Title IX's "on the basis of" somehow conveys a different meaning than Title VII's "because of." Tex. Reply at 34. But "there is no canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing," much less words used in *different* statutes. *Jennings v. Rodriguez*, 583 U.S. 281, 303 (2018) (quotation omitted). Moreover, any difference between these phrases has no bearing on the causation standard—which was the critical element of the Supreme Court's analysis in *Bostock*. "[B]ut-for causality has not been restricted to statutes using the term 'because of.'" *Burrage v. United States*, 571 U.S. 204, 213 (2014). Rather, phrases like "based on" and "by reason of" can also "indicate[] a but-for causal relationship." *Id.* So too can the phrase "on the basis of," which is "strongly suggestive of a but-for causation standard." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1016 (2020); *see Trudeau v. Univ. of N. Tex.*, 861 F. App'x 604, 608 (5th Cir. 2021) (applying but-for causation standard to Title IX retaliation claim under 20 U.S.C. 1681(a) because, "[i]n the comparable context of Title VII retaliation claims, the Supreme Court has applied a but-for causation standard"); *Taylor-Travis v. Jackson St. Univ.*, 984 F.3d 1107, 1119 (5th Cir. 2021) ("[T]he causation standard for Title IX [retaliation] claims should be the same as the causation standard for Title VII claims."). The fact that both the Supreme Court and the Fifth Circuit have used the terms "because of" and "on the basis of" interchangeably further suggests that the applicability of *Bostock*'s analysis does not depend on such a minor textual difference. *See* DMSJ at 37-38.

Texas has no response to several other important points. Texas does not dispute that the text of Title IX controls even if, as in *Bostock*, it might lead to consequences that its drafters may not have intended. DMSJ at 33. Or that the Supreme Court, the Fifth Circuit, and this Court have all consistently relied upon interpretations of Title VII's anti-discrimination provision in

interpreting Title IX's textually similar prohibition. *See id.* at 34-35; *Texas*, 201 F. Supp. 3d at 819 n.7 ("Title VII is used to help explain the legislative intent and purpose of Title IX because the two statutes are commonly linked."). The Court should give Title IX's prohibition on sex discrimination its plain and unambiguous meaning and hold that it, like Title VII's parallel prohibition, encompasses discrimination on the basis of sexual orientation and gender identity.

2.     Texas also asserts that the Challenged Documents conflict with other provisions of Title IX and ED's implementing regulations because the Documents purportedly "condemn separating students based on their biological sex as it pertains to the use of restrooms and school sports." Tex. Reply at 33 (citing 20 U.S.C. §§ 1681(a), 1686; 34 C.F.R. § 106.33). Again, they do no such thing. The Notice does not even address these subjects, much less "determine the outcome in any particular case or set of facts," Appx.2. Although the Fact Sheet notes that ED *could investigate* an incident where a transgender girl is barred from using the girls' restroom or trying out for the girls' cheerleading team, Appx.11, it does not conclude or even suggest that such an incident would *necessarily* violate Title IX. ED could only reach that determination after conducting an investigation, one that would look at the totality of the circumstances to assess whether the school's policies or their application violate Title IX—and one in which the school would be able to challenge ED's interpretation of Title IX, including in court.

Contrary to Texas's assertions, ED is not trying to work around any "concessions" with a "linguistic device." Tex. Reply at 35. Neither the Fact Sheet nor the other Challenged Documents "tell schools" they must have "exceptions for students who subjectively identify as the same sex," *id.*, because they do not reach any conclusion or dictate any result regarding how Title IX's prohibition on sex discrimination would apply in any specific circumstances. Neither the Fact Sheet nor the other Challenged Documents conclude, one way or the other, that schools

must operate single-sex facilities in any particular manner. They simply inform the public of ED's overarching interpretation of Title IX, identify topics that ED may investigate, and leave questions of application to be worked out in rulemaking and enforcement proceedings.

Nor do the cited provisions conflict with ED's interpretation of Title IX. Title IX establishes a general prohibition on sex discrimination, including discrimination on the basis of sexual orientation and gender identity, and then includes specific, narrow exceptions to that prohibition, 20 U.S.C. §§ 1681(a)(1)-(9), as well as a provision permitting sex-separate living facilities, *id.* § 1686. ED's regulations also provide limited contexts in which Title IX permits recipients to separate students on the basis of sex as long as doing so does not impose harm on students. *E.g.*, 34 C.F.R. § 106.33. These provisions recognize that, in some cases, differential treatment on the basis of sex may be exempt from, or consistent with, Title IX's prohibition on sex discrimination, and are not contrary to ED's reading of that prohibition's scope. *Cf. Bostock*, 590 U.S. at 681 (holding that Title VII covers discrimination on the basis of sexual orientation and gender identity but declining to "address bathrooms, locker rooms, or anything else of the kind").

3.      Finally, Texas relies on several canons of construction that are inapplicable in light of Title IX's unambiguous statutory text. *See* Tex. Reply at 35-37. Title IX provides the requisite "clear statement" to satisfy the Spending Clause in two independently sufficient ways: it clearly informs recipients that they must comply with the prohibition on sex discrimination, even if "application of [the condition] *might be unclear in [some] contexts*," *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 665-66, 673 (1985) (emphasis added), and, in any event, Title IX's prohibition on sex discrimination unambiguously covers discrimination on the basis of sexual orientation and gender identity for the same reasons as Title VII in *Bostock*. DMSJ at 38-39.

Texas does not address the first point, and its response to the second is wrong. Title IX is no more ambiguous than Title VII: both statutes cover discrimination for which sex was a but-for cause, and sex is necessarily a but-for cause of discrimination on the basis of sexual orientation and gender identity. *See Bostock*, 590 U.S. at 655-62. Nor do Title IX's regulations governing sex-specific facilities and sports teams produce any ambiguity. Those provisions recognize that not all distinctions based on sex constitute impermissible discrimination under Title IX, but do not change the fact that sex is a but-for cause of discrimination on the basis of sexual orientation or gender identity. Moreover, it bears repeating that the Challenged Documents *do not conclude* that any specific policies addressing these subjects violate Title IX. In that respect, *Adams* is inapposite; the plaintiff in that case asserted that their school's bathroom policies violated Title IX, and in rejecting that assertion, *Adams* expressly did not address whether Title IX prohibits discrimination on the basis of sexual orientation and gender identity as a general matter. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808-09 (11th Cir. 2022) (en banc).

For the same reasons, interpreting Title IX to encompass discrimination on the basis of sexual orientation and gender identity does not run afoul of the major questions doctrine. *See* Tex. Reply at 37. Texas did not even invoke the major questions doctrine in its first brief, presumably because *Bostock* disposed of it in all but name. *See Bostock*, 590 U.S. at 680 (explaining that the "no-elephants-in-mouseholes canon … has no relevance here"). Both Title VII and Title IX unambiguously prohibit discrimination on the basis of sexual orientation and gender identity as bases of sex discrimination. And both Title VII and Title IX are "major piece[s] of federal civil rights legislation," that are "written in starkly broad terms"—neither statute can fairly be characterized as a "mousehole." *Id.* ED's interpretation is therefore fully consistent with the unambiguous statutory text that Congress enacted.

21

**B.     The Challenged Documents are, at most, interpretive statements that were not required to undergo notice-and-comment rulemaking.**

ED also explained that the Challenged Documents simply "advise the public of the agency's construction of the statutes and rules which it administers" and are therefore, at most, interpretive statements exempt from notice and comment. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quotation omitted). Notably, ED now *has* engaged in notice-and-comment rulemaking, in which Texas participated, and promulgated the Final Rule, which enacts substantive regulations concerning Title IX. In contrast, the Challenged Documents are expressly non-binding, do not purport to "have the force or effect of law," *id.*, and would not—indeed, could not—serve as the basis for any enforcement action. *See* DMSJ at 40-43. Texas's responses rest on misunderstandings of the law and of the nature of the Challenged Documents.

By insisting that a rule cannot be interpretive if it limits the agency's discretion, Texas again misconstrues the applicable Fifth Circuit precedent. Tex. Reply at 38-39. The applicable precedent is *Flight Training Int'l, Inc. v. FAA*, in which the Fifth Circuit explicitly held that whether a rule limits the agency's discretion has no bearing on whether it is interpretive or legislative. 58 F.4th 234, 242 (5th Cir. 2023). The Fifth Circuit reasoned that "[i]f the law is mandatory, then it is natural for an agency's restatement of the law to speak in mandatory terms as well," and therefore "join[ed] other Circuits in rejecting the proposition that a rule cannot be interpretive if it limits discretion or uses binding language." *Id.* The Court distinguished the very cases upon which Texas relies, noting that *Texas v. United States ("DAPA")*, 809 F.3d 134 (5th Cir. 2015), dealt with policy statements, and that to the extent *EEOC*, 933 F.3d 433, dealt with interpretive rules, it did so in dicta. *Flight Training Int'l*, 58 F.4th at 242-43 & n.8.

Nor do the Challenged Documents "create significant new obligations on recipients of federal education funding." Tex. Reply at 39. The documents do not themselves "determine the

law or the consequences of not following it"; they simply "inform [recipients] of what the law, previously enacted or adopted, is." *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 432-33 (4th Cir. 2010). Put differently, the Challenged Documents do not "create" obligations or "draw[] … line[s] in the sand," *Texas*, 201 F. Supp. 3d at 830 (quotation omitted), that a funding recipient would be exposed to enforcement simply by virtue of crossing. Sometimes an agency uses its legislative rulemaking powers to fill in an open-ended statutory prohibition—like acts "'in contravention of such rules … as the [agency] may prescribe'"—to provide a "legislative basis for agency enforcement" that otherwise would not exist. *Am. Min. Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993) (quoting 15 U.S.C. § 78n(b)). But that is not this case. ED issued the Challenged Documents to explain its interpretation of Title IX to the public; any obligations that a recipient might have flow from the statute itself, as applied in a subsequent enforcement proceeding in which the Documents would not carry the force of law.

Texas's remaining arguments fare no better. The Challenged Documents do not create any "safe harbors" because they do not definitively address whether any specific circumstances would or would not violate Title IX, and they do not "open[] the field of potential plaintiffs" any wider because students would be able to file complaints and lawsuits whether the agency issued the Challenged Documents or not. Tex. Reply at 39-40 (quoting *EEOC*, 933 F.3d at 443-44). And, as explained above, the interpretation of Title IX expressed in the Challenged Documents is fully consistent with—indeed, "compel[led]" and "logically justifie[d]" by—the statute itself. *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021) (quotation omitted). Even if it were not, however, whether an interpretation is right or wrong has no bearing on its interpretive nature. Unlike the recently released Title IX Final Rule, the Challenged Documents are nothing more than a statement of how ED interprets Title IX, not substantive regulations.

### III.    If the Court enters judgment for Texas, it should limit any relief consistent with fundamental principles of equity.

The Court should uphold the Challenged Documents and enter judgment in ED's favor. But if it rules for Texas, it should do nothing more than enter a remedy that precludes ED from applying the Challenged Documents to the State's programs (i.e., either enjoining ED from applying those documents to Texas or vacating those documents as applied to Texas). *See* DMSJ at 43-47 & n.8. The (mistaken) premise of Texas's jurisdictional arguments is that the Challenged Documents impose binding and legally enforceable requirements on the State, and so "all of the State's injuries are traceable to the Notice, Letter, and Fact Sheet." Tex. Reply at 21. Any remedy should go no further than redressing that purported injury. Enjoining ED from acting on its interpretation of Title IX at all, or doing so with respect to other parties, would stretch far beyond Texas's claims and exceed fundamental equitable principles.

Texas does not dispute that, "[i]f a less drastic remedy (such as partial or complete vacatur …) [is] sufficient to redress [the plaintiff's] injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). That is the case here: a limited vacatur order or injunction would prevent the application of the Challenged Documents to Texas and thereby remedy Texas's alleged injuries. Contrary to the State's assertions, *see* Tex. Reply at 45-46, the Fifth Circuit's decision in *Franciscan Alliance v. Becerra* confirms that sweeping injunctive relief would be inappropriate for Texas's wholly APA-based claims. *Franciscan Alliance* held that the plaintiffs were entitled to an injunction on their Religious Freedom Restoration Act claims, *not* their APA claims. 47 F.4th 368, 371 (5th Cir. 2022). As the Court explained, "an APA claim challenges a particular regulation, while a RFRA claim challenges burdens placed on religious conduct." *Id.* at 374. Plaintiffs could not have sought more than vacatur for their APA claim because, under

24

Fifth Circuit precedent, "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Id.* at 374-75. Because Texas challenges several agency actions under the APA and does not assert any challenges to the operation of the statute itself, it is not entitled to an injunction that would preclude ED from applying its interpretation of the statute writ large.

Nor can Texas show that the equities favor such an injunction. As to irreparable harm, limited injunctive relief or vacatur would eliminate the purported "sovereign-stripping impact of those agency documents," as well as any risk that the State might lose "federal funding for noncompliance" with them. Tex. Reply at 44. Enjoining ED from acting on its interpretation of Title IX would go much further: it would disrupt the public's interest in the enforcement of Title IX, DMSJ at 45, and interfere with a federal agency's constitutional authority to faithfully execute a statute that Congress principally charged it with enforcing, *id.* at 46. Texas fails to engage with these concerns, or to provide any justification for entering relief that would sweep beyond the State. *Id.* at 46-47.

Texas closes by again invoking this Court's decision in *Texas*, 201 F. Supp. 3d 810, which preliminarily enjoined several documents dealing with specific applications of Title IX to discrimination on the basis of gender identity over seven years ago. Tex. Reply at 46. But as explained throughout this brief, this case is not that one. The State cannot leverage a challenge to several discrete agency documents that do nothing more than express an interpretation of Title IX—one fully consistent with both Title IX's text and *Bostock*—to obtain an injunction that would essentially micromanage how ED carries out its responsibility to implement the statute nationwide. The Court should reject the State's extraordinary and unwarranted request.

## CONCLUSION

The Court should dismiss this case for lack of subject-matter jurisdiction. In the alternative, the Court should enter judgment for ED.

Dated: April 29, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CARLOTTA WELLS
Assistant Branch Director

*/s/ John T. Lewis*
JOHN T. LEWIS (TX Bar No. 24095074)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20530
Tel: (202) 353-0533
Fax: (202) 616-8460
E-mail: john.t.lewis.iii@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2024, a copy of the foregoing was filed electronically via the Court's ECF system, which effects service upon counsel of record.

*/s/ John T. Lewis*
John T. Lewis