# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | | |
|---|---|---|
| **THE STATE OF TEXAS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:23-cv-00604-O** |
| | § | |
| **MIGUEL CARDONA, *et al.*,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff's Motion for Summary Judgment (ECF No. 23) and Brief in Support (ECF No. 24), filed October 20, 2023; Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 27) and Brief in Support (ECF No. 28), filed December 1, 2023; Plaintiff's Consolidated Reply in Support of Its Motion for Summary Judgment and Brief in Opposition to Cross-Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 31), filed April 29, 2024; Defendants' Reply Brief in Support of Their Cross-Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 32), filed April 29, 2024; Defendants' Supplemental Brief (ECF No. 35), filed May 9, 2024; and Plaintiff's Supplemental Brief (ECF No. 36), filed May 9, 2024. Also before the Court is the Administrative Record (ECF No. 22), filed on September 15, 2023. These filings focus on whether the federal government may lawfully impose conditions on a state's educational institutions by purporting to interpret Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, as prohibiting discrimination based on sexual orientation and gender identity.

Having considered the briefing and applicable law, the Court concludes that Defendants cannot regulate state educational institutions in this way without violating federal law.

1

Accordingly, the Court holds that Defendants engaged in unlawful agency action taken in excess of their authority, all while failing to adhere to the appropriate notice-and-comment requirements when doing so. Therefore, the Court **GRANTS** Plaintiff's Motion for Summary Judgment (ECF No. 23) and **DENIES** Defendants' Cross-Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 27).

I.    **BACKGROUND**

    **A.  Parties and Procedural Background**

On June 14, 2023, the State of Texas ("Plaintiff" or "Texas') filed this lawsuit against the United States Department of Education (the "Department"), Miguel Cardona, in his official capacity as Secretary of Education, the Department of Justice (the "DOJ"), and Merrick Garland, in his official capacity as Attorney General of the United States (collectively, the "Defendants").[1] The Department is the federal executive agency responsible for administering and enforcing federal education assistance, including Title IX.[2] The other federal executive agency in this lawsuit, the DOJ, is also empowered to enforce Title IX.[3] In response to agency action taken by Defendants, Plaintiff asks the Court to: (1) vacate and set aside the June 22, 2021 Notice of Interpretation, the June 23, 2021 Dear Educator Letter, and the June 23, 2021 Fact Sheet (collectively, the "Guidance Documents"); (2) declare the Guidance Documents unlawful, along with the underlying Title IX interpretation; and (3) enjoin enforcement or implementation of the Guidance Documents and the underlying interpretation.[4]

---

[1] Pl.'s Compl., ECF No. 1.
[2] *Id.* at 4.
[3] *Id.* (first citing *Leadership and Coordination of Nondiscrimination Laws*, Exec. Order No. 12250, 45 Fed. Reg. 72,995 (Nov. 2, 1980); and then citing 28 C.F.R. § 41)
[4] *Id.* at 15–16.

In support of this requested relief, Plaintiff asserts two theories: (1) the Guidance Documents are "not in accordance with law and are in excess of statutory authority because they rely upon the interpretation of Title VII described in *Bostock* and apply it to Title IX" and (2) the Guidance Documents "are substantive or legislative rules that required notice-and-comment rulemaking."[5] The parties separately move for summary judgment.[6] Additionally, Defendants assert five jurisdictional challenges, arguing that any one of its various jurisdictional arguments warrants dismissal prior to the Court's consideration of the merits of Plaintiff's claims.[7]

### B.  Statutory and Regulatory Landscape

Motivated by "corrosive and unjustified discrimination against women . . . in all facets of education," Congress enacted Title IX in 1972. 118 Cong. Rec. 5803 (Feb. 28, 1972) (Statement of Sen. Bayh). Title IX generally provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). This landmark legislation prohibits "the use of federal resources to support discriminatory practices" among federal fund recipients. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979). Its original goal was to ensure women experienced "full citizenship stature," including the "equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities." *United States v. Virginia, et al.*, 518 U.S. 515, 532 (1996).

Under Title IX, the Department is "authorized and directed to effectuate the provisions of section 1681 . . . by issuing rules, regulations, or orders of general applicability which shall be

---

[5] *Id.* at 14.

[6] Pl.'s Mot. for Summ. J., ECF No. 23; Defs.' Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J., ECF No. 27. The Court entered the parties' proposed consolidated schedule for briefing the cross-dispositive motions. Sept. 12, 2023 Scheduling Order, ECF No. 21.

[7] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 1–2, ECF No. 28.

consistent with achievement of the objectives of the statute." *Id.* § 1682. These enforcement activities include issuing regulations that permit educational institutions to separate students on the basis of sex provided that the separate accommodations are comparable. For instance, Title IX allows for exemptions to certain single-sex organizations such as fraternities and sororities, single-sex activities like "Boys State" and "Girls State" conferences, and "father-son or mother-daughter activities," so long as there are "opportunities for reasonably comparable activities . . . provided for students of the other sex." *Id.* § 1681(a)(6)–(8). These exceptions allow entities subject to Title IX to provide sex-specific programs, facilities, and opportunities when doing so ensures equal opportunities for members of both sexes. 34 C.F.R. § 106.41(b), (c). This comparative equality is essential given that, prior to 1972, schools often prioritized boys over girls. *See Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993) (noting "the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs in high schools as well as colleges").

Enforcement of Title IX typically begins with a complaint from a private party. 34 C.F.R. § 100.7(b). However, the Department also has authority to initiate investigations on its own. *Id.* § 100.7(a), (c). The Department generally must "make a prompt investigation" of any "compliance review, report, complaint, or any other information" that "indicates a possible failure to comply" with Title IX, which "should include, where appropriate, a review of the pertinent practices and policies of the [funding] recipient, the circumstances under which the possible noncompliance with [Title IX] occurred, and other factors relevant to a determination as to whether the recipient has failed to comply with [Title IX]." *Id.* § 100.7(c). If the investigation "indicates a failure to comply," the Department will inform the recipient and must attempt to secure voluntary compliance through "informal means." *Id.* § 100.7(d)(1). Should these efforts fail, the Department will make a written finding that the recipient is in violation of Title IX and then, if further attempts at voluntary

resolution are not successful, it may either refer the matter to the DOJ with a recommendation that proceedings be brought to enforce Title IX or begin its own administrative proceedings. *Id.* §§ 100.7(d), 100.8(a). The result of these proceedings could be the termination of funding to educational programs or a request to the DOJ to initiate other legal action. 20 U.S.C. § 1682. Private parties can also bring civil actions under Title IX directly against recipients of federal financial assistance. *Cannon*, 441 U.S. at 689.

### C.  Guidance Documents

The Guidance Documents build on previously enjoined guidance issued under President Barack Obama. *See Questions and Answers on Title IX and Sexual Violence* B-2, 89 Fed. Reg. 33,474 (Apr. 29, 2014) ("Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity."); *see also 2016 Dear Colleague Letter on Title IX and Transgender Students* 2, U.S. Dep'ts of Educ. & Just. (May 13, 2016) (informing educational institutions about the new "Title IX obligations regarding transgender students"). This Court enjoined the implementation of these prior guidance documents as contrary to law because "the plain meaning of the term sex as used in § 106.33 when it was enacted by [the Department] following passage of Title IX meant the biological and anatomical differences between male and female students as determined at their birth." *Texas v. United States*, 201 F. Supp. 3d 810, 832–33 (N.D. Tex. 2016) (O'Connor, J.). Following the presidential administration change in 2017, the Department withdrew this guidance. *2017 Dear Colleague Letter on Title IX*, U.S. Dep'ts of Educ. & Justice (Feb. 22, 2017). And by 2020, the Department formally promulgated regulations recognizing that Title IX has been consistently applied in a manner that treats "sex" as biological sex. *Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance*, 85 Fed. Reg. 30,026, 30,036 (May 19, 2020).

The next month, on June 15, 2020, the Supreme Court held that the statutory language "because of . . . sex" prohibits employment discrimination based on "sexual orientation" and "gender identity" in a related anti-discrimination statute, Title VII. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 681–83 (2020). According to the Supreme Court, discrimination on the basis of sexual orientation or gender identity is necessarily discrimination "because of sex." *Id.* In response, the Department under President Donald Trump published a memorandum clarifying that *Bostock*'s holding did not apply to Title IX and did not require the Department to interpret Title IX in a manner inconsistent with its longstanding implementing regulations.[8]

Reversing course once again in 2021, the Department resurrected its prior position on Title IX consistent with President Joseph Biden's Executive Order. *Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation*, Exec. Order No. 13,988, 86 Fed. Reg. 7023 (Jan. 20, 2021). In a memorandum sent to federal agency partners on March 26, 2021, the Department renewed the interpretation that Title IX's prohibition on sex discrimination extends to sexual orientation and gender identity.[9] This time, however, the Department's interpretation cited the recent Supreme Court opinion for support: "*Bostock*'s reasoning applies with equal force" to Title IX.[10] Treating the "statutory prohibitions against sex discrimination" contained in Titles VII and IX as similar, the memorandum stated that the Supreme Court and other federal courts "consistently look to interpretations of Title VII to inform Title IX."[11] Specifically, the memorandum reasoned that Title IX's prohibition of discrimination "on the basis of sex" is sufficiently comparable to Title VII's prohibition of discrimination "because of sex" to

---

[8] Admin. R. 295–307, ECF No. 22-1.
[9] *Id.* at 5–7.
[10] *Id.* at 5.
[11] *Id.* (citation omitted).

justify viewing the phrases as interchangeable.[12] Promptly following the issuance of this memorandum, the Department promulgated the specific Guidance Documents at issue here: the Notice of Interpretation, the Dear Educator Letter, and the Fact Sheet.

### 1. Notice of Interpretation

On June 22, 2021, the Department published the Notice of Interpretation (the "Notice") in the Federal Register "to clarify [its] enforcement authority over discrimination based on sexual orientation and discrimination based on gender identity under Title IX" in light of *Bostock*.[13] In the Notice, the Department explains that, "[c]onsistent with the Supreme Court's ruling and analysis in *Bostock*, [it] interprets Title IX's prohibition on discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity."[14] The Department asserts that this interpretation flows from Title IX's "plain terms," which are similar to those of Title VII, as well as case law recognizing that *Bostock*'s reasoning applies to Title IX.[15] However, the Notice also conveys that this new interpretation will guide the processing of complaints and conducting of investigations. At the same time, the Notice states that "it does not itself determine the outcome in any particular case or set of facts."[16] Likewise, the Notice explains that, "[s]imilar to the [Supreme] Court's interpretation of Title VII, the Department's interpretation of the scope of discrimination 'on the basis of sex' under Title IX does not require the Department to take a position on the definition of sex, nor do we do so here."[17]

---

[12] *Id.* at 6.
[13] *Id.* at 1–5.
[14] *Id.* at 2.
[15] *Id.* at 1–3.
[16] *Id.* at 1.
[17] *Id.* at 1–2 n.1.

## 2. Dear Educator Letter and Fact Sheet

The next day, the Department issued the Dear Educator Letter (the "Letter") highlighting, among other things, the revived interpretation of Title IX as expressed in the Notice.[18] The Letter conveys that, consistent with the Notice, "[the Department] will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive [f]ederal financial assistance from the Department."[19] The Letter also includes a fact sheet (the "Fact Sheet"), jointly issued by the DOJ and the Department, which provides examples of the types of incidents the federal government "can investigate" under Title IX, as well as information on how to file complaints.[20]

> Consider one example the Fact Sheet condemns as violative of Title IX:
>
> On her way to the girls' restroom, a transgender high school girl is stopped by the principal who bars her [sic] entry. The principal tells the student to use the boys' restroom or nurse's office because her [sic] school records identify her [sic] as "male."[21]

Take another example:

> A transgender high school girl student joins her [sic] friends to try out for the girls' cheerleading team and the coach turns her [sic] away from tryouts solely because she [sic] is transgender. When the student complains, the principal tells her [sic] "those are the district's policies."[22]

Finally, as a third example, the Fact Sheet explains that referring to a transgender student by a name or pronouns other than those the student prefers would be discrimination under Title IX.[23]

---

[18] Pl.'s App'x to Mot. for Summ. J., 7–12, ECF No. 24-1.
[19] *Id.* at 9.
[20] *Id.* at 7–12.
[21] *Id.* at 11.
[22] *Id.*
[23] *Id.*

### D.  Title IX in Texas

In Texas, state officials administer numerous educational programs across thousands of institutions at the state level through constituent agencies and political subdivisions. Local school districts and charter schools "have the primary responsibility for implementing the state's system of public education." TEX. EDUC. CODE § 11.002. However, the Texas Education Agency ("TEA") administers all federal and state funding, which includes distributing those funds to local school districts. *Id.* §§ 7.021, 7.031.

The Guidance Documents impact all Texas educational entities that accept federal dollars, including Texas schools in receipt of substantial funding.[24] In fiscal year 2022, TEA distributed approximately $9.29 billion in federal funds to Texas public schools.[25] In the same fiscal year, Texas public school districts received approximately $5.47 billion in additional federal funding, including about $580 million received directly from the federal government and about $4.89 billion distributed through entities other than TEA.[26] Public post-secondary education institutions in Texas received approximately $3.5 billion in federal funding during the fiscal year 2021.[27] As a condition of continuing to receive this federal funding in subsequent years, Texas schools must adhere to Title IX. 20 U.S.C. § 1681(a). Following the Department's changed interpretation of Title IX, Texas filed this lawsuit out of fear that its schools would lose this critical federal funding.[28]

---

[24] *See* Pl.'s Mem. in Support of Mot. for Summ. J. 2–3, ECF No. 24 (describing the federal assistance Texas schools received).

[25] Pl.'s App'x to Mot. for Summ. J. 38, ECF No. 24-1.

[26] *Id.* at 39.

[27] Pl.'s Mem. in Support of Mot. for Summ. J. 2–3, ECF No. 24 (citing Texas Higher Education Coordinating Board, Sources and Uses Detail Universities 2021 Report, https://www.highered.texas.gov/our-work/supporting-our-institutions/institutional-fundingresources/sources-and-uses/).

[28] Pl.'s Compl. 5, 9, 13, 15–16, ECF No. 1.

### E.  Texas Laws and School Policies

Multiple Texas laws and school policies implicate the concept of sex in the educational context. The Texas Education Code prohibits school districts from allowing "a student to compete in an interscholastic athletic competition sponsored or authorized by the district or school that is designated for the biological sex opposite to the student's biological sex." TEX. EDUC. CODE § 33.0834. The Board of Trustees for the many independent school districts "have the exclusive power and duty to govern and oversee the management of the public schools of the district." *Id.* § 11.151(b). Pursuant to that oversight power, Texas school districts promulgate additional policies on related issues that mirror § 33.0834. All of these school districts receive federal funds.[29]

The additional district-specific policies take various forms. For example, some Texas school districts—such as Frisco ISD, Grapevine–Colleyville ISD, and Carroll ISD—mandate that their schools maintain separate bathrooms, locker rooms, and showers based on biological sex.[30] These school districts also prohibit the assignment of bathrooms, locker rooms, and showers based on subjective gender identity.[31] Consistent with the biological reality of sex, Carroll ISD precludes district employees from "requir[ing] the use of pronouns that are inconsistent with a student's or other person's biological sex."[32]

Other representative district policies include those that limit communication of certain sexual content, messages, and ideas. In Granbury ISD, a policy prohibits obscene materials, including anything "that [d]epicts or describes . . . [p]atently offensive representations or descriptions of ultimate sexual acts, normal or perverted, including sexual intercourse, sodomy,

---

[29] Pl.'s App'x to Mot. for Summ. J. 39, ECF No. 24-1.
[30] *Id.* at 14, 18, 26.
[31] *Id.*
[32] *Id.* at 16.

10

and sexual bestiality."[33] Another north Texas school district, Grapevine-Colleyville ISD, advises its personnel not to "teach, instruct, train, or otherwise communicate to any individual or group topics regarding sexual orientation or gender identity unless and until persons or the entire group have fully completed the fifth grade."[34] Grapevine-Colleyville ISD also prohibits its personnel from "teach[ing], instruct[ing], train[ing], or otherwise promot[ing] gender fluidity" to any students.[35] Likewise, Keller ISD prohibits instructional resources related to "[g]ender fluidity" for students of any age, including resources communicating the views "that gender is merely a social construct," "that it is possible for a person to be any gender or none," or discussing "hormone therapy or other medical treatments or procedures to . . . alter a person's body or genetic make-up . . . that is different from the person's biological sex."[36]

### F.  Related Cases

On April 29, 2024, the Department published a new regulation reflecting its renewed interpretation of Title IX: *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (to be codified at 34 C.F.R. § 106) (the "Final Rule"). To prevent the Final Rule from taking effect, various lawsuits arose around the country. By the Court's count, there are seven such cases.[37] These related lawsuits involve subject matter strikingly similar to the present case. Like the

---

[33] *Id.* at 21.

[34] *Id.* at 31.

[35] *Id.*

[36] *Id.* at 36.

[37] *E.g., Texas, et al. v. United States, et al.*, 2:24-cv-00086-Z (N.D. Tex. Apr. 29, 2024); *Alabama, et al. v. Cardona, et al.*, 7:24-cv-00533-ACA (N.D. Ala. Apr. 29, 2024); *Louisiana, et al. v. U.S. Dep't of Education, et al.*, 3:24-cv-00563-TAD-KDM (W.D. La. Apr. 29, 2024); *Tennessee, et al. v. Cardona, et al.*, 2:24-cv-00072-DCR-CJS (E.D. Ky. Apr. 30, 2024); *Arkansas, et al. v. U.S. Dep't of Education, et al.*, No. 4:24-cv-00636-RWS (E.D. Mo. May 7, 2024); *Kansas, et al. v. U.S. Dep't of Education, et al.*, No. 5:24-cv-04041-JWB-ADM (D. Kan. May 14, 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Education, et al.*, No. 4:24-cv-00461-O (N.D. Tex. May 21, 2024).

Guidance Documents, the Final Rule makes clear that "[d]iscrimination on the basis of sex includes discrimination on the basis of . . . sexual orientation[] and gender identity." *Id.* at 33,886. Essentially, the main difference is that these related lawsuits focus on the Department's articulation of its *Bostock*-driven interpretation in the form of the Final Rule rather than the pre-Final Rule Guidance Documents. All related cases featured motions for preliminary injunction seeking to enjoin the Final Rule.[38] Six district courts—including this Court—preliminarily enjoined enforcement of the Final Rule based, in part, on a functionally unlawful interpretation of Title IX,[39]

Beyond the Final Rule context, one sister court has addressed the same Guidance Documents at issue here (the "Tennessee Case").[40] *Tennessee, et al. v. U.S. Dep't of Educ., et al.* (*Tennessee Case*), 615 F. Supp. 3d 807, 830 (E.D. Tenn. July 15, 2022), *affirmed*, 104 F.4th 577, 584 (6th Cir. 2024). In the Tennessee Case, Judge Charles Atchley granted a preliminary injunction on July 15, 2022, enjoining Defendants—along with the Equal Employment Opportunity Commission and its Chair, Charlotte Burrows—from implementing the Guidance Documents against the plaintiffs to the lawsuit—the states of Tennessee, Alabama, Alaska, Arizona, Arkansas, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska,

---

[38] *Id.*

[39] *E.g.*, *Louisiana, et al. v. U.S. Dep't of Educ., et al.*, 3:24-cv-00563-TAD-KDM, 2024 WL 2978786, at *2 (W.D. La. June 13, 2024); *Tennessee, et al. v. Cardona, et al.*, 2:24-cv-00072-DCR-CJS, 2024 WL 3019146, at *1 (E.D. Ky. June 17, 2024); *Kansas, et al. v. U.S. Dep't of Educ., et al.*, No. 5:24-cv-04041-JWB-ADM, 2024 WL 3273285, at *6 (D. Kan. July 2, 2024); *Texas, et al. v. United States, et al.*, 2:24-cv-00086-Z, 2024 WL 3405342, at *16 (N.D. Tex. July 11, 2024); *Carroll ISD v. U.S. Dep't of Educ.*, No. 4:24-cv-00461-O, 2024 WL 3381901, at *14 (N.D. Tex. July 11, 2024); *Arkansas, et al. v. U.S. Dep't of Educ., et al.*, No. 4:24-cv-00636-RWS, 2024 WL 3518588, at *23 (E.D. Mo. July 24, 2024). Only one district court has declined to grant a preliminary injunction. *Alabama*, 7:24-cv-00533-ACA, 2024 WL 3607492, at *1 (N.D. Ala. Apr. 29, 2024). However, the Eleventh Circuit granted a temporary administrative injunction of the Final Rule pending further review of the Alabama district court's denial. *Alabama, et al. v. U.S. Dep't of Educ., et al.*, No. 24-12444 (11th Cir. July 31, 2024).

[40] The Guidance Documents at issue in the Tennessee Case also included an additional document issued by the EEOC: the Technical Assistance Document. *Tennessee Case*, 615 F. Supp. 3d. at 818. Even the Technical Assistance Document recognizes that *Bostock* "'explicitly reserved some issues for future cases.'" *Id.* at 840.

Ohio, Oklahoma, South Carolina, South Dakota, and West Virginia. *Id.* at 816 n.1. Based on Sixth Circuit dicta cautioning district courts to think twice before issuing nationwide injunction, Judge Atchley declined to extend the preliminary injunction beyond the parties to the lawsuit. *Id.* at 842 n.18. Additionally, the Tennessee Case rejected jurisdictional arguments similar to those raised by Defendants. *Id.* at 820–37, 840. The Sixth Circuit affirmed the preliminary injunction. *Tennessee*, 104 F.4th at 584. As a result, this preliminary injunction remains validly in effect as to the twenty states participating in the Tennessee Case. The Court finds the decision in the Tennessee Case, along with the Sixth Circuit's opinion affirming that decision, highly persuasive.

## II.   JURISDICITONAL ISSUES

Texas maintains that its claims are justiciable and the Court should proceed with evaluating the merits.[41] Nevertheless, Defendants challenge the Court's subject matter jurisdiction.[42] Specifically, Defendants raise five jurisdictional defects: (1) no final agency action, (2) no Article III standing, (3) unripe claims, (4) alternative adequate opportunity for judicial review under Title IX, and (5) Title IX's exclusive review scheme.[43] Addressing each jurisdictional challenge in turn, the Court finds no jurisdictional bars.

### A.  Final Agency Action[44]

The Court first evaluates whether the Guidance Documents constitute final agency action. Importantly, the issue of final agency action "contextualizes the standing inquiry," which is why

---

[41] Pl.'s Mem. in Support of Mot. for Summ. J. 6–32, ECF No. 24.

[42] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 8–31, ECF No. 28

[43] *Id.*

[44] Defendants take issue with Texas treating the Guidance Documents together to constitute final agency action. But Defendants misstate the law when they contend that "Texas improperly lumps all of the [Guidance] Documents together." *Id.* at 8. Instead, the Guidance Documents must be viewed in context. After all, a challenged agency action with a "skeletal" explanation may be supplemented by "accompanying explanatory correspondence" from the agency. *Alaska Dept. of Env't. Conservation v.*

the Fifth Circuit instructs that it be addressed first. *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019); *see also Peoples Nat'l Bank v. Off. of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 336 (5th Cir. 2004) ("If there is no 'final agency action,' a federal court lacks subject matter jurisdiction." (citation omitted)). Importantly, the Administrative Procedure Act (the "APA") only permits judicial review of "final agency action." 5 U.S.C. § 704; *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61–62 (2004) ("Where no other statute provides a private right of action, the 'agency action' complained of must be '*final* agency action.'") (quoting 5 U.S.C. § 704)).

Agency action is "final" for the purposes of judicial review when two conditions are met. First, "the action must mark the consummation of the agency's decisionmaking [sic] process" and "must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as 'flexible.'" *EEOC*, 933 F.3d at 441 (cleaned up). Embracing this call for pragmatism, the Fifth Circuit recognizes that "guidance letters can mark the 'consummation' of an agency's decision-making process." *Nat'l*

---

*EPA*, 540 U.S. 461, 497 (2004). That is why "[f]inal agency action may result from a series of agency pronouncements rather than a single edict." *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000) (cleaned up). Likewise, that is also why multiple documents, such as "a preamble plus a guidance plus an enforcement letter from [an agency][,] could crystallize an agency position into final agency action." *Id.*; *see also Ciba-Geigy v. EPA*, 801 F.2d 430, 436 n.8 (D.C. Cir. 1986) (explaining that final agency action consisted of a "series of steps taken by EPA" culminating in a letter from an EPA official clarifying the agency's position). And, finally, that is why an agency may not avoid judicial review "merely by choosing the form of a letter to express its definitive position on a general question of statutory interpretation." *Ciba–Geigy*, 801 F.2d at 438 n.9. Finding that multiple documents constitute final agency action is the type of approach most consistent with the "flexible and pragmatic way" in which courts apply the finality requirement. *Her Majesty the Queen in Right of Ont. v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990). Therefore, the Court rejects Defendants' objection that each document must be addressed on its own. But even if the Court were to review each document in isolation, nothing in this analysis would produce a different conclusion.

*Pork Producers Council v. EPA*, 635 F.3d 738, 755 (5th Cir. 2011). In similarly employing a pragmatic approach here, the Court concludes that both finality prongs are met.

### 1. Consummation of Decision-making

The Court finds that the Guidance Documents satisfy the first finality requirement. "Final agency action may result from a series of agency pronouncements rather than a single edict." *Barrick Goldstrike Mines Inc.*, 215 F.3d at 48–49 (cleaned up). "Hence, a preamble plus a guidance plus an enforcement letter from [an agency] could crystallize an agency position into final agency action." *Id.*; *see also Ciba-Geigy*, 801 F.2d at 436 n.8 (holding that final agency action consisted of a "series of steps taken by [the agency]," culminating in a letter from an [agency] official clarifying the agency's position). In other words, where "the challenged action is a definitive statement of the agency's position," the "agency action is final." *Jobs, Training & Servs., Inc. v. E. Tex. Council of Gov'ts*, 50 F.3d 1318, 1324 (5th Cir. 1995); *Barrick Goldstrike Mines*, 215 F.3d at 48 (explaining that "a guidance document reflecting a settled agency position and having legal consequences for those subject to regulation may constitute 'final agency action'") (citation omitted)).

Defendants argue that the Guidance Documents do not satisfy the first finality prong because the Department has not "consummated its views on how Title IX applies to *specific* laws, policies, and contexts involving issues of sexual orientation and gender identity, which are the subject of ongoing notice-and-comment rulemaking."[45] In essence, "beyond the top-line determination that Title IX encompasses discrimination on the basis of sexual orientation and gender identity," Defendants argue that the Department's views on these specific subjects are

---

[45] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 9, ECF No. 28 (emphasis in original).

merely tentative.[46] But at the same time, Defendants concede that the Notice "represents the consummation of [the Department's] view that Title IX's prohibition on sex discrimination encompasses discrimination on the basis of sexual orientation and gender identity *as a general matter*."[47] Even if there is not a consummated view for each and every factual situation (of which there could be an infinite number), the overarching view that Title IX prohibits discrimination on the basis of sexual orientation and gender identity reflects the Department's "settled agency position." *Barrick Goldstrike Mines*, 215 F.3d at 48. This top-line determination also reflects the "'consummation' of an agency's decision-making process." *Nat'l Pork Producers Council*, 635 F.3d at 755. As a result, the Guidance Documents form the Department's final position.

While Defendants' concession ends the matter as to the first finality prong, the Court also addresses the three additional arguments Defendants raise against finality. First, Defendants reference that the Department was "engaged in ongoing rulemaking about how to apply Title IX's general non-discrimination mandate to contexts involving sexual orientation and gender identity" to support the contention that the Guidance Documents are not the agency's final position.[48] However, the simultaneous existence of rulemaking does not undo the fact that the Guidance Documents are final agency action in their own right. And the fact that agencies regularly change positions—such as when a new administration takes over—is immaterial to a determination of final agency action. *Clarke v. CFTC*, 74 F.4th 627, 639 (5th Cir. 2023) (emphasizing "'[t]he mere fact that an agency could—or actually does—reverse course in the future does not change' an

---

[46] *Id.* at 11.

[47] *Id.* at 9–10 (emphasis added).

[48] *See* Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 10, ECF No. 28 (first citing *Sex-Related Eligibility Criteria for Male and Female Athletic Teams*, 88 Fed. Reg. 22,860 (Apr. 13, 2023); and then citing *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41,390 (July 12, 2022)).

action's finality") (quoting *Data Mktg. P'ship, L.P. v. U.S. Dep't of Lab.*, 45 F.4th 846, 854 (5th Cir. 2022))); *Sackett v. EPA*, 566 U.S. 120, 127 (2012) (explaining "[t]he mere possibility that an agency might reconsider [its position] does not suffice to make an otherwise final agency action nonfinal"). After all, the Supreme Court emphasized that the relevant time period for evaluating the finality of agency action is *when* the action is taken. *See Biden v. Texas* (*MPP*), 597 U.S. 785, 808 (2022) (illustrating that a matter is considered "final agency action" when it "'mark[s] the consummation of the agency's decisionmaking [sic] process' and result[s] in 'rights and obligations being determined'") (quoting *Bennett*, 520 U.S. at 178)). If anything, the ongoing rulemaking process actually undermines Defendants' consummation argument because that process generated a final rule that affirmed the same top-line position conveyed in the Guidance Documents.

Not only do the Guidance Documents bind the Department and its employees to a particular legal position—that is, the applicability of *Bostock* to broadly expand the scope of actionable discrimination under Title IX—but they are also not subject to further agency review.[49] For example, the Notice does not provide a mere *introduction* to the topic it covers. Instead, it articulates the *conclusion* that Title IX prohibits discrimination based on sexual orientation and gender identity.[50] The Notice also states that it "supersedes and replaces any prior inconsistent

---

[49] *See* Pl.'s App'x to Mot. for Summ. J. 4, ECF No. 24-1 (noting that the Department will "[i]mplement[] [t]his [i]nterpretation" and "will fully enforce Title IX to prohibit discrimination and on sexual orientation and gender identity in education programs and activities"); *see also id.* at 11 (making clear that the Department will help to confront "[a]nti-LGBTQI+ [h]arassment in [s]chools . . . by enforcing federal laws that protect students from discrimination").

[50] *See id.* at 3 ("[T]he Department has *determined* that the interpretation of sex discrimination set out . . . in *Bostock* . . . properly guides the Department's interpretation of discrimination 'on the basis of sex' . . . and leads to the *conclusion* that Title IX prohibits discrimination based on sexual orientation and gender identity") (emphases added)); *see also id.* ("[T]he Department has *concluded* that . . . Title IX prohibits recipients of [f]ederal financial assistance from discriminating based on sexual orientation and gender identity." (emphasis added)); *id.* ("[T]he Department has also *concluded* . . . this is the best interpretation of the statute." (emphasis added)); *id* at 4 ("[T]he Department also *concludes* that the interpretation set forth in this document is most consistent with the purpose of Title IX.") (emphasis added));

statements made by the Department regarding the scope of Title IX's jurisdiction over discrimination based on sexual orientation and gender identity.[51] Because these statements provide a clear expression of the Department's conclusion rather than its initial thoughts on the matter, the Notice asserts the Department's final position.

Setting the Notice aside, there is no indication whatsoever that the other Guidance Documents are subject to further agency review beyond the ever-present possibility that an agency might later reconsider its position. *Cf. Sackett*, 566 U.S. at 127 (holding that "invit[ing] [plaintiffs] to 'engage in informal discussion of the terms and requirements' of the order . . . and to inform the agency of 'any allegations [t]herein which [they] believe[d] to be inaccurate' . . . confers no entitlement to further Agency review"). What matters is not the label given to a particular action or document. Instead, "the key question [for the first finality prong] is whether [the agency action] is 'subject to further agency review.'" *Clarke*, 74 F.4th at 638; *see also Texas v. United States* (*DAPA*), 809 F.3d 134, 171 (5th Cir. 2015) ("We focus primarily on whether the rule has binding effect on agency discretion or severely restricts it.") (cleaned up)). That key question is answered in the negative here. Therefore, "by [their] own terms," the Guidance Documents "implement[] a new policy." *Dep't of Homeland Sec. v. Regents of the Univ of Cal.*, 591 U.S. 1, 21 (2020); *see also MPP*, 597 U.S. at 808 (concluding that the agency's memoranda "made . . . clear 'by its own terms'" that it was "supersed[ing] and rescind[ing] the [previous] memorandum" (quoting *Regents*, 591 U.S. at 21)).

Second, Defendants maintain that their actions will only be final when they apply these interpretations to particular factual circumstances via enforcement.[52] But a substantive

---

[51] *Id.* at 4.

[52] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 25, ECF No. 28.

interpretation that will eventually result in investigative and enforcement activities constitutes final agency action even if an application to specific individual cases has yet to occur. *Cf. MPP*, 597 U.S. at 809 n.7 (noting agreement between the majority and dissenting opinions that final agency action exists when the action results in a final determination of rights or obligations regardless of some contingent future event). All substantive "rules" must eventually be applied via "orders" under the APA, but that does not mean these rules are not subject to pre-enforcement judicial review until after that specific application occurs. Defendants supply no authority to support the argument that pre-enforcement judicial review hinges on whether the lawsuit challenges a broad agency view or a more specific agency view. Instead, persuasive precedent points the opposite direction. *See, e.g.*, *Tennessee Case*, 615 F. Supp. 3d at 841 (preliminarily enjoining enforcement of the Guidance Documents prior to the Final Rule because twenty states "suffered an immediate injury to their sovereign interests when Defendants issued the challenged guidance" that would inhibit the states' respective abilities to enforce their own laws). As Texas points out, Defendants "did not dispute that the [agency] documents [at issue there] mark[ed] the 'consummation' of their decision-making processes" in a similar lawsuit challenging the exact same agency documents at issue here.[53] *See id.* at 830 ("The first . . . prong is not contested. That is, Defendants do not dispute that the [G]uidance [D]ocuments mark the 'consummation' of their decision-making processes.").[54] And although Defendants now contest what they conceded in the Tennessee Case,

---

[53] Pl.'s Consolidated Reply in Support of Its Mot. for Summ. J. and Br. in Opposition to Cross-Mot. for Summ. J. 9, ECF No. 31 (alterations in original) (quoting *Tennessee Case*, 615 F. Supp. 3d at 830).

[54] Reviewing the relevant filings from Defendants in the Tennessee Case confirms that the district court's characterization of the jurisdictional argument is correct. Defendants only argue that the challenge "fails on this second prong" because the Guidance Documents "have no independent legal effect." Defs.' Opp. to Pls.' Mot. for Prelim. Inj. at 23, *Tennessee Case*, 3:21-cv-00308-CEA-DCP (E.D. Tenn. Sept. 23, 2021) (ECF No. 48). The verbatim concession is made in a separate filing from Defendants on the same day. Defs.' Mot. to Dismiss at 11–12, *Tennessee Case*, 3:21-cv-00308-CEA-DCP (E.D. Tenn. Sept. 23, 2021) (ECF No. 49-1).

this new argument—inconsistent with their prior position without explanation—wholly fails for the reasons explained above. Therefore, contrary to Defendants' arguments, the Court finds that the Guidance Documents constitute final and reviewable agency action under the APA.

## 2.    Determination of Rights or Obligations and Legal Consequences

The Guidance Documents also satisfy the second finality prong. Action "bind[ing]" an agency to a legal view "giv[ing] rise to 'direct and appreciable legal consequences'" is final agency action. *U.S. Army Corps of Eng'rs v. Hawkes*, 578 U.S. 590, 598 (2016) (citation omitted). This remains true even if an agency employee merely "loses discretion." *Data Mktg. P'ship, LP*, 45 F.4th at 854. As the Fifth Circuit explained, "where an agency action withdraws an entity's previously held discretion[] that alters the legal regime [and] binds the entity," this is "textbook final agency action." *Id.* And even if the agency action only removes "*some* of the [agency's] discretion," it still satisfies the second prong of finality. *Clarke*, 74 F.4th at 638 (emphasis added). Put differently, "[s]ome agency orders are so impactful that the [continued] existence of some amount of discretion is not determinative." *Texas v. United States*, 549 F. Supp. 3d 572, 602 (S.D. Tex. 2021), *aff'd in part and vacated in part*, 50 F.4th 498 (5th Cir. 2022).

In contrast, "[i]nterpretive rules remind parties of existing statutory duties, or merely track the statutory requirements and thus simply explain something the statute already requires." *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 601–02 (5th Cir. 1995) (cleaned up). But "[i]f an agency pronouncement is to be an interpretive rule or a statement of policy, it cannot effect a substantive change in the regulations." *Id.* (cleaned up). Of course, even policy statements or interpretive rules may sometimes be final agency actions due to their effects. *See, e.g.*, *MPP*, 597 U.S. at 809 n.7 (recognizing that an agency's later memorandum constituted final agency action by merely elaborating on the prior memorandum since both marked the consummation of the

agency's decision-making process). What matters is the actual effect of the challenged actions—
not the label assigned to the action. *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d
592, 596 (5th Cir. 1995) ("The label that the particular agency puts upon its given exercise of
administrative power is not, for our purposes, conclusive; rather, it is what the agency does in
fact.") (citing *Brown Express, Inc. v. United States*, 607 F.2d 695 (5th Cir.1979))); *see also Nat'l
Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) (Kavanaugh, J.) (emphasizing that
the title of the agency's document is irrelevant and focusing instead on whether the document
functions as something more than a general policy statement).

        Here, the Guidance Documents do not merely "remind parties of existing statutory or
regulatory duties" but instead impose new duties by "chang[ing] the text" of the statute they
"profess to interpret." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020). Nor
do the Guidance Documents merely repeat the relevant provisions of Title IX. Rather, the
Guidance Documents do more than simply "put[] the public on notice of pre-existing legal
obligations." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020). The Guidance
Documents "speak with the force of law" and independently "creat[e] legal effects" for regulated
entities, which qualifies them as a "legislative [or substantive] rule." *Id.* Binding the Department
and its employees to a particular legal position, the Guidance Documents create significant legal
consequences for Texas schools by purporting to authoritatively interpret the requirements of Title
IX with the accompanying pledge to fully enforce the expanded interpretation. If a later
memorandum that plainly elaborates on a similar memorandum previously issued qualifies as final

agency action, *MPP*, 597 U.S. at 808–09, the Guidance Documents are an even more obvious example since they go beyond elaboration to instead supersede and rescind prior guidance.[55]

     As explained in the section analyzing the merits below, the requirements imposed by the Guidance Documents are not pre-existing legal obligations under *Bostock*. Rather, these requirements are substantive, legislative rules that impose new duties on the states. And all legislative rules are, "by definition, . . . final agency action." *EEOC*, 933 F.3d at 441. Because neither the statutory text of Title IX nor *Bostock* "compels or logically justifies" the Guidance Documents, *Wheeler*, 955 F.3d at 84, they are substantive final agency action issued in violation of the APA. It is this consummated agency position that has "a direct and immediate impact on the parties." *Nat'l Pork Producers Council*, 635 F.3d 738 at 755.

     For these reasons, the Guidance Documents constitute reviewable final agency action. The Guidance Documents "mark the 'consummation' of the agency's decisionmaking [sic] process" and are not "of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 177–78 (citations omitted). Likewise, the Guidance Documents involve "rights or obligations [that] have been determined" and carry "legal consequences [that] will flow" directly from them. *Id.* (citations omitted). In taking the required "pragmatic" approach to finality, the Court looks past the form in which agency actions are announced and instead considers their substance. *Hawkes*, 578 U.S. at 599 (citing *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967)). Thus, the Guidance Documents are "binding as a practical matter because private parties can rely on them as a norm or safe harbor by which to shape their actions." *EEOC*, 933 F.3d at 444 (cleaned up). As in *EEOC*, the Guidance

---

[55] *Compare* Pl.'s App'x to Mot. for Summ. J. 4, ECF No. 24-1 ("This interpretation supersedes and replaces any prior inconsistent statements made by the Department regarding the scope of Title IX's jurisdiction over discrimination based on sexual orientation and gender identity.") *with MPP*, 597 U.S. at 808–09 (recognizing that an agency's later memorandum constituted final agency action by merely elaborating on the prior memorandum since both marked the consummation of the agency's decision-making process).

Documents likewise invite private parties to "fil[e] a complaint with the Civil Rights Division of the [DOJ]" for the types of incidents newly listed as examples of impermissible discrimination.[56] Such an invitation "open[s] the field of potential plaintiffs." *Id.* (citation omitted). By declaring a now-settled position as bound by the outside authority of *Bostock*, the Department cannot now claim a lack of finality.

### B. Standing

The Court next evaluates standing. Standing doctrine asks "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004)). To establish Article III standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The party invoking federal jurisdiction bears the burden of proving each element of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because "standing is not dispensed in gross," the general rule is that a plaintiff must demonstrate a personal stake in the outcome of the case or controversy at bar. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 438–39 (2017) (citations omitted). This means that a plaintiff to a case "must demonstrate standing for each claim it seeks to press and for each form of relief that is sought." *Id.* (cleaned up).

While states generally cannot bring a *parens patriae* lawsuit against the federal government, *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023), there is an open question as to "what extent states can still bring a *parens patriae* suit against the federal government when a state asserts its own sovereign or quasi-sovereign interest." *Texas v. SEC*, No. 23-60079, 2024 WL 2106183,

---

[56] Pl.'s App'x to Mot. for Summ. J. 12, ECF No. 24-1.

at *3 (5th Cir. May 10, 2024) (describing the circuit split on this question but declining to join one side or the other). The Sixth Circuit recognizes *parens patriae* lawsuits as acceptable when a state "seeks to vindicate its *own* sovereign and quasi-sovereign interests against the United States" and does not merely "represent[] its citizens in a purely third-party . . . capacity." *Kentucky v. Biden*, 23 F.4th 585, 596 (6th Cir. 2022) (emphasis in original). Finding the Sixth Circuit's position persuasive, the Court adopts the same understanding of permissible *parens patriae* lawsuits here to the extent that Texas seeking relief for school districts is akin to a lawsuit on behalf of its political subdivisions.

### 1. Injury

Injuries sufficient to confer standing must be "concrete and particularized" and "actual or imminent," as opposed to "conjectural" or "hypothetical." *Lujan*, 504 U.S at 560. When "a plaintiff can establish that it is an 'object' of the agency regulation at issue, 'there is ordinarily little question that the action or inaction has caused [the plaintiff] injury, and that a judgment preventing or requiring the action will redress it.'" *Texas v. EEOC*, 827 F.3d at 378 (alteration in original) (quoting *Lujan*, 504 U.S. at 561–62). And "[w]hether someone is in fact an object of a regulation is a flexible inquiry rooted in common sense." *Id.* (quoting *Contender Farms LLP v. U.S. Dep't of Agric.*, 779 F.3d 258, 265 (5th Cir. 2015)). This inquiry does not change in the APA context, as "Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse." *DAPA*, 809 F.3d at 152 (quoting 5 U.S.C. § 702).

Texas argues that its standing to sue derives from three separate injuries: (1) the sovereign injury of undermining its own state laws and policies; (2) the imminent danger of enforcement actions that are premised on the challenged actions; and (3) the procedural injury of its inability to

participate in notice-and-comment rulemaking.[57] Defendants challenge each of these purported injuries as insufficient to confer standing to sue.[58] However, the Court disagrees with Defendants, finding each asserted injury by Texas sufficient to confer standing.

### a. *Sovereign Injury*

Texas suffers a sovereign injury due to the Guidance Documents interfering with state laws and policies. Generally, states have an interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). "Pursuant to that interest, states may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law." *DAPA*, 809 F.3d at 153 (footnotes omitted). These "intrusions are analogous to pressure to change state law." *Id*. More specifically, "[b]ecause a state alone has the right to create and enforce its legal code, only the state has the kind of direct stake necessary to satisfy standing in defending the standards embodied in that code." *Texas v. Becerra*, 623 F. Supp. 3d 696, 714 (N.D. Tex. 2022) (Hendrix, J.) (cleaned up). And, critically relevant in this case, "[s]tates historically have been sovereign" in the area of education. *United States v. Lopez*, 514 U.S. 549, 564 (1995).

At least two of the above-mentioned circumstances exist here. First, the Guidance Documents necessarily declare the authority to regulate a matter the Department believes is within federal control: expansion of Title IX's prohibition on discrimination to gender identity and sexual orientation. The Guidance Documents set out an approach to Title IX—akin to a mandate—that is

---

[57] Pl.'s Mem. in Support of Mot. for Summ. J. 12–16, ECF No. 24.
[58] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 14–21, ECF No. 28.

not only novel, but also incompatible with Texas state law (along with various school district policies adopted pursuant to state law). For example, the Texas Education Code generally requires that students compete in athletic competitions designated for their own biological sex. *See* TEX. EDUC. CODE § 33.0834 (mandating that students who "compete in an interscholastic athletic competitions" must do so only in competitions "designated for [their] biological sex" unless a corresponding activity "is not offered or available"). Contradicting Texas law, the Guidance Documents leave no doubt that schools may not prohibit students from competing in athletic competitions designated for the opposite biological sex.[59] Likewise, schools may not prohibit students from using the bathroom designated for members of the opposite biological sex under the Guidance Documents.[60] By initiating investigations and threatening to withhold federal funds in situations like these examples, the Guidance Documents present Texas with a Hobson's choice: stand by its state laws and spend, at a minimum, millions of dollars, to absorb the federal funding forfeited by Texas school districts *or* change its state laws (and require school districts to change their policies) to conform with the Guidance Documents in order to safeguard federal funding. It is this choice that confers standing for Texas assert its claims.[61] Such a choice is tantamount to a

---

[59] Pl.'s App'x to Mot. for Summ. J. 11, ECF No. 24-1 (listing, as an example of [a]nti-LGBTQI+ [h]arassment in [s]chools," a "coach turn[ing] . . . away from tryouts . . . for a girls' cheerleading term" a "transgender high school girl"). This example is backed by the Department's clear promise of enforcement. *Id.* at 2 (noting that the Department "issues this interpretation to clarify the Department's enforcement authority" and "guide the Department in processing complaints and conducting investigations"); *id.* at 4 (explaining that the Department will "[i]mplement [t]his [i]nterpretation" and "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity"); *id.* at 11 (discussing how to "[c]onfront[] [a]nti-LGBTQI+ [h]arassment in [s]chools" by "enforcing federal laws that protect students from discrimination," including in specifically enumerated "[e]xamples of the kinds of incidents [the Department] can investigate").

[60] *Id.* at 11 (listing, as an example of [a]nti-LGBTQI+ [h]arassment in [s]chools," a "transgender high school girl . . . [o]n her [sic] way to the girls' restroom" and subsequently "stopped by the principal who bars her [sic] entry").

[61] *See generally id.* at 39, ECF No. 24-1 (Decl. of Michael Meyer) ("The loss of federal funds would require Texas's public schools to either eliminate certain educational services offered using federal funds or find funding from another source.").

federal assertion of the authority to regulate a matter the Department believes it controls, particularly when accounting for the Department's follow-on investigatory and enforcement actions that will occur.

Second, the Guidance Documents interfere with the enforcement of Texas state law. In addition to the direct impact on § 33.0834 of the Texas Education Code, Texas adduces several additional policies from multiple school districts that conflict with the Guidance Documents.[62] Section 11.151 of the Texas Education Code authorizes these district-specific policies provided that they comply with state law. TEX. EDUC. CODE § 11.151(b) (authorizing trustees of the school board to oversee and manage the public schools in the district). Due to the disruptive impact the Guidance Documents impose on Texas's state sovereignty over its education system, these additional policies are effectively abrogated if they wish to maintain their federal funding. Examples of vulnerable policies include those that require students to use sex-segregated facilities—such as bathrooms and locker rooms—that match their biological sex.[63] Other policies at odds with the Guidance Documents are those that restrict faculty from requiring, or even encouraging, the use of pronouns that do not reflect a student's biological sex.[64] While one injury alone is sufficient to confer standing, these additional school district policies further underscore Texas's standing because its subdivisions exercise state authority. *Cf. Kentucky v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023) ("An injunction barring the federal government from enforcing the mandate against the States would also run to the States' subdivisions.").

---

[62] Pl.'s Mem. in Support of Mot. for Summ. J. 17, ECF No. 24.
[63] Pl.'s Consolidated Reply in Support of Its Mot. for Summ. J. and Br. in Opposition to Cross-Mot. for Summ. J. 15, ECF No. 31.
[64] *Id.*

In response, Defendants argue that "Texas does not identify a single law, policy, or practice, at either a statewide or district level, that conflicts with the [Guidance] Documents."[65] But then they immediately list one such conflicting state law—§ 33.0834 of the Texas Educational Code—requiring student athletes to compete according to their biological sex.[66] Moreover, Defendants reference the Fact Sheet that specifically lists this exact gender-separation restriction as a scenario meriting investigation as a Title IX violation. The particular prohibited conduct in the Fact Sheet example concerns a school barring a biologically male student from tryouts for an all-female athletic team.[67] Of course, Defendants are careful not to concede that the Fact Sheet explicitly regards this scenario as unlawful under its interpretation of Title IX. Instead, Defendants maintain that the Guidance Documents allow for sex-specific separation so long as there are exceptions for students who subjectively identify as the opposite sex regardless of their biology.[68] In other words, sex separation is fine until it conflicts with subjective gender identity. But Defendants' argument that no actual conflict exists presupposes that Texas shares the Department's novel view of Title IX. Absent that assumption, the undeniable inference from the Fact Sheet's scenarios is that it is unlawful to ever separate students based on sex unless exceptions are made for students with gender identities that do not match their biological sex. Texas law directly conflicts with this interpretation of sex. Combined with the potential stakes of losing billions in federal funding, the Court finds that the Guidance Documents generate "federal interference with the enforcement of state law." *DAPA*, 809 F.3d at 153.

---

[65] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 16, ECF No. 28.

[66] *Id.* at 16.

[67] Pl.'s App'x to Mot. for Summ. J. 11, ECF No. 24-1

[68] *E.g.*, Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 16, ECF No. 28 ("[The Department] has proposed a rule (not yet finalized) which outlines the circumstances under which schools would be permitted to adopt and apply sex-related criteria for athletics eligibility that may result in the exclusion of transgender students.").

Defendants also characterize Texas's sovereign interest as a "bare assertion" of a "distant prospect of enforcement."[69] According to Defendants, such "unspecified 'pressure'" is insufficient to show "'interfer[ence] with the enforcement of state law' . . . to establish an injury in fact."[70] Contrary to Defendants' rebuttal, Texas schools will be concurrently subject to conflicting state and federal regulations if the Guidance Documents are allowed to stand. Indeed, the contents of the Guidance Documents facially contradict the Texas Education Code and numerous local education policies authorized by state law. As a result, the Guidance Documents directly "require the state[] to do or to yield [some]thing" in order to receive critical federal funding. *Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923). It is this causal mechanism that reveals that the Guidance Documents contain "the ulterior purpose of tempting [states] to yield" to the Department's novel Title IX position. *Id.* The resulting frustration of Texas state law is a cognizable injury. Far from raising an "abstract question[] . . . of sovereignty," Texas faces the "threatened operation [of federal regulation] upon rights properly falling under judicial cognizance." *Id.* at 484. Therefore, the Court finds that Texas suffers a sovereign injury.

### b. *Threat of Imminent Enforcement*

On top of sovereign harms, Texas also suffers an injury in fact from the substantial threat of enforcement against its many school systems based on the novel Title IX interpretation set forth in the Guidance Documents. The linchpin of Texas's standing argument is the credible fear that Defendants will invoke the Guidance Documents in a future enforcement action that goes beyond existing investigations.[71]

---

[69] *Id.* at 15–16.
[70] *Id.* at 15.
[71] Pl.'s Mem. in Support of Mot. for Summ. J. 16, ECF No. 24.

To satisfy the imminence prong for a future injury, a plaintiff must demonstrate "'a credible threat' of enforcement." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014) (citation omitted). "A *substantial* threat can be shown by complaints based on violations of policy or warnings, statements, or other pre-enforcement actions indicating an intent to enforce the policy." *Becerra*, 623 F. Supp. 3d at 716 (Hendrix, J.) (emphasis added) (cleaned up). For instance, in *Texas v. EEOC*, the Fifth Circuit upheld Texas's standing to challenge an agency guidance letter before the agency had taken remedial action, because the letter's contents clearly labeled the Texas policy as "unlawful discrimination." 933 F.3d at 446. Although the EEOC argued that its guidance materials alone could not injure Texas, the Fifth Circuit rejected the need for showing some "immediate injury" when the agency's guidance had already taken a position authorizing legal consequences detrimental to the state. *Id.* at 448; *see also Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 924–30 (5th Cir. 2023) (upholding standing to challenge EEOC guidance despite complete lack of action taken against individual plaintiffs). Like those cases, Texas faces a substantial risk of imminent enforcement from the Guidance Documents. That is because the Guidance Documents unambiguously state the Department's intent to "fully enforce" its expanded interpretation of Title IX.[72] Because Texas's current state law and policies are precisely the type of conduct the Guidance Documents condemn, the Department has labeled these state laws and policies as unlawful discrimination subject to enforcement.

Perhaps even more telling, the Guidance Documents have already prompted actualized threats of enforcement against Texas school districts. For instance, on December 6, 2022, the Department opened an investigation against Granbury ISD.[73] Specifically, the Department is

---

[72] Pl.'s App'x to Mot. for Summ. J. 4, ECF No. 24-1
[73] *Texas superintendent ordered librarians to remove LGBTQ-themed books. Now the federal government is investigating.*, TEX. TRIBUNE (Dec. 20, 2022), https://www.texastribune.org/2022/12/20/granbury-

evaluating whether Granbury ISD created a hostile environment for students based on "gender identity" after the American Civil Liberties Union of Texas filed a complaint that relied on the Guidance Documents as the basis for its allegations of discrimination.[74] More recent complaints have also been filed against other Texas school districts.[75] For instance, on May 6, 2024, the Department opened a new investigation into Katy ISD on gender-identity grounds.[76] These investigations are occurring simultaneous to ongoing investigations of other Texas school districts—Frisco ISD, Keller ISD, Brownsville ISD, Carroll ISD, Devine ISD, Hays Consolidated ISD, Pflugerville ISD, and Tyler ISD—for "gender harassment" based on sexual orientation or gender identity.[77]

---

books-investigation-civil-rights/ (last visited June 8, 2024); *see also* Pl.'s Mem. in Support of Mot. for Summ. J. 16 n.2, ECF No. 24 (citing December 20, 2022 Texas Tribune article).

[74] Talia Richman, *Feds open civil rights investigation into Granbury schools after LGBTQ book removals*, DALL. MORNING NEWS (Dec. 20, 2022), available at https://www.dallasnews.com/news/education/2022/12/20/feds-open-civil-rights-investigation-into-granbury-schools-after-lgbtq-book-removals/ (last visited June 8, 2024); Granbury Indep. Sch. Dist. Compl. at 5–6, available at https://www.aclutx.org/sites/default/files/aclutx_granbury_isd_title_ix_complaint.pdf (accessed DATE); *see also* Pl.'s Mem. in Support of Mot. for Summ. J. 16 n.3, n.4, ECF No. 24 (citing December 20, 2022 Dallas Morning News article and the July 8, 2022 ACLU complaint against Granbury ISD).

[75] *E.g.*, Meghan Mangrum, *Southlake schools now face 8 investigations into alleged retaliation, discrimination*, DALL. MORNING NEWS (Feb. 9, 2023), available at https://www.dallasnews.com/news/education/2023/02/09/southlake-schools-now-face-8-investigations-into-alleged-retaliation-discrimination/ (last visited June 8, 2024); Frisco Indep. Sch. Dist. Compl. at 4, available at https://www.aclutx.org/sites/default/files/ ocr_complaint_letter_for_frisco_isd.pdf (accessed October 20, 2023); Keller Indep. Sch. Dist. Compl. at 6, available at https://www.aclutx.org/sites/default/files/keller_isd_ocr_complaint.pdf (last visited June 8, 2024); *see also* Pl.'s Mem. in Support of Mot. for Summ. J. 17 n.5, n.6, ECF No. 24 (citing February 9, 2023 Dallas Morning News article, along with the October 20, 2023 ACLU complaints against Frisco ISD and Keller ISD).

[76] Nina Banks, *Feds Investigate Another Texas School District for its Gender Identity Mandate*, TEX. TRIBUNE (May 8, 2024), available at https://www.texastribune.org/2024/05/08/katy-isd-lgbtq-policy-investigation/ (last visited June 8, 2024); *see also* Pl.'s Suppl Br. 3 n.2, ECF No. 36 (citing May 8, 2024 Texas Tribune article).

[77] Pl.'s Suppl. Br. 3 n.2, ECF No. 36 (citing Department of Education Office for Civil Rights, *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools,* https://ocrcas.ed.gov/open-investigations?field_ois_state=686&field_ois_discrimination_statute=701&field_ois_type_of_discrimination=721&items_per_page=20&field_ois_institution=&field_ois_institution_type=All&field_open_inv

Defendants do not deny that the Department has opened multiple investigations into Texas school districts. Instead, Defendants insist that such investigations bear too little connection to enforcement to render credible Texas's fears of future enforcement.[78] But in doing so, Defendants mistakenly downplay the salience of an investigation premised on the validity of the Guidance Documents at issue here. After all, a responsive investigation strongly indicates that future enforcement is not a "distant prospect," as Defendants maintain, but an imminent possibility.[79] Making matters worse, the fact that the complaint launching the Granbury ISD investigation references the Guidance Documents in support of the allegations of discrimination demonstrates that the Department has acted on a "complaint[] based on violations of policy."[80] Thus, the Granbury ISD investigation shows that Texas's fear of enforcement is "not too speculative for Article III purposes." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).

Moreover, apart from monetary penalties, the expense and trouble of complying with more expansive rules is a cognizable injury in itself. "An increased regulatory burden typically satisfies the injury in fact requirement." *Contender Farms, L.L.P.*, 779 F.3d at 266. Here, the Department widened the scope of Title IX to protect a new—and much larger—range of behavior. Observing this expanded anti-discrimination mandate is certainly more onerous than following a narrower version. Texas schools and educators must take many new and costly precautions to ensure they implement the Department's broadened view of sex. Defendants cannot deny that compliance will require efforts around what counts as an appropriate "education environment" that Texas schools

---

estigation_date_1=&field_open_investigation_date_2=&field_open_investigation_date=&field_open_investigation_date_3=).

[78] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 31–34, ECF No. 28.

[79] *Id.* at 15.

[80] *See* Granbury Indep. Sch. Dist. Compl. at 5–6, available at https://www.aclutx.org/sites/default/files/aclutx_granbury_isd_title_ix_complaint.pdf (last visited June 8, 2024); *see also* Pl.'s Mem. in Support of Mot. for Summ. J. 15, ECF No. 24 (referencing the July 8, 2022 ACLU complaint against Granbury ISD).

would not otherwise need to consider absent the Guidance Documents.[81] And, assuredly, costs to implement the changes to sex-specific programs and facilities, along with appropriate training protocols concerning those changes, naturally follow.

Even without an active investigation, the Guidance Documents by themselves convey an enforcement intent sufficient to create standing. Defendants would like to soften the meaning of their Guidance Documents by characterizing them as statements about what the Department "can" investigate and discipline.[82] By this logic, the purpose of the Guidance Documents is merely to assert the Department's authority to enforce a novel anti-discrimination mandate, without implying an intent to enforce it. But Defendants' twist is undercut by the actual contents of the Guidance Documents themselves. For instance, the Letter expressly admonishes educators to refrain from "discrimination based on sexual orientation and gender identity."[83] Then the Letter directs its readers to the Fact Sheet to specify the sort of conduct in response to which "[the Department] will fully enforce Title IX," listing multiple examples that conflict with Texas state law and policy.[84] And per the Notice, the Department's expansive interpretation "will guide the Department in processing complaints" and pledges that the Department "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity."[85]

This language in the Department's Guidance Documents is purposeful. *Cf. Neese v. Becerra*, No. 2:21-CV-163-Z, 2022 WL 1265925 at *6 (N.D. Tex. Apr. 26, 2022) (Kacsmaryk, J.) (concluding that the agency's notification imposed anti-discrimination protections giving rise to a credible prospect of enforcement because the notification repeated that the agency "will interpret

---

[81] Pl.'s App'x to Mot. for Summ. J. 8, ECF No. 24-1.
[82] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 32, ECF No. 28.
[83] Pl.'s App'x to Mot. for Summ. J. 11, ECF No. 24-1.
[84] *Id.*
[85] *Id.* at 2, 7.

and enforce" the authorizing statute), *appeal filed*, No. 23-10078 (5th Cir. 2023). Couched in language similar to the guidance at issue in *Neese*, the Guidance Documents convey a credible threat of enforcement should Texas schools fail to prohibit discrimination based on sexual orientation and gender identity.

Finally, Defendants appear to question the right to pre-enforcement judicial review.[86] Although the basic contours of Defendants' pre-enforcement contentions are true, it still remains that separation-of-powers concerns do not preclude pre-enforcement judicial review. *Cf. Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that [a plaintiff] first expose himself to actual [harm] to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *Susan B. Anthony List*, 573 U.S. at 158 ("When an individual is subject to such a threat [of enforcement of a law], an actual [harm] or other enforcement action is not a prerequisite to challenging the law."). Without access to courts to bring pre-enforcement challenges, vulnerable citizens may surrender the ability to promptly challenge unlawful executive branch actions. This cannot be.

Under the APA, federal courts have the express authority to review challenges to agency actions on a pre-enforcement basis. *See McCarthy*, 758 F.3d at 251 (Kavanaugh, J.) (identifying that legislative rules and sometimes even interpretive rules may be subject to pre-enforcement judicial review). These challenges include an endless variety of agency actions that are "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Notably, judicial review of agency actions "contrary to constitutional right, power, privilege, or immunity; . . . [or] in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(B)–(C), is cumulative under the arbitrary and capriciousness standard, which "governs review of *all* proceedings that are subject to challenge

---

[86] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 18–19, ECF No. 28 (quoting *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021)).

under the APA." *Menkes v. DHS*, 637 F.3d 319, 329 (D.C. Cir. 2011) (citing *Consumers Union of U.S., Inc. v. FTC*, 801 F.2d 417, 422 (D.C. Cir. 1986)). Thus, "[i]n *all* cases" of judicial review under § 706, "agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) (citing 5 U.S.C. § 706(2)(A), (B), (C), (D)) (emphasis added). This is also consistent with the Supreme Court's emphasis that the APA's "'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Lab'ys*, 387 U.S. at 140–44 (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955)).

The import of this statutory text is that the APA's relief is available without any express limitation precluding relief on a pre-enforcement basis. Moreover, the APA's text in § 702 makes clear that "[a] person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action" is "entitled to judicial review thereof." *Shaughnessy*, 349 U.S. at 50. This ability to obtain an appropriate remedy is not contingent on the person being subject to existing enforcement. To the contrary, the APA recognizes judicial authority to "issue all necessary and appropriate process . . . to preserve status or rights" from "irreparable injury" caused by agency action.[87] *Id.* § 705. Indeed, the APA's explicit textual entitlement would be undermined by an interpretation that § 702 confers no right to obtain meaningful equitable relief on a pre-enforcement basis when wronged by agency action. Provided that the claim is justiciable, the APA's broad entitlement to judicial review is not limited in the way Defendants would like it to be.

---

[87] *See generally* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 1012–17 (2018) (explaining that, although the power of judicial review is not akin to an executive veto, the APA expressly grants courts additional authority to review agency action).

Based on its statutory text, the APA empowers courts with specific authority to "set aside agency action, findings, and conclusions found to be . . . unlawful" without subjecting that authority only to post-enforcement situations. *Id.* § 706. This is the only reading of the text that gives "a 'hospitable' interpretation" to the APA's "'generous review provisions.'" *Abbott Lab'ys*, 387 U.S. at 140 (quoting *Shaughnessy*, 349 U.S. at 51). It also tracks with the important purpose the APA serves. *See Franciscan Alliance*, 47 F.4th at 378 ("[A]n agency 'literally has no power to act . . . unless and until Congress authorizes it to do so by statute.'" (quoting *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1649 (2022)).

To be sure, the constitutional check of judicial review is an essential component of separation-of-powers principles to oblige another branch to control itself. *See* THE FEDERALIST NO. 78, at 380 (Alexander Hamilton) (Dover ed., 2014) ("There is no position which depends on clearer principles, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void."). And this remains just as important today as it was at the Founding. The Court elects not to ignore decades of Supreme Court precedent and the APA's plain textual authorization of judicial review. Nor will the Court twist the foundational value of separation-of-powers into something it is not. Instead, the Court finds that it possesses both constitutional and statutory authority to review pre-enforcement challenges to the Department's Guidance Documents based on nothing more than the credible pledge of enforcement combined with current investigative activities—even if those investigations have not yet culminated into an enforcement proceeding.

At bottom, Texas "must show that the likelihood of future enforcement is substantial" enough that it faces "a realistic danger of sustaining a direct injury." *California v. Texas*, 593 U.S. 659, 670–71 (2021) (quotations omitted). This is all that is required to demonstrate standing in a

pre-enforcement challenge. Texas has done so here. Contrary to Defendants' contention otherwise, the Court finds that the Department's rampant investigations opened against Texas schools supply the requisite evidence that future enforcement beyond existing investigations is both likely and substantial.

### c. *Procedural Injury*

Texas's third asserted injury is procedural in nature because of the Department's decision not to promulgate the Guidance Documents through notice-and-comment rulemaking.[88] Texas can show a cognizable injury if it has been deprived of "a procedural right to protect [its] concrete interests." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). "A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right." *EEOC*, 933 F.3d at 447 (citing *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012)).

Defendants counter by arguing that the deprivation of a procedural right without an *accompanying* concrete interest is insufficient to confer standing.[89] According to Defendants, Texas must also demonstrate a resulting substantive injury.[90] Texas has done so. There are two concrete interests sufficiently identified this case. As explained above, Texas has a concrete sovereign interest in the creation and enforcement of state laws applicable to public education within its borders. Likewise, "Texas has at least one additional concrete interest in the avoidance of direct injury to" the State through the loss of federal funds both to the State and to its school districts."[91]

---

[88] Pl.'s Mem. in Support of Mot. for Summ. J. 14, ECF No. 24.
[89] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 17, ECF No. 28.
[90] *Id.*
[91] Pl.'s Mem. in Support of Mot. for Summ. J. 14, ECF No. 24.

Despite these other concrete interests, Defendants promulgated the Guidance Documents without public notice and comment. And because the Guidance Documents constitute final agency action the APA requires to undergo notice-and-comment rulemaking, Texas possessed the right to participate in the formal notice-and-comment process to protect its concrete interests—even if such harm to those interests has yet to occur. This is a critical safeguard, because public notice and comment provides an opportunity for stakeholders to express their concerns and persuade an agency to alter proposed regulations that may cause harm. That Texas was a signatory to letters sent by other states does not qualify as the type of meaningful participation in the rulemaking process the APA requires.[92] Not only were these letters sent *after* the Department promulgated the Guidance Documents,[93] but they fail to fulfill the APA's goal of ensuring that the public provides feedback *before* a final agency action occurs. *See* 5 U.S.C. § 553(c) (describing the process by which "interested persons" are given "an opportunity to participate in the rule making" before any rule becomes final); *id.* § 553(d) (requiring "publication or service of a substantive rule . . . not less than 30 days before its *effective* date") (emphasis added)). Otherwise, why allow for public comment in the first place? Therefore, without receiving the benefit of this statutory safeguard, Texas suffers a procedural injury from the promulgation of the Guidance Documents.

---

[92] *See* Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 17 n.3, ECF No. 28 (citing two letters sent to the Department from the Indiana and Tennessee Attorneys General). According to Defendants, "Texas has hardly been robbed of the opportunity to comment, given that it *has* commented on the notices of proposed rulemaking." *Id.* But even accepting as true that Texas commented on the notices of proposed rulemaking, this is hardly sufficient to satisfy the APA's formal requirements.

[93] *Compare id.* (showing that the letters issued on September 12, 2022) *with* Pl.'s App'x to Mot. for Summ. J. 2, 8, 11 ECF No. 24-1 (showing that the Notice issued on June 22, 2021, the Dear Education letter issued on June 23, 2021, and the Fact Sheet issued in June 2021). It appears that the letters Defendants reference are public comment in response to the Final Rule that was proposed long after the Department issued the Guidance Documents.

## 2. Traceability

Texas's injuries are caused by the Guidance Documents rather than Title IX itself. Indeed, Texas's injuries are directly traceable to the Guidance Documents because they—not Title IX—prohibit discrimination based on sexual orientation or gender identity. As explained below, "on the basis of sex" is best read to *not* include sexual orientation or gender identity, notwithstanding the Department's incorrect characterization that *Bostock* requires and permits the newly expanded interpretation of Title IX.

Unsurprisingly, Defendants claim that the Guidance Documents contain the correct interpretation of Title IX and, therefore, do nothing more than reflect the statutory meaning.[94] But this argument stakes Defendants' traceability response on the validity of its interpretation of Title IX, meaning that this jurisdictional argument must stand or fall with the merits of this case. Importantly, neither the Supreme Court nor the Fifth Circuit has recognized the Guidance Documents' novel rationale in the Title IX context. In fact, the Supreme Court expressly declined to recognize this extension of Title IX in *Bostock*. 590 U.S. at 681 (noting that "other federal or state laws that prohibit sex discrimination"—like Title IX—were not "before" the Court and refused to "prejudge any such question" about what those statutes require). This Court finds no basis for recognizing such an extension of *Bostock*. Because the Guidance Documents—and not Title IX—are the exclusive force prohibiting discrimination based on sexual orientation or gender identity, the Court finds that Texas's harms are traceable to the Guidance Documents.

## 3. Redressability

Texas's injuries are capable of relief. The traceability and redressability elements "are closely related, and can be viewed as two facets of a single requirement." *Scenic Am., Inc. v. U.S.*

---

[94] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 34–35, ECF No. 28.

*Dep't of Transp.*, 836 F.3d 42, 54 (D.C. Cir. 2016). Similar to traceability, redressability is satisfied as long as it is "likely" and not merely "speculative" that a favorable judicial decision will redress the injuries allegedly caused by the challenged agency action. *Lujan*, 504 U.S. at 561.

It is possible to remedy any harm to Texas caused by the Guidance Documents. Because the only source of Texas's harms is the Department's expansion of Title IX as consummated in the Guidance Documents, the Court can sufficiently redress Texas's injuries. The Court may do so by declaring the Guidance Documents unlawful and by setting them aside. Moreover, the Court may provide relief by enjoining Defendants from conducting enforcement actions based on the Guidance Documents—or similar agency action containing the same interpretation—in the future.

Defendants nonetheless argue that the relief Texas requests will not remedy the asserted injuries.[95] That is because Defendants believe they are free to penalize the expanded form of discrimination under Title IX without the Guidance Documents. But even accepting as true Defendants' suggestion that they could still enforce this expansion of Title IX against Texas schools for discrimination based on sexual orientation or gender identity, a declaration that such an interpretation is unlawful, paired with an injunction restraining reliance on this interpretation in future agency action and concomitant enforcement activity, would certainly protect Texas from adverse agency action—Guidance Documents or otherwise. Specifically, "a court order preventing [the Department] from using the enforcement mechanisms provided for and available under Title IX when enforcing [its] prohibition on sex discrimination would reduce the harm [Texas] allege[s]." *Neese*, 2022 WL 1265925, at *7. Likewise, a declaratory judgment that the documents are unlawful *because* Title IX does not bar certain discrimination on the basis of sexual orientation or gender identity would be a binding decision precluding administrative action that would

---

[95] *Id.* at 21–23.

penalize Texas and its schools for their current laws and policies. Finally, contrary to Defendants' arguments, vacatur of the Guidance Documents would relieve Texas's injuries by nullifying the new anti-discrimination mandate that this final agency action—not Title IX itself—establishes.

This is not a novel approach to redressability. A favorable decision would likely relieve Texas of at least some of the injuries allegedly caused by the Department. Texas "need not show that a favorable decision will relieve . . . *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Rather, a "substantial likelihood" of the requested relief redressing the alleged injury is enough. *Duke Power Co. v. Caroline Env't Study Grp., Inc.*, 438 U.S. 59, 79 (1978); *see also Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (holding that a plaintiff "need only show that a favorable ruling could potentially lessen its injury"). Thus, even if "private parties will still be able to file complaints with [the Department], and their own lawsuits against Texas, asserting that Title IX prohibits discrimination on the basis of gender identity or sexual orientation," relief from the Court would at least lessen Texas's potential injuries and prevent the loss of funding.[96] This is all that is needed for standing.

### 4. Special Solicitude

In addition to the traditional analysis, Texas is also entitled to special solicitude in the standing inquiry.[97] Special solicitude is warranted when "(1) the State [has] a procedural right to challenge the action in question, and (2) the challenged action affect[s] one of the State's quasi-sovereign interests." *Texas v. Biden*, 20 F.4th at 969 (citing *Massachusetts v. EPA*, 549 U.S. 497, 516–20 (2007)). As previously explained, quasi-sovereign interests that satisfy this second prong arise in response to three types of federal action:

---

[96] Pl.'s Consolidated Reply in Support of Its Mot. for Summ. J. and Br. in Opposition to Cross-Mot. for Summ. J. 23, ECF No. 31; Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 36, ECF No. 28.
[97] Pl.'s Mem. in Support of Mot. for Summ. J. 15, ECF No. 24.

(1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law, at least where the state statute at issue regulates behavior or provides for the administration of a state program and does not simply purport to immunize state citizens from federal law.

*DAPA*, 809 F.3d at 153. Critically, special solicitude is not a shortcut for establishing standing that is otherwise lacking. *La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 882 (5th Cir. 2023) (quoting *Texas*, 50 F.4th at 514); *see also Arizona v. Biden*, 40 F.4th 375, 385 (6th Cir. 2022) ("Article III's foundational standing requirements remain for private and public litigants alike."). In other words, special solicitude "does not absolve States from substantiating a cognizable injury." *La. Dep't of Wildlife & Fisheries*, 70 F.4th at 882.

Both special solicitude criteria are satisfied here. Texas establishes the first prong because it "is asserting a procedural right under the APA to challenge an agency action." *Id.* The second prong is likewise satisfied because the challenged agency action "affect[s] quasi-sovereign interests by imposing substantial pressure on [Texas] to change [its] laws." *Texas v. Biden*, 20 F.4th at 970 (citation omitted). As a result, Texas's burden for establishing standing is lightened.

Defendants argue that "Texas has not, as it must, presented facts demonstrating that it has suffered *any* injury from the Guidance Documents, and special solicitude cannot cure that deficiency."[98] The Court disagrees. As explained above, Texas sufficiently asserts three separate injuries: (1) a sovereign injury due to the Department's intrusion on and impairment of state education law via the Guidance Documents, (2) a direct injury due to the imminent prospect of enforcement in Texas premised on the Guidance Documents' unprecedented expansion of Title IX, and (3) a procedural injury based on the deprivation of Texas's right under the APA to comment on proposed final agency action impacting a concrete interest.

---

[98] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 18, ECF No. 28.

Notably, Defendants do not directly engage with either special solicitude factor. Instead, Defendants latch on to dictum from Justice Gorsuch's concurring opinion in *United States v. Texas*, 599 U.S. 670, to suggest that this Court ignore special solicitude entirely.[99] Notwithstanding this dictum, it remains that special solicitude is still a binding legal doctrine that the Court must heed. *See Gen. Land Office v. Biden*, 71 F.4th 264, 274 (5th Cir. 2023) (recognizing a state's entitlement to special solicitude as to the standing analysis in the APA context); *see also Missouri v. Biden*, 680 F. Supp. 3d 630, 718–19 (W.D. La. July 4, 2023) (recognizing the continued viability of special solicitude doctrine), *rev'd in part on other grounds*, 83 F.4th 350 (5th Cir. 2023).

Thus, the Court concludes that Texas is entitled to special solicitude in the standing inquiry. "If nothing else, that means imminence and redressability are easier to establish here than usual." *Texas v. Biden*, 20 F.4th at 970 (citation omitted). But the remaining prong of the standing analysis—causation (or traceability)—is also subject to the special solicitude doctrine. *See Texas v. United States*, No. 1:18-CV-00068, 2021 WL 3025857, at *9 (S.D. Tex. July 16, 2021) ("The Fifth Circuit has explicitly interpreted special solicitude to lower the level of certainty required in the traditional causation and redressability analysis."). Combined with the results of the traditional analysis, the Court finds that special solicitude further reveals that Texas has standing.

### C. Ripeness

As its third jurisdictional challenge, Defendants contend that Texas's claims are unripe.[100] Under Article III, "[a] case or controversy must be ripe for decision, meaning that it must not be premature or speculative." *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002). Ripeness is a justiciability doctrine designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies,"

---

[99] *Id.* at 31 (citing *United States v. Texas*, 599 U.S. 670, 687–89 (2023) (Gorsuch, J., concurring)).
[100] *Id.* at 23–26.

and "also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (citation omitted). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)). More specifically, for a case to be ripe, courts must examine (1) "the fitness of the issues for judicial decision" and (2) the "hardship of the parties withholding court consideration." *Oh. Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).

Defendants argue that neither ripeness prong is met here.[101] But given that "there is a fair amount of overlap between Article III standing requirements and the ripeness analysis," the same reasons showing that Texas has standing likewise demonstrate that its claims are ripe. *Braidwood Mgmt., Inc.*, 70 F.4th at 930 (citing *Texas v. United States*, 497 F.3d 491, 496 (5th Cir. 2007)). Accordingly, the Court finds neither of Defendants' ripeness arguments availing.

### 1. Fit for Review

Texas's claims are fit for judicial review. Issues fit for review are those that "'would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now.'" *DM Arbor Ct., Ltd. v. Houston*, 988 F.3d 215, 218 (5th Cir. 2021) (quotation omitted). Specifically, "a challenge to administrative regulations is fit for review if (1) the questions presented are 'purely legal one[s],' (2) the challenged regulations constitute 'final agency action,' and (3) further factual development would not 'significantly advance [the court's] ability to deal with the legal issues presented.'" *Texas v. United States*, 497

---

[101] *Id.*

F.3d at 498–99 (quoting *Nat'l Park Hosp. Ass'n*, 538 U.S. at 812). At the outset, the second element is established given the Court's above determination that the Guidance Documents constitute final agency action.

Turning to the first element, Texas's claims are purely legal challenges to the facial validity of the Department's final agency action. Facial challenges to a regulation are generally ripe the moment the challenged agency action occurs. *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 736 n.10 (1997); *see also Texas v. EEOC*, 827 F.3d at 388 n.9 (explaining that, upon determining an agency's "[g]uidance is 'final agency action' under the APA, it follows naturally that [an] APA claim is ripe for review"); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 287–88 (5th Cir. 2012) (holding that a facial attack on a regulation raises a "purely legal" question and is, therefore, ripe). Accordingly, Texas's challenge to the Guidance Documents is a purely legal one, satisfying the first element.

As to the final element, Texas's claims do not require further factual development to ensure that the Court is able to address the legal issues presented. In APA situations like this one, it is typically unnecessary "to wait for the [final agency action] to be applied in order to determine its legality." *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1008 (D.C. Cir. 2014). Texas's claims—procedural and substantive—turn on the content of the Guidance Documents. And the Guidance Documents advance a clear enforcement ideology based on an expansion of Title IX's non-discrimination mandate. Additionally, the Guidance Documents specify factual situations the Department considers unlawful. Although waiting for further factual development before rendering a decision would assuredly produce many other situations the Department would find unlawful, doing so is unnecessary. The record in this case provides sufficient facts for the

45

Court and nothing more is required to adjudicate Texas's claims today. Thus, Texas's claims also satisfy the final component of fitness for review.

Even so, Defendants argue that the "issues in this case are presently unfit for decision because it remains to be seen whether the Guidance Documents will have any effect on Texas."[102] To the contrary, the Court is able to derive a "sense of what . . . activities would fall under [Department's regulation]." *Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*, 413 F.3d 479, 483 (5th Cir. 2005). No further factual development is necessary to identify an immediate potential effect should Texas not comply with the Guidance Documents: the loss of federal funding. Without the need for further factual development, the sole question for the Court is purely legal. This makes Texas's claims fit for this Court's review.

### 2. Hardship

Texas will face sufficient hardship without relief now. Even where a case presents questions that are fit for review, "the plaintiff must show some hardship in order to establish ripeness." *Cent. & Sw. Servs. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000). "The Supreme Court has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being 'force[d] . . . to modify [one's] behavior in order to avoid future adverse consequences.'" *Texas*, 497 F.3d at 499 (quoting *Oh. Forestry Ass'n*, 523 U.S. at 734). Indeed, the "fear of future sanctions" to "force immediate compliance" with the Guidance Documents is a sufficient hardship. *Oh. Forestry Ass'n*, 523 U.S. at 734. In other words, "[w]here a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to

---

[102] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 24, ECF No. 28.

noncompliance, hardship has been demonstrated." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 545 (5th Cir. 2008) (citation omitted); *see also Abbott Lab'ys*, 387 U.S. at 152 ("These regulations purport to give an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business of all prescription drug companies; its promulgation puts petitioners in a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate."); *Reckitt Benckiser v. EPA*, 613 F.3d 1131, 1136–41 (D.C. Cir. 2010) (concluding that the challenge was ripe because the agency's letter asserting authority to bring future enforcement proceedings created a "compliance 'dilemma'" for the plaintiff).

The typical hardship example occurs where the "only alternative to obtaining judicial review now is to violate [the agency's] directives . . . and then defend an enforcement proceeding on the grounds it raises" in the lawsuit. *Barrick Goldstrike Mines Inc.*, 215 F.3d at 49. Such an "imposition of a Hobson's choice" through potential "civil penalties" satisfies the hardship prong of ripeness. *Pennzoil Co. v. FERC*, 645 F.2d 394, 400 (5th Cir. 1981). That is exactly the situation here. Texas should not be forced to either abandon its laws or risk the loss of federal funding to show hardship. There is no reason to place a "sovereign [state] at such risk when so little would be gained by doing so" and when "so much might be lost." *Florida v. Weinberger*, 492 F.2d 488, 493 (5th Cir. 1974).

Contrary to Defendants' assertions, "an agency rule, unlike a statute, is typically reviewable without waiting for enforcement." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 739 (D.C. Cir. 2016) (citation omitted). Where, as here, Congress did nothing to prohibit Texas from seeking pre-enforcement review of the Guidance Documents, the ripeness inquiry all but disappears, and pre-enforcement review is "the norm." *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 586 (7th Cir. 2011). To create an exception to that norm, the

issues must be somehow unfit for judicial review and the balance of hardships must tip in Department's favor. *Abbott Lab'ys*, 387 U.S. at 149; *Owner-Operator*, 656 F.3d at 586–87. Neither is the case here.

Despite this availability of pre-enforcement review, Defendants still argue that "Texas will not face hardship by waiting to litigate until such time as the Department reaches the conclusion that the [Texas]'s laws or practices violate Title IX by discriminating on the basis of sexual orientation or gender identity in the context of a concrete enforcement action."[103] Essentially, Defendants would have Texas wait to assert the merits of its claims *after* the Department reaches the conclusion that specific Texas laws or practices violate Title IX—for instance, waiting until the pending investigation into Granbury ISD yields an enforcement action and subsequent decision.[104] Only at that point, Defendants argue, would Texas have "'an avenue to test its theories' in court."[105] But this position is at odds with what the law requires. The Supreme Court has suggested that "the harm of being 'force[d] . . . to modify [one's] behavior in order to avoid future adverse consequences'" is sufficient hardship to make a claim ripe. *Texas*, 497 F.3d at 499 (quoting *Oh. Forestry Ass'n*, 523 U.S. at 734). Here, Texas's credible fear of future sanctions in the form of lost funding is a sufficient hardship.

Overall, Texas's claims against the Guidance Documents are ripe because they are fit for judicial review. Withholding review would also cause Texas to suffer substantial hardship. Texas need not "wait[] for [the agency] to 'drop the hammer' in order to have their day in court." *Hawkes*, 578 U.S. at 600. Accordingly, Texas's claims are ripe.

---

[103] *Id.* at 25–26.
[104] *Id.*
[105] *Id.* at 26 (quoting *Walmart*, 21 F.4th at 313).

### D.  Adequate Alternative Remedy

Defendants' fourth jurisdictional challenge is that Title IX provides an adequate alternative remedy to Texas.[106] Specifically, Defendants contend that "Texas will have an adequate opportunity for judicial review at the conclusion of an enforcement action" and during any enforcement action because of its ability to defend itself through that process.[107] Defendants are incorrect.

The APA provides federal courts with jurisdiction over a "final agency action *for which there is no other adequate remedy in a court*." 5 U.S.C. § 704 (emphases added). Put differently, even where an agency's action is final, the APA provides jurisdiction only where the challenger lacks another adequate remedy in a court. *Id.*; *see also Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*, 59 F.4th 180, 192 (5th Cir. 2023) (characterizing the "adequate remedy" requirement as jurisdictional). When enacting § 704, "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Thus, to be adequate, an "alternative remedy must provide the petitioner 'specific procedures' by which the agency action can receive judicial review or some equivalent." *Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018) (quoting *Bowen*, 487 U.S. at 903). "The adequacy of the relief available need not provide an identical review that the APA would provide, so long as the alternative remedy offers the 'same genre' of relief." *Id.* (quoting *CREW v. DOJ*, 846 F.3d 1235, 1245 (D.C. Cir. 2017)). Moreover, "the fact that judicial review is delayed by multiple steps of intermediary administrative review does not render the procedure inadequate so long as the agency review is not discretionary." *Id.* at 311; *Rollerson v. Brazos River Harbor*

---

[106] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 26–28, ECF No. 28.
[107] *Id.* at 27.

*Navigation Dist.*, 6 F.4th 633, 642 (5th Cir. 2021) ("A legal remedy is not inadequate for purposes of the APA because it is procedurally inconvenient for a given plaintiff.") (quotation omitted)).

Defendants stress that "Texas will have an adequate opportunity for judicial review at the conclusion of any enforcement action, such as an enforcement action that could follow the active investigation into Granbury ISD.[108] And, according to Defendants, upon the occurrence of such enforcement that triggers the loss of federal funding, Texas would have an opportunity for multiple layers of administrative review followed by judicial review in the court of appeals.[109] But the procedures of Title IX do not constitute an adequate remedy in this particular posture. A remedy is inadequate when it imposes on the plaintiff "an arduous, expensive, and long administrative process" that does not aid in the determination of the underlying legal question. *Hawkes*, 578 U.S. at 600–01. Indeed, when administrative action imposes immediate consequences on regulated parties, courts routinely allow pre-enforcement challenges even if the parties could raise the same arguments as defenses in an eventual enforcement action. For example, a pre-enforcement challenge to an EPA compliance order was allowed even though "judicial review ordinarily comes by way of a civil action brought by the EPA." *Sackett*, 566 U.S. 127. And because those plaintiffs could not "initiate that process" and instead had to "wait for the [EPA]to drop the hammer" while accruing daily penalties, "APA review" was the only "adequate remedy." *Id.* at 127, 131.

That same reasoning applies here. The Guidance Documents force Texas to choose between complying with their mandates, which would cause irreparable injury, or violating those mandates at the risk of significant financial harm. And like the proposed alternatives in *Sackett*, the latter option would require Texas to "wait for the [agency] to drop the hammer," *id*. at 127, since there is no way for Texas to initiate the enforcement action. For an alternative to be adequate,

---

[108] *Id.*
[109] *Id.*

it must "provide the same genre of relief." *De La Garza Gutierrez v. Pompeo*, 741 F. App'x 994, 998 (5th Cir. 2018). And an inability to obtain equitable pre-enforcement relief (as would be the case when defending in an enforcement action or undergoing the internal Title IX review process) makes an alternative inadequate. That is why "a plaintiff need not pursue a remedy whose existence is 'doubtful' or 'uncertain,'" nor "run the risk of enforcement proceedings or pursue an 'arduous, expensive, and long' permitting process to seek review of an already-final agency action." *Id.* (citation omitted).

Under Defendants' view, Texas would have to undergo the long, arduous, and costly process to challenge the Guidance Documents, all while waiting to get a decision that could pose crippling financial harms to the state and its schools. This makes Defendants' proposed adequate alternative doubtful and uncertain. And contrary to Defendants' arguments,[110] Texas will *not* have the opportunity to assert the same argument here as it would in an enforcement proceeding. Thus, Title IX is not an adequate alternative remedy.

### E. Exclusive Review Scheme

Defendants' final jurisdictional argument is that Title IX includes an exclusive review scheme that precludes judicial review.[111] "Congress may preclude district court jurisdiction either explicitly or implicitly." *Bank of La. v. Fed. Deposit Ins. Corp.*, 919 F.3d 916, 923 (5th Cir. 2019). The APA extends the right to judicial review to agency actions "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985) (quoting 5 U.S.C. § 701(a)). However, this "'strong presumption' favoring judicial review of administrative action . . . fails when a statute's language or structure demonstrates that Congress wanted an agency to police its own conduct." *Mach*

---

[110] *Id.* at 28.
[111] *Id.* at 28–31.

*Mining, LLC, v. EEOC*, 575 U.S. 480, 486 (2015) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)). Courts must consider the "statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994) (citations omitted). "'[W]here substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling.'" *DAPA*, 809 F.3d at 164 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)).

Applied to the applicable review scheme at issue here, the Court concludes that Title IX neither explicitly nor implicitly precludes judicial review of Texas's pre-enforcement challenge to the Guidance Documents. This is consistent with the conclusions reached by other federal courts— including this one. *E.g.*, *Texas v. EEOC*, No. 2:21-cv-194-Z, slip op. at 15–16 (N.D. Tex. May 26, 2022) (Kacsmaryk, J.); *Texas v. United States*, 201 F. Supp. 3d 810, 826–27 (N.D. Tex. 2016) (O'Connor, J.). That is because Title IX's "legislative scheme explicitly contemplates a cause of action under the [APA] for redress of unlawful agency action 'not otherwise subject to judicial review.'" *Romeo Cmty. Schs. v. U.S. Dep't of Health, Educ., & Welfare*, 438 F. Supp. 1021, 1029 (E.D. Mich. 1977) (finding no exclusive-review bar to a pre-enforcement challenge to an agency's regulation).

### 1. Explicit Preclusion

To begin, Title IX does not explicitly preclude judicial review. When determining whether a statute explicitly excludes district court review, courts first look to the statute's text. *Bank of La.*, 919 F.3d at 923; *see also Elgin v. Dep't of Treasury*, 567 U.S. 1, 25 (2012) (Alito, J., dissenting) ("When dealing with an express preclusion clause like this, we determine the scope of preclusion simply by interpreting the words Congress has chosen."). Here, the text of Title IX's statutory

review scheme fails to establish an explicit preclusion of this Court's jurisdiction. Specifically, 20 U.S.C. § 1682 fails to do so, as do § 1683 and § 1234g.

Beginning with § 1682, the statutory text merely states that compliance with any requirement under Title IX "may be effected" in one of two ways: (1) terminating financial assistance to any recipient of Title IX, or (2) "by any other means authorized by law." 20 U.S.C. § 1682. By explicitly allowing enforcement of Title IX through "any other means authorized by law," § 1682 does not lay out a comprehensive review scheme. *Id.* Instead, it expressly allows other avenues of relief, such as judicial review. Hence, § 1682 does not preclude this Court's ability to review this case. In fact, its textual open door to relief swings even wider when looking at the text of its companion statutory provision: § 1683.

Turning next to that companion provision, § 1683 goes even further than § 1682 by expressly *allowing* for judicial review. Specifically, under § 1683, any "agency action taken pursuant to section 1682 . . . *shall* be subject to judicial review." *Id.* § 1683 (emphasis added). And when any agency terminates or refuses to grant or continue financial assistance—and that agency action is "not otherwise subject to judicial review"—§ 1683 further allows "any person aggrieved (*including any State* or political subdivision thereof and any agency of either)" to "obtain judicial review of such action." *Id.* (emphasis added). Therefore, § 1683's explicit allowance of judicial review of agency actions falls far short of expressly precluding this Court's review.

And finally, the text of § 1234g fails to expressly preclude the Court's review because it does not even apply to this case. Section 1234g only applies when a Title IX recipient is adversely affected by one (or more) of three types of final agency actions.[112] None of these agency actions

---

[112] *See* 20 U.S.C. § 1234(a) (Secretary makes a preliminary departmental determination that a recipient has made an unallowable expenditure); *id.* § 1234d(a) (Secretary withholds future funds from a recipient after having reason to believe that the recipient failed to comply with the legal requirements); *id.* § 1234e(a) (Secretary issues a complaint in order to compel compliance through a cease-and-desist order).

represent the type of action that Texas challenges here. Texas instead challenges Defendants' claimed authority to enforce Title IX in the way prescribed by the challenged actions, not the particular enforcement mechanisms themselves. Stated differently, Texas challenges the issuance of "rules, regulations, or orders of general applicability" pursuant to § 1682 rather than the withholding of funds or other specific enforcement measure under § 1234g. Thus, Defendants contention that "Title IX's review procedures implicitly preclude Texas's claims" is unavailing.[113] Section 1234g's statutory review scheme is inapplicable to this case.

By examining the words selected by Congress, Title IX does not expressly preclude a district court's jurisdiction. And the sister court that already preliminarily enjoined the same Guidance Documents has already rejected Defendants' arguments on this point. *See Tennessee Case*, 615 F. Supp. 3d at 836 ("[T]he express language of Title IX does not foreclose all judicial review."). Accordingly, the Court finds no explicit preclusion of judicial review.

### 2. Implicit Preclusion

Defendants further fail to establish that Title IX implicitly precludes this Court's review. To find an implicit preclusion of a district court's jurisdiction, a court must make two determinations: (1) "the 'statutory scheme' displays a 'fairly discernible' intent to limit jurisdiction" based on the "text, structure, and purpose" and (2) "the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" *Bank of La.*, 919 F.3d at 923 (quoting *Thunder Basin*, 510 U.S. at 207). Neither of those conditions are met here.

---

[113] Defs.' Reply Br. in Support of Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 14, ECF No. 32.

### a. *Congressional Intent*

First, Title IX does not indicate a fairly discernable Congressional intent to preclude judicial review. That is because it does not provide a comprehensive or elaborate statutory review framework. Contrary to Defendants' cursory references to the pertinent provisions,[114] Title IX is *not* "an elaborate statutory framework" and does *not* constitute the type of "statutory scheme that would preclude [Texas] from bringing these claims in federal district court." *Texas v. United States*, 201 F. Supp. 3d at 826. And this is especially true because "the Supreme Court has held that Title IX's enforcement provisions . . . do[] not provide the exclusive statutory remedy for violations." *Id.* at 826–27 (citing *Cannon*, 441 U.S. at 677). Therefore, Defendants fail to show how Title IX provides "an elaborate administrative enforcement scheme that culminates in the opportunity for judicial review before a court."[115]

Defendants insist that "courts have routinely barred funding recipients and others from circumventing the civil rights laws' administrative processes."[116] But none of the cases Defendants cite address Title IX. *See, e.g.*, *Rogers v. Bennett*, 873 F.2d 1387, 1392–93 (11th Cir. 1989) (addressing the Education of the Handicapped Act); *Bakersfield City Sch. Dist. v. Boyer*, 610 F.2d 621, 624–26 (9th Cir. 1979) (addressing Title VI of the Civil Rights Act of 1964); *Taylor v. Cohen*, 405 F.2d 277, 279–81 (4th Cir. 1968) (en banc) (same). And because jurisdiction-stripping questions are statute-specific, these cases are inapposite. Given that Title IX lacks an elaborate or comprehensive statutory review structure, and Defendants have failed to prove otherwise, the Court finds that Title IX does not contain a fairly discernible intent to preclude judicial review.

---

[114] *Id.* at 29.

[115] *Id.*

[116] *Id.*

### b. *Type of Claims Intended for Review*

Second, Texas's claims do not form the type that Congress intended to be reviewed within Title IX's statutory structure. Claims intended to be reviewed within the statutory structure are those that fail to satisfy three factors. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023) (applying *Thunder Basin*, 510 U.S. at 212–13). Colloquially known as "the *Thunder Basin* factors," a court must determine (1) whether precluding the district court's jurisdiction would "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral to [the] statute's review provisions;" and (3) whether the claim is "outside the agency's expertise." *Id.*

Here, all three factors show that judicial review exists for Texas's challenge. At the outset, precluding judicial review of Texas's claims would foreclose all meaningful review of the claims authorized by Title IX. For instance, Title IX expressly allows judicial review over any "rules, regulations, or orders of general applicability" issued by the Department. 20 U.S.C. §§ 1682, 1683. But, as discussed above, Texas's claims fall outside the scope of § 1234g. And while § 1234g allows subsequent litigation at the conclusion of an administrative hearing process over certain types of claims, 20 U.S.C. § 1234g(b)–(d), at no point during that administrative process will § 1234g allow Texas to challenge Defendants' authority to proceed at all. In other words, precluding this Court's review will foreclose all meaningful judicial review of Texas's challenge to the Guidance Documents themselves. *Cf. Free Enter. Fund*, 561 U.S. at 490 (determining that the preclusion of jurisdiction would foreclose all meaningful judicial review when the statutory scheme provided for judicial review only over some agency actions, but not others). Therefore, factor one weighs against a finding that Texas's claims are of the type Congress intended to be exclusively reviewed within Title IX's statutory structure. To conclude otherwise would be to foreclose all avenues of meaningful relief to Texas.

56

Texas's claims are also wholly collateral to the statute's review provisions. "[W]hether a claim is collateral to the relevant statutory-review scheme depends on whether that scheme is intended to provide the sort of relief sought by the plaintiff." *Cochran v. SEC*, 20 F.4th 194, 207 (5th Cir. 2021). For example, a claim is wholly collateral if it "challeng[es] the [agency's] power to proceed at all, rather than actions taken in the agency proceedings." *Axon Enter., Inc.*, 598 U.S. at 192. In this case, Texas does not challenge a particular enforcement action by Defendants that finds Texas out of conformity with the Guidance Documents. Instead, Texas challenges both the legitimacy of Defendants' interpretation of Title IX and their authority to even promulgate that expansive interpretation in the Guidance Documents in the first place. Nor do Texas's claims "address the sorts of procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* at 193. Because Texas takes issue with Defendants' power to proceed at all—and not particular attempts to enforce compliance against the state or its subdivisions—its claims are wholly collateral to the statutory review scheme. Therefore, factor two also prevents a finding that Texas's claims are of the type Congress intended to be reviewed exclusively within Title IX's statutory structure.

The third, and final, factor fares no better. Texas's claims are outside of Defendants' expertise. Claims generally fall outside an agency's expertise when they "raise 'standard questions of administrative' and constitutional law, detached from 'considerations of agency policy.'" *Id.* at 194 (quoting *Free Enter. Fund*, 561 U.S. at 491). Texas's claims are entirely comprised of administrative law issues—not policy ones. As a result, Texas's challenge to the Guidance Documents falls outside the Department's expertise, squarely placing the claims asserted in this lawsuit within the expertise of this Court instead.

Given the applicable presumption of reviewability and the fact that Title IX contains no explicit or implicit bars to judicial review of the Guidance Documents, Texas's pre-enforcement challenge is subject to judicial review. Therefore, the Court concludes there is not an exclusive review scheme barring jurisdiction.

*      *      *      *      *

In sum, the Court determines that (1) the Guidance Documents constitute final agency action, (2) Texas has standing to sue based on the Guidance Documents, (3) Texas's claims are ripe for judicial review, (4) an adequate alternative remedy is not applicable here because Texas does not challenge Title IX, and (5) Congress has not precluded district court jurisdiction either explicitly or implicitly. Therefore, the Court **DENIES** Defendants' Motion to Dismiss for lack of subject matter jurisdiction. Finding no jurisdictional bars, the Court proceeds with its analysis of the merits.

## III.   LEGAL STANDARDS

### A.  Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[A] material fact is genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotations omitted). "[T]he substantive law will identify which facts are material[,]" and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*.

58

A party seeking summary judgment must inform the court of the basis for its motion and identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing summary judgment must then set forth specific facts showing that there is a genuine issue for trial. *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968). "If reasonable minds could differ as to the import of the evidence," then the court should deny the motion. *Anderson*, 477 U.S. at 250. Here, the questions before the Court are of a purely legal nature and contain no fact disputes.

## B. The APA

The APA "authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004) (quoting 5 U.S.C. § 702). Disputes arising under the APA are commonly resolved on summary judgment, where district courts sit as an appellate tribunal to decide legal questions on the basis of the administrative record. *Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022). Upon review of agency action, the APA requires the district court to "hold unlawful and set aside agency action" found to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). Once a court determines the contested agency action falls short of the APA's substantive or procedural requirements, the reviewing court "shall" set aside the unlawful agency action. *Id.*; *Data Mktg. P'ship*, 45 F.4th at 859.

Among other procedural requirements, the APA requires agencies to provide "legislative" rules (*i.e.*, substantive regulations) for public notice and comment, 5 U.S.C. § 553(b), and to ensure

that the final version of such a rule is a "logical outgrowth" of the agency's initial regulatory proposal. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021). The APA's arbitrary and capricious standard requires that agency action be both "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This means that agencies must not "rel[y] on factors which Congress has not intended it to consider" or "entirely fail[] to consider an important aspect of the problem" when issuing regulations. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## IV.    ANALYSIS

Plaintiff raises two challenges to the Guidance Documents: (1) they are contrary to law and (2) they were promulgated without notice-and-comment rulemaking.[117] Defendants disagree, maintaining that the Guidance Documents "correctly interpret Title IX's prohibition on sex discrimination" and, as interpretative rules, were "not required to undergo notice-and-comment rulemaking."[118] Defendants are incorrect. For the reasons explained below, the Court finds that the Guidance Documents constitute a substantive legislative rule that is contrary to law and in excess of the Department's authority. Additionally, as a legislative rule, the Court finds that the Guidance Documents failed to undergo the required notice-and-comment rulemaking prior to promulgation by the Department.

---

[117] Pl.'s Mem. in Support of Mot. for Summ. J. 19–29, ECF No. 24
[118] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 31, ECF No. 28.

### A. The Guidance Documents are Contrary to Law and Were Promulgated in Excess of Agency Authority.[119]

The Guidance Documents are contrary to law. Generally, the APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law," or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C). Here, neither Title IX nor its implementing regulations provide a basis for Defendants to define discrimination on the basis of sex in the manner described in the Guidance Documents. *See, e.g.*, 20 U.S.C. § 1686 (providing that, notwithstanding specific exceptions, "nothing contained [within this chapter] shall be construed to prohibit any educational institution receiving funds . . . from maintaining separate living facilities for the different sexes"); *see also* 34 C.F.R. § 106.33 (providing that "recipients [of federal financial assistance under this chapter] may provide separate toilet, locker room, and shower facilities on the basis of sex"). In fact, the Court finds that the Guidance Documents (1) flout Title IX's text, (2) were made without the legislative authority to rewrite Title IX to decide major questions, and (3) lack the clear-statement rule required by the Spending Clause of the Constitution. As a result, the Guidance Documents directly clash with Title IX and its implementing regulations—far from being in accordance with the law. This conflict renders the Guidance Documents substantively unlawful under the APA because they exceed Defendants' statutory and regulatory authority. *See* 5 U.S.C. § 706(2)(A), (C) (stating that this Court shall, in both deciding relevant questions of law and determining the applicability of the terms of an agency

---

[119] Although not raised in the briefing and, thus, not addressed here, the Court also notes the serious First Amendment implications that further show that the Guidance Documents are contrary to law. The Guidance Documents functionally turn recipients of federal funds into federally commandeered censors of speech, forcing schools to require engagement in—or, at a minimum, prohibit—certain kinds of speech, such as the use of preferred pronouns, which in turn repress what has long been regarded as protected forms of expression and religious exercise.

action, hold unlawful such action found to be either not in accordance with law or in excess of statutory authority). And there is no statement in Title IX that clearly delegates such authority to the Department.

There are currently several cases across the country involving similar APA challenges to either the Department's Guidance Documents or the Final Rule. This is the first case to reach the merits of whether such agency action—here, the Guidance Documents—is lawful. Although the Tennessee Case involved the same Guidance Documents, it focused only on their procedural correctness without making any preliminary determinations on the merits of the contrary-to-law claim. *See Tennessee Case*, 615 F. Supp. 3d at 838 ("The Court begins, and ends, with assessing Plaintiffs' notice and comment claim."). Instead, the Tennessee Case's preliminary injunction was premised on the determination that the Guidance Documents likely constitute legislative rules never subjected to the APA's required notice-and-comment procedures. *Id.* at 840 (finding that the "first preliminary injunction factor weigh[ed] in Plaintiffs' favor" given the likelihood that "Defendants' guidance documents [were] legislative rules . . . that . . . failed to comply with [APA's] required notice and comment procedures"). Thus, as it relates to the Texas's contrary-to-law claim, the Court's contrary-to-law analysis proceeds on a blank slate.

### 1.   The Guidance Documents Flout the Text of Title IX.

The Guidance Documents' interpretation of "sex" and the accompanying requirement that schools treat "gender identity" the same as biological sex flouts Title IX. The Department lacks the authority to "rewrite clear statutory terms to suit its own sense of how the statute should operate," particularly in a way that undercuts a statute's purpose. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Yet this is exactly what the Guidance Documents do. By interpreting the

term "sex" in Title IX to embrace "gender identity"[120] as distinct from biological sex, the Guidance Documents are contrary to law and exceed the Department's statutory authority.

When construing a statute, a court's "job is to interpret the words consistent with their 'ordinary meaning' . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). To do so, courts "look to dictionary definitions for help in discerning a word's ordinary meaning," *Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020). Likewise, courts also read and interpret words in context and "not in isolation." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022). Applying the rules of statutory construction here, the Court finds that the Guidance Documents' mandate that recipients refrain from discrimination based on gender identity—by treating people consistent with their subjective gender identities—is directly at odds with Title IX.

### a. *Statutory Text*

The Court begins by first identifying the ordinary meaning of the applicable statutory text. Title IX's statutory text at issue here is plain. Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving [f]ederal financial assistance." 20 U.S.C. § 1681(a). Because of this prohibition on sex discrimination, recipients of federal funds generally cannot discriminate based on someone's sex. However, nothing in the statute expressly prohibits discrimination based on gender identity or other unexpressed grounds.

---

[120] While the Guidance Documents refer to both sexual orientation and gender identity, Texas's contrary-to-law claim appears focused on the practical impact of the Guidance Documents' expansion of "sex" to include a person's self-professed and subjective gender identity. Consistent with Texas's focus, the Court's analysis of the contrary-to-law claim similarly focuses on those gender-identity examples. Nothing in this order should be construed as pertaining to other forms of discrimination based on a student's sexual orientation unless that characteristic diverges from the understanding of "sex" tethered to biology or otherwise in conflict with Title IX.

And where Title IX allows for differentiation based on sex due to biological differences—such as intimate facilities and athletic teams—recipients may treat persons in accordance with their biological sex without regard to subjective gender identity.

Start with "on the basis of sex." Defendants argue that "sex," as used in this phrase, includes gender identity.[121] But a review of contemporaneous dictionaries does not support such a definition. In 1972, "sex" carried an unambiguously binary meaning. When Congress enacted Title IX that year, the term "sex" meant only a person's biological sex—that is, either male or female— which "is an immutable characteristic determined solely" at "birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (Brennan, J.) (plurality opinion) (joined by Justice Douglas, White, & Marshall). Additionally, "[r]eputable dictionary definitions of 'sex' from the time of Title IX's enactment" reinforce this interpretation, revealing that "when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, i.e., discrimination between males and females." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (en banc). Sex exists on a binary continuum. *See Sex*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2081 (1972) (noting "the two divisions of organic . . . human beings," respectively "designated male or female").[122] And during this same period of time, gender

---

[121] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 33–35, ECF No. 28 (stating that "[i]f a school discriminates against a student for being gay or transgender, it has discriminated "on the basis of sex") (citing 20 U.S.C. § 1681)).

[122] Dictionaries from this time are all in accord. *See, e.g.*, *Sex*, 9 OXFORD ENGLISH DICTIONARY 578 (1961) ("The sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these."); *Sex*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2081 (1966) ("The sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change."); *Sex*, BLACK'S LAW DICTIONARY 1541 (1968) ("The sum of the peculiarities of structure and function that distinguish a male from a female organism; the character of being male or female."); *Sex*, AMERICAN HERITAGE DICTIONARY 1187 (1969) ("1.a. The property or quality by which organisms are classified according to their reproduction functions. b. Either of two divisions, designated male and female, of this classification."); *Sex*, WEBSTER'S NEW WORLD DICTIONARY (1971) ("[T]he sum

was synonymous with sex. Ryan T. Anderson, *Neither Androgyny Nor Stereotypes: Sex Differences and the Difference They Make*, 24 TEX. REV. L. & POL. 211, 233 (2019) ("Historically, gender was primarily a linguistic and grammatical term. But when the word gender was used to mean a personal attribute, it was synonymous with a person's sex—until recently."). This understanding continued for decades. *See United States v. Virginia*, 518 U.S. at 532–33 (using the terms "gender classifications" and "sex classifications" when discussing laws and policies that treat people according to whether they are biological "women" or "men"); *see also id.* at 533 (discussing the "[i]nherent differences between men and women" without referring to gender identity). The common theme running through these definitions of "sex" is the focus on reproduction and the associated anatomical differences of men and women.

Courts today similarly read contemporaneous dictionaries as affirming this interpretation of sex. *See, e.g.*, *Neese*, 640 F. Supp. 3d 668, 678 n.6 (N.D. Tex. Nov. 11, 2022) (Kacsmaryk, J.) (quoting various dictionary definitions of "sex" as focusing on "reproductive organs" and "the other physiological differences consequent on these" for "distinguish[ing] . . . male and female"); *Adams*, 57 F.4th at 812 (quoting various dictionary definitions of "sex" to show that "either of two divisions of organisms distinguished respectively as male or female," with "female" as "an individual that bears young or produces eggs as distinguished from one that begets young," and "male" as "of, relating to, or being the sex that begets young by performing the fertilizing function"). The overwhelming dictionary evidence conclusively reveals that, until recently, no one

---

of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change."); *Sex*, WEBSTER'S NEW WORLD DICTIONARY (1972) ("[E]ither of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions"); *Sex*, American Heritage Dictionary 2018 (1976) ("The property or quality by which organisms are classified according to their reproductive functions.").

seriously questioned the reality that sex is inextricably bound up with reproductive biology. Accordingly, "sex" in Title IX means biological sex.

Next, consider the phrase "subjected to discrimination." While Defendants state that the meaning of the operative word—discrimination—turns on "uncertain and fact-intensive" inquiries,[123] they nonetheless outline the contours of their understanding of discrimination: "Whenever a school discriminates against a student on the basis of gender identity or sexual orientation, sex is a but-for cause of that discrimination" because "the school is *singling out* the student for *differential treatment* on the basis of traits or actions that it would have tolerated in a student of a different sex."[124] This position suggests that any distinction or differential treatment based on sex violates Title IX. But nothing could be further from Title IX's ordinary meaning. True, sometimes "discrimination," standing alone, can mean "to make a distinction" or to treat someone "differently." *Discrimination*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 648 (1966). However, the remaining words in the phrase distinguish discrimination in an important way. To "be subjected to discrimination" suggests a negative distinction or differential treatment for the wrong reasons, such as acting on "a difference in treatment" that bestows a "favor on a class or categorical basis in disregard of individual merit." *Id.* As the Supreme Court explained shortly after Title IX's enactment, distinctions between men and women are problematic when they "have the effect of *invidiously* relegating the entire class of females to *inferior* legal status without regard to the capabilities of its individual members." *Frontiero*, 411 U.S. at 686–87 (emphases added).

---

[123] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 24, ECF No. 28 (stating that "[i]f a school discriminates against a student for being gay or transgender, it has discriminated "on the basis of sex") (citing 20 U.S.C. § 1681)).

[124] Defs.' Reply Br. in Support of Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 16, ECF No. 32 (emphases added).

Read together, the combined meanings of "sex" and "subjected to discrimination" reveal that Title IX *only* prohibits differential treatment that disfavors, denies, excludes, or otherwise treats one biological sex worse than the other. But Title IX does *not* prohibit differential treatment that allows for sex-separation or sex-specific benefits, provided that one biological sex is not treated as inferior to the other in the process. Recognition of innate biological differences is permissible—encouraged, even—under Title IX while invidious subjugation based on such differences is not.

### b.  *Statutory and Historical Context*

These textual interpretations—"sex" as tethered solely to biology and "subjected to discrimination" as inferior or negative treatment—find additional support in Title IX's statutory and historical context. Consideration of such context comports with the "cardinal rule" of reading a statute "as a whole." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (citing *Massachusetts v. Morash*, 490 U.S. 170, 115 (1989)). In doing so here, Title IX's context highlights the inherent conflict between the Guidance Documents' use of the phrases "sex" and "subjected to discrimination" versus the ordinary meanings of those phrases as used in Title IX.

Title IX exclusively uses the biological understanding of "sex" throughout its provisions. *Neese*, 640 F. Supp. 3d at 680 ("Title IX presumes sexual dimorphism in section after section, requiring equal treatment for each 'sex.'"). For instance, one provision discusses institutions that were "chang[ing] 'from being an institution which admits only students of *one sex* to being an institution which admits students of *both sexes*.'" *Id.* (emphases added) (quoting 20 U.S.C. § 1681(a)(2)). Another provision refers to "students of *one sex*" and "students of the *other sex*." 20 U.S.C. § 1681(a)(8) (emphases added); *accord Neese*, 640 F. Supp. 3d at 680 (recognizing these distinctions within Title IX). This context demonstrates that Title IX contemplates two—and only

two—biological sexes. Reading into the statute a more fluid conception of sex—one that is based on subjective gender identity and divorced from biological reality—would ignore the ordinary meaning of sex used in Title IX.

Although Title IX was amended in 2022 to reference sexual orientation and gender identity, the way in which the statute incorporates these references makes clear that sexual orientation and gender identity do not otherwise alter how the statute contemplates "sex." *See* 20 U.S.C. § 1689(a)(6) (directing the formation of a sexual-violence task force to, in part, "develop recommendations on . . . inclusive approaches to supporting survivors, which include consideration of . . . lesbian, gay, bisexual, or transgender (commonly referred to as 'LGBTQI+') *status*") (emphasis added)). As the text makes plain, sexual orientation and gender identity are statuses. Moreover, the statutory reference to these statuses does nothing more than authorize information gathering, presumably for consideration of potential statutory changes in the future. Until Congress enacts such a change, § 1689(a)(6) cannot be construed as broadening the definition of "sex."

Furthermore, the words associated with "subject to discrimination"—specifically, "excluded from participation in" and "denied the benefits of"—provide important clarification that the meaning of "discrimination" involves some form of negative differentiation. *Cf.* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 195–98 (2012) (explaining the applicability of the associated-words canon). To "exclude" a person means to "bar from participation, enjoyment, consideration, or inclusion." *Exclude*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 793 (1966). Similarly, to "deny" means "to turn down or give a negative answer." *Deny*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 603 (1966). As part of the same statutory phrase, these nearby and associated words reinforce the understanding

that "discrimination" does not cover any differential treatment. Rather, "discrimination," as used in Title IX, means some less favorable or negative treatment based on biological sex. *Cf. CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 287 (2011) (explaining that discrimination occurs when "there is no justification for the difference in treatment").

Title IX explicitly appreciates the innate biological variation between men and women that occasionally warrants differentiation—and even separation—to preserve educational opportunities and to promote respect for both sexes. The statutory language even goes as far as declaring that "nothing contained herein shall be construed to prohibit" recipients of federal funds "from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. The same is true for certain single-sex educational institutions, organizations, activities, and scholarship awards. *Id.* § 1681(a)(1)–(9) (listing various sex-specific exclusions from Title IX's anti-discrimination provision). These instructions are the authoritative expression of Congress's view that separating the two sexes "where personal privacy must be preserved" is not the type of discrimination prohibited by the statute. *Cf.* 118 Cong. Rec. 5807 (Feb. 28, 1972) (Statement of Sen. Birch Bayh) (acknowledging that Title IX necessarily "permit[s] differential treatment by sex" in certain circumstances, including "in sport facilities or other instances where personal privacy must be preserved"). As this context reveals, not all differential treatment based on biological sex will qualify as prohibited discrimination under Title IX. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (explaining that "discrimination means 'less favorable' treatment"); *see also Bostock*, 590 U.S. at 657 (describing discrimination as "treating [an] individual worse than others who are similarly situated"); *Muldow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024) (applying *Bostock* to explain that "'[d]iscriminate against' means treat worse . . . based on sex").

Safeguarding these equal educational opportunities for men and women necessarily requires differentiation and separation at times.

Contrary to Title IX's text, the Guidance Documents actually condemn separating students based on their biological sex, including as it pertains to the use of restrooms and school sports. For example, the Fact Sheet describes, as negative examples, a school principal preventing a biological male who identifies as a female from using the girls' restroom and from participating on the girls' cheerleading team.[125] Yet, as discussed above, Title IX's text and statutory context would side with the school's principal to protect this permissible form of sex-based privacy and separation. While preventing a biological male from entering the girls' restroom or joining the girls' cheerleading team are certainly forms of sex differentiation, such exclusion is not the type of invidious or worse-off discrimination Title IX envisions. *See, e.g.*, 20 U.S.C. § 1681 (allowing institutions to maintain separate living facilities for different sexes); *id.* § 1681(a) (allowing single-sex educational institutions, organizations, activities, and scholarship awards). As a result, there is a patent conflict between the Guidance Documents and Title IX.

Finally, context from contemporaneous regulations bolsters the Court's interpretation of Title IX's statutory language. *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) (finding immediate "post-enactment developments" to be "expressions concerning the scope and purpose" of the statutory text) (cleaned up)). Longstanding regulations—particularly those that were adopted with congressional approval immediately following Title IX's enactment—have consistently interpreted "sex" to mean biological sex. *See, e.g.*, 40 Fed. Reg. at 24,132 ("either sex"); *id.* at 24,135 ("male and female"); *id.* (referring to "one sex" and "the opposite sex"); 34 C.F.R. § 106.33 (referring to "one sex" and "the other sex"). And these regulations approve of sex-

---

[125] Pl.'s App'x to Mot. for Summ. J. 11, ECF No. 24-1.

specific programs and facilities. 34 C.F.R. § 106.41(b) (allowing "separate teams for members of each sex where selection for such teams is based on competitive skill or the activity involved is a contact sport"); *id.* § 106.41(c) (referring to "both sexes" and "male and female teams"); *id.* § 106.33 (authorizing "separate toilet, locker room, and shower facilities on the basis of sex"). These regulations supply additional "powerful evidence" of Title IX's "original public meaning" of sex discrimination. *Kisor v. Wilkie*, 588 U.S. 558, 594 (2019) (Gorsuch, J., concurring) (emphasis omitted).

What dictionaries say, "statutory and historical context" confirm. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001). That is, the exclusion of the opposite sex from participation in sex-specific programs and the denial of sex-specific benefits to members of the opposite sex are not actionable sex discrimination under Title IX when the opposite biological sex is not treated worse with respect to full and equal enjoyment of educational opportunities. This understanding of sex discrimination is consistent with the statute's fundamental motivation: "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004); *see also Cannon*, 441 U.S. at 704, 704 n.36, 707 (discussing the remediation of "invidious discrimination" that Title IX "sought to accomplish").

### c. *Canons of Construction*

Canons of construction supply further powerful evidence consistent with the above statutory meanings. *Clark v. Martinez*, 543 U.S. 371, 381 (2005) (recognizing that, where a statute is subject to "competing plausible interpretations," the statute should be construed in accordance with canons of construction). Here, the logical consequences that would result from the Guidance Documents' expanded definition of "sex" conflict with Title IX's ordinary meaning.

Most obvious is that the Department's expanded interpretation injects notions of self-professed and potentially ever-changing gender identity into "sex," rendering other provisions of Title IX meaningless. And to do so violates "[t]he canon against surplusage." *City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021). This canon "is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Id.* After all, because the Guidance Documents require recipients of federal funds to treat a man who identifies as a woman the same as the other female students, it follows that this man must be allowed to live in women's dormitories. But such a situation would render Title IX's provision allowing for sex-specific dormitories utterly meaningless. *See Adams*, 57 F.4th at 813 (discussing § 1686).

This inconsistency displays the untenable interpretation of "sex" articulated in the Guidance Documents. As a result, Defendants cannot overcome the presumption that "sex" means "the same thing throughout [the] statute." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). If "sex" in § 1686 means biological sex, then the general prohibition on sex discrimination in § 1681 means that only discrimination based on biological sex is prohibited under Title IX. As a result, specific instances of differential treatment based on other grounds are not necessarily discrimination because of biological sex (even though it can be evidence that prohibited sex discrimination occurred). *See* 89 Fed. Reg. at 33,811 ("[N]ot all conduct one might label 'sex stereotyping' necessarily violates Title IX.").

Assuredly, ignoring the innate biological differences between the two sexes would rob women and girls of meaningful access to education and related opportunities. Consider intimate spaces like bathrooms and locker rooms. Even in these spaces, students retain "a significant privacy interest in their unclothed bodies." *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494, 496 (6th Cir. 2008). This necessarily includes "the right to shield one's body from exposure to

viewing by the opposite sex." *Id.*; *see also Neese*, 640 F. Supp. 3d at 681 n.9 (collecting cases). As Justice Ginsburg understood, the integration of an all-male military institution "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *United States v. Virginia*, 518 U.S. at 550 n.19.

This interest in protecting bodily privacy is sex-specific because of—not in spite of—the different male and female anatomies. *See id.* at 533 ("Physical differences between men and women, however, are enduring: '[T]he two sexes are not fungible.'" (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946)); *see also Frontiero*, 411 U.S. at 686 ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth."); *Nguyen v. INS*, 533 U.S. 53, 73 (2001) (Scalia, J.) ("The difference between men and women in relation to the birth process is a real one, and the principle of equal protection does not forbid Congress to address the problem at hand in a manner specific to each."). Yet despite this enduring recognition of biological differences and bodily privacy by justices across the ideological spectrum, the Guidance Documents nonetheless mandate that schools must permit biological men into women's intimate spaces within the educational environment, and vice versa, based on nothing more than a person's subjective gender identity. This result is not only impossible to square with Title IX, but also with the broader guarantee of equal protection. *Nguyen*, 533 U.S. at 73 ("To fail to acknowledge even our most basic biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it."). As a result, the Guidance Documents would deny many persons in the educational context the dignity and freedom of bodily privacy.

Similar problems arise for ensuring equal opportunities in school sports. In the athletic realm, "relevant differences cannot be ignored." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Ed. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981). Due to the "average

physiological differences" between men and women, "males would displace females to a substantial extent if they were allowed to compete" for the same teams. *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982). This would "diminish[] . . . athletic opportunities for women." *Id.*; *see also Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) (per curiam) (emphasis added) ("It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement."), *superseded on other grounds*, *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 190 F.3d 705, 706 (6th Cir. 1999). And specifically in contact sports, it is easy to imagine scenarios in which unfair competition risks physical injuries to women and girls who compete against their physiologically distinct male counterparts.

To be sure, that the Guidance Documents mandate that schools permit biological males in women's athletics "certainly creates a barrier for female students" to achieve equal athletic opportunities. *Pederson v. La. State Univ.*, 213 F.3d 858, 871 (5th Cir. 2000). And, as explained above, this also distorts Title IX's fundamental goal expressed by its statutory provisions. To artificially contend, as the Guidance Documents do, that biological differences carry no weight when interpretating the ordinary meaning of "sex" renders multiple provisions in Title IX obsolete. This is not how courts interpret statutes.

Another canon of construction also confirms this understanding of sex discrimination. For instance, the prior-construction canon requires that words subject to authoritative construction should be understood accordingly. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 322–26 (2012). Various courts have already interpreted "sex" to mean biological sex. *E.g.*, *Neese*, 640 F. Supp. 3d at 678 n.6; *Adams*, 57 F.4th at 815. The same

is true for the vast majority of the Department's regulations. *E.g.*, 40 Fed. Reg. at 24,132, 24,135; 34 C.F.R. §§ 106.33, 106.41(b)–(c). Most influential of these agency interpretations is the original implementing regulation from shortly after Title IX's enactment. *Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance*, 40 Fed. Reg. 24,128, 24,139–43 (June 4, 1975). The Guidance Documents, along the brief tenure of its 2016 predecessor, are outliers compared to all other Title IX implementing regulations consistently promulgated since 1975.

Courts have long understood the original 1975 regulation to "accurately reflect congressional intent." *Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984), *superseded by statute on other grounds*, Civil Rights Restoration Act of 1987, Pub. L. 100-259, 102 Stat. 28. In contrast to situations of legislative inaction, there is little doubt that Congress was aware of this 1975 regulation. In fact, Congress itself specifically prompted the 1975 regulation. *See* Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 612 (1974) (delegating the task of proposing standards for implementing programs under Title IX's anti-discrimination provision). This, in turn, warrants strong deference to the subsequent legislative determination not to overrule the construction in the 1975 regulation. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985) (refusing "to overrule an agency's construction" that Congress was aware of provides "some evidence of the reasonableness of that construction"); *see also Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) (recognizing the "particularly high . . . degree of deference" owed to Congress not altering the 1975 regulation); *Kelley v. Bd. of Ts.*, 35 F.3d 265, 270 (7th Cir. 1994) (same). Legislative efforts since then have also routinely failed. *E.g.*, Student Non-Discrimination Act of 2013, H.R. 1652, 113th Cong. (2013); Student Non-Discrimination Act of 2015, S. 439, 114th Cong. (2015); Title IX Take Responsibility Act of 2021, H.R. 5396,

117th Cong. (2021); Equality Act, H.R. 5, 117th Cong. § 9(2) (2021). Although the Court does not assign dispositive weight to these post-enactment developments or legislative history, that Congress has yet to change Title IX's settled understanding of sex discrimination—based largely on the highly authoritative 1975 regulation and judicial recognitions of the 1975's understanding— lends further support to the present statutory-interpretation exercise. Together with the canon against surplusage, the prior-construction canon provides powerful evidence of Title IX's meaning.

### 2. The Department Lacks Legislative Authority to Rewrite IX and Decide Major Questions.

The Guidance Documents' expanded definition of "sex" are contrary to law due to violating another rule of interpretation. That is, Congress must "speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (quoting *Util. Air Regulatory Grp.*, 573 U.S. at 324). Known as the Major Questions Doctrine, it promotes the principle of statutory interpretation that courts should not assume Congress delegated questions of "deep 'economic and political significance'" unless done expressly. *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324).

In *West Virginia v. EPA,* the Supreme Court explained that the Major Questions Doctrine requires applying "common sense as to the manner in which Congress would have been likely to delegate such power to the agency at issue." 597 U.S. 697, 722–23 (2022) (cleaned up). That is because "[e]xtraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices." *Id.* A central characteristic of our constitutional republic is that "[a]gencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *Id*. Thus,

the Supreme Court explained that "Congress typically [does not] use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme." *Id.* (cleaned up). Instead, courts "presume that Congress intends to make major policy decisions itself" and "not leave those decisions to agencies." *Id.*; *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("Given [the] history and the breadth of the authority that the FDA has asserted, we are obliged to defer not to the agency's expansive construction of the statute, but to Congress' consistent judgment to deny the FDA [the] power to regulate the entire tobacco industry.").

To begin, the Department lacks the authority to rewrite Title IX and decide the major policy question of whether discrimination on the basis of sex should include gender identity. Doing so subverts Title IX's text. An administrative agency, such as the Department, is a "creature[] of statute," "possess[ing] only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). A "core administrative-law principle [is] that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp.*, 573 U.S. at 328. Because Congress only authorized mere implementation of Title IX in § 1682—and not the authority to rewrite the statute or render any statutory provisions meaningless—the Department exceeded its authority when it issued the Guidance Documents.

The Department's lack of authority is exceptionally pernicious here. Specifically, the Guidance Documents decide a major question—whether to force schools, including staff, students, or parents to accept a person's subjective and potentially ever-changing gender identity regardless of biological sex—that must be decided by "Congress itself" or, at the very least, by "an agency acting pursuant to a clear delegation from that representative body." *West Virginia*, 597 U.S. at 735. Yet the Guidance Documents elect to answer this major question that properly belongs to

Congress despite the enormous social and political significance associated with transgenderism and gender-identity issues.

Undeniably, questions about how to address and treat people claiming a particular gender identity inconsistent with their biological sex have prompted significant legislative debate at the state level.[126] Stepping into this policy sphere, the Guidance Documents promulgate a "novel" and "transformative" conception of sex despite the absence of consensus. *Id.* at 731–32. At the federal level, Congress, too, "has consistently rejected proposals" that would expand Title IX's anti-discrimination provisions to include sexual orientation and gender identity. *E.g.*, Student Non-Discrimination Act of 2013, H.R. 1652, 113th Cong. (2013); Student Non-Discrimination Act of 2015, S. 439, 114th Cong. (2015); Title IX Take Responsibility Act of 2021, H.R. 5396, 117th Cong. (2021); Equality Act, H.R. 5, 117th Cong. § 9(2) (2021). If Congress cannot yet decide whether or not it wants to expand Title IX's reach, there is zero reason to believe the Department may do so.

A clear political question for Congress to decide, the Guidance Documents nevertheless intrude on education, which is an area "where States historically have been sovereign." *Lopez*, 514 U.S. at 564. To allow such an intrusion would involve more than just a major question—it would also implicate federalism concerns. *West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring); *see also Sackett*, 598 U.S. at 679 (noting that federalism principles require Congress to use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power"). The Department points to no statutory authority—much less clear authority—that their

---

[126] For instance, the Court notes that there are various proposed laws concerning discrimination based on gender identity. *E.g.*, Idaho Code §§ 73-114(2), 33-6201–6203, 33-6701–6707; S.B. 2753, 2024 Leg. Reg. Sess. (Miss. 2024); La. Rev. Stat. §§ 4:442, 4:444; Miss. Code Ann. §§ 37-97-1, 37-97-3, Mont. Code Ann. §§ 1-1-201, 20-7-1306, 40-6-704; H.B. 610, 2024 Leg. Reg. Sess. (La. 2024); H.B. 121, 2024 Leg. Reg. Sess. (La. 2024); 89 Fed. Reg. at 33,885.

novel rewriting of Title IX that transforms American schools is somehow lawful. The lack of support is ultimately fatal to the validity of the Department's action.

Despite the Department's lack of authority, Defendants nonetheless maintain that *Bostock* supports the expanded definition of "sex." But this argument falls flat. *Bostock* stated without equivocation that its holding only applies to Title VII. 590 U.S. at 680 (limiting the holding to Title VII because "other federal or state laws that prohibit sex discrimination"—like Title IX— were not "before" the Supreme Court such that it would not be proper to "prejudge any such question" about what those statutes require); *see also Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (explaining "the rule in *Bostock* extends no further than Title VII"); *Tennessee Case*, 615 F. Supp. 3d at 830 (acknowledging that "the Supreme Court expressly declined to 'prejudge' how [*Bostock*'s] holding would apply" to laws outside of Title VII "such as Title IX"). And while Defendants maintain that "it is *Bostock*'s underlying reasoning—which applies with equal force to Title IX—that compels the result here, not *Bostock*'s top-line holding,"[127] precedent says otherwise. Surely, "[o]ne cannot rely on the words and reasoning of *Bostock* itself to explain why the Court prejudged what the Court expressly refused to prejudge." *Neese*, 640 F. Supp. at 676 ("*Bostock* decided only what *Bostock* decided."); *see also L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 420 (6th Cir. 2023) (Sutton, C.J.) (explaining that *Bostock*'s "reasoning applies only to Title VII, as *Bostock* itself and . . . subsequent cases make clear."). Therefore, the rewriting of Title IX in the Guidance Documents cannot be justified by *Bostock* even if its reasoning applies.

In any event, it is difficult to envision how *Bostock*'s reasoning could even apply to Title IX. That is because "Title VII differs from Title IX in important respects." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). Chief among these differences is that the workplace is not

---

[127] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 37, ECF No. 28.

the same as the educational environment. Title VII focuses exclusively on hiring and firing in employment, whereas Title IX deals with educational opportunities. *Compare Bostock*, 590 U.S. at 657 ("Title VII does not concern itself with everything that happens 'because of' sex.' The statute imposes liability on employers only when they 'fail or refuse to hire,' 'discharge,' 'or otherwise . . . discriminate against' someone because of . . . sex.") *with Jackson*, 544 U.S. at 175 ("Title VII . . . is a vastly different statute from Title IX."). Perhaps this explains why Congress used different language in each statute: "because of . . . sex" versus "on the basis of sex."

Given the differences between Title VII and Title IX, what counts as discrimination under one statute is not necessarily discrimination under the other. By importing *Bostock*'s holding that employers cannot consider sex to hire or fire an employee, the comparable logic in the Title IX context would mean that schools could not consider sex to create sports teams. But this directly conflicts Title IX's approval of sex-segregation athletic programs. 20 U.S.C. § 1681(a) (allowing single-sex educational institutions, organizations, activities, and scholarship awards); *see also Cohen*, 101 F.3d at 177 ("[A]thletics programs necessarily allocate opportunities separately for male and female students."). Not to mention Title IX *only* covers sex—unlike Title VII which treats sex the same as race, national origin, and other protected classifications. *Bostock*, 590 U.S. at 649 (describing Title VII as "outlaw[ing] discrimination in the workplace on the basis of race, color, religion, sex, or national origin"). That sex is the only immutable characteristic in Title IX's anti-discrimination provision is instructive, demonstrating the need for "a different analysis in order to determine the existence *vel non* of discrimination." *Cohen*, 101 F.3d at 177; *see also Neal v. Bd. of Tr. of Cal. State Univs.*, 198 F.3d 763, 772 n.8 (9th Cir. 1999) (finding Title VII's "precedents . . . not relevant in the context of collegiate athletics" because, "[u]nlike most employment settings, athletic teams are gender segregated.").

80

Even ignoring that *Bostock* does not automatically apply in the Title IX context, Defendants' argument for how *Bostock* applies is otherwise unavailing. *Bostock* simply held that firing a homosexual or transgender employee qualifies as sex discrimination when the firing is "because of" the employee's "traits or actions" that the employer would otherwise tolerate in an employee of the opposite sex. 590 U.S. at 660–61. More concretely, *Bostock* stated that Title VII prohibits the firing of, say, a male employee who is attracted to men or presents as a woman. *Id.* at 660 (recognizing that "Title VII stands silent" if an employer fires a woman for traits that it also "would not have tolerated" in a man). Nothing about this determination alters the meaning of "sex." Indeed, *Bostock* assumed "sex" as used in Title VII meant "biological distinctions between male and female" and agreed that "homosexuality and transgender status are distinct concepts from sex." *Id.* at 655, 669. As a result, *Bostock*'s holding turned on the conduct and traits associated with a particular sex rather than sex itself. Thus, Defendants' argument that discrimination based on gender identity always demands consideration of sex is entirely wrong.[128]

Curiously, Defendants characterize the Guidance Documents as "not prohibit[ing] recipients of federal funding from maintaining certain single-sex educational institutions, organizations, activities, or scholarship awards . . . or from maintaining separate living facilities for the different sexes . . . or establish[ing] specific rules for subjects like toilets, locker rooms, and shower facilities."[129] But this effort is nothing more than a creative attempt to linguistically reconcile the Guidance Documents with Title IX's use of "sex." These linguistic gymnastics unsuccessfully obfuscate the central question: whether the ordinary meaning of sex includes

---

[128] *See* Defs.' Reply Br. in Support of Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 16, ECF No. 32 ("[I]t is impossible to discriminate against a person for being gay or transgender without discriminating against that individual based on their sex.").

[129] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 48, ECF No. 28.

subjective gender identity. The answer remains no. Expanding this understanding of "sex" as encompassing self-professed and potentially ever-changing gender identity is inconsistent with Title IX's sex-separation dictates. *Cf. Doe 2 v. Shanahan*, 917 F.3d 694, 723 (D.C. Cir. 2019) (Williams, J., concurring in the result) (noting plaintiffs' inconsistent concession that the military may have sex-specific standards at the same time they maintain that "sex" should be determined by subjective gender identity).

Defendants' supposed concessions regarding continued sex-separation provide no consolation to Texas schools that seek to maintain sex-specific bathrooms (or sports teams and pronoun usage) based on biology. Defendants' concession is conditional: so long as Texas schools allow exceptions for students who subjectively identify as the opposite sex, sex-segregated practices can continue.[130] This utterly defies the purpose for various types of sex separation in the first place and is nothing more than an effort to displace "on the basis of sex" with "on the basis of gender identity." As the Department would have it, "sex" means biological sex except when gender identity comes into play. Not only is this an illogical distinction forbidden by Title IX's exclusions, but it would also constitute the very type of sex discrimination Title IX prohibits by privileging transgender persons with the ability to abide by their biological sex (or not) in order to take advantage of preferred benefits or services.

Doubling down on its efforts to show how *Bostock* applies to Title IX, Defendants point out that some courts interchangeably use the phrases "because of," "based on," and "on the basis of".[131] Certainly, what sister courts or other circuits do may often be persuasive. But nothing more.

---

[130] *See* Pl.'s App'x to Mot. for Summ. J. 11, ECF No. 24-1 (containing the Fact Sheet which treats transgender students in hypotheticals as entitled to use facilities, access sports teams, and demand to be referred to by pronouns of opposite biological sex).

[131] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 37–38, ECF No. 28.

Assigning additional value beyond this would "read[] too much into too little," because "'[t]he language of an opinion is not always to be parsed as though we were dealing with language of a statute.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (2023) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)); *see also Neese*, 640 F. Supp. 3d at 678 ("[J]ust because a *judicial opinion* employs two phrases interchangeably in one context does not mean *Congress* employed those same terms interchangeably in a different context." (emphasis in original)). Indeed, the Supreme Court's "opinions dispose of discrete cases and controversies" such that they must be read with a careful eye to context." *Nat'l Pork Producers Council*, 598 U.S. at 374–75 (citing *Cohens v. Virginia*, 6 Wheat. 264, 399–400, 19 U.S. 264 (1821) (Marshall, C. J.)). Doing so here compels the Court to disregard those judicial decisions that improperly conflate the meanings of Titles VII and IX.

At the end of the day, the dispositive question is what *Congress* intended. The fact that Congress used different language in Title IX than it did in Title VII suggests that it intended "to convey a different meaning." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 398 (2016) (Thomas, J., concurring in the judgment). And rightfully so. Consider a situation that would occur in Texas under the Guidance Documents. Two Texas public universities provide private lactation spaces for nursing mothers who, necessarily, are biological females.[132] Must these schools allow biological men who subjectively identify as female access to these very private spaces? Under the Guidance Documents, the answer is clearly yes. Yet despite being prohibited

---

[132] *See Women's Support Services: Breastfeeding Welcomed Here*, TEX. A&M UNIV., https://studentlife.tamu.edu/wss/pregnant-parenting/breastfeeding/ (last visited on June 8, 2024) (discussing the provision of lactation space for pregnant and nursing students); Lactation/Quiet Room Locations, UNIV. OF TEX. AT AUSTIN, https://hr.utexas.edu/current/services/lactation-quiet-room-locations (last accessed on June 8, 2024) (noting that "[l]actation/quiet rooms are available at the following locations for students, faculty, and staff of The University of Texas at Austin who are *nursing mothers*") (emphasis added).

sex discrimination under the Guidance Documents, "[b]reastfeeding is a gender-specific condition because it 'clearly imposes upon women a burden that male[s] . . . need not—indeed, could not—suffer." *Hicks v. City of Tuscaloosa*, 870 F.3d 1253, 1260 (11th Cir. 2017) (citation omitted)); *see also EEOC v. Hous. Funding II, Ltd.*, 717 F.3d 425, 428 (5th Cir. 2013) ("It is undisputed . . . that lactation is a physiological result of being pregnant and bearing a child."). The Guidance Documents' novel interpretation of "sex" would ignore biological truths such as this by privileging one student's subjective feelings over objective biological realities. No doubt, "it might appear to the lay mind that we are treading on the brink of a precipice of absurdity." *AT&T Corp. v. Hulteen*, 556 U.S. 701, 727 (2009) (Ginsburg, J., dissenting) (citation omitted); *see also* Anderson, *supra*, at 218 ("No one finds it particularly difficult—let alone controversial—to identify male and female members of the bovine species or the canine species. It's only recently, and only in the human species, that the very concept of sex has become convoluted and controversial.").

Ignoring the Guidance Documents and looking only at what Congress intended, one critical conclusion becomes apparent from the lactation example: differentiation based on biological sex is contemplated by Title IX so long as neither sex is privileged over the other. Put differently, so long as one sex is not treated worse than the other, differential treatment is permissible and does not rise to the level of actionable sex discrimination. When both sexes have access to similar facilities (*i.e.*, comparable bathrooms and locker rooms), organizations (*i.e.*, sororities and fraternities), and activities (*i.e.*, father-son and mother-daughter events), neither sex is elevated over the other. In this example, no sex is treated worse despite the separation.[133] The same remains

---

[133] Even if one does not view certain sex-specific organizations, such as sororities and pageants, or sex-specific activities, such as father-son and mother-daughter events, as essential to ensuring educational opportunities, Congress decided to protect them anyways. While the Department may dislike these forms of sex-segregation, they were democratically enacted and can only be undone through that same democratic process.

true even when a comparable alternative is not available for the other sex, such as with lactation spaces, provided that the benefit one sex receives is something the other sex could never enjoy. These situations arise when the physiological and reproductive characteristics innate to each sex manifest into unique accommodations linked those biological realities. Lactation rooms offer a case-in-point, as they are an accommodation from which biological men cannot glean any benefit. As a result, requiring biological men access to private lactation rooms for women would not be an example of similar treatment. Rather, it is an example of privileging one sex (biological men) over the other sex (biological women) to give a biological man access to a non-biological benefit while impeding the biological woman's ability to enjoy a biological benefit. This sort of privilege bestows on biological men who profess a female gender identity the *additional* privilege of feeling included at the cost of privacy for nursing mothers.[134] Given the impetus for Title IX, privileging men at the expense of women should be viewed through an especially skeptical lens.

　　As this example demonstrates, the Guidance Documents' reformulation of "sex" to include gender identity incoherently alters the meaning of sex when nothing in Title IX supports such a construction. Only Congress can make this definitional change. And because Congress has not spoken clearly on this incredibly significant political issue, the Major Questions Doctrine forbids the construction set forth in the Guidance Documents.

　　Even assuming that Congress delegated to the Department the authority to promulgate substantive rules that expand Title IX's definition of sex, this delegation would violate Article I and separation-of-powers principles. Such an assignment of legislative power would improperly empower politically unaccountable bureaucrats to settle a major policy debate regarding fundamental beliefs about humanity and the ways to socially structure society. By doing this, the

---

[134] Another example could include the provision of free menstruation products in the women's restroom but not in the men's restroom.

Department is staking out a position on a major policy issue, which comprises "the very essence of legislative authority under our system." *Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring). Acting on issues with such a staggering degree of political significance "must be made by the elected representatives of the people." *Id.*; *see also Paul v. United States*, 140 S. Ct. 342, 342 (2019) (mem.) (Kavanaugh, J., statement regarding denial of certiorari) (suggesting that "congressional delegations . . . to decide major policy questions" are impermissible). This is not a modern conception. As early as 1825, Chief Justice Marshall recognized that "there are 'important subjects' with respect to which Congress must make the relevant decisions, and there are matters of 'less interest' with respect to which the executive may 'fill up the details.'" Ilan Wurman, *Nondelegation at the Founding*, 130 YALE L. J. 1490, 1502–03, 1538, 1554 (2021) (quoting *Wayman v. Southard*, 23 U.S. 1, 43 (1825) (Marshall, C.J.)). Questions about gender identity are not one of those lesser interests.

At a minimum, Congress must provide "an intelligible principle" to ensure that "the agency exercises only executive power." *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022), *affirmed*, 144 S. Ct. 2117, 2139 (2024). Because the Guidance Documents were promulgated in excess of the Department's authority—subverting the purpose of Title IX and destroying the consistency of the statutory scheme in the process—it follows that there was no true intelligible principle justifying the Department's discretionary action. Therefore, the Guidance Documents functionally rewrite Title IX and decide major policy questions reserved for Congress. This is an impermissible exercise of the legislative power.

### 3. The Guidance Documents Violate the Clear-Statement Rule Required by the Spending Clause.

Additionally, the Guidance Documents violate the inherent limits in the Spending Clause. Ranking among the most important legislative powers, the Spending Clause authorizes, in relevant

part, that "Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provided for the common Defence and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. In order to impose conditions pursuant to this power, Congress must speak "unambiguously" with "a clear voice" to give funding recipients notice of the obligations to receive that funding. *Pennhurst St. Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The Supreme Court has construed the Spending Clause as the legislative authority for many consequential federal programs. *See, e.g.*, *Helvering v. Davis*, 301 U.S. 619, 641 (1937) (Social Security); *Armstrong v. Exception Child Ctr., Inc.*, 575 U.S. 320, 332 (2015) (Medicaid). Nondiscrimination in education is also among those programs. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (recognizing that Congress enacted the IDEA pursuant to the Spending Clause). One of those education programs, Title IX, was also passed pursuant to Congress's power to impose conditions on recipients of federal funds under the Spending Clause. *Adams*, 57 F.4th at 815; *see also Davis*, 526 U.S. at 640 ("[W]e have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause[.]"). However, Title IX does not contain the "unmistakably clear language" required to justify the interpretation in the Guidance Documents. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (cleaned up).

The Spending Clause "power is of course not unlimited, but is instead subject to several general restrictions." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). Among these restrictions are the requirements that: (1) the conditions must be "unambiguous[]" so that States are able to "exercise their choice knowingly, cognizant of the consequences of their participation," (2) the conditions must be related to the "federal interest in the project," (3) the spending must not "induce the States to engage in activities that would themselves be unconstitutional," and (4) the spending must not "be so coercive as to pass the point at which 'pressure turns into compulsion.'" *Id.* at

207–11. Each of the four requirements is "equally important" and must be "equally" satisfied to find that a spending condition comports with the Constitution. *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1142 (11th Cir. 2023). The Guidance Documents dictate conditions that fail to satisfy any of these four requirements.

To begin, the Guidance Documents introduce conditions that are not "unambiguously" clear. *Pennhurst*, 451 U.S. at 17. Absent a clear command, the Department cannot usurp Congress's spending power by dictating conditions via the Guidance Documents that are not authorized by Title IX. *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021). Even if the Department could, the Guidance Documents fall short of articulating unambiguously clear conditions given that the Department declines to discuss how the Guidance Documents will apply in various situations, leaving open multiple questions.[135] Moreover, Texas did not "voluntarily and knowingly" agree to ignore the differences between biological sex and gender identity in exchange for federal funds under Title IX. *Cf. NFIB v. Sebelius*, 567 U.S. 519, 577 (2012) ("The legitimacy of Congress's exercise of the spending power 'thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)). Nor did Texas agree to abolish sex-specific bathrooms, locker rooms, room assignments, and sports in exchange for Title IX's funds. *Cf. Adams*, 57 F.4th at 816 ("The notion that the School Board could or should have been on notice that its policy of separating male and female bathrooms violates Title IX and its precepts is untenable."). Thus, the Guidance

---

[135] *See* Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 1–2, ECF No. 28 (acknowledging that the Guidance Documents do not "render[] judgments about how th[e] interpretation might bear on specific policies or circumstances"). Making matters worse, the Court takes judicial notice of the Department's April 29, 2024 Final Rule, which still fails to provide answers to a variety of questions. One of those unanswered questions includes whether it would be a potential violation of Title IX for a recipient to treat a student according to their biological sex if requested by the parents to do so. 89 Fed. Reg. at 33,821–22.

Documents cannot preempt Texas state law without violating the anti-commandeering doctrine. *Murphy v. NCAA*, 584 U.S. 453, 470–75 (2018) (describing the anti-commandeering doctrine as "a fundamental structural decision incorporated into the Constitution" to prevent the federal government from "claim[ing] the powers inherent in [state] sovereignty").

If that does not end the matter, Defendants still fare no better with the remaining three requirements under the Spending Clause. Regarding the second requirement, the Guidance Documents impose conditions that are contrary to the federal interest of promoting and preserving equal opportunities in education for both sexes. In particular, the Guidance Documents will deprive women of opportunities in which physical differences most readily come to bear: athletics. *Adams*, 57 F.4th at 819–21. As to the third requirement, the Guidance Documents appear to impermissibly induce recipients of Title IX funds "to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210. Such unconstitutional acts could arise in many contexts, including infringement of a student's or a teacher's Free Speech, Free Exercise, and Due Process rights. Likewise, there could conceivably be an impact on parental rights should a school decline to treat a student according to their biological sex—being born male or female— when requested by the parents to do so. Finally, the "threatened loss" of a massive percentage of Texas's Title IX funding—estimated in the billions of dollars[136]—"is economic dragooning that leaves [Texas] with no real option but to acquiesce," causing Defendants to also fail the fourth requirement. *Sebelius*, 567 U.S. at 582. As a result, the Guidance Documents do not comport with the Spending Clause.

Although Texas does not affirmatively bring a Spending Clause claim, its Complaint nonetheless contends that this case "brings into play the clear-statement rule applicable to . . . exercises of authority . . . under the . . . Spending Clause."[137] Texas argues that even if Title IX is

---

[136] Pl.'s Mem. in Support of Mot. for Summ. J. 28, 30, ECF No. 24.
[137] Pl.'s Compl. 10–11, ECF No. 1.

somehow ambiguous, "that ambiguity [must] be resolved in favor of [Texas] since conditions on federal funding must be stated clearly."[138] Examining the Guidance Documents through the Spending Clause lens highlights the conflict with Title IX's text. That is because the Guidance Documents fail to provide adequate notice to recipients of federal funding that they could be liable for the discrimination based on gender identity.

Defendants disagree, arguing that "[r]ecipients of federal funds like Texas are clearly on notice that they must comply with the discrimination prohibition under Title IX, and 'the possibility that application of [the condition] might be unclear in [some] contexts' does not render it unenforceable under the Spending Clause."[139] But Title IX *itself* fails to provide clear notice of Defendants' proposed requirements. Title IX does not unambiguously prohibit discrimination based on sexual orientation or gender identity. Nor does it unambiguously prohibit institutions from separating athletic teams or living facilities based on biological sex. Instead, both Title IX and its implementing regulations expressly allow sex-separated facilities. 20 U.S.C. § 1686; 34 C.F.R. § 106.33. And other longstanding Title IX regulations expressly authorize sex-separated sports teams. 34 C.F.R. § 106.41(b).

Since 1972, the Department has consistently[140] interpreted the word "sex" in Title IX to mean only biological sex—not sexual orientation and not gender identity. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026-01, 30,178 ("Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current

---

[138] Pl.'s Mem. in Support of Mot. for Summ. J. 25, ECF No. 24 (citing *Adams*, 57 F.4th at 815).

[139] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 39, ECF No. 28 (quoting *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 665–66, 673 (1985)).

[140] Although the Guidance Documents (along with their 2016 predecessor) prevent perfect consistency, their novel interpretation of sex discrimination is an outlier.

regulations . . . reflect this presupposition."). As a result, "schools across the country separate bathrooms based on biological sex and colleges and universities across the country separate living facilities based on biological sex," making the idea that Texas "could or should have been on notice that its policy of separating male and female bathrooms violates Title IX and its precepts is untenable." *Adams*, 57 F.4th at 816. *Bostock* not only proceeded on an understanding of the term "sex" as used in Title VII to mean biological sex, but it expressly held that its subsequent interpretation regarding sex discrimination was unexpected. 590 U.S. at 649 (acknowledging the "unexpected consequences" associated with the ruling); *id.* at 653 ("Those who adopted the Civil Rights At might not have anticipated that their work would lead to this particular result."); *id.* at 674–81 (discussing the unexpected application of Title VII's broad language). *Bostock*'s holding cannot be reconciled with an argument that Congress spoke clearly on this "unexpected" condition Defendants ask the Court to read into Title IX.

Critically, "[a] safeguard of our federalist system is the demand that Congress provide the States with a clear statement when imposing a condition on federal funding because 'legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.'" *Adams*, 57 F.4th at 815 (quoting *Pennhurst*, 451 U.S. at 17); *see also Cummings v. Premier Regab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) ("Unlike ordinary legislation, . . . Spending Clause legislation operates based on consent: 'in return for federal funds, the [recipients] agree to comply with federally imposed conditions.'" (quoting *Pennhurst*, 451 U.S. at 16–17)). Title IX falls far short of providing adequate notice to Texas that sex discrimination includes gender identity. "Absent a clear statement from Congress, such a reading of Title IX would offend first principles of statutory interpretation and judicial restraint." *Adams*, 57 F.4th at 817.

Overall, Defendants' attempts to conflate Title VII and Title IX fail. Careful analysis of Title IX's statutory terms, contextual clues, and canons of construction reveal that the use of "sex" means biological sex. Although Title IX prohibits sex-based discrimination as a general matter, it identifies many situations in which differential treatment and separation of the two sexes is permissible. By electing to expand the statutory meaning of "sex," the Guidance Documents directly conflict with—and, in some cases, undermine certain provisions in—Title IX by condemning precisely what Title IX allows. The Department lacks the legislative power to do so. By rewriting Title IX to decide a major question, the Guidance Documents further violate the Spending Clause in the process. Contrary to Defendants' contentions, there is no basis whatsoever for reconciling the interpretation in the Guidance Documents with the ordinary meaning of "sex" in Title IX. That is because the Court must "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *West Virginia*, 597 U.S. at 723 (citation omitted). Accordingly, the Guidance Documents are contrary to law and exceed the Department's authority.

### B.  The Guidance Documents Constitute a Substantive Rule Requiring Notice-and-Comment Rulemaking.

The Guidance Documents constitute a substantive rule—rather than interpretative statements—subject to the APA's notice-and-comment rulemaking process. The APA requires federal agencies to follow a three-step notice-and-comment process when formulating, amending, or repealing an administrative rule. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95-96 (2015); 5 U.S.C. §§ 553, 551(5). The agency rules that must undergo this formal rulemaking process include "'statements of general or particular applicability and future effect' that are designed to 'implement, interpret, or prescribe law or policy.'" *Perez*, 575 U.S. at 95–96 (citing 5 U.S.C. § 551(4)). Although the APA exempts "interpretative rules, general statements of policy, or rules

of agency organization, procedure, or practice" from notice-and-comment procedures, 5 U.S.C. § 553(b)(A), those exceptions "must be narrowly construed." *DAPA*, 809 F.3d at 171.

"Agencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements." *Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019). "On the contrary, courts have long looked to the contents of the agency's action, not the agency's self-serving label, when deciding whether statutory notice and comment demands apply." *Id*. Courts must be "mindful but suspicious of the agency's own characterization," and "focus[] primarily on whether the rule had binding effect on agency discretion or severely restricts it." *DAPA*, 809 F.3d at 171. Hence, courts determine whether an agency's pronouncement is an interpretative rule or a substantive rule by analyzing "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *Id*. (cleaned up). "These factors are not treated like different elements of a cause of action, both of which must be proved." *Texas v. United States*, 328 F. Supp. 3d 662, 730 (S.D. Tex. 2018) (internal quotations omitted). Instead, "a matter of judgment is involved in distinguishing between rules however discretionary in form, that effectively circumscribe administrative choice." *Id.* "An agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding. *Texas v. United States*, 787 F.3d 733, 763 n.101 (5th Cir. 2015) (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2022)). Additionally, an agency rule is substantive and notice-and-comment rulemaking is required if it "adopt[s] a new position inconsistent with any of the [agency's] existing regulations." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 88 (1995).

Despite not being labeled as a final rule, the Guidance Documents are subject to the APA's notice-and-comment process. They create significant new obligations on recipients of federal

education funding to refrain from discrimination based on gender identity or sexual orientation, and they do not leave the Department or the DOJ—along with their decision-makers—free to exercise discretion regarding the scope of Title IX's prohibition on discrimination on the basis of sex. *DAPA*, 809 F.3d at 171. They are more than "derivative, incidental, or mechanical burdens" on Texas, and they "change[] the substantive standards by which" Defendants enforce Title IX and its implementing regulations. *Id.* at 176. Such standards can only be set by Congress. *West Virginia*, 597 U.S. at 721–22. The resulting burden directly affects billions of dollars in funding for educational programs.[141]

Defendants characterize the Guidance Documents as "interpretive rules" that do not merit notice-and-comment rulemaking.[142] They specifically assert that these documents are expressly non-binding, do not claim to carry the force or effect of law, "represent [the Department's] understanding of Title IX's sex discrimination prohibition[,] and merely 'advise' the regulated parties of that interpretation."[143] But the fact that the Guidance Documents themselves state that they are not binding misunderstands both law and reality. After all, when an agency action "'broadly condemn[s]' an employment practice, it 'leaves no room for [the agency's] staff not to issue referrals to the Attorney General when an employer'" or other relevant entity implements the condemned practice. *Texas v. EEOC*, 633 F. Supp. 3d 824, 840 (N.D. Tex. 2022) (quoting *EEOC*, 933 F.3d at 443). And because the Guidance Documents condemn what Title IX allows and what *Bostock* does not address, their prohibitions are "binding as a practical matter because private parties can rely on [a prohibition] as a norm or safe harbor by which to shape their actions." *EEOC*, 933 F.3d at 444 (cleaned up). As in *EEOC*, this possibility becomes even clearer when the Fact

---

[141] Pl.'s App'x to Mot. for Summ. J. 38–39, ECF No. 24-1.
[142] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 40, ECF No. 28.
[143] *Id.*

Sheet also invites students to "fil[e] a complaint" for the types of incidents the Guidance Documents list as examples,[144] "thus opening the 'field of potential plaintiffs.'" *Id.* at 444 (citation omitted). Thus, the fact that the Guidance Documents themselves state they are not binding is of no relevance.

Moreover, an interpretive rule "clarifies, rather than creates, law." *Flight Training Int'l, Inc. v. Fed. Aviation Admin.*, 58 F.4th 234, 240 (5th Cir. 2023) (quoting *Shalala*, 56 F.3d at 602). And interpretive rules "advise the public of the agency's construction of the *statutes* and *rules* which it administers," not the Supreme Court opinions of which it is aware. *Perez*, 575 U.S. at 97 (citation omitted). Here, in contrast, the Guidance Documents "go beyond informing the public and expressing the agenc[y's] views as to *Bostock*'s effect in interpreting Title VII and Title IX." *EEOC*, 633 F. Supp. 3d at 839–40. Indeed, they do not merely "remind parties of existing statutory or regulatory duties" but rather imposed new duties, "chang[ed] the text" of the statute the Department "profess[ed] to interpret," and effect[ed] a substantive change in existing law or policy," making them a substantive (or "legislative") rule. *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020). Yet, the obligation not to discriminate on the basis of sexual orientation or gender identity is nowhere within the text of Title IX. Furthermore, the Guidance Documents directly conflict with the Department's regulations that explicitly allow recipients of Title IX funding to maintain separate living facilities, bathrooms, locker rooms, shower facilities, and sports teams in accordance with biological sex. *E.g.*, 34 C.F.R. §§ 106.33, 106.41(b). Put simply, "[t]he hallmark of a legislative rule is that it 'modifies or adds to a legal norm.'" *Flight Training Int'l, Inc.*, 58 F.4th at 241. And that is precisely what the Guidance Documents accomplished: an unlawful modification of Title IX.

---

[144] Pl.'s App'x to Mot. for Summ. J. 12, ECF No. 24-1.

Further, despite Defendants' allegations to the contrary, the Guidance Documents are legislative rules because no statutory authority "compels or logically justifies" them. *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021). That is because the Guidance Documents do not simply repeat the relevant provisions of Title IX. Rather, the Guidance Documents purport to interpret authoritatively Title IX's statutory requirements. This Court has always considered such a distinction important when deciding whether agency action is "final" under the APA." *Texas v. EEOC*, 827 F.3d at 385. Accordingly, Texas has established that the Guidance Documents are substantive—"legislative"—rules required to undergo notice-and-comment rulemaking. *Cf. Tennessee Case*, 615 F. Supp. 3d at 838 (granting preliminary injunctive relief for failure to comply with the APA's notice-and-comment procedures because the same guidance documents challenged here were "legislative rules that create new rights and obligations").

*       *       *       *       *

The Guidance Documents are substantively and procedurally unlawful in violation of the APA. They are substantively unlawful because the Department's purported interpretations of Title IX squarely conflict with the statute. Contrary to the Department's assertions, these interpretations are not required by the Supreme Court's decision in *Bostock*. Additionally, the Guidance Documents are procedurally unlawful because they impose new substantive obligations on states and other regulated entities without adhering to the APA's notice-and-comment requirements— which were designed to ensure public participation. Another federal district court already found that the Guidance Documents are likely unlawful in this regard. *Id.* at 840 ("Plaintiffs have demonstrated that they are likely to succeed on their claim that Defendants' [G]uidance [D]ocuments are legislative rules and that th[is] guidance is invalid because Defendants failed to

comply with the required notice and comment procedures under the APA."). And even this Court

reached the same conclusion when it enjoined a previous version of the Guidance Documents. *See*

*Texas v. United States*, 201 F. Supp. 3d at 828 ("The Court finds that Plaintiffs have shown a

likelihood of success on the merits because . . . Defendants bypassed the notice and comment

process required by the APA."). Because Title IX has never been amended to expand its anti-

discrimination provisions to include sexual orientation and gender identity, the Court finds that the

Guidance Documents are unlawful.

## V.    REMEDIES

Having found in favor of Texas on the merits after first evaluating the jurisdictional basis

for doing so, the Court must finally consider the proper remedy. To alleviate the harms and injuries

suffered as a result of the Guidance Documents, Texas requests that this Court (1) declare the

Guidance Documents unlawful because Title IX does not apply to discrimination based on sexual

orientation or gender identity, (2) set aside (*i.e.*, vacate) the challenged agency actions, and (3)

permanently enjoin their implementation and enforcement of Title IX as including discrimination

based on sexual orientation or gender-identity.[145] Defendants argue that Texas's requested relief

goes too far.[146] According to Defendants, an entry of a judgment for Texas "should do nothing

more than vacate the [Guidance] Documents" and "should not issue injunctive relief, let alone

relief prohibiting [the Department] from acting on the basis of the underlying interpretation in the

[Guidance] Documents" going forward.[147] Additionally, Defendants argue that any relief should

---

[145] Pl.'s Compl. 15–16, ECF No. 1.
[146] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 43–47, ECF No. 28.
[147] *Id.* at 43.

not "sweep beyond the state of Texas."[148] The Court disagrees with Defendants on all fronts except for the scope of injunctive relief.

For the reasons explained below, the Court **VACATES** and **SETS ASIDE** the Guidance Documents, **DECLARES** the Guidance Documents unlawful, **DECLARES** unlawful the interpretation in the Guidance Documents—as well as any *future* agency action—that the anti-discrimination provisions of Title IX include sexual orientation and gender identity, and permanently **ENJOINS** the Department from otherwise implementing and enforcing of the interpretations of Title IX advanced in the Guidance Documents as it relates to Texas and its schools.

### A. Vacatur

Texas is entitled to a vacatur of the Guidance Documents. The proper remedy upon determining that an agency has exceeded its authority is vacatur of the unlawful agency action. 5 U.S.C. § 706(2). While in some cases a court may remand a rule or decision to the agency to cure procedural defects, the Fifth Circuit considers vacatur the "default rule" for agency action otherwise found to be unlawful. *Data Mktg. P'ship*, 45 F.4th at 859–60 (describing vacatur as the default remedy under 5 U.S.C. § 706(2)); *accord Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75, 375 n.29 (5th Cir. 2022) (concluding that "[v]acatur is the *only* statutorily prescribed remedy for a successful APA challenge to a regulation") (emphasis added)). The D.C. Circuit agrees. *See United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action . . . . In rare cases, however, we do not vacate the action but instead remand for the agency to correct its errors."). The propriety of vacatur "turns on two factors: (1) the seriousness of the deficiencies of the action, that is, how likely it is

---

[148] *Id.*

the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Id.* (cleaned up). Applying these factors here, the Court cannot envision how the Department could satisfactorily salvage the Guidance Documents on remand.

### 1. Seriousness of Deficiencies and Ability to Provide Justification on Remand.

Regarding the first vacatur-versus-remand factor, the Department will not be able to justify its decision to create law that Congress did not pass and that the Supreme Court did not allow. Broadly speaking, remand to the Department "is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) (citing *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000)). Under the first factor, remand without vacatur is proper only where the agency failed "adequately to explain why it chose one approach rather than another for one aspect of an otherwise permissible rule." *Tex. Med. Ass'n*, 2023 WL 4977746, at *13 (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009)). That is not what occurred with the Guidance Documents. Likewise, the complete "[f]ailure to provide the required notice and to invite public comment is a fundamental flaw that normally requires vacatur of the rule." *Wheeler*, 955 F.3d at 85; *see also Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 103 (D.C. Cir. 2013) (noting that "the court typically vacates rules when an agency 'entirely fail[s]' to provide notice and comment"); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021) ("[A]n agency that bypassed required notice and comment rulemaking obviously could not ordinarily keep in place a regulation while it completed that fundamental procedural prerequisite.").

These severe deficiencies do not warrant remand. The Fifth Circuit has explained that remand is appropriate when there is "no possibility that [the agency] could obviate the[] conflicts

on remand" because the challenged document had "severe . . . deficiencies" and "fundamental substantive defects" that "contradict[ed] significant portions of the [enabling statute]." *Texas v. United States* (*DACA*), 50 F.4th 498, 529 (5th Cir. 2022). The same reasoning applies here. Not only are the Guidance Documents contrary to law and in excess of the Department's authority, but the Department will also not be able to substantiate its decision on remand because there is no possibility that it could correct the fundamental substantive and procedural errors.

## 2. Disruptive Consequences

As to the second factor—disruptiveness—Defendants may not rely on the "uncertainty that typically attends vacatur of any rule." *Wheeler*, 955 F.3d at 85 (rejecting agency's disruption argument). And "the threat of disruptive consequences cannot save a rule when its fundamental flaws 'foreclose [the agency] from promulgating the same standards on remand.'" *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (quoting *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261–62 (D.C. Cir. 2007)). No amount of asserted disruptiveness can save the Guidance Documents.

Not only do the Guidance Documents suffer from severe deficiencies that cannot be corrected on remand, but a vacatur that simply reinstates the longstanding status quo would not cause disruptive consequences. Vacatur is, thus, appropriate given the Court's conclusion that Defendants have exceeded their statutory authority. An illegitimate agency action is void *ab initio* and cannot be remanded as there is nothing for the agency to justify. Moreover, vacating this unlawful assertion of the Department's authority would be minimally disruptive because vacatur simply "establish[es] the status quo" that existed for decades prior to the agency's issuance of the substantive rule. *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (explaining that "[t]here are meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,'

and vacatur, which is 'a less drastic remedy'") (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010))). "[A] vacatur does nothing but re-establish the status quo absent the unlawful agency action." *Id.* at 220. "Apart from the . . . statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making." *Id.*

Thus, the Court applies this default remedy and **VACATES** the Guidance Documents on the grounds that the Department enacted a substantive rule that is contrary to law, did so in a manner beyond the scope of its legitimate statutory authority to promulgate it in the first place, and failed to promulgate this substantive rule after first submitting it through the formal notice-and-comment process.

### 3. Scope of Vacatur

Vacatur in this case is necessarily universal in scope. There may be circumstances that justify a court fashioning a more limited remedy. *Cf. VanDerStok v. Garland*, 86 F. 4th 179, 196–97 (5th Cir. 2023) (remanding in part for consideration of narrowing the vacatur to only cover certain provisions of the final rule rather than the entire rule), *cert. granted*, No. 23-852, 2024 WL 1706014 (U.S. 2024). But that does not mean a vacatur should be limited just to the parties in the lawsuit. Indeed, by its very nature, a vacatur is universal in scope because an unlawful regulation cannot be vacated as to only one party. *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ., et al.*, 98 F.4th 202, 255 (2024) (Jones, J.) (recognizing that "the scope of ultimate relief under Section 706 . . . is not party-restricted and allows a court to 'set aside' an unlawful agency action"). If the opposite remedy—remand to the agency—were the default, it would "create[] a risk that an agency may drag its feet and keep in place an unlawful agency rule. *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.). Remand would also "invite[] agency

indifference." *In re Core Comm'n, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J.,

concurring) (urging courts "to consider the alternatives to the open-ended remand without

vacatur"); *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1264 (D.C. Cir. 2007)

(Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the

effectiveness of the court's decision and agencies naturally treat it as such."). And "[b]ecause

vacatur is the default remedy . . . defendants bear the burden to prove that vacatur is unnecessary."

*Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, No. 6:23-cv-59-JDK, 2023 WL 4977746,

at *13 (E.D. Tex. Aug. 3, 2023) (citation omitted). Defendants have not done so here.

Avoiding the pitfalls that accompany remand-without-vacatur and finding no reason to

otherwise limit this particular remedy, the Court **VACATES** the Guidance Documents on the

grounds that the Department enacted a substantive rule that is contrary to law, did so in a manner

beyond the scope of its legitimate statutory authority to promulgate it in the first place, and failed

to submit its substantive rule through the required notice-and-comment procedures.

### B. Declaratory Relief

Texas is also entitled to declaratory relief in this case. Under the Declaratory Judgment

Act, a federal court "may declare the rights and other legal relations of any interested party seeking

such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 220l(a). "Any

such declaration shall have the force and effect of a final judgment or decree and shall be

reviewable as such." *Id.* The Declaratory Judgment Act is "an enabling Act, which confers . . .

discretion on courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515

U.S. 277, 287 (1995) (citation omitted). Moreover, the APA expressly contemplates declaratory

relief: "The form of proceeding for judicial review . . . includ[es] actions for declaratory judgments

or writs of prohibitory or mandatory injunction[.]" 5 U.S.C. § 703. And "[t]he existence of another

adequate remedy [such as a vacatur or injunction] does not preclude a declaratory judgment that is otherwise appropriate." FED. R. CIV. P. 57.

Texas successfully established that the Guidance Documents violate the APA. As a result, the Court finds that Texas is entitled to a declaration delineating the rights and legal relations among itself (and its school districts) and Defendants. Thus, the Court **DECLARES** that the Guidance Documents are unlawful. Relatedly, the Court also **DECLARES** unlawful the interpretation in the Guidance Documents—as well as in any *future* agency action—that the anti-discrimination provisions of Title IX include sexual orientation or gender identity.

### C.  Permanent Injunctive Relief

Texas is further entitled to permanent injunctive relief. A permanent injunction is proper when a plaintiff prevails on the merits, there is no adequate remedy at law for the plaintiff's otherwise irreparable injury, the balance of the harms favors the plaintiff, and an injunction would serve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Texas satisfies each of these elements.

#### 1.  Success on the Merits

As extensively explained above, the Guidance Documents constitute a substantive, legislative rule that is not only contrary to law and in excess of the Department's authority, but also promulgated without undergoing the required notice-and-comment rulemaking process. For these reasons, the Court concludes that Texas prevails on the merits. Therefore, the first requirement for a permanent injunction is easily met.

#### 2.  Irreparable Harm

Not only are the Guidance Documents substantively unlawful and procedural deficient, but they will also cause irreparable harm to Texas. This risk of harm must be more than speculative to

rise to the level of irreparability: "there must be more than an unfounded fear on the part of the applicant." *Id. Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.3d 992, 997 (5th Cir. 1985)). Once a movant shows that more than a de minimis harm is likely, the focus turns to irreparability. *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985). While financial injuries generally do not qualify, if those costs cannot be recovered, the harm is irreparable. *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016); *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). It is "well established that an injury is irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984)). Qualifying injuries can include "increased costs of compliance, necessary alternations in operation procedures, and immediate threats of costly and unlawful adjudications of liability." *Career Colls. & Schs. of Tex.*, 98 F.4th at 235.

Here, Texas argue that it suffers all three injuries in the form of financial and compliance injuries, neither of which can be undone through monetary recovery at a later point.[149] As discussed above, Texas faces harm to its sovereign interests by complying with the Guidance Documents given that they directly conflict with state law and policies. Should Texas decide to stand firmly by its laws, its school districts will face administrative and judicial proceedings that could result in the collective loss of billions of dollars in federal funding for noncompliance with the Guidance Documents. Moreover, because the federal government "generally enjoy[s] sovereign immunity for any monetary damages," Texas schools will not be able to financially recover for these injuries by compelling reimbursement from Defendants. *Wages & White Lion Invs., L.L.C.*, 16 F.4th at

---

[149] Pl.'s Mem. in Support of Mot. for Summ. J. 29–30, ECF No. 24.

1142. That is why "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *EPA*, 829 F.3d at 433 (emphasis in original) (quoting *Thunder Basin*, 510 U.S. at 220–21 (Scalia, J., concurring in part and in the judgment)). Should Texas instead choose to submit to the Guidance Documents in order to sustain its federal funding, Texas schools must necessarily alter their operating procedures and resources that are currently based on a biologically oriented view of "sex." Regardless of which path Texas chooses, it will suffer irreparable harm absent an injunction.

Defendants contest this point and argue that Texas's injuries are not irreparable because Texas "would have the benefit of an extensive administrative process, followed by judicial review."[150] But that misunderstands the administrative review scheme of Title IX. As previously discussed, any such administrative process is inapplicable to Texas's claims in this case and would only further harm Texas. Defendants' arguments thus fail. Furthermore, Texas's injuries are not limited just to the loss of funding. The Guidance Documents also strip Texas of its sovereign interests in establishing and enforcing its own laws. This sovereign-stripping impact of the Guidance Documents imposes irreparable injuries on Texas. After all, Texas's "inability to enforce its duly enacted" laws "inflicts irreparable harm." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *see also, e.g.*, *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (finding irreparable harm where agency action put its "sovereign interests and public policies at stake"). Together, the injuries to Texas's financial and sovereign interests are irreparable and warrant protection in the form of a permanent injunction.

---

[150] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 44, ECF No. 28.

### 3. Balance of the Equities and Public Interest

Finally, the remaining injunction factors—balance of the equities and public interest—also tilt in Texas's favor. When the government is a party to a case, the balance-of-equities and public-interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court must weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997). Likewise, the Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). In doing so, courts recognize that there is no public interest in favor of preventing unlawful and unconstitutional government action. *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1143.

Texas argues that Defendants' asserted interest in carrying out the Guidance Documents is illegitimate because they are unlawful agency action.[151] Defendants, on the other hand, contend that "[t]here is a substantial public interest in achieving Title IX's goal of eliminating discrimination in education" and that "there is also 'inherent harm to an agency' in preventing it from enforcing statutes and regulations.[152] But as Texas notes, any claimed interest in carrying out the Guidance Documents is "illegitimate," because the federal government has no interest "in enforcing an unlawful" law or agency action. *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.C. Cir. 2009) ("The public interest is served when administrative agencies comply with their obligations

---

[151] Pl.'s Consolidated Reply in Support of Its Mot. for Summ. J. and Br. in Opposition to Cross-Mot. for Summ. J. 45, ECF No. 31.
[152] Defs.' Br. in Support of Opp. to Pl.'s Mot. for Summ. J. & Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. 45, ECF No. 28.

under the APA.")). In contrast, failure to enjoin the Guidance Documents would significantly harm Texas and its schools by requiring compliance with unlawful agency action that undermines state law. These compliance costs, as discussed above, jeopardize massive amounts of federal funds, which presumably cover the salaries of educators, costs of educational facilities, and numerous educational programs and activities. Accordingly, the balance of equities and the public interest jointly weigh in favor of Texas. Therefore, an injunction that redresses Texas injuries serves the public interest without unduly harming Defendants.

### 4. Scope of Injunction

Because Texas carried its burden as to each of the permanent injunction factors, the Court next addresses the scope of the injunction. When ordering equitable relief, the Court is obligated to state "specifically" and "in reasonable detail . . . the act or acts restrained or required" under the injunction. FED. R. CIV. P. 65(d)(1)(b)–(c). The scope of injunctive relief is "dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). An injunction "should be crafted to provide 'complete relief to the plaintiffs.'" *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (quoting *Yamasaki*, 442 U.S. at 702). At the same time, the injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr.*, 512 U.S. 743, 765 (1994) (cleaned up). And it must be tailored to "redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018) (citation omitted). Under appropriate circumstances, however, the demand for "complete" relief may necessitate that injunctive redress benefit many claimants of a common legal right in order to prevent "more confusion" and a multiplicity of suits. *Mock*, 75 F.4th at 587 (citation omitted).

In a previous challenge to the Department's issuance of a guidance document on this subject, this Court granted injunctive relief against the Department's interpretation of Title IX as including discrimination based on sexual orientation and gender identity:

> Defendants are enjoined from enforcing the Guidelines against Plaintiffs and their respective schools, school boards, and other public, educationally-based institutions. Further, while this injunction remains in place, Defendants are enjoined from initiating, continuing, or concluding any investigation based on Defendants' interpretation that the definition of sex includes gender identity in Title IX's prohibition against discrimination on the basis of sex. Additionally, Defendants are enjoined from using the Guidelines or asserting the Guidelines carry weight in any litigation initiated following the date of this Order.

*Texas v. United States*, 201 F. Supp. 3d at 836. Once again, the harm done to Texas arises from the Department's reassertion of a similarly incorrect interpretation and application of Title IX in the Guidance Documents.

Given that the Department has enacted similar guidance in the past and may attempt to do so again as an end-run to the Court's relief, a broader injunction is necessary to provide complete relief. *See Texas v. United States*, 201 F. Supp. 3d at 836 (enjoining previous enforcement of predecessor Title IX guidance). Indeed, this would not be the first time that a government body repeals a challenged document or action and replaces it with something substantially similar, thereby causing comparable injuries. *See, e.g.*, *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 660 (1993) (involving the repeal of an ordinance and its subsequent replacement with a comparable ordinance causing similar injuries to the plaintiff despite minor differences between the different ordinances). To avoid that situation here and keeping with Rule 65's instructions, the Court carefully tailors the scope of the injunction to redress the violation established and to also avoid upsetting competing interests. Importantly, this injunction does not extend to the Final Rule. Instead, the injunction pertains only to the Guidance Documents in this case, along with any other future agency action, such as guidance documents, that rely on the errant

Title IX interpretation declared unlawful. Therefore, the Court **ENJOINS** Defendants from implementing or enforcing the Guidance Documents—as well as any future agency action promoting a similar interpretation of Title IX—against Plaintiff.

The implications of this injunction's scope bear further explanation. At the outset, the Court is acutely aware of the Supreme Court's concerns regarding nationwide injunctions. *See, e.g.*, *California v. Texas*, 593 U.S. 659, 672 (2021) (explaining that a valid Article III remedy generally must "'operate with respect to specific parties'" rather than "in the abstract") (quoting *Murphy*,584 U.S. at 489 (Thomas, J., concurring)); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 599–601 (2020) (mem.) (Gorsuch, J., concurring) (lamenting the "serious questions about the scope of courts' equitable powers under Article III" caused by "trial courts ordering relief that transcends the cases before them" by "direct[ing] how the defendant must act toward persons who are not parties to the case"); *Trump v. Hawaii*, 585 U.S. 667, 713–14 (2018) (Thomas, J. concurring) (conveying "skeptic[ism] that district courts have the authority to enter universal injunctions" without "authority . . . from a statute of the Constitution"). While remaining mindful of this guidance, there may be "certain circumstances" in which "nationwide relief is appropriate and . . . necessary." *Mock*, 75 F.4th at 587.

When deciding the geographic scope of an injunction, the relevant considerations are similar to those in the analysis for the public-interest factor to justify an injunction in the first place. *Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-cv-00278-P, 2024 WL 965299, at *46–*47 (N.D. Tex. Mar. 5, 2024) (Pittman, J.). Those considerations include the avoidance of unconstitutional laws or government action, government efficiency, administrability of remedies, and public confidence in the judiciary. *Id.* Having carefully considered those circumstances here, the Court declines the invitation to extend the scope of the permanent injunction nationwide. This

determination is the result of diligent adherence to recent Supreme Court guidance, along with an evaluation of the public-interest considerations that may warrant nationwide relief in select cases.

Although the first situation—avoidance of an unconstitutional law or government action—favors a nationwide injunction, the remaining factors do not. Regarding the second and third factors, it is difficult to see how government efficiency and administrable remedies weigh in favor of a nationwide injunction when, nearly two years ago, another district court limited its injunction of the same Guidance Documents to the twenty states in that case. *Tennessee Case*, 615 F. Supp. 3d at 842. Texas provides no indication that this limited injunction against just those twenty states caused administrability and efficiency concerns. And, finally, as to the remaining factor, the Supreme Court has made clear just how difficult it is to overcome the presumption that a nationwide injunction is "consistent with the historical limits on equity and judicial power." *Trump v. Hawaii*, 585 U.S. at 720 (Thomas, J. concurring).

Therefore, the Court's injunction covers the sole plaintiff in this lawsuit: Texas. Parties beyond this lawsuit are *not* covered. Crucially, this Court's award of injunctive relief does not offer Texas blanket immunity from enforcement of all Title IX violations. Texas is only protected from investigations and enforcement based the Guidance Documents and the interpretation on which the Guidance Documents rely. This injunction likewise extends to future agency actions that promote the Department's unlawful interpretation of Title IX. Other enforcement against Texas may still proceed for violations of otherwise lawful applications of Title IX. This relief should alleviate Texas's demonstrable injuries without unnecessarily burdening Defendants.

## VI.    CONCLUSION

This case involves an immensely difficult policy issue: balancing the protection of personal privacy and rights in school classrooms, bathrooms, locker rooms, and other intimate facilities

while, at the same time, ensuring that no student is marginalized in an educational setting. But the resolution of this difficult policy issue is not for the Court to decide. Instead, the Constitution assigns such major policy choices to the appropriate elected officials, who must follow the proper legal procedures to initiate any desired change. Defendants failed to follow the proper procedures here. Rather than promote the equal opportunity, dignity, and respect that Title IX demands for both biological sexes, Defendants' Guidance Documents do the opposite in an effort to advance an agenda wholly divorced from the text, structure, and contemporary context of Title IX. Not to mention, recipients of Title IX funding—including Texas schools—will face an impossible choice: revise policies in compliance with the Guidance Documents but in contravention of state law[153] *or* face the loss of substantial federal funding. Thus, to allow Defendants' unlawful action to stand would be to functionally rewrite Title IX in a way that shockingly transforms American education and usurps a major question from Congress. That is not how our democratic system functions.

To be clear, this Order does not encourage the outright deprivation of any student's rights. Rather, this Order clarifies that the Department lacks authority to redefine "sex" in a way that conflicts with Title IX. Therefore, the Court **GRANTS** Plaintiff's Motion for Summary Judgment (ECF No. 23) and **DENIES** Defendants' Cross-Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 27). Specifically, the Court **ORDERS** the following relief:

1. The Court **VACATES** the Guidance Documents.

2. The Court **DECLARES** that the Guidance Documents are unlawful. Relatedly, the Court also **DECLARES** unlawful the interpretation in the Guidance Documents—as well as in any *future* agency action—that the anti-discrimination provisions of Title IX include sexual orientation or gender identity.

---

[153] Such compliance would seemingly require schools to violate the constitutional rights of certain staff, students, and parents in an effort to comply with the Guidance Documents.

3. The Court **ENJOINS** Defendants and their agents from implementing or enforcing the Guidance Documents against Plaintiff and its respective schools, school boards, and other public, educationally based institutions. Defendants and their agents are also **ENJOINED** from implementing or enforcing Title IX based on an interpretation that "sex" includes gender identity or sexual orientation in Title IX's prohibition against discrimination on the basis of sex against Plaintiff and its respective schools, school boards, and other public, educationally based institutions. Further, Defendants and their agents are **ENJOINED** from initiating, continuing, or concluding any investigation based on Defendants' interpretation that defines "sex" to include gender identity or sexual orientation in Title IX's prohibition against discrimination on the basis of sex against Plaintiff and its respective schools, school boards, and other public, educationally based institutions. Additionally, Defendants and their agents are **ENJOINED** from using the Guidance Documents or asserting that the unlawful interpretation of Title IX in the Guidance Documents—as well as asserting the same interpretation in any *future* agency action—carries any weight in future litigation initiated in Texas or against Plaintiff and its respective schools, school boards, and other public, educationally based institutions following the date of this Order.

4. This scope of this relief **SHALL NOT** extend to pending cases involving *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (to be codified at 34 C.F.R. § 106 on August 1, 2024).

This order **SHALL** fully bind Defendants and any officers, agents, servants, employees, attorneys, or other persons in active concert or participation with Defendants. Separate final judgment shall issue.

**SO ORDERED** on this **5th** day of **August, 2024**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

113